DAVIDOFF HUTCHER & CITRON, LLP
*Proposed Attorneys for the Debtor*
605 Third Avenue
New York, New York 10158
(212) 557-7200
Robert L. Rattet, Esq.
Derek A. Wolman, Esq.
Jonathan S. Pasternak, Esq.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X

| | |
|---|---|
| In re: | Chapter 11 |
| | Case Nos. |
| URBAN COMMONS 2 WEST LLC, | 22-11509-PB |
| URBAN COMMONS 2 WEST II LLC, | 22-11510 |
| URBAN COMMONS 2 WEST III LLC, | 22-11511 |
| URBAN COMMONS 2 WEST IV LLC, and | 22-11512 |
| URBAN COMMONS 2 WEST OPERATING | 22-11513 |
| TENANT LLC, | (Joint Administration |
| | Requested) |
| Debtors. | |

------------------------------------------------------------------X

## DECLARATION OF TAYLOR WOODS PURSUANT TO LOCAL BANKRUPTCY RULE 1007-2 AND 9077-1 IN SUPPORT OF A HEARING ON SHORTENED NOTICE ON THE DEBTORS' FIRST DAY MOTIONS

TAYLOR WOODS, under penalties of perjury, hereby declares and states as follows:

1.      I am the Authorized Signatory and the co-Manager of each of the above captioned debtors (collectively, the "Debtors") and I submit this Declaration pursuant to Rule 1007-2 of the Local Rules for the United States Bankruptcy Court for the Southern District of New York and pursuant to Local Rule 9077-1 in support of the Debtors' motions and applications filed substantially simultaneous with this Declaration (the "First Day Motions").

# PART I

## BACKGROUND

1.      I co-founded the real estate investment vehicle Urban Commons LLC in 2008, and was instrumental in launching the firm's portfolio and growing it to an impressive $1.5 billion in less than a decade.  I have varied and length experience in analyzing and engaging in investment opportunities with high value-add potential, which quickly involved expansion of a diverse collection of assets across the United States. My 25 years of real estate finance experience has also given me a keen understanding of the inner workings of the industry and I have established myself as one of the country's leading real estate investors. I focus on identifying the most compelling real estate opportunities and am especially passionate about developing properties that will have a positive impact on the surrounding community.

2.      Background.  On January 1, 2000, Millennium BPC Development, LLC ("Millennium BPC") entered into a ground lease (the "Ground Lease") with Battery Park City Authority ("BPCA") to develop a mixed-use condominium building in Battery Park City located at 2 West Street, New York, New York 10004 (the "Property") and known as the Millennium Point Condominium (the "Condominium").

3.      Pursuant to the Ground Lease, the Condominium was to contain both a commercial portion (with the "Hotel" under a "Hotel Lease") and a separate residential portion.

4.      BPCA and Millennium BPC concurrently entered into a January 1, 2000, Hotel Lease (the "Hotel Sublease" and together with the "Ground Lease," the "Lease").

5.      By their express terms, the Hotel Lease and Hotel Sublease transferred all the Ground Lease rights and obligations relating solely to the Hotel into the Hotel Until Lease and Hotel Sublease.

2

6.    On August 3, 2001, the Millennium Point Condominium entered into a condominium form of ownership.  By operation of the terms of Section 43.01 of the Ground Lease, the Condominium Board became the successor-in-interest to Millennium BPC and thus the Tenant.

7.    The offering plan provided for a hotel on floors 1-14 and residential apartments on floors 15-39, and provided that the hotel would be operated by the Ritz Carlton Hotel Company, LLC ("Ritz Carlton"). To facilitate this hybrid residential/commercial condominium, three boards of managers were designated to manage the Condominium: (i) the Residential Board of Millennium Point (the "Residential Board") to handle matters solely affecting the residential units, (ii) the Commercial Board of Millennium Point (the "Commercial Board") to handle matters solely affecting the commercial unit, and (iii) the Condominium Board of Millennium Point (the "Condo Board") to handle matters that concern both the residential and commercial units.

8.    The Operation of the Hotel and the Hotel Requirements. The Ground Lease and the Hotel Operator Management Agreement (which is incorporated into the Ground Lease) sets forth certain requirements and standards which govern the operation and management of the hotel (collectively, the "Hotel Requirements").

9.    Specifically, Section 23.05(a) of the Ground Lease ("Sec. 23.05") provides:

> Tenant shall cause the Hotel to be operated by the Hotel Operator only as a hotel with the highest rating by a nationally recognized hotel rating service (e.g., Mobil or Triple A) taking into account the age of the Hotel assuming a first-class repair and restoration program under a hotel brand, flag or franchise approved at the sole discretion of Landlord…. In addition, for as long as compliance with the rating requirement in the first sentence of this Section 23.05(a) is maintained, any other nationally recognized brand, flag or

3

franchise that is equal or better in quality of service and furnishings than those standards set forth in the Hotel Operator Management Agreement … is approved.

10.    In turn, Section 2.9, "Standards of Operation and Care" of the Hotel Operator Management Agreement ("Sec. 2.9") provides:

> Operator's operation of the Hotel shall at all times maintain standards of quality as a luxury hotel not less than those generally prevailing from time to time in other five-star hotels operated by Ritz-Carlton in urban areas, in all respects, including the following: cleanliness, quality of service to guests, quality of food and beverages, and quality of silverware, tableware and glassware. In determining the Hotel's standards, the standards of quality at The Ritz-Carlton, San Francisco, CA (or such other hotel as Owner and Operator agree, if the San Francisco, CA hotel ceases to be operated as a Ritz-Carlton hotel), shall constitute the primary standards of reference, and regional variations shall be taken into account.

> In fulfilling its obligations hereunder. Operator shall act as a reasonable and prudent operator of the Hotel, having regard to the luxury status of the Hotel.

> Operator agrees that the hotels it operates that are members of Leading Hotels shall not be operated in such a manner, number or location as to cause a diminution in the image or reputation of the Leading Hotels. As a material inducement to the execution of this Agreement by Owner, Operator agrees to maintain and preserve the Ground Lease Standards and quality of the Leading Hotels guest experience as it is known to exist as of the date hereof in Leading Hotels and shall continue to improve and implement training programs to educate staff and personnel as to the Leading Hotels sensory experience and Leading Hotels philosophy.

11.    *The Debtors Identify the Hotel.* The Debtors are operated by experienced real estate developers and hoteliers who have owned and operated over 20 hotels with a combined valuation of over $1.5 billion. Debtors focus on repositioning hotels whereby they identify an underperforming hotel, rebrand it, and then modernize it through design upgrades, property improvements, and service enhancements such as, *inter alia*, connecting it to new management

4

software and international hospitality networks to expand recognition nationally and internationally, as well as streamline the booking process.

12.     The Hotel was marketed to the Debtors as a value-add opportunity due to its deteriorating performance and inferior branding as a result of an ill-advised transition from the Ritz Carlton to the Wagner Hotel at Battery Park (the "Wagner").

13.     *The Prior Transition.* Specifically, until March 29, 2018, the Hotel was operated by Ritz Carlton under the Ritz-Carlton brand pursuant to the Hotel Operator Management Agreement with Ritz Carlton. As a result of the Hotel suffering millions of dollars in operating losses under the management and brand of the Ritz-Carlton, the Debtors' predecessor in interest, MPE Hotel I (Downtown New York) LLC and MPE Hotel I Tenant (Downtown New York) LLC (collectively, "Predecessors") terminated and replaced Ritz Carlton, as the hotel operator. The Predecessors were not hoteliers. The Predecessors, together with their affiliate, BPC Lender, LLC, (the "Lender"), are a multi-billion-dollar real estate investment fund operated by Westbrook Partners (collectively, "Westbrook").

14.     On November 15, 2017, the Predecessors informed BPCA of their plans to (i) enter into a new Hotel Operator Management Agreement with Highgate Hotels, L.P. ("Highgate") as the hotel operator and (ii) change the brand of the Hotel to The Leading Hotels of the World, Ltd. ("LHW") under the name The Wagner at Battery Park ("Wagner") (the "Transition"). To that end, on November 29, 2017, BPCA issued (i) a letter stating that it "approves Highgate as the successor operator of the Hotel" (the "November Letter") and (ii) an Estoppel Certificate stating that Highgate "will operate the Hotel under the 'LHW's' brand and national reservation system" (the "Estoppel Certificate").

15.     The Transition then proceeded and was slated to be finalized over the course of

5

several months.

16.    On March 14. 2018,  however, the Residential Board commenced a lawsuit

claiming that the Predecessors/Westbrook had

> run[] the Hotel into the ground [] to create a pretext by which to
> justify eliminating the Hotel altogether and replacing it with non-
> descript residential apartments listed for sale, conferring upon
> Westbrook a windfall from the sale proceeds in lieu of managing the
> required five-star hotel that [Predecessors] evidently [did] not want
> to operate.

The Residential Board further claimed that Westbrook that

>  the Hotel Portion has gradually reduced, and in many instances
> eliminated, offerings and attributes that nationally recognized, five-
> star luxury hotels typically feature. Among other things, Westbrook,
> and/or those acting on its behalf or at its direction, have stripped the
> hotel of its capital funding, failed to make improvements or even
> basic repairs, and refused to reopen the 14th floor luxury restaurant
> known as the "Rise Bar," which, under the provisions of the
> Governing Documents, is required to remain open, not only to the
> Residents, but to the general public

Crucially, the Residential Board claimed that

> Unlike the Ritz, the Wagner enjoys no national or even local brand
> recognition; apparently, Westbrook selected the name (Wagner)
> based upon the designation of a neighborhood park of which, other
> than a handful of members of the surrounding community, few
> outside of Battery Park City have ever heard. Thus, whereas visitors
> familiar with the Ritz brand regularly flock to its hotels around the
> world, attracted to its stellar reputation for luxury accommodations,
> patrons of five-star facilities and resorts are extremely unlikely to
> patronize an unknown, non-brand identified hotel known simply as
> the Wagner - all but assuring the hotel's demise.

Accordingly, the Residential Board sought injunctive relief to prevent the Transition from

occurring, which was opposed by Westbrook who argued, predominantly, that the Residential

Board did not have standing under the Ground Lease (and other governing documents) (the "RB Lawsuit").

17.     The Residential Board's application for injunctive relief was denied and the Predecessors proceeded to finalize the Transition in due course.

18.     On March 29, 2018, the Transition became effective and soon thereafter, Highgate was operating the Hotel under the LHW brand as the Wagner. In the months that followed, however, the Hotel continued to underperform and began to sustain even greater losses. Despite the foregoing, the Debtors recognized that the Hotel had significant value which could be unlocked by appropriate rebranding and modernizing (the "Repositioning Plan").

19.     *Debtors' Acquisition of the Hotel and the Repositioning Plan.* Crucial to the Repositioning Plan are the express terms of Sec. 23.05 and Sec. 2.9, which provide specific exemptions from the requirement that Debtors secure the BPCA's consent prior to rebranding the Hotel from the Wagner (such as when the Predecessors rebranded from the Ritz Carlton to the Wagner by LHW).

20.     Such approval is only required if Debtors seek to change the hotel operator (such as when the Predecessors changed from the Ritz Carlton to Highgate), or if the proposed brand would not be equal to or better in quality of service and furnishing than those standards set forth in the Hotel Requirements. In fact, Sec. 2.9 only binds the hotel operator (such as Highgate), leaving the hotel brand as a component intended to enhance and support an operator's performance.

21.     Since the Repositioning Plan did not require changing the hotel operator, but only rebranding and property improvements to maintain and operate a luxury brand, Debtors believed that Repositioning was expressly contemplated by Sec. 23.05 ("Tenant shall cause the Hotel to

7

be operated by the Hotel Operator only as a hotel with the highest rating ... taking into account

the age of the Hotel **assuming a first-class repair and restoration program under a hotel**

**brand**...." (emphasis added)) and would not require BPCA's approval or, for that matter, the

approval of the Residential Board. Stated otherwise, Debtors reasonably believed their proposed

rebranding would have enabled Highgate to operate the Hotel "with the highest rating by a

nationally recognized hotel rating service" with equal or better quality of service and furnishing

than those standards set forth in the [Hotel Operator Agreement] and was, therefore, approved.

22.    Indeed, the Debtors' understanding of the Hotel Requirements is underscored by

the fact that BPCA never issued an approval to permit rebranding the Hotel from the Ritz Carlton

to the Wagner, despite doing so with respect to the change in hotel operator.

23.    In view of the foregoing, on September 20, 2018, the Debtors secured a purchase

money mortgage from Westbrook, through the Lender, in the amount of $96 million and

acquired the Hotel from the Predecessors for the purchase price of $147 million (by the time we

closed the price had increased to approximately. $151 million).  Upon acquisition, Debtors' first

order of business was to rebrand the Hotel from the Wagner to an internationally recognized

brand, failure of which would jeopardize Debtors' ability to finance the Hotel's modernization.

24.    *The Debtors Attempt to Implement the Repositioning Plan.* The Debtors reached

out to BPCA and the Residential Board to secure their cooperation and to "reset" the previous

acrimonious relationship stemming from the Transition and the resulting Residential Board

dispute with the Predecessors. The Residential Board, however, did not cooperate with the

Debtors. In contrast, BPCA, through their CEO, George Tsunis ("Tsunis") was receptive to the

Debtors' efforts. In addition to being the CEO of BPCA, Tsunis is an experienced hotelier and

founder, chairman, and CEO of Chartwell Hotels, LLC, which owns, develops, and manages

hotels throughout the Northeast and the Middle Atlantic States, and a politician who was recently

appointed as the Ambassador of the United States to Greece. As such, continuing through the

late spring and summer of 2019, Tsunis made himself available to the principals of the Debtors

to develop a viable path forward for the Hotel. During these discussions, BPCA, through Tsunis

consistently expressed eagerness to reposition the Hotel away from the failed Transition to the

Wagner and LHW. Fundamentally, the Debtors trusted Tsunis, as BPCA's CEO and an

experienced hotelier, to cooperate in implementing the Repositioning Plan. Accordingly, they

justifiably relied on his advice and guidance. To that end, BPCA, through Tsunis gave Debtors

operational and economic suggestions that would facilitate a workable transition from the

Wagner.

25.    For example, Tsunis suggested, *inter alia*, that Plaintiff should request from

BPCA's general counsel, Abigail Goldenberg ("Goldenberg") (i) a "clean" unqualified estoppel

to Debtors' mortgage lenders to stave off defaults on the Loan and secure additional financing

while the Hotel was undergoing rehabilitation; (ii) permission for Debtors to convert up to 50%

of the hotel rooms to condotel units to increase cash flow in recognition of the universal

downturn in the hotel industry; (iii) approval of a 99-year extension of the current ground lease

term; and (iv) a reduction or elimination of the rent re-set based on the CPI escalation formula, to

set the rent at market levels, effective January 1, 2042. Above all, however, Tsunis strongly

advised that the Debtors rebrand the Hotel to The Luxury Collection by Marriott (the "Proposed

Brand" or the "Marriott Brand").

26.    On June 25, 2019, Debtors reached out to the BPCA's General Counsel, Abigail

Goldenberg ("Goldenberg") and proposed rebranding the Hotel to the Marriot Brand together

with certain operational changes as recommended by Tsunis.. Goldenberg however did not

respond. Weary of the silence, on March 2019, the Debtors spoke with Tsunis who repeated his support, stating that "I will support you 100% if you deliver The Luxury Collection by the Marriott."

27.    Finally, on August 2, 2019 (more than a month after the Debtors' proposed their plan to Goldenberg), BPCA's hotel consultant, Washington Square Partners ("WSP"), replied to Debtors' counsel, rejecting the Repositioning Plan. WSP's delayed reply was given in a summary fashion and misapplied the Hotel Requirements.

28.    Ultimately, BPCA's rejection of the Repositioning Plan was particularly disconcerting as the Repositioning Plan was based on the advice of BPCA's own CEO who specifically suggested the Proposed Brand while knowing the Hotel Requirements. BPCA's unreasonable delays, conditions and refusal undermined the Repositioning Plan. Aside from rebranding, the Debtors were unable to provide the Lender or other financiers assurances (such as an estoppel certificate akin to the one that BPCA provided during the Transition) that the Hotel would be repositioned and profitable.

29.    Although they continued to lose tens of millions of dollars in carrying costs, Debtors continued to try and work with BPCA, particularly in light of the support they received from Tsunis. On October 10, 2019, the Debtors submitted an updated Repositioning Plan.

30.    Anxious about defaulting on the Loan and other financial obligations, as a result of the delay in Repositioning, Debtors continuously followed up with BPCA and demanded their prompt attention and cooperation. In response, on October 10, 2019, BPCA's consultant wryly informed Debtors that he was "not sure of the 'approval' time frame but I think everyone is aware of your decision to get a response quickly." This derisive tone was especially telling in view of the fact that BPCA was singularly and admittedly aware of the Debtors' need to secure

10

an estoppel certificate from BPCA in order to refinance the Loan and secure additional funding to keep the Hotel operating. Notwithstanding BPCA's irreconcilable position, on Friday, November 8, 2019 (a federal holiday), BPCA sent a draft rent demand to Debtors' counsel while continuing to ignore the proposed Repositioning Plan and Debtors' requests for an estoppel certificate.

31.    Despite BPCA's transparent gamesmanship, on Tuesday, November 12, 2019, Debtors wired $591,130.10 to BPCA in good faith, to satisfy the demand for additional rent. In response, BPCA stated that Debtors failed to include a late fee in the amount of $67,497.00. Debtors recognized this demand for what it was: a petty complaint made to harm Debtors and stifle the Repositioning Plan. The Debtors obliged and immediately wired the allegedly unpaid balance while expressly voicing their disagreement as to BPCA's calculations. The following day, on November 13, 2019 (almost 6 months from the Debtors' initial proposal of the Repositioning Plan), the Debtors' counsel, Sandor Green, wrote to BPCA. Asking to move forward on the Repositioning Plan. BPCA never responded.

32.    Tellingly, BPCA's failure to address the Repositioning Plan did not prevent BPCA from issuing draft default notices.  BPCA's selective communication was in bad faith as it was obvious that the Debtors were unable to operate the Hotel and generate cash flow without Repositioning the Hotel. Nevertheless, Debtors continued to pay BPCA the rent amounts due. After several months of attempting to illicit a response form BPCA, in March 2020, the COVID-19 pandemic began.

33.    *Debtors Were Forced into Always being Ready with a Contingency Plan.* Even Before the COVID-19 Pandemic, BPCAs consistently forced Debtors into financial distress. Once the Pandemic forced the Hotel to close, the financial pressure on the Hotel mounted.

11

Nonetheless, Debtors have continued to garner numerous offers of financing. However, all of these have been subject to securing an estoppel certificate confirming that the Repositioning Plan was permitted to proceed.

34.    Debtors continued their desire to Reposition the Hotel through the Pandemic, continuing to be proactive. In this regard, in April 2020 the Debtors prepared a comprehensive proposal to address and mitigate the new challenges. Again, these requests fell on deaf ears. Quite simply, there was no response.

35.    By this time, it became obvious that the Pandemic was decimating the hotel industry, especially in New York City.

36.    On July 30, 2020, Debtors were advised that Highgate intended to terminate its contract as the hotel operator, effective no later than August 15, 2020, stating that "due to the COVID-19 global pandemic and resulting economic crisis that has inflicted significant repercussions on the hospitality industry, including the Wagner Hotel." Since the Debtors could not be left without a hotel operator, the Debtors and Highgate reconciled their differences until a new operator could be secured.

37.    Anticipating the eventual termination of Highgate by December 2020, Debtors reached out to BPCA and requested approval to replace Highgate with HEI Hotels + Resorts ("HEI"). Despite the urgency of Plaintiff's request and HEI's adequacy as an established hotel management company, Plaintiff's request was ignored, and neither approved nor rejected by BPCA.

38.    Unfortunately, by the end of December 2020, Highgate was terminated and HEI remained unapproved. Indeed, as recently as June 14, 2022, HEI advised Debtors that they still

had not heard from BPCA on the request for replacement.

39.    By virtue of the Landlord's chronic bad faith, unreasonable delays, conditions, refusals, and express violations of the Ground Lease and Hotel Sublease, the Debtors were prevented from effectuating any of their intended plans, necessary to make the Hotel commercially viable.

40.    Despite the foregoing obstacles, the Debtors remained committed to Repositioning the Hotel and have always been willing and able to take necessary action to make sure the Hotel complied with the Ground Lease. To this end, Debtors have obtained (a) loan and investment offers from reputable parties, ranging from $30 million to $112.5 million and, recently, (b) acquisition offers in the $160 million range.

41.    On or about May 9, 2022, BPCA served Debtors with a notice of termination (the "Notice of Termination"), threatening to terminate the Lease on June 28, 2022, unless alleged defaults were cured by Debtors on or before May 27, 2022 (the "Cure Deadline").

42.    Since the termination of the Lease would trigger, inter alia, a default under the Loan and trigger other springing rights to the Lender, the Debtors, in order to preserve their estates, on June 9, 2022, were forced to commence an action against BPCA in New York County Supreme Court (the "BPCA Action"), seeking a variety of injunctive and declaratory relief so that the Debtors could move forward with, inter alia, the replacement hotel operator.

43.    In the BPCA Action, the Debtors' request for a *Yellowstone* injunction to stay the effectiveness of the Notice of Termination BPCA's attempt to terminate the Lease was ultimately denied, and the Debtor appealed to the First Department, which granted only a temporary stay, which stay, absent extension, was scheduled to dissolve yesterday, November 15, 2022.

13

44.    Unfortunately, the bad faith actions and delay caused by BPCA have also led to the Debtor defaulting on the Loan and falling in arrears with the Condominium, with each party commencing foreclosure actions against the Debtors in the recent months.

45.    Accordingly, on November 15, 2022 the Debtor filed for protection under Chapter 11 before this Court.

46.    Meanwhile the Debtor has been in negotiation with (a) a potential DIP lender to address the working capital needs to deliver the hotel to a new operator, (b) a potential new five-star operator, who has offered a triple net lease arrangement in the approximate amount of $8,500,000 in annual rents, (c) a potential new restaurant, which could realize an additional approximate $3 million in annual NOI, and (d) a potential purchaser, subject to the subletting of the Hotel by the Debtors to a new five-star operator.

47.    The Debtor intends to utilize the Chapter 11 process to appeal and/or resolve the BPCA Action, restructure its debt, seek out the needed additional capital and other strategic transactions described above and liquidate its claims against BPCA and others that may exist so that a Plan of Reorganization can be filed within a reasonable amount of time.  The Debtors are confident that proceeding in Chapter 11 is in the best interest of the Debtors, their estates, and the creditors as a whole.

48.    The needs and interests of the Debtors' creditors will best be served by the continued possession of its property and management of its affairs as a debtor in possession under Chapter 11 until a restructuring plan can be formulated and presented to creditors.

14

## PART II

### INFORMATION REQUIRED BY LOCAL BANKRUTPCY RULE 1007

49.     In addition to the foregoing, S.D.N.Y. Local Bankruptcy Rule 1007-2 requires certain information related to the Debtor, which is set forth below.

### Local Rule 1007-2(a)(1)

19.     The Debtors' mailing address is 3334 E. Coast Hwy #350, Corona Del Mar, CA. 92625. The Property is located at 2 West Street, New York, New York 10004. The Debtors were established in 2018 to manage, operate and own the Hotel Condominium.

### Local Rule 1007-2(a)(2)

20.     This case was not originally commenced under Chapter 7 or 13 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.*(the "Bankruptcy Code").

### Local Rule 1007-2(a)(3)

21.     Upon information and belief, no committee was organized prior to the order for relief in this Chapter 11 case.

### Local Rule 1007-2(a)(4)

22.     A list of the names and addresses of the Debtor's 20 largest unsecured claims, excluding those who would not be entitled to vote at a creditors' meeting and creditors who are "insiders" as that term is defined in §101(31) of the Bankruptcy Code is annexed hereto as **Schedule I**.

### Local Rule 1007-2(a)(5)

23.     The Debtor has several secured creditors who assert various mortgages and liens on the Hotel Condominium. A schedule of the Debtor's secured creditors ins annexed hereto as **Schedule II**.

15

**Local Rule 1007-2(a)(6)**

24.      A summary of the Debtor's assets and liabilities is annexed hereto as **Schedule III.**

**Local Rule 1007-2(a)(7)**

25.      There are no publicly held securities of the Debtor.

**Local Rule 1007-2(a)(8)**

26.      None of the Debtor's property is in the possession of any custodian, public officer, mortgagee, pledge, assignee of rents, or secured creditor, or any agent for such entity.

**Local Rule 1007-2(a)(9)**

27.      The Debtor leases the Hotel Condominium pursuant to the Hotel Sublease as assigned to the Debtors.

**Local Rule 1007-2(a)(10)**

28.      The Debtor's digital books and records are located at 3334 E. Coast Hwy #350, Corona Del Mar, CA. 92625.

**Local Rule 1007-2(a)(11)**

29.      The following litigation is pending involving the Debtors:

1)  *Urban Commons 2 West LLC Et Al. v. Battery Park City Authority,* Index No. 656505/2022, Supreme Court, NY County.

2)  *BPC Lender v. Urban Commons 2 West LLC, Et Al,* Index No. Not Assigned, Supreme Court, NY County.

3)  *Residential Board of Managers of the Millennium Point Condominium v. Urban Commons 2 West LLC Et Al.,* Index No. 150433/2022. Supreme Court, NY County.

**Local Rule 1007-2(a)(12)**

30.      I and Howard Wu are the 2 managers/authorized signatories for the Debtors.

16

31.    A corporate ownership statement was filed simultaneously with the Chapter 11 Petitions.

**Local Rule 1007-2(b)(1) and (2)**

32.    The Debtor currently has approximately 2 employees.

33.    The Debtor's estimated payroll and payments to officers, shareholders and directors for the thirty (30) day period following the Chapter 11 petition is $30,000.

34.    The Debtor's estimated payroll to non-officer employees for the thirty (30) day period following the Chapter 11 petition is approximately $0.

**Local Rule 1007-2(b)(3)**

35.    A schedule including for the 30-day period following the filing of the chapter 11 petition, of estimated cash receipts and disbursements, net cash gain or loss, obligations and receivables expected to accrue but remain unpaid, other than professional fees is annexed as **Schedule IV**.

## PART III

### AFFIDAVIT IN SUPPORT OF HEARING ON SHORTENED NOTICE ON THE DEBTOR'S FIRST DAY MOTIONS PURSUANT TO LOCAL BANKRUPTCY RULE 9077

36.    Contemporaneously with these Chapter 11 filings, the Debtors expect to file a number of motions and applications (the "First Day Motions"), including but not limited to:

    i.    Debtors' Motion for Joint Administration of the Chapter 11 Cases (the "Joint Admin Motion");

    ii.    Debtors' Motion for Order Extending Time To File Schedules of Assets and Liabilities and Statements of Financial Affairs (the "Schedules Extension Motion"); and

    iii.    Debtor's Motion To Compel Utilities To Continue to Provide Service and Provide Adequate Protection Therefor (the "Utilities Motion").

37.    I submit that the relief requested in the First Day Motions should be heard and determined on an expedited basis in order to allow the Debtor to continue its normal business operations without any interruption, which interruption that could severally detriment the Debtors' ability to successfully reorganize.

A.    The Joint Admin Motion

38.    The Joint Admin Motion seeks authority to jointly administer these Chapter 11 cases for procedural purposes only, This will help make the administration of the Chapter 11 cases more efficient and has no substantive effect on the treatment of claims or other substantive matters that may arise in the Chapter 11 cases.

B.    The Schedules Extension Motion

39.    The Schedules Extension Motion is necessary due to the complexity of the Debtors' affairs. It would be nearly impossible for the Debtors to be able to file complete and accurate Schedules within the first 15 days of the Chapter 11 cases and therefore the Debtors request a reasonable extension of time to file the Schedules and Statement of Financial Affairs.

C.    The Utilities Motion

40.    The Debtors requires protection of its utility accounts and continued services in order to void any disruption of business operations.

41.    In exchange for compelling the utilities to continue to provide services to the Debtors, the Debtors shall establish a segregated security deposit account equal to one months' total utility costs in order to provide adequate protection to the utility providers.

47.    Thus, for the foregoing reasons, I believe that good cause exists to have an emergency hearing on the First Day Motions which typically requires a minimum of twenty-one (21) days' notice as provided for in Federal Rule of Bankruptcy Procedure 2002 and 6003.

18

48.    I have reviewed each of the First Day Motions and the facts set forth there in are true and correct to the best of my knowledge, information and belief.

## **CONCLUSION**

Pursuant to 28 U.S.C. § 1746, I declare under the penalty of perjury that the foregoing is true and correct.

Dated: November 16, 2022

*/s/ Taylor Woods*
Taylor Woods

# SCHEDULE 1

## 20 LARGEST UNSECURED CREDITORS

Fill in this information to identify the case:

| | |
|---|---|
| Debtor name | **Urban Commons 2 West II LLC** |
| United States Bankruptcy Court for the: | **SOUTHERN DISTRICT OF NEW YORK** |
| Case number (if known): | |

☐ Check if this is an

amended filing

## Official Form 204

### Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 20 Largest Unsecured Claims and Are Not Insiders

12/15

A list of creditors holding the 20 largest unsecured claims must be filed in a Chapter 11 or Chapter 9 case. Include claims which the debtor disputes. Do not include claims by any person or entity who is an insider, as defined in 11 U.S.C. § 101(31). Also, do not include claims by secured creditors, unless the unsecured claim resulting from inadequate collateral value places the creditor among the holders of the 20 largest unsecured claims.

| Name of creditor and complete mailing address, including zip code | Name, telephone number and email address of creditor contact | Nature of claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of claim | | |
|---|---|---|---|---|---|---|
| | | | | If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| **Battery Park City Authority** c/o Ephron-Mandel & Howard L.L.P. attn: Damon P. Howard 299 Broadway, 17th Floor New York, NY 10007 | | Landlord of the hotel at 2 West Street Battery Place, New York, New York 10004, that the Debtor owns pursuant to a lease | Disputed | | | $13,737,073.52 |
| **Con Edison** 4 Irving Place New York, NY 10003 | | Utilities | | | | $125,450.86 |
| **Direct Energy Business** 1001 Liberty Avenue Pittsburgh, PA 15222 | | Utilities | | | | $53,139.66 |
| **Highgate Hotels, L.P.** 870 Seventh Avenue, 2nd Floor New York, NY 10019 | | | Disputed | | | $1,800,000.00 |
| **Ichigo, Inc.** Imperial Hotel Tower 1-1-1, Uchisaiwaicho Chiyoda-ku, Tokyo, Japan | | Bond holder | | | | $5,000,000.00 |
| **Landmark Ventures (USA) Inc.** 475 Park Avenue South, 25th Floor New York, NY 10016 | | Judgment creditor | | | | $59,524.45 |

Debtor  **Urban Commons 2 West II LLC**                                    Case number *(if known)* _____
         Name

| Name of creditor and complete mailing address, including zip code | Name, telephone number and email address of creditor contact | Nature of claim (for example, trade debts, bank loans, professional services, | Indicate if claim is contingent, unliquidated, or disputed | Amount of claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| **LHW Services GMBH Haldenstrasse 23, 6006 Lucerne, Switzerland** | | **Judgment creditor** | | | | **$94,460.20** |
| **New York Hotel & Motel Trades Council Attn: Peter Ward 707 Eighth Avenue New York, NY 10036** | | | **Unliquidated** | | | **$2,000,000.00** |
| **NY Hotel Trades Council Employee Benefit Funds 305 West 44th Street New York, NY 10036** | | | | | | **$0.00** |
| **NYC Environmental Control Board 66th John Street, 10th Floor New York, NY 10038** | | **Judgment creditor** | | | | **$3,000.00** |

Official form 204          Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 20 Largest Unsecured claims          page 2

# SCHEDULE II

## LARGEST SECURED CREDITORS

| Fill in this information to identify the case: | |
| --- | --- |
| Debtor name | **Urban Commons 2 West II LLC** |
| United States Bankruptcy Court for the: | SOUTHERN DISTRICT OF NEW YORK |
| Case number (if known) | |

☐ Check if this is an amended filing

Official Form 206D

# Schedule D: Creditors Who Have Claims Secured by Property          12/15

Be as complete and accurate as possible.

**1. Do any creditors have claims secured by debtor's property?**

☐ No. Check this box and submit page 1 of this form to the court with debtor's other schedules. Debtor has nothing else to report on this form.

■ Yes. Fill in all of the information below.

**Part 1:    List Creditors Who Have Secured Claims**

**2.** List in alphabetical order all creditors who have secured claims. If a creditor has more than one secured claim, list the creditor separately for each claim.

| | | **Column A**<br>**Amount of claim**<br>Do not deduct the value of collateral. | **Column B**<br>**Value of collateral that supports this claim** |
| --- | --- | --- | --- |

**2.1  BPC Lender, LLC**
Creditor's Name

**c/o Herrick, Feinstein LLP
Attn: Avery Mehlman
2 Park Avenue
New York, NY 10016**
Creditor's mailing address

Creditor's email address, if known

Date debt was incurred

Last 4 digits of account number

**Describe debtor's property that is subject to a lien**
**Hotel condominium unit located at 2 West Street**

**Describe the lien**
**First Mortgage**

**Is the creditor an insider or related party?**
■ No
☐ Yes

**Is anyone else liable on this claim?**
☐ No
■ Yes. Fill out Schedule H: Codebtors (Official Form 206H)

**As of the petition filing date, the claim is:**
Check all that apply
☐ Contingent
☐ Unliquidated
■ Disputed

Amount of claim: **$87,000,000.00**
Value of collateral: **$180,000,000.00**

**Do multiple creditors have an interest in the same property?**
☐ No
■ Yes. Specify each creditor, including this creditor and its relative priority.
1. BPC Lender, LLC
2. Kone Inc.
3. Galaxy Investment Capital Inc.
4. Matco Service Corporation
5. Residential Board of Managers of MPC
6. VIK XS Services, Inc.
7. Wimberly Allison Tong & Goona, Inc.
8. George M. Lee
9. ERJMJ, Investments LP
10. West Bay Capital, LLC

**2.2  ERJMJ, Investments LP**

**Describe debtor's property that is subject to a lien**

Amount of claim: **$17,000,000.00**
Value of collateral: **$180,000,000.00**

Debtor **Urban Commons 2 West II LLC**                    Case number (if known) _____
_____
Name

| | |
|---|---|
| Creditor's Name | **Hotel condominium unit located at 2 West Street** |
| **92 S. La Sendra Drive**<br>**Laguna Beach, CA 92651** | |
| Creditor's mailing address | **Describe the lien** |
| | _____ |
| | **Is the creditor an insider or related party?** |
| | ■ No |
| Creditor's email address, if known | ☐ Yes |
| | **Is anyone else liable on this claim?** |
| **Date debt was incurred** | ☐ No |
| | ☐ Yes. Fill out *Schedule H: Codebtors* (Official Form 206H) |
| **Last 4 digits of account number** | |
| **Do multiple creditors have an interest in the same property?** | **As of the petition filing date, the claim is:**<br>Check all that apply |
| ☐ No | ☐ Contingent |
| ■ Yes. Specify each creditor, including this creditor and its relative priority. | ☐ Unliquidated |
| **Specified on line 2.1** | ☐ Disputed |

| 2.3 | **Galaxy Investment Capital Inc.** | **Describe debtor's property that is subject to a lien** | **$3,500,000.00** | **$180,000,000.0 0** |
|---|---|---|---|---|
| | Creditor's Name | **Hotel condominium unit located at 2 West Street** | | |
| | **81 N. Mentor Avenue**<br>**Pasadena, CA 91106** | | | |
| | Creditor's mailing address | **Describe the lien**<br>**Second Mortgage** | | |
| | | **Is the creditor an insider or related party?** | | |
| | | ■ No | | |
| | Creditor's email address, if known | ☐ Yes | | |
| | | **Is anyone else liable on this claim?** | | |
| | **Date debt was incurred** | ■ No | | |
| | | ☐ Yes. Fill out *Schedule H: Codebtors* (Official Form 206H) | | |
| | **Last 4 digits of account number** | | | |
| | **Do multiple creditors have an interest in the same property?** | **As of the petition filing date, the claim is:**<br>Check all that apply | | |
| | ☐ No | ☐ Contingent | | |
| | ■ Yes. Specify each creditor, including this creditor and its relative priority. | ☐ Unliquidated | | |
| | **Specified on line 2.1** | ☐ Disputed | | |

| 2.4 | **George M. Lee** | **Describe debtor's property that is subject to a lien** | **$1,000,000.00** | **$180,000,000.0 0** |
|---|---|---|---|---|
| | Creditor's Name | **Hotel condominium unit located at 2 West Street** | | |
| | **Trustee of MSL Family Trust**<br>**81 N. Mentor Avenue**<br>**Pasadena, CA 91106** | | | |
| | Creditor's mailing address | **Describe the lien**<br>**Co-mortgagee with Galaxy Investment Capital, Inc.** | | |
| | | **Is the creditor an insider or related party?** | | |
| | | ■ No | | |
| | Creditor's email address, if known | ☐ Yes | | |
| | | **Is anyone else liable on this claim?** | | |
| | **Date debt was incurred** | ■ No | | |

Official Form 206D          Additional Page of **Schedule D: Creditors Who Have Claims Secured by Property**          page 2 of 5

Debtor    **Urban Commons 2 West II LLC**                              Case number (if known) _____
_____
Name

Last 4 digits of account number

☐ Yes. Fill out *Schedule H: Codebtors* (Official Form 206H)

| | |
|---|---|
| **Do multiple creditors have an interest in the same property?** | **As of the petition filing date, the claim is:** Check all that apply |
| ☐ No | ☐ Contingent |
| ■ Yes. Specify each creditor, including this creditor and its relative priority. | ☐ Unliquidated |
| **Specified on line 2.1** | ☐ Disputed |

---

| 2.5 | **Kone Inc.** | Describe debtor's property that is subject to a lien | $76,212.50 | $180,000,000.0 0 |
|---|---|---|---|---|
| | Creditor's Name | **Hotel condominium unit located at 2 West Street** | | |

**4225 Naperville Road, Suite 400**
**Lisle, IL 60532**
Creditor's mailing address

Describe the lien
**Mechanic's Lien**
Is the creditor an insider or related party?

■ No

Creditor's email address, if known               ☐ Yes
Is anyone else liable on this claim?

**Date debt was incurred**                        ■ No
☐ Yes. Fill out *Schedule H: Codebtors* (Official Form 206H)

**Last 4 digits of account number**

| | |
|---|---|
| **Do multiple creditors have an interest in the same property?** | **As of the petition filing date, the claim is:** Check all that apply |
| ☐ No | ☐ Contingent |
| ■ Yes. Specify each creditor, including this creditor and its relative priority. | ☐ Unliquidated |
| **Specified on line 2.1** | ☐ Disputed |

---

| 2.6 | **Matco Service Corporation** | Describe debtor's property that is subject to a lien | $9,824.23 | $180,000,000.0 0 |
|---|---|---|---|---|
| | Creditor's Name | **Hotel condominium unit located at 2 West Street** | | |

**584 Mineola Avenue**
**Carle Place, NY 11514**
Creditor's mailing address

Describe the lien
**Mechanic's Lien**
Is the creditor an insider or related party?

■ No

Creditor's email address, if known               ☐ Yes
Is anyone else liable on this claim?

**Date debt was incurred**                        ■ No
☐ Yes. Fill out *Schedule H: Codebtors* (Official Form 206H)

**Last 4 digits of account number**

| | |
|---|---|
| **Do multiple creditors have an interest in the same property?** | **As of the petition filing date, the claim is:** Check all that apply |
| ☐ No | ☐ Contingent |
| ■ Yes. Specify each creditor, including this creditor and its relative priority. | ☐ Unliquidated |
| **Specified on line 2.1** | ☐ Disputed |

---

| 2.7 | **Residential Board of Managers of MPC** | Describe debtor's property that is subject to a lien | $2,310,503.77 | $180,000,000.0 0 |
|---|---|---|---|---|

---

Official Form 206D          Additional Page of **Schedule D: Creditors Who Have Claims Secured by Property**          page 3 of 5

Debtor    **Urban Commons 2 West II LLC**                                  Case number (if known) _____

          Name

**Creditor's Name**
**c/o Michael S. Hiller**
**Hiller, P.C.**
**641 Lexington Avenue**
**New York, NY 10022**
Creditor's mailing address

**Hotel condominium unit located at 2 West
Street**

**Describe the lien**
**Common charge liens**
**Is the creditor an insider or related party?**
■ No
☐ Yes
**Is anyone else liable on this claim?**
■ No
☐ Yes. Fill out *Schedule H: Codebtors* (Official Form 206H)

Creditor's email address, if known

**Date debt was incurred**

**Last 4 digits of account number**

**Do multiple creditors have an
interest in the same property?**
☐ No
■ Yes. Specify each creditor,
including this creditor and its relative
priority.
**Specified on line 2.1**

**As of the petition filing date, the claim is:**
Check all that apply
☐ Contingent
■ Unliquidated
■ Disputed

---

| 2.8 | **VIK XS Services, Inc.** | **Describe debtor's property that is subject to a lien** | **$189,819.55** | **$180,000,000.0 0** |
|---|---|---|---|---|

Creditor's Name
**26 Journal Square Plaza,
Suite 505
Jersey City, NJ 07306**
Creditor's mailing address

**Hotel condominium unit located at 2 West
Street**

**Describe the lien**
**Mechanic's Lien**
**Is the creditor an insider or related party?**
■ No
☐ Yes
**Is anyone else liable on this claim?**
■ No
☐ Yes. Fill out *Schedule H: Codebtors* (Official Form 206H)

Creditor's email address, if known

**Date debt was incurred**

**Last 4 digits of account number**

**Do multiple creditors have an
interest in the same property?**
☐ No
■ Yes. Specify each creditor,
including this creditor and its relative
priority.
**Specified on line 2.1**

**As of the petition filing date, the claim is:**
Check all that apply
☐ Contingent
☐ Unliquidated
☐ Disputed

---

| 2.9 | **West Bay Capital, LLC** | **Describe debtor's property that is subject to a lien** | **$2,351,500.00** | **$180,000,000.0 0** |
|---|---|---|---|---|

Creditor's Name
**222 N. Pacific Coast
Highway, Suite 1780
El Segundo, CA 90245**
Creditor's mailing address

**Hotel condominium unit located at 2 West
Street**

**Describe the lien**

**Is the creditor an insider or related party?**
■ No
☐ Yes
**Is anyone else liable on this claim?**
■ No
☐ Yes. Fill out *Schedule H: Codebtors* (Official Form 206H)

Creditor's email address, if known

**Date debt was incurred**

---

Official Form 206D         Additional Page of **Schedule D: Creditors Who Have Claims Secured by Property**         page 4 of 5

Debtor    **Urban Commons 2 West II LLC**                    Case number (if known) _____
_____
Name

**Last 4 digits of account number**

| Do multiple creditors have an interest in the same property? | As of the petition filing date, the claim is: Check all that apply |
|---|---|
| ☐ No | ☐ Contingent |
| ■ Yes. Specify each creditor, including this creditor and its relative priority. | ☐ Unliquidated |
| **Specified on line 2.1** | ☐ Disputed |

---

| 2.1 0 | **Wimberly Allison Tong & Goona, Inc.** | | $85,096.71 | $180,000,000.00 |
|---|---|---|---|---|

Creditor's Name

Describe debtor's property that is subject to a lien
**Hotel condominium unit located at 2 West Street**

**300 Spectrum Center Drive, Suite 500**
**Irvine, CA 92618**
Creditor's mailing address

Describe the lien
**Mechanic's Lien**
**Is the creditor an insider or related party?**
■ No
☐ Yes

_____
Creditor's email address, if known

**Is anyone else liable on this claim?**
■ No
☐ Yes. Fill out *Schedule H: Codebtors* (Official Form 206H)

**Date debt was incurred**

**Last 4 digits of account number**

| Do multiple creditors have an interest in the same property? | As of the petition filing date, the claim is: Check all that apply |
|---|---|
| ☐ No | ☐ Contingent |
| ■ Yes. Specify each creditor, including this creditor and its relative priority. | ☐ Unliquidated |
| **Specified on line 2.1** | ☐ Disputed |

---

3.    Total of the dollar amounts from Part 1, Column A, including the amounts from the Additional Page, if any.     | $113,522,956.76 |

**Part 2:    List Others to Be Notified for a Debt Already Listed in Part 1**

List in alphabetical order any others who must be notified for a debt already listed in Part 1. Examples of entities that may be listed are collection agencies, assignees of claims listed above, and attorneys for secured creditors.

If no others need to notified for the debts listed in Part 1, do not fill out or submit this page. If additional pages are needed, copy this page.

| Name  and address | On which line in Part 1 did you enter the related creditor? | Last 4 digits of account number for this entity |
|---|---|---|

SCHEDULE III

SUMMARY OF ASSETS AND LIABILITES

| Fill in this information to identify the case: |
| --- |
| Debtor name    **Urban Commons 2 West II LLC** |
| United States Bankruptcy Court for the:    SOUTHERN DISTRICT OF NEW YORK |
| Case number (if known) _____ |

☐ Check if this is an
amended filing

## Official Form 206Sum
## Summary of Assets and Liabilities for Non-Individuals                    12/15

**Part 1:    Summary of Assets**

1.  *Schedule A/B: Assets-Real and Personal Property* (Official Form 206A/B)

    **1a. Real property:**
    Copy line 88 from *Schedule A/B*.................................................................    $    180,000,000.00

    **1b. Total personal property:**
    Copy line 91A from *Schedule A/B*.............................................................    $    0.00

    **1c. Total of all property:**
    Copy line 92 from *Schedule A/B*...............................................................    $    180,000,000.00

**Part 2:    Summary of Liabilities**

2.  *Schedule D: Creditors Who Have Claims Secured by Property* (Official Form 206D)
    Copy the total dollar amount listed in Column A, *Amount of claim,* from line 3 of *Schedule D*...........    $    113,522,956.76

3.  *Schedule E/F: Creditors Who Have Unsecured Claims* (Official Form 206E/F)

    **3a. Total claim amounts of priority unsecured claims:**
    Copy the total claims from Part 1 from line 5a of *Schedule E/F*............................................    $    0.00

    **3b. Total amount of claims of nonpriority amount of unsecured claims:**
    Copy the total of the amount of claims from Part 2 from line 5b of *Schedule E/F*.............................    +$    53,891,148.69

4.  **Total liabilities** ....................................................................................    $    167,414,105.45
    Lines 2 + 3a + 3b

SCHEDULE IV

30 DAY PROJECTION

**Monthly Pro-Forma Cash Flow Statement**

| | | |
|---|---|---:|
| Sub-Lessee Property Taxes | $ | 412,500.00 |
| Sub-Lessee Insurance | $ | 11,250.00 |
| Sub-Lessee Base Minimum Rent | $ | 41,250.00 |
| Sub-Lessee Common Charges | $ | 26,250.00 |
| Sub-Lessee Lease Payment | $ | 708,333.33 |
| **UC Monthly Revenue total** | $ | **1,199,583.33** |
| | | |
| UC Property Taxes | $ | 458,333.33 |
| UC Insurance | $ | 12,500.00 |
| UC Base Minimum Rent | $ | 45,833.33 |
| Sub-Lessee Common Charges | $ | 29,166.67 |
| **Expense total** | $ | **545,833.33** |
| | | |
| **Monthly Net Income** | $ | **653,750.00** |