**KWJS&S** KLESTADT WINTERS JURELLER SOUTHARD & STEVENS, LLP

200 WEST 41ST STREET
17TH FLOOR
NEW YORK, NY 10036-7203
TELEPHONE (212) 972-3000
TELEFAX (212) 972-2245
WWW.KLESTADT.COM

TRACY L. KLESTADT
PARTNER
E-mail: tklestadt@klestadt.com
Direct: (212) 679-8700

November 20, 2022

**VIA ECF**
The Honorable Philip Bentley
United States Bankruptcy Judge
United States Bankruptcy Court for the
Southern District of New York
One Bowling Green
New York, New York 10004

Re:   **In re Urban Commons 2 West LLC, *et al.*, Debtors (Case No. 22-11509 (PB))**

Dear Judge Bentley:

This firm represents The Residential Board of Managers of the Millennium Point Condominium (the "Residential Board"), a secured creditor and party-in-interest in the above-referenced bankruptcy cases of Urban Commons 2 West LLC, Urban Commons 2 West II, LLC (Case No. 22-11510 (PB)), Urban Commons 2 West III, LLC (Case No. 22-11511 (PB)), Urban Commons 2 West IV, LLC (Case No. 22-11512 (PB)) and Urban Commons 2 West Operating Tenant LLC (Case No. 22-11513 (PB)) (collectively, the "Debtors").

For the reasons discussed seriatim, the controlling principals of Urban Commons—Howard Wu and Taylor Woods—should not be permitted to control the Debtors in these cases. Messrs. Wu and Woods are subject to numerous serious accusations of fraud in a plethora of cases filed across the United States and Mr. Wu has recently filed for personal bankruptcy. Due to glaring material errors and omissions in the Rule 1007 Declaration filed by Taylor Woods (the "Woods Declaration")—who was adjudged a "fraudster" by the Delaware Bankruptcy Court only last year— the Court may wish to consider the appointment of a Trustee *sua sponte* or to set a hearing on expedited notice so that the major stakeholders in this case can be heard before the Debtors are granted the relief sought in the First Day Motions.

   1. **Background on the Condominium – a Hybrid Hotel-Residential Structure**

The Millennium Point Condominium (the "Condominium), located at 2-10 West Street in Battery Park City, is a hybrid residential and commercial condominium association, comprised of a commercial unit and a residential section. The commercial unit consists of the hotel, which is required to be operated as a 5-star hotel on the first 14 floors of the Condominium (the "Hotel" or "Hotel Unit") and a museum (together, the "Commercial Unit"). The Commercial Unit is managed by its own Board of Mangers (the "Commercial Board"), which is distinct from the Residential Board. The residential portion of the Condominium consists of 100 apartment units occupied by

more than 200 residents (collectively, the "Residents"), which comprises the remaining floors of the Condominium above the Hotel (the "Residential Section"). The Condominium is situated on property owned by the Battery Park City Authority ("BPCA"), which entered into a lease with the Condominium ("Ground Lease") on January 1, 2000, with which the Debtors, as owners of the Hotel Unit, are required to comply.

Above the Residential Board and the Commercial Board is the Condominium Board or the "Big Board". The Big Board is comprised of three (3) appointees from the Commercial Board or Hotel Unit and two (2) appointees from the Residential Section. Because the Hotel owner, Urban Commons, effectively abandoned the property in 2020, as discussed *infra*, the Big Board has been inactive and nonfunctioning and, among other things, has been unable to issue financial statements since 2020. This, among other infractions caused by the Debtors, has created enormous ongoing hardship for the Residents.

### 2. The Condominium Operations under the Governing Documents

The operation of the Condominium is governed by a Declaration of Condominium ("Declaration"), Bylaws, and a Ground Lease (together, the "Governing Documents"), dated January 1, 2000, between the BPCA, as landlord, and Millennium BPC Development LLC, the Condominium's sponsor, as initial tenant. Upon acceptance of the Declaration by the New York Secretary of State approximately 20 years ago, the sponsor was replaced as tenant by the Condominium Board, which now serves as the exclusive tenant under the Ground Lease.

Importantly, under the terms of the Condominium's Governing Documents, the Hotel Unit *must* be operated as a nationally recognized brand of hotel that garners the highest rating from an industry rating service, such as Triple A or Mobil Forbes (the "Hotel Requirements"). As reflected in *Residential Bd. of Mgrs. v. Condominium Bd. of Millennium Pt. Condominium*, 197 A.D.3d 420 (1st Dep't. 2021), a case initiated by the Residential Board against the former hotel owner, each of the Residents purchased their apartments in the Condominium based upon, among other things, the promise that they would live in a building that also included a hotel that met or exceeded the Hotel Requirements.

In June 2021, the Appellate Division, First Department expressly held that, as a matter of law, the Residents are intended third-party beneficiaries under the Ground Lease and, as such, have standing to enforce its provisions against the owner of the Hotel Unit. *See Residential Bd. Of Millennium Point v. Condo. Bd. of Millennium Point*, 197 A.D.3d 420 (1st Dep't. 2021). Separate and apart from their standing as third-party beneficiaries, the First Department has also confirmed that the Residents and Residential Board have standing to enforce the Declaration and Bylaws against the Hotel Unit owner based upon principles of contract law. *Id*.

### 3. Urban Commons' Disastrous History as the Hotel Unit Owner

Urban Commons purchased the Hotel Unit of the Condominium in September 2018. At that time, the Hotel was rated five diamonds by Triple A -- the highest rating a hotel can receive from that industry-recognized rating service. Within four months of Urban Commons' purchase,

The Honorable Philip Bentley
November 20, 2022
Page 3

the Hotel was downgraded by Triple A; it has never returned to the top-rating status it achieved prior to Urban Commons' acquisition of it.

### a. Debtors' Failure to Pay Shared Condominium Expenses at the Residents' Expense

Shortly after being downgraded by Triple A, the Hotel was placed into receivership by Urban Commons. Unbeknownst to the Residential Board or the Residents, Urban Commons stopped paying their portion of shared Condominium expenses pertaining to the common elements of the building which are assessed and allocated based on proportionate ownership of the building ("Shared Condominium Expenses")[1], as required by the Governing Documents. Urban Commons, as the owners of approximately 53% of the Condominium, are responsible for paying their allocable portion of these Shared Condominium Expenses; however, the Debtors have not paid any portion of their required share of these expenses for several years.

When Urban Commons stopped paying their portion of Shared Condominium Expenses, funds belonging to the Residents were taken from the Condominium's general operating account and used to make up the shortfall.[2] By the time the Residential Board discovered what was going on, approximately $2 million of the Residents' funds were already applied to cover the Hotel's share of the Shared Condominium Expenses.[3] Thereafter the Residents had no choice but to continue paying the *entirety* of the Shared Condominium Expenses or risk a more catastrophic outcome for the entire Condominium. The Shared Condominium Expenses must be paid to ensure the building remains habitable. For example, if electricity for the fire safety equipment or the elevators, or the gas for the boiler and burner, were discontinued due to nonpayment, the Residents would be forced to vacate their homes. Similarly, the cost of personnel to operate the boiler and burner, which provide heating service to the entire Condominium, including the Hotel Unit, must be paid to continue to provide the Residents with a habitable living environment.[4]

---

[1] Shared Condominium Expenses include, but are not limited to, engineering, security, fire/life/safety personnel, insurance, and utilities (electric and water) – all common elements which must be paid to keep the building habitable ("Indispensable Condominium Services").

[2] The Residents' maintenance and other assessments are deposited into the Condominium's general operating account.

[3] Urban Commons' failure to pay their portion of Shared Condominium Expenses began before the COVID-19 pandemic. Once the pandemic took hold in March 2020, Urban Commons closed the Hotel and effectively abandoned it. The Hotel has been a "zombie" hotel ever since. Consequently, Urban Commons' Hotel manager, Highgate Hotels, LP, terminated its contract with Urban Commons during this period based upon the latter's failure to pay invoices claimed due, which amounted to no less than $23 million. To date, the Hotel has no employees, is dark, and offers no services other than those that the Residents are paying for out of necessity.

[4] Urban Commons' failure to pay their Con Ed bill resulted in a threatened termination of electricity for the entire Condominium in 2021. Recently, Con Ed has again threatened to shut off services to the building,

The Honorable Philip Bentley
November 20, 2022
Page 4

To ensure that the Condominium remained open, operable and habitable despite the Debtors' failings, the Residential Board was forced to specially assess the Residents to ensure that there were sufficient funds available to pay the entirety of the Shared Condominium Expenses, including coverage of a substantial portion of funds needed to provide common services to the Hotel, which Urban Commons did not pay. The Residential Board was left with no choice but to cover the Shared Condominium Expenses because Urban Commons' failure to do so left the entire Condominium in a precarious position. Without such payment, the Residents would have been forced from their homes.

At present, the Residents have been forced to pay the Debtors' portion of the Shared Condominium Expenses at a rate of more than $151,666 per month or $1.819 million per year. The Residential Board has already specially assessed the Residents in the amount of $1.5 million to cover a portion of Urban Commons' share of the Shared Condominium Expenses for 2022. For every day that passes without Urban Commons curing these defaults, a new, irreparable injury to the Residents is imposed. Although a full accounting will be provided, the current balance owed by the Hotel to the Residents is, upon information and belief, approximately $4 million.[5] This is far less than the Debtors represented on their voluntary bankruptcy petition.

### b. *Urban Commons' Negligence Caused Serious and Ongoing Damage to the Condominium and the Residents*

In addition to the foregoing misuse of the Residents' funds, Urban Commons followed a course of conduct which has caused serious damage to the Residents and the Condominium. *First*, Urban Commons has failed to meet their obligations to the Condominium for more than three years leading to the near catastrophic failure of the Condominium's operations and a resulting decline in the quality of life and safety for the Residents. Urban Commons, in addition to their failure to pay their proportion of General Common Charges, has also failed to pay their payments in lieu of taxes ("PILOT"), shared utilities or their own utilities. Urban Commons' failure to pay the Hotels' utilities costs has caused the Residents severe harm.

---

even though the Residential Board had reached an agreement with Con Ed to prevent the shutoff of power by covering the current bills on a going forward basis. Regardless, only through the Residential Board's intervention was it able to prevent the constructive eviction of every one of the 200+ Residents who live in the Condominium.

[5] Given Urban Commons' complete abandonment of their obligations to the Condominium, in just one example, the Residents were required to unilaterally fund a major repair to the boiler costing approximately $250,000 to ensure that the entire building, including the Hotel, is heated. Among other things, without heat in the Hotel, and electricity to ensure that thermostats are working, the pipes would likely freeze in the Winter with catastrophic consequences for the entire Condominium. Again, Urban Commons and their compromised principals have done literally nothing to ensure the safety of the building for the past 32 months. The continued involvement of Urban Commons, by and through their principals, in the Condominium presents a clear and present danger to the safety and well-being of the Residents who have already suffered enormously at the hands of Urban Commons.

Regarding utilities, on October 29, 2021, Con Edison gave notice that there was $346,823.18 in Urban Commons' unpaid electric charges (the bill now exceeds $500,000), and that Con Edison intended to discontinue electrical service if payment was not made by November 29, 2021. This created a crisis at the Condominium because several of the building's essential systems are run through the Hotel Unit's electric service lines. After consulting with utilities consultants and other experts in the design of electrical systems, the Residential Board was unable to discern which of those systems (e.g., the electrical systems associated with the operations of the burner/boiler) would terminate and force the Residents to vacate the Condominium if the electric service was suspended. Given the timing of Con Ed's first threatened termination (late November 2021), the risk to the Residents of losing their heat, as recorded temperatures on those dates ranging from 39 to 41 degrees Fahrenheit, would have endangered the occupants of the Condominium.[6]

In addition, the electricity to operate and maintain the fire safety equipment appeared to run through the Hotel Unit's electric line. Worse, the common areas, including general lighting and emergency lighting, were thought to have been run through the electricity on the Hotel Unit's line. In a word, and without exaggeration, the suspension of electricity presented a clear and present danger to the Residents. Consequently, Con Ed's potential shutoff threatened to force a mass vacate order for the entire Condominium, leaving over 100 families without a place to live as winter approached. If the Hotel Unit's electricity was suspended, the Condominium could have become a risk to the lives and safety of every Resident therein. Consequently, the loss of electricity through the lines maintained by Urban Commons threatened to force a mass vacate order for the entire Condominium, leaving over 100 families without a place to live as winter approached.

As noted above, through negotiations with Con Ed, the Residential Board obtained an extension through Christmas 2021 but only by assuming part of Urban Commons' obligations to avoid the discontinuation of electrical service. Throughout that period, the Residential Board was in direct contact with Mr. Wu and urged him to resolve Urban Commons' overdue invoices with Con Ed. In response, Mr. Wu repeatedly attempted to assuage the Residents' concerns, by telling

---

[6] **The Hotel and Residences share common metering for certain utility services. Thus, any utility order entered by the Bankruptcy Court with respect to the *Debtors' Motion To Prohibit Utilities From Discontinuing Service and Providing Adequate Assurance Pursuant to Section 366 of the Bankruptcy Code* [ECF Doc. No. 6] (the "<u>Utilities Motion</u>"), should obligate the Debtors: (i) to provide adequate assurance to the Residents for post-petition utility costs, which, to date, the Residents continue to fund on behalf of the Debtors; and (ii) to reimburse the Residents contemporaneously for such post-petition expenses which the Residents continue to pay on the Debtors' behalf. This Court should also be aware of the Debtors' representation in the Utilities Motion seeking authorization to "enter into the DIP Credit Facility." *See* Utilities Motion at p. 11. To date, the Debtors have not filed a DIP financing motion in these cases, nor has the Woods Declaration made clear how the Debtors plan to operate post-petition without any financing, other than to continue to impose upon the Residents to involuntary finance the Debtors' portion of the Shared Condominium Expenses, as they did pre-petition. The Debtors' reference to the DIP Credit Facility is yet one more misrepresentation by these Debtors and further supports the Residential Board's belief that the Debtors have been, and will be, challenged in obtaining post-petition financing.**

The Honorable Philip Bentley
November 20, 2022
Page 6

them that he had been in touch with Con Ed and had negotiated a resolution. However, when the Residential Bord checked with Con Ed to ask whether Mr. Wu or any other representative from Urban Commons had attempted to negotiate a resolution, the response was always the same -- Urban Commons did not arrange for anyone to resolve their electric bills with Con Ed. Mr. Wu, while representing to the Residential Board that he had developed a strategy to resolve Urban Commons' outstanding issues with Con Ed, had apparently taken no action whatsoever to do so.[7]

*Second*, upon information and belief, Urban Commons additionally owed the following amounts required under the Ground Lease, *none of which have been paid*: (i) $900,000 to the Utility Reserve; (ii) $4,382,101 in Ground Lease Reserves; (iii) $12,461,121 in real estate tax reserves; and (iv) $3.5 Million in union liability reserves.

*Third*, Urban Commons breached their agreement (the "Management Agreement") with Highgate Hotels ("Highgate") to operate the Hotel and, in connection therewith, failed to manage the Condominium's employees, including five engineers, a security subcontractor and doormen (collectively, "Building Employees"). Urban Commons had apparently discontinued paying Highgate its management fees along with other monies necessary to run the Condominium. Consequently, Highgate terminated its Management Agreement with Urban Commons and surrendered the keys in December 2021. Highgate currently has a lawsuit against Urban Commons' principal, Howard Wu, for more than $23 Million.[8] Mr. Woods' contentions with respect to the hotel operator HEI are a red herring. The BPCA hired an expert to assess whether HEI satisfied the requisite standards under the Ground Lease and determined that they did not. As noted above, based on the First Department's ruling, the Residents have both the legal and equitable right to enforce the Ground Lease standards.

Meanwhile, when Highgate terminated its Management Agreement with Urban Commons, the Building Employees were all fired, leaving the Condominium without engineers or security. It was the understanding of the Residential Board that, because the Condominium houses more than 100 residential units, the absence of Building Employees to provide engineering services for the burner/boiler equipment would constitute a Housing Maintenance Code Violation and, consequently, could require all Residents to vacate their homes. To avoid yet another potential cause of a mass vacate order, the Residents transferred various of the Building Employees to the Residential Section's payroll to maintain the basic operations of the Condominium Building and to keep the doors open. Urban Commons never lifted a finger to help during this arduous process because they did not and do not care what happened to the Condominium or the Residents, and they cannot be trusted to remain in possession as there is absolutely no hope that they can obtain financing or a sale anywhere close to Mr. Woods' wholly unsupported, fantastical claims concerning the current valuation of this "zombie" Hotel that has been shuttered for more than 30

---

[7] The Residents were also forced to assume the gas and water liabilities for the Condominium. The outstanding water bill for the Hotel alone exceeds $300,000.

[8] *Highgate Hotels, L.P. v. Howard Chorng Jeng Wu (In re Wu)*, Adv. Pro. No. 2:22-ap-1076-ER (Bankr. C.D. Cal. March 28, 2022).

The Honorable Philip Bentley
November 20, 2022
Page 7

months, that is in a state of desuetude, and that will require a Property Improvement Plan ("PIP") of many, many tens of millions of dollars to achieve the required 5-Star standard.

Furthermore, due to Urban Commons' failure to monitor (or even visit) the Hotel Unit over a period of months, they also failed to discover a massive water leak that resulted in the accumulation and spread of black mold throughout the Condominium. Notwithstanding their eventual discovery of the water leak and mold, Urban Commons failed to disclose it to the Residents, subjecting them to months of potential exposure to toxic material.

### 4. The Real Story Behind Urban Commons and their Principals

The Debtors, their affiliates and their principals, Messrs. Woods and Wu, have been embattled in litigation throughout the United States related to their business and personal dealings, which have led to a series of adverse orders and judgments against them, essentially punishing them for their bad acts. In fact, now retired Bankruptcy Judge Christopher S. Sontchi was quoted as saying about the Debtors' principals, when granting a preliminary injunction freezing their personal assets, "Woods and Wu have a history of wrongful acts and have proven that they are capable of shuffling assets." This was only after Judge Sontchi indicated months prior in that same case, that he was considering a criminal referral for Messrs. Woods and Wu for misrepresenting or lying to the U.S. Government to obtain a federal Paycheck Protection Program loan.

As noted in a recent decision in California, in which the principals of Urban Commons, Messrs. Wu and Woods, were found to have misappropriated over $10 million from the plaintiff in that case: "Wu and Woods needed loans for their real estate projects, namely the purchase and sale of hotel properties. Wu and Woods formed Defendant Urban Commons and related alter-ego entities, through which they bought hotels. They made some renovations or upgrades to the properties and sold them to EHT, a Singapore Stock Exchange listed REIT, sponsored and managed by Wu and Woods through another alter-ego entity, Eagle Hospitality REIT Management Pte, Ltd. EHT leased the hotels back to Wu and Wood through Urban Commons and their subsidiaries."

Wu and Woods, and their alter-ego EHT entities, then ended up defending a series of adversary cases in Delaware Bankruptcy Court in 2021. Specifically, in the Eagle Hospitality Case, Judge Sontchi found, on the record at a hearing held on May 26, 2021 [Eagle Hospitality Cases, ECF No. 791] at p. 49:13-23:

> "And let me be perfectly clear. These defendants' [Taylor Woods and Howard Wu, principals of Urban Commons] behavior is beyond the pale. It was reprehensible. It was a violation of public trust. It's an abuse of Congress' attempt to help businesses survive the pandemic, not to line the pockets of rich people.
>
> There is an overwhelming likelihood of success on the merits, as far as I can see. Indeed, I'm considering reference -- I'm considering referring the matter to the U.S. Attorney for investigation for possible criminal

7

> conduct. And I do not say that lightly. I've done that twice in 15 years on the bench."

Judge Sontchi further held in his letter opinion dated August 27, 2021:

> "Defendants Woods and Wu have a history of wrongful acts and have proved that they are capable of shuffling assets. Mr. Woods misrepresented or lied to U.S. authority with the implied consent of Mr. Wu by applying for and obtaining SBA PPP loan in Defendant Woods' name or to be used for wrongful purposes. Specifically, Mr. Woods knowingly or recklessly made false statements to obtain an SBA PPP loan by signing an SBA PPP loan application on behalf of Plaintiff without Plaintiff's knowledge or consent. After wrongfully obtaining the funds, Messrs. Woods and Wu transferred them to Defendant EHT Asset Management, an entity they wholly owned, and then caused the funds to disappear. … These facts show Defendants' willingness to flaunt the law, use entities and transfers to avoid paying money wrongfully obtained, and a lack of remorse for doing so.
>
> Additionally, Plaintiffs bring before the Court evidence of multiple lawsuit and judgments against Defendants Woods and Wu for fraud, breach of repayment obligations and other loan defaults."

And later, in his opinion dated November 15, 2021 [Eagle Hospitality Cases, ECF No. 1638] at p. 2 of 19, on a *Motion for Judgment of Civil Contempt against Defendants* [Messrs. Wood and Wu] *for Failure to Comply with Preliminary Injunction Filed on September 23, 2021* (the "<u>Contempt Motion</u>"), Judge Sontchi found:

> "Messrs. Woods and Wu are fraudsters. They fraudulently obtained a PPP loan on behalf of the Debtor without authority and absconded with the proceeds, leaving either the Debtor or the United States to pay back the lender. They were sued by the Debtor, and, after notice and a hearing, the Court entered summary judgment against them and their company and enjoined Defendants from dissipating their assets. In addition, the Court ordered a detailed accounting. Defendants have not provided a sufficient accounting and have baldly stated they intend to dissipate their assets.
>
> The Court cannot countenance Defendants' willful refusal to comply with its injunction to the detriment of the Debtor's creditors. Thus, the Court finds Defendants in contempt of the preliminary injunction, and will convene a hearing on Friday, November 19th to consider what sanction to impose, including whether to place Messrs. Wu and Wood in custody. The Court does not take this step lightly, but the actions of Defendants in derogation of a Court order entered after notice and a hearing leave no alternative."

The Honorable Philip Bentley
November 20, 2022
Page 9

Copies of an excerpt from the May 26, 2021 Hearing Transcript and the November 15, 2021 opinion of Judge Sontchi from the Eagle Hospitality Case are annexed hereto as **Exhibits A and B**, respectively, for the Court's consideration.

Following the Contempt Motion, the Delaware Bankruptcy Court considered whether sanctions against Messrs. Woods and Wu were appropriate. In finding that sanctions were appropriate as against both Messrs. Woods and Wu, Judge Sontchi specifically stated in the December 14, 2021 Order of the Delaware Bankruptcy Court (the "Sanctions Order") awarding sanctions in favor of adversary proceeding plaintiff, Urban Commons Queensway, LLC, "[T]he Court believes that the Personal Financial Statements reflect that the Defendants exaggerate and mislead themselves and others to what assets they actually have. It is additional evidence of the Defendants' flimsy relationship with reality," and that Messrs. Wu and Woods, "made financial representations to the Court which were 'ripe with fraudulent inconsistencies.'" A copy of the Sanctions Order is annexed hereto as **Exhibit C** and includes numerous other statements and findings about the Delaware Bankruptcy Court's distrust of Messrs. Woods and Wu's actions and representations to the court.

### 5. Urban Commons' Failed Yellowstone Injunction Strategy

In March 2022, the BPCA issued a default notice to Urban Commons for failure to pay their obligations under the Ground Lease, including PILOT and ground rent.[9] Urban Commons was provided an opportunity to cure the defaults, but in May 2022, immediately before the expiration of the cure period, Urban Commons filed an emergency application for a Yellowstone Injunction to enjoin the BPCA from terminating their lease and commencing a summary proceeding for eviction. *See Urban Commons 2 West LLC v. Battery Park City Authority*, Index No. 656505/2022, NYSCEF Doc. No. 1 (Sup. Ct., N.Y. County, filed May 26. 2022).

On September 28, 2022, the New York Supreme Court denied the injunction. *Id*., NYSCEF Doc. No. 102, finding, for the following reasons, that Urban Commons had no ability to cure the default: (1) was not operating and (2) owes over $166 million to creditors. There was also evidence in the record, as set forth above, that Urban Commons' corporate principals are dishonest, exaggerate, and otherwise misrepresent, their access to capital, are fraudsters and may be the subject of a criminal referral by Judge Sontchi.

Urban Commons appealed the denial of their application for a Yellowstone Injunction and, on November 3, 2022, the First Department held Urban Commons' application for a stay pending appeal would be granted on the condition that Urban Commons post an undertaking in the amount of $5 million by or before November 15, 2022, and that they pay use and occupancy, at the same rate due under the lease, on the first day of every month, pending the hearing and determination of

---

[9] Urban Commons also defaulted in their obligation to pay common area maintenance ("CAM"), but the Condominium's managing agent, which has access to the common account in which Residential deposits are commingled with Hotel monies, applied the Residents' deposits to satisfy over $2 Million of Urban Commons' CAM obligations.

The Honorable Philip Bentley
November 20, 2022
Page 10

the appeal. If Urban Commons failed to comply with these conditions, the stay was to be automatically vacated without further notice. It is believed that the bond was required by the First Department as security for the harm to the Residents. To provide the Court with additional background on this issue, annexed hereto as **Exhibit D** is a copy of the Residential Board's Affirmation of Michael Hiller in Opposition to Stay Pending Appeal, dated October 11, 2022, filed in the First Department.

Apparently, unable to meet these minimal conditions[10], Urban Commons filed the within petitions on November 15, 2022.

### 6. Conclusion

Although the Debtors have made only limited representations to the Bankruptcy Court in their filings during the first week of these cases, the Woods Declaration is already replete with material mischaracterizations and misstatements.

First, Mr. Woods fails to designate this case as a single asset real estate case, which carries its own implications in a Chapter 11 proceeding. Additionally, in the first numbered paragraphs 19-22 of the Woods Declaration,[11] Mr. Woods misstates the Residents' rights. Additional material misstatements appear in Paragraph 37, in which Mr. Woods criticizes the BPCA for failing to approve HEI Hotels + Resorts as Hotel Operator to replace Highgate. However, Mr. Woods failed to disclose that, as a threshold matter, HEI did not satisfy the requisite standards to qualify as a Hotel Operator under the Ground Lease, and therefore had the BPCA approved HEI, that would have been a breach of the Ground Lease.

It is noteworthy that nowhere in the pleadings filed by Urban Commons filed to date is there reference to any extant, committed sources of funding. The Debtors have not made clear who or from what sources the Debtors will fund their operations during the pendency of these cases. Indeed, the Residential Board is not aware of any unencumbered assets from which the Debtors might operate or otherwise cure or prevent the post-petition default on their obligations. Without credit support, it is unclear how the Debtors will obtain debtor in possession financing. Moreover, since the Hotel is closed and therefore not generating any current revenue, there is not even any cash collateral available. Without financing, and in turn the ability to promptly satisfy post-petition obligations currently being incurred, the Debtors cannot operate under Chapter 11. For this and other reasons, the Debtors should not be allowed to maintain control of their assets, and a prompt sale process supervised by a trustee should be implemented. The glaring absence of an appended commitment letter or even a letter of intent and term sheet to provide any credence

---

[10] The premium for a $5 million bond is $100,000. Evidently, Urban Commons could not raise $100,000, or show sufficient assets, to secure the bond.

[11] The paragraph numbering in the Woods Declaration is erroneous. Specifically, immediately following Paragraph. 49, the next numbered paragraph is Paragraph 19, and then it counts upwards from there. All cited paragraph references herein precede Debtors' numbering glitch.

to these claims is telling about the future of the Debtors' cases. The Debtors can play the part of Pollyanna and cast themselves as a victim (as they try to do in the Woods Declaration), but they clearly cannot establish that they currently have the capital or liquidity to fund basic operating expenses, let alone an exit strategy. The Debtors' filings in these cases to date provide no reasonable basis to believe they have (or will have) the ability, or even the intent, to own and operate the Hotel in an acceptable manner, or to reasonably satisfy the contractual obligations owed to the Residents.

Although these cases are only a week old, the Residential Board thought it important to bring the history of these Debtors and their management to the Court's attention as soon as possible, so the Court may carefully consider the relief requested while the Debtors are in possession.

The Residential Board thanks the Court in advance for its attention to this matter. Please do not hesitate to contact us if the Court has any questions regarding the foregoing.

Sincerely yours,

*/s/ Tracy L. Klestadt*

Tracy L. Klestadt

Enclosures