# **Exhibit D**

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION: FIRST DEPARTMENT

- - - - - - - - - - - - - - - - - - - - - - - - - -    x

URBAN COMMONS 2 WEST LLC,           :
URBAN COMMONS 2 WEST II             :
LLC, URBAN COMMONS 2 WEST           :    App. Dkt. No. 2022-04261
III LLC, URBAN COMMONS 2            :    Index No.:    656505/2022
WEST IV LLC,                        :
                                    :
         Plaintiffs-Appellants,   :    **AFFIRMATION IN**
                                    :    **OPPOSITION TO**
       -against-              :    **APPELLANTS' MOTION**
                                    :    **FOR A STAY PENDING**
BATTERY PARK CITY                   :    **APPEAL**
AUTHORITY d/b/a                     :
THE HUGH L. CAREY BATTERY           :
PARK CITY AUTHORITY,                :
                                    :
        Defendant-Respondent.    :
                                    :

- - - - - - - - - - - - - - - - - - - - - - - - - -    x

     **MICHAEL S. HILLER**, an attorney duly admitted to the practice of law, and

aware of the penalties of perjury, hereby affirms as follows pursuant to CPLR 2106:

     1.     I am the Managing Principal of Hiller, PC, attorneys for the Residential

Board of Managers of the Millennium Point Condominium (the "Board"). I have been

the Board's attorney since 2014, and am fully familiar with the circumstances set forth

below. I submit this Affirmation in Opposition to the application by Plaintiffs-

Appellants ("Appellants") to obtain a stay pending appeal of the Court's order,

denying Appellants' request below for a Yellowstone Injunction ("Yellowstone

Denial").[1] While this Court has granted an interim stay, the full stay should be denied

for the reasons set forth below.

## STATEMENT OF THE CASE

2.    In their moving papers, Appellants suggest that their appeal from the

Yellowstone Denial involves a typical landlord-tenant dispute involving only

themselves as tenants and the Battery Park City Authority ("BPCA") as landlord.  In

fact, however, Appellants share a building with 200+ residents ("Residents"), who

own approximately 100 residential units, in a hybrid residential-commercial

condominium ("Condominium"), in which, as shown *infra*, Appellants are legally

obligated to, *inter alia*, operate a five-star, nationally-recognized, branded hotel

("Hotel Requirements").  As confirmed by this Court's August 5, 2021 decision, the

Residents of the Condominium are intended third-party beneficiaries under, and have

the right to enforce against Appellants, the Ground Lease that governs their

relationship with the BPCA -- the very Ground Lease that is at issue in this dispute

("Ground Lease").  *Residential Bd. of Mgrs. of Millennium Point v. Condominium*

*Board of Millennium Point*, 197 A.D.3d 420 (1st Dep't. 2021) ("plaintiffs [the Board

and Residents] are intended third-party beneficiaries of the Ground Lease").[2]  As

---

[1]We have received confirmation that the Board has standing to oppose, and is thus
entitled to file papers in opposition to, Appellants' request for a stay pending appeal (Ex. A).

[2]That is the reason why the Board and undersigned counsel are copied on all of the
various notices of default and directives to cure sent by the BPCA to Appellants (*see* Notices of
Default and to Cure, Ex. A to Appellants' Counsel's Moving Aff.).

2

shown below, any decision to grant Yellowstone or other stay relief pending appeal
to Appellants would have a substantial and irreversible impact on the Residents.  *See*
Affidavit of Andrew Heymann, President of the Board ¶9 ("Updated Heymann
Aff.").[3]

3.      Appellants' failure to mention, anywhere in their papers, the existence
of the Residents, their judicially-recognized interest in this dispute,[4] and the clear
record below confirming the outright calamities that would befall the Residents were
this Court to grant a stay pending appeal constitute clear grounds upon which to deny
the application.[5]

4.      Regarding the substance of Appellants' application, it fails as a matter
of fact and law.  With respect to a likelihood of success on the appeal, Appellants'

---

[3]Mr. Heymann submits an updated affidavit to ensure that this Court will be fully aware
of the permanent consequences that would befall the Board and Residents if the Appellants'
application for a stay pending appeal were to be granted.

[4]*Residential Bd. of Mgrs.,* 197 A.D.3d at 422.

[5]The Residents requested and were ultimately denied intervention below but only
because the lower court had already denied the request for a Yellowstone Injunction -- the
implication being that, had the Yellowstone been granted, the Residents would have been
permitted to intervene. *See* Notice of Appeal and Order Denying Intervention ("Intervention
Order") (Ex. B).  In this regard, the lower court ruled:

> In light of the court's decision and order dated September 28, 2022 on
> motion sequence number 001, which denied [Appellants'] motion for a
> Yellowstone Injunction, non-party Residential Board [] to intervene to
> oppose the Yellowstone Injunction pursuant to CPLR 1013, is denied.

*See* Ex. B. If a stay pending appeal were to be granted by this Court, it would be the equivalent
of a Yellowstone Injunction, thereby adversely affecting the interests of the Board and
Residents, and defeating their rights.

3

submission is completely misleading, bordering on fraudulent.  As reflected *infra*, the standard for the grant of a Yellowstone Injunction includes a requirement that the tenant plausibly demonstrate that it is able to cure its default to its commercial landlord.  And Appellants seem to be under the impression that the courts are required to grant a Yellowstone Injunction based upon the mere allegation that a tenant is "ready, willing and able" to cure, *even under circumstances in which the overwhelming weight of uncontested evidence shows otherwise*. Appellants are wrong. Where, as here, it is clear that a tenant cannot cure its defaults, and has a clear track record of misleading the courts with respect to its assets and economic circumstances, a Yellowstone Injunction must be denied.

5.     In particular, Appellants are indisputedly in default to the BPCA because: (i) Appellants, as of the date of the notice of default and to cure, owed over $10.6 Million in back rent, PILOT and other sums due under the parties' Ground Lease;[6] and (ii) operationally, Appellants have, for the last 2+ years, failed to pay their bills or operate their unit in the Condominium as a luxury hotel.  Appellants contend that they will be able to cure their operational and financial defaults because they are going to be able to find a lender to advance them tens of millions of dollars to restore the hotel they are supposed to be operating ("Hotel") in order to reopen it, and pay all of the

---

[6]Appellants' debt to BPCA is now in excess of $12 Million (Updated Heymann Aff. ¶11).

sums due the BPCA.  However, as shown *infra*:

- Appellants' Hotel fell into receivership in 2019, shortly after Appellants defaulted on their obligations to the Condominium, just four months after they purchased the Hotel (Previous Affidavit of Board President Andrew Heymann at ¶¶16, 19, Ex. C);[7]

- the Hotel has been out of business, vacant and abandoned since March 2020 (*Id.* ¶17);

- the Hotel recently experienced a massive, multi-million loss due to a water leak that Appellants didn't appear to know about for months after it occurred, and which they failed to timely remediate, resulting in a severe mold condition that seeped into the Residents' section of the Condominium, creating a serious health risk to over 200 Residents (*Id.* ¶15);

- Appellants' Hotel operator, Highgate Hotels ("Highgate"), terminated its relationship with Appellants nearly a year ago after Appellants failed to pay monies due (*Id.* ¶¶13, 19, 20);

- well prior to the pandemic, Appellants were in such dire straits financially that they stopped paying shared Condominium expenses, including utilities, resulting in a threatened shutdown of electricity for the entire Condominium, which would have forced over 200 people from their homes in the dead of winter (*Id.* ¶¶7, 9, 10, 11, 16);

- *Appellants currently have debts in excess of $166 Million*, including, *inter alia*, over:

  (i) $109 Million to the successor to the lender from which Appellants borrowed money to purchase the Hotel;

  (ii) $12 Million to the BPCA;

  (iii) $23 Million to Highgate;

---

[7] Mr. Heymann submitted this "Previous Affidavit" to the court below.

(iv) $2.5 Million to the Residents whose funds were wrongfully used without their knowledge or consent in order to fund the Hotel's portion of shared expenses;

(v) over $500,000 to Con Ed;[8] and

(vi) countless other scorned vendors and creditors across the United States (*Id.* ¶20);

• most of Appellants' business related entities and affiliates were forced into an involuntary bankruptcy in Delaware by their creditors ("Involuntary Bankruptcy") (*Id.* ¶21);

• in one of the adversary proceedings in the Involuntary Bankruptcy, the presiding judge concluded that Appellants' corporate principals -- the very individuals who represent the Hotel herein and one of whom provided Appellants' moving affidavits below -- are "fraudsters," and suggested that he intended to refer them for prosecution by the Justice Department (*Id.* ¶21);

• *in a "Sanctions Order," directing Appellants' principals to obtain a bond, or escrow, in the sum of $2,437,500, \Federal Bankruptcy Judge Sontchi found that their submissions regarding their supposed assets "reflect that the[y] exaggerate and mislead themselves and others to what assets they actually have.  It is additional evidence of the Defendants' flimsy relationship with reality."*  Urban Commons Queensway, LLC v. EHT Asset Mgt., Taylor Woods and Howard Wu, 21-50476-CSS (Dkt. No. 127) at 11 (D. Del. Bankr. Dec. 14, 2021) (Ex. I hereto); and

• Appellants' corporate principals are the subject of a multi-million dollar class action lawsuit for securities fraud, arising from their failure to notify investors of their default on a $341 Million loan and an ensuing

---

[8]In his Previous Affidavit, Mr. Heymann mentioned that the outstanding balance, as of 2021, was approximately $346,000; however, that figure has since been adjusted and increased, ostensibly by Con Ed, to in excess of $500,000 (Updated Heymann Aff. ¶10).

investigation by the Singapore Monetary Authority (*Id*. ¶24).

6.    Notably, Appellants failed to disclose any of this information -- *i.e.*, their massive debt, operating defaults, financial defaults, receivership, Involuntary Bankruptcy, the requirement that they post a $2.4+ Million bond or escrow because their representations concerning their financial situation cannot be believed, the possible referral to the Justice Department for prosecution for fraud, etc. -- to this Court when applying for a stay pending appeal.  The reason they hid these facts from the Court is obvious.  No one could reasonably believe that a lender would ever advance to Appellants the tens of millions of dollars necessary to restore the Hotel and resolve Appellants' outstanding indebtedness to the BPCA, given that they are out of business; their hotel has been abandoned for over two years; they are over $166 Million in debt; they can't even afford to keep the lights on or otherwise maintain or safeguard their property; their affiliates were forced into Involuntary Bankruptcy by their creditors; their Hotel Operator quit for non-payment; and their corporate principals – again, the very same individuals who have been involved with the Hotel – are likely the subject of a criminal investigation, arising from a fraud detected by a federal bankruptcy judge.[9]

_____

[9]Appellants will, no doubt, accuse undersigned counsel of "needlessly maligning" Appellants and their corporate principals – an accusation they leveled below.  In fact, however, the purpose of including this information concerning Appellants is to make clear that they will neither qualify for financing nor attract investors necessary to retire their substantial debt and

7.    As further reflected *infra*, Appellants also failed to address any of the foregoing evidence below.  Instead, they attempted to rely upon three purported "showings," none of which is probative, for the false proposition that they are able to cure their defaults: (i) a conclusory affidavit of Taylor Woods (one of the two "fraudsters" identified by the Delaware Bankruptcy Court as an individual whose representations concerning his financial position cannot be believed); (ii) supposed "financing" allegedly proven through two unauthenticated, purported letters of intent that were plainly manufactured for this litigation – indeed, they are both dated after the cure period was set to expire and after the Complaint herein was filed; and (iii) a series of documents from 2019, which Appellants claim constitute a supposed "roadmap" to restore the Hotel.  As reflected below, Appellants' "showing" is simply an attempt at yet *another* con job; for the reasons demonstrated *infra*, there is zero chance that Appellants will be able to cure their massive defaults.

8.    Further, as reflected in the annexed Updated Heymann Affidavit with respect to Appellants' ongoing failure to pay shared Condominium expenses, the Residents have no choice but to cover Appellants' portion.  Why? Because expenses charged to unit owners (including Appellants) pertain to utilities, security, physical

---

monthly operating budget deficit.  In particular, any financier with the requisite resources to satisfy Appellants' debt and continuing budget deficits would certainly engage in the necessary due diligence to reveal Appellants' massive defaults, irresponsible corporate behavior and outright criminality.

plant (including, *inter alia*, boiler and burner maintenance), Condominium insurance, and such other services at the Condominium which cannot be segregated from those provided to the Residents.   Thus, if the Residents were to stop paying shared Condominium expenses, including that portion owed by Appellants, indispensable building services would cease, forcing the Residents to leave their homes.

9.      For example, the boiler and burner cover the entire Condominium, as do security personnel, and utility charges for the common areas of the building.  These charges cannot be separated.  Thus, if the Residents were to fail to pay the utility charges, the Residents would lose gas, water and electricity that service their apartments.  Worse, the elevators would stop working; the heat and hot water would be lost.  In other words, the Residents would have to abandon their homes.  *See* Updated Heymann Aff. ¶¶7, 8, 10.   To avoid that consequence and other consequences, *the Residents have had to pay Appellants' share of utility costs, as well as other shared Condominium expenses, which as reflected in the Heymann Affidavit and the exhibits annexed thereto, equal $151,666 per month*.  *Id*.  Thus, every month during which a stay would be in effect would require the Residents to pay $151,666 to cover Appellants' expenses (*Id*.).  And because Appellants are insolvent, such losses to the Residents would be permanent (*Id*.).  In short, the grant of any stay would cause the Board and the Residents they represent to sustain permanent harm for which

9

there would be no monetary remedy.

10.     Again, Appellants address none of the foregoing evidence.  Instead, they cite a series of decisions for the proposition that the mere allegation that a tenant is able to cure constitutes a sufficient showing to justify the grant of a Yellowstone Injunction; however, as reflected below, none of those decisions involved a situation in which the overwhelming weight of uncontested evidence made plain that the tenant's conclusory allegation was false and that the tenant had no realistic chance of curing.  As further shown below, none of the cases cited by Appellants included a circumstance in which granting Yellowstone relief would have caused irreparable harm to a third party, which would undeniably occur here.  Accordingly, as reflected *infra*, Appellants' cases are all completely inapposite.

11.     Lastly, as shown *infra*, the equities weigh heavily against granting a stay. Appellants only focus their weighing analysis upon themselves and the BPCA.  Such an analysis is flawed for two reasons -- (i) the Residents' interests cannot be ignored, and the showing below confirmed that the grant of any Yellowstone relief in favor of Appellants would be catastrophic to the Residents; and (ii) Appellants' contention that they would lose their entire investment in the Hotel if the stay were to be denied presupposes that Appellants have any chance of retaining an interest in the Hotel – another pipe dream given their massive debt, including their $109 Million default to

10

their lenders' successor alone.  Plainly, Appellants are going to lose their interest in

the Hotel, whether by reason of the BPCA's eviction of them, an eventual foreclosure

by their lender's successor, or completion of the foreclosure litigation instituted by the

Board against Appellants.[10]  It is plain that Appellants know this, which explains why

they walked away from the Hotel over two years ago.  By their application, Appellants

are asking this Court to drag out the process of their eviction, ostensibly so they can

cajole a payoff in consideration for their voluntary relinquishment of rights to a Hotel

they have long since abandoned.  Given these circumstances (as further described

below), the equities weigh heavily against granting this application.

12.    To the extent that the Court were inclined to grant any further stay relief,

it is imperative, for the reasons set forth below, that the Residents be protected with

a substantial bond: (i) in the amount of $151,666 per month, insofar as they are

currently being forced to cover Appellants' expenses and carrying charges at the

Condominium, which, given Appellants' insolvency, the Residents would never be

able to recoup; plus (ii) $2,500,000 for the Residents' funds previously and

wrongfully used for the benefit of the Appellants.

---

[10]As reflected in Mr. Heymann's Affidavit below, when Appellants ran out of money to
satisfy their obligations to the Condominium, approximately $2.5 Million in funds belonging to
the Residents and continuing ("Residents' Funds") have been wrongfully used to make up the
shortfall.  To date, Appellants have refused to return the money.  Accordingly, the Residents
instituted a separate condominium foreclosure action against Appellants. *See* Complaint, Ex. D
hereto.

13.     For these and the reasons below, the Board and Residents respectfully
urge the Court to deny the application.

## JURISDICTION AND STANDING

14.     We have filed an appeal of the Intervention Order.  Copies of the Appeal
and Intervention Order are annexed as Exhibit B hereto.

15.     As reflected in note 5 *supra*, the lower court denied the Board's Motion
to Intervene expressly because the application for a Yellowstone Injunction was
denied (Ex. E).   The Board's showing below, which the lower court implicitly
recognized, was that, had the Yellowstone Injunction been granted, such would have
severely and adversely impacted the Board and the 200+ Condominium Residents
whom the Board represents.   Because Appellants seek a stay of the Yellowstone
Denial and, in effect, ask this Court to grant a Yellowstone Injunction pending appeal,
the Board has a substantial stake in the outcome of the impending application by
Appellants for a stay of the Yellowstone Denial.  *See* Previous Heymann Aff. ¶¶8-25,
Ex. C hereto.[11]

---

[11]We elaborate on these circumstances in the balancing of equities section (Point II,
*infra*).

12

## ARGUMENT

**Point I:**      **Appellants Have No Realistic Chance of Success on their Appeal**

16.      To prevail on a Yellowstone Injunction, the movant must show, *inter
alia*, that it is "prepared and maintains the ability to cure the alleged default by any
means short of vacating the premises." *225 E. 36th St. Garage Corp. v. 221 E. 36th
Owners Corp.*, 221 A.D.2d 420, 421 (1st Dep't. 1995).  A tenant's failure to make a
credible showing that the default can be cured requires denial of the application for
a Yellowstone Injunction.  *ACIM NY, LLC v. Nissan N. Am., Inc.*, 2017 WL 782498,
at *3 (S.D.N.Y. Feb. 28, 2017) ("Plaintiffs have not demonstrated that 'a basis exists
for believing that [they have] the ability to cure by any means short of vacating the
premises'") (citation omitted); *JH Parking Corp. v. E. 112th Realty Corp.*, 298 A.D.2d
258, 258 (1st Dep't. 2002) ("record supports the motion court's conclusion that
plaintiff would not or could not cure the alleged default by means short of vacating
the premises, and therefore could not establish its entitlement to Yellowstone relief");
*accord Authentic Hansom Cabs, Ltd. v. Nisselson*, 2004 WL 2997794, at *8 (S.D.N.Y.
Dec. 27, 2004), *aff'd. sub nom. In re Fayolle*, 159 F. App'x. 221 (2d Cir. 2005).  Thus,
for example, the allegation that a tenant will be able to cure its default with
questionable, un-committed outside financing has been deemed insufficient to
constitute a basis to grant a Yellowstone Injunction.  *See ACIM NY,*  2017 WL

782498, at \*4. (motion for Yellowstone Injunction, denied: "This limited, expensive financing does not supply a basis for belief that Plaintiffs will be able to secure viable sources of alternate funding to cure their very substantial financial defaults, which constitute defaults under the sublease of the Premises, by any means short of vacating the Premises"). As in *ACIM NY*, Appellants here failed to credibly show below that there was any plausible basis to believe that they had a reasonable chance of curing their massive financial and operational defaults to the BPCA through procurement of outside financing.

17.    *First*, with respect to their financial defaults, as reflected *supra*, Appellants are out of business, essentially insolvent, and have debt in excess of $166 Million.    Further, after Appellants' affiliates were forced into the Involuntary Bankruptcy; and the Bankruptcy Court, by decision of Judge Sontchi in an adversary proceeding arising from theft of PPP funds, concluded that Appellants' corporate principals, who were directly involved with operating the Hotel at the Condominium, are "fraudsters," who could appropriately be referred to the Justice Department for prosecution. *See In re EHT USI, et al.*, Case No. 21-0036 (CSS), Adv. Pro. No. 21-50476 (CSS), Doc. 1638 at 2 (Bankr. Ct. Del. Nov. 15, 2021). While Appellants contend that they will be able to procure outside financing, any third-party lender with the capacity to provide the tens of millions of dollars that would be necessary to

14

restore the Hotel and pay down Appellants' debt to the BPCA would certainly perform

due diligence beforehand, and undoubtedly discover the following further description

of Appellants and their principals from the Bankruptcy Court's decision – a

description raising eerily similar circumstances to those present here:

> WHEREAS, neither the testimony of Mr. Woods or Mr. Wu [*i.e.,*
> Appellants' principals] was credible. Among other things: (i) their
> answers were often incomplete and purposefully vague; (ii) they
> blamed all their financial difficulties on the COVID-19 pandemic,
> which, while partially true, ignored the uncontroverted fact that
> their business enterprise was in serious difficulty months before
> the pandemic-having missed substantial payments in January and
> February 2020; (iii) they were unable to identify with particularity
> the source of the funds upon which they have been living for the
> last 6 months; (iv) their testimony implied they had engaged in
> elaborate efforts to hide assets; (v) Mr. Woods refused to take
> personal responsibility for the fraudulent PPP loan application,
> which he signed under penalty of perjury, and the diversion of the
> proceeds of their company-blaming, instead, his staff; and (vi) the
> accounting of their assets was incomplete, vague and inconsistent
> with documents from May 2021-indicating that either the previous
> or the current document was fraudulent.

*Id.*, Doc. 118 at 2-3 (Nov. 22, 2021).   Judge Sontchi of the Delaware Bankruptcy

Court repeated these findings in the Sanctions Order (Ex. I at 12) ("WHEREAS, the

Court previously found that Mr. Woods and Mr. Wu are fraudsters").   And it is worthy

of repetition that the Court therein made the following additional observation with

respect to Appellants' principals – Messrs. Woods and Wu:

> the Court believes that the Personal Financial Statements reflect

that the Defendants [Wu and Woods] exaggerate and mislead themselves and others to what assets they actually have. It is additional evidence of the Defendants' flimsy relationship with reality (Ex. I at 11).

18.    The Court further noted in the Sanctions Order that Appellants' principals (Wu and Woods) made financial representations to the Court which were "ripe with fraudulent inconsistencies." *Id*. at 12.

19.    No lender with access to the amount of capital Appellants would require would ever lend funds to Appellants under circumstances in which their only asset (*i.e.*, the Hotel) is insolvent and out of business; they owe over $166 Million in debt; and their corporate principals are disreputable "fraudsters" who filed paperwork to defraud the U.S. Government out of PPP monies, and who have been sanctioned by the Bankruptcy Court because they continue to misrepresent the state of their finances.[12]

20.    *Second*, Appellants' Hotel has been operationally out of business for over two years.  Worse, in December 2021, Appellants' Hotel Operator and Management Company, Highgate, terminated its contract with Appellants for non-payment of more than $23 Million claimed due (Previous Heymann Aff. ¶¶16, 19, Ex. C).  Thus, the

---

[12]Any rudimentary due diligence would also uncover the article entitled, *Shipwrecked: A Betrayal You Can't Even Put into Words*, which focuses on the many lawsuits brought against Appellants' corporate principals Woods and Wu, who are accused of duping dozens of investors out of their savings. https://lbpost.com/features/queen-mary/a-betrayal-you-cant-even-put-into-words.

16

Hotel has not had a manager to maintain its property and assets for over nine months.

In addition, the massive water leak in the Hotel, which created a serious mold problem

in the Residential Section of the Condominium Building, was left unaddressed by

Appellants for months, creating a health hazard for the 200+ Residents (*Id*. ¶15).

Meanwhile, Appellants' failure to pay hundreds of thousands of dollars in electricity

charges resulted in a threatened shutdown and termination of service for the entire

Condominium (including the Residential Section) by Con Ed -- a shutdown and

termination which would have forced the Residents from their homes (*Id*. ¶¶7, 9-11,

13,16).   The financial and operational defaults referenced above make plain that

Appellants lack the operating capital, reserves and borrowing capacity to pay the

amounts due and reopen the Hotel.

21.    Notwithstanding the foregoing, Appellants argued below that certain

unsworn and unauthenticated letters of intent that they attached to their papers proved

their ability to obtain financing to satisfy their $166+ Million in liabilities; however,

the unauthenticated letters were created only after this litigation was commenced.

Thus, it is not as if Appellants were in the process of procuring financing and then

were served with a notice to cure; they essentially took no action for three years after

providing a supposed "roadmap" to the BPCA in 2019, and then, after receiving a

notice to cure, procured or manufactured the unauthenticated letters of intent, not for

the purpose of obtaining funding, but rather to use as supposed "evidence" in this lawsuit. Indeed, as the lower court properly noted, one of the unauthenticated letters, assuming it were real, expired 24 hours after it was supposedly issued back in June 2022 (Yellowstone Denial, Ex. E at 5).[13]

22.    With regard to the 2019 supposed "roadmap," it is completely unrealistic to the point of being utterly absurd. In particular, the "roadmap" includes a series of exacting demands to change the Hotel, such as, *inter alia*: (i) a permanent reduction in services at the Hotel -- which would violate the Ground Lease to which the Residents are third-party beneficiaries; (ii) conversion of certain Hotel rooms into private apartments – a plan that was rejected by the BPCA in 2014 as violative of the Ground Lease; (iii) amendment of the Ground Lease, which would require approval from the Residents and Board who are third-party beneficiaries thereunder;[14] and (iv)

---

[13]The record before the lower court also included evidence that, when the Board was in negotiations with Con Ed to avert a power shutdown, one of Appellants' corporate principals repeatedly claimed to the Board that he had been in contact with Con Ed and had negotiated a resolution – claims that were proven false (Previous Heymann Aff. ¶11, Ex. C). Such reflects a continuing pattern of deception by Appellants who seem at ease suggesting that they have resolved issues that were, in fact, never resolved, based upon negotiations that had, in fact, never occurred.

[14]*Silverman v. Miranda*, 213 F. Supp. 3d 519, 524–25 (S.D.N.Y. 2016) ("because Plaintiffs are third-party beneficiaries of the CBAs, their consent was required for any amendment modifying their benefits"), *aff'd. sub nom. Silverman v. Teamster Loc. 210 Affiliated Health & Ins. Fund*, 725 F. App'x 79 (2d Cir. 2018), as amended (June 7, 2018), and *aff'd. sub nom. Silverman v. Teamster Loc. 210 Affiliated Health & Ins. Fund*, 725 F. App'x. 79 (2d Cir. 2018), as amended (June 7, 2018) (citation omitted); *Flack v. Friends of Queen Catherine Inc.*, 139 F. Supp. 2d 526, 539 (S.D.N.Y. 2001)("Indeed, once a third party beneficiary accepts,

a wholesale renegotiation of the Hotel's collective bargaining agreement with the union of employees who are supposed to provide services to Appellants.

23.    All of the "roadmap" changes proposed by Appellants as part of their 2019 roadmap would require approval of the Residents and Board. *Residential Bd. of Mgrs.*, 197 A.D.3d at 422 ("The availability of the services provided by a first-class hotel to the residential unit owners 'affect[s] a condominium unit owner's standards of living and ability to sell'") (*quoting Board of Mgrs. of Astor Terrace Condominium v Schuman, Lichtenstein, Claman & Efron*, 183 A.D.2d at 489).

24.    The Residents have no present intention of agreeing to a reduction in services, conversion of hotel rooms into apartments, or a reduction in the number of union employees providing security and other services at the Hotel.  Further, even assuming *arguendo* that the Residents were willing to change the Ground Lease and reduce the services available at the Hotel, the BPCA, which has the discretion to refuse to amend the Ground Lease in the manner suggested by Appellants, is already on record rejecting the proposed changes.  In other words, even assuming *arguendo* that Appellants had the access to capital and other financial wherewithal necessary to restore the Hotel, and had not been found to be "fraudsters" who regularly

---

adopts, or relies upon a contract, the contracting parties cannot modify that contract without the third-party beneficiary's consent").

misrepresent their finances to the courts, their "roadmap" is premised upon approvals
Appellants will never receive.

25.    In addition, the 2019 "roadmap" presupposes that any Marriott Luxury
hotel would meet the requirements of the Ground Lease; it wouldn't.   Under the
Ground Lease, any replacement hotel must garner the "highest rating by a nationally
recognized hotel rating service under a nationally recognized brand, flag, or franchise
that was equal to or better than the standards set forth in the Hotel Operator
Management Agreement between Millennium BPC and nonparty Ritz–Carlton Hotel
Company, L.L.C." *Residential Bd. of Millennium Point,* 197 A.D.3d at 422.   As
conceded by Appellants in their Amended Complaint below, the only two hotel rating
services referenced in the Ground Lease are Triple A and Mobil Forbes -- two
industry-regulated ratings services.   Thus, any replacement hotel must receive the
highest rating by Triple A, Mobil Forbes or another equally industry-recognized rating
service ("Rating Requirement").   *See* Appellants' Amended Complaint at ¶18,
annexed to Affirmation of Appellants' Counsel, Derek Wolman.

26.    Marriott has only two hotel brands that would meet the Rating
Requirement – the Ritz-Carlton and the Regis.  The "2019 roadmap" proposes to
engage Marriott to re-open the hotel under a different brand name, *i.e.*, not named
Ritz-Carlton or Regis.  Thus, the 2019 "roadmap," even if effectuated, would not meet

the requirements of the Ground Lease. While Appellants allege that the 2019

"roadmap" was rejected in bad faith, it is worth noting that Appellants conceded

below that the _BPCA, prior to rendering a decision denying Appellants' request for_

_approval, hired an independent, third-party hotel consultant who reached precisely_

_the same conclusion referenced above – specifically, that the Marriott hotels that_

_Appellants proposed for the Hotel Unit did not meet the requirements of the Ground_

_Lease_. _See_ Appellants' Amended Complaint at ¶¶25, 60 and 62, annexed to the

Appellants' Counsel's Affirmation. Plainly, the BPCA acted in good faith, affording

Appellants every opportunity to meet the Hotel Requirements of the Ground Lease --

Requirements they did not satisfy.[15]

27.    Lastly, as for the conclusory affidavit submitted by Appellants' corporate

principal, who claims that Appellants can cure their default, the lower court properly

rejected it, insofar as the uncontested evidence below left no doubt that Appellants

have no realistic possibility of obtaining outside financing to raise the monies

necessary to cure their defaults to the BPCA. Indeed, even the case law cited by

Appellants confirms that, with respect to a tenant's ability to cure an alleged default,

there must be some "basis [] for believing" that the tenant has "_plausible_ means of

---

[15]Appellants could have timely interposed legal action in the form of an Article 78
proceeding or a suit in equity to challenge BPCA's denial of their proposed hotel, but Appellants
instead took no action until they received a notice of default and to cure nearly three years later.

curing the default." *New Deal Realty LLC v. 684 Owners Corp.*, 204 A.D.3d 447, 447 (1st Dep't. 2022) (citations omitted); *see also WPA/Partners LLC v. Port Imperial Ferry Corp.*, 307 A.D.2d 234, 236 (1st Dep't. 2003) ("The party seeking *Yellowstone* relief must *demonstrate* that 'it is prepared and maintains the ability to cure the alleged default by any means short of vacating the premises'") (citations omitted) (emphasis added). Here, Appellant has not demonstrated, because it cannot, that it has a *plausible* means of curing its myriad defaults in order to open the Hotel and operate it consistently with the Ground Lease. Again, no lender is going to advance to Appellants, the $12+ Million necessary to retire the balance due BPCA and the tens of millions of additional dollars required to reopen the Hotel – especially given the $166 Million they owe, coupled with the repeated judicial findings against Appellants' principals, who have consistently misrepresented their financial circumstances to a federal judge.

28.    Moreover, none of the cases cited by Appellants involved a circumstance in which such allegation was completely controverted by uncontested evidence. As such, the case law cited by Appellants is inapposite.

* * * * * * * *

29.    Because Appellants cannot demonstrate that they are likely to succeed on their appeal, the application for a stay pending appeal should be denied.

**Point II:**    **The Equities Weigh in Favor of Denying the Stay
Pending Appeal, Which, if Granted, Would Cause the
Residents Severe and Irreparable Harm**

30.    The equities weigh in favor of denying the stay pending appeal because,

based upon the manner in which the Condominium operates in accordance with the

governing documents, any continued ownership of the Hotel by Appellants would

perpetuate the transfer the costs of maintaining the Condominium building -- the

entire building, including the Hotel section ("Condominium Building") -- to the

Residents, who would never be able to recoup the monies they are forced to spend.

31.    In particular, because Appellants share the Condominium Building with

the Residents, the parties are supposed to share common expenses through the

payment of common charges.  Unfortunately, Appellants defaulted in payment of their

common charges beginning in January 2019 – (again) three years ago and a full year

prior to the pandemic (Previous Heymann Aff. ¶¶7, 16, Ex. C).   Unbeknownst to the

Residents, _their_ funds were wrongfully used in order to pay Appellants' portion of

shared expenses (_Id_.).  These and other monies now equal approximately $2.5 Million

(Ex. F; _see also_ Updated Heymann Aff. ¶12).   And Appellants have refused to return

any of the Residents' funds, ostensibly because Appellants don't have the money.  As

a consequence, the Residents' capital reserves have been depleted.

32.    Further,  the  shared  expenses  of  the  Condominium,  for  which  the

23

Residents and the Hotel are responsible ("Shared Condominium Expenses"), cannot be segregated. All essential services which are supposed to be funded by Shared Condominium Expenses must be paid for, even though the services in question benefit both the Hotel and the Residents -- otherwise, the Residents would lose their essential services, such as light, heat, water, security, etc. Consequently, in addition to the depletion of their entire capital reserve, the Residents have been forced to absorb the Hotel's portion of Shared Condominium Expenses – expenses that should have been paid in substantial part by Appellants who own approximately 53% of the Condominium (Previous Heymann Aff. ¶¶7, 16; Ex. C).

33.     As reflected in the annexed Updated Heymann Affidavit, Appellants' portion of Shared Condominium Expenses is $151,666 per month (Updated Heymann Aff. ¶9; *see also* Ex. G in Highlighted Section at the Bottom). And that is the additional amount that the Residents have been forced to pay every month in order to remain in their homes (*Id*.). If any stay pending appeal were to be granted, the Residents, who have, to date, been forced to absorb $2.5 Million of Appellants' share of Condominium expenses, would be required to continue funding such expenses -- again, at a rate of $151,666 per month. *See* Ex. G and the Updated Heymann Aff. ¶7, 9.

34.     Owing to Appellants' continuing defaults and refusal to restore the

Residents' funds and pay ongoing shared expenses, *the Board has been constrained to approve, and the Residents have been required to pay, a multi-million dollar assessment* (*See* Previous Heymann Aff. ¶17; *see also* Board Resolution, Ex. H). Plainly, this cannot continue.

35.    Any grant of a stay of the Yellowstone Denial pending appeal would essentially perpetuate the circumstances that currently exist, thereby continuing to subject the Residents to the hardship of sharing the Condominium Building with an insolvent Hotel and delinquent hotel owner with a dysfunctional leadership team of con artists, and a mountain of un-resolvable debt.  Every passing month, the Residents are subjected to absorbing $151,666 of Appellants' portion of Shared Condominium Expenses, without the slightest hope of recoupment, since Appellants are out of business, owe over $166 Million, and have no means of raising the money to pay it back (Previous Heymann Aff.  ¶28; Ex. C).

36.    It is well established that the inability to collect an ensuing money judgment from a potentially insolvent debtor constitutes irreparable harm as a matter of law.  *See, e.g., Benedict v. Amaducci*, 1993 WL 87937, *11 (S.D.N.Y. 1993) ("'as a practical matter, the defendant would not or could not respond fully for those damages, preliminary injunctive relief has been deemed necessary to protect plaintiff from irreparable injury'") (*citing American Savings Bank, F.S.B. v. Cheshire*

*Management Co.*, 693 F. Supp. 42, 49 (S.D.N.Y. 1988) (*quoting Drobbin v. Nicolet Instrument Corp.*, 631 F. Supp. 860, 912 (S.D.N.Y.1986)); *Ma v. Lien,* 198 A.D.2d 186, 186 (1st Dep't. 1993) (preliminary injunction warranted with respect to disputed lottery winnings given the likelihood that the funds would not be available for judgment collection if not subject to restraint). Given the uncontested showing below that the grant of Yellowstone relief would result in the ongoing and permanent loss of the Residents' funds, the equities weigh heavily against the grant of a stay pending appeal.

37. By contrast, denial of a stay pending appeal would not cause any prejudice to Appellants since they are very likely to lose their appeal. And even if they were somehow to prevail on the appeal, such would simply defer their inevitable forfeiture of the Hotel to their primary note holder (*i.e.*, their lender's successor), to which Appellants owe in excess of $109 Million. Unlike efforts to terminate commercial leases, mortgage foreclosures are not subject to Yellowstone relief. In other words, Appellants are going to lose the Hotel one way or another; the only issue is how much of the Residents' funds will be sucked into Appellants' economic vortex and thus permanently lost before Appellants' unavoidable eviction.[16]

---

[16]As this Court found in *Residential Bd. of Mgrs., supra*, the Condominium governing documents were drawn in such a manner as to permit ejectment of the owner of the Commercial Unit without evicting the Residents. 197 A.D.3d at 422.

38.    Lastly, to the extent that the Court were inclined to grant a stay, it is imperative that Appellants be required to post an undertaking to ensure that the Residents don't suffer irreparable harm in the form of lost funds that they could never recoup.  Assuming an accelerated briefing schedule, the earliest term during which the appeal could be considered would be the January 2023 Term.  Thus, any undertaking should presuppose at least six months of Appellants' share of Condominium expenses, which equals $909,996, plus the outstanding balance to date, which equals another $2.5 Million, for a total of $3,409,996.  The Updated Heymann Affidavit and the exhibits referenced therein delineate each of the costs and amounts comprising this sum.  Obtaining a bond in that amount should be easily achievable for Appellants that claim to have the financial wherewithal to cure the $12+ Million in debt they owe to the BPCA.

## CONCLUSION

39.    For all of the foregoing reasons, the Board respectfully urges the Court to deny the application for a stay pending appeal.  Were the Court inclined to consider granting a stay, Appellants should be required to post an undertaking in the form of a secure bond in the amount of $3,409,996 to ensure that the costs incurred by the Residents over the period comprising the stay ultimately may be recouped.

Dated:      New York, New York
         October 11, 2022

*s/ Michael S. Hiller*

Michael S. Hiller