**KLESTADT WINTERS JURELLER
SOUTHARD & STEVENS, LLP**
200 West 41st Street, 17th Floor
New York, NY 10036
Telephone: (212) 972-3000
Facsimile: (212) 972-2245
Tracy L. Klestadt
Kathleen M. Aiello

*Counsel to The Residential Board of
Managers of the Millennium Point
Condominium*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re | Chapter 11 |
| URBAN COMMONS 2 WEST LLC, | Case No. 22-11509 (PB) |
| Debtors. | (Jointly Administered) |

**LIMITED OBJECTION OF THE RESIDENTIAL BOARD OF MANAGERS OF THE MILLENNIUM POINT CONDOMINIUM TO THE DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) PROHIBITING UTILITY COMPANIES FROM ALTERING OR DISCONTINUING SERVICE ON ACCOUNT OF PREPETITION INVOICES, (II) DEEMING UTILITY COMPANIES ADEQUATELY ASSURED OF FUTURE PERFORMANCE, AND (III) ESTABLISHING PROCEDURES FOR RESOLVING REQUESTS FOR ADDITIONAL ADEQUATE ASSURANCE**

The Residential Board of Managers of the Millennium Point Condominium (the "Residential Board"), by its undersigned counsel Klestadt Winters Jureller Southard & Stevens LLP, as and for its objection (the "Objection") to the *Motion of Debtors for Entry of Interim and Final Orders (I)Prohibiting Utility Companies from Altering or Discontinuing Service on Account of Prepetition Invoices, (II) Deeming Utility Companies Adequately Assured of Future Performance, and (iii) Establishing Procedures for Resolving Requests for Additional Adequate Assurance* (the "Utilities Motion") [ECF No. 8], respectfully sets forth and represents as follows:

1

**PRELIMINARY STATEMENT**

For approximately thirty-two months prior to the Petition Date, since the Hotel Portion of the Condominium has been shuttered, the Residential Board has been forced to cover or advance the cost of the utilities for the Hotel (defined below) to avoid complete shut off and termination of Utility Services[1] to avoid the building from being rendered uninhabitable. Leading into the Debtors' bankruptcy filing[2] on November 15, 2022 (the "Petition Date"), the Residential Board had accrued a sizeable, secured claim against the Debtors' estate arising from the Debtors' failure to pay utilities, and other obligations, since the Hotel was shuttered in March 2020 (and prior to that date). In the Utilities Motion, the Debtors suggest that they will insert a new, *unapproved* hotel operator to pay the Debtors' utilities post-petition and to otherwise propose adequate protection in the form of deposit accounts to the Utilities providers, as well as to propose a process for addressing requests for additional security by the Utilities Companies.

The assumptions underlying the Debtors' proposals set forth in the Utilities Motion are no longer valid and must be addressed in any order regarding the relief requested in the Utilities Motion, even on an interim basis.

*First*, the Residential Board vehemently opposes the implementation of a hotel operator, even on a short-term basis, that is not unanimously approved by the entire Condominium Board and does not otherwise satisfy the statutory and contractual requirements set forth in the Condominium's Governing Documents (defined below), *inter alia*, that the Hotel Unit must be

---

[1] Capitalized terms not specifically defined herein shall have the meaning ascribed to them in the Utilities Motion.

[2] The "Debtors" shall hereafter mean Urban Commons 2 West LLC, Urban Commons 2 West II, LLC (Case No. 22-11510 (PB)), Urban Commons 2 West III, LLC (Case No. 22-11511 (PB)), Urban Commons 2 West IV, LLC (Case No. 22-11512 (PB)) and Urban Commons 2 West Operating Tenant LLC (Case No. 22-11513 (PB)) (collectively, the "Debtors" or "Urban Commons").

operated as a nationally recognized brand of hotel that garners the highest rating from an industry rating service, such as Triple A or Mobil Forbes.

*Second*, the Residential Board does not oppose the adequate protection requirement or the procedures for Utilities Companies to request additional adequate protection, but it does oppose any provision in the the proposed order accompanying the Utilities Motion which contemplates the Debtors' former management, adjudicated "fraudsters," making *any* decisions regarding these issues. Rather, all decision-making authority should vest in the Chief Restructuring Officer (the "CRO") and/or the Independent Manager (the "Independent Manager"), both of whom have now been appointed to their positions by amended corporate governance documents and by Order of this Court.

*Third*, upon information and belief, the Debtors, by and through their newly appointed CRO and Independent Manager, have reached an agreement for debtor-in-possession financing (the "DIP Loan") with BPC Lender, which is pending approval of this Court. Subject to review of the terms of the finalized agreement and any interim or final orders proposed for entry by this Court, the Residential Board conceptually supports the DIP Loan that would be used to cover expenses the Residential Board has been involuntarily covering or advancing since the Hotel was closed in 2020, including utilities. However, there is a presumption embedded in the Utilities Motion which implies that the Residents, through assessments, will provide involuntary financing of the utilities for the Hotel, which are the Debtors' obligations, if the Debtors cannot secure approval of the proposed DIP Loan. The Residential Board strongly opposes any relief that continues to make the Residential Board and, by extension, the Residents, the default financer of the Debtors during the post-petition period.

It is also critical that the Debtors not permit the utilities to be shut off or terminated. The shutoff of Utility Services in the Hotel will critically impact the entire building because of the shared systems throughout the building and would likely require the Residents to vacate the building. In sum, the Debtors should not be permitted to involuntarily rely upon the Residential Board to pay its utilities, or other, obligations post-petition, or otherwise to continue the situation whereby the Hotel's pre-petition obligations were foisted upon the Residential Board. This situation is financially unsustainable for the Residents and has brought the Residential Section to the brink of financial ruin. Thus, while it is critical that the Utility Services are uninterrupted post-petition, it is equally important that the Residents not be presented with the Hobson's choice of advancing funds for the Hotel or having the entire building rendered uninhabitable. At a minimum, if the threat of termination becomes likely, then the Residential Board requires advanced notice of such circumstances so it may consider its options to protect the building.

## STATEMENT OF FACTS

1. The Millennium Point Condominium (the "Condominium"), located at 2-10 West Street in Battery Park City, is a hybrid residential and commercial condominium association, comprised of a commercial unit and a residential section. The commercial unit consists of the hotel, which is required to be operated as a 5-star hotel on the first 14 floors of the Condominium (the "Hotel" or "Hotel Unit") and a museum (together, the "Commercial Unit"). The Commercial Unit is managed by its own Board of Mangers (the "Commercial Board"), which is distinct from the Residential Board.

2. The residential portion of the Condominium consists of 100 apartment units occupied by more than 200 residents (collectively, the "Residents"), which comprises the remaining floors of the Condominium above the Hotel (the "Residential Section"). The

4

Condominium is situated on property owned by the Battery Park City Authority ("BPCA"), which entered into a lease with the Condominium ("Ground Lease") on January 1, 2000, with which the Debtors, as owners of the Hotel Unit, are required to comply.

3. The operation of the Condominium is governed by a Declaration of Condominium ("Declaration"), Bylaws, and a Ground Lease (together, the "Governing Documents"), dated January 1, 2000, between the BPCA, as landlord, and Millennium BPC Development LLC, the Condominium's sponsor, as initial tenant. Upon acceptance of the Declaration by the New York Secretary of State approximately 20 years ago, the sponsor was replaced as tenant by the Condominium Board, which now serves as the exclusive tenant under the Ground Lease.

4. On or around September 20, 2018, the Debtors acquired the Hotel from Millennium BPC Development LLC.

5. Urban Commons' failure to pay their portion of Shared Condominium Expenses began before the COVID-19 pandemic. Once the pandemic took hold in March 2020, Urban Commons closed the Hotel and effectively abandoned it. The Hotel has been a "zombie" hotel ever since. Consequently, Urban Commons' Hotel manager, Highgate Hotels, LP, terminated its contract with Urban Commons during this period based upon the latter's failure to pay invoices claimed due, which amounted to no less than $23 million. To date, the Hotel has no employees, is dark, and offers no services other than those that the Residents are paying for out of necessity, which includes the Utility Services and other Common Area Maintenance charges.

6. Shortly after being downgraded by Triple A, the Hotel was placed into receivership by Urban Commons. Unbeknownst to the Residential Board or the Residents, Urban Commons stopped paying their portion of shared Condominium expenses pertaining to the common elements of the building which are assessed and allocated based on proportionate ownership of the building

5

("Shared Condominium Expenses")[3], as required by the Governing Documents. Urban Commons, as the owners of approximately 53% of the Condominium, are responsible for paying their allocable portion of these Shared Condominium Expenses; however, the Debtors have not paid any portion of their required share of these expenses for several years.

7. When Urban Commons stopped paying their portion of Shared Condominium Expenses, funds belonging to the Residents were taken from the Condominium's general operating account and used to make up the shortfall.[4] By the time the Residential Board discovered what was going on, more than $2 million of the Residents' funds were already applied to cover the Hotel's share of the Shared Condominium Expenses. Thereafter the Residents had no choice but to continue paying the *entirety* of the Shared Condominium Expenses or risk a more catastrophic outcome for the entire Condominium, including a disruption in Utility Services, that would likely require the building to be vacated.[5] The Shared Condominium Expenses must be paid to ensure the building remains habitable because the building shares systems between the Residential Unit and the Hotel Unit which comes together in a central plant. The termination of the Utility Services at the Hotel Unit would impact the shared systems and jeopardize the Utility Services to the

---

[3] Shared Condominium Expenses include, but are not limited to, engineering, security, fire/life/safety personnel, insurance, and utilities (electric and water) – all common elements which must be paid to keep the building habitable ("Indispensable Condominium Services").

[4] The Residents' maintenance and other assessments are deposited into the Condominium's general operating account.

[5] Urban Commons' failure to pay their Con Ed bill resulted in a threatened termination of electricity for the entire Condominium in 2021. Recently, Con Ed has again threatened to shut off services to the building, even though the Residential Board had reached an agreement with Con Ed to prevent the shutoff of power by covering the current bills on a going forward basis. Regardless, only through the Residential Board's intervention was it able to prevent the constructive eviction of every one of the 200+ Residents who live in the Condominium.

building's systems, which would jeopardize the operation of certain systems impacting the Residential Unit.

8. For example, on October 29, 2021, Con Edison gave notice that there was $346,823.18 in Urban Commons' unpaid electric charges (the bill now exceeds $500,000), and that Con Edison intended to discontinue electrical service if payment was not made by November 29, 2021. This created a crisis at the Condominium because several of the building's essential systems are run through the Hotel Unit's electric service lines. After consulting with utilities consultants and other experts in the design of electrical systems, the Residential Board was unable to discern which of those systems (e.g., the electrical systems associated with the operations of the burner/boiler) would terminate and force the Residents to vacate the Condominium if the electric service was suspended. Given the timing of Con Ed's first threatened termination (late November 2021), the risk to the Residents of losing their heat, as recorded temperatures on those dates ranging from 39 to 41 degrees Fahrenheit, would have endangered the occupants of the Condominium.

9. At present, the Residents have been forced to pay the Debtors' portion of the Shared Condominium Expenses at a rate of more than $151,666 per month or $1.819 million per year. The Residential Board has already specially assessed the Residents in the amount of $1.5 million to cover a portion of Urban Commons' share of the Shared Condominium Expenses for 2022. For every day that passes without Urban Commons curing these defaults, a new, irreparable injury to the Residents is imposed.

10. As of the Petition Date, the balance owed to the Residential Board is nearly $5 million. Without the DIP Loan or another post-petition financing alternative, the damage to the Residential Board to maintain the Hotel Unit will continue to mount and place an oppressive burden on the Residents or risk the untenable alternative of constructive eviction of the tenants.

7

**OBJECTION**

11.  The Residential Board supports the Debtors' Utilities Motion to the extent that it seeks to prevent the Utility Companies from terminating the Utility Services to the Hotel Unit and otherwise establishes mechanisms to provide the Utility Companies with adequate protection to avoid an interruption of Utility Services to the Hotel.  However, the Residential Board seeks clarification of a few points to be incorporated into interim or final orders with respect to the Utilities Motion.

12.  The Debtors represented in the Utilities Motion that they were seeking authorization to "enter into the DIP Credit Facility"; however, the Debtors' motion to approve the proposed DIP Loan was only recently proposed and is not yet approved by order of this Court. *See* Utilities Motion at p. 11.  If the DIP Loan is not approved, the Debtors will not be able to pay their post-petition obligations for the Utility Services or other ongoing expenses at the Hotel.  But the Debtors' lack of funds should not continue to force the Residential Board into a position of responsibility to pay the Debtors' post-petition obligations, as it was required to do pre-petition to avoid disruption in the Utility Services to the building.  The Residential Board also objects to the Utilities Motion to the extent the Debtors contemplate putting a new hotel operator in place, even on a short-term basis, but which does not satisfy the obligations of the Governing Documents for the type of operator required at the Hotel.

13.  The Hotel and Residences share common metering for certain Utility Services. Thus, any order entered by the Bankruptcy Court with respect to the Utilities Motion, should obligate the Debtors: (i) to provide adequate assurance to the Residential Board for post-petition utility costs, which, through the Petition Date, the Residents continue to fund on behalf of the Debtors; and (ii) to reimburse the Residents contemporaneously for such post-petition expenses

which the Residents are forced to pay on the Debtors' behalf to avoid a more catastrophic impact that may cause the Residences to be rendered uninhabitable.

14. Specifically, the Residential Board requests that this Court strike from any proposed order regarding the Utilities Motion, the following language as proposed in Paragraph 5 of the proposed order (Exhibit B), annexed to the Utilities Motion:

> Any third party, including the Condominium Board, that pays directly for Utility Services for the benefit of the Debtors pursuant to a nonresidential real property lease must continue paying for such Utility Services in the ordinary course of business and may not cease, reduce, delay, or otherwise interfere with the payment or delivery of such Utility Services, regardless of any nonpayment, deferral, or waiver of rent, or any defaults with respect to the applicable lease; provided that a landlord may cease payments on account of Utility Services following the effective date of the rejection of the applicable lease pursuant to section 365 of the Bankruptcy Code, if any.

*See* Utilities Motion at Ex. B, ¶ 5.

15. Additionally, this Court should not authorize any relief for the Debtors that sanctions the Debtors' continued failure to satisfy its obligations with respect to the Utility Services or otherwise, but also permits the Debtors to continue to make the Residential Board the involuntary financer of the Debtors' obligations.

16. However, the Residential Board should be given advanced notice of the Debtors' decisions with respect to the Utility Services at the Hotel on a reasonable basis. To the extent the Debtors place the entire Condominium at risk of a utilities shut off or termination, then the Residential Board will need to consider all available options to avoid further risk of vacate orders.

17. Moreover, since the Debtors proposed the Utilities Motion at the beginning of this case, the circumstances have changed, including those persons with decision-making authority for the Debtors. Management of the Debtors has now shifted from the Debtors to the CRO and the Independent Manager. Thus, any order approving the Utilities Motion should vest any

management or authority to make decisions on behalf of the Debtors with respect to the Utilities, any deposit accounts maintained by the Debtors for the utilities, or any procedures to address requests for adequate assurance, with the CRO and/or the Independent Manager in accordance with the corporate governance documents and the prior order of this Court. The Debtors' pre-petition management should not be placed in a position of authority, management, or decision-making with respect to any relief sought in the Utilities Motion, or any other post-petition issues.

## RESERVATION OF RIGHTS

18. The Residential Board expressly reserves its rights to seek further relief or to amend or supplement this Objection as new information becomes known to it or if there is a further change of circumstances. Nothing in this Objection shall be deemed an admission or waiver, nor shall it be deemed the testimony of anyone connected with the Residential Board with respect to the Utilities Motion or any of the issues, assertions or requests made therein, or any other issues or claims that may be raised or asserted by the Debtors, the CRO, the Independent Manager, or any other party in interest, against the Residential Board.

## CONCLUSION

This Court should deny the relief requested by the Debtors in the Utilities Motion to the extent that it: (i) would require the Residential Board to involuntarily fund the Debtors' post-petition obligations with respect to the Utility Services in the Hotel; (ii) fails to provide the Residential Board with reasonable notice to intervene in any situation or negotiations with the Utilities Companies that might place the Condominium at risk by interrupting or turning off the Utility Services in the Hotel; (iii) fails to vest all control, management and decision-making authority with respect to the Debtors in the hands of the CRO and/or Independent Manager; and/or

(iv) relies upon an unqualified and unauthorized hotel operator, even on a short term basis, to cover the cost of the Utility Services or any adequate protection deposits or payments.

Dated: New York, New York
December 20, 2022

          **KLESTADT WINTERS JURELLER SOUTHARD & STEVENS, LLP**

By: */s/ Tracy L. Klestadt*
Tracy L. Klestadt
Kathleen M. Aiello
200 West 41st Street, 17th Floor
New York, NY 10036
Tel: (212) 972-3000
Fax: (212) 972-2245
Email: tklestadt@klestadt.com
kaiello@klestadt.com

*Counsel to The Residential Board of Managers of the Millennium Point Condominium*