DAVIDOFF HUTCHER & CITRON LLP  
*Attorneys for the Debtors*  
605 Third Avenue  
New York, New York 10158  
(212) 557-7400  
Robert L. Rattet, Esq.  
Derek A. Wolman, Esq.  
Jonathan S. Pasternak, Esq.

*Hearing Date:*  
*January 12, 2023 @ 10:00 A.M.*

UNITED STATES BANKRUPTCY COURT  
SOUTHERN DISTRICT OF NEW YORK  
----------------------------------------------------------X  

| | |
|---|---|
| In Re: | Chapter 11 |
| URBAN COMMONS 2 WEST LLC, ET AL.,[1] | Lead Case No.: 22-11509 (PB) |
| Debtors. | (Jointly Administered) |

----------------------------------------------------------X

**DECLARATION OF CHIEF RESTRUCTURING OFFICER IN SUPPORT OF DEBTORS' APPLICATION FOR ORDER SEEKING AUTHORITY (1) TO OBTAIN CREDIT FROM AFFILIATE OF EXISTING FIRST PRIORITY LENDER SECURED BY LIENS ON PROPERTY OF THE ESTATE AND SUPER PRIORITY CLAIMS PURSUANT TO SECTIONS 364(c)(1) AND 364(d) OF THE BANKRUPTCY CODE, (2) FOR PRELIMINARY RELIEF PENDING FINAL HEARING, AND (3) TO MODIFY THE STAY TO PERMIT THE TURNOVER OF ESCROWED INSURANCE PROCEEDS TO PREPETITION LENDER ON ACCOUNT OF ITS PRE-PETITION FIRST PRIORITY LIEN THEREON PURSUANT TO SECTION 362(d)(1)**

---

[1] *Jointly administered with Urban Commons 2 West II LLC (Tax ID: \*\*-\*\*\*7987), Urban Commons 2 West III LLC (Tax ID: \*\*-\*\*\*3270), Urban Commons 2 West IV LLC (Tax ID: \*\*-\*\*\*8418), and Urban Commons 2 West Operating Tenant LLC (Tax ID: \*\*-\*\*\*0849), with a shared mailing address of 3334 East Coast Highway, No. 350, Corona Del Mar, CA 92625.*

1

**TO THE HONORABLE PHILIP BENTLEY,**
**UNITED STATES BANKRUPTCY JUDGE:**

The Declaration of Mark D. Podgainy, Chief Restructuring Officer of the above captioned debtors and debtors-in-possession (collectively, the "Debtors"), under penalties of perjury, hereby declares and states the following:

1. I am the Chief Restructuring Officer of the Debtors.

2. In connection with the making of this Declaration, I have carefully and thoroughly reviewed the Application and all of the exhibits attached thereto, as well as the Debtors' Response and Memorandum of Law in further support of the Application.

3. I have also, since the time of my appointment, been reviewing all of the financial and other historical information concerning the Debtors, their acquisition of the Hotel, their debt and equity structure and all agreements entered into by the Debtors prior to the Petition Date, to the extent made available to me.

4. I have also conducted an initial physical inspection of the Hotel and its current condition.

5. As such I possess sufficient information to permit me to make this Declaration under penalties of perjury.

6. I hereby submit this Declaration in support of entry of a final order granting the Debtors' Application ("Application")[2] pursuant to Sections 362, 363(c)(2) and 364(d) of the Bankruptcy Code (the "Code") and Bankruptcy Rule 4001(c) to the extent that this Application

seeks authority to (a) obtain credit from BPC DIP Lender, LLC ("BPC DIP Lender"), an affiliate of BPC Lender, LLC ("BPC Lender"), the Debtors' existing first priority secured lender, pursuant to the DIP Loan Term Sheet annexed hereto as Exhibit A (the "DIP Loan Term Sheet") and, in consideration of BPC DIP Lender providing a post-petition loan pursuant to the DIP Loan Term Sheet (the "DIP Loan"), granting BPC DIP Lender, subject only to the Carve-Out as defined in the DIP Loan Term Sheet, and to the extent advances are made under the DIP Loan, a first priority lien pursuant to Section 364(d) of the Code upon all of the Debtors' assets and a super-priority claim pursuant Section 364(c)(1) of the Code; (b) authorize the modification of the automatic stay under Section 362(d)(1) of the Code to permit the turnover of the Insurance Escrow (as defined below) to BPC Lender to be applied to the Prepetition Obligations.

7.     On or about November 15, 2022 (the "Petition Date"), each of the Debtors filed a voluntary petition for reorganization pursuant to Chapter 11 of the Bankruptcy Code (the "Code") and have been in continued possession of their business, management of their property and management of their affairs as debtors-in-possession pursuant to §§1107 and 1108 of the Code.

8.     No examiner or trustee has been heretofore appointed in said proceeding. The United States Trustee has recently appointed an Official Committee of Unsecured Creditors (the "Committee"), which has selected the law firm of Silverman Acampora LLP as its proposed counsel.

---

[2] Capitalized terms not otherwise defined herein shall have the meanings as set forth in the Application.

3

9. Pursuant to an order of this Court dated December 9, 2022, I was appointed as CRO ("CRO") of the Debtors and Bernard A. Katz as Independent Manager ("Independent Manager", or "IM") of the Debtors, with full, exclusive authority to act on behalf of and to bind the Debtors in these Chapter 11 Cases. This Motion is brought with the consent and direction of the CRO and IM, respectively.

10. The Debtors lease and hold the right to use and operate the hotel located at the Millennium Point Condominium located at 2 West Street, New York, New York 10004 (the "Hotel"). The Hotel is not currently operating. However, the Debtors continue to accrue post-petition obligations in connection with leasing the Hotel unit, including, inter alia, (a) lease and real estate tax related payments to Battery Park City Authority, the owner of the underlying land ("BPCA"), and (b) The Millennium Point Residential Condominium (the "Residential Board"), which shares the property with the Debtors and has been carrying various utility and maintenance related obligations for both the Residential Board and the Debtors since the Hotel went "dark" in early 2020.

11. The Debtors acquired the Hotel back in 2018 from Millennium Partners for the approximate purchase price of $154,000,000, of which $96,000,000 was financed through a purchase money secured loan issued by BPC Lender back to the Debtors. Copies of the relevant loan documents are annexed to the Application as Exhibits "B" through "D".

12. In 2021, BPC Lender was acquired by an investment firm known as Silver Creek.

13. All of the Debtors' assets are subject to the first priority liens and perfected security interests of BPC Lender who, as of the Petition Date, claims to be owed approximately $114 million plus pre-petition legal costs and other related fees.

14. In addition, there are several creditors of the Debtors who may assert a junior lien or security interest against the Hotel and/or the Debtors' assets. See Application, Exhibit "E". Notwithstanding, Declarant believes that all such liens and security interests are junior in priority to the liens and security interests of BPC Lender.

15. As the Court has been made aware, the Debtors, as of the Petition Date, had no cash on hand or current income to generate cash to pay for such ongoing administrative expense obligations. The Debtors need cash to pay for, inter alia, (a) insurance, (b) utilities, (c) the CRO and IM, (d) the Chapter 11 Professionals and (e) other ordinary and necessary expenses in order to pay all of their post-petition obligations and maintain the current condition of the Hotel pending the filing of a Plan and/or consummation of a sale, refinance, or other strategic transaction. In 2021, the Hotel experienced a water damage-related casualty resulting in mold infestation to portions of the Hotel. The loss was covered by the Debtor's carrier Sompo International ("Sompo"). The total casualty was adjusted in the insured aggregate amount of $13,409,097.67.

16. The mold remediation phase of the necessary repairs was completed and paid for from the above referenced insurance proceeds in 2021, leaving the Hotel with additional repairs to restore the Hotel and its furniture, fixtures and equipment to pre-loss condition, with an

estimated completion cost of approximately $5,600,000.

17. Sompo funded said amounts and placed said sum, along with an earned contingency fee of $1,407,676.20 in escrow with the Debtors' pre-petition insurance counsel, Gauthier, Murphy & Houghtaling LLC ("GM&H"). The contingency fee was paid to GM&H on consent of all parties on or about August 18, 2022. The current amount still being held in escrow is $5,592,323.80 (the "Insurance Escrow"). Pursuant to the Prepetition Loan Documents (defined in the DIP Term Sheet), Declarant agrees and acknowledges, on behalf of the Debtors, BPC Lender has a first priority perfected lien on and security interest in, inter alia, the Insurance Escrow, and that BPC Lender has the right to apply any insurance proceeds to their loan in their sole and unfettered discretion. See Mortgage and Security Agreement §§ 1.1 and 7.1, Application Exhibit D. In addition, Highgate Hotels, L.P. ("Highgate"), the Debtors' hotel operator at the time of the loss event, and ERJMJ Investments, LLP ("ERJMJ"), a lienholder junior in priority to the Lender, have or may assert interests in the Insurance Escrow. However, pursuant to the relevant escrow agreements and related documentation annexed to the Debtors' Response In Further Support dated December 21, 2022 (ECF Doc. 82; the Debtors' Response"), and as further set forth in the Debtors' Memorandum of Law in Support dated January 9, 2023 (ECF Doc. 101), (a) Highgate has no lien or security interest in, or right to payment from the Insurance Escrow, (b) the amount of the Insurance Escrow is substantially less than the debt owed to BPC Lender and, as I am advised by counsel, is therefore unsecured with respect to such property of the Debtors' estate and (c) Highgate's attempt to exercise control over the Insurance

Escrow is violative of the automatic stay provided under Section 362(a)(3) of the Bankruptcy Code.

18. At the onset of my appointment, BPC DIP Lender indicated to myself and the Independent Manager that it would be interested in making a DIP loan to the Debtors but only if, inter alia, the Insurance Escrow was released to BPC Lender to be applied to the Prepetition Indebtedness.

19. I understand that, pursuant to the Prepetition Loan Documents, absent BPC Lender's consent, the Insurance Escrow may not be used for any other purpose, including the completion of the construction arising from the mold remediation.

20. I have inspected the Hotel property and have consulted with The Independent Manager and the Debtors' proposed real estate consultants and have determined and concluded, in my business judgment, that (a) even if the construction repairs are made, the Hotel may not be in suitable and acceptable condition as required prior to operation of the Hotel under the strict quality standards required under the Land Lease and the Hotel Unit Lease/Sublease, (b) the Debtors could not otherwise use the Insurance Escrow for ordinary and necessary operating costs and administrative expenses in the Chapter 11 cases, (c) BPC DIP Lender is not willing to make the necessary DIP Loan needed to pay for such necessary expenses unless the Insurance Escrow is released to BPC Lender and applied to the Prepetition Indebtedness, and (d) the Debtors, despite having received informal interest or proposals from at least three other sources of funding, have been unable to obtain a commitment from any other sources of DIP financing on

7

any less stringent terms than being offered under the DIP Loan and/or that would not result in an objection from, inter alia, BPC Lender under a forced "priming" scenario, with the anticipated contested litigation and other potential adverse consequences of such a contested proceeding.

21.    Accordingly, I have determined, after consultation with the Independent Manager, in my independent business judgement, that obtaining DIP financing from BPC DIP Lender on the terms and conditions set forth in the DIP Loan Term Sheet provides the estates with the best chance to maximize a return to creditors in the Chapter 11 cases and is therefore in the best interests of creditors, and that absent obtaining the DIP Loan from BPC DIP Lender, which can only occur if the Insurance Escrow is released to BPC Lender to apply toward the Prepetition Indebtedness, the Chapter 11 cases are likely to be forced into Chapter 7 and a forced liquidation. To the contrary, the DIP Loan facility affords the Debtors a chance to maximize value and/or restructure their affairs under a Plan.

22.    As referred to above, since the onset of the Chapter 11 cases, I along with the Independent Manager and Debtors' counsel, conducted arms' length negotiation with BPC Lender, BPC DIP Lender and their counsel concerning (a) the disposition of the Insurance Escrow, (b) the Debtors' need for debtor-in-possession financing and (c) a consensual plan of action in the Chapter 11 cases.

23.    These discussions intensified upon my appointment and, as a result of an arms' length, good faith negotiation, BPC DIP Lender has agreed to provide, subject to and upon the terms set forth in the DIP Loan Term Sheet and the Budgets annexed thereto, DIP financing to

the Debtors for an approximate 4 month period, subject to an agreed upon budget and other conditions, all as set forth in the budgets and term sheet annexed to the Application, which will provide the Debtors with badly needed cash to pay for its ongoing administrative and professional expenses pending a marketing and strategic transaction process to be approved by the Court upon further application and motion.

24. Annexed to the Application as Exhibit "A" is the DIP loan term sheet negotiated between the Debtor and the Parties ("DIP Term Sheet").

25. I was fully involved in the negotiation and execution of the DIP Term Sheet. I also negotiated and prepared the DIP Budgets annexed to the DIP Loan Term Sheets as Exhibits A-1 and A-2.

26. The DIP Term Sheet was negotiated in good faith and arms' length between me and the Independent Manager on behalf of the Debtors on the one hand, and BPC DIP Lender on the other hand.

27. The DIP Term Sheet represents an exercise of my reasonable business judgment, and I believe the DIP Term Sheet provides the best possible opportunity for the estates to maximize the value of their assets while permitting the Debtors to meet their essential and necessary obligations in Chapter 11.

28. The DIP Budgets were the product of my thorough analysis and understanding of all of the ordinary, necessary and essential expenses the Debtors are incurring in Chapter 11. I hereby submit that the DIP Budgets are complete and accurate as to such ordinary and necessary expenses

to the best of my information and belief, subject to modification or adjustment for particular expense items and to further information provided to me by third parties.

29. For the reasons set forth above, there is no possibility that any lender would make post-petition loan advances with simply either an unsecured, junior administrative priority provided by Section 503(b)(1) of the Code or a junior lien provided by Section 364(c)(3) of the Code. In addition, the Debtors have no unencumbered assets. Therefore, I believe that the proposed terms set forth in the DIP Loan Term Sheet regarding the providing of super-priority claims and liens to BPC DIP Lender are fair, reasonable and in the nest interests of the Debtors and their estates.

30. I also believe, after consultation with Debtors' proposed real estate consultants, and based on my significant experience in managing or providing consulting services in connection with distressed assets and, in particular, hotels, that the Milestones set forth in the DIP Loan Term Sheet, subject to extension of the sale closing date from 9 days to 30 days as provided for in the proposed final order submitted to the Court (ECF Doc. 103) are reasonable and will permit enough time for a proper and thorough marketing process of the Hotel and related assets. I also believe that arbitrarily extending the Milestones would leave the estates with insufficient funds to continue to pay ongoing administrative expenses beyond the time periods proscribed therein.

31. Accordingly, I believe it is a reasonable exercise of my business judgement to have the Debtors agree to the Milestones, which Milestones are also another necessary and material condition of BPC DIP Lender's willingness to make the DIP Loan.

32.     I further believe that BPC DIP Lender has acted in good faith in connection with the DIP Loan Term Sheet, which document was the product of an arms' length, good faith negotiation and was not obtained by any means contrary to or forbidden by law.

33.     As a result of the foregoing statements and representations, for which I am prepared to testify under oath at the Final Hearing, I respectfully submit that good and sufficient cause exists for the granting of the Application on a final basis in accordance with the Final Order submitted to the Court, and that the relief requested in the Application is in the best interests of the Debtors and their creditors and their estates as a whole.

34.     In the event that the Court were not to approve the Application, I do not see a pathway for the Debtors to continue, let alone succeed, in Chapter 11 and further believe that the Chapter 11 cases, if converted to Chapter 7, would result in a materially diminished return to creditors, material harm to the residential condominium and its owners, and an overall devaluation of the estates. Accordingly, in my reasonable business judgment, the DIP Loan arrangement is the best and only possible recourse to preserve and maximize the Debtors' estates in Chapter 11 and strongly support approval of the Application on a final basis.

**WHEREFORE**, your Declarant respectfully submits the foregoing under penalties of perjury and respectfully requests (a) the Court grant all of the relief sought in the within Application on a final basis, together with such other and further relief as is just and proper under the circumstances.

Dated:  New York, New York
January 9, 2023

*/s/ Mark D. Podgainy*
MARK D. PODGAINY