DAVIDOFF HUTCHER & CITRON LLP
*Attorneys for the Debtors*
605 Third Avenue
New York, New York 10158
(212) 557-7400
Robert L. Rattet, Esq.
Derek A. Wolman, Esq.
Jonathan S. Pasternak, Esq.

*Hearing Date:*
*February 9, 2023 @ 2:00 P.M.*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X
In Re:

URBAN COMMONS 2 WEST LLC, ET AL.,[1]

Debtors.

--------------------------------------------------------X

Chapter 11

Lead Case No.: 22-11509 (PB)
(Jointly Administered)

## DEBTORS' MOTION SEEKING ENTRY OF: (I) SALE PROCEDURES ORDER (A) APPROVING BIDDING PROCEDURES, (B) SCHEDULING AUCTION AND SALE APPROVAL HEARING; AND (II) SALE APPROVAL ORDER (A) AUTHORIZING (I) THE SALE OF ALL OF THE DEBTORS' REAL PROPERTY AND LEASEHOLD INTERESTS AND ASSIGNMENT OF HOTEL UNIT LEASE AND SUBLEASE FREE AND CLEAR OF ALL LIENS, CLAIMS INTEREST AND ENCUMBRANCES, (II) REJECTING FRANCHISE AND OWNER AGREEMENTS WITH MARRIOTT INTERNATIONAL, INC. AND (III) GRANTING THE SUCCESSFUL <u>BIDDER GOOD FAITH STATUS</u>

---

[1] *Jointly administered with Urban Commons 2 West II LLC (Tax ID: **-***7987), Urban Commons 2 West III LLC (Tax ID: **-***3270), Urban Commons 2 West IV LLC (Tax ID: **-***8418), and Urban Commons 2 West Operating Tenant LLC (Tax ID: **-***0849), with a shared mailing address of 3334 East Coast Highway, No. 350, Corona Del Mar, CA 92625.*

1

TO:    THE HONORABLE PHILIP BENTLEY,
       UNITED STATES BANKRUPTCY JUDGE:

Urban Commons 2 West LLC, et al., the above captioned reorganized debtors (collectively,

"Debtors"), by their attorneys, Davidoff Hutcher & Citron LLP, hereby file this motion ("Motion")

pursuant to sections 105(a) and 363(b), (f) and (m) and 365of title 11 of the United States Code, 11

U.S.C. §§ 101, et seq., as amended by the Bankruptcy Abuse Prevention and Consumer Protection

Act of 2005 (the "Bankruptcy Code"), Rules 2002(a)(2), 6004 and 9007 of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules") and Rules 2014-1 and 6004-1 of the Local Rules for

the United States Bankruptcy Court for the Southern District of New York (the "Local Rules") and

Administrative Guideline Order GM-331 for the United States Bankruptcy Court for the Southern

District of New York, for entry of the following order:

**Sale Procedures Order** substantially in the form annexed hereto as **Exhibit A**):

(i) establishing bidding procedures, annexed hereto as **Exhibit B,** to govern the

auction sale (the "Sale") of the Debtors' interests in (a) the Ground Lease (as

defined herein), (b) the Hotel Unit Lease (as defined herein), (c) the Hotel Unit

Sublease (as defined herein), and other related documents concerning the Hotel

Unit located at 2 West Street, New York, New York 100004 (collectively, the

"Hotel Lease Interests"); (ii) scheduling an auction to sell the Hotel Lease

Interests in accordance with the Bidding Procedures and subject to higher and

better bids (the "Auction"); and (iii) scheduling a hearing to approve (a) the Sale

of the Hotel Lease Interests in accordance with the results of the Auction (the

"Sale Hearing"), (b) authorizing and directing the sale of the Hotel Lease

Interests free and clear of all liens, claims, interests and encumbrances of any

2

kind pursuant to Section 363(b) and (f) of the Bankruptcy Code, (c) affording the successful purchaser at Auction good faith purchaser status and protections as provided under Section 363(m) of the Bankruptcy Code, and (d) rejection of the Franchise Agreement and Owner Agreement between the Debtors and Marriott International, Inc. ("Marriott") pursuant to Section 365 of the Bankruptcy Code.

## JURISDICTION AND VENUE

1.      The Court has jurisdiction over this Application pursuant to 28 U.S.C. §§ 157 and 1334. Consideration of the Application is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A).

2.      Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      This proceeding has been initiated pursuant to Bankruptcy Code §§ 105(a), 363(b), (f) and (m), 503, 507, Bankruptcy Rules 2002(a)(2), 6004 and 9007 and Local Rules 2014-1 and 6004-1.

**Background**

4.      On November 15, 2022 (the "Petition Date"), the Debtors each filed a voluntary petition for reorganization pursuant to Chapter 11 of the Bankruptcy Code. The Debtors have continued in possession of their property and the management of their business affairs as debtors-in-possession pursuant to §§1107 and 1108 of the Bankruptcy Code.

5.      An Official Committee of Unsecured Creditors has been appointed and has retained Silverman Acampora, P.C. as its counsel. No trustee or examiner has been appointed.

6.      As set forth in (a) the Debtors' Rule 1007 Declaration and (b) the Debtors' Application for Authority To Obtain Debtor In Possession Financing, the Debtors were opportunistic real estate developers.

3

**The Hotel Lease Interests**

7.      On January 1, 2000, Millennium BPC Development, LLC ("Millennium BPC"), as tenant, entered into a ground lease (the "Ground Lease") with Battery Park City Authority (the "BPCA"), as the landlord, to develop a mixed-use condominium building in Battery Park City known as the Millennium Point Condominium (the "Condominium"), located at 2 West Street, New York, New York 10004 (the "Property"). Pursuant to the Ground Lease, the Condominium was to contain both a 14-story commercial portion, consisting of a Hotel ("Hotel" under a "Hotel Lease") and a museum, and a separate 30-story residential portion.

**8.**      The Ground Lease was subsequently assigned to Millennium BPC as a landlord, and BPCA as lessee, on January 1, 2000, pursuant to the Hotel Unit Lease and Hotel Unit Sublease dated January 1, 2000 between BPCA as sublessor and Millennium BPC as sublessee (the "Hotel Sublease", the "Hotel Sub-Sublease" and together with the Hotel Unit Lease, Ground Lease and related assignment and other documents, the "Hotel Lease Interests"). See **Exhibits C-1 through C-14.**

9.      By their express terms, the Hotel Lease and Hotel Sublease transferred all the Ground Lease rights and obligations relating solely to the Hotel into the Hotel Until Lease and Hotel Unit Sublease.

10.      On August 3, 2001, the Millennium Point Condominium entered into a condominium form of ownership. By operation of the terms of Section 43.01 of the Ground Lease, the Condominium Board became the successor-in-interest to Millennium BPC and thus the tenant.

11.      The offering plan provided for a hotel on floors 1-14 and residential apartments on floors 15-39, and provided that the hotel would be operated by the Ritz Carlton Hotel

4

Company, LLC ("Ritz Carlton"). To facilitate this hybrid residential/commercial condominium, three boards of managers were designated to manage the Condominium: (i) the Residential Board of Millennium Point (the "Residential Board") to handle matters solely affecting the residential units, (ii) the Commercial Board of Millennium Point (the "Commercial Board") to handle matters solely affecting the commercial unit, and (iii) the Condominium Board of Millennium Point (the "Condo Board") to handle matters that concern both the residential and commercial units.

12.    The Ground Lease (Exhibit C-1) and the Hotel Operator Management Agreement (which is incorporated into the Ground Lease) sets forth certain requirements and standards which govern the operation and management of the hotel (collectively, the "Hotel Requirements").

13.    Specifically, Section 23.05(a) of the Ground Lease ("Sec. 23.05") provides:

a)    Tenant shall cause the Hotel to be operated by the Hotel Operator only as a hotel with the highest rating by a nationally recognized hotel rating service (e.g., Mobil or Triple A) taking into account the age of the Hotel assuming a first-class repair and restoration program under a hotel brand, flag or franchise approved at the sole discretion of Landlord…. In addition, for as long as compliance with the rating requirement in the first sentence of this Section 23.05(a) is maintained, any other nationally recognized brand, flag or franchise that is equal or better in quality of service and furnishings than those standards set forth in the Hotel Operator Management Agreement … is approved.

14.    In turn, Section 2.9, "Standards of Operation and Care" of the Hotel Operator Management Agreement ("Sec. 2.9") provides:

a)    Operator's operation of the Hotel shall at all times maintain standards of quality as a luxury hotel not less than those generally prevailing from time to time in other five-star hotels operated by Ritz-Carlton in urban areas, in all respects, including the following: cleanliness, quality of service to guests, quality of food and beverages, and quality of silverware, tableware and glassware. In determining the Hotel's standards, the standards of quality at The Ritz-Carlton, San Francisco, CA (or such other hotel as Owner and Operator agree, if the San Francisco, CA hotel ceases to be operated as a Ritz-Carlton hotel), shall constitute the primary standards of reference, and regional variations shall be

5

taken into account.

    In fulfilling its obligations hereunder. Operator shall act as a reasonable and prudent operator of the Hotel, having regard to the luxury status of the Hotel. Operator agrees that the hotels it operates that are members of Leading Hotels shall not be operated in such a manner, number or location as to cause a diminution in the image or reputation of the Leading Hotels. As a material inducement to the execution of this Agreement by Owner, Operator agrees to maintain and preserve the Ground Lease Standards and quality of the Leading Hotels guest experience as it is known to exist as of the date hereof in Leading Hotels and shall continue to improve and implement training programs to educate staff and personnel as to the Leading Hotels sensory experience and Leading Hotels philosophy.

15.    Up until March 29, 2018, the Hotel was operated by Ritz Carlton under the Ritz-Carlton brand pursuant to the Hotel Operator Management Agreement. As a result of the Hotel suffering millions of dollars in operating losses under the management and brand of the Ritz-Carlton, the Plaintiffs' predecessor in interest, MPE Hotel I (Downtown New York) LLC and MPE Hotel I Tenant (Downtown New York) LLC (collectively, "Predecessors") terminated and replaced Ritz Carlton, as the hotel operator.

16.    On November 15, 2017, the Predecessors informed BPCA of their plans to (i) enter into a new Hotel Operator Management Agreement with Highgate Hotels, L.P. ("Highgate") as the hotel operator and (ii) change the brand of the Hotel to The Leading Hotels of the World, Ltd. ("LHW") under the name The Wagner at Battery Park ("Wagner") (the "Transition").

17.    On March 29, 2018, the Transition became effective and soon thereafter, Highgate was operating the Hotel under the LHW brand as the Wagner.

18.    On September 20, 2018, the Debtors acquired from the Predecessors, the Hotel Lease Interests for the purchase price of $147 million, secured by a purchase mortgage from Westbrook, through BPC Lender, LLC ("BPC Lender") in the amount of $96 million, with the

6

remaining balance paid in cash by the Debtors though a capital raise with their various investors.

19.    This acquisition resulted in the Debtors' current interests in the Hotel Lease Interests as an assignee of the Predecessors, with BPCA as the primary lessor/sublessor.

20.    Upon acquisition, the Debtors' first order of business was to try and rebrand the Hotel from the Wagner to an internationally recognized brand.

21.    To that end, the Debtors attempted to negotiate a franchise and owner agreement with Marriot, subject to obtaining BPCA's approval for the change in brand.

22.    On December 5, 2019, the Debtors entered into two contracts with Marriot, dated December 5, 2019, to wit, (a) an owner agreement (the "Owner Agreement"), and (b) a franchise agreement (the "Franchise Agreement") (collectively, the "Marriott Contracts"). Under the Marriot Contracts, the Debtors were granted by Marriot a limited, non-exclusive license to use Marriot's proprietary marks and system to operate the Hotel for a term of 30 years starting at the proposed opening deadline of October 1, 2022. Copies of the Marriot Contracts are annexed hereto as **Exhibit E.**

23.    Due to a failure to obtain consent from BPCA for their plans to rebrand the Hotel and the onset of the Covid 19 Pandemic, the Debtors were never able to effectuate the Marriott Contracts and believe they were void and no longer valid or enforceable.

24.    Although the Debtors believe the Marriot Contracts are no longer in force and effect, Marriot maintains it never affirmatively terminated them as required in the agreements. Notwithstanding the Debtors believe that the Marriot Contracts are not assignable. Therefore, the Marriot Contracts, to the extent that they are executory, will be rejected as part of the Sale process.

25.    On December 30, 2020, the loan from BPC Lender matured with no additional extensions available under the loan documents.    BPC Lender afforded sixteen separate

7

amendments to the loan documents over a two-year period, further extending maturity to accommodate the Debtors.

26.    On or about April 1, 2021, after continued noticing the Debtors, BPC Lender served the Debtors with a notice of default under the Loan Documents.

27.    On or about March 1, 2022, BPCA served the Debtors with a notice of default related to Debtors' failure to pay Hotel Base Rent, Payments in Lieu of Taxes ("PILOT"), Hotel Percentage Rent, Supplemental Hotel Base Rent, and Civic Facilities Payments. BPCA gave Debtors' until March 18, 2022 to cure such defaults.

28.    On or about May 9, 2022, BPCA served the Debtors with a notice of termination (the "Notice of Termination"), threatening to terminate the Ground Lease on June 28, 2022, unless alleged defaults were cured by Debtors on or before May 27, 2022 (the "Cure Deadline").

29.    On or about November 2, 2022, BPC Lender filed an action in N.Y. State Supreme Court to foreclose its interest as mortgagee in the Property owned by Debtors.

30.    After the State Court's decision and order denying the Debtors' motion for a Yellowstone injunction, and the Debtors' failure to comply under the 1st Dept's decision, the Debtors ultimately filed the Chapter 11 Cases in an attempt to preserve the value of their interests in the Hotel Lease Interests.

31.    Pursuant to an order of this Court dated December 9, 2022, Mark D. Podgainy has been appointed as CRO ("CRO") of the Debtors and Bernard A. Katz as Independent Manager ("IM") of the Debtors, with full, exclusive authority to act on behalf and bind the Debtors in the Chapter 11 Cases. This Motion is brought on the consent and direction of the CRO and IM, respectively.

32.    All of the Debtors' assets are subject to the first priority liens and perfected security interests of BPC Lender who, as of the Petition Date, are owed at least $116 million plus pre-petition legal costs and other related fees.

33.    In addition, there are several creditors of the Debtors who may assert a junior lien or security interest against the Hotel and/or the Debtors' assets. Notwithstanding, all such liens and security interests are junior in priority to the liens and security interests of BPC Lender.

34.    Due to the lack of funds and cessation of operations for several years, on December 19, 2022, the Debtors filed a motion (the "DIP Motion") seeking authority to (a) obtain credit from BPC DIP Lender, LLC ("BPC DIP Lender") in consideration of BPC DIP Lender providing a post-petition loan pursuant to the DIP Loan Term Sheet (the "DIP Loan"), granting BPC DIP Lender, subject to the Carve-Out and terms defined in the DIP Loan Term Sheet, and to the extent advances are made under the DIP Loan, a first priority lien pursuant to Sections 364(d) and 364(c)(2) of the Bankruptcy Code upon all of the Debtors' assets and a super-priority claim pursuant Section 364(c)(1) of the Bankruptcy Code; and (b) authorize the modification of the automatic stay under Section 362(d)(1) of the Bankruptcy Code to permit the turnover of the Debtors' insurance escrowed proceeds to BPC Lender to be applied to its prepetition obligations.

35.    The DIP Loan requires the compliance of certain milestones in commencement with a marketing and sale process of the Hotel Lease Interests, including the requirement to file this instant Motion by January 24, 2023, and, subject to extension by BPC DIP Lender, conduct an auction no later than April 21, 2023.

36.    On January 16, 2023, the Court entered an Order approving the Debtors' DIP Motion (the "Final DIP Order"), and the Debtors therefore are now required to file the instant Motion to establish sale procedures and conduct an auction of the Hotel Lease Interests.

9

37.    To that end, the Debtors have selected and retained under Court authority, Rosewood Realty Group ("Rosewood") and Newmark & Company Real Estate, Inc. ("Newmark") as their real estate advisors and brokers (collectively, the "Brokers").

**Secured Claims Against the Hotel Lease Interests**

38.    <u>Statutory Liens</u> – The Debtors may be indebted to the City of New York for unpaid real estate taxes in an amount currently unknown.[2]

39.    <u>BPC DIP Lender</u> – Pursuant to the Final DIP Order, BPC DIP Lender has an allowed first priority secured claim pursuant to section 364(d)(1) of the Bankruptcy Code in respect of all DIP Obligations, including the budgeted DIP Loan amount of up to $6,046,157.00, plus interest, costs, and fees thereon.

40.    <u>BPC Lender LLC</u> - On or about September 20, 2018, BPC Lender an affiliate of BPC DIP Lender made a loan to the Debtors in the original principal amount of $96,000,000.00 (the " Prepetition Loan"). The terms of the Prepetition Loan are set forth in a Loan Agreement dated as of September 20, 2018 (the "Prepetition Loan Agreement"). On or about September 20, 2018, in order to evidence the indebtedness under the Prepetition Loan, the Debtors executed and delivered to BPC Lender a certain Promissory Note (the "Note"), dated September 20, 2018, in which the Debtors promised to pay BPC Lender the principal sum of $96,000,000.00, plus interest at the rate set forth in the Prepetition Loan Agreement. To secure repayment of all amounts due to BPC Lender under the terms of the Note, the Debtors executed and delivered to BPC Lender a Mortgage and Security Agreement (the "Mortgage"), in the original principal amount of $96,000,000.00, dated as of September 20, 2018. The Mortgage was duly recorded on October 5, 2018, in the Register's Office in CRFN

---

[2] The PILOT payments due to BPCA may also be considered statutory liens; however, these liens are being treated for purposes herein as rent related claims and their treatment is covered under the BPCA cure claim amounts section below.

2018000332622, and the recording tax thereon was duly paid.

41.     As of the Petition Date, the Debtors were justly and lawfully indebted and liable to the BPC Lender, without defense, counterclaim or offset of any kind, in the aggregate outstanding amount of not less than $116,000,000[3], which amount includes, as of the Petition Date, outstanding principal balance and accrued interest of $112,419,250.84 (as defined in the Prepetition Loan Documents) (all of the foregoing collectively, together with accrued and unpaid interest, any fees, expenses and disbursements (including attorneys' fees, accountants' fees, auditor fees, appraisers' fees and financial advisors' fees, and related expenses and disbursements), treasury, cash management, bank product and derivative obligations, indemnification obligations, guarantee obligations, and other charges, amounts and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of the Debtors' or the Guarantors' obligations pursuant to, or secured by, the Prepetition Loan Documents, including all Obligations (as defined in the Prepetition Loan Documents, and all interest, fees, prepayment premiums, early termination fees, costs and other charges, the "Prepetition Debt").

42.     Prior to the Petition Date, the Debtors granted to BPC Lender a first priority security interest in and continuing lien (the "Prepetition Liens") on all of the assets and property of the Debtors that existed as of the Petition Date, including the Hotel Lease Interests.

43.     ERJMJ Investments, LP – On April 12, 2021, ERJMJ Investments, LP ("ERJMJ") filed a UCC-1 lien against all of the Debtors and their assets. However, the Debtors have not been able to identify any documents executed by the Debtors in the capacity as obligors and believe this may instead be an obligation of the Debtors' interest holders. ERJMJ's lien is therefore subject to bona fide dispute.

---

[3] BPC Lender received insurance escrow proceeds in conjunction with BPC DIP Lender providing the DIP Loan.  The amount of approximately $5.6 million is to be applied to the Prepetition Debt.

44.    <u>Tax Warrants</u> – Pursuant to various pre-petition sales tax warrants against the Debtors, Urban Commons 2 West Operating Tenant LLC, New York State asserts liens against said Debtors and therefore, the Hotel Lease Interests in the amount of $453,183.18.

45.    <u>Various Mechanic's Liens</u> – Three mechanic's liens belonging to 1) Kone Inc., in the amount of $76,212.50, 2) Matco Service Corporation, in the amount of $9,824.23, and 3) Wimberly Allison Tong & Goona, Inc., in the amount $85,096.71 have been filed against the Debtors and their Hotel Lease Interests. To the extent these liens have not expired by law, these liens may constitute valid junior liens on the Hotel Lease Interests.

## Cure Claim Amounts

46.    BPCA claims it is owed on account of pre-petition monetary defaults under the Ground Lease, assigned to the Debtors in the approximate amount of $14,000,000.00. The Debtors filed a pre-petition lawsuit against BPCA in New York County Supreme Court styled as *Urban Commons 2 West LLC et al v. Battery Park City Authority dba The Hugh L. Carey Battery Park City Authority et al* (Index No. 656505/2022. In this lawsuit the Debtors assert approximately $75,000,000 in breach of contract damages against BPCA. Notwithstanding BPCA is likely to assert that the Debtors' claims may not be set off against any monetary cure amounts due to BPCA under the Ground Lease.

## Marketing Efforts

47.    According to the Debtors' prior management, the Debtors have been actively marketing the Hotel Lease Interests since no later than 2021. In that year alone, prior management claims to have received numerous expressions of offers of interest in the Hotel Lease Interests and has provided copies of the letters of interest to the Brokers, and the Debtors' CRO and counsel.

48.     Since the commencement of the Chapter 11 Cases, the Debtors have engaged Rosewood and Newmark as their Brokers for the sale contemplated herein. The Brokers and their principals have extensive experience representing sellers and debtors in this Court while achieving successful results for numerous bankrupt estates, including other hoteliers.

49.     Pursuant to the terms of their engagement, the Brokers shall be entitled to compensation of $600,000 in the event of a credit bid by BPC Lender and/or BPC DIP Lender, and for all other bidders a 1.5% buyer's premium incentive fee.

50.     It is contemplated by the Debtors, in consultation with the Brokers and pursuant to the DIP Loan Term Sheet, that the Hotel Lease Interests will be marketed for the next approximate 70 days prior to an Auction, and that the Debtors may, subject to approval by BPC Lender, after consultation with the Consulted Parties (defined below), select a "stalking horse" offer(s) prior to the Auction, with such stalking horse to receive no greater than a 1% "break-up" fee, with such fee to be paid from the proceeds of sale to the ultimate successful bidder(s).

51.     In the event that no stalking horses are obtained prior to the Auction, the Debtors, after consulting with the Consulted Parties (defined below), shall have the right to require a minimum opening bid for the Hotel Lease Interests.

## RELIEF REQUESTED

52.    By this motion, the Debtors are seeking entry of the Sale Procedures Order, substantially in the form annexed hereto as **Exhibit A**.

## I.    The Sale Procedures Order

### A. The Proposed Bidding Procedures

53.    The Sale of the Hotel Lease Interests are subject to higher and/or better offers. In order to ensure that the highest and best offer is received for the Hotel Lease Interests, the Debtors have established the proposed Bidding Procedures to govern the submission of competing bids at an Auction. Accordingly, the Debtors seek this Court's approval of the Bidding Procedures set forth in **Exhibit B** and incorporated herein in their entirety.

54.    The Bidding Procedures provide that bidders submit initial overbids to either (a) a stalking horse offer or (b) the minimum opening bid as established by the Debtors subject to approval by BPC Lender, after consultation with counsel to the Official Creditors Committee, the Residential Board, and BPCA (collectively, with BPC Lender and BPC DIP Lender, the "Consulted Parties"), with each subsequent higher and better offer being in increments of not less than $100,000each.

55.    All bids submitted for the purchase of the Hotel Lease Interests shall remain open, and all deposits held in the attorney escrow account of the Debtors' counsel until the sale of the Hotel Lease Interests to the Successful Bidder is consummated. In the event that a Successful Bidder is unable to close on the sale of the Hotel Lease Interests, the next highest and/or best bidder (the "Backup Bidder") will then be required to consummate on the sale of such Hotel Lease Interests.

### B. <u>Bidder Qualification</u>

56.    In order for a potential purchaser of the Hotel Lease Interests to qualify as a Bidder, the Debtors propose that the purchaser's Competing Bid must be received no later than April 21, 2023, at 5 p.m. (the "Bid Deadline"). To be considered a Qualified Competing Bid, each Competing Bid must comply with all of the following requirements:

(a)    it is in writing and is irrevocable through a closing of the sale of the Hotel Lease Interests;

(b)    it includes a duly authorized and executed purchase and sale agreement, in a form acceptable to the Debtors and a marked copy of the proposed order to approve the Sale by the Bankruptcy Court which is annexed hereto as **Exhibit D**;

(c)    it includes written evidence of a firm, irrevocable commitment for financing, or other evidence of ability to consummate the proposed transaction, that will allow the Debtors to make a reasonable determination as to the Bidder's financial and other capabilities to consummate the transaction contemplated by the purchase and sale agreement;

(d)    it includes evidence of prior experience in owning or operating a hotel;

(e)    it is not conditioned on any contingencies, such as, without limitation: (i) the outcome of unperformed due diligence by the Bidder, and/or (ii) obtaining financing;

(f)    it includes an acknowledgement and representation that the Bidder: (i) has had an opportunity to conduct any and all required diligence regarding the subject property prior to making its offer; (ii) has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Hotel Lease Interests in making its bid; (iii) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express or implied (by operation of law or otherwise), regarding the Hotel Lease Interests or the completeness of any information provided in connection therewith or the Auction; and (iv) is not entitled to any expense reimbursement or break-up fee in connection with its bid;

(g)    it includes evidence, in form and substance reasonably satisfactory to the Debtors, after consulting with the Consulted Parties, of authorization and approval from the Bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery, and closing of the Marked Agreement; and

15

(h)     it is accompanied by a good faith deposit in the form of a wire transfer (to a bank account specified by the Seller), certified check or such other form acceptable to the Seller, payable to the order of the Seller (or such other party as the Seller may determine) in an amount equal to 10% of the Bid.

Annexed hereto as Exhibit B, are the complete Bidding Procedures.

57.     For the avoidance of doubt, and notwithstanding the foregoing, any credit bid(s) submitted by BPC Lender and/or BPC DIP Lender shall be a Qualified Competing Bid.

58.     The Debtors believe that the Bidding Procedures are fair and reasonable and will permit all parties truly interested in acquiring the Property an opportunity to submit a bid that can be weighed or compared against other competing offers.

### C.    The Proposed Bidding Procedures Are Adequate and Should Be Approved

59.     In determining whether bidding procedures governing the sale of a debtor's property are adequate, courts have consistently deferred to the debtor's business judgment for their specific industry. *See, In re Integrated Resources, Inc.*, 147 B.R. 650, 656-57 (Bankr. S.D.N.Y. 1992) (holding that where overbid procedures are negotiated by the chapter 11 debtor, the business judgment rule applies and said procedures are "presumptively valid").

60.     Furthermore, the purpose of bidding procedures is to solicit the highest and best bid, which would in turn best benefit the creditors. *In re Financial News Network Inc.*, 980 F.2d 165 (2nd. Cir., 1992) (stating that the bankruptcy court's principal responsibility relating to bidding procedures that govern sale is to secure best possible bid for benefit of creditors).

61.     Thus, courts deem appropriate those bidding procedures intended to maximize the value of the debtor's estate. *See, e.g., Financial News*, 980 F.2d at 170-71 (allowing bidder to

supplement one of two bids for Chapter 11 debtor's property after bidding was closed since the revision was consistent with both rules by which particular auction was being conducted and reasonable expectations of bidders); *Integrated Resources*, 147 B.R. at 656-57.

62.     The Debtors believe that the Bidding Procedures proposed will additionally procure serious parties interested in acquiring the Hotel Lease Interests and will result in realizing the full value of the Hotel Lease Interests. The Bidding Procedures are designed to facilitate a competitive bidding process in an expeditious manner, especially in light of the fact that the Debtors have significant time constraints to sell and close under the DIP Loan Terms. The Bidding Procedures will allow the Debtors to conduct the Auction in an open fashion that will encourage participation from those bidders that demonstrate they are financially capable to consummate the transaction.

63.     The Debtors believe, in their business judgment, that the Bidding Procedures are adequate and will result in maximizing the value of the Hotel Lease Interests and are therefore appropriate under the relevant standards governing auction proceedings.

**D. The Proposed Form and Manner of Notice of Sale is Adequate**

64.     Bankruptcy Rule 2002(a) and (c) requires the Debtors to notify creditors of the proposed sale of the Hotel Lease Interests, including the date, time and place of the Auction, terms of the Sale, and the deadline for filing any objections.

65.     The Debtors propose to comply with these requirements by serving via first class mail within three (3) days of entry of the Sale Procedures Order copies of: (i) Sale Procedures Order; (ii) Bidding Procedures; and (iii) this Motion.

66.    The Debtors propose to serve the following parties: (i) the Office of the U.S.

Trustee; (ii) counsel to BPC Lender; (iii) counsel to BPC DIP Lender; (iv) counsel to the

Creditors Committee; (v) counsel to the Residential Board; (vi) counsel to BPCA; (vii) all taxing

authorities; (viii) all known creditors, whether disputed, unliquidated or contingent, of the

Debtors; i(x) all entities known or reasonably believed to have asserted a lien, claim, interest, or

encumbrance in the Hotel Lease Interests; (x) all potential buyers known by the Debtors as

having previously expressed interest in acquiring the Hotel Lease Interests; and (xi) all parties

that have requested notice pursuant to Bankruptcy Rule 2002.

67.    The Debtors submit that the foregoing notice fully complies with the requirements

set forth in Bankruptcy Rule 2002 and 6004. Based upon the foregoing, the Debtors respectfully

request that this Court approve the form and manner of the proposed above.

**F. The Auction**

68.    If the Debtors receive one or more Qualified Competing Bids, the Debtors will

conduct the Auction to select the highest or best bid for the Hotel Lease Interests (the "Successful

Bids"). The Auction, which shall be transcribed or recorded to the extent required under New

York local practice, shall be held on April 25, 2023 at noon (prevailing Eastern time) at the New

York offices of Debtors' counsel, Davidoff Hutcher & Citron LLP, 605 Third Avenue, New

York, New York 10158, or such other remote or virtual locations as timely communicated to all

entities entitled to attend the Auction.

69.    The Debtors will conduct the Auction in any manner and upon any terms and

conditions satisfactory to the Court and consistent with the Bidding Procedures, that will

achieve the maximum value for the Hotel Lease Interests. Such terms and conditions may

include, by way of example, one or more rounds of sealed or open bids and any Bidder who

18

submitted a Qualified Competing Bid. The initial bid at the Auction shall be the highest or otherwise best bid, as determined by the Debtors in their reasonable discretion after consulting with the Consulted Parties, as among the Qualified Competing Bids, and such initial bid shall be announced to BPC DIP Lender and any Bidder submitting a Qualifying Competing Bid at the commencement of the Auction.

70.     Any subsequent bidding for the Hotel Lease Interests at the Auction shall be in increments of at least $100,000 each or any other reasonable amount established by the Debtors at the Auction.

71.     At the conclusion of the Auction, the Debtors shall submit the Successful Bids to the Court at the Sale Hearing, for entry of a Sale Approval Order. Any Bid that fails to comply with the Bidding Procedures or any other procedures established at the Auction may be refused.

72.     Prior to the conclusion of the Auction, the Brokers, the Debtors and their counsel will (a) review and evaluate each Qualified Competing Bid, (b) identify the highest or otherwise best offer for the Hotel Lease Interests received at the Auction (such bid, the "Successful Bid" and the bidder making such bid, the "Successful Bidder") and (c) communicate to the Consulted Parties and the Qualified Competing Bidders the identity of the Successful Bidder and the details of the Successful Bid. The determination of the Successful Bid by the Debtors shall be final, subject to approval by the Court.

73.     The Debtors will sell the Hotel Lease Interests to the Successful Bidder pursuant to the terms of the Successful Bid upon the approval of such Successful Bid by the Court at the Sale Hearing.

74.     For the avoidance of doubt, the Debtors shall not consider or support any bid (whether or not such bid is a Qualified Competing Bid) for the Hotel Lease Interests received

19

after the close of the Auction.

75.    If, following the entry of the Sale Approval Order, the Successful Bidder fails to consummate the sale because of a breach or failure to perform on the part of the Successful Bidder, the second highest or otherwise best bid ("Back-Up Bid") will be deemed the new Successful Bid, and the Debtors will be authorized and directed to consummate the Sale with the bidder who submitted the Back-Up Bid without further order of the Court. In such case, the good faith deposit of the Successful Bidder (10% of the Qualified Bid) shall be forfeited to the Debtors and the Debtors shall have the right to seek any and all other remedies and damages from the defaulting Successful Bidder to the extent permissible under the applicable purchase agreement and applicable law.

**II.    This Court Should Approve the Sale of the Hotel Lease Interests to the Successful Bidder**

76.    Following the Auction, the Debtors will seek this Court's approval of the sale of the Hotel Lease Interests free and clear of all liens, claims, interests and encumbrances to the Successful Bidder.

77.    All of the sale proceeds will be received in escrow by Debtors' counsel, with all liens, claims, interests and encumbrances, if any, to attach to the proceeds in accordance with Section 363(f) of the Bankruptcy Code, with the Debtors being authorized to distribute the sale proceeds as set forth in paragraph 11 of the Sale Approval Order, annexed hereto as **Exhibit D**, with the balance of the sale proceeds to be distributed in accordance with the Broker Agreement, the Sale Approval Order, the Carve-Out and the Plan, respectively.

78.    In the event that none of the secured creditors object, the Debtors believe they will satisfy the requirements of a sale under Section 363(f)(2) of the Bankruptcy Code.

79.    Pursuant to Section 363(b) and (f) and 365 of the Bankruptcy Code, the Debtors seek entry of an order authorizing the sales, assignment and transfer of the Hotel Lease Interests and the Debtors' Hotel Lease Interests. Section 363(b)(1) of the Bankruptcy Code provides, in pertinent part, "The trustee, after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." §363(f) of the Bankruptcy Code states as follows:

(f) The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if--

(1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;

(2) such entity consents;

(3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4) such interest is in bona fide dispute; or

(5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

80.    The conditions set forth in 11 U.S.C. §363(f) are in the disjunctive, which means that only one of the tests must be met. The Debtors believe that the Purchase Price for the sale of the Hotel Lease Interests in this manner is in the best interests of the estates and their creditors, for a variety of reasons, including the following: (i) the Debtors believes that an immediate sale of the Hotel Lease Interests is in the best interests of creditors and the estates at large; (ii)  the sale proceeds will be used to satisfy the secured claims of BPC Lender.

21

81.     As to the conditions of Section 363(f), the Debtors submit that all secured creditors will either (a) affirmatively consent, (b) not object, or (c) their claim is subject to a bona fide dispute. It is therefore submitted that Section 363(f) will be satisfied, and an immediate sale of the Hotel Lease Interests is in the best interests of creditors and the estate and will prevent unnecessary, irreparable harm to the creditors and the estates.

82.     In connection with this motion, the Debtors propose to invite interested parties to make higher or better offers by way of conducting an auction of the Hotel Lease Interests in contemplation of sales free and clear of all liens, claims, interests and encumbrances, with all such liens, claims, interests and encumbrances to attach to the sale proceeds. The bid procedures and the related order should authorize the Debtors to select a stalking horse bidder, subject to the reasonable approval in each case of the Consulted Parties.

83.     The Debtors seek authority to conduct the Auction free and clear of all liens with the liens to attach to the proceeds of sale pursuant to 11 U.S.C. §363(f). Since the Auction contemplated hereby is not in the ordinary course, its authorization requires notice and a hearing pursuant to Section 363(b) of the Bankruptcy Code. Auction sales are specifically authorized under the Bankruptcy Code and F.R.B.P. Rule 6004(f) provides that, "All sales not in ordinary course of business may be by private sale or public auction."

84.     It is within the discretion of the Court to determine whether to approve or disapprove of a method for the disposition of property. *In re Alves*, 52 B.R. 353 (Bankr. D.R.I. 1985); *See, generally, In re Stogsdill*, 102 B.R. 587 (Bankr. W.D. Tex. 1989). As stated above, the Hotel Lease Interests constitutes substantially all of the Debtors' assets.

85.     The Debtors respectfully submit that the Auction will provide the greatest recovery for the Debtors' estates than would be provided by any other available alternative. In addition, the

sales will be tested in the market through an auction process, which will support the fairness and reasonableness of the consideration being received. Therefore, the Debtors request that the Court authorize and approve the sale of the Hotel Lease Interests.

**B.**      **Protections as a Good Faith Purchaser**

61.      Section 363(m) of the Bankruptcy Code protects a good-faith purchaser's interest in property purchased from a debtor notwithstanding that the sale conducted under Section 363(b) is later reversed or modified on appeal. *See Allstate Ins. Co. v. Hughes*, 174 B.R. 884, 888 (S.D.N.Y. 1994) ("Section 363(m) . . . provides that good faith transfers of property will not be affected by the reversal or modification of an unstayed order, whether or not the transferee knew of the pendency of the appeal").

62.      The selection of the Successful Bidder will be the product of an arm's-length, good-faith negotiation in a competitive purchasing process. Based on the record to be made at the Sale Hearing, the Debtors will request a finding that the Successful Bidder is a good-faith purchaser entitled to the protections of Section 363(m) of the Bankruptcy Code.

## NOTICE

63.      Notice of this Motion has been provided to (i) the Office of the U.S. Trustee; (ii) counsel to BPC Lender; (iii) counsel to BPC DIP Lender; (iv) counsel Creditors Committee; (v) counsel to the Residential Board; (vi) counsel to BPCA; (vii) all taxing authorities; (viii) all known creditors, whether disputed, unliquidated or contingent, of the Debtors; (ix) all entities known or reasonably believed to have asserted a lien, claim, interest, or encumbrance in the Hotel Lease Interests; (x) all potential buyers known by the Debtors as having previously expressed interest in acquiring the Hotel Lease Interests; and (xi) all parties that have requested notice pursuant to

23

Bankruptcy Rule 2002.

## **NO PRIOR REQUEST**

64.     No prior Motion for the relief requested herein has been made to this or any other

Court.

## **CONCLUSION**

65.     For all of the foregoing reasons, the Debtors respectfully request entry of (i) the

Sale Procedures Order, substantially in the form annexed hereto as Exhibit A, and (ii) after the

Auction and a Sale Hearing, entry of the Sale Approval Order, substantially in the form annexed

hereto as Exhibit D.

**WHEREFORE,** the Debtors respectfully request that the Court grant all of the relief

requested herein, together with such other and further relief as is just and proper under the

circumstances.

Dated: New York, New York
     January  24, 2023

                              DAVIDOFF HUTCHER & CITRON LLP
                              *Attorneys for the Debtors*
                              605 Third Avenue
                              New York, New York 10158
                              (212) 557-7200

                              By:*/s/ Jonathan S. Pasternak*
                              Jonathan S. Pasternak