UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

In re:

URBAN COMMONS 2 WEST LLC, ET AL.,[1]

                        Debtors.

------------------------------------------------------------x

FOR PUBLICATION

Chapter 11

Case Nos. 22-11509 (PB)
(Jointly administered)

## MODIFIED BENCH DECISION GRANTING DEBTORS' MOTION
## FOR APPROVAL OF DIP FINANCING

**A P P E A R A N C E S :**

DAVIDOFF HUTCHER CITRON, LLP
*Attorneys for the Debtor*
605 Third Avenue
New York, NY 10158
   By:   Jonathan S. Pasternak
           Robert Leslie Rattet

SILVERMAN ACAMPORA LLP
*Attorneys for Creditors Committee*
100 Jericho Quadrangle, Suite 300
Jericho, NY 11753
   By:   Ronald J. Friedman
           Haley Trust

PRYOR CASHMAN LLP
*Attorneys for Highgate Hotels, LP*
7 Times Square, 40th Floor
New York, NY 10036
   By:   Itai Y. Raz
           Sameer M. Alifarag

---

[1] The Debtors in these Chapter 11 Cases and the last four digits of the Debtors' taxpayer identification numbers are as follows: Urban Commons 2 West II LLC (7987), Urban Commons 2 West III LLC (3270), Urban Commons 2 West IV LLC (8418), and Urban Commons 2 West Operating Tenant LLC (0849), with a shared mailing address of 3334 East Coast Highway, No. 350, Corona Del Mar, CA 92625.

KLESTADT WINTERS JURELLER SOUTHARD STEVENS, LLP
*Attorneys for The Residential Board of Managers of the Millennium Point Condominium*
200 West 41st Street, 17th Floor
New York, NY 10036
   By:    Tracy L. Klestadt
           Kathleen M. Aiello

HILLER, P.C.
*Attorneys for The Residential Board of Managers of the Millennium Point Condominium*
641 Lexington Avenue, 29th Floor
New York, NY 10022
   By:    Michael Hiller
           Scott Woller

FRIED, FRANK, HARRIS, SHRIVER JACOBSON LLP
*Attorneys for Battery Park City Authority*
1 New York Plaza
New York, NY 10004
   By:    Janice MacAvoy
           Jennifer L. Rodburg

HERRICK, FEINSTEIN LLP
*Attorneys for BPC Lender, LLC*
2 Park Avenue
New York, NY 10016
   By:    Steven B. Smith
           Avery S. Mehlman
           Silvia A. Stockman

COHEN, WEISS AND SIMON, LLP
*Attorneys for New York Hotel Trades Council & Hotel Association of New York City, Inc. Employee Benefits Funds*
900 Third Avenue, 21st Floor
New York, NY 10022
   By:    Richard M. Seltzer

UNITED STATES DEPARTMENT OF JUSTICE
*Attorneys for the U.S. Trustee*
Alexander Hamilton Custom House
One Bowling Green, Room 534
New York, NY 10014
   By:    Tara Tiantian

**PHILIP BENTLEY**
**UNITED STATES BANKRUPTCY JUDGE**

## Introduction

Before the Court is the Debtors' motion (the "DIP Motion" or "Motion") for a final order approving post-petition financing and granting related relief, including adequate protection to BPC Lender, LLC (the "Lender"), the Debtors' senior secured pre-petition lender and an affiliate of the DIP lender. The Debtors have consensually resolved all objections to the Motion except the limited objection filed by their former property manager, Highgate Hotels, L.P. ("Highgate").[2]

Highgate objects to only one aspect of the Motion: a provision of the DIP Order authorizing and directing the Debtors' former counsel to turn over approximately $5.6 million in insurance proceeds (the "Insurance Proceeds"), which counsel has been holding in a trust account since it received these monies from the Debtors' insurer last summer. The DIP Order requires these funds to be released to the Lender and applied to its pre-petition debt, as a form of adequate protection for the priming of that debt by the liens granted to the DIP lender.

Highgate contends that turnover of the Insurance Proceeds violates the terms of a purported escrow agreement, dated August 16, 2022 (the "Agreement" or "Procuration Agreement"), which provides that no funds will be disbursed from the attorney trust account without the consent of all signatories, including Highgate. The Debtors' only right to or interest in these funds, Highgate claims, is their contingent right to receive the funds if and when Highgate consents. Highgate has

---

[2] On January 13, 2023, the Court read into the record its bench ruling granting the Motion, and on January 16, 2023, the Court entered a final order (the "DIP Order" or "Order") granting the Motion. This decision memorializes, and to a limited degree clarifies and expands upon, that bench ruling.

3

neither consented nor given any indication of the circumstances in which it might be willing to do so.

The Court finds that Highgate's objection lacks merit for two independent reasons. First, it is a basic contract law principle that, when an agreement omits a term essential to a determination of the parties' rights and duties, the court will supply a term that is reasonable in the circumstances. Here, given the Agreement's failure to provide any conditions for release of the deposited funds other than the consent of all parties, and given the absence of any evidence that the parties intended otherwise, it is appropriate to add an implied term permitting the Court to determine the parties' respective rights to the funds and to direct that the funds be disbursed accordingly.

Second, even if the Court were constrained to construe the Agreement literally so as to bar release of the funds absent the parties' unanimous consent, turnover of the funds would still be appropriate. In that event, the Agreement would fail to satisfy the requirements for the creation of an escrow agreement under New York law — in particular, the requirement that the agreement specify the conditions under which the escrowed assets will be released. The Agreement's provision that the funds may be released if all parties agree does not satisfy this requirement, either as a matter of common sense or under the limited case law that has addressed this issue.

For both of these reasons, the Court holds that the Insurance Proceeds should be disbursed from the attorney trust account in accordance with the parties' underlying rights to these funds. Highgate does not dispute that the funds, which are proceeds of the Debtors' insurance policies, belong to the Debtors and are subject to the Lender's perfected senior lien. The funds therefore are property of the estate, and Highgate has no basis to challenge either turnover of these funds or their use to partially satisfy the Lender's pre-petition debt.

With Highgate's objection disposed of, approval of the DIP Motion requires little discussion. The Debtors have presented uncontroverted evidence that the DIP loan is necessary and in their estates' best interests, and that the loan's specific terms are fair and reasonable. The loan and the related grant of adequate protection to the Lender satisfy the requirements of Bankruptcy Code § 364(c) and (d) and should be approved.

**Factual Background[3]**

The Debtors own a hotel located at 2 West Street in Manhattan (the "Hotel"), at the southern end of Battery Park City. The Hotel is part of a mixed-use condominium building, constructed in the early 2000s, which also includes a separate residential condominium portion. Until March 2018, the Hotel was operated by Ritz Carlton under the Ritz Carlton brand. At that time, the Debtors' predecessors hired Highgate to replace Ritz Carlton as the hotel operator and changed the Hotel's brand to "The Leading Hotels of the World" under the name "The Wagner at Battery Park."

In September 2018, the Debtors purchased the Hotel for the approximate purchase price of $147 million, of which $96 million was financed through a purchase money mortgage issued by the Lender, an affiliate of the seller. (That loan matured in 2020, and the amount owed under the loan has since grown to approximately $114 million, plus fees and costs.) The Debtors hired Highgate to continue to serve as the Hotel's property manager, pursuant to a operating agreement with the Debtors.

---

[3] The Court's factual findings are based principally on the record of the January 12, 2023 hearing on the Motion — specifically, the testimony of the Debtors' chief restructuring officer, Mark Podgainy, and the exhibits offered by the Debtors (referred to as "Ex. __"). For certain undisputed facts, the Court has relied on documents filed on the docket of these chapter 11 cases.

5

Prior to their November 15, 2022 bankruptcy filing, the Debtors were owned and managed by two individuals, Taylor Woods and Howard Wu. These two individuals have a checkered past, a topic that was the subject of much discussion at the initial hearing in this case.[4] In early December 2022, Messrs. Woods and Wu voluntarily relinquished their management positions, and they have played no role in the Debtors' management or in these chapter 11 cases since that time.

Highgate contends that, within months after acquiring the Hotel, the Debtors ceased providing the funds necessary for Highgate to pay the Hotel's operating expenses. In 2020, the Hotel ceased operating, and it has been shuttered ever since. By early 2021, Highgate claims, it was owed substantial monies by the Debtors not only for its own fees, but also for sums it had advanced to cover the Hotel's other obligations. Highgate claims it was concerned that, as the Hotel's property manager, it faced possible liability for certain of the Debtors' defaults, including for amounts owed to the Hotel's employees and union.

On January 5, 2021, Highgate entered into a letter agreement (the "January 2021 Letter") with the Debtors and Messrs. Woods and Wu. (Ex. A.) Among other things, the letter stated that the Hotel had suffered water damage in October 2020 and had filed a claim with its insurance carrier. The letter provided that the Debtors would cause any insurance proceeds received in satisfaction of this water damage claim to be deposited in an account "under [Highgate's] sole dominion and control," and that Highgate would use these insurance proceeds "to pay costs relating to the Hotel Employees and otherwise as [Highgate] determines in its sole and absolute

---

[4] Among other things, Messrs. Woods and Wu were the subject of a series of rulings in the Eagle Hospitality bankruptcy, by Judge Christopher Sontchi of the Bankruptcy Court for the District of Delaware, finding that they had misappropriated the proceeds of a PPP loan from the U.S. government and then refused to account to the bankruptcy court for the proceeds. *See, e.g.*, *Urban Commons Queensway, LLC v. EHT Asset Mgmt., LLC (In re EHT US1, Inc.)*, 633 B.R. 223 (Bankr. D. Del. 2021).

6

discretion (notwithstanding any expiration or earlier termination of the Operating Agreement)." The letter further stated that the Debtors "appoint[ed Highgate] as [their] attorney-in-fact for any and all purposes of administering the Water Damage Claim and any insurance proceeds paid in partial or total satisfaction thereof." (*Id.* at 1.)

Subsequently, the Debtors' insurance counsel, Gauthier Murphy & Houghtaling, LLC ("GMH"), received an initial payment of approximately $6.4 million from the insurer to fund the mold remediation phase of the repairs. The Debtors, the Lender and Highgate then entered into an escrow agreement with GMH, dated October 26, 2021, to govern GMH's disbursement of these funds from its attorney trust account. (Ex. B.) The agreement attached a list of specific approved payments, and it authorized GMH to make additional payments "after approval by Lender." (*Id*. at 2.)

The following month, the Debtors and the Lender (but not Highgate) executed an addendum, dated November 10, 2021, to the October escrow agreement. (Ex. C.) The addendum stated that the Debtors intended to file additional water leak claims against their insurer for the repairs needed to restore the Hotel and its furniture, fixtures, and equipment to pre-loss condition. The addendum stated that, if any monies were recovered, the parties would execute a "procuration agreement" providing for these funds to be held in GMH's escrow account "until the parties with an interest in any such additional insurance proceeds execute an amendment . . . authorizing GMH to disburse any such additional insurance proceeds . . . ."[5] (*Id.* ¶ 1.)

---

[5] According to Black's Law Dictionary, a procuration is "[t]he act of appointing someone as an agent or attorney-in-fact." *Procuration*, BLACK'S LAW DICTIONARY (11th ed. 2019).

7

Shortly thereafter, on November 22, 2021, Highgate terminated its operating agreement with the Debtors, effective the following month.

In August 2022, the Debtors reached an agreement with their insurer to settle their remaining water leak claims for an additional payment of $7 million. The Debtors, the Lender, ERJMJ Investments LP (a junior secured lender) and Highgate then entered into a "Procuration," dated August 16, 2022, with GMH. (Ex. D.) This agreement, which consisted of three short paragraphs, stated that these four parties, as the named payees on the insurer's $7 million settlement check, authorized GMH to endorse their names on that check, to deposit the check in its client trust account, and to disburse about $1.4 million to pay its and its co-counsel's legal fees and costs, leaving a balance of almost $5.6 million — *i.e.*, the Insurance Proceeds. (*Id.* at 1.) The Agreement stated that "no further amounts will be disbursed from the trust account until such time as the parties signing this Procuration unanimously agree to such further disbursement." (*Id.*)

## **Proceedings in These Bankruptcy Cases**

The Debtors filed chapter 11 petitions on November 15, 2022. By order dated December 8, 2022, the Court approved the appointment of an independent chief restructuring officer, or CRO, and an independent manager, with exclusive authority to act on behalf of the Debtors in these bankruptcy cases. Since these appointments, Messrs. Woods and Wu, the Debtors' owners and former managers, have played no role in the bankruptcy or in the management of the Debtors. On December 21, 2022, an official committee of unsecured creditors was appointed.

As of the petition date, the Debtors had no cash on hand and no current income to pay for their ongoing administrative expenses. Although the Hotel is not currently operating, the Debtors need to fund a variety of ongoing obligations to maintain the condition of the Hotel pending a sale, refinancing or other strategic transaction and the consummation of that transaction through a plan

8

of reorganization. These ongoing obligations include rent under a ground lease, real estate taxes, a variety of utility, maintenance and insurance obligations, and compensation of the Debtors' chief restructuring officer, independent director, and chapter 11 professionals.

The Debtors have acknowledged (and no one has disputed) that all of their assets, including their rights to the Insurance Proceeds, are subject to the perfected first priority liens of the Lender, and that the Lender has the right to apply any Insurance Proceeds to its pre-petition loan in its sole discretion. As of the petition date, the Lender claimed to be owed approximately $114 million, plus fees and costs. In addition, several creditors of the Debtors may assert junior liens against the Hotel or other assets of the Debtors.

Following the appointment of the CRO and independent manager, an affiliate of the Lender (the "DIP Lender") informed the Debtors that it would be willing to provide debtor-in-possession, or "DIP," financing to the Debtors pursuant to Bankruptcy Code § 364, but only if the Insurance Proceeds were released to the Lender to be applied to its prepetition debt as a form of adequate protection. Arms'-length negotiations between the Debtors and the DIP Lender ensued, ultimately resulting in agreement on the financing terms set forth in the DIP Order. This financing provides the Debtors with sufficient cash to pay their professional fees and other operating expenses for the four months they anticipate they will need to complete a marketing and strategic transaction process and to obtain confirmation of a plan of reorganization.

As is customary, the DIP Order provides the Lender with adequate protection of various sorts pursuant to Bankruptcy Code § 364(d). Part of the adequate protection package demanded by the DIP Lender, and included in the DIP Order, is that the Insurance Proceeds will be released and delivered to the Lender and applied to its pre-petition debt.

9

While they were negotiating with the DIP Lender, the Debtors received indications of interest from several other potential funders. However, each of these alternative financings would have required the grant of liens senior to those held by the Lender; consequently, none of these alternatives could have been approved without hotly contested litigation over whether the Lender could be "primed" by the grant of such senior liens. The Debtors therefore concluded that obtaining financing on the terms offered by the DIP Lender provided the estates with the best chance to maximize the return to creditors. Absent approval of this DIP financing, the Debtors concluded, they likely would be unable to pay their ongoing financial obligations, and these chapter 11 cases would be converted to a chapter 7 liquidation.

On December 19, 2022, the Debtors moved for preliminary and final approval of the DIP Order. On December 28, the Court granted preliminary approval of the DIP financing, while deferring consideration of certain issues, including the proposed treatment of the Insurance Proceeds, to a later date. Based on this preliminary approval, the DIP Lender made an initial advance of $816,425 to the Debtors.

On January 12, 2023, the Court held a hearing on the Debtors' motion for final approval of the DIP Order. All parties other than Highgate supported the motion, and Highgate itself supported the proposed financing in all respects other than the DIP Order's treatment of the Insurance Proceeds.

The factual record presented at the January 12 hearing was quite limited. Only one witness testified: the Debtors' CRO, Mark Podgainy, who testified by sworn declaration to the Debtors' need for DIP financing and related matters.[6] No party chose to cross-examine Mr. Podgainy. The

---

[6] Mr. Podgainy's testimony also covered certain background facts relating to the Debtors' insurance claims and the

Debtors also put into evidence a number of exhibits, including the Procuration Agreement and several other agreements relevant to Highgate's objection. Highgate presented no evidence of its own.

**Discussion**

Characterizing the Procuration Agreement as an escrow agreement, Highgate contends that the funds held pursuant to this agreement are not property of the Debtors' estates, and therefore the Debtors lack the power to compel turnover of these funds or to use the funds to pay down the Lender's pre-petition debt. According to Highgate, the estates' only right to these funds is their contingent right to receive the funds if and when Highgate agrees to their release.

Highgate is correct that, *if* the Procuration Agreement were a true escrow that conditioned release of the Insurance Proceeds on Highgate's consent, the estates would have no right to compel turnover of these proceeds or use them to pay down the Lender's debt. As the Collier treatise states, "most courts have held that assets in escrow are not property of the estate. Estate property is confined to the rights conferred upon the debtor by the escrow agreement, not property rights in the assets escrowed." 5 COLLIER ON BANKRUPTCY ¶ 541.09[2] (16th ed. 2023); *accord, e.g.*, *Musso v. N.Y. State Higher Educ. Servs. Corp. (In re Royal Bus. Sch., Inc.)*, 157 B.R. 932, 940-42 (Bankr. E.D.N.Y. 1993) (estate's interest in escrowed assets is its contingent right to receive these assets if and when the contractual conditions for release to the debtor are satisfied).

However, the Court does not agree with Highgate's characterization of the Procuration Agreement. First, as a matter of contract interpretation, it is proper to read into the Procuration Agreement an implied term, allowing the Court to determine the parties' underlying rights to the

---

Insurance Proceeds. Because Mr. Podgainy has no personal knowledge of these facts, the Court has not relied on this portion of his testimony, but instead has relied on the relevant documentary evidence.

11

funds. Second, even if the Court were required to read the Procuration Agreement literally so as to bar release of the funds absent the parties' unanimous consent, this would not change the outcome. An agreement that provides no condition for the release of funds except the parties' consent is not a true escrow agreement. Consequently, the funds held pursuant to the Procuration Agreement are property of the estate, and Highgate has no basis to challenge either the turnover of those funds or their use to pay down the Lender's pre-petition debt.

**A. The Procuration Agreement Does Not Foreclose a Judicial Determination of the Parties' Rights to the Deposited Funds**

The hyper-literal reading of the Procuration Agreement advanced by Highgate would produce an absurd result: It would prevent the funds deposited in counsel's trust account from ever being distributed absent the consent of all signatories — a consent that Highgate has said it is not willing to give. It defies common sense that the Debtors could ever have intended to give Highgate such an unfettered and perpetual veto power over distribution of the Insurance Proceeds. Highgate has offered no explanation why the Debtors might conceivably have intended this, much less any evidence that the Debtors in fact intended or expected such an outcome.

An essential term of any purported escrow agreement is a mechanism to determine the parties' rights to the escrowed assets. The Court therefore finds it is appropriate to read into the Procuration Agreement an implied term providing such a mechanism in the event the parties' consent to release of the funds cannot be obtained. Specifically, the agreement should be read to provide that, absent an agreement to release the funds, any party may seek a judicial determination of the parties' respective rights to the monies.

Such an outcome is consistent with basic contract interpretation principles, as set forth in Section 204 of the Restatement (Second) of Contracts (the "Restatement"). Section 204 of the Restatement, entitled *Supplying an Omitted Essential Term*, provides:

> When the parties to a bargain sufficiently defined to be a contract have not agreed with respect to a term which is essential to a determination of their rights and duties, a term which is reasonable in the circumstances is supplied by the court.

Rest. (Second) of Contracts § 204. Comment (b) to Section 204 discusses the circumstances that may give rise to an omitted term. It explains that an omitted term may be one that the parties failed to foresee, or it may be one that they foresaw but failed to address in their contract for a variety of reasons, including "because discussion of it might be unpleasant or might produce delay or impasse" — a possible explanation in the present case. Comment (d) addresses the process by which the court should supply an omitted term, and notes that the court may supply "the term the parties would have agreed to if the question had been brought to their attention" or, alternatively, "a term which comports with community standards of fairness and policy."

New York courts have followed Restatement § 204. The decision of the Appellate Division in *Reiss v. Fin. Performance Corp.*, 715 N.Y.S.2d 29 (N.Y. App. Div. 2000), is particularly instructive. That case was brought by holders of a corporation's stock warrants, who sought a declaration that they were entitled to purchase stock under the warrants' literal language, without adjustment for a reverse stock split. Although the warrants contained no contractual language addressing the possibility of a stock split, the First Department nevertheless held that it was appropriate to add an "omitted term," providing for a proportional adjustment of the number of shares and their price in the event of a stock split.

The court reasoned that a literal application of the warrants' terms would lead to an absurd result, which the parties could not have intended:

> Financial . . . could have eviscerated the value of plaintiffs' warrants and escaped its contractual obligations by simply declaring a massive stock split . . . . [I]t defies all bounds of common sense to believe that plaintiffs could have ever intended such an outcome.

*Id.* at 33. The court concluded:

> [T]o the extent that the warrants may be viewed as not containing an implicit requirement for the proportional adjustment of Financial's stock upon a split or reverse-split, it means that the parties omitted what is undeniably an essential term of the agreement. . . . In a circumstance where an essential term is omitted, section 204 of the Restatement (Second) of Contracts is instructive . . . . Here, following the Restatement approach, the only reasonable term would be the one consistent with the self-evident expectations of the parties when the warrants were executed . . . .

*Id.* at 34.[7]

The First Department's reasoning in *Reiss* applies with at least equal force here. As a general matter, one would rarely expect any party to agree to put money into an escrow or other fund and agree to give other parties a perpetual veto power over the release of the monies. While such an agreement might perhaps make sense if the other parties were aligned in interest with the grantor, or under the grantor's control, it would almost never make sense to grant such a veto power to parties hostile or adverse to the grantor. Notably, at the time of the Procuration

---

[7] The New York Court of Appeals' later decision in *Quadrant Structured Prods. Co., Ltd. v. Vertin*, 16 N.E.3d 1165 (N.Y. 2014), is not to the contrary. At issue in that appeal was whether the "no-action" clause in a bond indenture should be read to bar securities law claims as well as contractual claims, when the indenture by its terms applied only to claims of the latter sort. The Court of Appeals construed the indenture to bar only contractual claims, reasoning that no-action clauses should be strictly construed and that, in any event, the indenture's unambiguous terms required this result. As a further ground for its holding, the court observed that, "if parties to a contract omit terms — particularly terms that are readily found in other, similar contracts — the inescapable conclusion is that the parties intended the omission." *Id.* at 1172. This latter statement has no proper application here, because no party in *Quadrant* had argued that the term omitted from the indenture — extending the no-action clause to securities law as well as contractual claims — was in any way essential to the parties' agreement. It was not, in contrast to the term omitted from the parties' agreement here.

14

Agreement, Highgate had terminated its role as property manager, and was asserting substantial claims against the Debtors.

The omitted term the Court reads into the Procuration Agreement — permitting the parties to seek a judicial determination of their respective rights to the funds — is particularly appropriate when one considers common practices concerning monies held in lawyers' trust accounts. It is not uncommon for a lawyer to pay such monies into court if there is a dispute among the parties. New York CPLR § 1006 allows an escrowee that fears possible liability to discharge itself of any duty by bringing an interpleader action and depositing the funds with the court. *See, e.g.*, *Fischbein, Badillo, Wagner v. Tova Realty Co.*, 597 N.Y.S.2d 676, 678 (N.Y. App. Div. 1993) (disputed funds deposited pursuant to CPLR § 1006); *see also* Vincent C. Alexander, Practice Commentary, *McKinney's Cons Laws of NY*, Interpleader, in General § 1006.1 (discussing escrow agents' use of interpleader actions to resolve competing claims and determine the parties' rights). Here, the parties presumably expected that a similar process — an interpleader action by the Debtors' insurance counsel, or alternatively a suit by one of the other parties for a judicial determination — would be followed in the event the parties were unable to reach agreement on the funds' release.

The brevity of the Procuration Agreement lends further support to the Court's conclusion. Had that agreement been a comprehensive and detailed escrow agreement, Highgate might have a more plausible argument that the omission of any mechanism to compel release of the funds absent consent was intentional. However, the text of the Procuration Agreement is a mere half page — three short paragraphs — making it much more plausible that this omission was inadvertent, or at least was not the subject of negotiation. Given the absence of any evidence that the parties intended otherwise, the Court concludes it is appropriate to add an implied term permitting a judicial determination of the parties' rights to the funds.

**B. The Procuration Agreement is Not a True Escrow Agreement**

Even if the Court were required to read the Procuration Agreement literally despite the absurd results this would produce, the funds would still be property of the estate, because in that event, the agreement would not be a true escrow.

It is well established that, in construing a purported escrow agreement, a court may look through the agreement's form to its substance to determine whether it creates a true escrow. *See generally* 5 COLLIER ON BANKRUPTCY ¶ 541.09[1] (16th ed. 2023). If the agreement is not a true escrow, the purportedly escrowed funds remain property of the grantor — or in a bankruptcy case, property of the estate. *See, e.g.*, *In re Chesapeake Assocs.*, 141 B.R. 737, 746 (Bankr. D. Kan. 1992) (purportedly escrowed funds held by attorney as debtor's agent, rather than as escrow agent for both parties, were property of estate). In that event, the funds are treated like any other property of the estate — for example, they are subject to the liens of the Debtors' judgment creditors. *Hassett v. Blue Cross and Blue Shield of Greater N.Y. (In re OPM Leasing Servs., Inc.)*, 46 B.R. 661, 667 (Bankr. S.D.N.Y. 1985).

The parties agree that, to determine whether the Procuration Agreement created a true escrow, the Court must consider whether that agreement satisfies the elements of an escrow agreement under New York law. Those elements are not disputed: "Under New York law, for an instrument to act as a valid escrow agreement[,] it must contain (a) an agreement as to the subject matter and delivery of the instrument; (b) a third party depositary; (c) delivery of the instrument to a third party *conditioned upon the performance of some act or the happening of some event*; and (d) relinquishment by the grantor." (Highgate Reply [ECF No. 98] ¶ 3 (quoting *George A. Fuller Co. v. Alexander & Reed, Esqs.*, 760 F.Supp. 381, 386 (S.D.N.Y. 1991) (internal citations omitted)

16

(emphasis added)); *accord Mid-Island Hosp., Inc. v. Empire Blue Cross and Blue Shield (In re Mid-Island Hosp., Inc.)*, 276 F.3d 123, 130 (2d Cir. 2002).

The Debtors contend that the Procuration Agreement does not satisfy one requirement of these elements: that delivery of the deposited funds be "conditioned upon the performance of some act or the happening of some event." While the agreement provides that funds may be released upon the parties' unanimous consent, the Court finds that this provision does not make the agreement a true escrow. This is so for several reasons.

First, it would make no sense to find an agreement of this sort to be a true escrow agreement, because any agreement can always be modified by the agreement of all parties. For this reason, the Procuration Agreement is no different in substance from an agreement that provides no conditions at all for the release of deposited funds — since the parties to an agreement of that sort, like the parties here, can always consent to the funds' release.

Second, the limited case law on this specific issue is in accord. While the Court is aware of only two cases that address this specific issue, both support the conclusion that the Procuration Agreement is not a true escrow. Highgate has cited no cases to the contrary, nor is the Court aware of any.

Most relevant is the recent decision of then-Chief Judge Morris in *DeFlora Lake Dev. Assocs. v. Hyde Park (In re Deflora Lake Dev. Assocs.)*, 628 B.R. 189 (Bankr. S.D.N.Y. 2021). That decision arose out of a series of transactions between two real estate developers, DeFlora Lake and Hyde Park. The developers entered into two purported escrow agreements, one governing more than $207,000 in funds and the other governing certain real estate deeds.

17

Subsequently, DeFlora Lake filed for bankruptcy and filed a motion asking the court to compel turnover of the supposedly escrowed funds and deeds on the ground that they were property of the estate. Judge Morris denied the motion as to the deeds, finding that escrow to meet the requirements for a true escrow. *Id.* at 203. At the same time, the court granted the turnover motion as to the funds, holding that this arrangement was not a true escrow under New York law, because the only specified condition for release was that the attorney would hold the funds "[u]ntil there was an agreement or determination by a Court as to where it would go." *Id.* at 199.

*Iacobazzi v. Cortese*, No. 53978/2017, 2017 WL 11529150 (N.Y. Sup. Ct. Sept. 22, 2017), is to the same effect. The court there found that monies held in an attorney's trust account were not a true escrow, because the only agreed condition for the funds' release was consent. *Id.* at *3 ("Plaintiff's claim that [the lawyer] was to hold his funds indefinitely, to be released only upon his authorization, rather than upon the occurrence of a specific event or when certain conditions are met, defeats any claim of an escrow agreement.").

## C. Highgate Has No Entitlement to the Insurance Proceeds

It is not seriously disputed that, other than its purported rights under the Procuration Agreement, Highgate has no entitlement to the deposited funds.

Highgate's only other asserted basis for entitlement to these funds is the January 2021 Letter that appointed Highgate as attorney-in-fact. That agreement, however, gave Highgate no entitlement to any of the Debtors' funds except the right to use those funds to satisfy the Debtors' own obligations. Any rights Highgate may have had as attorney-in-fact were subordinate to the Lender's rights as the Debtors' senior secured lender. Highgate does not dispute that the Lender has a valid and perfected senior lien on the Insurance Proceeds, and that the Lender's loan documents prohibited the Debtors from transferring or encumbering those proceeds. *See* Mortgage

& Security Agreement [ECF No. 71-5] § 6.2 ("Mortgagor . . . shall [not] Transfer the Property or any part thereof or any direct or indirect interest therein, . . . other than as expressly permitted pursuant to the terms of the Loan Agreement."); *id.* § 14.2 ("Mortgagor shall not have the right to assign or transfer its rights or obligations under this Security Instrument without the prior written consent of Lender, . . . and any attempted assignment without such consent shall be null and void.").

Thus, any claims Highgate may have against the Debtors are merely general unsecured claims, which will be paid pursuant to a plan of reorganization, after all secured claims, such as the Lender's, have been satisfied. Highgate has no basis to object to turnover of those funds to the Debtors, or to the Debtors' release of those funds to the Lender to pay down its pre-petition debt. Highgate's objection to the DIP Order is denied.

\*     \*     \*

As discussed above, no party other than Highgate objects to the DIP Motion, and the Debtors have presented uncontroverted evidence that the DIP loan is necessary and in the best interests of their estates and creditors, as well as that the loan's specific terms are fair and reasonable. The loan and the related grant of adequate protection to the Lender satisfy the requirements of Bankruptcy Code § 364(c) and (d) and should be approved.

## Conclusion

The Debtors' motion for approval of post-petition financing and related relief is **GRANTED**.

Dated: New York, New York
February 16, 2023

/s/ Philip Bentley
**Honorable Philip Bentley**
**United States Bankruptcy Judge**