

FRIED, FRANK, HARRIS, SHRIVER & JACOBSON LLP
One New York Plaza
New York, New York 10004

Janice Mac Avoy, Esq.
Direct Line: +1.212.859.8182
Email: janice.macavoy@friedfrank.com
February 21, 2023

<u>VIA ECF</u>
Honorable Judge Philip Bentley
United States Bankruptcy Court for the Southern District of New York
One Bowling Green
New York, New York 10004

**Re:    Letter of Battery Park City Authority Pursuant to Scheduling Order [ECF No. 174]**
*In re Urban Commons 2 West LLC, et al.* **(Case No. 22-11509 (PB))[1]**

Dear Honorable Judge Philip Bentley,

As you are aware, this firm represents Battery Park City Authority d/b/a Hugh L. Carey Battery Park City Authority ("BPCA") as ground lessor and party-in-interest in the Debtors' Chapter 11 Cases.  Reference is made to the *Scheduling Order* [ECF No. 174] entered by this Court, pursuant to which the parties have been asked to provide their positions with respect to setting a schedule for briefing, discovery if needed, and a hearing on (i) any request, pursuant to the *First Amended Stipulation and Order Between the Millennium Point Condominium Board and Battery Park City Authority With Respect to Schedule for Rent Re-Set and Appraisal Process* [ECF No. 168], dated February 17, 2023 (the "Stipulation"), for review of the Appraisal Process or the Appraisals by this Court; and (ii) the scope and extent of the Residential Board's rights, under the Ground Lease and related documents, with respect to the management and operation of the Hotel.

In summary, BPCA's positions on the issues set forth in the scheduling order are outlined below, including anticipating arguments that we understand will be made by the Debtors or the Residential Board, particularly the gating issue of this Court's jurisdiction to address the two issues set forth in the Scheduling Order.  As set forth below, any request or challenge to the Appraisal Process that affects an asset of the Debtors can and must be brought before this Court, which has the exclusive jurisdiction to hear matters affecting the Debtors' assets.  Further, any such request or challenge should be brought in accordance with the Stipulation, so that it may be resolved prior to the Bid Deadline.

With respect to the scope and extent of the Residential Board's rights under the Governing Documents, this Court has the exclusive jurisdiction to decide such matters to the extent that any such decision would have a direct and material impact on the Debtors' estates and the disposition of the Debtors' assets, which is the crux of the Chapter 11 Cases.  However, adjudicating such matters at this time is premature and would be equally inefficient for all parties involved.  Rather,

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Stipulation and the parties' various pleadings related to the approval of the Debtors' bid procedures, as applicable.

Honorable Judge Philip Bentley
February 21, 2023

these issues should be decided, if necessary, after the Bid Deadline once any unresolved issues have been narrowed.

*Background*

The Condominium is a hybrid residential and commercial condominium association. The Commercial Unit includes the Hotel, which is owned and managed by the Debtors through leasehold and other arrangements. The Residential Unit is managed separately by the Residential Board. The entire Condominium is managed by the Condo Board and sits on real property owned by BPCA pursuant to the Ground Lease, with BPCA as landlord and the Condo Board as tenant. The Hotel Lease Interests governed by the Hotel Lease and the Hotel Unit Sublease make up substantially all of the Debtors' assets, and the Chapter 11 Cases are premised and dependent upon the successful consummation of a sale of such assets.

*This Court Has Jurisdiction Over Any Dispute Concerning the Appraisal Process Because Any Such Dispute Affects Assets of the Debtors*

This Court has subject matter jurisdiction over all matters and disputes in connection with the Appraisal Process to determine the base rent under the Ground Lease because any such matters and disputes are both "arising in" and "related to" a case under title 11 of the United States Code (the "Bankruptcy Code"). 28 U.S.C. § 1334(b) ("district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11"). Because the Appraisal Process will set the base rent under the Ground Lease, the majority of which must be paid by the Debtors, the Appraisal Process has a direct impact on the Debtors' estates. *See, e.g.*, *In re Verrazano Holding Corp.*, 86 B.R. 755, 762 (Bankr. E.D.N.Y. 1988) (the debtor need not be a party to bring a suit that otherwise qualifies as one arising in or related to a case under chapter 11); *In re Extended Stay, Inc.*, 2020 Bankr. LEXIS 2128 at *8-9 (Bankr. S.D.N.Y. Aug. 8, 2020) (a civil proceeding is related to a case under the Bankruptcy Code if the outcome of the action may have a conceivable effect on the debtor's estate).

While the Residential Board has indicated that it intends to challenge the Appraisal Process because it fears the outcome of such Appraisal Process on the Residential Unit, because the base rent under the Ground Lease is determined on a unitary basis for the entirety of the land subject to the Ground Lease, such determination necessarily affects an asset of the Debtors' estates. If this were solely a dispute between BPCA and the Residential Board as to the base rent solely for the Residential Unit, this Court would lack jurisdiction. *See Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 2014 Bankr. LEXIS 4603 at *15 (Bankr. S.D.N.Y. Oct. 30, 2014) (the bankruptcy court lacked subject matter jurisdiction over a lawsuit between non-debtor parties because the litigation concerned a third-party dispute whose outcome would have no conceivable effect on the debtor's estate). However, because the base rent under the Ground Lease necessarily affects both the Residential Unit and the Debtors, it is fundamental to the Debtors' estates and will directly impact both the value the Debtors may receive for their assets and the Debtors' ability to successfully emerge from Chapter 11.

The results of the Appraisal Process will determine the current base rent for the entire Condominium, the majority of which the Debtors, or any Successful Bidder, will be required to pay under the Hotel Lease (absent any modification with the consent of BPCA) and cure for

2

Honorable Judge Philip Bentley
February 21, 2023

assumption and assignment.  Even if BPCA were to be amenable to negotiating adjustments to the
go-forward rent with potential bidders, the actual contractual rent amount still needs to be
determined in order for parties to frame and enter into such negotiations.  Given the impact and
importance of the Appraisal Process on the Debtors and their estates (the Hotel Lease Interests are
the Debtors' primary asset), this Court must likewise adjudicate any challenges brought by the
Residential Board with respect to the Appraisal Process because the outcome of any such challenge
directly affects assets of the Debtors.  A final determination from the Appraisal Process is
absolutely critical to the Debtors' sale process, and any request or challenge to the Appraisal
Process, or the appraisal provisions of the Ground Lease itself, will have a direct effect on the
Debtors' estates.  This is why the essential parties entered into the Stipulation.  Because, by the
terms of the Ground Lease, the Appraisal Process will determine the value (and rent) for the entire
Condominium, including for both the Hotel and the Residential Unit, any challenge to the
Appraisal Process or the Appraisals must be brought before this Court, even if such challenge has
an impact on the Residential Unit.

Moreover, each of the parties has already consented to this Court's jurisdiction over the
Appraisal Process.  The Stipulation provides that "[n]otwithstanding any prior agreements between
the Parties designating the applicable court to challenge the Appraisal Process or Rent Re-Set, all
Parties to this Stipulation reserve their rights to petition the Bankruptcy Court (**but no other court**)
for judicial review of the fair market value determination as set forth in paragraph 7 above …."
The Stipulation further provides that "[t]he Bankruptcy Court shall retain jurisdiction to interpret,
implement, and enforce the provisions of this Stipulation."

Attorneys for the Residential Board signed the Stipulation.  To the extent that the
Residential Board now wishes to challenge the appraisal provisions of the Ground Lease, the
Appraisal Process, and/or the Appraisals (now that the Appraisals have been received and the
Residential Board is unhappy with the results, which it deems untenable for the Residents), it must
do so before this Court in accordance with the explicit requirements of the Stipulation that the
Residential Board freely entered into because any such challenge directly affects an asset of the
Debtors.

Furthermore, as all key parties in interest have repeatedly said, time is of the essence with
respect to the sale process for the Debtors' Hotel Lease Interests, and litigating these challenging
issues based on complex documents in front of a new court (as opposed to this Court, which has
spent significant time and effort understanding the relevant issues and documents) will only serve
to significantly delay this process and likely result in conversion of the Chapter 11 Cases to chapter
7.  Therefore, to the extent there is any request or challenge, it must be resolved before the Bid
Deadline as contemplated by the Stipulation.

*This Court's Jurisdiction to Determine the Scope and Extent of the Rights of the Residential Board
Under the Ground Lease and Related Documents*

Because any dispute concerning the interpretation of the Ground Lease, the Hotel Lease,
and the Hotel Unit Sublease will undoubtedly have a direct effect on the Debtors' estates (given
that such leases govern the Hotel Lease Interests – the Debtors' primary asset), this Court has
subject matter jurisdiction to adjudicate any challenges or disputes in connection therewith that

Honorable Judge Philip Bentley
February 21, 2023

directly affect the Debtors, with any such challenge or dispute both "arising in" and "related to" the Chapter 11 Cases. Any interpretation of the Ground Lease, the Hotel Lease, and the Hotel Unit Sublease – including with respect to any party's rights thereunder to enforce strict compliance therewith by any bidder – will necessarily have a fundamental impact on the Debtors' ability to monetize such assets pursuant to their contemplated marketing and sale process. This is especially true where, as here, parties assert rights that would prohibit or restrict the Debtors' ability to monetize their assets through withholding consent to the disposition of such assets. *See generally In re Jamesway Corp.*, 201 B.R. 73, 78 (Bankr. S.D.N.Y. 1996) (holding that a "use" restriction limiting the retailer's ability to realize the intrinsic value of the lease thwarted fundamental bankruptcy policy that a debtor should seek to realize the maximum value for its interests); *In re Toys "R" Us, Inc.*, 2018 WL 2676680 (Bankr. E.D. Va. May 31, 2018) ("to prevent an assignment of an unexpired lease by demanding strict enforcement of a use clause, and thereby contradict clear Congressional policy, a landlord or lessor must show that actual and substantial detriment would be incurred by him").

Further, the Residential Board has asserted that it has the right to enforce the requirements, conditions, and covenants with respect to the management and operation of the Hotel by the Debtors or any purchaser of the Debtors' Hotel Lease Interests. It is precisely these alleged rights and the scope of these alleged rights that could be at issue before this Court and could require an interpretation of the terms of the Debtors' unexpired leases and executory contracts. Moreover, the Residential Board has asserted in prior pleadings that undertakings in the Governing Documents must be expressly affirmed or assumed by the Debtors and any Successful Bidder. Whether this is actually required for the Debtors' sale process is an unresolved point before this Court, but these issues are squarely within this Court's jurisdiction to resolve.

*Potential Issues Regarding the Scope and Extent of the Residential Board's Rights Under the Ground Lease and Related Documents and Timing and Process to Resolve Such Issues*

There could be a myriad of issues and disputes before this Court regarding the scope of the Residential Board's rights under the Ground Lease and related documents, as well as whether all or a subset of these agreements must be assumed and assigned pursuant to the Debtors' sale process and the extent to which these agreements can be modified to achieve the same. The Residential Board has asserted (i) that the Hotel Lease, the Hotel Unit Sublease, and the Governing Documents must all be assumed and assigned to the Successful Bidder, (ii) it has a general consent right, as a third-party beneficiary, to any and all modifications to the Ground Lease, including Sections 15.03, 23.01, and 23.05 and Exhibit D thereof, and (iii) its absolute right to require the Debtors' strict compliance with the Ground Lease's covenants through its purported rights under the Governing Documents. The Residential Board relies on the decision of the First Judicial Department of the Supreme Court of the State of New York Appellate in *Residential Board of Millennium Point v. Condominium Board of Millennium Point* (Case No. 2018-4312), dated August 5, 2021 (the "First Department's Decision"), in asserting these rights.

The ability of, or necessity for, the Debtors to assume and assign their rights under the Governing Documents to a Successful Bidder (and satisfy purported "cure costs") is an open issue. BPCA disagrees with the Residential Board's assertion to a general consent right for the Residential Board arising out of the First Department's Decision. First, BPCA was a nominal

Honorable Judge Philip Bentley
February 21, 2023

party only and did not actively participate in *Residential Board of Millennium Point*, BPCA did not brief any of the issues and did not have a full and fair opportunity to litigate the issues. Second, that decision merely affirmed the denial of a motion to dismiss and left unresolved the scope and extent of such rights.   The First Department's Decision also did not finally resolve all such issues because it was not a final order, nor were BPCA or the Debtors active parties to such litigation. Therefore, the First Department's Decision is not binding and has no preclusive effect. To the extent this Court considers the issue of third-party beneficiary rights, BPCA would like the opportunity to fully brief the issue.  Even if there actually are any third-party beneficiary rights (an issue BPCA does not concede), BPCA believes the scope of any such third-party rights should be narrow and that BPCA and the Condo Board retain the ability to modify the Ground Lease without the consent of the Residential Board.

Resolving the scope of the Residential Board's rights could involve protracted and complicated litigation among the parties before this Court.  However, it is premature to consider the issues at this point in time.  The necessity of understanding the Residential Board's third-party beneficiary rights with respect to the management and operation of the Hotel (whatever their scope and extent may be) depends entirely on the outcome of the qualified bids that the Debtors receive pursuant to their marketing and sale process.  No one can predict what those bids will look like at this point in time.  It is possible that the qualified bids received by the Debtors will set forth business plans for managing and operating the Hotel that satisfy most or all of the requirements that the Residential Board insists must be complied with under the Ground Lease, or the Residential Board and BPCA may be amenable to modifications in light of the bids.  To the extent that the Debtors receive qualified bids that contemplate a business plan that would not satisfy all of the Residential Board's demands for how the Hotel must be managed and operated, any process for litigating the extent of the Residential Board's third-party beneficiary rights would be best served by waiting until that is known and the issues are narrowed.  It is impractical for this Court and the parties to analyze in a vacuum each and every provision in the Ground Lease, the Hotel Lease, and the Hotel Unit Sublease to determine whether the Residential Board is a third-party beneficiary with respect to each and every provision thereto and how the Governing Documents impact such analysis.  For the sake of maximizing efficiency in terms of cost, time, and resources expended, any such litigation can be narrowly tailored to focus on what particular objections to particular bids submitted the Residential Board may have, and whether the Residential Board's third-party beneficiary rights extend to such particular issue.

Therefore, any litigation schedule that this Court sets with respect to adjudicating the scope and extent of the Residential Board's third-party beneficiary rights, if any, (including any pre-hearing briefing) should contemplate dates, including briefing and discovery, set after the deadline for bids in the Debtors' sale process when the issues have been narrowed and are not being litigated in a vacuum.

New York, New York                              Respectfully Submitted,


                                                By: /s/ *Janice Mac Avoy*

Enclosures

cc: All registered ECF users via ECF

FRIED, FRANK, HARRIS, SHRIVER & JACOBSON LLP
One New York Plaza
New York, New York 10004



### Cited Caselaw in Order of Citation

⬥ Positive
As of: February 18, 2023 1:55 AM Z

# *In re Verrazano Holding Corp.*

United States Bankruptcy Court for the Eastern District of New York

June 1, 1988

Bankruptcy No. 186-62428, Adversary No. 187-0121

## Reporter

86 B.R. 755 *; 1988 Bankr. LEXIS 940 **; Bankr. L. Rep. (CCH) P72,371; 17 Bankr. Ct. Dec. 1162

In re  VERRAZANO HOLDING CORP., Debtor. Shulamith LEVOVITZ, Yitzchok Edeltuch, Hershel Kanarek, Osher Levovitz, Matis Pincus,  Isaac Swiatycki, and Elimelech Bluth, Barry Botuck, Naomi Botuck, Shlomo Cweiber, Shmuel Gutfreund, Yaakoz Moshe Gutfreund, Rivka Levovitz, Henry Loebenberg, Reuven Mandel, Myrim Serebrowski, Ralph Shain and Ruth Wilamowsky, Plaintiffs, v. VERRAZANO HOLDING CORP., Yeshiva Beth Henoch, Inc., Uziel Frankel, Judith Potash Siegel, Henoch Potash and Sholom Potash, Defendants

## Core Terms

premises, district court, proceedings, bankruptcy court, matters, cases, state court, third party, claim for relief, bankruptcy case, purchasers, rights, exclusive jurisdiction, state law, abstention, adjudicate, consummate, conferred, abstain, parties, specific performance, sales contract, federal court, entitlement, comity

## Case Summary

### Procedural Posture

Defendant sellers filed a motion to dismiss this action for breach of contract, tortious interference with contract, fraudulent misrepresentation, and declaratory judgment on jurisdictional grounds, pursuant to *Bankr. R. 7012(a)* and *Bankr. R. 7012(h)(3)*.

### Overview

This adversary proceeding arose out of a contract for the sale of property. The sellers refused to close the deal with the original purchaser, then entered into a second contract for the sale of the property to defendant debtor. Thereafter, plaintiff assignees commenced suit against the debtor and sellers alleging an entitlement of title to the property. The bankruptcy court authorized the debtor to sell the property free and clear of all liens and claims. After an appeal was denied, the sale was consummated. The assignees then sued the debtor and sellers for breach of contract, tortious interference with contract, and fraudulent misrepresentation and sought a declaratory judgment. The sellers filed a motion to dismiss on jurisdictional grounds, pursuant to *Bankr. R. 7012(a)* and *Bankr. R. 7012(h)(3)*. The court ruled that it lacked jurisdiction over the breach of contract and fraudulent misrepresentation claims because they were non-core, non-related matters. The court noted that even if the assignees were successful on those claims, they could secure no entitlement as against the debtor. Moreover, the court lost its jurisdiction over the premises upon the sale to third parties.

### Outcome

The court granted the seller's motion to dismiss because the bankruptcy court lacked jurisdiction over the non-core, non-related matters, and the court abstained from hearing a related claim.

## LexisNexis® Headnotes

Bankruptcy Law > Case Administration > Commencement of Case > Abstention

Governments > Courts > Judicial Comity

Bankruptcy Law > Procedural Matters > Jurisdiction > General Overview

Bankruptcy Law > Procedural Matters > Jurisdiction > Federal District Courts

Civil Procedure > ... > Jurisdiction > *Subject Matter*

86 B.R. 755, *755; 1988 Bankr. LEXIS 940, **940

*Jurisdiction* > General Overview

Civil Procedure > ... > **Subject Matter**
**Jurisdiction** > Jurisdiction Over Actions > General
Overview

Civil Procedure > ... > **Subject Matter**
**Jurisdiction** > Jurisdiction Over Actions > Exclusive
Jurisdiction

Civil Procedure > Pleading & Practice > Motion
Practice > General Overview

Civil Procedure > Pleading & Practice > Motion
Practice > Time Limitations

**HN1**[⬇] Commencement of Case, Abstention

As amended by the Bankruptcy Amendments and
Federal Judgeship Act, *28 U.S.C.S. § 1334(a)* now
provides that except as provided in *28 U.S.C.S. §
1334(b)*, the district courts shall have original and
exclusive jurisdiction of all cases under title 11. *28
U.S.C.S. § 1334(b)* provides that notwithstanding any
act that confers exclusive jurisdiction on a court or
courts other than the district courts, the district courts
shall have original but not exclusive jurisdiction of all
civil proceedings arising under title 11, or arising in or
related to cases under title 11. *28 U.S.C.S. § 1334(c)(1)*
provides that nothing in this section prevents a district
court in the interest of justice, or in the interest of comity
with state courts or respect for state law from abstaining
from hearing a particular proceeding arising under title
11 or arising in or related to a case under title 11.

Bankruptcy Law > ... > Automatic Stay > Scope of
Stay > General Overview

Bankruptcy Law > Administrative
Powers > Automatic Stay > General Overview

Bankruptcy Law > ... > Administrative
Powers > Automatic Stay > Judicial Review

Bankruptcy Law > Case
Administration > Commencement of
Case > Abstention

Bankruptcy Law > Procedural Matters > Judicial
Review > Jurisdiction

Bankruptcy Law > Procedural

Matters > Jurisdiction > General Overview

Civil Procedure > ... > Jurisdiction > **Subject Matter**
**Jurisdiction** > General Overview

Civil Procedure > ... > **Subject Matter**
**Jurisdiction** > Jurisdiction Over Actions > General
Overview

Civil Procedure > ... > **Subject Matter**
**Jurisdiction** > Jurisdiction Over Actions > Exclusive
Jurisdiction

Civil Procedure > Preliminary
Considerations > Federal & State
Interrelationships > General Overview

Civil Procedure > Preliminary
Considerations > Federal & State
Interrelationships > Abstention

Civil Procedure > Pleading & Practice > Motion
Practice > General Overview

**HN2**[⬇] Automatic Stay, Scope of Stay

*28 U.S.C.S. § 1334(2)* provides that upon timely motion
of a party in a proceeding based upon a state law claim
or state law cause of action, related to a case under
Title 11 but not arising under Title 11 or arising in a case
under Title 11, with respect to which an action could not
have been commenced in a court of the United States
absent jurisdiction under this section, the district court
shall abstain from hearing such proceeding if an action
is commenced, and can be timely adjudicated, in a state
forum of appropriate jurisdiction. Any decision to abstain
made under this subsection is not reviewable by appeal
or otherwise. This subsection shall not be construed to
limit the applicability of the stay provided for by *11
U.S.C.S. § 362*, as such section applies to an action
affecting the property of the estate in bankruptcy. *28
U.S.C.S. § 1334(d)* provides that the district court in
which a case under Title 11 is commenced or is pending
shall have exclusive jurisdiction of all of the property,
wherever located, of the debtor as of the
commencement of such case, and of property of the
estate.

Bankruptcy Law > Procedural
Matters > Jurisdiction > Core Proceedings

Civil Procedure > Judicial

Officers > Judges > General Overview

Bankruptcy Law > Procedural
Matters > Jurisdiction > General Overview

Bankruptcy Law > Procedural
Matters > Jurisdiction > Federal District Courts

*HN3*[🔽] **Jurisdiction, Core Proceedings**

*28 U.S.C.S. § 157* now authorizes the district court to refer to the bankruptcy judges for the district any or all cases under Title 11 and any or all proceedings arising under Title 11 or arising in or related to a case under Title 11. Bankruptcy judges may hear and determine all cases under Title 11 and all core proceedings (nonexclusively defined in *28 U.S.C.S. § 157(b)(2)*) arising under Title 11, or arising in a case under Title 11 referred under *28 U.S.C.S. § 157(a)* and may enter appropriate orders and judgments.

Bankruptcy Law > Procedural
Matters > Jurisdiction > Federal District Courts

Civil Procedure > ... > ***Subject Matter Jurisdiction*** > Jurisdiction Over Actions > Exclusive Jurisdiction

Bankruptcy Law > Procedural
Matters > Jurisdiction > General Overview

Civil Procedure > ... > Jurisdiction > ***Subject Matter Jurisdiction*** > General Overview

Civil Procedure > ... > ***Subject Matter Jurisdiction*** > Jurisdiction Over Actions > General Overview

*HN4*[🔽] **Jurisdiction, Federal District Courts**

*28 U.S.C.S. § 1334(b)* provides the district courts with original, but not exclusive, jurisdiction of any civil proceedings arising under Title 11, or arising in or related to a case under Title 11.

Bankruptcy Law > Procedural
Matters > Jurisdiction > Core Proceedings

Bankruptcy Law > Procedural
Matters > Jurisdiction > General Overview

Bankruptcy Law > Procedural
Matters > Jurisdiction > Noncore Proceedings

*HN5*[🔽] **Jurisdiction, Core Proceedings**

*28 U.S.C.S. § 157* provides that absent express consent by the parties, final adjudicatory powers over non-core, related proceedings shall remain with the district court, an Article III tribunal possessing the essential attributes of judicial power.

Bankruptcy Law > Procedural
Matters > Jurisdiction > General Overview

*HN6*[🔽] **Procedural Matters, Jurisdiction**

"Arising under" and "arising in" jurisdiction should be broadly construed so as to include any matter under which a claim is made pursuant to Title 11.

Bankruptcy Law > Procedural
Matters > Jurisdiction > General Overview

Civil Procedure > ... > ***Subject Matter Jurisdiction*** > Jurisdiction Over Actions > General Overview

*HN7*[🔽] **Procedural Matters, Jurisdiction**

Courts use different standards to determine whether ***subject matter jurisdiction*** existed in a proceeding claimed to be "related to" a particular bankruptcy case. The usual articulation of the "related to" test requires a determination of whether the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy, which will turn on the extent to which the outcome would alter the debtor's rights, liabilities, options or freedoms of action (whether positively or negatively) and which in any way impacts upon the handling and administration of the bankruptcy estate.

Bankruptcy Law > Procedural
Matters > Jurisdiction > General Overview

*HN8*[🔽] **Procedural Matters, Jurisdiction**

The fact that the debtor itself is not a party to the proceeding does not, without more, necessarily

preclude the proceeding from qualifying as one which is "related to." However, it is always the burden of the party alleging bankruptcy court jurisdiction to establish its existence over the matter in dispute.

Civil Procedure > ... > Declaratory Judgments > Federal Declaratory Judgments > General Overview

Constitutional Law > ... > Case or Controversy > Mootness > General Overview

Bankruptcy Law > Procedural Matters > Jurisdiction > General Overview

Civil Procedure > ... > Justiciability > Case & Controversy Requirements > Actual Controversy

Civil Procedure > ... > Justiciability > Mootness > Real Controversy Requirement

Civil Procedure > Judgments > Declaratory Judgments > General Overview

*HN9*[ ]   **Declaratory Judgments, Federal Declaratory Judgments**

The Declaratory Judgment Act, *28 U.S.C.S. § 2201*, states in a case of actual controversy any court of the United States may declare the rights and other legal relations of any interested party. The bankruptcy court therefore is only empowered to issue a declaratory judgment in an actual controversy; if an actual controversy does not exist, the claim is moot and this court is without jurisdiction to grant the relief requested.

Bankruptcy Law > Case Administration > Commencement of Case > Abstention

Civil Procedure > Preliminary Considerations > Federal & State Interrelationships > Abstention

Governments > Courts > Judicial Comity

Bankruptcy Law > Procedural Matters > Jurisdiction > General Overview

Civil Procedure > Preliminary

Considerations > Federal & State Interrelationships > General Overview

*HN10*[ ]   **Commencement of Case, Abstention**

The bankruptcy court may abstain from a "related to" proceeding in favor of state court adjudication. *28 U.S.C.S. § 1334(c)(1)*. The primary criteria for the exercise of discretionary abstention is whether there exists unsettled questions of state law, or whether the action implicates important state interests or policies. Abstention in the interest of justice or in the interest of comity or respect for state law, must also be considered as well as concerns of case administration and judicial economy. Discretionary abstention is further appropriate where the action could not have been commenced in federal court absent bankruptcy jurisdiction and the issues can be timely adjudicated in state court.

**Counsel:** Weil, Gotshal & Manges, by: George G. Love III, Esq., New York, New York, Attorneys for Plaintiffs.

Richard H. Bliss, Esq., New York, New York, Attorneys for Yeshiva Beth Henoch, Inc., Judith Potash Siegel, Henoch Potash and Sholom Potash.

Harvis & Zeichner, by: Nathan Schwed, Esq., New York, New York, Attorneys for Debtor.

**Judges:**  [**1] Marvin A. Holland, Bankruptcy Judge.

**Opinion by:** HOLLAND

# Opinion

 [*757]  MARVIN A. HOLLAND, Bankruptcy Judge:

On June 25, 1987 the plaintiffs filed a complaint in this bankruptcy case (Adv. Pro. 187-0121) setting forth the following four claims for relief respectively:

1) a declaratory judgment that they, together with other parties, are the owners of a certain parcel of property located at 2080 77th Street, Brooklyn, New York (hereinafter "premises");

2) damages for breach of contract against Yeshiva Beth Henoch, Inc. (hereinafter "The Yeshiva"), a third party;

3) damages for tortious interference with contract against the debtor and its principal; and

4) damages for the tort of fraudulent misrepresentation against The Yeshiva and its principals, Judith Potash

Siegel and Henoch Potash (also third parties) in an amount equal to the value of the premises.

The third parties now seek **[\*\*2]** dismissal of those claims asserted against them (claims two and four) on jurisdictional grounds, pursuant to *Bankruptcy Rules 7012(a)* and *(h)(3)*.

### Statement of Jurisdiction

This court has jurisdiction of the subject matter and the parties to this proceeding pursuant to *28 U.S.C. §§ 1334* and *157(a)*. Venue is properly placed pursuant to *28 U.S.C. § 1409(a)*.

### Statement of Issue

Whether this court possesses jurisdiction pursuant to *28 U.S.C. §§ 157(c)(1)* and *1334* over the second and fourth claims for relief outlined in the complaint.

### Statement of Facts

This adversary proceeding arises out of a contract entered into on September 29, 1980 between Ruth Wilamowsky, as purchaser, and The Yeshiva, acting by and through Judith Potash, as seller of the premises. The contract called for payment of $ 22,000, $ 2,000 of which was to be paid on contract and for a conveyance subject to (i) a first mortgage on the premises amounting to approximately $ 47,000 as of September, 1980, and (ii) a second mortgage amounting to approximately $ 25,000 as of September, 1980. Thereafter, Ruth Wilamowsky assigned her contract rights to Myrim Serebrowski whose rights were, in turn, assigned to Shulamith **[\*\*3]** Levovitz, the current nominee and one of the plaintiffs to this proceeding.

On October 13, 1980, The Yeshiva requested permission, pursuant to section 511 of New York's Not for Profit Law, [1] to **[\*758]** consummate the contract of

---

[1] Section 511 of New York's Not for Profit Law provides in pertinent part:

A corporation required by law to obtain leave of court to sell, lease, exchange or otherwise dispose of all or substantially all its assets, shall present a verified petition to the supreme court of the judicial district, or the county court, wherein the corporation has its office or principal place of carrying out the purposes for which it was

sale entered into between Wilamowsky and The Yeshiva. Annexed to the petition was a resolution dated September 22, 1980, certified by The Yeshiva's secretary, Judith Potash, authorizing and directing the appropriate officers of the corporation to enter into and consummate the sale. On November 24, 1980 the petition requesting approval of the sale was granted by the Supreme Court of the State of New York (Kooper, J.).

On December 4, 1980 the original signatories to the contract entered into a letter agreement detailing their respective **[\*\*4]** obligations and calling for payment of the balance of $ 20,000 on or before December 31, 1982. Within the time set forth, the purchasers tendered full payment of the balance due and demanded tender of the deed. The Yeshiva refused, claiming that the contract entered into between the parties had not been authorized by the Yeshiva's trustees and therefore invalid.

The non-signatory trustees submitted the validity of the Wilamowsky contract of sale to arbitration before a rabbinical tribunal ("Beth Din"). It is not clear from the record whether Ruth Wilamowsky received notice of the rabbinical arbitration. In any event, she did not participate. On April 22, 1983, that tribunal held the contract null and void since it had not been approved by the proper authorities of The Yeshiva.

The non-signatory trustees moved, without notice to the contract vendee, Ruth Wilamowsky, to confirm the Beth Din's decision. On July 27, 1983, the Supreme Court of the State of New York (Vaccaro, J.) entered an order confirming the Beth Din's decision.

In August, 1983, The Yeshiva entered into a second contract for the sale of the premises, this time to the debtor. On October 5, 1983, the Supreme Court for **[\*\*5]** the State of New York (Pizzuto, J.), approved the contract authorizing that sale. A deed was executed on October 31, 1983, and recorded on February 27, 1984. In the interim however, on January 31, 1984, Ruth Wilamowski, the original contract vendee, had assigned her rights to Serebrowski. On or about February 6, 1984, Serebrowski commenced an action against The Yeshiva for specific performance on the September 29, 1980 contract and filed a lis pendens. On March 5, 1984, Serebrowski further assigned his rights under the contract to Levovitz who then commenced a separate action against The Yeshiva for specific performance and also filed a lis pendens. The Yeshiva, pursuant to New

---

formed.

22-11509-pb    Doc 180    Filed 02/21/23    Entered 02/21/23 16:53:50    Main Document
Pg 12 of 191

Page 6 of 10
86 B.R. 755, *758; 1988 Bankr. LEXIS 940, **5

York's Civil Practice Law and Rules §§ 3211(a)(1), (3) and (7), moved to dismiss Levovitz' action.

By order dated September 7, 1984, Special Term (Vaccaro, J.) granted The Yeshiva's motion to dismiss. Thereafter, on January 18, 1985, a motion for renewal and reargument was made and denied by order of the Supreme Court (Krasman, J.). An appeal was taken and on November 17, 1986, the Appellate Division in *Levovitz v. Yeshiva Beth Henoch, Inc., 120 A.D.2d 289, 508 N.Y.S.2d 196 (1986)* reversed Justice Vaccaro's **[**6]** order dated September 7, 1984, remanding for further proceedings in accordance with its instructions.

The Appellate Division instructed the Supreme Court to determine whether The Yeshiva had authorized the September 29, 1980 contract of sale. If unauthorized, an appropriate order should be entered dismissing the complaint for specific performance and the judgment of Justice Vaccaro dated July 27, 1983 setting aside the order of Justice Kooper dated November 24, 1980 may stand. If, on the other hand, The Yeshiva had authorized the contract of sale mentioned above, then an appropriate order should be entered (1) vacating the judgment of Special Term (Vaccaro, J.) dated July 27, 1983 and reinstating the order of Special Term (Kooper, J.) dated November 24, 1980, (2) vacating the order of Special Term (Pizzuto, J.) dated October 5, 1983, and (3) granting specific performance to either plaintiff Levovitz or Wilamowsky, depending on a resolution of a dispute regarding **[*759]** the assignment from Wilamowsky to Serebrowski, and directing Verrazano Holding Corp. to convey the subject realty.

After the Appellate Division's order of remand, but prior to the commencement of the remanded proceedings, **[**7]** Verrazano Holding Corp., on December 19, 1986, filed its petition herein.

The assignee of the original purchaser thereupon filed this proceeding alleging an entitlement of title to, and ownership of, the premises.

During the course of this proceeding an application was granted pursuant to *11 U.S.C. § 363(b)* authorizing the debtor to sell the subject premises, free and clear of all liens and claims, such liens and claims, if any, to attach to the proceeds. An appeal was taken, stay was denied, and the sale consummated. The premises are no longer property of the estate.

DISCUSSION

The complaint alleges plaintiffs' entitlement to the premises upon the following grounds:

A) The contract had been duly authorized by The Yeshiva's trustees. Assuming arguendo that the trustees did not formally approve the contract, "their knowledge and tacit approval thereof was adequate to constitute it a due and enforceable obligation of the Yeshiva." Complaint at 9.

B) Henoch Potash and Judith Potash, as officers and trustees of The Yeshiva, had apparent authority to enter into and consummate the contract and the purchasers relied upon that authority. *Id.*

C) The subsequent conduct of the Yeshiva, **[**8]** the Potashes and The Yeshiva's trustees operated to ratify and confirm such contract. *Id.;* and

D) The purchasers reasonably and detrimentally relied upon the enforceability of the contract of sale by performing thereunder, hence The Yeshiva is equitably estopped from denying the validity thereof. *Id.*

Mr. Bliss, counsel to the third parties, asserts in his original answer that this court lacks **_subject matter jurisdiction_** to entertain those claims asserted against The Yeshiva and the Potashes. His amended answer asserts that the second and fourth claims outlined in the complaint are "non-core" claims, between the two sets of strangers to this bankruptcy case, pointing out that "such claims are within the jurisdiction of this court only if they are 'related to' the bankruptcy case under *28 U.S.C. § 1334(b).*" Movant's notice of motion at 3. Since "the outcome of these claims, whatever it may be, cannot affect the estate of the debtor" *id.,* jurisdiction is lacking and dismissal is mandated.

In order to analyze these jurisdictional defenses, a brief discussion of the recent history of the jurisdiction of the bankruptcy court is in order.

As a part of the 1978 Bankruptcy Reform **[**9]** Act which created the current Bankruptcy Code Congress enacted 28 U.S.C. § 1471(b) which gave the district court "original but not exclusive jurisdiction of all civil proceedings arising under Title 11 or arising in or related to cases under Title 11", and further provided in § 1471(c) that "the bankruptcy court for the district in which a case under Title 11 is commenced shall exercise all of the jurisdiction conferred by the section on the district courts."

After the Supreme Court in *Northern Pipeline Construction Co. v. Marathon Pipel Line Co., 458 U.S.*

*50, 102 S. Ct. 2858, 73 L. Ed. 2d 598 (1982)*, held that the exercise by non-Article III bankruptcy judges of such broad and sweeping jurisdiction was unconstitutional, Congress, in the 1984 amendments, repealed all of § 1471. *Wood v. Wood (In re Wood), 825 F.2d 90, 93 (5th Cir. 1987)*; *Commercial Heat Treating of Dayton, Inc. v. Atlas Industries, Inc. (In re Commercial Heat Treating of Dayton, Inc.), 80 B.R. 880, 885 (Bankr. S.D. Ohio 1987)*.

In accord with *Northern Pipeline,* Congress reconstituted bankruptcy court jurisdiction and enacted the Bankruptcy Amendments and Federal Judgeship Act of 1984 ("BAFJA"). This legislation conferred upon the district court **[**10]** jurisdiction over Title **[*760]** 11 cases, as had been the case under § 1471 of the 1978 Act. However, "there is no longer any provision analogous to former Section *1471(c)* which authorized the bankruptcy court to exercise 'all' such jurisdiction." *Acolyte Electric Corp. v. The City of New York, 69 B.R. 155, 162 (Bankr. E.D.N.Y. 1986)* (emphasis added), *aff'd,* No. 86-0329 (JBW) (E.D.N.Y. Mar. 27, 1987).

*HN1*[⬆] As amended by BAFJA, *28 U.S.C. § 1334* now provides that --

(a) Except as provided in subsection (b) of this section, the district courts shall have original and exclusive jurisdiction of all cases under title 11.

(b) Notwithstanding any Act that confers exclusive jurisdiction on a court or courts other than the district courts, the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11.

(c)(1) Nothing in this section prevents a district court in the interest of justice, or in the interest of comity with State courts or respect for State law from abstaining from hearing a particular proceeding arising under title 11 or arising in or related to a case under title 11.

*HN2*[⬆] ] (2) Upon **[**11]** timely motion of a party in a proceeding based upon a State law claim or State law cause of action, related to a case under title 11 but not arising under title 11 or arising in a case under title 11, with respect to which an action could not have been commenced in a court of the United States absent jurisdiction under this section, the district court shall abstain from hearing such proceeding if an action is commenced, and can be timely adjudicated, in a State forum of appropriate jurisdiction. Any decision to abstain made under this subsection is not reviewable by appeal or

otherwise. This subsection shall not be construed to limit the applicability of the stay provided for by *section 362 of title 11, United States Code*, as such section applies to an action affecting the property of the estate in bankruptcy.

(d) The district court in which a case under title 11 is commenced or is pending shall have exclusive jurisdiction of all of the property, wherever located, of the debtor as of the commencement of such case, and of property of the estate.

*HN3*[⬆] *28 U.S.C. § 157* now authorizes the district court to refer to the bankruptcy judges for the district "any or all cases under Title 11 and **[**12]** any or all proceedings arising under Title 11 or arising in or related to a case under Title 11 . . . . Bankruptcy judges may hear and determine all cases under Title 11 and all core proceedings (nonexclusively defined in sub-paragraph (b)(2)) arising under Title 11, or arising in a case under Title 11 referred under subsection (a) . . . . and may enter appropriate orders and judgments . . . ."

Post-BAFJA, the district court, pursuant to *28 U.S.C. § 1334*, is therefore empowered with jurisdiction over four types of matters:

1) "cases under title 11",

2) proceedings "arising under" title 11,

3) proceedings "arising in" a case under title 11, and

4) proceedings "related to" a case under title 11.

The first category refers to the district court's original and exclusive jurisdiction over the bankruptcy petition itself. *28 U.S.C § 1334(a)*. *HN4*[⬆] *28 U.S.C. § 1334(b)* provides the district courts with original, but not exclusive, jurisdiction of any civil proceedings arising under title 11, or arising in or related to a case under title 11. (2, 3, and 4 outlined above).

Clearly, then, in old § 1471 Congress had intended to confer upon those courts which were to exercise bankruptcy jurisdiction very **[**13]** broad jurisdiction over peripheral matters. The Supreme Court in *Northern Pipeline* found nothing wrong with such a broad grant so long as it was exercised by an Article III judge. *See In re Wood, 825 F.2d at 93-4*. *28 U.S.C. § 1334* now gives this jurisdiction to the district court and authorizes delegation to the bankruptcy court of so much thereof as Congress believes to be constitutionally permissible.

**[*761]** Since *28 U.S.C. § 1334(b)* was taken from §

1471(b) of the 1978 Act, the legislative history and judicial interpretations of that section are instructive. *In re Wood, 825 F.2d at 92*. The "legislative history indicates that the phrase 'arising under title 11, or arising in or related to cases under title 11' was meant, not to distinguish between different matters, but to identify collectively a broad range of matters subject to federal bankruptcy jurisdiction," *id. at 92*, and that Congress intended to grant federal courts broad power to adjudicate all matters having an effect on the bankruptcy case, subject only to a concern that an overly broad interpretation of *section 1334* might bring into federal court those matters best suited for state court adjudication. The **[**14]** issue which we now face is the extent to which Congress in the 1984 amendments intended the bankruptcy court to exercise this jurisdiction and the extent to which such jurisdiction may constitutionally be conferred upon us.

This court believes that while Congress in enacting BAFJA intended to continue providing the district court with the broadest constitutionally permissible grant of jurisdictional power to adjudicate all matters connected to a bankruptcy case or proceeding, as it had in the 1978 legislation, the exercise of that jurisdiction by the Bankruptcy Court was subject to limitations and restrictions Congress believed necessary in order to avoid the constitutional impediments pointed out in *Northern Pipeline. Accord FDIC v. Majestic Energy Corp. (Matter of Majestic Energy Corp.), 835 F.2d 87, 90 (5th Cir. 1988)*; *In re Arkansas Communities, Inc., 827 F.2d 1219, 1221 (8th Cir. 1987)*; *In re Wood, 825 F.2d at 90*; *In re Mankin, 823 F.2d 1296, 1300-02 (9th Cir. 1987)*; *In re Arnold Print Works, Inc., 815 F.2d 165, 169-70 (1st Cir. 1987)*; *In re Double TRL, Inc., 65 B.R. 993, 999-1002 (Bankr. E.D.N.Y. 1986)*.

Congress, in promulgating *28 U.S.C. § 1334(c)(1)*, **[**15]** provided the district court with *sua sponte* power to abstain wherever appropriate "in the interest of justice, or in the interest of comity with State courts or respect for state law." Rather than restricting federal bankruptcy jurisdiction, Congress reasoned that those "concerns of comity and judicial convenience should be met, not by rigid limitations on the jurisdiction of federal courts, but by the discretionary exercise of abstention when appropriate in a particular case." *In re Wood, 825 F.2d 90 at 93*; *Accord In re Salem Mortgage Co., 783 F.2d 626, 635 (6th Cir. 1986)*; *In re Outlet Co. Stores, 82 B.R. 694, 698-99 (Bankr. S.D.N.Y. 1988)*. This is consistent with the Supreme Court holding in *Northern Pipeline*.

Congress, by promulgating *28 U.S.C. §§ 157(b)(2)* and *(c)(1)* drew a statutory distinction between core and non-core proceedings which was enacted to address and resolve the constitutional infirmities enunciated in *Northern Pipeline* effectually restricting the jurisdiction of bankruptcy courts to adjudicate those matters having a tangential and remote effect on the bankruptcy. *HN5*[ ] This new legislative enactment provides that absent express consent by the **[**16]** parties, final adjudicatory powers over non-core, related proceedings shall remain with the district court, *In re Lafayette Radio Electronics Corp., 761 F.2d 84, 90 (2d Cir. 1985)*, an Article III tribunal possessing "the essential attributes of judicial power." *Northern Pipeline, 458 U.S. 50, 77, 73 L. Ed. 2d 598, 102 S. Ct. 2858, 2874 (1982)* (quoting *Crowell v. Benson, 285 U.S. 22, 51, 76 L. Ed. 598, 52 S. Ct. 285, 292 (1932))*.

The legislative history of BAFJA clearly indicates that *HN6*[ ] "arising under" and "arising in" jurisdiction should be broadly construed so as to include any matter under which a claim is made pursuant to title 11. However, BAFJA fails to give definition to "related to" jurisdiction.

A survey of the earlier Code cases indicates that prior to *Northern Pipeline* bankruptcy courts did not hesitate in finding a sufficient nexus between a title 11 case and a civil proceeding to confer upon itself "related to" jurisdiction. [2]

**[**17]** **[*762]** After *Northern Pipeline, HN7*[ ] courts began to develop different standards to determine whether **subject matter jurisdiction** existed in a proceeding claimed to be "related to" a particular bankruptcy case. The usual articulation of the "related to" test requires a determination of "whether the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy", *In re Wood, 825 F.2d 90 at 93*; *Bobroff v. Continental Bank (In re Bobroff), 766 F.2d 797, 800 (3d Cir. 1985)*; *Pacor v. Higgins (In re Pacor), 743 F.2d 984, 994 (3d Cir. 1984)*; *Turner v. Ermiger (In re Turner), 724 F.2d*

---

[2] *See, e.g., Cohen v. Beneficial Fin. Co. of Fla., Inc. (In re Claypool), 2 C.B.C. 2d 64 (M.D. Fla. 1980)* (Truth in Lending Act violations); *Trim-Cut Co., Inc. v. Beasley (In re Trim Lean Meat Products, Inc.), 4 B.R. 243 (D. Del. 1980)* (willful appropriation of corporation opportunity); *Griffith v. Realty Executives, Inc. (In re Griffith), 6 B.R. 753 (Bankr. N. M. 1980)* (recision of contract on fraudulent misrepresentation grounds); *Family Savings & Loan Assn. v. Calabria (In re Calabria), 5 B.R. 73 (D. Conn. 1980)* (mortgage foreclosure action).

338, 342 (2d Cir. 1983); *Beebe International, Inc. v. French American Banking Corp. (In re Wedtech), 72 B.R. 313, 315 (Bankr. S.D.N.Y. 1987)*; *Geschke v. CLDC Management Corp. (In re CLDC Management Corp.), 58 B.R. 176, 179 (Bankr. W.D. Ill. 1985)*, which will turn on the extent to which "the outcome would alter the debtor's rights, liabilities, options or freedoms of action (whether positively or negatively) and which in any way impacts upon the handling and administration of the bankruptcy estate." *Dogpatch Properties, Inc. v. Dogpatch U.S.A., Inc.* **[**18]** *(In re Dogpatch U.S.A., Inc.), 810 F.2d 782-786 (8th Cir. 1987)*; *Pacor v. Higgins, 743 F.2d at 994.*

**HN8[↑]** The fact that the debtor itself is not a party to the proceeding does not, without more, necessarily preclude the proceeding from qualifying as one which is "related to". *Pacor v. Higgins, 743 F.2d at 994.* However, it is always the burden of the party alleging bankruptcy court jurisdiction to establish its existence over the matter in dispute. *Elsant, Inc. v. First Wisconsin Financial corp. (In re Xonics, Inc.), 813 F.2d 127, 132 (7th Cir. 1987)*; *State ex rel. Roberts v. Mushroom King, Inc., 77 B.R. 813, 820 (D. Or. 1987)*; *see generally Lehigh Valley Indus. v. Birenbaum, 527 F.2d 87, 92 (2d Cir. 1975)*. In this case, the plaintiffs have failed to meet this burden.

Assuming the plaintiffs were to succeed in their breach of contract and fraudulent misrepresentation claims (claims two and four), the judgment granted would entitle them to compensatory damages against The Yeshiva and its principals, both non-debtor, third party entities. The plaintiffs would secure no entitlement as against the debtor, nor would The Yeshiva or its principals have a contingent claim for **[**19]** contribution or indemnification from the debtor.

Even were we to assume a claim to indemnification or contribution existed against the debtor, this court would still lack jurisdiction to adjudicate the claim. The plaintiffs' ability to obtain and collect upon the judgment would be totally unaffected by any action The Yeshiva and its principals might take against the debtor and its principal. *In re Maislin Indus., U.S., Inc., 75 B.R. 170, 172 (Bankr. E.D. Mich. 1987)*. The outcome of claims two and four, either in favor of or against the plaintiffs, would in no way alter the debtor's rights, liabilities, options or freedom of action (either positively or negatively). Nor would it deplete the assets of the estate, or lead to a restructuring of the debtor/creditor relationship. *See, e.g., In re Xonics, Inc., 813 F.2d at 132* (where the court held that jurisdiction may exist if there is a nexus between the disposition of those claims and the treatment of other creditors of the bankrupt, insofar as it effects the ultimate amount of property available to creditors or restructures the allocation of property among creditors).

The plaintiffs also request that this court declare them **[**20]** the rightful owners of the premises. The standard for seeking this declaration in federal courts is outlined in the Declaratory Judgment Act, *28 U.S.C. § 2201* ("Act"). **HN9[↑]** The Act states "in a case of *actual* controversy . . . . any court of the United States . . . . may declare the rights and other legal relations of any interested **[*763]** party" (emphasis added). [3] This court therefore is only empowered to issue a declaratory judgment in an actual controversy; if an actual controversy does not exist, the claim is moot and this court is without jurisdiction to grant the relief requested.

**[**21]** With regard to the prerequisite of "actual controversy", this court authorized the debtor to sell the premises to a third party. An appeal was taken and a stay pending the appeal denied by the District Court. Thereafter, a sale was consummated and title to the premises transferred to a third party good-faith purchaser for value. Since the debtor neither retains title to the premises, nor seeks any entitlement to it, the claim for specific performance is a "right without a remedy", no longer justiciable in this court, although there still may exist in the plaintiffs a right to the proceeds of that sale. Upon the sale of the premises to the third party this court lost jurisdiction over the premises, *In re Xonics, Inc.,* 823 F.2d at 132, since the debtor or its estate no longer has any interest in the premises, *In re Muller, 72 B.R. 280, 284 (C.D. Ill. 1987)*, and does not allege any further equitable interest in it.

_____

[3] *28 U.S.C. § 2201* refers to "any Court of the United States." *28 U.S.C. § 451* defines a "Court of the United States" as one which is created by Act of Congress the judges of which are entitled to hold office during good behavior. The Third Circuit in *Matter of Becker's Motor Transp., Inc., 632 F.2d 242 (3d Cir. 1986)*, cert. denied, **Becker's Motor Transp., Inc. v. Dept. of Treasury, Internal Revenue Service, 450 U.S. 916, 67 L. Ed. 2d 341, 101 S. Ct. 1358 (1981)**, concluded that bankruptcy courts are not courts whose judges hold office during good behavior, suggesting that they are not Courts of the United States. *See also* **Matter of Richardson, 52 B.R. 527 (Bankr. W.D. Mo. 1985)** (where the court similarly suggests that the bankruptcy court is not a Court of the United States to which *28 U.S.C. § 1927* applies). We need not address whether *28 U.S.C. § 2201* applies to the bankruptcy court since the request for declaratory judgment is moot.

86 B.R. 755, *763; 1988 Bankr. LEXIS 940, **21

*In re Chicago, Rock Island & Pacific R.R. Co., 794 F.2d 1182, 1187 (7th Cir. 1986)* (adjustment of the parties' rights to property of the estate subject to liens is a central function of bankruptcy law -- but jurisdiction lapses when the property leaves the estate). **[**22]** When the closing was consummated the divestiture of the debtor's title resulted in a divestiture of this court's jurisdiction over the premises.

The third claim for relief outlined in the complaint alleging tortious interference with contract by the debtor-in-possession, Verrazano Holding Corp., and its principal, is a related proceeding. To the extent that the debtor did in fact interfere with the contractual relationship between the original purchasers and The Yeshiva, the original purchasers have a claim against the debtor and its estate. If they timely file a proof of claim this court's core jurisdiction may be invoked to determine both its existence and amount in a proceeding between the debtor and the claimant. Additionally, if the plaintiffs elect to litigate in an independent proceeding against not only the debtor, but against its principals as well, the extent to which that action may be "related to" this bankruptcy case is not presently before this court and need not be addressed.

*HN10*[⬆] The bankruptcy court, however, may abstain from a "related to" proceeding in favor of state court adjudication. *28 U.S.C. § 1334(c)(1)*. The primary criteria for the exercise of discretionary abstention **[**23]** is whether there exists unsettled questions of state law, *See Thompson v. Magnolia Petroleum Co., 309 U.S. 478, 84 L. Ed. 876, 60 S. Ct. 628 (1940); In re Earle Indus., Inc., 72 B.R. 131, 133 (Bankr. E.D.Pa. 1987); In re Double TRL, Inc., 65 B.R. 993, 1002 (Bankr. E.D.N.Y. 1986)*, or whether the action implicates important state interests or policies. *See Younger v. Harris, 401 U.S. 37, 27 L. Ed. 2d 669, 91 S. Ct. 746 (1971)*. Abstention "in the interest of justice or in the interest of comity or respect for State law", *28 U.S.C. § 1334(c)(1)*, must also be considered as well as concerns of case administration and judicial economy. Discretionary abstention is further appropriate where the action could not have been commenced in federal court absent bankruptcy jurisdiction and the issues can be timely adjudicated in state court. *In re Titan Energy, Inc., 837 F.2d 325, 333 (8th Cir. 1988)*.

**[*764]** All four claims for relief set forth in the complaint are predicated upon the same operative facts. Although this court has jurisdiction over claim three, the *sine qua non* of that claim, as well as claims two and four, are premised upon state law. These claims require interpretation of state contract and tort doctrines, which determination **[**24]** and interpretation invokes precisely the type of issues which the Supreme Court in *Northern Pipeline* deemed best left to state court resolution. Further, no diversity jurisdiction exists between the parties to this proceeding, and no bankruptcy issues exist upon which this court might claim a special expertise.

We therefore believe abstention from this proceeding is warranted in the interest of judicial economy, interest of comity with state courts, and respect for state law. This court, aware that abstention should be utilized only in limited circumstances, notes that no prejudice is directed toward any parties to this proceeding since it is only at the pleading stage, no serious discovery has yet to take place, and nothing in the record suggests that this matter could not be timely litigated in a state court. This court, however, retains jurisdiction with respect to the enforcement of any judgment or decree so obtained to the extent it may affect the conduct of the case or property of the estate.

CONCLUSIONS OF LAW

(1) The second and fourth claims for relief sought in the complaint are non-core, non-related matters for which this court lacks jurisdiction.

(2) The first claim **[**25]** for relief is moot, and therefore not justiciable in this court.

(3) To the extent that the third claim for relief may be a related proceeding, this court abstains from hearing it pursuant to *28 U.S.C. § 1334(c)(1)*.

SETTLE ORDER in accordance with *Bankruptcy Rules 5011(b)* and *9033*.

Dated: Brooklyn, New York, June 1, 1988

---

*End of Document*

◆ Positive
As of: February 21, 2023 4:48 PM Z

# *In re Extended Stay, Inc.*

United States Bankruptcy Court for the Southern District of New York

August 8, 2020, Decided

Chapter 11, Case No. 09-13764-JLG, Adv. Pro. No. 11-02254-JLG

**Reporter**
2020 Bankr. LEXIS 2128 *

In re: Extended Stay, Inc., et al., Reorganized Debtors.Finbarr O'Connor, as Trustee for and on behalf of the Extended Stay Litigation Trust, and The Extended Stay Litigation Trust, Plaintiffs, v. DL-DW Holdings, L.L.C., et al., Defendants.

**Notice:** NOT FOR PUBLICATION

## Core Terms

Transfers, amended complaint, entities, Certificates, allegations, Floor, Lenders, distributions, asserts, Mortgage, fiduciary duty, funds, Counts, insolvent, consolidation, dividends, fraudulent transfer, extended stay, contends, holders, Mezzanine, cash management, Defendants', insiders, proceeds, Borrowers, cases, piercing, shareholders, affiliates

## Case Summary

### Overview

HOLDINGS: [1]-The Trust alleged facts enough to satisfy constitutional standing requirements because the Trust demonstrated that this was the rare case in which the interrelationships of the debtors were hopelessly obscured such that the time and expense necessary even to attempt to unscramble them was so substantial as to threaten the realization of any net assets for all the creditors; [2]-The fraudulent transfer claims predicated on the Floor Certificate Distributions were dismissed because the trust failed to demonstrate that debtors ever owned the Floor Certificates or the proceeds thereof. As such, the Trust could not plausibly allege that it could avoid the Floor Certificate Transfers under 11 U.S.C.S. §§ 544 and 548 or recover the Floor Certificates and the proceeds thereof under 11 U.S.C.S. § 550.

### Outcome

Defendants' motions granted in part and denied in part.

## LexisNexis® Headnotes

Bankruptcy Law > Procedural Matters > Jurisdiction > Federal District Courts

Civil Procedure > ... > Removal > Specific Cases Removed > Bankruptcy Related Claims

Bankruptcy Law > Procedural Matters > Jurisdiction > Noncore Proceedings

### *HN1*[ ] Jurisdiction, Federal District Courts

District courts have original bankruptcy jurisdiction over civil proceedings arising under title 11, or arising in or related to cases under title 11. 28 U.S.C.S. § 1334(b). The district court may provide that any or all such proceedings shall be referred to the bankruptcy judges for the district. 28 U.S.C.S. § 157(a).

Bankruptcy Law > Procedural Matters > Jurisdiction > Core Proceedings

Bankruptcy Law > Procedural Matters > Jurisdiction > Noncore Proceedings

Bankruptcy Law > Procedural Matters > Jurisdiction > Federal District Courts

### *HN2*[ ] Jurisdiction, Core Proceedings

Core proceedings correspond to proceedings arising under title 11 and proceedings that arise in cases under title 11. Proceedings that arise under the Bankruptcy Code are those that have their origin in the Bankruptcy

Code. Proceedings that arise in a case under title 11 are those that are not based on any right expressly created by Title 11, but nevertheless, would have no existence outside of the bankruptcy. Noncore proceedings are those that are related to a bankruptcy case. 28 U.S.C.S. § 157(c)(1). A civil proceeding is related to a title 11 case if the action's outcome might have any conceivable effect on the bankrupt estate.

Bankruptcy Law > Procedural Matters > Jurisdiction > Core Proceedings

Bankruptcy Law > ... > Plans > Postconfirmation Effects > Plan Implementation

Bankruptcy Law > ... > Plans > Plan Contents > Discretionary Provisions

Bankruptcy Law > ... > Plans > Postconfirmation Effects > Effects of Confirmation

Bankruptcy Law > Procedural Matters > Jurisdiction > Noncore Proceedings

*HN3*[ ] Jurisdiction, Core Proceedings

28 U.S.C.S. § 1334 does not expressly limit bankruptcy jurisdiction following plan confirmation. Nonetheless, all courts that have addressed the question have ruled that once confirmation occurs, the bankruptcy court's jurisdiction shrinks. To invoke the bankruptcy court's post-confirmation jurisdiction a party must show both (i) that the plan provides for the retention of jurisdiction over the dispute, and (ii) that the matter has a close nexus to the bankruptcy plan. Some courts hold that the "close nexus" test does not apply in core proceedings and that, post-confirmation, a bankruptcy court's core jurisdiction remains the same as it was pre-confirmation.

Governments > Courts > Authority to Adjudicate

*HN4*[ ] Courts, Authority to Adjudicate

In a multi-count complaint, the Court must determine the extent of its jurisdiction to adjudicate the matters on a count by count basis.

Bankruptcy Law > Procedural Matters > Jurisdiction > Core Proceedings

Bankruptcy Law > ... > Judicial Review > Standards of Review > De Novo Standard of Review

Bankruptcy Law > Procedural Matters > Jurisdiction > Noncore Proceedings

*HN5*[ ] Jurisdiction, Core Proceedings

Bankruptcy courts may hear and determine and enter appropriate orders and judgments in core proceedings arising under title 11 or arising in a case under title 11. 28 U.S.C.S. § 157(b)(1). Without the consent of all parties to the proceeding, a bankruptcy court may hear, but not determine a proceeding that is not a core proceeding but that is otherwise related to a case under title 11. 28 U.S.C.S. § 157(c)(1). In such proceedings, the bankruptcy court may only submit proposed findings of fact and conclusions of law to the district court. Thereafter, the district court shall enter final judgment in such cases after reviewing de novo any matter to which a party objects. However, if all parties to the litigation consent, the bankruptcy court may hear and determine the matter. 28 U.S.C.S. § 157(c)(2). The consent need not be express and can be implied.

Civil Procedure > ... > Summary Judgment > Supporting Materials > Discovery Materials

Civil Procedure > ... > Responses > Defenses, Demurrers & Objections > Motions to Dismiss

*HN6*[ ] Supporting Materials, Discovery Materials

On a motion to dismiss for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1), the court may consider matters outside the pleadings, such as affidavits, documents, deposition testimony and the like, but cannot rely on conclusory or hearsay evidence. Fed. R. Civ. P. 56.

Bankruptcy Law > Procedural Matters > Adversary Proceedings > Causes of Action

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State Claim

Evidence > Judicial Notice > Adjudicative Facts > Public Records

2020 Bankr. LEXIS 2128, *2128

Civil
Procedure > ... > Pleadings > Complaints > Requirements for Complaint

*HN7*[↧]  **Adversary Proceedings, Causes of Action**

A Fed. R. Civ. P. 12(b)(6) motion tests the sufficiency of the allegations in support of a complaint in light of the pleading requirements in Fed. R. Civ. P. 8. To overcome a Rule 12(b)(6) motion, the plaintiff must demonstrate that the complaint contains sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face. Consequently, on a motion to dismiss pursuant to Rule 12(b)(6), a court is generally limited to the allegations contained in the four corners of the complaint, which it must accept as true. A complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference. However, even if a document is not formally incorporated by reference a court may consider it if it was integral to the complaint. A court also may consider matters of which a court may take judicial notice. In the context of bankruptcy litigation, the public records of which the court may take judicial notice include documents filed in a related bankruptcy proceeding, an adversary proceeding and the underlying bankruptcy case.

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State Claim

*HN8*[↧]  **Motions to Dismiss, Failure to State Claim**

The presence of a document in a court file alone does not mean that judicial notice of the document can be taken of any factual material asserted in the document. Rather, the contents of a judicially noticed document may be considered in a motion to dismiss where it is clear on the record that no dispute exists regarding the authenticity or accuracy of the document, and it is clear that there exists no material disputed issues of fact regarding the relevance of the document.

Civil
Procedure > ... > Pleadings > Complaints > Requirements for Complaint

*HN9*[↧]  **Complaints, Requirements for Complaint**

Limited quotation from or reference to documents that may constitute relevant evidence in a case is not enough to incorporate those documents, wholesale, into a complaint. Rather, case law instructs that a document is integral to a complaint when the plaintiff has actual notice of the extraneous information and relied on it in framing the complaint. That is to say that a document is integral to a complaint when the plaintiff relies heavily upon its terms and effect in the complaint.

Civil Procedure > ... > Responses > Defenses, Demurrers & Objections > Motions to Dismiss

*HN10*[↧]  **Defenses, Demurrers & Objections, Motions to Dismiss**

In resolving claims regarding a lack of jurisdiction under Fed. R. Civ. P. 12(b)(1), a court may rely on evidence outside the pleadings.

Civil
Procedure > ... > Justiciability > Standing > Burdens of Proof

*HN11*[↧]  **Standing, Burdens of Proof**

In every federal case, the party bringing the suit must establish standing to prosecute the action. The question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues. This inquiry involves both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise. Accordingly, a party must demonstrate both constitutional standing and prudential standing.

Civil
Procedure > ... > Justiciability > Standing > Injury in Fact

Constitutional Law > ... > Case or Controversy > Standing > Elements

*HN12*[↧]  **Standing, Injury in Fact**

Under Article III of the Constitution, federal judicial power extends only to Cases and Controversies. U.S. Const. art. III, § 2, cl. 1. Article III standing is a threshold requirement for federal court jurisdiction. The

irreducible constitutional minimum requirements of constitutional standing are: (1) an injury in fact (i.e., a concrete and particularized invasion of a legally protected interest); (2) causation (i.e., a fairly traceable connection between the alleged injury in fact and the alleged conduct of the defendant); and (3) redressability (i.e., it is likely and not merely speculative that the plaintiff's injury will be remedied by the relief plaintiff seeks in bringing suit).

Constitutional Law > ... > Case or Controversy > Standing > Third Party Standing

*HN13*[⤓]  **Standing, Third Party Standing**

The Constitution is not the source of the prudential standing requirements. Rather, those requirements have been developed by the Supreme Court on its own accord and applied in a more discretionary fashion as rules of judicial self-restraint further to protect, to the extent necessary under the circumstances, the purpose of U.S. Const. art. III. The doctrine of prudential standing encompasses the general prohibition on a litigant's raising another person's legal rights, the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches, and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked.

Civil Procedure > ... > Justiciability > Standing > Burdens of Proof

Evidence > Burdens of Proof > Allocation

*HN14*[⤓]  **Standing, Burdens of Proof**

A plaintiff must establish its standing to sue on a claim by claim basis. To meet that burden, the plaintiff must demonstrate that its complaint clearly alleges facts demonstrating that it is a proper party to invoke judicial resolution of the dispute.

Bankruptcy Law > Individuals With Regular Income > Estate Property

*HN15*[⤓]  **Individuals With Regular Income, Estate Property**

When a bankruptcy case is commenced, an estate is created by operation of law. 11 U.S.C.S. § 541. The estate includes all legal or equitable interests of the debtor in property as of the commencement of the case. 11 U.S.C.S. § 541(a).

Bankruptcy Law > Estate Property > Avoidance > Limitations on Trustee Powers

*HN16*[⤓]  **Avoidance, Limitations on Trustee Powers**

11 U.S.C.S. § 548 is a simple grant of power to the bankruptcy trustee to avoid transfers under certain circumstances.

Bankruptcy Law > ... > Prepetition Transfers > Voidable Transfers > Unsecured Creditors

Bankruptcy Law > Claims > Types of Claims > Unsecured Nonpriority Claims

*HN17*[⤓]  **Voidable Transfers, Unsecured Creditors**

Pursuant to 11 U.S.C.S. § 544(b)(1), a trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable. 11 U.S.C.S. § 544(b)(1). In other words, § 544(b) allows the Trust to stand in the shoes of an existing unsecured creditor and bring a state fraudulent conveyance action, or other state law claim that such a creditor could bring.

Bankruptcy Law > ... > Prepetition Transfers > Voidable Transfers > Unsecured Creditors

*HN18*[⤓]  **Voidable Transfers, Unsecured Creditors**

If an actual, unsecured creditor can, on the date of the bankruptcy, reach property that the debtor has transferred to a third party, the trustee may use 11 U.S.C.S. § 544(b) to step into the shoes of that creditor and avoid the debtor's transfer.

Civil Procedure > ... > Responses > Defenses, Demurrers & Objections > Motions to Dismiss

Evidence > Burdens of Proof > Allocation

Evidence > Burdens of Proof > Preponderance of Evidence

### *HN19*[ ] Defenses, Demurrers & Objections, Motions to Dismiss

On a Fed. R. Civ. P. 12(b)(1) motion, the plaintiff bears the burden of proving subject-matter jurisdiction by a preponderance of the evidence. Rule 12(b)(1) motions can present factual or facial challenges to the court's subject matter jurisdiction. A facial attack challenges the sufficiency of the jurisdictional facts alleged, not the facts themselves. In reviewing such a challenge, a trial court takes the allegations in the complaint as true. In contrast, a factual attack challenges whether sufficient facts exist for the court to determine that it has jurisdiction to hear the plaintiff's claims. Where there is a factual attack on the court's subject matter jurisdiction, no presumptive truthfulness attaches to the complaint's jurisdictional allegations rather, the burden is on the plaintiff to satisfy the Court, as fact-finder, of the jurisdictional facts.

Civil Procedure > ... > Pleadings > Complaints > Requirements for Complaint

### *HN20*[ ] Complaints, Requirements for Complaint

Complaints that are brought for the benefit of a number of parties are deficient where they fail to identify which parties are harmed and the extent of such harm. That is so because there may be defenses available to the defendants which are applicable to one or more plaintiffs but not to the others.

Bankruptcy Law > Estate Property > Avoidance > Transferee Liabilities & Rights

### *HN21*[ ] Avoidance, Transferee Liabilities & Rights

Standing requires a particular plaintiff to demonstrate that it is entitled to assert particular claims. The distinction between which Debtors were rendered insolvent by which transfers is important in evaluating the avoidance claims because a particular Debtor transferor is only entitled to avoid a transfer for the benefit of that Debtor transferor's creditors.

Civil Procedure > ... > Federal & State Interrelationships > Choice of Law > Forum & Place

### *HN22*[ ] Choice of Law, Forum & Place

Veil piercing is a state law remedy that allows the creditor of one entity to recover its claim from a separate but related entity. The choice of law rules of the forum state determine which state's law governs a veil piercing claim. Under New York choice of law principles, the law of the state of incorporation determines when the corporate form will be disregarded and liability will be imposed on shareholders.

Business & Corporate Law > ... > Shareholders > Shareholder Duties & Liabilities > Personal Liability

Business & Corporate Law > ... > Piercing the Corporate Veil > Alter Ego > Reverse Piercing

### *HN23*[ ] Shareholder Duties & Liabilities, Personal Liability

Veil piercing is a tool of equity used to disregard the existence of a corporation and impose liability on the corporation's individual principals and their personal assets. The first and most common variety of corporate veil piercing is the vertical veil pierce. In a vertical pierce, a court pierces a limited liability entity's veil to hold the entity's principal liable for the entity's obligations. Liability therefore extends from the limited liability entity to the entity's principal. In a reverse veil pierce, either a corporate insider or a person with a claim against a corporate insider has the insider and the corporate entity treated as alter egos for some purpose. There are therefore two distinct forms of reverse veil piercing, each characterized by whether the party seeking to pierce a limited liability entity's corporate veil is outside or inside the limited liability entity. In an insider reverse veil pierce, a limited liability entity's insider seeks to pierce the corporate veil so that the insider may use the entity's claims against third parties. In an outsider reverse veil pierce, a limited liability entity's creditor seeks to hold the entity liable for the

insider's obligation. An outsider reverse veil piercing claim originates from outside the limited liability entity, with liability extending from the entity to the entity's insider.

Business & Corporate Law > ... > Piercing the Corporate Veil > Alter Ego > Corporate Formalities

*HN24*[⚓]  **Alter Ego, Corporate Formalities**

In the context of horizontal veil piercing, a limited liability entity is considered to be the alter ego of another limited liability entity with the same owner. In this situation, a creditor with a claim against one of the limited liability entities seeks to disregard corporate separateness between the entities to reach assets belonging to both.

Business & Corporate Law > ... > Piercing the Corporate Veil > Alter Ego > Corporate Formalities

Business & Corporate Law > ... > Corporate Existence, Powers & Purpose > Existence > Distinct & Separate Legal Entity

*HN25*[⚓]  **Alter Ego, Corporate Formalities**

Under Delaware law, a corporation has an identity separate from the identities of its shareholders. Delaware courts take the corporate form and corporate formalities very seriously. Indeed, it is only the exceptional case where a court will disregard the corporate form. For that reason, persuading a Delaware court to disregard the corporate entity is a difficult task. Delaware courts recognize vertical, or forward, veil piercing.

Business & Corporate Law > ... > Shareholders > Shareholder Duties & Liabilities > Personal Liability

Business & Corporate Law > ... > Piercing the Corporate Veil > Alter Ego > Reverse Piercing

*HN26*[⚓]  **Shareholder Duties & Liabilities, Personal Liability**

Conventional, or forward, veil piercing is used to hold shareholders, who would otherwise have no liability for corporate debts, liable for those debts. Reverse veil piercing is used to hold the corporation liable for the debts of a shareholder or corporate insider.

Business & Corporate Law > ... > Piercing the Corporate Veil > Alter Ego > Corporate Formalities

Business & Corporate Law > ... > Piercing the Corporate Veil > Alter Ego > Inadequate Capitalization

Business & Corporate Law > ... > Piercing the Corporate Veil > Alter Ego > Fraud & Misrepresentation

*HN27*[⚓]  **Alter Ego, Corporate Formalities**

In determining whether to disregard the corporate form, Delaware courts require a fact intensive inquiry, which may consider the following factors, none of which are dominant: (1) whether the company was adequately capitalized for the undertaking; (2) whether the company was solvent; (3) whether corporate formalities were observed; (4) whether the controlling shareholder siphoned company funds; and (5) whether, in general, the company simply functioned as a facade for the controlling shareholder. There also must be an element of fraud to justify piercing the corporate veil.

Business & Corporate Law > ... > Piercing the Corporate Veil > Alter Ego > Corporate Formalities

Business & Corporate Law > ... > Piercing the Corporate Veil > Alter Ego > Inadequate Capitalization

Business & Corporate Law > ... > Shareholder Duties & Liabilities > Piercing the Corporate Veil > Sham Corporations

*HN28*[⚓]  **Alter Ego, Corporate Formalities**

Specific facts a court may consider when being asked to disregard the corporate form include: (1) whether the company was adequately capitalized for the undertaking; (2) whether the company was solvent; (3) whether corporate formalities were observed; (4) whether the dominant shareholder siphoned company funds; and (5) whether, in general, the company simply functioned as a facade for the dominant shareholder. A decision to disregard the corporate entity generally

results not from a single factor, but rather some combination of them, and an overall element of injustice or unfairness must always be present, as well. Most importantly, because Delaware public policy does not lightly disregard the separate legal existence of corporations, a plaintiff must do more than plead that one corporation is the alter ego of another in conclusory fashion in order for the Court to disregard their separate legal existence.

> Business & Corporate Law > ... > Corporate Existence, Powers & Purpose > Existence > Distinct & Separate Legal Entity

> Business & Corporate Law > ... > Piercing the Corporate Veil > Alter Ego > Reverse Piercing

*HN29*[🔽]   **Existence, Distinct & Separate Legal Entity**

Where a subsidiary is a mere alter ego of the parent to the extent that the Court may engage in reverse veil-piercing, the Court may treat the assets of the subsidiary as those of the parent for purposes of a trustee's standing to void allegedly fraudulent transfers of such assets.

> Business & Corporate Law > ... > Piercing the Corporate Veil > Alter Ego > Corporate Formalities

> Business & Corporate Law > ... > Piercing the Corporate Veil > Alter Ego > Reverse Piercing

> Business & Corporate Law > ... > Piercing the Corporate Veil > Alter Ego > Fraud & Misrepresentation

> Business & Corporate Law > ... > Shareholder Duties & Liabilities > Piercing the Corporate Veil > Illegal Purposes & Interests of Justice

> Business & Corporate Law > ... > Management Duties & Liabilities > Causes of Action > Fraud & Misrepresentation

*HN30*[🔽]   **Alter Ego, Corporate Formalities**

Delaware law permits a court to pierce the corporate veil where there is fraud or where the corporation is in fact a mere instrumentality or alter ego of its owner. To prevail

under the alter-ego theory of piercing the veil in Delaware, a plaintiff need not prove that there was actual fraud but must show a mingling of the operations of the entity and its owner plus an overall element of injustice or unfairness. That standard applies equally to claims for reverse veil piercing.

> Business & Corporate Law > ... > Piercing the Corporate Veil > Alter Ego > Reverse Piercing

*HN31*[🔽]   **Alter Ego, Reverse Piercing**

In effect, although reverse pierce claims implicate different policies and require a different analytical framework from the more routine corporate creditor veil-piercing attempts, the basic finding of injustice or unfairness is still required.

> Bankruptcy Law > ... > Commencement of Case > Joint Cases > Consolidation

> Civil Procedure > Trials > Consolidation of Actions

*HN32*[🔽]   **Joint Cases, Consolidation**

The concept of substantively consolidating separate estates begins with a commonsense deduction. Corporate disregard as a fault may lead to corporate disregard as a remedy. Substantive consolidation is an equitable doctrine that permits a Court in a bankruptcy case involving one or more related corporate entities, in appropriate circumstances, to disregard the separate identity of corporate entities, and to consolidate and pool their assets and liabilities and treat them as though held and incurred by one entity. The result is that claims of creditors against separate debtors morph to claims against the consolidated survivor. Substantive consolidation stems from a bankruptcy court's equitable powers and is a remedy unique to bankruptcy, and, indeed, does not exist outside of it.

> Bankruptcy Law > ... > Commencement of Case > Joint Cases > Consolidation

> Business & Corporate Law > ... > Piercing the Corporate Veil > Alter Ego > Corporate Formalities

*HN33*[🔽]   **Joint Cases, Consolidation**

Courts consider the following factors in determining whether to approve substantive consolidation: The presence or absence of consolidated financial statements; The unity of interest and ownership among various corporate entities; The degree of difficulty in segregating and ascertaining individual assets and liabilities; The transfers of assets without formal observance of corporate formalities; The commingling of assets and business functions; The profitability of consolidation at a single physical location; and The disregard of legal formalities.

Bankruptcy Law > ... > Commencement of Case > Joint Cases > Consolidation

**_HN34_**[ ]  **Joint Cases, Consolidation**

The first prong of the Augie/Restivo test embodies the Court's recognition that lenders structure their loans according to their expectations regarding the borrower and do not anticipate either having the assets of a more sound company available in the case of insolvency or having the creditors of a less sound debtor compete for the borrower's assets. Accordingly, in practice, that prong is applied from the creditors' perspective and the inquiry is whether creditors treated the debtors as a single entity, not whether the managers of the debtors themselves, or consumers, viewed the debtors as one enterprise.

Bankruptcy Law > ... > Commencement of Case > Joint Cases > Consolidation

**_HN35_**[ ]  **Joint Cases, Consolidation**

The second prong of the Augie/Restivo test focuses on whether the proponent of substantive consolidation demonstrates either an operational or a financial entanglement of business affairs. In applying that prong, the question is not whether some affairs were not entangled, but rather whether the commingling in this case was so pervasive that the time and expense necessary even to attempt to unscramble the debtors' books would be so substantial as to threaten the realization of any net assets for all the creditors or where no accurate identification and allocation of assets is possible. In applying the second prong of the test, resort to consolidation should not be Pavlovian, but should be used only after it has been determined that all creditors will benefit because untangling is either

impossible or so costly as to consume the assets.

Bankruptcy Law > ... > Commencement of Case > Joint Cases > Consolidation

Evidence > Burdens of Proof > Allocation

**_HN36_**[ ]  **Joint Cases, Consolidation**

The sole purpose of substantive consolidation is to ensure the equitable treatment of all creditors. However, since application of that doctrine may place creditors of one debtor on parity with creditors of a less solvent debtor, the power to consolidate should be used sparingly because of the possibility of unfair treatment of creditors of a corporate debtor who have dealt solely with that debtor without knowledge of its interrelationship with others. The Trust bears the burden of proving the appropriateness of substantive consolidation.

Civil Procedure > ... > Preclusion of Judgments > Estoppel > Judicial Estoppel

**_HN37_**[ ]  **Estoppel, Judicial Estoppel**

In applying the doctrine of judicial estoppel, the exact criteria for invoking judicial estoppel will vary based on specific factual contexts, and courts have uniformly recognized that its purpose is to protect the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment.

Civil Procedure > ... > Preclusion of Judgments > Estoppel > Judicial Estoppel

**_HN38_**[ ]  **Estoppel, Judicial Estoppel**

The circumstances under which judicial estoppel may appropriately be invoked are probably not reducible to any general formulation of principle, three factors typically inform the decision whether to apply the doctrine in a particular case. Those factors as: First, whether a party's later position is clearly inconsistent with its earlier position. Second, whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create

the perception that either the first or the second court was misled. Third, whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped. In considering those factors, whether a party's position with regard to the ownership of assets is inconsistent with its later claims is largely informed by the bankruptcy court's treatment of those claims.

Bankruptcy Law > ... > Commencement of Case > Joint Cases > Consolidation

*HN39*[ ]  **Joint Cases, Consolidation**

Some courts have found that substantive consolidation can confer standing on a trustee for purposes of satisfying the elements for the avoidance of fraudulent transfers.

Bankruptcy Law > ... > Examiners, Officers & Trustees > Duties & Functions > Capacities & Roles

*HN40*[ ]  **Duties & Functions, Capacities & Roles**

The Bankruptcy Code places a trustee in the shoes of the bankrupt corporation and affords the trustee standing to assert any claims that the corporation could have instituted prior to filing its petition for bankruptcy. However, a trustee lacks standing to assert claims belonging to estate creditors. State law determines whether a claim belongs to the debtor or to individual creditors.

Business & Corporate Law > ... > Management Duties & Liabilities > Causes of Action > Fraud & Misrepresentation

Civil Procedure > ... > Equity > Maxims > Own Wrongs Principle

Civil Procedure > ... > Defenses, Demurrers & Objections > Affirmative Defenses > Unclean Hands

*HN41*[ ]  **Causes of Action, Fraud & Misrepresentation**

Under New York law, a claim against a third party for defrauding a corporation with the cooperation of

management accrues to creditors, not to the guilty corporation. The rationale underlying the Wagoner rule derives from the fundamental principle of agency that the misconduct of managers within the scope of their employment will normally be imputed to the corporation. In that way, the Wagoner rule draws on the state law affirmative defense of in pari delicto and standard agency principles which allow the imputation of management's misconduct to the corporation itself. While the Wagoner rule draws on the in pari delicto doctrine, it differs from it because in pari delicto is a defense to liability and Wagoner focuses on standing. The Wagoner doctrine elevates the in pari delicto defense to a jurisdictional bar based on lack of standing.

Bankruptcy Law > Individuals With Regular Income > Estate Property

*HN42*[ ]  **Individuals With Regular Income, Estate Property**

A Trust's function is virtually indistinguishable from that of the bankruptcy estate itself: to gather the assets of a defunct debtor for distribution to its creditors.

Business & Corporate Law > ... > Management Duties & Liabilities > Causes of Action > Fraud & Misrepresentation

Civil Procedure > ... > Defenses, Demurrers & Objections > Affirmative Defenses > Unclean Hands

*HN43*[ ]  **Causes of Action, Fraud & Misrepresentation**

An important limitation to the application of the Wagoner rule is that it does not protect fiduciaries or insiders of the debtor from their own alleged wrongdoing. The rationale underlying that exception is as follows: The insider exception derives from the notion that it would be inequitable to allow an insider to rely on in pari delicto imputation because it would essentially shield the insiders from the consequences of their own handiwork. Accordingly, a trustee may assert claims against the debtor's insiders when there is an alleged injury to the debtor. (It would be absurd to allow a wrongdoing insider to rely on the imputation of his own conduct to the corporation as a defense.)

Bankruptcy Law > ... > Examiners, Officers &
Trustees > Duties & Functions > Capacities & Roles

*HN44*[ ]  **Duties & Functions, Capacities & Roles**

The Wagoner rule does not bar a litigation trustee
standing in the shoes of a debtor from suing a fiduciary
of the debtor to redress alleged wrongdoing on the part
of the fiduciary.

Business & Corporate Law > ... > Duties &
Liabilities > Knowledge & Notice > Exceptions

Business & Corporate Law > ... > Duties &
Liabilities > Causes of Action &
Remedies > Unauthorized Acts

*HN45*[ ]  **Knowledge & Notice, Exceptions**

The adverse interest exception is the second of the two
exceptions to application of the Wagoner doctrine.  The
adverse interest exception is a narrow exception to the
presumption of imputation existing where the
corporation is actually the victim of a scheme
undertaken by the agent to benefit himself or a third
party personally, which is therefore entirely opposed
(i.e., adverse) to the corporation's own interests. The
adverse interest exception has its own exception known
as the sole actor rule. Under that rule, even if
management takes harmful, entirely unbeneficial
actions, if management acts as the sole decision maker,
its actions will be imputed to the corporation.

Bankruptcy Law > ... > Plans > Postconfirmation
Effects > Effects of Confirmation

Bankruptcy Law > ... > Plans > Plan
Confirmation > Effects of Confirmation

*HN46*[ ]  **Postconfirmation Effects, Effects of
Confirmation**

A confirmed chapter 11 plan is treated as a contract that
is binding on all parties to the plan.

Bankruptcy Law > ... > Plans > Plan
Confirmation > Effects of Confirmation

*HN47*[ ]  **Plan Confirmation, Effects of Confirmation**

Where the language of a plan is unequivocal a court
must adopt the plain and natural meaning only of the
words contained within the text of the instrument itself.

Business & Corporate
Compliance > ... > Trusts > Trust
Administration > Construction & Interpretation of
Trusts

*HN48*[ ]  **Trust Administration, Construction &
Interpretation of Trusts**

Litigation trust agreements and plans are contracts to be
read using the ordinary rules of contractual
interpretation.

Civil Procedure > ... > Defenses, Demurrers &
Objections > Motions to Dismiss > Failure to State
Claim

*HN49*[ ]  **Motions to Dismiss, Failure to State Claim**

A Fed. R. Civ. P. 12(b)(6) motion is designed to test the
legal sufficiency of the complaint, and thus does not
require the court to examine the evidence at issue.
Accordingly, in resolving a Rule 12(b)(6) motion, a court
must accept all factual allegations in the complaint as
true, even if the allegations are doubtful in fact.

Civil Procedure > ... > Defenses, Demurrers &
Objections > Motions to Dismiss > Failure to State
Claim

Civil
Procedure > ... > Pleadings > Complaints > Require
ments for Complaint

*HN50*[ ]  **Motions to Dismiss, Failure to State Claim**

In resolving a Fed. R. Civ. P. 12(b)(6) motion, courts
assess the sufficiency of the complaint in light of the
pleading requirements in Fed. R. Civ. P. 8. Under Rule
8(a)(2) a complaint must contain a short and plain
statement of the claim showing that the pleader is
entitled to relief. Fed. R. Civ. P. 8(a)(2). A claim is
the aggregate of operative facts which give rise to a right
enforceable in the courts. Under Rule 8's liberal notice
pleading standards, the pleader need only set forth a
short and plain statement of the claim showing that the

pleader is entitled to relief. Thus, Rule 8 does not demand that a complaint be a model of clarity or exhaustively present the facts alleged. However, it requires that each defendant is given fair notice of what the plaintiff's claim is and the ground upon which it rests. Accordingly, the short and plain statement called for in Rule 8 must provide enough facts to state a claim to relief that is plausible on its face. In other words, the plaintiff must plead factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. To meet this standard, and thus survive a motion to dismiss under Rule 12(b)(6), a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.

Bankruptcy Law > ... > Avoidance > Fraudulent Transfers > Elements

Civil Procedure > ... > Pleadings > Heightened Pleading Requirements > Fraud Claims

Civil Procedure > ... > Pleadings > Heightened Pleading Requirements > Mistake

**HN51[↓]  Fraudulent Transfers, Elements**

Where an Amended Complaint includes claims seeking to avoid transfers of estate property as actual fraudulent conveyances under federal and state law pursuant to 11 U.S.C.S. § 548(a)(1)(A) and 11 U.S.C.S. § 544, those claims must satisfy the additional pleading requirements of Fed. R. Civ. P. 9(b). Rule 9(b) provides that in alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Fed. R. Civ. P. 9(b). The rule is intended to provide a defendant with fair notice of a plaintiff's claim, to safeguard a defendant's reputation from improvident charges of wrongdoing, and to protect a defendant against the institution of a strike suit. To serve the purpose of Rule 9(b), plaintiffs must allege facts that give rise to a strong inference of fraudulent intent.

Bankruptcy Law > ... > Avoidance > Fraudulent Transfers > Elements

Civil Procedure > ... > Pleadings > Complaints > Requirements for Complaint

**HN52[↓]  Fraudulent Transfers, Elements**

To satisfy the pleading requirements in Fed. R. Civ. P. 8(a)(2), at a minimum, the Trust must provide notice to the Defendants of which Debtor made each transfer, the date and amount of the transfer, the Defendant who received the transfer and the other necessary elements of the cause of action.

Civil Procedure > ... > Pleadings > Heightened Pleading Requirements > Fraud Claims

Securities Law > Civil Liability Considerations > Securities Litigation Reform & Standards > Group Pleading Doctrine

**HN53[↓]  Heightened Pleading Requirements, Fraud Claims**

It is settled that where multiple defendants are asked to respond to allegations of fraud, the complaint should inform each defendant of the nature of its alleged participation in the fraud. The requirements of Fed. R. Civ. P. 9(b) are not satisfied by a complaint in which defendants are clumped together in vague allegations. The so-called group pleading doctrine is an exception to that general rule.  It allows plaintiffs to rely on a presumption that statements in prospectuses, registration statements, annual reports, press releases, or other group-published information, are the collective work of those individuals with direct involvement in the everyday business of the company.

Securities Law > Civil Liability Considerations > Securities Litigation Reform & Standards > Group Pleading Doctrine

**HN54[↓]  Securities Litigation Reform & Standards, Group Pleading Doctrine**

The group pleading doctrine is extremely limited in scope. First, it applies only to group-published documents, such as SEC filings and press releases. Second, it only applies where the officers or directors of the company participated in the preparation and dissemination of the group published document.

Bankruptcy Law > ... > Examiners, Officers & Trustees > Duties & Functions > Capacities & Roles

**HN55**[🔽]  **Duties & Functions, Capacities & Roles**

Courts take a liberal approach when construing allegations of actual fraud when pled by a bankruptcy trustee, because a trustee is an outsider to the transaction who must plead fraud from second-hand knowledge.

Civil Procedure > ... > Pleadings > Heightened Pleading Requirements > Fraud Claims

Civil Procedure > ... > Pleadings > Heightened Pleading Requirements > Mistake

**HN56**[🔽]  **Heightened Pleading Requirements, Fraud Claims**

Application of Fed. R. Civ. P. 9(b) is relaxed when the factual information regarding the alleged fraud is peculiarly within the defendant's control. In those cases, courts will permit group pleading provided that the complaint delineates at least the nature and scope of plaintiffs' effort to obtain, before filing the complaint, the information needed to plead with particularity. This requirement is intended to ensure that plaintiffs thoroughly investigate all possible sources of information, including but not limited to all publicly available relevant information, before filing a complaint. The case of is instructive.

Civil Procedure > ... > Pleadings > Complaints > Requirements for Complaint

**HN57**[🔽]  **Complaints, Requirements for Complaint**

The use of group pleading does not permit a plaintiff to circumvent the requirement of Fed. R. Civ. P. 8 that the complaint give a defendant fair notice of what the plaintiff's claim is and the ground upon which it rests.

Business & Corporate Law > ... > Actions Against Corporations > Derivative Actions > Enforcement of Corporate Rights

**HN58**[🔽]  **Derivative Actions, Enforcement of Corporate Rights**

A stockholder who has purchased all or substantially all

of the shares of a corporation from a vendor at a fair price may not seek to have the acquired corporation recover against the vendor for prior corporate mismanagement and waste of corporate assets that may have occurred during the prior vendor's ownership.

Business & Corporate Law > Closely Held Corporations > Valuation

**HN59**[🔽]  **Closely Held Corporations, Valuation**

Where a buyer purchases a subsidiary for fair value, it cannot later cause the subsidiary to pursue claims against the seller that had accrued prior to the sale.

Real Property Law > Purchase & Sale > Fraudulent Transfers

**HN60**[🔽]  **Purchase & Sale, Fraudulent Transfers**

An estate representative cannot use the avoidance powers in actions in which estate creditors will not benefit from the action. This principle was applied under the Bankruptcy Act to efforts to avoid liens, as well as to pursue preference or fraudulent conveyance actions. Courts apply that principle to bar actions under the Bankruptcy Code to avoid fraudulent transfers where the debtor on whose behalf the action is brought has no unpaid unsecured creditors of its own.

Bankruptcy Law > Estate Property > Avoidance > Transferee Liabilities & Rights

Bankruptcy Law > ... > Prepetition Transfers > Voidable Transfers > Unsecured Creditors

**HN61**[🔽]  **Avoidance, Transferee Liabilities & Rights**

In fraudulent transfer actions, avoidance and recovery are distinct concepts and processes that are addressed in two separate sections of the code, 11 U.S.C.S. § 544 and 11 U.S.C.S. § 550, respectively. Section 544 focuses on the avoidance of a transfer. In substance, it provides that a transfer must first be avoided before a plaintiff can recover it under § 550. 11 U.S.C.S. § 544(b)(1). In turn, § 550 specifies the conditions under which a trustee can recover an avoided transfer. 11

U.S.C.S. § 550. For these purposes, a triggering creditor is a creditor holding an allowable unsecured claim who could have avoided the transfer under non-bankruptcy law. 11 U.S.C.S. § 544(b)(1).

Bankruptcy Law > ... > Prepetition Transfers > Voidable Transfers > Unsecured Creditors

*HN62*[⤓]  **Voidable Transfers, Unsecured Creditors**

It is settled that if a trustee establishes standing to avoid a fraudulent transfer under 11 U.S.C.S. § 544(b) based on the existence of a so-called triggering creditor, the trustee may do so for the benefit of all of the estate's unsecured creditors, and not merely for that creditor. The rule is subject to an important caveat: the trustee is subject to any defenses that could be asserted against the triggering creditor. Thus, in order for a trustee to maintain an action for avoidance of a fraudulent conveyance, the trustee must show that at least one of the present unsecured creditors of the estate holds an allowable claim, against whom the transfer or obligation was invalid under applicable state or federal law.

Bankruptcy Law > ... > Avoidance > Fraudulent Transfers > Constructively Fraudulent Transfers

*HN63*[⤓]    **Fraudulent Transfers, Constructively Fraudulent Transfers**

A fraudulent transfer is not void, but voidable; thus, it can be ratified by a creditor who is then estopped from seeking its avoidance. Ratification is the act of knowingly giving sanction or affirmance to an act which would otherwise be unauthorized and not binding. It may be express or implied, or may result from silence or inaction. However, the intent required for ratification must be clearly established and may not be inferred from doubtful or equivocal acts or language. Creditors can consent to allegedly fraudulent transfers in advance of the transfer.

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State Claim

Contracts Law > Remedies > Ratification

*HN64*[⤓]  **Motions to Dismiss, Failure to State Claim**

Ratification is an affirmative defense to liability. It may be raised by a pre-answer motion to dismiss under Fed. R. Civ. P. 12(b)(6), if the defense appears on the face of the complaint.

Contracts Law > Remedies > Ratification

*HN65*[⤓]  **Remedies, Ratification**

Courts reject claims that a party has ratified a transaction where that party lacks all the material facts necessary to do so.

Torts > ... > Settlements > Multiple Party Settlements > Partial Settlements

*HN66*[⤓]    **Multiple Party Settlements, Partial Settlements**

Under the "one-satisfaction rule" rule, a plaintiff may not recover twice for the same injury. In other words, a person can gain but one satisfaction, even though that person may pursue numerous possible avenues of relief simultaneously and should not be allowed a double recovery for the same wrong.

Bankruptcy Law > ... > Avoidance > Fraudulent Transfers > Constructively Fraudulent Transfers

Evidence > Burdens of Proof > Allocation

Bankruptcy Law > ... > Prepetition Transfers > Voidable Transfers > Lien Creditors & Purchasers

*HN67*[⤓]    **Fraudulent Transfers, Constructively Fraudulent Transfers**

11 U.S.C.S. § 548 allows a trustee to avoid a transfer of an interest of the debtor in property, or any obligation incurred by the debtor. 11 U.S.C.S. § 548(a)(1). An interest in property, for purposes of § 548, includes any interest of the debtor that would have been preserved for the benefit of the bankruptcy estate but for the alleged transfer. Under § 544, a trustee can avoid any transfer of property of the debtor or any obligation incurred by the debtor. 11 U.S.C.S. § 544(a). Section

544 only applies to actions based on pre-bankruptcy transfers of a debtor's own property. It does not apply to claims that are based on transfers of property that were made by non-debtor entities. The burden is on the party seeking to avoid an alleged fraudulent conveyance to establish the debtor's interest in property transferred. The primary consideration in determining if funds are property of the debtor's estate is whether the payment of those funds diminished the resources from which the debtor's creditors could have sought payment.

Bankruptcy Law > ... > Avoidance > Fraudulent Transfers > Constructively Fraudulent Transfers

Real Property Law > Purchase & Sale > Fraudulent Transfers

Bankruptcy Law > ... > Avoidance > Fraudulent Transfers > Elements

_HN68_[⬇]    **Fraudulent Transfers, Constructively Fraudulent Transfers**

In the Second Circuit, property fraudulently transferred is not considered property of the estate unless and until it is recovered. When a Trustee pursues a fraudulent transfer claim the Trustee seeks to recover property (or the value of property) that once belonged to an estate but that was previously transferred. The prior transfer deprived the estate of its ownership interest in the transferred property, and that interest is not restored unless and until the Trustee succeeds in avoiding the transfer and recovering the property.

Bankruptcy Law > ... > Avoidance > Fraudulent Transfers > Constructively Fraudulent Transfers

Contracts Law > ... > Affirmative Defenses > Fraud & Misrepresentation > Constructive Fraud

Real Property Law > Purchase & Sale > Fraudulent Transfers

Civil Procedure > Judgments > Enforcement & Execution > Fraudulent Transfers

Bankruptcy Law > ... > Avoidance > Fraudulent Transfers > Intent

_HN69_[⬇]    **Fraudulent Transfers, Constructively**

**Fraudulent Transfers**

By its terms 11 U.S.C.S. § 546(e) bars the avoidance of a limited group of transfers that otherwise would be avoidable as actual and/or constructive fraudulent transfers under state fraudulent transfer law, or as constructive fraudulent transfers under federal fraudulent transfer law. As such, the structure of § 546(e) is that of an affirmative defense: even if a trustee can succeed in proving the elements of a case in chief under any of the enumerated avoidance provisions, § 546(e) intervenes to shield the transfer from avoidance, except in cases where § 548(a)(1)(A) (actual fraud) applies.

Bankruptcy Law > Estate Property > Avoidance > Postpetition Transactions

_HN70_[⬇]    **Avoidance, Postpetition Transactions**

11 U.S.C.S. § 101(54) defines the term "transfer" to include each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with-- (i) property; or (ii) an interest in property. 11 U.S.C.S. § 101(54)(D).

Banking Law > Regulators > US Federal Deposit Insurance Corporation > Enforcement Powers

Bankruptcy Law > Claims > Types of Claims > Definitions

_HN71_[⬇]    **US Federal Deposit Insurance Corporation, Enforcement Powers**

The Bankruptcy Code defines the term "financial institution" to include a commercial or savings bank. 11 U.S.C.S. § 101(22)(A).

Securities Law > Initial Offerings of Securities > Securities Act Actions > Definitions

_HN72_[⬇]    **Securities Act Actions, Definitions**

11 U.S.C.S. § 101(49) contains a non-exclusive definition of the term securities. Membership units in a limited liability corporation constitute securities under the Bankruptcy Code.

Bankruptcy
Law > ... > Bankruptcy > Liquidations > Clearing
Banks, Commodity Brokers & Stockbrokers

*HN73*[ ] **Exclusions, Clearing Banks, Commodity Brokers & Stockbrokers**

The plain language of 11 U.S.C.S. § 741(7) is very broad in its application and encompasses virtually any contract for the purchase or sale of securities, any extension of credit for the clearance or settlement of securities transactions, and a wide array of related contracts, including security agreements and guarantee agreements.

Bankruptcy Law > Estate
Property > Avoidance > Limitations on Trustee
Powers

*HN74*[ ] **Avoidance, Limitations on Trustee Powers**

11 U.S.C.S. § 546(e)'s in connection with language is by its own terms very broad; in the context of avoidance of transfers it has been interpreted to mean related to an agreement. The hallmarks of a dividend are that (i) it is subject to the control of the corporate board, (ii) it may be paid only when a company is solvent, and (iii) it is paid on account of the ownership of equity in the company, not in exchange for ownership.

Bankruptcy
Law > ... > Bankruptcy > Liquidations > Clearing
Banks, Commodity Brokers & Stockbrokers

Bankruptcy Law > Estate
Property > Avoidance > Limitations on Trustee
Powers

*HN75*[ ] **Exclusions, Clearing Banks, Commodity Brokers & Stockbrokers**

The safe-harbor provisions in 11 U.S.C.S. § 546(e) were enacted to minimize the displacement caused in the commodities and securities markets in the event of a major bankruptcy affecting those industries.

Business & Corporate Law > Limited Liability

Companies > Management Duties & Liabilities

Business & Corporate Law > Limited Liability
Companies > Member Duties & Liabilities

*HN76*[ ] **Limited Liability Companies, Management Duties & Liabilities**

Limited liability companies are creatures of contract, and the parties have broad discretion to use an LLC agreement to define the character of the company and the rights and obligations of its members. Among other things, a company's LLC agreement defines when members of the LLC can be liable for breach of provisions of that agreement. Thus, an LLC operating agreement is the essential contract that governs the affairs of a limited liability company.

Bankruptcy
Law > ... > Bankruptcy > Liquidations > Clearing
Banks, Commodity Brokers & Stockbrokers

Bankruptcy Law > Estate
Property > Avoidance > Limitations on Trustee
Powers

*HN77*[ ] **Exclusions, Clearing Banks, Commodity Brokers & Stockbrokers**

As used in 11 U.S.C.S. § 546(e), the term "settlement payment" means a preliminary settlement payment, a partial settlement payment, an interim settlement payment, a settlement payment on account, a final settlement payment, or any other similar payment commonly used in the securities trade. 11 U.S.C.S. § 741(8). It is clear that the term must be construed in the context of the securities trade.

Bankruptcy Law > Claims > Types of
Claims > Definitions

Bankruptcy Law > Estate
Property > Avoidance > Limitations on Trustee
Powers

*HN78*[ ] **Types of Claims, Definitions**

The term settlement payment is defined for purposes of the forward contract provisions of the Bankruptcy Code as a preliminary settlement payment, a partial

settlement payment, an interim settlement payment, a settlement payment on account, a final settlement payment, a net settlement payment, or any other similar payment commonly used in the forward contract trade. 11 U.S.C.S. § 101(51A).

Business & Corporate Law > ... > Corporate Finance > Dividends & Reacquisition of Shares > Declaration & Distribution of Dividends

Business & Corporate Law > ... > Corporate Finance > Dividends & Reacquisition of Shares > Right to Dividends

**HN79[↓]  Dividends & Reacquisition of Shares, Declaration & Distribution of Dividends**

A dividend is a distribution by a corporation to its shareholders of a share of the earnings of the corporation. Thus, by definition, a dividend transaction does not involve an exchange of value, it is a one-way payment. A traditional corporation-to-shareholder dividend may not be a settlement payment within the plain meaning of 11 U.S.C.S. § 546(e) because it is a one-way distribution that occurs without commensurate consideration.

Civil Procedure > Judgments > Enforcement & Execution > Fraudulent Transfers

**HN80[↓]  Enforcement & Execution, Fraudulent Transfers**

It is settled that bankruptcy courts confronting state law claims that do not implicate federal policy concerns should apply the choice of law rules of the forum state. Fraudulent transfer actions do not implicate federal policy concerns.

Civil Procedure > ... > Federal & State Interrelationships > Choice of Law > Governmental Interests

Torts > Procedural Matters > Conflict of Law > Governmental Interests

**HN81[↓]  Choice of Law, Governmental Interests**

A fraudulent conveyance is considered to be a tort. New

York applies an interest analysis in determining the choice of law for tort claims. Under that analysis, the law of the jurisdiction having the greatest interest in the litigation will be applied. The factors relevant to such an analysis are the nature of the legal issue in conflict, the policy or purpose supporting the provision in conflict, and an examination of the contacts of the competing jurisdictions to determine which jurisdiction has the greatest concern with the specific issue in question. As part of interest analysis, the New York Court of Appeals has distinguished between rules regulating conduct and rules governing loss allocation. Generally, when the laws in conflict are conduct regulating, the law of the locus jurisdiction applies. For these purposes, a fraudulent conveyance statute is conduct regulating rather than loss allocating. (order amended on reconsideration.

Bankruptcy Law > ... > Avoidance > Fraudulent Transfers > Constructively Fraudulent Transfers

Civil Procedure > ... > Federal & State Interrelationships > Choice of Law > Significant Relationships

Torts > Procedural Matters > Conflict of Law > Place of Injury

Torts > Procedural Matters > Conflict of Law > Significant Relationships

**HN82[↓]  Fraudulent Transfers, Constructively Fraudulent Transfers**

The law of the jurisdiction with the most significant contacts to the relevant transfers and relevant parties applies to a state constructive fraudulent transfer claim brought under 11 U.S.C.S. § 544(b). Contacts to be considered include the domicile, residence, place of incorporation and place of business of the parties; the place of injury; and the place of injury-causing conduct.

Bankruptcy Law > ... > Liquidations > Denial of Discharge > Concealment & Fraudulent Transfers

Bankruptcy Law > ... > Avoidance > Fraudulent Transfers > Intent

**HN83[↓]  Denial of Discharge, Concealment & Fraudulent Transfers**

To plead a claim of an actual fraudulent transfer under federal law, a plaintiff must allege, with specificity, that in making the transfers, the transferor acted with actual intent to hinder, delay or defraud its creditors. 11 U.S.C.S. § 548(a)(1)(A). For these purposes, only the intent of the transferor in making the transfer is relevant.

Civil Procedure > ... > Pleadings > Heightened Pleading Requirements > Fraud Claims

Civil Procedure > ... > Pleadings > Heightened Pleading Requirements > Mistake

### *HN84*[⤓] Heightened Pleading Requirements, Fraud Claims

To state a claim for actual fraudulent conveyance, a plaintiff must satisfy the general pleading requirements in Fed. R. Civ. P. 8(a) and the heightened standards of Fed. R. Civ. P. 9(b). To satisfy the pleading requirements of Rule 9(b), a complaint must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent. That is to say that the plaintiff must plead the who, what, when and where of his allegations. The plaintiff also must state with particularity the circumstances constituting fraud or mistake, including, at a minimum, facts that give rise to a strong inference of fraudulent intent. A strong inference of fraudulent intent arises if a plaintiff plausibly alleges: (i) that the defendants had both motive and opportunity to commit fraud, or (ii) strong circumstantial evidence of conscious misbehavior or recklessness. To qualify as strong, the inference of scienter must be more than merely reasonable or permissible—it must be cogent and compelling, thus strong in light of other explanations. The court must consider plausible opposing inferences such that a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.

Securities Law > Civil Liability Considerations > Securities Litigation Reform & Standards > Group Pleading Doctrine

### *HN85*[⤓] Securities Litigation Reform & Standards, Group Pleading Doctrine

In proving fraud, the group pleading doctrine has no effect on the scienter requirement. It merely gives plaintiffs the benefit of a presumption that certain kinds of statements were made by certain kinds of defendants. It does not permit plaintiffs to presume the state of mind of those defendants at the time the alleged misstatements were made.

Bankruptcy Law > ... > Avoidance > Fraudulent Transfers > Intent

### *HN86*[⤓] Fraudulent Transfers, Intent

Because proving actual intent is difficult, to support its case, the pleader is allowed to rely on badges of fraud i.e., circumstances so commonly associated with fraudulent transfers that their presence gives rise to an inference of intent. Common badges of fraud include: (1) lack or inadequacy of consideration; (2) the family, friendship or close associate relationship between the parties; (3) the retention of possession, benefit or use of the property in question; (4) the financial condition of the party sought to be charged both before and after the transaction in question; (5) the existence or cumulative effect of a pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; (6) the general chronology of the events and transactions under inquiry; (7) a questionable transfer not in the usual course of business; and (8) the secrecy, haste, or unusualness of the transaction.

Bankruptcy Law > ... > Avoidance > Fraudulent Transfers > Intent

### *HN87*[⤓] Fraudulent Transfers, Intent

Courts routinely apply the badges of fraud test in assessing the adequacy of fraud claims.

Bankruptcy Law > ... > Avoidance > Fraudulent Transfers > Intent

### *HN88*[⤓] Fraudulent Transfers, Intent

The case law is clear that the presence or absence of any single badge of fraud generally is not conclusive evidence of a plaintiff's intent to hinder, delay or defraud existing or future creditors. Rather, in assessing whether

the badges of fraud demonstrate fraudulent intent in a particular case, courts look to whether, when viewed together, the badges present in that case evidence an intent to defraud. Thus, while the presence of a single badge of fraud may spur mere suspicion, the confluence of several can constitute conclusive evidence of an actual intent to defraud, absent significantly clear evidence of a legitimate supervening purpose. (No particular badge is dispositive, and courts typically require the confluence of multiple badges to establish fraudulent intent.

Bankruptcy Law > ... > Avoidance > Fraudulent Transfers > Intent

**HN89[🔽] Fraudulent Transfers, Intent**

In applying the badges in a given case, the proper inquiry is whether the badges of fraud are present, not whether some factors are absent.

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State Claim

Evidence > Inferences & Presumptions > Inferences

Civil Procedure > ... > Pleadings > Complaints > Requirements for Complaint

**HN90[🔽] Motions to Dismiss, Failure to State Claim**

The factual allegations in support of a complaint must consist of more than mere labels, legal conclusions, or a formulaic recitation of the elements of a cause of action. In assessing the adequacy of the pleadings, plausibility is a relative measure. The plausibility determination is a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. Thus, a claim is plausible when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. A plaintiff's factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true. The plausibility standard does not require a showing of a probability of misconduct, however it demands more than a sheer possibility that a defendant has acted unlawfully. Where there is an obvious alternative explanation that is more likely, the plaintiff's cause of action is not plausible and must be dismissed. Allegations become implausible when the court's commonsense credits far more likely inferences from the available facts.

Bankruptcy Law > ... > Avoidance > Fraudulent Transfers > Constructively Fraudulent Transfers

**HN91[🔽] Fraudulent Transfers, Constructively Fraudulent Transfers**

A court must focus precisely on the specific transaction or transfer sought to be avoided in order to determine whether that transaction falls within the statutory parameters of either an intentional or constructive fraudulent conveyance.

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State Claim

Civil Procedure > ... > Pleadings > Complaints > Requirements for Complaint

**HN92[🔽] Motions to Dismiss, Failure to State Claim**

For pleading purposes, a defendant's rebuttal of a plaintiff's contentions with its own does not entitle the defendant to dismissal of an action. The plausibility standard is not akin to a probability requirement. The relative strength of the parties' explanations is not a question to be decided at the pleading stage unless the plaintiff's version is so remote as to be implausible.

Bankruptcy Law > ... > Avoidance > Fraudulent Transfers > Constructively Fraudulent Transfers

Bankruptcy Law > ... > Avoidance > Fraudulent Transfers > Value

Bankruptcy Law > ... > Avoidance > Fraudulent Transfers > Elements

**HN93[🔽] Fraudulent Transfers, Constructively Fraudulent Transfers**

To state a claim for constructive fraudulent conveyance

under 11 U.S.C.S. § 548(a)(1)(B), the plaintiff must allege facts demonstrating that within two years of the Petition Date, (i) there was a transfer of an interest of the Debtor in property; (ii) the debtor (a) was insolvent at the time of the transfer or became insolvent as a result of the transfer, (b) was engaged in business or was about to engage in business for which the debtor's remaining property was an unreasonably small capital, or (c) intended to incur or believed that it would incur debts beyond its ability to pay as they matured, and (iii) the debtor received less than a reasonably equivalent value in exchange for such transfer. 11 U.S.C.S. § 548(a)(1)(B).

Bankruptcy Law > ... > Avoidance > Fraudulent Transfers > Constructively Fraudulent Transfers

Bankruptcy Law > ... > Avoidance > Fraudulent Transfers > Value

**HN94**[⬇] **Fraudulent Transfers, Constructively Fraudulent Transfers**

11 U.S.C.S. § 548 defines value as property, or satisfaction or securing of a present or antecedent debt of the debtor 11 U.S.C.S. § 548(d)(2)(A). However, the Bankruptcy Code does not define reasonably equivalent value.

Business & Corporate Law > ... > Corporate Finance > Dividends & Reacquisition of Shares > Right to Dividends

**HN95**[⬇] **Dividends & Reacquisition of Shares, Right to Dividends**

In general, repayment of an antecedent debt constitutes fair consideration unless the transferee is an officer, director or major shareholder of the transferor. It is also the case that a lawful declaration of dividend establishes a debt between the corporation and stockholder.

Bankruptcy Law > ... > Bankruptcy > Liquidations > Clearing Banks, Commodity Brokers & Stockbrokers

**HN96**[⬇] **Exclusions, Clearing Banks, Commodity Brokers & Stockbrokers**

Courts have recognized that, in addition to providing expressly for director liability on account of an illegal dividend, 11 U.S.C.S. § 741(c) also provides a cause of action against a shareholder that receives an illegal dividend or redemption payment with notice of its impropriety.

Business & Corporate Law > ... > Corporate Finance > Dividends & Reacquisition of Shares > Cancellation & Redemption

Business & Corporate Law > Corporations > Corporate Finance > Corporate Ownership of Stock

Business & Corporate Law > ... > Corporate Finance > Initial Capitalization & Stock Subscriptions > Classes of Stock

Business & Corporate Law > ... > Meetings & Voting > Special Meetings > Fundamental Changes

Business & Corporate Law > ... > Directors & Officers > Terms in Office > Elections

**HN97**[⬇] **Dividends & Reacquisition of Shares, Cancellation & Redemption**

Del. Code Ann. tit. 8, § 160 bars a corporation from purchasing or redeeming its own shares of capital stock if its capital is impaired or would be impaired by the redemption. Del. Code Ann. tit. 8, § 160(a)(1).

Business & Corporate Compliance > ... > Contracts Law > Types of Contracts > Quasi Contracts

Contracts Law > Remedies > Equitable Relief > Quantum Meruit

Trade Secrets Law > ... > Remedies > Damages > Unjust Enrichment

Contracts Law > Remedies > Restitution

**HN98**[⬇] **Types of Contracts, Quasi Contracts**

A claimant seeking relief under a theory of unjust enrichment must demonstrate (1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution. Unjust

enrichment is a quasi-contractual doctrine that applies only in the absence of a contract. Accordingly, the existence of a contract between parties to a dispute ordinarily precludes recovery for unjust enrichment for events arising out of the same subject matter as the contract.

Business & Corporate Law > ... > Shareholder Actions > Actions Against Corporations > Internal Corporate Affairs

**HN99[⤓]  Actions Against Corporations, Internal Corporate Affairs**

The internal affairs doctrine is a conflict of laws principle which recognizes that only one State should have the authority to regulate a corporation's internal affairs—matters peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders—because otherwise a corporation could be faced with conflicting demands. Under New York law, questions relating to the internal affairs of corporations are decided in accordance with the law of the place of incorporation. The New York Court of Appeals has rejected automatic application of the internal affairs doctrine. That is because in certain circumstances application of the local law of some other state is required by reason of the overriding interest of that other state in the issue to be decided.

Business & Corporate Law > ... > Causes of Action & Remedies > Breach of Fiduciary Duty > Defenses

**HN100[⤓]  Breach of Fiduciary Duty, Defenses**

As a general rule, the law of the state of incorporation governs an allegation of breach of fiduciary duty owed to a corporation.

Civil Procedure > ... > Pleadings > Heightened Pleading Requirements > Fraud Claims

Torts > Intentional Torts > Breach of Fiduciary Duty > Elements

**HN101[⤓]  Heightened Pleading Requirements, Fraud Claims**

Fed. R. Civ. P. 9(b) is not limited to allegations styled or

denominated as fraud or expressed in terms of the constituent elements of a fraud cause of action. To the extent any of the plaintiff's claims are premised on fraudulent conduct, the facts alleging that conduct are subjected to the higher pleading standard of Rule 9(b). Although fraud, per se, is not an element of a claim for breach of fiduciary duty, if that claim is based on fraudulent conduct, the allegations in support of the claim must satisfy Rule 9(b).

Civil Procedure > ... > Pleadings > Heightened Pleading Requirements > Fraud Claims

Civil Procedure > Pleading & Practice > Pleadings > Rule Application & Interpretation

**HN102[⤓]  Heightened Pleading Requirements, Fraud Claims**

A claim will sound in fraud if either the claim arose out of events that the pleading describes in terms of fraud, or the pleading includes a claim based on fraud, and the non-fraud claim incorporates the fraud allegations.

Civil Procedure > ... > Pleadings > Heightened Pleading Requirements > Fraud Claims

Securities Law > Civil Liability Considerations > Securities Litigation Reform & Standards > Group Pleading Doctrine

**HN103[⤓]  Heightened Pleading Requirements, Fraud Claims**

Application of the group pleading doctrine applies whenever Fed. R. Civ. P. 9(b) applies, which is whenever the alleged conduct of defendants is fraudulent in nature.

Torts > Intentional Torts > Breach of Fiduciary Duty > Elements

**HN104[⤓]  Breach of Fiduciary Duty, Elements**

To state a claim for breach of a fiduciary duty under Delaware law, the factual allegations in a complaint must be such that they reasonably could support a finding that a fiduciary duty existed and the defendant

breached that duty. The elements of a breach of fiduciary duty claim are (1) that the fiduciary duty exists and (2) that the fiduciary breached that duty. If there is no existing fiduciary duty then the claims fail, and there is no need to examine whether a fiduciary breached a duty.

Business & Corporate Law > ... > Management Duties & Liabilities > Fiduciary Duties > Duty to Third Parties

Business & Corporate Law > ... > Actions Against Corporations > Derivative Actions > Enforcement of Corporate Rights

### HN105[🔻] Fiduciary Duties, Duty to Third Parties

Under Delaware law, a parent corporation does not owe fiduciary duties to its wholly owned subsidiaries or their creditors. As the ultimate beneficial owners of a corporation, shareholders have standing to bring breach of fiduciary duty claims derivatively on behalf of the corporation. Once the corporation becomes insolvent, however, creditors take the place of the shareholders as the residual beneficiaries of any increase in value, and such creditors have standing to maintain derivative claims against directors on behalf of the corporation for breaches of fiduciary duties.

Business & Corporate Law > ... > Management Duties & Liabilities > Fiduciary Duties > Duty of Care

Business & Corporate Law > ... > Management Duties & Liabilities > Fiduciary Duties > Duty of Good Faith

Business & Corporate Law > ... > Management Duties & Liabilities > Fiduciary Duties > Duty of Loyalty

Business & Corporate Law > ... > Duties & Liabilities > Care, Good Faith & Reasonable Skill > Duty of Good Faith

### HN106[🔻] Fiduciary Duties, Duty of Care

Directors and officers of Delaware corporations owe identical fiduciary duties of care, good faith and loyalty to their corporations and stockholders.

Business & Corporate Law > ... > Shareholder Duties & Liabilities > Controlling Shareholders > Fiduciary Duties

### HN107[🔻] Controlling Shareholders, Fiduciary Duties

Controlling shareholders of a Delaware corporation are considered to be fiduciaries of that corporation. For these purposes, a controlling shareholder exists when a stockholder: 1) owns more than 50% of the voting power of a corporation; or 2) exercises control over the business and affairs of the corporation.

Business & Corporate Law > ... > Shareholder Duties & Liabilities > Controlling Shareholders > Fiduciary Duties

### HN108[🔻] Controlling Shareholders, Fiduciary Duties

Minority shareholders will be treated as controlling shareholders if they have such formidable voting and managerial power that they, as a practical matter, are no differently situated than if they had majority voting control. A minority shareholder will be considered a fiduciary only if it actually exercises control over the corporation, and its business. However, that control need not be pervasive, and can be evaluated with regard to particular transactions. To be deemed a controlling stockholder for purposes of imposing fiduciary obligations, the plaintiff must establish the actual exercise of control over the corporation's conduct by that otherwise minority stockholder. In order to append the label of controlling shareholder, pervasive control over the corporation's actions is not required; indeed, a plaintiff can survive the motion to dismiss by alleging actual control with regard to the particular transaction that is being challenged. The focus of the inquiry is whether the party, through its control of the relevant board, dominated the corporate decision-making process. However, it is the actual exercise of such control, not the simple potential for control, that creates the special duty.

Business & Corporate Law > Limited Liability Companies > Management Duties & Liabilities

Contracts Law > Contract Interpretation > Fiduciary Responsibilities

Business & Corporate Law > Limited Liability Companies > Member Duties & Liabilities

### HN109[👤] Limited Liability Companies, Management Duties & Liabilities

In the context of LLCs, there are three ways fiduciary duties can be established. Primarily, fiduciary duties in LLCs are governed by the limited liability company agreement. Absent an agreement, or if the LLC agreement is silent, the Delaware Chancery Court has found consistently a default rule that the manager or director of the LLC owes fiduciary duties to fellow LLC members and the LLC. That is because an LLC manager has more than an armslength, contractual relationship with the members of the LLC, and is vested with discretionary power to manage the business of the LLC. The corollary to this rule, however, is that while managers and managing members owe default fiduciary duties, passive members do not. Absent a modification of the LLC agreement or facts suggesting the purportedly passive member was acting in a managerial capacity. Third, in rare and highly fact-specific instances courts may find a defendant had actual control over an LLC which was not granted under the LLC agreement.

Business & Corporate Law > Agency Relationships > Fiduciaries > Definitions

### HN110[👤] Fiduciaries, Definitions

A fiduciary relationship is characterized by the reliance by one party on the integrity or discretion of another. It requires great confidence and trust on the one part, and a high degree of good faith on the other part. As a general rule, an arms-length business transaction is not sufficient to establish a special relationship.

Business & Corporate Law > ... > Management Duties & Liabilities > Causes of Action > Breach of Fiduciary Duty

### HN111[👤] Causes of Action, Breach of Fiduciary Duty

A director, member, or officer of a corporate entity serving as the general partner of a limited partnership

who exercises control over the partnership's property owes fiduciary duties directly to the partnership and its limited partners. That principle has been extended to cases in which an LLC is acting as the managing member of an LLC.

Business & Corporate Law > ... > Management Duties & Liabilities > Fiduciary Duties > Business Judgment Rule

Business & Corporate Law > ... > Management Duties & Liabilities > Fiduciary Duties > Duty of Care

Business & Corporate Law > ... > Management Duties & Liabilities > Fiduciary Duties > Duty of Good Faith

### HN112[👤] Fiduciary Duties, Business Judgment Rule

The business judgment rule is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company. Where the business judgment rule presumptions are applicable, the board's decision will be upheld unless it cannot be attributed to any rational purpose. To rebut that presumption, a plaintiff must provide evidence that directors, in reaching their challenged decision, breached any one of the triads of their fiduciary duty—good faith, loyalty or due care. In that way, the business judgment rule is process oriented and informed by a deep respect for all good faith board decisions.

Business & Corporate Law > ... > Management Duties & Liabilities > Fiduciary Duties > Business Judgment Rule

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State Claim

### HN113[👤] Fiduciary Duties, Business Judgment Rule

The business judgment rule is an affirmative defense. Where claims in a complaint allege facts that invoke application of the business judgment rule, the Court may

dismiss the claim pursuant to Fed. R. Civ. P. 12(b)(6), unless the plaintiff pleads around the business judgment rule to show it is inapplicable. Otherwise, it is inappropriate to consider the affirmative defense in the context of the Rule 12(b)(6) motion.

Business & Corporate Law > ... > Management Duties & Liabilities > Fiduciary Duties > Duty of Care

Torts > Negligence > Gross Negligence

Business & Corporate Law > ... > Management Duties & Liabilities > Causes of Action > Negligent Acts of Directors & Officers

### HN114[⤓] Fiduciary Duties, Duty of Care

The duty of care is the duty to act on an informed basis. A corporate director is only considered to have breached his duty of care in instances of gross negligence.

Business & Corporate Law > ... > Management Duties & Liabilities > Fiduciary Duties > Duty of Care

### HN115[⤓] Fiduciary Duties, Duty of Care

In assessing the merits of actions taken by a board and reviewing whether the board members breached their duty of care, courts focus on the process undertaken by the directors in reaching their decision, not on the merits of the decision that they reached.

Business & Corporate Law > ... > Management Duties & Liabilities > Fiduciary Duties > Duty of Care

Business & Corporate Law > ... > Management Duties & Liabilities > Fiduciary Duties > Duty of Good Faith

### HN116[⤓] Fiduciary Duties, Duty of Care

Compliance with a director's duty of care can never appropriately be judicially determined by reference to the content of the board decision that leads to a corporate loss, apart from consideration of the good faith or rationality of the process employed. That is, whether a judge or jury considering the matter after the fact, believes a decision substantively wrong, or degrees of wrong extending through stupid to egregious or irrational, provides no ground for director liability, so long as the court determines that the process employed was either rational or employed in a good faith effort to advance corporate interests. (noting that in applying the duty of care, courts do not measure, weigh or quantify directors' judgments.

Business & Corporate Law > ... > Management Duties & Liabilities > Causes of Action > Self-Dealing

### HN117[⤓] Causes of Action, Self-Dealing

In reviewing the adequacy of the plaintiff's allegations in stating a claim for negligent mismanagement, the court noted that an elementary precept of corporation law is that in the absence of facts showing self-dealing or improper motive, a corporate officer or director is not legally responsible to the corporation for losses that may be suffered as a result of a decision that an officer made or that directors authorized in good faith.

Business & Corporate Law > ... > Causes of Action & Remedies > Breach of Fiduciary Duty > Defenses

Business & Corporate Law > Corporations > Articles of Incorporation & Bylaws > Interpretation of Articles of Incorporation

Business & Corporate Law > ... > Management Duties & Liabilities > Fiduciary Duties > Duty of Loyalty

Business & Corporate Law > ... > Management Duties & Liabilities > Fiduciary Duties > Duty of Good Faith

Business & Corporate Law > ... > Management Duties & Liabilities > Causes of Action > Misfeasance & Nonfeasance

### HN118[⤓] Breach of Fiduciary Duty, Defenses

Del. Code Ann. tit. 8, § 102(a) identifies matters that must be set forth in a certificate of incorporation. Section 102(b)(7) provides that a certificate may

include: A provision eliminating or limiting the personal liability of a director to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, provided that such provision shall not eliminate or limit the liability of a director: (i) for any breach of the director's duty of loyalty to the corporation or its stockholders; (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law; (iii) under § 174 of this title; or (iv) for any transaction from which the director derived an improper personal benefit. Del. Code Ann. tit. 8, § 102(b)(7).

Business & Corporate Law > Corporations > Articles of Incorporation & Bylaws > Interpretation of Articles of Incorporation

**HN119[↓]    Articles of Incorporation & Bylaws, Interpretation of Articles of Incorporation**

Courts characterize a Del. Code Ann. tit. 8, § 102(b)(7) charter provision as in the nature of an affirmative defense.

Business & Corporate Compliance > ... > Contracts Law > Contract Conditions & Provisions > Exculpatory Clauses

Torts > ... > Defenses > Exculpatory Clauses > Interpretation

**HN120[↓]    Contract Conditions & Provisions, Exculpatory Clauses**

Exculpatory clauses in certificates of incorporation are enforceable against a bankruptcy estate representative asserting a debtor's claims on behalf of creditors.

Business & Corporate Law > ... > Management Duties & Liabilities > Fiduciary Duties > Duty of Care

Business & Corporate Law > ... > Management Duties & Liabilities > Fiduciary Duties > Duty of Loyalty

Business & Corporate Law > Corporations > Articles of Incorporation & Bylaws > Interpretation of Articles of Incorporation

Business & Corporate Law > ... > Management Duties & Liabilities > Fiduciary Duties > Duty of Good Faith

Business & Corporate Law > ... > Directors & Officers > Management Duties & Liabilities > Indemnification & Reimbursement

**HN121[↓]    Fiduciary Duties, Duty of Care**

Since its enactment, Delaware courts have consistently held that the adoption of a charter provision, in accordance with Del. Code Ann. tit. 8, § 102(b)(7), bars the recovery of monetary damages from directors for a successful shareholder claim that is based exclusively upon establishing a violation of the duty of care. Nonetheless, it is well settled that under § 102(b)(7), an exculpation clause can exculpate directors from monetary liability for a breach of the duty of care, but not for conduct that is not in good faith or a breach of the duty of loyalty. Thus, a complaint is subject to dismissal under § 102(b)(7) if the only claim it asserts is for breach of the duty of care.

Business & Corporate Law > ... > Directors & Officers > Terms in Office > Elections

Business & Corporate Law > Corporations > Articles of Incorporation & Bylaws > Interpretation of Articles of Incorporation

**HN122[↓]    Terms in Office, Elections**

Delaware courts are virtually unanimous in holding that Del. Code Ann. tit. 8, § 102(b)(7) does not apply to officers.

Business & Corporate Law > ... > Causes of Action & Remedies > Breach of Fiduciary Duty > Burdens of Proof

Torts > Intentional Torts > Breach of Fiduciary Duty > Elements

Business & Corporate Law > ... > Management Duties & Liabilities > Causes of Action > Self-Dealing

Business & Corporate Law > ... > Management Duties & Liabilities > Fiduciary Duties > Duty of

Loyalty

Business & Corporate Law > ... > Shareholder Duties & Liabilities > Controlling Shareholders > Fiduciary Duties

*HN123*[⤓]    **Breach of Fiduciary Duty, Burdens of Proof**

The duty of loyalty mandates that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally. The essence of a duty of loyalty claim is the assertion that a corporate officer or director has misused power over corporate property or processes in order to benefit himself rather than advance corporate purposes. Accordingly, to state a legally sufficient claim for breach of the duty of loyalty, plaintiffs must allege facts showing that a self-interested transaction occurred, and that the transaction was unfair to the plaintiffs. Where a plaintiff alleges an otherwise sufficient breach of duty of loyalty, there is no obligation to plead resulting injury as an element of the claim. (To establish a breach of the fiduciary duty of loyalty, plaintiffs must show that the defendants either (1) stood on both sides of the transaction and dictated its terms in a self-dealing way, or (2) received in the transaction a personal benefit that was not enjoyed by the shareholders generally.

Business & Corporate Law > ... > Causes of Action & Remedies > Breach of Fiduciary Duty > Burdens of Proof

Business & Corporate Law > ... > Management Duties & Liabilities > Fiduciary Duties > Duty of Good Faith

Business & Corporate Law > ... > Management Duties & Liabilities > Fiduciary Duties > Duty of Loyalty

Business & Corporate Law > ... > Management Duties & Liabilities > Fiduciary Duties > Duty of Care

Business & Corporate Law > ... > Duties & Liabilities > Care, Good Faith & Reasonable Skill > Duty of Good Faith

*HN124*[⤓]    **Breach of Fiduciary Duty, Burdens of**

Proof

Although good faith may be described colloquially as part of a triad of fiduciary duties that includes the duties of care and loyalty, the obligation to act in good faith does not establish an independent fiduciary duty that stands on the same footing as the duties of care and loyalty. In other words, acts taken in bad faith breach the duty of loyalty. The behavior that must be shown to prove a violation of the duty to act in good faith requires conduct that is qualitatively different from, and more culpable than, the conduct giving rise to a violation of the fiduciary duty of care (i.e., gross negligence). The Delaware Supreme Court has identified three examples of conduct that may establish a failure to act in good faith: First, it has held that such a failure may be shown where a director intentionally acts with a purpose other than that of advancing the best interests of the corporation. Second, it has held that a failure may be proven where a director acts with the intent to violate applicable positive law. Third, it has held that a failure may be shown where the director intentionally fails to act in the fact of a known duty to act, demonstrating a conscious disregard for his duties. There may be other examples of bad faith yet to be proven or alleged, but these three are the most salient.

Business & Corporate Compliance > ... > Breach > Breach of Contract Actions > Elements of Contract Claims

*HN125*[⤓]    **Breach of Contract Actions, Elements of Contract Claims**

Under Delaware law, to state breach of contract claim, a plaintiff must allege: (i) a contractual obligation, (ii) a breach of that obligation, and (iii) resulting damage to the plaintiff.

Business & Corporate Law > ... > Management Duties & Liabilities > Fiduciary Duties > Duty of Care

Contracts Law > Contract Interpretation > Good Faith & Fair Dealing

Business & Corporate Law > Limited Liability Companies > Member Duties & Liabilities

Business & Corporate Law > Limited Liability

Companies > Management Duties & Liabilities

Business & Corporate Law > Agency
Relationships > Fiduciaries > Fiduciary Duties

#### HN126[⬇] Fiduciary Duties, Duty of Care

Under Delaware law, the scope of the fiduciary duties
owed by members or managers of an LLC is primarily
governed by the LLC agreement. In the absence of a
contrary provision in the LLC agreement, LLC managers
and members owe traditional fiduciary duties of loyalty
and care to each other and to the company. Under Del.
Code Ann. tit. 6, § 18-1101(c)(1), parties to an LLC
agreement can expand, restrict or eliminate altogether
common law fiduciary duties of members and managers
of the LLC. That means that members of an LLC can
contractually eliminate both the duty of care and the
duty of loyalty. The statute is clear, however, that they
cannot eliminate the implied contractual covenant of
good faith and fair dealing from the agreement.

Business & Corporate Law > Limited Liability
Companies > Management Duties & Liabilities

Contracts Law > Contract Interpretation > Good
Faith & Fair Dealing

#### HN127[⬇] Limited Liability Companies, Management Duties & Liabilities

As a matter of Delaware law, there is an implied
contractual duty of good faith and fair dealing imposed
on management in every Delaware LLC, and the parties
to an LLC agreement cannot waive it.

Contracts Law > Contract Interpretation > Good
Faith & Fair Dealing

#### HN128[⬇] Contract Interpretation, Good Faith & Fair Dealing

Stated in its most general terms, the implied covenant of
good faith and fair dealing requires a party in a
contractual relationship to refrain from arbitrary or
unreasonable conduct which has the effect of
preventing the other party to the contract from receiving
the fruits of the bargain. Thus, the implied covenant
does not constitute a free floating duty imposed on a
contracting party, instead it can only be used

conservatively to ensure the parties' reasonable
expectations' are fulfilled. To state a claim of breach of
the implied covenant of good faith and fair dealing, a
party must allege: (1) a specific implied contractual
obligation, (2) a breach of that obligation by the
defendant, and (3) damages resulting to the plaintiff.

Business & Corporate Law > ... > Causes of Action
& Remedies > Breach of Fiduciary Duty > Remedies

Civil Procedure > Remedies > Damages > Punitive
Damages

#### HN129[⬇] Breach of Fiduciary Duty, Remedies

Punitive damages for breaches of fiduciary duty and are
available to plaintiffs under New York and South
Carolina law.

Business & Corporate Law > ... > Management
Duties & Liabilities > Causes of Action > Breach of
Fiduciary Duty

Torts > Intentional Torts > Breach of Fiduciary
Duty > Remedies

Civil Procedure > Remedies > Damages > Punitive
Damages

Business & Corporate Law > ... > Causes of Action
& Remedies > Breach of Fiduciary Duty > Remedies

#### HN130[⬇] Causes of Action, Breach of Fiduciary Duty

It is settled that because the Delaware Chancery Court
sits only in equity, it cannot award punitive damages for
breaches of fiduciary duty.

Business & Corporate Law > ... > Causes of Action
& Remedies > Breach of Fiduciary Duty > Remedies

Torts > Intentional Torts > Breach of Fiduciary
Duty > Remedies

Civil Procedure > Remedies > Damages > Punitive
Damages

#### HN131[⬇] Breach of Fiduciary Duty, Remedies

The majority rule in Delaware is that the limitation on punitive damages for breach of fiduciary duties under Delaware law is strictly limited to actions brought in the Chancery Court.

Business & Corporate Law > ... > Causes of Action & Remedies > Breach of Fiduciary Duty > Defenses

Business & Corporate Law > ... > Management Duties & Liabilities > Fiduciary Duties > Duty to Third Parties

Business & Corporate Law > ... > Shareholder Actions > Actions Against Corporations > Direct Actions

*HN132*[⬇]  **Breach of Fiduciary Duty, Defenses**

Under Delaware law, creditors of an insolvent corporation have no right to assert direct claims for breach of fiduciary duty against corporate directors.

Business & Corporate Law > ... > Termination & Winding Up > Distribution of Assets > Creditor Rights

Business & Corporate Law > ... > Management Duties & Liabilities > Fiduciary Duties > Duty to Third Parties

Business & Corporate Law > ... > Shareholder Actions > Actions Against Corporations > Direct Actions

Business & Corporate Law > ... > Actions Against Corporations > Derivative Actions > Enforcement of Corporate Rights

*HN133*[⬇]  **Distribution of Assets, Creditor Rights**

While creditors of an insolvent corporation do not have standing to prosecute direct claims against directors and officers for breach of their fiduciary duties, they have standing to maintain derivative claims against directors on behalf of the corporation for breaches of fiduciary duties.

Business & Corporate Law > ... > Management Duties & Liabilities > Fiduciary Duties > Duty to

Third Parties

*HN134*[⬇]  **Fiduciary Duties, Duty to Third Parties**

Creditors of an insolvent corporate debtor have derivative standing to assert that the debtor was injured as a result of a director's breach of fiduciary duty.

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State Claim

*HN135*[⬇]  **Motions to Dismiss, Failure to State Claim**

There is no bar to dismissing duplicative or redundant claims at the pleading stage.

**Counsel:**  **[*1]** Gregory A. Cross, Esq., Mitchell Y. Mirviss, Esq., Venable, LLP, Baltimore, Maryland, Counsel to the Extended Stay Litigation Trust and Finbarr O'Connor, as Trustee for and on behalf of the Extended Stay Litigation Trust.

Gary J. Mennitt, Esq., Shmuel Vasser, Esq., Dechert, LLP, Counsel to the Arbor Parties.

Robert M. Novick, Esq., Kasowitz, Benson, Torres & Friedman, LLP, New York, New York, Counsel to the Lightstone Parties.

Peter M. Levine, Esq, Law Offices of Peter M. Levine, New York, New York, Counsel to Polar Extended Stay, USA.

David Elbaum, Esq., Simpson, Thacher & Bartlett, LLP, New York, New York, Counsel to the HVM Defendants.

Robert M. Hermes, Esq., Butler, Rubin, Saltarelli & Boyd, LLP, Chicago, Counsel to PGRT ESH, Inc.

**Judges:** Hon. James L. Garrity, Jr., United States Bankruptcy Judge.

**Opinion by:** James L. Garrity, Jr.

# Opinion

---

MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART, THE DEFENDANTS' MOTIONS TO DISMISS THE AMENDED COMPLAINT PURSUANT TO *FED. R. CIV.*

P. 12(b)(1) AND 12(b)(6)

**HON. JAMES L. GARRITY, JR.**

**UNITED STATES BANKRUPTCY COURT:**

Introduction[1]

In 2007, Extended Stay, Inc. ("ESI") and its affiliated entities (collectively, the "Debtors") owned and managed the leading mid-priced extended stay hotel business [*2] in the United States. In June of 2007, the Blackstone Group ("Blackstone") sold the Debtors and their business to a group led by David Lichtenstein ("Lichtenstein"), in a $8 billion leveraged buyout (the "LBO" or "LBO Transaction") comprised of $7.4 billion of debt, $400 million of cash, and $200 million of roll over equity. Approximately two years later, the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in this Court.[2] In July of 2010, the Debtors confirmed their joint chapter 11 plan of reorganization (the "Plan").[3] Pursuant to the Plan and under the Confirmation Order, the Extended Stay Litigation Trust (the "Litigation Trust") was established for the benefit of certain of the Debtors' creditors (the "Litigation Trust Beneficiaries"). Finbarr O'Connor is the successor trustee (the "Trustee") under the trust. The trust's assets (the "Litigation Trust Assets") include claims and causes of action that are identified in the report (the "Examiner's Report") filed in this case by Ralph R. Mabey, Esq., the Court-appointed examiner (the "Examiner").[4]

In June of 2011, the Trustee's predecessor commenced [*3] five lawsuits that collectively asserted over 100 counts against dozens of defendants seeking damages aggregating more than $1 billion to address wrongdoing that allegedly occurred prior and subsequent to the closing of the LBO Transaction. The claims in those lawsuits fell into two categories. The first covered claims arising out of the LBO Transaction and were based on the conduct of the Debtors' officers and directors, lenders and advisors prior to and in connection with the closing of the LBO Transaction (the "LBO Claims"). The defendants in those actions included Blackstone and related entities (the "Blackstone Defendants"), as the seller in the LBO Transaction, various Bank of America N.A. and Citibank N.A. entities (collectively "BofA" and "Citibank," respectively), as advisors to the seller and purchaser in the LBO Transaction, respectively, and the banks that financed the LBO Transaction. The second category was for claims arising after the LBO Transaction closed (the "Post LBO Claims"). Those claims arose out of the conduct of the Debtors' members, officers, and directors that allegedly gave rise to the loss of the Debtors' funds through the payment of purportedly improper [*4] dividends and other distributions to equity holders and their affiliates. In September of 2012, the Trustee took his predecessor's place and assumed control over the lawsuits. In June of 2013, he entered into settlement agreements that resolved all litigation involving the LBO Claims. The Trustee did not settle the Post LBO Claims. Rather, with the Court's permission, the Trustee consolidated the lawsuits asserting the Post LBO Claims into this adversary proceeding and filed the amended complaint at issue herein (the "Amended Complaint").[5]

The defendants in the Amended Complaint (collectively, the "Defendants") are individuals and entities that supposedly owned, controlled, dominated or otherwise managed all aspects of the Debtors' businesses after the LBO Transaction closed. The Trustee and Litigation Trust, as plaintiffs (collectively the "Trust") contend in the Amended Complaint that the LBO Transaction left ESI and its affiliates in dire financial straits and in desperate need of cash. It asserts that the Defendants are "insiders" of the Debtors, who, despite being aware of ESI's financial difficulties, abused their authority either

---

[1] In this Memorandum of Decision, the Court cites to documents filed on the Electronic Case Filings of documents in the Debtors' chapter 11 cases (the "Chapter 11 Cases"), this Adversary Proceeding (i.e., AP No. 11-2254) and in other adversary proceedings filed in the Chapter 11 Cases. When citing to documents filed in this adversary proceeding, the Court will cite to "Dkt. __". In all other instances, the Court will cite to "Case No./AP No. __, Dkt. __".

[2] The Chapter 11 Cases are jointly administered under Case No. 09-13764.

[3] See Debtors' Fifth Amended Plan of Reorganization Under Chapter 11 of the Bankruptcy Code [Case No. 09-13764, Dkt. 1157]; Order Confirming Debtors' Fifth Amended Plan [Case No. 09-13764, Dkt. 1172] (the "Confirmation Order"). See also Disclosure Statement for the Debtors' Fifth Amended Plan of Reorganization Under Chapter 11 of the Bankruptcy Code [Case No. 09-13764, Dkt. 1028] (the "Disclosure Statement").

[4] See Order Directing Appointment of Examiner [Case No. 09-

13764, Dkt. 311]; Notice of Appointment of Examiner [Case No. 09-13764, Dkt. 312]; Report of Ralph R. Mabey, as Examiner [Case No. 09-13764, Dkt. 913].

[5] See Amended Complaint, Dkt. 213.

by improperly withdrawing cash and assets from **[*5]** the Debtors to benefit themselves and their affiliates, or by aiding and abetting such conduct. In substance, but without limitation, the Trust complains that the Defendants: (i) for no consideration, diverted so-called "LIBOR Floor Certificates" and $74 million in proceeds generated from those certificates, from the Debtors to their own benefit and control; (ii) arranged for more than $62 million in cash distributions to be paid to the Debtors' equity holders despite the fact that, among other things, the Debtors were insolvent when they made those distributions; and (iii) caused Lichtenstein or one of his affiliates to be paid management fees totaling up to $1 million per year for at least three years, notwithstanding that neither Lichtenstein nor the affiliate provided management services or other consideration for those payments.

The Trust contends that it is entitled to recover those transfers, and associated damages from the Defendants. In the seventeen count Amended Complaint, the Trust seeks to recover those payments and damages from all or some of the Defendants. The twenty-six Defendants are grouped, as follows:

(i) The "Lightstone Defendants," consisting of David Lichtenstein **[*6]** and individuals and entities (collectively, the "Lightstone Individuals" and "Lightstone Entities," respectively) allegedly affiliated with Lichtenstein, as follows:

Lightstone Individuals
David Lichtenstein
Bruno de Vinck
Peyton "Chip" Owen
Joseph Teichman

Lightstone Entities
DL-DW Holdings, LLC ("DL-DW")
BHAC Capital IV, LLC ("BHAC")
Lightstone Holdings, LLC ("Lightstone Holdings")
The Lightstone Group, LLC ("Lightstone Group")
Lightstone Commercial Management ("Lightstone Commercial")
Park Avenue Funding, LLC ("Park Avenue")
(ii) The "Arbor Defendants," consisting of individuals and entities (collectively, the "Arbor Individuals" and "Arbor Entities," respectively) allegedly affiliated with Ivan Kaufman ("Kaufman") (not a Defendant herein), as follows:

Arbor Individuals
Guy R. Milone, Jr.
Joseph Chetrit

Joseph Martello

Arbor Entities
Arbor ESH II, LLC ("Arbor ESH")
Arbor Commercial Mortgage, LLC ("Arbor Commercial")
Atmar Associates LLC ("Atmar Associates")
ABT-ESI LLC ("ABT-ESI")
Glida One LLC ("Glida One")
Mericash Funding LLC ("Mericash Funding")
Princeton ESH LLC ("Princeton ESH")
Ron Invest LLC ("Ron Invest")

(iii) The "HVM Defendants" consisting of Gary DeLapp, Dae Hum Kim (a/k/a David Kim), and F. **[*7]** Joseph Rogers.
(iv) Polar Extended Stay (U.S.A.) L.P. ("Polar Extended Stay")
(v) PGRT ESH, Inc. ("PGRT ESH")

The five motions before the Court (the "Motions") are filed, respectively, on behalf of the Lightstone Defendants,[6] PGRT ESH,[7] the Arbor Defendants,[8]

---

[6] *See* Lightstone Defendants' Motion to Dismiss the Amended Complaint Pursuant to *Fed. R. Bankr. P. 7012(b)* and *Fed. R. Civ. P. 12(b)(2)* and *(b)(6)*, and Memorandum of Law in Support Thereof [Dkt. 225] (the "Lightstone MTD"); Declaration of Andrew Kurland in Support of Lightstone Defendants' Motion to Dismiss the Amended Complaint Pursuant to *Fed. R. Bankr. P. 7012(b)* and *Fed. R. Civ. P. 12(b)(1)* and *(b)(6)* [Dkt. 226] (the "Kurland Declaration"); Lightstone Defendants' Reply in Further Support of Motion to Dismiss the Amended Complaint Pursuant to *Fed. R. Bankr. P. 7012(b)* and *Fed. R. Civ. P. 12(b)(2)* and *(b)(6)* [Dkt. 243] (the "Lightstone Reply"); Declaration of Michele L. Angell in Support of Lightstone Defendants' Reply in Further Support of Motion to Dismiss the Amended Complaint Pursuant to *Fed. R. Bankr. P. 7012(b)* and *Fed. R. Civ. P. 12(b)(1)* and *(b)(6)* [Dkt. 244] (the "Angell Declaration"); Supplemental Brief in Support of All Defendants' Motion to Dismiss the Amended Complaint [Dkt. 255] (the "Supplemental MTD").

[7] *See* PGRT ESH, Inc.'s Reply in Further Support of its Joinder in the Lightstone Defendants' Motion to Dismiss Pursuant to *Fed. R. Bankr. P. 7012(b)* and *Fed. R. Civ. P. 12(b)(1)* and *(b)(6)*, and Memorandum of Law in Support Thereof [Dkt. 237] (the "PGRT Reply").

[8] *See* The Arbor Defendants' Notice of Motion to Dismiss Amended Complaint [Dkt. 220]; The Arbor Defendants' Memorandum of Law in Support of Moving Defendants' Motion to Dismiss the Amended Complaint [Dkt. 221] (the "Arbor MTD"); Declaration of Richard A. Goldberg in Support of Moving Defendants' Motion to Dismiss the Amended

Polar Extended Stay,[9] and the HVM Defendants.[10] *Rule 12 of the Federal Rules of Civil Procedure* is made applicable herein by *Rule 7012 of the Federal Rules of Bankruptcy Procedure* (the "Bankruptcy Rules"). In broad strokes, in the Motions, the Defendants seek to

---

Complaint [Dkt. 222] (the "Goldberg Declaration"); Arbor Defendants' Reply Memorandum of Law in Further Support of Moving Defendants' Motion to Dismiss the Amended Complaint [Dkt. 240] (the "Arbor Reply").

On July 19, 2018, the Trust filed a letter [Dkt. 261] to apprise the Court of the Supreme Court's then recent decision in *Merit Mgmt. Group, L.P. v. FTI Consulting, Inc.*, 138 S. Ct. 883, 897, 200 L. Ed. 2d 183 (2018) ("*Merit*"). The Trustee noted that *Merit* expressly overruled *In re Quebecor World (USA) Corp.*, 719 F.3d 94, 99 (2d Cir. 2013) (which the Defendants rely upon), and held that the safe harbor provision under *11 U.S.C. § 546(e)* does not apply to settlement payments in which neither the transferor nor the transferee are financial institutions, which is the situation concerning the challenged transfers in this case.

In response, the Arbor Defendants filed a letter, dated July 24, 2018 [Dkt. 262], explaining the limited holding in *Merit*. In particular, the Arbor Defendants explained that the holding in Merit went to the application of the safe harbor to transfers where financial intermediaries were used, but did not address the issue of the definition of a "financial institution" under the Bankruptcy Code, and whether the parties themselves qualified as financial institutions. The Arbor Defendants contended that in this case, the Debtor-transferors were themselves financial institutions by virtue of their status as customers within the definition of the Bankruptcy Code, and therefore, *Merit* had no impact on the Motions and the claims in the Amended Complaint.

[9] *See* Polar Extended Stay (USA) L.P.'s [Joinder in] Motion to Dismiss Adversary Proceeding of the Arbor Defendants [Dkt. 224]; Polar Extended Stay's Reply Affidavit of Peter M. Levine in Further Support of Polar's Motion to Dismiss [Dkt. 242].

[10] *See* Notice of Motion to Dismiss the Amended Complaint Against the HVM Defendants Pursuant to *Rule 7012(b) of the Federal Rules of Bankruptcy Procedure* and *Federal Rules of Civil Procedure 12(b)(1)* and *12(b)(6)* [Dkt. 227]; Memorandum of Law in Support of Defendants Gary DeLapp, Dae Hum Kim and F. Joseph Rogers' Motion to Dismiss the Amended Complaint [Dkt. 228] (the "HVM MTD"); Reply Memorandum of Law in Further Support of Defendants Gary DeLapp, Dae Hum Kim and F. Joseph Rogers' Motion to Dismiss the Amended Complaint [Dkt. 238]; Declaration of David Elbaum in Support of the HVM Defendants' Motion to Dismiss the Amended Complaint [Dkt. 229] (the "First Elbaum Declaration"); Reply Declaration of David Elbaum in Further Support of the HVM Defendants' Motion to Dismiss the Amended Complaint [Dkt. 239] (the "Second Elbaum Declaration").

dismiss all or specific Counts of the Amended Complaint pursuant to *Rule 12(b)(1)*, on the grounds that the Trust lacks standing to assert the claims and, accordingly, the Court lacks subject matter jurisdiction to adjudicate them, and pursuant to *Rule 12(b)(6)*, on the grounds that certain of the Counts fail to state claims for relief under applicable law. The Lightstone, Arbor and HVM Defendants have borne the "laboring oars" in support of the Motions. PGRT ESH and Polar Extended Stay submitted papers in support of their respective motions but are clear that they join in all the arguments made by the Lightstone Defendants and Arbor Defendants, respectively, in support of their motions to dismiss. The Trust opposes the Motions.[11] For the reasons discussed herein, the Motions are granted in part, and denied **[*8]** in part.

Jurisdiction

**HN1**[🔼]] District courts have original bankruptcy jurisdiction over "civil proceedings arising under title 11, or arising in or related to cases under title 11." *28 U.S.C. § 1334(b)*. The "district court may provide that any or all" such proceedings "shall be referred to the bankruptcy judges for the district." *Id. § 157(a)*. The district court

---

[11] *See* Plaintiffs' Memorandum in Opposition to Defendants' Motions to Dismiss [Dkt. 233] (the "Opposition"); Declaration of Michael Schatzow [Dkt. 234] (the "Schatzow Declaration"); Plaintiffs Supplemental Memorandum in Opposition to Defendants' Motions to Dismiss [Dkt. 257].

On December 23, 2019, the Arbor Defendants filed their own letter [Dkt. 296], apprising the Court of the Second Circuit's recent decision in *In re Tribune Co. Fraudulent Conveyance Litig., No. 13-3992-cv, 2019 U.S. App. LEXIS 38855 (2d Cir. Dec. 19, 2019)*. In that case, the Second Circuit held that the transferor qualified as a "financial institution" within *§ 101(22) of the Bankruptcy Code* because it was a customer of a bank and trust company, which acted as depository in connection with an LBO transaction. Thus, the Arbor Defendants argued that to the extent the Amended Complaint alleged that the challenged transfers were made from the Debtors' accounts with financial institutions, such pleadings establish that the Debtors were financial institutions.

In turn, the Trustee filed a letter dated December 27, 2019 [Dkt. 297], addressing the points raised by the Arbor Defendants. More specifically, the Trustee asserted that *Tribune* did not eliminate the Trustee's argument under *Merit* that the transfers at issue were not made by, from, or to a financial institution. In any event, the Trustee reserved all rights to proffer additional argument on the issue if needed.

has done so here pursuant to that certain Amended Standing Order of Referral of Cases to Bankruptcy Judges of the United States District Court for the Southern District of New York, dated January 31, 2012 (Preska, C.J.).

HN2[⬆] Core proceedings correspond to proceedings "arising under title 11" and proceedings that "arise in" cases under title 11. *See Stern v. Marshall, 564 U.S. 462, 476, 131 S. Ct. 2594, 180 L. Ed. 2d 475 (2011).* Proceedings that "arise under" the Bankruptcy Code are those that have their origin in the Bankruptcy Code. *See In re Adelphia Communs. Corp., 307 B.R. 404, 413 (Bankr. S.D.N.Y. 2004).* Proceedings that arise in a case under title 11 are those that "are not based on any right expressly created by [T]itle 11, but nevertheless, would have no existence outside of the bankruptcy." *Baker v. Simpson, 613 F.3d 346, 351 (2d Cir. 2010)* (quoting *In re Wood, 825 F.2d 90, 97 (5th Cir. 1987)).* Noncore proceedings are those that are "related to" a bankruptcy case. *28 U.S.C. § 157(c)(1).* "[A] civil proceeding is 'related [*9] to' a title 11 case if the action's 'outcome might have any 'conceivable effect' on the bankrupt estate.'" *Parmalat Capital Fin. Ltd. v. Bank of Am. Corp., 639 F.3d 572, 579 (2d Cir. 2011)* (citation omitted).

HN3[⬆] *Section 1334* does not expressly limit bankruptcy jurisdiction following plan confirmation. *See U.S. Brass Corp. v. Travelers Ins. Grp., Inc. (In re U.S. Brass Corp.), 301 F.3d 296, 304 (5th Cir. 2002).* Nonetheless, "all courts that have addressed the question have ruled that once confirmation occurs, the bankruptcy court's jurisdiction shrinks." *Penthouse Media Grp. v. Guccione (In re Gen. Media, Inc.), 335 B.R. 66, 73 (Bankr. S.D.N.Y. 2005)* (first citing *North Am. Car Corp. v. Peerless Weighing & Vending Mach. Corp., 143 F.2d 938, 940 (2d Cir. 1944);* and then citing *Pettibone Corp. v. Easley, 935 F.2d 120, 122 (7th Cir. 1991)).* To invoke the bankruptcy court's post-confirmation jurisdiction a party must show both (i) that the plan provides for the retention of jurisdiction over the dispute, and (ii) the matter has a "close nexus" to the bankruptcy plan. *Kravitz v. Apollo Glob. Mgmt., LLC (In re AOG Entm't), 569 B.R. 563, 574 (Bankr. S.D.N.Y. 2017). See also ResCap Liquidating Tr. v. Primary Capital Advisors, LLC (In re Residential Capital, LLC), 527 B.R. 865, 871-72 (Bankr. S.D.N.Y. 2014); In re Gen. Media, Inc., 335 B.R. at 73-74.* Some courts hold that the "close nexus" test does not apply in core proceedings and that, post-confirmation, a bankruptcy court's core jurisdiction remains the same as it was pre-confirmation. *See Geruschat v. Ernst Young LLP (In re*

*Seven Fields Dev. Corp.), 505 F.3d 237, 260 (3d Cir. 2007); In re Millennium Lab Holdings II, LLC, 562 B.R. 614, 621-22 (Bankr. D. Del. 2016).* The Second Circuit has not directly addressed that issue. However, it has applied the test in summary orders relating to both core and non-core post-confirmation proceedings. *See Cohen v. CDR Creances S.A.S. (In re Euro-Am. Lodging Corp.),* 549 F. App'x 52, 54 (2d Cir. 2014) (noting that "[a] party may invoke the authority of the bankruptcy court to exercise post-confirmation jurisdiction only if the matter has a close nexus to the bankruptcy plan . . ." **[*10]** but concluding that lower court correctly found it lacked jurisdiction because the non-core state court actions at issue were between non-debtors and did not implicate assets of the debtor's estate as it had already been fully administered) (internal citation omitted); *In re DPH Holdings Corp., 448 F. App'x 134, 137 (2d Cir. 2011)* (stating that "[a] party can invoke the authority of the bankruptcy court to exercise post-confirmation jurisdiction if the matter has a close nexus to the bankruptcy plan . . . and the plan provides for the retention of such jurisdiction" and finding that "close nexus" criteria met for the core matters in dispute) (internal citations omitted).

Here, the first condition is satisfied because in the Plan and Confirmation Order, the Court retained jurisdiction over "any matters ... arising in or related to the Chapter 11 Cases or the Plan" (Confirmation Order ¶ 59), including any claims by the Trust "to recover assets for the benefit of the Debtors' estates." Plan § 12.2. *See also* Plan Art. VII ("[T]he Bankruptcy Court shall retain and shall have exclusive jurisdiction over any matter (a) arising under the Bankruptcy Code, (b) arising in or related to the Chapter 11 Cases or the Plan" including any claims by the Trustee "to recover **[*11]** assets for the benefit of the Debtor's estates."). The second condition is satisfied because the claims at issue in the Amended Complaint directly affect "the interpretation, implementation, consummation, execution or administration" of the Plan because the Plan expressly preserves "potential claims and causes of action, charges, suits or rights of recovery referenced in the Examiner's report[.]" Plan at § 1.89. The Plan also provides that certain creditors of the Debtors including the Mortgage Trust, Mezzanine Facility Claims holders and general unsecured creditors share in any recovery to the extent they are Litigation Trust Beneficiaries (each defined below). *See id.* at § 1.90. Accordingly, both the transfer of these claims by the Debtors to the Litigation Trust under the Plan, and the distribution of any recovery to certain creditors of the Debtor, establish that the Amended Complaint has a close nexus to the

Plan. *See In re Gen. Media, Inc., 335 B.R. at 73* (noting that the "close nexus" test is met "when a matter affects the interpretation, implementation, consummation, execution, or administration of the confirmed plan or incorporated litigation trust agreement." (quoting *Binder v. Price Waterhouse & Co., LLP (In re Resorts Int'l, Inc.), 372 F.3d 154, 168-69 (3d Cir. 2004)))*. *See also In re Residential Capital, LLC, 527 B.R. at 871* (noting that courts in the Second Circuit **[\*12]** have held that claims against a third party directly affect "the interpretation, implementation, consummation, execution or administration" of the plan where the plan expressly preserves the claims and transfers them to a litigation trust to prosecute, the purpose of the adversary proceeding is to prosecute such a transferred claim and the plan provides that the debtor's creditors will share in any recovery); *Harrison v. Rabinovici (In re Jesup & Lamont, Inc.), No. 12-01169, 2012 Bankr. LEXIS 4064, 2012 WL 3822135, at \*4 (Bankr. S.D.N.Y. Sept. 4, 2012)* (finding "related to" jurisdiction where "[t]he implementation and execution of the Plan is directly at issue as the Trustee is prosecuting claims that were transferred [to the Liquidating Trust] pursuant to the terms of the Plan [and the Litigation Trust Agreement].").

**HN4[↑]** In a multi-count complaint like the Amended Complaint, the Court must determine the extent of its jurisdiction to adjudicate the matters on a count by count basis. *See Halper v. Halper, 164 F.3d 830, 836 (3d Cir. 1999)* ("To determine the extent of the Bankruptcy Court's jurisdiction in this case we must examine each of the five claims presented to ascertain if it is core, non-core, or wholly unrelated to a bankruptcy case."); *Peterson v. 610 West 142 Owners Corp. (In re 610 W. 142 Owners Corp.), 219 B.R. 363, 367-69 (Bankr. S.D.N.Y. 1998)* (employing claim by claim analysis). In applying that analysis here, the Court finds **[\*13]** that in the aggregate, the claims asserted in Counts 12-17 fall within the Court's core jurisdiction because they arise under *§§ 502(d), 542, 544, 548* and *550 of the Bankruptcy Code*. *See 28 U.S.C. § 157(b)(2)*. In contrast, the claims asserted in the remaining Counts of the Amended Complaint (i.e., Counts 1-11), neither arise under title 11, nor arise in a case under title 11. That is because in those Counts the Trust is seeking damages based upon claims of illegal distributions to equity holders, conversion, waste, unjust enrichment and breach of fiduciary duties (including conspiracy and aiding and abetting) under applicable state law. However, although those claims fall outside the Court's core jurisdiction, they fit squarely within the Court's "related to" jurisdiction. *See In re Residential Capital, LLC, 527 B.R. at 871*; *see also In re Jesup & Lamont,*

*Inc., 2012 Bankr. LEXIS 4064, 2012 WL 3822135, at \*4*.

**HN5[↑]** Bankruptcy courts may "hear and determine" and "enter appropriate orders and judgments" in "core proceedings arising under title 11 or arising in a case under title 11. *28 U.S.C. § 157(b)(1)*. Without the consent of all parties to the proceeding, a bankruptcy court may hear, but not determine "a proceeding that is not a core proceeding but that is otherwise related to a case under title 11." *Id. § 157(c)(1)*. In such proceedings, the bankruptcy court may only "submit proposed findings of fact **[\*14]** and conclusions of law to the district court[.]" *Id.* Thereafter, the district court shall enter final judgment in such cases after reviewing *de novo* any matter to which a party objects. *Id.* However, if all parties to the litigation consent, the bankruptcy court may hear and determine the matter. *Id. § 157(c)(2)*. The consent need not be express and can be implied. *See Wellness Int'l Network, Ltd. v. Sharif, 575 U.S. 665, 135 S. Ct. 1932, 1940, 191 L. Ed. 2d 911 (2015)* (explaining that consent to bankruptcy adjudication need not be express and a party may impliedly consent based on its "'actions rather than words' . . . . the key inquiry is whether 'the litigant or counsel was made aware of the need for consent and the right to refuse it, and still voluntarily appeared to try the case' before the non—Article III adjudicator." (quoting *Roell v. Withrow, 538 U.S. 580, 590, 123 S. Ct. 1696, 155 L. Ed. 2d 775 (2003)))*; *Lynch v. Mascini, Ltd. (In re Kirwan Offices S.a.R.L.)*, No. 18-3371, 792 Fed. Appx. 99, 2019 WL 6998891, at \*1 (2d Cir. Dec. 20, 2019); *ICP Strategic Credit Income Fund Master Fund, Ltd. v. DLA Piper (In re ICP Strategic Credit Income Fund Ltd.)*, 568 B.R. 596, 605 (S.D.N.Y. 2017), *aff'd*, 730 F. App'x 78 (2d Cir. 2018). The parties have consented to the Court's entry of a final order resolving the Motions.

Scope of the Record

**HN6[↑]** On a motion to dismiss for lack of subject matter jurisdiction under *Rule 12(b)(1)*, the court may consider matters outside the pleadings, such as affidavits, documents, deposition testimony and the like, but "cannot rely on conclusory or hearsay evidence." *In re Gen. Media, Inc., 335 B.R. at 72* (first citing *J.S. ex rel. N.S. v. Attica Cent. Sch., 386 F.3d 107, 110 (2d Cir. 2004)*; then citing *Zappia Middle East Constr. Co. v. Emirate of Abu Dhabi, 215 F.3d 247, 253 (2d Cir. 2000))*. *See also Dillard v. Runyon, 928 F. Supp. 1316, 1322 (S.D.N.Y. 1996)*, *aff'd*, 108 F.3d 1369 (2d Cir. 1997); *John St. Leasehold, LLC v. Capital Mgmt. Res.,*

*L.P.*, *154 F. Supp. 2d 527, 533-34 (S.D.N.Y. 2001)* ("Thus, the standard used to evaluate a *Rule 12(b)(1)* claim is **[*15]** similar to that for summary judgment under *Fed. R. Civ. P. 56*." (citing *Kamen v. Am. Tel. & Tel. Co., 791 F.2d 1006, 1011 (2d Cir. 1986)))*, *aff'd*, *283 F.3d 73 (2d Cir. 2002)*.

*HN7*[↑] A *Rule 12(b)(6)* motion tests the sufficiency of the allegations in support of a complaint in light of the pleading requirements in *Rule 8 of the Federal Rules of Civil Procedure*.[12] To overcome a *Rule 12(b)(6)* motion, the plaintiff must demonstrate that the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)* (quoting *Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007))* (hereinafter, "*Iqbal*"). Consequently, on a motion to dismiss pursuant to *Rule 12(b)(6)*, a court is generally limited to the allegations contained in the "four corners of the complaint," which it must accept as true. *Williams v. Time Warner Inc., 440 F. App'x 7, 9 (2d Cir. 2011)* (quoting *Taylor v. Vt. Dep't of Educ., 313 F.3d 768, 776 (2d Cir. 2002))*; s*ee also City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 179 (2d Cir. 2014) ("We review de novo a district court judgment granting a motion to dismiss pursuant to *Federal Rule of Civil Procedure 12(b)(6)*, accepting all factual allegations in the complaint as true."). A complaint is "deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." *Chambers v. Time Warner, Inc., 282 F.3d 147, 152 (2d Cir. 2002)*. However, "even if [a document] is not formally incorporated by reference" a court may consider it if it was "integral to the complaint." *Id. at 153* (citing *Broder v. Cablevision Sys. Corp., 418 F.3d 187, 196 (2d Cir. 2005))*. *See also Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 47-48 (2d Cir. 1991)* (noting that district court may consider exhibits omitted from plaintiff's complaint but attached as exhibits to defendant's **[*16]** motion papers because "there was undisputed notice to plaintiffs of their contents and they were integral to plaintiffs' claim"). A court also may consider "matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, 551 U.S. 308, 322, 127 S. Ct. 2499, 168 L. Ed. 2d 179 (2007)*; *see also Thomas v. Westchester Cty. Health Care Corp., 232 F. Supp. 2d 273, 276 (S.D.N.Y. 2002)*

(stating that even where the proceeding transcripts were not attached to the complaint, incorporated by reference or integral to the plaintiff's claims, they could still be considered because the Court "may take judicial notice of the records of state administrative procedures, as these are public records, without converting a motion to dismiss to one for summary judgment."). In the context of bankruptcy litigation, the public records of which the court may take judicial notice include documents filed in a related bankruptcy proceeding, an adversary proceeding and the underlying bankruptcy case. *See, e.g., In re MSR Hotels & Resorts, Inc., No. 13-11512, 2013 Bankr. LEXIS 4422, 2013 WL 5716897, at *1 (Bankr. S.D.N.Y. Oct. 1, 2013)* ("A court is empowered to take judicial notice of public filings, including, in an adversary proceeding, those filed on its own dockets in the underlying bankruptcy case."); *Madison Equities, LLC v. Condren (In re Condren), 385 B.R. 511, 520 (Bankr. S.D.N.Y. 2008)* (noting that "the court can take note of the contents of the various pleadings in those adversary proceedings, as well as pleadings and other documents in the case itself."); *cf. Adelphia Recovery Tr. v. Bank of Am., N.A., 390 B.R. 80, 88 (S.D.N.Y. 2008)* ("In a bankruptcy-related **[*17]** proceeding, the terms of a confirmed plan of reorganization are binding on parties to the plan and should be considered by a court when deciding a motion to dismiss."), *aff'd, 379 F. App'x 10 (2d Cir. 2010)*.

The Arbor, Lightstone and HVM Defendants filed documents in support of their respective motions.[13]

---

[12] *Rule 8 of the Federal Rules of Civil Procedure* is made applicable herein by *Bankruptcy Rule 7008*.

---

[13] The Goldberg Declaration attached the following exhibits:

Exhibit A: Second Amended and Restated Limited Liability Company Agreement of BHAC Capital IV, L.L.C., dated June 29, 2007

Exhibit B: *First Amendment* to The Second Amended and Restated Limited Liability Company Agreement of BHAC Capital IV, LLC

Exhibit C: Waiver and Consent Agreement, dated as of September 12, 2007

Exhibit D: Second Amended And Restated Limited Liability Agreement of DL-DW Holdings LLC, dated as of June 29, 2007

Exhibit E: Cash Management Agreement, dated as of June 11, 2007

Exhibit F: LBO Closing Funds Sources & Uses

Exhibit G: Extended Stay Inc.'s Certificate of Incorporation, with two amendments

---

The Arbor Defendants assert that all of the documents they have relied upon in their motion to dismiss or attached to the Goldberg Declaration meet this standard as having been referred or cited to in the Amended Complaint, utilized by the Trustee in analyzing the LBO and preparing the Amended Complaint, or the Court may take judicial notice of. *See* Arbor MTD at 11 n.7.

The Goldberg Declaration attached the following exhibits:

Exhibit A: First Amended Complaint filed in Adversary Proceeding 11-02255 [Adv. Proc. 11-02255, Dkt. 28]

Exhibit B: Complaint filed in Adversary Proceeding 11-02255 [Adv. Proc. 11-02255, Dkt. 1]

Exhibit C: Complaint filed in Adversary Proceeding 11-02254 [Adv. Proc. 11-02255, Dkt. 1]

Exhibit D: Confirmation Order [Case No. 09-13764, Dkt. 1172]

Exhibit E: Objection of Special Servicer to Motion of the Official Committee of Unsecured Creditors for an Order Appointing the Creditors' [*19] Committee as Estate Representative with Respect to the Prosecution of Certain Causes of Action [Case No. 09-13764, Dkt. 1065]

Exhibit F: Cash Management Agreement, dated June 11, 2007

Exhibit G: Wachovia Bank Commercial Mortgage Trust Commercial Mortgage Pass-Through Certificates, Series 2007-ESH, Class X-A and Class X-B Certificates, dated November 5, 2007

Exhibit H: Debtors' Disclosure Statement [Case No. 09-13764, Dkt. 1028]

Exhibit I: Intercreditor Agreement, dated June 11, 2007

Exhibit J: Second Amended and Restated Limited Liability Company Agreement of BHAC Capital IV, L.L.C., dated June 29, 2007

Exhibit K: Amendment to the Extended Stay Litigation Trust Agreement, dated September 12, 2012

Exhibit L: August 31, 2007 Letter Agreement

Exhibit M: Order Pursuant to *Bankruptcy Rule 9019* Approving a Settlement Agreement Between Extended Stay Inc. and Remaining Debtors [Case No. 09-13764, Dkt. 1170]

Exhibit N: Stipulation an Order Reconciling, Fixing and Allowing Class 4B Mezzanine Facilities Claims [Case No. 09-13764, Dkt. 1709]

The First Elbaum Declaration attached the following exhibits:

Exhibit 1: Excerpts of the Debtors' Disclosure Statement [Case No. 09-13764, Dkt. 1098].

Some of those documents are mentioned, cited or relied on by the Trust in the Amended Complaint. Others are filed of record in these Chapter 11 Cases or in adversary proceedings filed in these cases. For the most part, the Defendants rely on their respective documents in support of their requests for relief under *Rule 12(b)(6)*, although some of the documents bear more directly on the question of whether the Trust has standing to sue and as such, are relevant to the *Rule 12(b)(1)* aspect of the Motions. The Trust attached two documents to Amended Complaint. *See* Amd. Compl. Exs. A & B. All parties have relied on those documents in connection with the Motions. The Trust did not submit other or additional documents in support of its opposition to the Motions. Although the Trust notes that

---

Exhibit 2: Examiner's *Ex Parte* Motion for Order Permitting Replacement of Certain Exhibits in Official [*20] Copies of Examiner's Report Exhibits Volume Maintained by Clerk of Court, [Case No. 09-13764, Dkt. 1033].

Exhibit 3: Amended Errata Sheet to the Examiner's Report, attaching Amended Exhibits III-E-1 & III-E-2 [Case No. 09-13764, Dkt. 1031]

Exhibit 4: Excerpts of ESI's SOFA [Case No. 09-13764, Dkt. 454]

Exhibit 5: Excerpts of Homestead's SOFA [Case No. 09-13764, Dkt. 452]

Exhibit 6: Excerpts from the Debtors' Motion for Order Authorizing Use of Cash Collateral for Payments Regarding HVM LLC Incentive Program [Case No. 09-13764, Dkt. 487]

Exhibit 7: Third Amended and Restated Limited Liability Company Agreement of ESA P Portfolio L.L.C., dated June 11, 2007

Exhibit 8: Excerpts from the Debtors' Plan [Case No. 09-13764, Dkt. 1172]

Exhibit 9: Excerpts from the Examiner's Report, publicly filed April 8, 2010

The Second Elbaum Declaration attached the following exhibits:

Exhibit 1: Excerpts from the Confirmation Order [Case No. 09-13764, Dkt. 1172]

Exhibit 2: Excerpts from the Examiner's Report publicly filed April 8, 2010

Exhibit 3: Excerpts from the Debtors' Plan [Case No. 09-13764, Dkt. 1172]

Exhibit 4: Litigation Trust Agreement [Case No. 06-13764, Dkt. 1636-1]

there is "not much omitted from the universe of possible materials and sources under Defendants' extremely liberal standards for citable facts" (Opp'n at 40-41), **[*18]** [14] it does not challenge the Court's use of the documents cited by the Defendants in evaluating the merits of the Motions. *Id.*

In opposing the Motions, the Trust relies heavily on the Examiner's Report. It asserts that the report "provides ample support for the validity of the Trust's) claims. Thus, rather than descend into a mind-numbing debate over which documents and facts are citable, [the Trust] will rely on (1) the allegations of the current Complaint; (2) the Examiner's Report; and (3) documents addressed in the complaints." Opp'n at 41. In doing so, the Trust correctly notes that the report is properly citable in connection with the Motions because it is cited in the Amended Complaint and, in any event, is properly citable through judicial notice of its separate **[*22]** filing in the Chapter 11 Cases. *See Liquidation Trust v. Daimler AG (In re Old Carco LLC)*, 509 F. App'x 77, 79 (2d Cir. 2013) (finding that lower courts "were permitted to take judicial notice of the $11.6 billion intercompany debt noted in the bankruptcy filings" in considering a motion to dismiss fraudulent conveyance and unjust enrichment claims); *Scerba v. Allied Pilots Ass'n, No. 13-3694, 2013 U.S. Dist. LEXIS 175291, 2013 WL 6481583, at *2 n.2 (S.D.N.Y. Dec. 10, 2013)* (taking judicial notice of filings in related bankruptcy court proceeding); *Sigmon v. Goldman Sachs Mortg. Co., No. 12-3367, 2013 U.S. Dist. LEXIS 141103, 2013 WL 5451410, at *3 (S.D.N.Y. Sept. 30, 2013)* (taking judicial notice of "documentation produced in the underlying bankruptcy proceeding" in considering a motion to dismiss). The Lightstone Defendants do not deny that the Trust can cite to the report, but they take issue with

---

[14] In describing the scope of the documents relied on by the Defendants in support of the Motions, the Trust states:

> As for the permissible sources of material that the Court may consider, Defendants have liberally **[*21]** cited to and quoted from myriad documents or otherwise asserted facts that (i) are referred to in the complaint; (ii) are contained somewhere in the record of these Bankruptcy proceedings; (iii) were previously alleged in the preceding version of the complaints; (iv) would, in the estimation, of Arbor, be something that the Trustee would have considered in the course of preparing one of the complaints; or (v) would, according to the prediction of Lightstone, be proved later in the case (meaning that it is totally outside of the record). . . .

Opp'n at 40-41.

the Trust's proposed use of the report in opposing the Motions. They contend that "[w]hile the Court can take judicial notice of the existence of the Examiner's Report — i.e., that it was written, that it was filed — the Examiner's Report was not attached to the Amended Complaint, nor are its contents matters of which judicial notice may be taken." Lightstone Reply at 15. Thus, the Lightstone Defendants assert that the Court should not consider the Trust's factual recitations that are based on the Examiner's Report and not found in the Amended Complaint, such as are set forth through the Trustee's Opposition, but solely **[*23]** limit its analysis to the facts pled in Amended Complaint. *Id.* **HN8[↑]** The Lightstone Defendants are correct that the presence of a document in a court file alone does not mean that judicial notice of the document can be taken of any factual material asserted in the document. *See Liberty Mutual Ins. Co. v. Rotches Pork Packers, Inc., 969 F.2d 1384, 1388 (2d Cir. 1992)* ("A court may take judicial notice of a document filed in another court 'not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related findings.'" (quoting *Kramer v. Time Warner Inc., 937 F.2d 767, 774 (2d Cir. 1991)))*. Rather, the contents of a judicially noticed document may be considered in a motion to dismiss where it is "clear on the record that no dispute exists regarding the authenticity or accuracy of the document," and it is "clear that there exists no material disputed issues of fact regarding the relevance of the document." *Faulkner v. Beer, 463 F.3d 130, 134 (2d Cir. 2006)*. That is not the situation here. Although the Defendants do not contest the authenticity of the report, they challenge the accuracy of the report.

The Trust also asserts, in substance, that the Examiner's Report is properly citable by all parties and that the Trust can rely on the contents of the report in opposing the Motions because the report is integral to the Amended Complaint. **[*24]** **HN9[↑]** "Limited quotation from or reference to documents that may constitute relevant evidence in a case is not enough to incorporate those documents, wholesale, into the complaint." *Sira v. Morton, 380 F.3d 57, 67 (2d Cir. 2004)*. Rather, case law instructs that a document is "integral" to a complaint when the plaintiff has "actual notice" of the extraneous information and relied on it in framing the complaint. *DeLuca v. AccessIT Grp., Inc., 695 F.Supp.2d 54, 60 (S.D.N.Y. 2010)* (citing *Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002))*. That is to say that a document is "integral" to a complaint when the plaintiff "relies heavily upon its terms and effect" in the complaint. *See Int'l Audiotext Network, Inc. v. Am. Tel. and Tel. Co., 62 F.3d 69, 72*

*(2d Cir. 1995)*. The Trust has not demonstrated that the complaint meets that standard because the Trust's sole reference in the Amended Complaint to the Examiner's Report is as follows:

> [The Trust] assets include, but are not limited to, any potential claims, causes of action, charges, suits, or rights of recovery of the Debtors referenced in the Examiner's Report of Ralph R. Mabey, Examiner in the Chapter 11 Cases, filed with the Bankruptcy Court on April 8, 2010. In the Examiner's Report, the Examiner set forth the facts leading up to the Chapter 11 Cases and claims and causes of action that could be asserted against various parties arising therefrom, including the claims and causes of action **[\*25]** asserted against the Defendants herein.

Amd. Compl. ¶ 9. The Trust did not "rely heavily" on its terms in drafting the Amended Complaint, and its limited reference to the report in ¶ 9 therein is not sufficient to label the report "integral" to the complaint, in the conventional sense. Nonetheless, although the Trust may not rely on the contents of the report as support for the adequacy of the allegations in the Amended Complaint, the report is plainly central to the complaint because the term "Litigation Trust Assets" is defined, in part, by reference to the Examiner's Report, and the Trust can only pursue claims that are among the Litigation Trust Assets. Indeed, as discussed below, the Arbor and HVM Defendants rely on the contents of the Examiner's Report in challenging the Trust's standing to sue and, thus, this Court's subject matter jurisdiction to adjudicate certain of the claims asserted herein.

*HN10*[⏏] In resolving claims regarding a lack of jurisdiction under *Rule 12(b)(1)*, a court may rely on evidence outside the pleadings. The HVM and Arbor Defendants submitted excerpts from the Examiner's Reports in support of their Motions. They base their contentions that the Trust lacks standing to sue them **[\*26]** on the contents of the Examiner's Report. They start from the proposition (not contested by the Trust) that the Trust has standing to assert only the claims that are "Litigation Trust Assets" referenced in the Examiner's Report. In substance, the HVM Defendants contend that the Court must dismiss them from the Amended Complaint because the Examiner's Report does not label them as potential defendants in the claims identified by the Examiner in his report and, as such, the Trust lacks standing to sue them because the Litigation Trust Assets do not include claims against the HVM Defendants. The Arbor and HVM Defendants contend that the Court must dismiss the Trust's claims

for waste (Count 8), conversion (Count 9), conspiracy (Count 11), and aiding and abetting breaches of fiduciary duties and conversion (Counts 6 & 10) because those claims are not specifically referenced in the Examiner's Report and, as such, are not Litigation Trust Assets. The Litigation Trust Assets Trust assets include "all . . . potential claims, causes of action, charges, suits or rights to recovery referenced in the Examiner's Report." *See* Plan § 1.89; *see also* Amd. Compl. ¶ 9 ("[The Trust] assets include, but are **[\*27]** not limited to, any potential claims, causes of action, charges, suits, or rights of recovery of the Debtors referenced in the Examiner's Report of Ralph R. Mabey, Examiner in the Chapter 11 Cases, filed with the Bankruptcy Court on April 8, 2010. In the Examiner's Report, the Examiner sets forth the facts leading up to the Chapter 11 Cases and claims and causes of action that could be asserted against various parties arising therefrom, including the claims and causes of action asserted against the Defendants herein."). An issue that the Court must consider in resolving these Motions is whether the Trust has standing to assert the claims underlying the seventeen Counts comprising the Amended Complaint. To resolve that issue, in part, the Court will refer to and rely upon the contents of the Examiner's Report — as the Trust and Defendants have, including the Examiner's description of the potential claims, causes of action, charges, suits or rights to recovery referenced in the report.

Facts

The Company Prior to the LBO Transaction

In March of 2004, two investment funds controlled by Blackstone purchased the Debtors' predecessor, Extended Stay America, Inc., and took the publicly traded **[\*28]** company private. *See* Amd. Compl. ¶ 107. Extended Stay America operated a portfolio of hotel properties and substantially all of its entities and business operations ran through the corporate ownership chains of either ESI, a Delaware corporation, or Homestead Village LLC ("Homestead"), a Delaware limited liability company. *See id.* ¶¶ 16-18, 108. Before the LBO Transaction, two Blackstone-controlled entities - BRE/HV Holdings and BHAC IV - directly and nominally owned Homestead and ESI, respectively. *See id.* ¶¶ 20, 107, 108. At that time, HVM, L.L.C. ("HVM"), and its Canadian affiliate, HVM Canada, both Blackstone entities, managed the day-to-day operations of the hotel properties and businesses. *See id.* ¶¶ 86,

22-11509-pb    Doc 180    Filed 02/21/23    Entered 02/21/23 16:53:50    Main Document
Pg 53 of 191

Page 37 of 153
2020 Bankr. LEXIS 2128, *28

109.

The LBO Transaction

In early 2007, Blackstone explored selling the ESI and Homestead businesses (including HVM and its related entities). In February of 2007, it solicited interest for such a transaction through an offering memorandum that included advanced financing commitments (i.e., "stapled financing") of $6.8 billion. *See id.* ¶¶ 113-114. The solicitation drew four expressions of interest, but only Lichtenstein made a definitive proposal. *See id.* ¶ 114. In April of 2007, **[*29]** he offered to purchase the business from Blackstone for approximately $8 billion. Blackstone accepted the offer six days later. *Id.*

DL-DW is a Delaware limited liability company that at all pertinent times was under Lichtenstein's control. *See* Amd. Compl. ¶¶ 25, 35. It was the nominal buyer of the Homestead and ESI businesses from BHAC IV and BRE/HV Holdings through its acquisition of 100% of the membership interests in Homestead and its acquisition of 100% of the membership interests in BHAC, a Delaware limited liability company. At all relevant times, BHAC held no less than 99% of the equity in ESI. *See Id.* ¶ 26. The LBO Transaction closed on June 11, 2007. At that time, DL-DW became the sole direct member of both Homestead and BHAC. In late June of 2007, pursuant to a planned "restructuring," DL-DW transferred its direct membership interests in BHAC to Homestead, but remained the sole direct member of Homestead. In addition, in connection with that "restructuring," several Arbor Entities invested in BHAC, thereby diluting DL-DW's, and indirectly, Homestead's, membership interests in BHAC. *See* Amd. Compl., Ex. A (Organization Chart). DL-DW and BHAC are not Debtors herein.

The LBO Transaction **[*30]** purchase price of $8 billion was financed by $7.4 billion of the stapled financing commitment, and $400 million in cash. Additionally, Lichtenstein contributed $200 million as "rollover equity" to BRE/ESH Holdings L.L.C. for Blackstone's benefit. *See* Amd. Compl. ¶ 115. The financing of the LBO Transaction and the related transaction documents are summarized below.

Mortgage Debt -- $4.1 billion
Pursuant to the Mortgage Loan Agreement,[15]

Wachovia Bank, N.A. ("Wachovia Bank"), Bear Stearns Commercial Mortgage, Inc., and Bank of America, N.A. (collectively, the "Mortgage Lenders") made a loan (the "Mortgage Loan") in the aggregate amount of approximately $4.1 billion (the "Mortgage Debt") to certain of the Debtors (the "Mortgage Borrowers")[16] The Mortgage Debt was secured by, among other things, first priority liens on the Debtors' hotel properties (the "Mortgage Properties") and the intellectual property held by BHAC and Homestead. Lichtenstein was a guarantor under the Mortgage Loan.

Subsequent to the closing of the LBO Transaction, the Mortgage Lenders sold and assigned the Mortgage Loan and collateral therefor to Wachovia Large Loan Inc.,[17] which, in turn, deposited the Mortgage Loan and the **[*31]** collateral into a vehicle -- the Wachovia Bank Commercial Mortgage Trust Commercial Mortgage Pass-Through Certificates, Series 2007-ESH (the "Mortgage Facility Trust").[18] The Mortgage Facility Trust issued commercial mortgage pass-through certificates representing ownership of the beneficial interests in the trust (the "Certificates") to the Mortgage Lenders. In turn, certain investors purchased the Certificates (the "Certificate Holders").[19]

---

Agreement [Dkt. 244-1].

[16] The Mortgage Borrowers were: ESA 2005 Portfolio L.L.C., ESA 2005-San Jose L.L.C., ESA 2005-Waltham L.L.C., ESA Acquisition Properties L.L.C., ESA Alaska L.L.C., ESA Canada Properties Borrower L.L.C., ESA FL Properties L.L.C., ESA MD Borrower L.L.C., ESA MN Properties L.L.C., ESA P Portfolio L.L.C., ESA P Portfolio MD Borrower L.L.C., ESA P Portfolio PA Properties L.L.C., ESA P Portfolio TXNC Properties L.P., ESA PA Properties L.L.C., ESA Properties L.L.C., ESA TX Properties L.P., ESH/Homestead Portfolio L.L.C., ESH/HV Properties L.L.C., ESH/MSTX Property L.P., ESH/TN Properties L.L.C. and ESH/TX Properties L.P. *See* Discl. Stmt. at 18, § III.A.1.93. *See also* Amd. Compl., Ex. A (Organization Chart).

[17] *See* Opp'n at 3 n.4.

[18] *See* Objection of U.S. Bank National Association, As Successor Trustee [for the Wachovia Mortgage Trust], With Respect to the Debtors' Motion Pursuant to *Bankruptcy Rule 2004* Authorizing Discovery (D.I. 524), dated November 6, 2009 [Case No. 09-13764, Dkt. 558].

[19] *See* Discl. Stmt. at 27, § IV.D.2.

---

[15] A copy of the Mortgage Loan Agreement is annexed as Exhibit 2 to the Angell Declaration. *See* Mortgage Loan

2020 Bankr. LEXIS 2128, *31

The trust's assets consist of the Mortgage Debt and collateral therefor. The Mortgage Facility Trust was established pursuant to the Trust and Servicing Agreement, dated as of August 1, 2007 (as amended or modified), originally entered into by and among Wachovia Large Loan, Inc., as Depositor, Wachovia Bank, National Association, as Servicer and Special Servicer, and Wells Fargo Bank, N.A., as Trustee relating to the issuance of the Mortgage Certificates and the servicing of the Mortgage Loan.[20] The Certificate Holders own 100% of the beneficial interests in the Mortgage Debt.[21] The rights of the Certificate Holders are governed by the Trust and Servicing Agreement.[22] As a result of the commencement of these Chapter 11 Cases, the Mortgage Debt became a "specially **[*32]** serviced loan" under the Trust Servicing Agreement and the servicing duties with respect to the Mortgage Debt were transferred from the Servicer to the Special Servicer. CW Capital Asset Management LLC currently serves as the Special Servicer of the Mortgage Debt.[23] U.S. Bank National Association ("U.S. Bank" or "Mortgage Trustee") was appointed as the successor in interest to Wells Fargo Bank, N.A.,[24] as Trustee of the Mortgage Trust.[25]

<u>Mezzanine Debt -- $3.3 billion</u>

Pursuant to ten different Mezzanine Loan Agreements, each dated June 11, 2007 (and each facility thereunder, a "Mezzanine Facility"), the Mortgage Lenders (as the "Mezzanine Lenders") loaned approximately $3.3 billion in the aggregate to certain of the Debtors (the "Mezzanine Borrowers"). The Mezzanine Borrowers are special purpose entity subsidiaries owned by ESI or Homestead that, in turn, either directly or indirectly, through lease or title, held the interests in the applicable hotel properties. *See* Discl. Stmt. at 24, § IV.B. Each Mezzanine Facility is secured by the membership interest held in the Mezzanine Borrower one level below pursuant to each applicable pledge agreement. The Mezzanine Lenders **[*33]** do not have an interest in the Mortgage Properties or any of the other collateral securing the Mortgage Debt, including the cash and proceeds generated from the Mortgage Properties.

<u>Cash -- $400 million</u>

Lichtenstein and his affiliates paid approximately $200 million in cash in return for their interests (i.e., "Units") in DL-DW. *See* DL-DW LLC Agmt., Sch. A.[26] In connection with the LBO Transaction and "restructuring" thereafter, PGRT ESH and Polar Extended Stay and certain of the Arbor Entities acquired membership interests in DL-DW and BHAC.[27] After the restructuring, the membership interests in DL-DW and BHAC were held, as follows:

A. <u>DL-DW</u>


Go to table1

B. <u>BHAC</u>


Go to table2

Glida One and Ron Invest also held membership interests in BHAC. *See* Amd. Compl. ¶¶ 64, 66, 151, 162, 166, 172 (alleging that Glida One and

---

[20] *Id.*

[21] *Id.* There are 18 principal balance classes of Certificates and, under the Trust and Servicing Agreement, distributions with respect to the Mortgage Debt are allocated to each class of Certificates based on their alphabetical (and, if applicable, numerical) designation, starting with Class A-1. The alphabetical (and numerical, if applicable) designation denotes the priority of the class of Certificates as among the other classes of Certificates. *Id.*

[22] *Id.*

[23] *Id.*

[24] In 2008, Wells Fargo & Company acquired Wachovia Corporation. *See* https://www.wellsfargo.com/about/corporate/wachovia/.

[25] *See* Discl. Stmt. at 28, § IV.D.2.

[26] A copy of the Second Amended and Restated Limited Liability Company Agreement of DL-DW LLC, dated June 29, 2007 (the "DL-DW LLC Agreement") is annexed as Exhibit D to the Goldberg Declaration.

[27] Copies of (i) the Second Amended and Restated Limited Liability Company Agreement of BHAC Capital IV, L.L.C., dated June 29, 2007 (as amended from time to time, the "BHAC LLC Agreement"), and (ii) the *First Amendment* to BHAC LLC Agreement, are annexed to the Goldberg Declaration as Exhibits A and B, respectively.

22-11509-pb    Doc 180    Filed 02/21/23    Entered 02/21/23 16:53:50    Main Document
Pg 55 of 191
2020 Bankr. LEXIS 2128, *33

Page 39 of 153

Ron Invest are members of BHAC, and received distributions in 2007 and 2008 on account of their Preferred Series A-1 Units (defined below) in BHAC); *see also* Amd. Compl., Ex. A (Organization Chart).

The Arbor Entities paid $200 million in the aggregate for their interests in BHAC. There were nine authorized series of Units under the BHAC LLC Agreement, *see* BHAC LLC Agmt. § 3.02 ("Units; Initial Capitalization"), and each series of Units was afforded different rights *vis-a-vis* BHAC and one another. *See id.* §§ 3.03-3.11 (series by series description of Units and rights of the holders of the Units). In particular, the holders of "Series A-1 Units" were entitled to be paid the "Series A-1 Minimum Cash Monthly Distribution," ahead of payments of any kind to the holders of any other Units in BHAC. *See id.* § 5.01(a) (providing for Distribution of Non-Capital Proceeds first to the Series A-1 Holders in respect of each Series A-1 Unit then outstanding, *pro rata*, and noting that for purposes of that provision, all Series A-1 Minimum Cash Monthly Distributions shall be distributions [*35] to the Series A-1 Holders). The "Series A-1 Minimum Cash Monthly Distribution" meant "a cash distribution on each Preferred Payment Date to each Series A-1 Holder on account of each Series A-1 Unit held by such Series A-1 Holder at a rate of 0.833% of the $1,000,000 liquidation preference of such Series A-l Unit." *See id.* ¶ 1.120.[29] In the aggregate, the Arbor Entities held 210 Series A-1 Units.

The BHAC LLC Agreement called for BHAC to maintain at all times (for the purpose of funding unpaid cash distributions in respect of the Preferred Return of the Preferred Series A-1 Units), a cash reserve account with $20,000,000 (the "Mandatory Cash Reserve Account"). *See id.* § 5.11(a);[30] *see*

---

[29] The payments were payable in arrears, and the Preferred Payment Date was the 15th day of each calendar month. *See* BHAC LLC Agmt. § 5.05(b).

[30] Section 5.11(a) of the BHAC LLC Agreement states:

5.11 Mandatory Cash Reserve.

(a) Until the Series A-1 Termination Date, the Company shall at all times maintain (for the purpose of funding unpaid cash distributions on the Preferred Return of the Series A-1 Units) a cash reserve in an amount equal to $20,000,000 with respect to the outstanding Series A-1 Units (the "Mandatory Cash Reserve"), which Mandatory

---

*also id.* § 5.11(f) ("The Board shall be permitted to replenish the Mandatory Cash Reserve Account with Non-Capital Proceeds and Capital Proceeds."). The agreement also provided that if BHAC failed to make "due and payable" Series A-1 Minimum Cash Monthly Distributions, the Series A-1 Unit holders had the right (through their "Reserve Representative") to withdraw amounts from the Mandatory Cash Reserve Account for such purpose. *See id.* § 5.11(b).[31] In the Amended Complaint, the Trust refers to the Mandatory Cash Reserve Account as the "Preferred [*36] Equity Reserve Account," or "PERA." *See* Amd. Compl. ¶ 182.

The Debtors' business was organized as a real estate investment trust ("REIT"), and a mezzanine finance structure, as follows:

<u>Property Owners</u>. Each of the eighteen entities that owned the hotel properties was a Mortgage Borrower under the Mortgage Loan. Their respective properties, among others (in all, 666 properties) secured the Mortgage Debt. *See* Discl.

---

Cash Reserve shall be deposited in an account maintained by the Company (the "Mandatory Cash Reserve Account") at Citibank, N.A. (Private Banking Division) ("Reserve Account Bank"); provided, however, that any earnings or interest on the Mandatory Cash Reserve shall be treated as Non-Capital Proceeds.

[31] Section 5.11(b) of the BHAC LLC Agreement states:

(b) The Company shall only be permitted to withdraw amounts from the Mandatory Cash Reserve Account to pay on the applicable Payment Date the Series A-1 Minimum Cash Distributions that are due and payable (and the Company hereby agrees that it will only withdraw funds from Mandatory Cash Reserve Account for such purpose). The Reserve Representative shall have the right (any time after the second Business Day immediately following the applicable Preferred Payment Date) to withdraw [*37] amounts from the Mandatory Cash Reserve Account if for any reason the Company fails to make the full Series A-1 Minimum Cash Monthly Distribution on any Preferred Payment Date. The amount withdrawn by the Reserve Representative shall be limited to the amount necessary to pay the full portion of the Series A-1 Minimum Cash Distribution that each Series A-1 Holder was entitled to receive on the applicable Preferred Payment Date and shall be distributed by the Reserve Representative to each Series A-1 Holder on account of their Series A-1 Units.

BHAC LLC Agmt. § 5.11(b).

Stmt. at 27, § IV.D.1; Amd. Compl., Ex. A.

Non-Property Owner Borrowers. Three additional entities — ESA Canada Properties Borrower L.L.C., ESA MD Borrower L.L.C., and ESA P Portfolio MD Borrower L.L.C. - did not own property but were borrowers under the Mortgage Loan. See Amd. Compl., Ex. A.

Operating Lessees. [*38] Four Debtors — ESA Canada Operating Lessee Inc., ESA 2005 Operating Lessee Inc., ESA Operating Lessee Inc., and ESA P Portfolio Operating Lessee Inc. - were the operating lessees. See id. They were not borrowers under the Mortgage Facility and they did not own the properties.

Mezzanine Borrowers. There were thirty Mezzanine Borrowers, divided into ten tiers of structural priorities. Each set of three structurally parallel Mezzanine Borrowers issued its own tier of Mezzanine Debt. See Discl. Stmt. at 26-27, § IV.D. The Mezzanine Lenders do not have an interest in the Mortgage Properties or any of the other collateral securing the Mortgage Debt, including the cash and proceeds generated from the Mortgage Properties. They did not have any business or operations. See First Amended Complaint, AP No. 11-2256, Dkt. 28 (the "Prior Amended Complaint") ¶ 112; Complaint, AP No. 11-2255, Dkt. 1 (the "Fraudulent Transfer Complaint") ¶ 109; Complaint, AP No. 11-2254, Dkt. 1 (the "Fiduciary Duty Complaint") ¶ 191.


Post LBO Management of the Debtors

After the LBO Transaction closed, the Debtors were under the control of entities and individuals associated with Lichtenstein and Kaufman. Lichtenstein was the Chairman and Chief [*39] Executive Officer of all or substantially all of the Lightstone Entities. See Amd. Compl. ¶ 34. Kaufman served as the Chairman and CEO of Arbor Realty Trust, Inc., and owned, either individually or indirectly through various entities, no less than approximately 90% of defendant Arbor Commercial. See id. ¶ 58.[32] He is a not a defendant

---

[32] Arbor Realty Trust, Inc. is a publicly traded REIT with managed assets well in excess of $1.5 billion. See Amd. Compl. ¶ 54. Arbor Realty Limited Partnership, is a wholly-owned operating subsidiary of Arbor Realty Trust, Inc. See id. Neither is a defendant herein.

herein. The Defendants include members of the so-called "Arbor Group," including Arbor ESH, Princeton ESH, Glida One, Ron Invest and Atmar Associates — each of which held membership interests in BHAC — and Joseph Chetrit, Joseph Martello and Guy Milone — each of whom served on the board of directors of the "Extended Stay Hotels Family of companies" at various points in time. The Trust contends that Joseph Chetrit, or members of his family, controlled Ron Invest, Glida One and Atmar Associates. See id. ¶¶ 65, 67. It maintains that Kaufman and Arbor ESH and its affiliates were heavily involved in planning and negotiating the LBO Transaction and that after the transaction closed, Arbor ESH exercised control over BHAC and ESI. See id. ¶¶ 52, 59. It asserts that through that control, and due to the Defendants' alleged failure to observe the corporate boundaries [*40] of the various Debtor entities, Arbor ESH also exercised indirect control over the other Debtor entities and had the right to appoint one or more Arbor designees to the board. See id. ¶¶ 52, 55.

Lichtenstein was CEO and President of all of the seventy-five Debtor entities, and as such, had general supervisory authority over the daily business operations and affairs of the Debtors. See Amd. Compl. ¶¶ 36-37. The Trust maintains that despite the "surfeit of Debtors resulting from a labyrinthine corporate structure," the Debtors were owned, managed and operated on a completely centralized basis, even if their corporate structure was nominally decentralized. See id. ¶¶ 13, 192. It contends that although many of the lower level Debtor entities had "independent" board members, only one board of directors met to make corporate decisions for the Debtors, none of the lower corporate level independent board members attended those meetings, and there were no independent directors at those meetings. See id. ¶ 13. The minutes of those meetings were labeled as the "consolidated Meetings of the Board of Directors of the 'Extended Stay Hotels family of companies,'" and referred to the "Extended [*41] Stay family of companies" as the "Company." See id. ¶¶ 13, 35. As set forth in the minutes, those companies included DL-DW, BHAC, Homestead, ESI, and each of their direct and indirect subsidiaries. See id. ¶ 35. The Trust sometimes refers to the board of directors as the "Company Board." Lichtenstein was a director and chairman of the board and held interlocking director positions with numerous entities in the "Extended Stay Hotels family of companies." See id. ¶¶ 35, 37. All board members likewise held interlocking director positions with numerous entities in the "Extended Stay Hotels family of companies." See id. ¶¶ 35, 41, 46, 48, 74, 79,

84. Lichtenstein regularly attended and, in most cases, chaired all meetings of the Company Board. *See id.* ¶ 38. Final decision-making authority for all the Debtors resided with and was exercised by the board. *See id.* ¶ 35.

The Company Board was comprised entirely of individuals affiliated with the Arbor and Lightstone Entities. *See* Amd. Compl. ¶¶ 16, 20. For the Lightstone Entities, those individuals were: Lichtenstein, Bruno de Vinck, Peyton "Chip" Owen Jr., and Joseph Teichman. *See id.* ¶¶ 34-50. For the Arbor Entities, those individuals included **[*42]** Joseph Martello, who sat on the Company Board from June 11, 2007 through May 15, 2008, when he was succeeded by Guy R. Milone, Jr. *See id.* ¶¶ 74-75, 79. The Trust asserts that Martello and Milone were selected to sit on the board by Arbor ESH, or one of its affiliates. *See id.* ¶¶ 74-75. The Trust also asserts that starting from at least November 13, 2008, Joseph Chetrit, a direct or indirect owner or member of senior management of certain Arbor Entities, attended board meetings as a "director and, in some cases, as an 'invited guest' (even though he was a director)" and approved or allowed the Debtors to make improper dividend distributions with full knowledge of the Debtors' financial difficulties. *See id.* ¶¶ 84-85. Moreover, it contends that by reason of his relationship with Arbor ESH and the members of the "Arbor Group," Kaufman attended and participated in two Company Board meetings (November 13, 2008 and January 29, 2009), and attended and participated in certain executive sessions of the board. *See* Amd. Compl. ¶ 58. The Trust alleges that Kaufman's attendance at those meetings was to ensure that equity distributions would continue to be made from the Debtors, either directly **[*43]** or through other entities, to the Arbor entities Kaufman owned or controlled. *See id.* Thus, the Trust asserts that from the moment that the LBO Transaction closed, the Debtors, under the control of the Defendants, disregarded all semblance of legal formality regarding the corporate status of the Debtors and affiliated entities. It contends that the Debtors made no effort to maintain their separateness or fulfill the covenants of the LBO loan agreements mandating their separateness, had common officers and directors and had no separate governance, and were treated internally at all relevant times as part of one company. *See id.* ¶192.

Prior to the LBO Transaction, HVM, then a Blackstone affiliate, managed the day-to-day operations of the Extended Stay Hotels family of companies, and the Debtors' hotel properties. *See* Amd. Compl. ¶ 86. It was sold in the LBO Transaction to Lichtenstein and the other Lightstone Defendants. *See id.* F. Joseph Rogers was the Executive Vice President of HVM and owned a 15% stake in it. *Id.* ¶ 90. The Trust maintains that Rogers also (i) served as the Executive Vice President of Finance of the "Extended Stay Hotels family of companies," (ii) served as the Assistant **[*44]** Secretary or Vice President of fifty-five of the Debtors, and (iii) was a high ranking officer of all or substantially all of the Mortgage Borrowers and Mezzanine Borrowers. *Id.* ¶ 91. Dae Hum Kim was an employee of HVM who also served, at all pertinent times since approximately 2007, as the Executive Vice President and Chief Investment Officer of the "Extended Stay Hotels family of companies." *Id.* ¶ 93. Gary DeLapp was the President and CEO of HVM and owned a 60% interest in HVM. *Id.* ¶ 96. Prior to the LBO, DeLapp served as President and CEO of ESI, and after the LBO, he served as the President of the "Extended Stay Hotels family of companies." *Id.*

The Trust contends that the HVM Defendants attended the Company Board meetings as "invited guests" on November 15, 2007, February 14, 2008, May 15, 2008, August 14, 2008, and November 13, 2008. *See id.* ¶¶ 92, 94, 97. It asserts that at those meetings, they received detailed reports regarding the Debtors' financial and operational performance and other material business issues relating to the Debtors. *See id.*

The LBO Transaction Leaves The

Debtors In Precarious Financial Condition

The Trust maintains that the Debtors received virtually none of **[*45]** the cash paid as consideration in the LBO Transaction, that the net economic effect of the transaction was that the sellers siphoned $1.9 billion of value out of the Debtors, and that the transaction left the Debtors with more than $1.65 billion in additional debt. *See* Amd. Compl. ¶ 122. Further, it says that conditions attached to the LBO financing significantly and negatively impacted the conduct of the Debtors' operations by, among other things, calling for the establishment of a centralized cash account and providing for the "cash trap" events.

In connection with the LBO Transaction and the associated financing, the parties to the Mortgage Loan Agreement agreed that revenues and other receipts from the Debtors' operations would be managed through a centralized cash account pursuant to a Cash

Management Agreement. *See* Amd. Compl. ¶ 118.[33] The account was maintained at Wachovia Bank, and was held in the name of "ESA P Portfolio L.L.C. for the benefit of Wachovia Bank, National Association, Bear Stearns Commercial Mortgage, Inc. and Bank of America, N.A., collectively." *See* Cash Mgmt. Agmt. § 2.2. In substance, the Cash Management Agreement called for the Debtors to transfer all revenue generated **[\*46]** through the operation of their business into a "Cash Management Account," and to maintain a number of "subaccounts" in that account, on a ledger-entry basis. *Id.* § 2.1. Those subaccounts included, without limitation: Debt Service Subaccount, Ground Lease Subaccount, Mezzanine A-J Debt Service Subaccounts, Tax and Insurance Escrow Subaccounts, Operating Expense and Management Fee Subaccounts and a Preferred Equity Subaccount. *Id.* § 2.1 (b) - (y). The agreement included a distribution "waterfall" whereby the funds on deposit in the Cash Management Account were distributed to the subaccounts pursuant to a fixed order of priority, and thereafter distributed in that order. *Id.* §§ 3.4 (a) - (gg) (establishment of subaccounts); 4.1 (a) - (v) (distribution of funds in subaccounts). The Trust asserts that there were two problems with the "waterfall." First, it altered, to the Debtors' detriment, the cash distribution scheme in place as of the closing of the LBO Transaction. The pre-LBO cash management agreement provided that management fees, through which operating expenses were paid, were higher in priority on the so-called "waterfall" than debt service on the then existing mezzanine loans, and thus management fees would be paid **[\*47]** before mezzanine loan debt service if there were insufficient funds to pay both. *See* Amd. Compl. ¶ 126. The Cash Management Agreement provided just the opposite: Mezzanine Debt service was higher in priority than management fees to HVM and was paid first if there were insufficient funds to pay both. *See id.*

*See also* Cash Mgmt. Agmt. §§ 3.4 (a) - (gg); 4.1 (a) - (v). The Trust contends that this severely threatened the Debtors' ability to maintain operations because most of the hotels were indirectly owned by ESI under its REIT structure, and as such were required to have an outside management company operate its hotels. But under the Cash Management Agreement, management fees — which included all operating expenses for the Extended Stay hotel chain — could be paid only if cash was available after debt service. If those management fees and operating costs were not paid, the Debtors' hotels would close, and the Debtors' entire business would abruptly shut down. *See id.* The Trust also complains that by design, and with the approval of the Defendants, the Cash Management Agreement provided a route for payments to be made to equity holders directly, appearing to circumvent the normal process for corporate **[\*48]** directors to determine in advance, before the payments were made, whether the company had the financial wherewithal to make such distributions. *See id.* ¶ 5. The Trust asserts that DL-DW's insiders (which it says included the preferred equity shareholders of BHAC) were able to siphon value from the Debtors regardless of the Debtors' financial and operational performance. That is because the "waterfall" accounted for the Series A-1 Minimum Cash Monthly Distributions as priority payments under the "waterfall."[34] The Trust maintains that through the Cash Management Agreement, post-LBO equity holders could receive improper dividends from the Debtors, even as the Debtors' financial condition deteriorated into insolvency. *See id.* ¶ 125; s*ee also* ¶ 118 ("The Cash Management Agreement sought to protect certain lenders and equity owners by imposing a set waterfall payout structure.").

The LBO Transaction loan agreements provided for a "Cash Trap Event," whereby upon the occurrence of a "Debt Yield Event," excess cash (i.e., cash after payment of taxes, reserves, and debt service) from the Debtors' operations was "trapped" and held as additional collateral for the Mortgage Lenders. *See* Amd. **[\*49]** Compl. ¶ 119. In the wake of a Cash Trap Event, cash was not available to pay the Debtors' costs of operations, including capital expenditures beyond a

---

[33] *See* Cash Management Agreement, dated as of June 11, 2007. Among those entities signatories thereto, collectively, as Borrower, and ESA P Portfolio MD Trust and ESA MD Properties Business Trust, as Maryland Owner and ESA Canada Trustee, Inc., as Canadian Owner and ESA P Portfolio Operating Lessee, Inc., ESA 2005 Operating Lessee, Inc. and ESA Canada Operating Lessee Inc. and ESA Operating Lessee Inc., collectively, as Operating Lessee and HVM L.L.C., as Manager and Homestead Village L.L.C., and Wachovia Bank, National Association, and Bear Stearns Commercial Mortgage, Inc., and Bank of America, N.A., collectively, as Lender, and Wachovia Bank, National Association, as Agent (the "Cash Management Agreement") (Kurland Decl., Ex. F) [Dkt. 226-6].

---

[34] *See* Cash Mgmt. Agmt. § 2.1(y) (establishment of "Preferred Equity Subaccount" under Cash Management Agreement); § 3.4(u) (application of funds in Cash Management Account to the Preferred Equity Account); § 4.1(g) (disbursement of funds on deposit in Preferred Equity Subaccount for the benefit of Preferred Series A-1 Unit holders).

small reserve, other than as budgeted in their annual budget that, under the Cash Management Agreement, was subject to the approval of the lenders; and no distributions to equity holders could be made, other than to Preferred Series A-1 Unit holders, unless the "Debt Yield" equaled or exceeded 7.75%. *See id.* ¶ 119.[35] The Cash Management Agreement provided that a Cash Trap Event would occur when, among other things, the Debt Yield percentage fell below 7.5% for seven consecutive months (a "Debt Yield Event"). *See id.* ¶¶ 120-121. Once a Debt Yield Event occurred, the "cash trap" would remain in place until the Debt Yield was maintained above the cure calculation of 7.6% for a period of six months. The Trust contends that, as of the closing of the LBO Transaction, the Debt Yield was only 7.09%. *See id.* ¶ 124. It maintains that for the first six months after the LBO Transaction closed, the only reason there was no technical Cash Trap Event was because the Debtors' failure to meet the 7.5% Debt Yield had no consequences until the seventh payment **[*50]** date, which was scheduled to occur in January of 2008.

After The LBO Transaction Closes—

### The Debtors' Financial Performance Declines

After the LBO Transaction closed, the Debtors' financial performance declined as they encountered significant economic problems and missed performance targets set forth in their budgets. *See id.* ¶ 127.[36] The Trust

_____

[35] The "Debt Yield" was a ratio that was intended to provide an indication of the amount of cash generated by the mortgaged properties compared to the level of debt associated with those properties and to measure the Debtors' ability to generate enough cash to service the LBO debt. The loan agreements defined Debt Yield roughly as a fraction: (a) the numerator of which was net operating income less (i) assumed management, marketing, and franchise fees equal to 4% gross income, (ii) replacement reserve fund contributions equal to 4% gross income, and (iii) income generated by leased properties; and (b) the denominator of which was the combined total outstanding principal balances on the mortgage and mezzanine loans. *See* Amd. Compl. ¶ 120.

[36] Specifically, the Trust asserts that:

> Post-LBO Transaction revenues for 2007 fell 5% ($32 million) below the pro forma budget of approximately $655 million prepared in connection with the LBO Transaction.

> The 2007 post-LBO Transaction EBITDA was

maintains that the Defendants knew or should have known of material events relating to the Debtors' subpar performance as it related both to the Debtors' peer group and internal targets, since, after the LBO Transaction, they received regular financial and other reports on both a weekly and monthly basis, depending on the nature of the reports. *See id.* ¶¶ 127, 129.[37] Moreover, it says that in 2007, the Debtors were in violation of their loan covenants because, among other things, they failed to prepare, and thus, did not furnish, Debt Yield reports to their lenders, as mandated under the loan agreements. *Id.* ¶ 130.

### The 2008 Debt Yield Test And Formal Cash Trap Event

The softening of room demand that the Debtors experienced in 2007 continued into early 2008, as occupancy rates decreased, and the overall room supply increased at rates far exceeding only modest increases in demand. *See* Amd. Compl. ¶ 149. On January 21, 2008, the Debtors reported their first Debt Yield calculation (covering the period ending December 31, 2007) to the lenders. It did not meet the minimum required Debt Yield of 7.5%, thus triggering both **[*52]** a Debt Yield Event and a Cash Trap Event. *See id.* ¶ 148. Beginning in February of 2008, and on a monthly basis thereafter, the lenders "trapped" any unallocated cash

_____

> approximately $327 million (or **[*51]** a 52% margin), as compared to a pro forma budget EBITDA of $364 million (or a 56% margin).

> During the second half of 2007, the Debtors experienced a continuing reduction in room demand, and the key monthly metrics (occupancy rate, average daily rate, and revenue per room) were at or below budget in every month following the LBO Transaction in 2007.

> Revenue growth reversed in the second half of 2007, and the Debtors missed projections for room revenue and property-level EBITDA in each of the last three quarters of 2007.

> According to regular industry reports, the Company's revenue and room rates were below the rates of the Company's peers by a significant amount: 10 to 22%.

*See id.* ¶ 128.

[37] For example, the Trust notes that weekly reports showed how this deteriorating performance compared to the Debtors' peer group in the second half of 2007, and that during a meeting on November 15, 2007, the Company Board received a report that revenue per room was below budget by 5.9% and property-level EBITDA was below budget by 10.5% for the third quarter of 2007. *See id.* ¶ 129.

remaining after the Debtors made the waterfall payments in a restricted cash collateral account. *See id.* Consequently, the Debtors used more than $27 million from a working capital reserve account to keep their business afloat.

In November of 2007, the Debtors submitted their proposed 2008 annual budget for the approval of certain of their lenders. *See id.* ¶ 133. The lenders rejected that budget and, as a result, the approved 2007 annual budget remained in place. *See id.* ¶ 158. However, the 2007 budget did not provide for funding of certain expenses (e.g., reservation system expenses and occupancy taxes), and the Debtors were left with inadequate funds to pay their operational expenses. *See id.* In April of 2008, the lenders made concessions to facilitate the budgeting of operating expenses in exchange for an amendment to the Mortgage Loan Agreement that restricted the Mortgage Borrowers' use of income, cash, fees, proceeds, property, and revenue from the mortgaged hotel properties (including disbursements to the Mortgage **[*53]** Borrowers of excess cash flow under the Cash Management Agreement) except in limited circumstances. *See id.* ¶ 159. Pursuant to that budget agreement, the Debtors received some of the cash to which they should have been entitled dating back to January 1, 2008. However, the receipt of that cash did not solve their financial problems.

The Debtors Retain Restructuring

Professionals As Their Business Continues To Decline

In April of 2008, the Debtors retained Weil Gotshal & Manges ("Weil") as restructuring and insolvency counsel to assist them with efforts to address the Debtors' financial distress and to restructure the debt structure. *See* Amd. Compl. ¶ 160. Two months later, they retained Lazard Freres ("Lazard") to assist with these efforts. During the second quarter of 2008, occupancy rates and revenues per room continued to decline. *See id.* ¶ 161.[38] By the fourth quarter of 2008, occupancy

---

[38] An "Audit Update" included in the May 15, 2008 board of directors package noted that:

> (a) debt waivers were required; and (b) significant liquidity concerns had to be addressed for audit issuance. In addition, a cash flow forecast prepared by the Debtors predicted that the effect of LIBOR rates would significantly affect liquidity, such that cash at year end was projected to range from $19.5 million to $49.8

rates, average daily rates, and revenue per room performance were far below budgeted projections. *See id.* ¶ 171. Revenue and property-level EBITDA performance had double-digit declines in the fourth quarter of 2007, and by the end of 2008, the Debtors' total revenue and EBITDA had also dramatically declined. **[*54]** In early December of 2008, the Debtors submitted their 2009 annual budget proposal to the lenders. *See id.* ¶ 176. That budget assumed a significant further decline in room revenues and property-level EBITDA. By December 31, 2008, the general ledger balance of cash available to fund operations had fallen to $26.5 million. *See id.* ¶ 179.

As a result of declining performance in December of 2008 and January of 2009, the receipts transferred to the Cash Management Account were not sufficient to cover the interest due on the Mezzanine Debt in January of 2009. *See id.* ¶ 180. To cover that shortfall, the Debtors transferred $5.9 million from their main operating account to the Cash Management Account. The sum of $19 million was distributed from the Cash Management Account to the Debtors for budgeted operating expenses in **[*55]** January of 2009, the lowest monthly amount distributed to the Debtors since the LBO Transaction closed. *See id.*

From mid-December of 2008 to late March of 2009, the Debtors funded occupancy taxes and other expenses totaling approximately $20 million out of a cash reserve account. Due to steep declines in the average daily rate, occupancy rate, room revenue, and property-level EBITDA, the general ledger balance of cash available to the Debtors to fund operating expenses as of March 31, 2009 decreased to only approximately $16.2 million, compared to approximately $26.5 million as of December 31, 2008. *See* Amd. Compl. ¶ 190. During the second quarter of 2009, the Debtors continued capital expenditure freezes and instituted hiring freezes related to all full-time and part-time personnel. The Debtors delayed making vendor payments in an effort to conserve cash. The Company Board was advised no later than May 14, 2009 that the Debtors might not have enough unrestricted cash to fund operations through the end of May 2009. As of May 31, 2009, the general ledger cash balance available to fund operating expenses had dropped to approximately $4.6 million. *See id.*

---

million, at best, depending on the LIBOR rates.

*See* Amd. Compl. ¶ 161.

The Debtors File For Bankruptcy [*56]

On June 15, 2009, (the "Petition Date") the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in this Court.[39] The Debtors remained in possession and control of their assets and business as debtors in possession under §§ 1107(a) and 1108 of the Bankruptcy Code. The United States Trustee (the "U.S. Trustee") appointed an Official Committee of Unsecured Creditors (the "Creditors' Committee"). On July 30, 2009, the U.S. Trustee filed a motion pursuant to § 1104 of the Bankruptcy Code seeking the appointment of an examiner in the Debtors' chapter 11 cases. On September 24, 2009, the Court granted the U.S. Trustee's motion and ordered the appointment of an examiner to investigate: (i) the structure, negotiation and closing of the LBO Transaction, (ii) the financial circumstances that led to the filing of the Debtors' chapter 11 cases, and (iii) whether the Debtors' estates have any claims against any person with respect to such matters. On September 28, 2009, the U.S. Trustee appointed Ralph R. Mabey, Esq. as Examiner. Mr. Mabey conducted his investigation and on April 8, 2010, he filed his Examiner's Report.

The Debtors Confirm Their Joint Chapter 11

Plan And Establish The Litigation Trust

The Debtors confirmed their Plan [*57] on July 10, 2010, and it became effective on October 8, 2010 (the "Effective Date"). Briefly, under the Plan, Centerbridge Partners L.P. and Paulson & Co., each on behalf of various investment funds and accounts managed by them, and Blackstone Real Estate Partners V L.P., on behalf of itself and its parallel funds, acting as sponsors (the "Sponsors"), acquired through an entity owned by the Sponsors the Debtors' business (and most, but not all of the Debtors) for the sum of approximately $3.6 billion (the "Proceeds"). As of the Effective Date, the principal amount due under the Mortgage Loan was approximately $4.1 billion. Under the Plan, the Mortgage Trust, through the Mortgage Trustee, held a secured claim (i.e., the "Mortgage Facility Claim") and an unsecured deficiency claim (i.e., the "Mortgage Facility

Deficiency Claim") against the Debtors.[40] In substance, the Plan called for the Proceeds, together with the Debtors' cash on hand, to be distributed in satisfaction of the Mortgage Facility Claim and Administrative Expense Claims and Priority Claims (as such terms are defined in the Plan) and to fund certain reserves called for under the Plan.[41] It also provided for the establishment [*58] of the Litigation Trust, pursuant to a Litigation Trust Agreement,[42] to hold and pursue certain causes of action and claims of the Debtors for the benefit of the "Litigation Trust Beneficiaries." See Plan §§ 1.87, 6.17. The "Litigation Trust Assets" consist of:

> (i) all claims and causes of action of the Debtors or the Debtors in Possession under sections 502(d), 542 through 551, and 553 of the Bankruptcy Code, and (ii) with certain irrelevant exceptions, any other potential claims, causes of action, charges, suits or rights of recovery referenced in the Examiner's Report.

See id. § 1.89. On the Effective Date, the holders of the Mortgage Facility Deficiency Claim, the Mezzanine Facilities Claims,[43] and General Unsecured Claims[44] were entitled to receive interests in the Litigation Trust to the extent they were Litigation Trust Beneficiaries.[45]

The Sponsors did not acquire ESI under the Plan and,

---

[39] Each of ESA P Portfolio TXNC GP L.L.C., ESA TXGP L.L.C., ESH/MSTX GP L.L.C., ESH/TXGP L.L.C., and ESH/TN Member Inc. separately filed its voluntary petition for relief under chapter 11 of the Bankruptcy Code in this Court on February 18, 2010.

[40] See Plan § 1.103 ("Mortgage Facility Claim means the Secured Claim of the Trustee under the Mortgage Facility."); id. § 1.104 ("Mortgage Facility Deficiency Claim means the Claim of the Trustee in respect of the Mortgage Facility, other than the Mortgage Facility Claim").

[41] See generally Plan Art. II (Payment of Administrative Expense Claims and Priority Tax Claims), Art. IV (Treatment of Claims and Equity Interests), Art. VI (Implementation of the Plan), and Art. VIII (Distributions).

[42] See Litigation Trust Agreement, a copy of which is attached as Exhibit Q to the Kurland Declaration.

[43] The "Mezzanine Facilities Claims" are collectively, the claims arising under the Mezzanine Facilities. See Plan § 1.99.

[44] A "General Unsecured Claim" is "any Claim other than an Administrative Expense Claim, a Priority Tax Claim, a Priority Claim, a Secured Claim, the Mortgage Facility Deficiency Claim or a Mezzanine Facilities Claim." Id. § 1.69.

[45] See id. §§ 4.4(b) (Mortgage Facility Deficiency Claim), 4.5(b) (Mezzanine Facilities Claims), and 4.6(b) (General Unsecured Claims).

as such, although ESI had assets and liabilities, it was not a Plan proponent. ESI was a guarantor of certain obligations under the Mortgage Loan (the "ESI Guaranty"), and was the obligor under certain senior subordinated notes, due on June 15, 2011, in the total principal amount [*59] of $8.2 million (the "M&T Notes," and the holders thereof, the "M&T Noteholders"). *See* ESI Settlement Motion at ¶¶ 8, 14.[46] Manufacturers and Traders Trust Company served as the Indenture Trustee (the "Indenture Trustee") under the M&T Notes. *See id.* ¶ 14. The ESI Guaranty represented one of the largest potential claims against the ESI estate. *See id.* ¶ 8. The Debtors determined that the Plan had to address those claims and potential inter-company claims by and against ESI. Although ESI was not a Plan proponent, ESI and its Debtor affiliates entered into a settlement agreement (the "ESI Settlement Agreement"), which was approved by order of this Court (the "ESI *Rule 9019* Order")[47] and incorporated into the Plan and Confirmation Order.[48] Pursuant to the settlement: (i) ESI was released from the ESI Guaranty, (ii) ESI granted a release to certain parties as set forth in § 10.10 of the Plan, (iii) the Debtors set aside the sum of $750,000 to be used to wind down ESI, (iv) ESI waived all claims to ownership of the Debtors' assets owned by the Debtors, or to be transferred pursuant to the Plan, and (v) ESI transferred to the Litigation Trust all claims and causes of action of ESI under *§§ 502(d)*, *542* through *551*, and *553 of the Bankruptcy Code* and [*60] any other potential claims and causes of action referenced in the Examiner's Report (with certain irrelevant exceptions). In addition, in consideration for the transfer of the ESI causes of action to the Litigation Trust, the Indenture Trustee was made a beneficiary under the Litigation Trust Agreement. *See* ESI Settlement ¶¶ 1, 2, 4, 6.

Under the Plan, the Litigation Trust Beneficiaries are: (i) the Mortgage Trust, (ii) the holders of the Mezzanine Facilities Claims, (iii) the Indenture Trustee, and (iv) the holders of the General Unsecured Claims. Each beneficiary received a beneficial interest in the Litigation Trust and is entitled to distributions from any recoveries the Litigation Trust obtains, in accordance with the terms of the Litigation Trust Agreement. *See* Plan §§ 1.90; 4.4-4.6. The "Tiers of Proceeds" under the Litigation Trust Agreement are as follows:

Tier I: first $142.5 million payable 100% to the Special Servicer (on account of Mortgage Facility Deficiency Claims).

Tier II: next $4.2 million in proceeds is payable 100% to the Indenture Trustee (representing the ESI Settlement payment).

Tier III: next proceeds are payable 83% to the Special Servicer and 17% to holders [*61] of the claims related to the $3.3 billion in mezzanine loan until the Special Servicer has received an amount equal to the so-called "Tier IV Threshold" (estimated to be $246 - $306 million).

Tier IV: additional payments to holders of claims related to the $3.3 billion in mezzanine loans.

*See* Litig. Tr. Agmt., Ex. A.

## The Litigation Trustee Commences Five Adversary Proceedings

The Plan provided that the Litigation Trustee would be "selected by mutual agreement of the Special Servicer . . . and the Creditors' Committee, as designated in the Plan Supplement, or, after the Effective Date, . . . appointed by the mutual agreement of the Special Servicer and the Creditor Representative, or as otherwise determined by the Bankruptcy Court." Plan § 1.93. Pursuant to the Confirmation Order and the Litigation Trust Agreement, Hobart G. Truesdell was appointed as the Litigation Trustee (the "Plan Trustee"). On June 14 and 15, 2011, he filed five complaints commencing five actions concerning the LBO Transaction. He filed four of the complaints as adversary proceedings in this Court and the fifth complaint in the New York State Supreme Court (the "State Court Action").[49] That action was removed to this Court. [*62] [50] In those actions, the Plan Trustee sought

---

[46] *See* Debtors' Motion pursuant to *Bankruptcy Rule 9019* for Approval of a Settlement Agreement Between Extended Stay Inc. and Remaining Debtors [Case No. 09-13764, Dkt. 1114] (the "ESI Settlement Motion").

[47] *See* Order Pursuant to *Rule 9019* Approving a Settlement Agreement Between Extended Stay Inc. and Remaining Debtors [Case No. 09-13764, Dkt. 1170].

[48] *See* Plan § 6.18 (incorporating the ESI Settlement into the Plan); Confirmation Order ¶ 51 (approving ESI Settlement).

[49] See Walker, Truesdell, Roth & Assocs., et al. v. The Blackstone Group, L.P., et al., Index No. 651667/2011 (N.Y. Sup. Ct. June 14, 2011), NYS Dkt. 1.

[50] After the State Court Action was removed to this Court, the adversary proceedings consisted of the following:

to recover more than $1 billion in damages and asserted over 100 counts based on various causes of action, including state law claims such as breach of fiduciary duties, waste, and unjust enrichment, and claims under the Bankruptcy Code such as avoidance and recovery actions, among others, to redress alleged wrongdoing in connection with, and subsequent to, the LBO Transaction. The complaints asserting the LBO Claims named dozens of individual and corporate entity defendants involved in the LBO, including the Blackstone Defendants, BofA, Citibank and the lenders. The complaints asserting Post LBO Claims named the Defendants herein, the Mezzanine Lenders, and others.

The Litigation Trust Is Amended, The Trustee

Is Appointed And The Trustee Settles The Estates' LBO Claims

Prior to the Petition Date, the Mezzanine Lenders were paid approximately $300 million in interest payments. As part of the Post LBO Claims litigation, the Plan Trustee sued the Mezzanine Lenders to avoid and recover those payments as fraudulent conveyances and preferences under the Bankruptcy Code (the "Mezzanine Lender Avoidance Action").[51] Ultimately, that litigation did not

---

*Walker, Truesdell, Roth & Assocs., et al. v. The Blackstone Group, L.P., et al. (In re Extended Stay Inc.),* Adv. Pro. No. 11-02254 (JMP) (Bankr. S.D.N.Y. June 14, 2011).

*Walker, Truesdell, Roth & Assocs., et al. v. The Blackstone Group, L.P., et al. (In re Extended Stay Inc.),* Adv. Pro. No. 11-02255 (JMP) (Bankr. S.D.N.Y. June 14, 2011).

[*63]

*Walker, Truesdell, Roth & Assocs., et al. v. Lightstone Holdings, LLC, et al. (In re Extended Stay Inc.),* Adv. Pro. No. 11-02256 (JMP) (Bankr. S.D.N.Y. June 14, 2011).

*Walker, Truesdell, Roth & Assocs., et al. v. The Blackstone Group, L.P., et al. (In re Extended Stay Inc.),* Adv. Pro. No. 11-02259 (JMP) (Bankr. S.D.N.Y. June 15, 2011).

*Walker, Truesdell, Roth & Assocs., et al. v. The Blackstone Group, L.P., et al. (In re Extended Stay Inc.),* Adv. Pro. No. 11-02398 (JMP) (Bankr. S.D.N.Y. July 12, 2011).

[51] *See* Complaint [AP No. 11-2256, Dkt. 1].

go forward. On or about September 12, 2012, the parties to the Litigation Trust Agreement amended the agreement to, among other things, replace the Plan Trustee with Mr. O'Connor as the successor Trustee, and to exclude the Mezzanine Lender Avoidance Action from the Litigation [*64] Trust Assets. *See* Amendment to Extended Stay Litigation Trust Agreement ¶¶ 2, 4.[52] *See also* Order Appointing Successor Litigation Trustee and Approving Amendment to Litigation Trust Amendment [Case No. 09-13764, Dkt. 1674]. The effect of the amendment was to remove the Mezzanine Lenders as defendants in the adversary proceedings, although they remained Litigation Trust Beneficiaries.[53]

---

[52] The Amendment to Extended Stay Litigation Trust Amendment is annexed as Exhibit K to the Kurland Declaration.

[53] Specifically, pursuant to that order, the amendment added a new § 1.2(d) to the Litigation Trust Agreement that reads:

(d) Notwithstanding anything else contained in the Plan, the Confirmation Order or this Litigation Trust Agreement, the Litigation Trust Assets, as defined in Section 1.89 of the Plan, shall not include (i) any and all claims and causes of action of the Debtors or the Debtors' estates under *sections 502(d), 542* through *551,* and *553 of the Bankruptcy Code* against the individual and corporate entity defendants who allegedly received, either directly or indirectly, avoidable transfers in connection with payments made on Mezzanine Facilities Claims, and are listed on Schedule A annexed hereto solely as defendants in Litigations numbered 11-02256 (JMP) and 11-02259 (JMP) (together, the "Mezzanine Lenders Adversary Proceedings"), whether named (w) individually, (x) in their capacity as alleged [*66] servicer in connection with the Mezzanine Loans, (y) as current or former holders of Mezzanine Facilities Claims, and/or (z) as an affiliate or alleged affiliate of (w), (y) or (z) who is identified as "Doe" in the complaints filed in the Mezzanine Lender Adversary Proceedings (collectively and solely in such capacity, the "Mezzanine Lender Defendants") and (ii) any other potential claims, causes of actions, charges, suits or rights of recovery against the Mezzanine Lender Defendants solely in such capacities or against any holder of Mezzanine Facilities Claims solely in such capacities, whether or not such holder was named as a defendant in the Mezzanine Lender Adversary Proceedings, including, without limitation, any and all claims and causes of action of the Debtors or the Debtors' estates under *sections 502(d), 542* through *551,* and *553 of the Bankruptcy Code* and any and all claims and causes of action referenced in the Examiner's Report. To the extent the Litigation Trustee has not already done so at the time this Amendment becomes effective, the Litigation Trustee shall promptly dismiss

Thereafter, the Trust discontinued the Mezzanine Lender Avoidance Action. The parties also agreed to amend the "Trust Oversight" provisions of the Litigation Trust Agreement to vest the Mortgage Trust with control over the conduct of the Litigation Trust's various lawsuits, until the Mortgage Trust's Tier I claim under the Litigation Trust Agreement is paid in full, as follows:

> Until the Special Servicer on behalf of the Mortgage [] Trust has received distributions of Litigation Trust Proceeds satisfying its Tier [I] claim in full, plus reimbursement of any funding of the Litigation Trust provided by the Mortgage [] Trust, the Special Servicer, and solely the Special Servicer, shall serve as an advisor to the Litigation Trustee with respect to all matters concerning the Litigation Trust. The Litigation Trustee **[*65]** shall consult with and obtain in advance the consent of the Special Servicer with respect to any material decisions made with respect to the Litigations, including without limitation the Litigation Trustee's decisions to retain professionals and any proposed settlements related thereto.

Amendment to Extended Stay Litigation Trust Agreement § 3(c). Thereafter, Venable LLP, then acting as the Mortgage Trust's counsel, was substituted as counsel to the Litigation Trust.

Upon his appointment, the Trustee engaged in comprehensive settlement negotiations to resolve the LBO Claims. On or about May 24, 2013, the Trustee entered into a Global Settlement Agreement with the Blackstone Defendants and BofA. On or about June 12, 2013, the Trustee entered into a settlement agreement with Citibank. The principal terms of those settlement agreements are:

- The Blackstone Defendants would pay or cause to be paid $10,000,000 to the Litigation Trust;
- Citibank would pay or cause to be paid $200,000 to the Litigation Trust; and
- The Trustee would dismiss, with prejudice, the

---

with prejudice the Mezzanine Lender Defendants from the Mezzanine Lender Adversary Proceedings. For the avoidance of doubt, this provision **[*67]** shall not in any way affect the Litigation Trustee's right to prosecute, or the viability or validity of, any claims that have been or may be asserted in the Litigations against any parties other than the Mezzanine Lender Defendants (in their capacities as Mezzanine Lender Defendants), which claims shall remain fully and in all respects Litigation Trust Assets.

Litig. Tr. Agmt. § 1.2(d).

adversary proceedings solely as against the Blackstone Defendants, BofA, and Citibank.

By order dated July 19, 2013, this Court approved the settlement agreements.[54] In reaching those agreements, the Trustee effectively resolved all of the estates' **[*68]** LBO Claims.

## The Trust Obtains Leave To File The Amended Complaint

Promptly after the Trustee settled the LBO Claims, the Trustee moved this Court for an order authorizing the Trust to file the Amended Complaint in respect of the Post LBO Claims. The Lightstone Defendants, joined by PGRT ESH, objected to that motion on the grounds that, *inter alia*, the Trustee's proposed amendments would be futile. At a hearing held on November 13, 2013, the Court granted the motion over their objections. *See* Order Granting Motion Pursuant to *Rule 7015 of the Federal Rules of Bankruptcy Procedure* For Leave to File Amended Complaint [Dkt. 212].[55] In doing so, the Court was clear that it was aware of the circumstances surrounding the replacement of the Plan Trustee with the Trustee, including the process leading up to that appointment.[56] However, the Court's decision to permit

---

[54] *See* Plaintiffs' Motion Pursuant to *Bankruptcy Rule 9019* and *11 U.S.C. § 105(a)* for an Order Approving Global Settlement Agreements with Blackstone Defendants, Bank of America Defendants and Citigroup [Dkt. 180]; *see also* Order Approving Global Settlement Agreements with Blackstone Defendants, Bank of America Defendants and Citigroup [Dkt. 193].

[55] By order dated January 31, 2014, this Court consolidated all of the Adversary Proceedings (Nos. 11-2254, 11-2255, 11-2256, and 11-2398) into this Adversary Proceeding No. 11-2254 [Dkt. 232].

[56] At the November 13 hearing, the Court (Peck, J.) stated, in relevant part:

> That said, understand that my mind set going into this is that I'm going to grant the amendment without prejudice to any of your substantive arguments and that we're going to re-boot everything. We'll re-boot the complaint and we'll re-boot **[*69]** and re-fashion your objections to the complaint in the form of a dispositive Motion to Dismiss. I'm going to permit the amendment without prejudice to your rights or the rights of any other Defendant to raise any and all appropriate arguments in a Motion to Dismiss that I assume will be re-done, re-cut, to meet the allegations of the amended complaint.

the filing of the Amended Complaint was without prejudice to the parties' rights to raise those objections in the context of a motion to dismiss.

## The Amended Complaint

### Overview

On November 15, 2013, the Trust filed the Amended Complaint, **[\*70]** by which it seeks to avoid and recover three groups of so-called "Improper and Fraudulent Transfers" (which the Court sometimes refers to herein as the "Transfers") totaling in excess of $143 million, and to recover compensatory and punitive damages in respect of those transfers. Below, the Court briefly summarizes the Trust's contentions relating to each group of the transfers.

### LIBOR Floor Certificates Distributions

The LIBOR Floor Certificates Distributions consist of the transfer of the LIBOR Floor Certificates (defined below) by the Mortgage Trust to DL-DW on or around November 5, 2007, and payment of the income stream from those certificates (i.e., the proceeds generated under those the certificates) totaling approximately $75 million over a roughly three-year period, to various alleged insiders of the Debtors. *See* Amd. Compl. ¶ 187. As described below, those payments consist of (i) the Floor Bonds Payments, (ii) the 25% Note Payments,

---

\* \* \*

I'm going to let [the Trust file an Amended Complaint] and I'm not going to simply preemptively say that you're right about anything. I'm saying that to you now with the understanding that I may agree with you completely later, but I'm not going to agree with you today, because the - the purpose here is to have a merits based assessment of the claims and I'm going to give the benefit of the doubt to the Plaintiff in all cases until we have a dispositive motion. . . . I'm letting you know now you've lost [the Motion to Amend], but in a kind and gentle way that doesn't in any way take away your substantive arguments later.

\* \* \*

By the way, nothing that I've said is designed to dignify in any respect any of the allegations of the amended complaint.

Nov. 13, 2013 Hr'g Tr. at 15, 19-20 (Schatzow Decl., Ex. 1).

and (iii) the LIBOR Floor Certificates Income Payments (each as defined below, and collectively, the "LIBOR Floor Certificates Income Distributions", and with the LIBOR Floor Certificates Transfers (also defined below), the "LIBOR Floor Certificates **[\*71]** Distributions"). The Trust asserts that from the outset of the LBO Transaction, the lenders had intended to sell their Mortgage Loan and Mezzanine Loans to third parties, but that after the transaction closed, the market softened dramatically, and the lenders had trouble doing so. *See id.* ¶ 136. At the lenders' request, the Debtor borrowers under the Mortgage Loan and Mezzanine Loans agreed to amend the loan agreements in a way that the lenders believed would make the debt more attractive to prospective purchasers. *See id.* ¶ 137. In exchange for those Debtor borrowers' consent to those accommodations, the lenders agreed to issue to the Debtor borrowers (or their designees) Class X-A and X-B certificates from the mortgage securitization (collectively, the "LIBOR Floor Certificates"). *See id.*; *see also* Letter Agreement dated August 31, 2007 (concerning agreement to issue LIBOR Floor Certificates).[57] The Trust alleges that the certificates were investment grade (AAA), and represented the right to receive a payment stream, derived from the Mortgage Loan payments, of the difference between the LIBOR "floor" and the actual LIBOR. *See id.* ¶ 137. Thus, whenever LIBOR dropped below the floor, **[\*72]** the difference would be paid to the holder of the LIBOR Floor Certificates from the payments by the Debtors on the Mortgage Debt. The Trust contends that although the Debtor borrowers made the pertinent concessions and all payments under the loan agreements, they did not receive the LIBOR Floor Certificates. *See id.* ¶ 138. Instead, on or about November 5, 2007, the Mortgage Trust issued the LIBOR Floor Certificates directly to DL-DW (the "LIBOR Floor Certificates Transfers"). *See id.* The Trust asserts that the LIBOR Floor Certificates were worth approximately $25 million when the lenders issued them, and that as LIBOR continued dropping throughout 2008 and 2009, the certificates became increasingly more valuable to DL-DW because the "floor" was higher than the actual LIBOR-based loan payments. *See id.* ¶ 139. It contends that this value should have belonged to the Debtors, not DL-DW, because the Debtors were the obligors under the Mortgage and Mezzanine Loans and were the parties who had contracted to receive the certificates. *See id.* ¶

---

[57] Copies of the LIBOR Floor Certificates and Letter Agreement are attached to the Kurland Declaration as Exhibits G and L, respectively.

138.

The Trust alleges that "DL-DW provided no value to the Debtor borrowers in exchange for these certificates," and that "[n]one of the pertinent accounting **[*73]** entries show that DL-DW provided consideration for its receipt of the certificates or otherwise account for the fact that property rightfully belonging to the Debtor borrowers was diverted to DL-DW." Amd. Compl. ¶ 138. The Trust maintains that the LIBOR Floor Certificates were valuable assets that should have been transferred to the Debtors in consideration for the concessions they made with respect to their mortgage loans, not to DL-DW, which paid no consideration for the certificates. *See id.* ¶ 200. It alleges that since DL-DW was both a direct and an indirect equity owner of the Debtors, the assignment of the LIBOR Floor Certificates to DL-DW was an improper distribution of the Debtors' property to the Debtor's equity owners. *See id.* ¶ 139. The Trust also asserts that by the time of their final disposition, the LIBOR Floor Certificates generated at least approximately $75 million in value (in addition to their initial book value of $25 million) that should have been paid to the Debtors. *See id.* In total, DL-DW received $20 million in LIBOR Floor Certificates income (the "LIBOR Floor Certificates Income Payments") during the time in which it held the LIBOR Floor Certificates from **[*74]** November 2007 to March of 2009. *See id.* ¶ 201.

As of the Petition Date, in addition to its indebtedness under the M&T Notes, ESI was the obligor under certain senior subordinated notes in the principal amount of $31 million (the "9.15% Note"). The 9.15% Note matured on March 15, 2008, and ESI defaulted thereunder. *See id.* ¶ 153. At that time, the indebtedness under the note (with accrued unpaid interest) exceeded $32 million. *Id.* On April 16, 2008, DL-DW obtained a $22 million "loan" from parties that the Trust describes as "affiliated investors who were insiders of the Debtors" and used the proceeds, plus $10.6 million of its own funds, to pay off the 9.15% Note, plus $100,000 in professional fees. *See id.* ¶¶ 154-155. The loan had a May 1, 2011 maturity date and was guaranteed by BHAC. It was evidenced by a note that accrued interest at an annual rate of 25% (the "25% Note") and was secured by a lien on the LIBOR Floor Certificates (pursuant to a pledge executed by Lichtenstein). *Id.* ¶ 155. The lenders under the 25% Note (the "25% Note Lenders") were the following Arbor Entities: Park Avenue ($11,000,000); Mericash Funding ($5,225,000); ABI-ESI ($5,225,000 ); and Princeton ESH ($550,000). **[*75]** ABI-ESI was the lead lender and servicer under the 25% Note. *Id.* ¶ 154.

The maximum monthly payment under the 25% Note was $416,666. *See* Amd. Compl. ¶ 156. DL-DW, as obligor under the 25% Note, did not make payments under the 25% Note. Rather, it caused the income generated from the LIBOR Floor Certificates to be paid directly to the 25% Note Lenders in satisfaction of all interest and principal payments due and owing under the note (the "25% Note Payments"). *Id.* The Debtors deposited the income from the LIBOR Floor Certificates in excess of the amounts paid to the 25% Note Lenders into a reserve bank account (the "Floor Bonds Reserve Account ") "for the benefit of BHAC Capital IV [Preferred] Series A-1 Unit Holders" and used those funds to pay distributions to equity. *Id.* ¶ 156. The Debtors caused the funds in the Floor Bonds Account to be paid for the benefit of equity holders (the "Floor Bonds Payments"). By the end of 2008, $3.3 million of the principal on the 25% Note had been repaid from the income under the LIBOR Floor Certificates, and approximately $3.6 million in funds from the Floor Bonds Reserve Account had been distributed by BHAC to Arbor Commercial (as a holder of the **[*76]** Preferred Series A-1 Units). *See id.* ¶¶ 156, 163, 167, 173.

In March of 2009, the Company Board unanimously resolved to pay off the 25% Note by transferring the LIBOR Floor Certificates to the 25% Note Lenders (*id.* ¶ 184), and to liquidate the Floor Bonds Reserve Account. *See id.* At that time, the LIBOR Floor Certificates were assigned a value $17.4 million, which was equal to the balance then due and owing under the 25% Note. *See id.* ¶ 186. The Trust says that the $17.4 million was an "artificial value" selected to "create the appearance of equivalent value for the agreement." *Id.* The terms of that resolution are embodied in the "Floor Bonds Agreement." Under that agreement:

> The LIBOR Floor Certificates were assigned to ABT-ESI, as lead lender and servicer under the 25% Note.
> The other 25% Note Lenders (i.e., Park Avenue, Mericash Funding, and Princeton ESH) contributed their interests under the note to ABT-ESI.
> ABT-ESI was simultaneously restructured so that each of Park Avenue, Mericash Funding, and Princeton ESH became owners of ABT-ESI in proportion to their respective rights and interests in the 25% Note.

> The Preferred Series A-1 Unit Holders waived their rights to the $4,817,986 **[*77]** balance of the Floor Bonds Reserve Account, which was then wired to Lightstone Commercial.

*Id.* ¶ 185. The 25% Note Lenders continued to receive payments on the LIBOR Floor Certificates until the certificates were canceled in October 2010. *See id.* ¶ 187. The Trust contends that Lichtenstein, Owen, Teichman, and de Vinck signed a written consent authorizing the pertinent parties to execute the necessary agreements for these transactions, and that the principals of Mericash Funding, ABT-ESI, and Princeton ESH, which included Chetrit and Joseph Tabak,[58] participated in the decisions to use proceeds of the LIBOR Floor Certificates for payments in satisfaction of the 25% Note. *See id.* ¶ 157.

The Trust alleges that the LIBOR Floor Certificates generated total proceeds consisting of:

> (i) $20 million in payments to DL-DW during period November 2007 through February 2009; and
> (ii) $55 million in payments to: (a) ABT-ESI ($13 million); (b) Mericash Funding ($13 million); Princeton ESH ($1.5 million); and Park Avenue and Lightstone Commercial ($27.5 million).

It maintains when DL-DW was initially assigned the LIBOR Floor Certificates and when the alleged insiders received the proceeds generated under **[*78]** those certificates (as described above), each alleged insider was aware that the Debtors did not have a surplus and/or were insolvent or that the assignment or payment rendered the Debtors insolvent, and was aware of the distressed condition of the Debtors. *See id.* ¶¶ 203, 205, 206.

Dividend Payments

The "Dividend Payments" consist of payments between 2007 and 2009 totaling approximately $61 million to the equity holders of DL-DW and BHAC on account of their interests in those LLCs, as follows:

> (i) Lightstone Holdings, as the holder of Series A-2 Units in DL-DW ($2.6 million);
> (ii) PGRT ESH, as the holder of Series A-2 Units in BHAC ($6.1 million); and
> (iii) Arbor Commercial, Glida One, Princeton ESH, Ron Invest and Polar Extended Stay, as holders of Preferred Series A-1 Units in BHAC (in excess of $52 million, in the aggregate).

Those transfers are more fully described below.

As previously noted, the LBO loan agreements provided that, except for distributions to the Preferred Series A-1 Unit holders of BHAC, the Debtors could not make distributions to equity holders if the Debt Yield - measured on a quarterly basis - did not exceed 7.75%. *See* Amd. Compl. ¶ 142. According to the Trust, although **[*79]** the first Debt Yield calculation should have been reported to the lenders in July of 2007, and monthly thereafter, no such calculation was submitted until January 21, 2008. At that time, the Debt Yield reported to the lenders indicated a Debt Yield of only 7.20% -- well short of the 7.75% required to make equity distributions other than to the Preferred Series A-1 Unit holders in BHAC. *See id.* [59]

Nonetheless, in 2007, there were distributions to the holders of Series A-2 Units in BHAC and DL-DW (the "Series A-2 Distributions"), as follows:

> During the period of June 11 - December 31, 2007, the Debtors made cash distributions totaling approximately $6.1 million to PGRT ESH on account of its holdings as an A-2 Series Unit Holder in BHAC. *See id.* ¶ 144.
>
> On August 31, 2007, DL-DW distributed approximately $2.6 million to Lightstone Holdings on account of its holdings as an A-2 Series Unit Holder in DL-DW. *See id.* ¶ 145.

During 2007 and 2008, there were distributions made to the holders of Preferred Series A-1 Units in BHAC (the "Preferred Dividends"), as follows:

2007

> During the period of July 13, 2007 - December 17, 2007, the Debtors made cash distributions totaling approximately $7.6 million **[*80]** among Arbor Commercial, Glida One, Polar Extended Stay, and Princeton ESH. *See Id.* ¶ 146.
>
> In 2007, Debtor ESA P Portfolio Operating Lessee Inc. made cash distributions totaling $5.2 million to Arbor Commercial. *See id.* ¶ 147.

2008

> First Quarter: The Debtors made cash distributions totaling $5.3 million to BHAC, which then distributed

---

[58] Joseph Tabak is not a Defendant herein. It is not clear what his role was in connection with the claims asserted in the Amended Complaint.

[59] The Trust contends that, had management calculated the Debt Yield in July of 2007, the calculation would have indicated a Debt Yield of 7.09%. *See* Amd. Compl. ¶ 142.

the cash among Arbor Commercial, Glida One, Polar Extended Stay, Princeton ESH, and Ron Invest. *See* Amd. Compl. ¶ 151.

Second Quarter: The Debtors distributed, either by wire transfer or by transfers from the Cash Management Account, cash totaling $4.3 million among Arbor Commercial, Glida One, Polar Extended Stay, Princeton ESH, and Ron Invest. *Id.* ¶ 162. BHAC distributed cash totaling $1.0 million to Arbor Commercial, on account of its Preferred Series A-1 Units in BHAC from the Floor Bonds Reserve Account. *See id.* ¶¶ 156, 163, 164.

Third Quarter: The Debtors distributed, either by wire or by transfers from the Cash Management Account, cash totaling $3.75 million among Arbor Commercial, Glida One, Polar Extended Stay, Princeton ESH, and Ron Invest. *See id.* ¶ 166. BHAC distributed cash totaling $1.6 million to Arbor Commercial, on account of its Preferred **[*81]** Series A-1 Units in BHAC from the Floor Bonds Reserve Account. *See id.* ¶¶ 156, 167.

Fourth Quarter: The Debtors distributed, either by wire or by transfers from the Cash Management Account, cash totaling $2.5 million among Arbor Commercial, Glida One, Polar Extended Stay, Princeton ESH, and Ron Invest. *See id.* ¶ 172. BHAC distributed cash totaling $1.0 million to Arbor Commercial on account of its Preferred Series A-1 Units in BHAC, from the Floor Bonds Reserve Account. *See id.* ¶¶ 156, 173.

The Trust contends that all those distributions ran afoul of the restrictions in the relevant loan agreements, and violated applicable law, as they were made despite a lack of surplus, when the Debtors were insolvent or were rendered insolvent by the distributions, and despite the future financial and operational declines that management foresaw or should have foreseen. *See* Amd. Compl. ¶¶ 144-147, 151, 162, 164, 166, 168. The Trust asserts that the Company Board acted with respect to the distributions on account of the Preferred Series A-1 Units on two occasions:

(i) At the August 14, 2008 meeting of the "Extended Stay Hotels family of companies" Teichman made a motion, seconded by Owen, that "each **[*82]** of the Companies declare dividends for the next quarter in the amounts necessary or appropriate to pay the minimum mandatory amounts payable to the holders of [Preferred Series A-1 Units]" and to "ratify all dividends paid by any of the Companies to

date." The motion passed unanimously. *See* Amd. Compl. ¶ 169. The Trust contends that the Company Board authorized and approved prospectively and retrospectively, payments and distributions to equity, notwithstanding that it had received detailed reports regarding the Debtors' poor performance in 2007 and anticipated continued decline in 2009. *Id.* ¶ 170. Lichtenstein, Owen, Milone, Teichman, and de Vinck were present at this meeting as directors. *Id.*

(ii) At a November 13, 2008 meeting of the "Extended Stay Hotels family of companies" a Weil attorney conducted a presentation of the fiduciary duties for directors of Delaware corporations, and that representatives of Weil and Lazard advised the board that the company was in the "zone of insolvency." *Id.* ¶ 175. The Weil attorney recommended that preferred shareholders forego the pending dividend and that the board resolve to cease all payments of dividends for the foreseeable future. *Id.* The **[*83]** Trust maintains that thereafter, Teichman made a motion, seconded by Owen, to suspend the monthly minimum payment to Preferred Series A-1 Unit holders. The motion passed unanimously, except that Milone abstained from voting. *Id.* Lichtenstein, Owen, Milone, Teichman, and de Vinck were present as directors. In addition, two attendees (Kaufman and Chetrit) affiliated with Arbor, and outside counsel to certain of the Preferred Series A-1 Unit holders were present as invited guests. *Id.* The Trust asserts that notwithstanding Weil's advice and the board resolution, on November 17, 2018, the Debtors distributed approximately $550,000 to Arbor Commercial on account of its Preferred Series A-1 Units. *Id. See also id.* ¶ 181 (On February 6, 2009, Weil issued a memorandum to the lower corporate level Debtors' "independent directors" regarding the liquidity crisis and that the Company Board was exploring the possibility of petitioning for relief under chapter 11 of the Bankruptcy Code.).

At the closing of the LBO Transaction, the PERA was established as "security" for dividend returns to be paid to the Preferred Series A-1 Unit Holders and allegedly funded with $20 million of the Debtors' funds. **[*84]** *See* Amd. Compl. ¶ 182. The Trust asserts that certain equity holders could instruct that distributions be made from that reserve account to them, and that if the account was used for such distributions, then BHAC, using the Debtors' cash, was required to replenish the reserve back up to $20 million. *See id.* The Trust alleges

that although the Company Board resolved in November of 2008 to halt equity distributions in light of the financial and liquidity crises, distributions to equity continued to be made after that resolution, using funds on deposit in the PERA. *See id.* The Trust says that following the November 13, 2008 board meeting, the Debtors made four distributions to Arbor Commercial from the PERA totaling more than $20 million, as follows: $1.75 million (December 18, 2008); $1.8 million (January 20, 2009); $1.8 million (February 20, 2009); and $15.0 million (March 11, 2009) (collectively, the "PERA Payments"). The Trust asserts that in light of the Debtors' poor performance, strained liquidity, budget issues and concerns, lack of surplus, and insolvency, those payments were made in violation of applicable law. *Id.*

### Management Fee Transfers

Before the LBO Transaction, HVM, a Blackstone **[*85]** affiliate, managed the day-to-day operations of the Debtors' hotel properties. *See* Amd. Compl. ¶ 86. In the LBO Transaction, Blackstone sold HVM to Lichtenstein and other Lightstone Defendants. The Trust asserts that after the LBO Transaction closed, the Lightstone Defendants continued to utilize HVM to manage the day-to-day operations of the Debtors' hotel business, and that at all pertinent times, HVM and HVM Canada, had day-to-day responsibility for operating the Debtors' hotels. *See id.* HVM itself was managed by HVM Manager, L.L.C. ("HVM Manager"), which was owned solely by Lichtenstein. *See id.* ¶ 87. The Trust contends that HVM's LLC agreement gives HVM Manager exclusive authority to manage the affairs of HVM, and HVM's members have no right to remove HVM Manager, even for cause. *Id.* The Management Fee Transfers consist of asset management fees (the "Management Fees") totaling up to $1 million per year (and at least $3 million in total) purportedly paid to Lichtenstein or a Lichtenstein-affiliated entity. *See id.* ¶ 188.

The Trust alleges that Lichtenstein or a Lichtenstein-affiliated entity was paid these sums for management services even though HVM and HVM Canada continued to **[*86]** manage all aspects of the Debtors' day-to-day business, including all operational, management, and administrative functions for the Extended Stay hotels, and even though HVM already charged significantly higher management fees than those typically seen in the industry. *See* Amd. Compl. ¶ 189. It further contends that neither Lichtenstein nor any Lichtenstein-affiliated entity ever performed any work that justified these fees

nor provided a detailed accounting to HVM or the Debtors that explaining those fees. Accordingly, it seeks to recover those Management Fee Transfers totaling up to $1 million per year paid to Lichtenstein and/or Lichtenstein-affiliated entities after the LBO Transaction. *See id.* ¶¶ 188-189, 213, 257.

### Claims For Relief

The Amended Complaint is comprised of seventeen Counts (Counts 1-17) asserted against all or most of the Defendants.[60] They consist of claims arising under state law and the Bankruptcy Code, as follows:

### State Law Claims (Counts 1-11)

#### Recovery of Illegal Dividends

In Counts 1-3, the Trust challenges the Transfers as illegal payments to equity holders and seeks (i) to recover them pursuant to *§ 541 of the Bankruptcy Code* and applicable state law (Counts 1 & 2); and (ii) to avoid and recover them pursuant to *§§ 544(b)* and *550*, respectively, and applicable state law. (Count 3). *See* Amd. Compl. ¶¶ 199-216 (Count 1); ¶¶ 217-224 (Count 2); ¶¶ 225-232 (Count 3).

---

[60] The Trust asserts the claims in Counts 5-11 and 17 against all Defendants. It asserts the claims in the remaining Counts against the Defendants, as follows:

Counts 1, 3, 12-15: Lichtenstein, Polar Extended Stay, PGRT ESH, the Lightstone Entities (except Lightstone Group), and the Arbor Entities (except Atmar Associates).

Count 2: Lightstone Individuals, Arbor Individuals, Lightstone Entities, Arbor ESH II L.L.C., **[*87]** Arbor Entities, Polar Extended Stay, and PGRT ESH.

Count 4: The Lightstone Entities (except Lightstone Group), Polar Extended Stay, PGRT ESH, and the Arbor Entities (except Atmar Associates).

Count 16: Lichtenstein, Polar Extended Stay, the Lightstone Entities, and the Arbor Entities.

Unless otherwise stated, when discussing the Counts, the reference to the "Defendants" is to the named defendants in those Counts.

Breach of Duties of Care, Loyalty and Good Faith

In Counts 5 and 7, the Trust contends that in receiving distributions under the Transfers, the Defendants breached (i) their fiduciary and contractual duties of care, loyalty and good faith to the Debtors (Count 5) and (ii) fiduciary duties to the Debtors' creditors (Count 7). It asserts that to the extent that any Defendant did not individually commit a particular act or omission at issue in the complaint, that Defendant aided and abetted the breaches [*88] of fiduciary and contractual duties by one or more of the other Defendants, as alleged in the complaint (Count 6). Pursuant to § 541 of the Bankruptcy Code and applicable state law, the Trust seeks to recover actual, compensatory and consequential damages from the Defendants, jointly and severally, and punitive damages against each Defendant individually. See id. ¶¶ 260-272 (Count 5); ¶¶ 273-279 (Count 6); ¶¶ 280-285 (Count 7).

Unjust Enrichment, Waste, Conversion

Aiding and Abetting Conversion and Conspiracy

In Count 4, the Trust contends that upon receipt of their respective distributions under the Transfers, each Defendant was unjustly enriched at the expense of the Debtors and, as such, pursuant to § 541 and applicable state law, such Defendants must make full restitution of all of the monies and assets received by each of them directly and indirectly, from the Debtors. See id. ¶¶ 233-259.

In Count 8, the Trust contends that each of the Defendants' acts or omissions described in the Amended Complaint damaged the Debtors and constituted a waste of the Debtors' assets for which the Defendants are jointly and severally liable in an amount of actual, compensatory and consequential damages to be determined at trial, pursuant [*89] to § 541 and applicable state law. See id. ¶¶ 286-291.

In Count 9, the Trust contends, in sum and substance, that the Defendants converted, and intentionally interfered with, the Debtors' right to possession, dominion, and control over their property when they caused to be made or received each of the allegedly improper Transfers.

In Count 10, it contends that to the extent that any Defendant did not individually convert the Debtors' right to own the assets subject to the Transfer, that Defendant aided, abetted, induced, or participated in, the conversion of the right of the Debtors to ownership of those assets. The Trust seeks to recover actual, compensatory, and consequential damages from the Defendants, jointly and severally, and punitive damages from each Defendant, all in amounts to be determined at trial, pursuant to § 541 of the Bankruptcy Code and applicable state law. See id. ¶¶ 292-308 (Count 9); ¶¶ 309-316 (Count 10).

In Count 11, the Trust asserts that the diversion of the Debtors' right to own, possess, and control the assets and property that are the subject of the Transfers constituted conversion, and that each Defendant corruptly agreed with the other Defendants to convert the Debtors' property, intentionally [*90] and willingly agreed to further this plan, and further agreed to the continued diversion of the proceeds from the LIBOR Floor Certificates to the benefit of the Defendants and not to the Debtors. The Trust maintains that the Defendants' agreement to convert the Debtors' property was facilitated by several overt acts, and that their agreement and conspiracy resulted in injury to the Debtors for which the Trust is entitled to recover actual, compensatory, and consequential damages from Defendants, jointly and severally, and punitive damages from each Defendant, all in amounts to be determined at trial, pursuant to § 541 of the Bankruptcy Code and applicable state law. See id. ¶¶ 317-325.

Bankruptcy Law Claims (Counts 12-17)

Actual Fraudulent Conveyance Claims

In Counts 12 and 13, the Trust seeks to avoid the Transfers as actual fraudulent transfers under federal and state law pursuant to § 548(a)(1)(A) (Count 12) and § 544 (Count 13) of the Bankruptcy Code, respectively (collectively, the "Actual Fraudulent Conveyance Claims"), and to recover the sums transferred, plus interest, from the Defendants pursuant to § 550 of the Bankruptcy Code. See Amd. Compl. ¶¶ 326-333 (Count 12); ¶¶ 334-342 (Count 13).

2020 Bankr. LEXIS 2128, *90

### Constructive Fraudulent Conveyance Claims

In Counts 14 and 15, **[\*91]** the Trust seeks to avoid the Transfers as constructive fraudulent transfers under federal and applicable state law pursuant to *§ 548(a)(1)(B)* (Count 14) and *§ 544* (Count 15) of the Bankruptcy Code (the "Constructive Fraudulent Transfer Claims"), and to recover the sums transferred, plus interest, from the Defendants pursuant to *§ 550 of the Bankruptcy Code*. *See id.* ¶¶ 343-350 (Count 14); ¶¶ 351-360 (Count 15).

### Turnover and Claims Disallowance

In Count 16, the Trust asserts that pursuant to *§ 542(a) of the Bankruptcy Code*, any entity which possesses property that the trustee may use, sell or lease under *§ 363 of the Bankruptcy Code* is obligated to deliver the property to the trustee. In substance, the Trust maintains that the Dividend Transfers and the Management Fee Transfers were illegal payments to equity under applicable state law, were unlawfully collected by the Defendants, and constitute property of the Debtors, and should be delivered by the Defendants to the Trust pursuant to *§ 542 of the Bankruptcy Code*. Likewise, it asserts that the LIBOR Floor Certificates and their proceeds were wrongfully converted from the Debtors, constitute property of the Debtors, and should be delivered by the Defendants to the Trust pursuant to *§ 542 of the Bankruptcy Code*. *See id.* ¶¶ 261-375.

### Disallowance of Claims

In Count 17, the Trust contends that the Defendants **[\*92]** are transferees of one or more transfers avoidable under *§§ 544* or *548 of the Bankruptcy Code* or are entities from which property is recoverable under *§§ 542* or *550 of the Bankruptcy Code* and have not paid the amount or turned over the property for which they are liable. It asserts that pursuant to *§ 502(d) of the Bankruptcy Code*, it is entitled to disallow any filed or scheduled claims of the Defendants. *See id.* ¶¶ 376-378.

### Motions to Dismiss

The Motions are filed, respectively, on behalf of the Lightstone Defendants, PGRT ESH, the Arbor Defendants, Polar Extended Stay, and the HVM Defendants and seek relief under *Rules 12(b)(1)* and *12(b)(6)*. In resolving the Motions, the Court first will consider the issues raised in the Motions regarding the Trust's standing to sue, and whether the Defendants have demonstrated that there are grounds to dismiss the Amended Complaint under *Rule 12(b)(1)*, for lack of subject matter jurisdiction. Thereafter, the Court will consider the Defendants arguments in support of their requests for relief under *Rule 12(b)(6)*.

Collectively, the Movants make three arguments in support of their motions to dismiss the Amended Complaint for lack of subject matter jurisdiction. They contend that the Trust has failed to allege facts that demonstrate that it has constitutional standing to assert any of the claims **[\*93]** at issue in the complaint. To that end, and without limitation, they assert that the Trust has not alleged an "injury in fact" to any particular Debtor and that it is "impossible" that all of the Debtors did or suffered the acts alleged in the Amended Complaint. They also argue that by application of the "*Wagoner* rule," the Trust lacks prudential standing — and thus subject matter jurisdiction — to assert the State Law claims against them. Finally, as noted previously, the HVM Defendants contend that the Trust lacks standing to sue them because they are not labeled as potential defendants in the Examiner's Report and, as such the Litigation Trust Assets do not include claims against them. Joined by the Arbor Defendants, they also contend that the Trust lacks standing to assert claims against any of the Defendants for waste (Count 8), conversion (Count 9), conspiracy (Count 11), and aiding and abetting breaches of fiduciary duties and conversion (Counts 6 & 10) because those claims are not specifically referenced in the Examiner's Report and, as such, are not Litigation Trust Assets.

As explained below, the Court finds no merit in the Defendants' contentions that the Trust has failed **[\*94]** to demonstrate constitutional standing to assert that claims at issue in the Amended Complaint. However, for the reasons set forth below, the Court finds that by application of the *Wagoner* rule, the Trust lacks standing to sue the following Defendants on account of the State Law claims:

Polar Extended Stay
PGRT ESH

Lightstone Entities
Lightstone Commercial

2020 Bankr. LEXIS 2128, *94

Park Avenue Funding

Arbor Entities
Arbor ESH
Arbor Commercial
Princeton ESH
Atmar Associates
Glida One
Ron Invest
ABT-ESI
Mericash Funding

Accordingly, the Court dismisses Counts 1-11 as alleged against those parties for lack of subject matter jurisdiction. The Court also finds that the Trust lacks standing (i) to sue the HVM Defendants because they are not identified as potential defendants in the Examiner's Report, and (ii) to assert the claims underlying Counts 6 and 8-11 against any of the Defendants, because those claims are not identified in the Examiner's Report. Accordingly, the Court dismisses Counts 5-11 as alleged against the HVM Defendants and dismisses Counts 6 and 8-11 as alleged against all Defendants.

In support of their requests for relief under *Rule 12(b)(6)*, the Defendants assert that the Trust has engaged in impermissible "group pleading" **[*95]** and that the Court must dismiss all Defendants from all Counts in the Amended Complaint. They also contend that, in any event, there are grounds to dismiss all or portions of select claims in the Amended Complaint pursuant to *Rule 12(b)(6)*, including by application of the *Bangor Punta* doctrine, and that the Trust is not entitled to recover punitive damages under Counts 5 and 7. As discussed below, the Court denies the Motions to dismiss all Counts in the complaint for allegedly running afoul of the "group pleading" rules, and the Defendants' request that the Court apply to the *Bangor Punta* doctrine. It also denies the Defendants' request to dismiss the punitive damage claims. Having determined that Counts 6 and 8-11 must be dismissed for lack of subject matter jurisdiction, the Count will not consider the relief sought in the Motions under *Rule 12(b)(6)* as to those Counts. As to the remaining Counts, the Court:

• Dismisses the Fraudulent Transfer Claims (Counts 3, 12-15) to the extent predicated on the LIBOR Floor Certificates Distributions.

• Dismisses Counts 1 and 2 of the Amended Complaint, to the extent they seek relief under §§ 160 and 174(a) of the Delaware General Corporation Law.

• Dismisses Count 4 of the Amended **[*96]**

Complaint to the extent the Trust seeks restitution on account of the Dividend Payments.

• Dismisses the following Defendants from Count 5 of the Amended Complaint:
    Polar Extended Stay
    PGRT ESH

Lightstone Entities
Lightstone Commercial
Park Avenue Funding

Arbor Entities
Arbor ESH
Arbor Commercial
Princeton ESH
Atmar Associates
Glida One
Ron Invest
ABT-ESI
Mericash Funding

• Dismisses Count 7 of the Amended Complaint.

• Dismisses, as moot, Count 17 of the Amended Complaint with respect to the HVM Defendants.

The Court now addresses the Defendants assertions that the Trust lacks standing to sue the Defendants.


The Trust's Standing To Sue

The Defendants contend that the Trust lacks constitutional and/or prudential standing to assert all or some of the claims at issue in the Amended Complaint. Accordingly, they seek to dismiss those claims pursuant to *Rule 12(b)(1)*. **HN11**[⬆] "In every federal case, the party bringing the suit must establish standing to prosecute the action." *Elk Grove Unified Sch. Dist. v. Newdow, 542 U.S. 1, 11, 124 S. Ct. 2301, 159 L. Ed. 2d 98 (2004)*. "[T]he question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues. This inquiry involves both constitutional limitations on federal-court jurisdiction and prudential limitations on **[*97]** its exercise." *Warth v. Seldin, 422 U.S. 490, 498, 95 S. Ct. 2197, 45 L. Ed. 2d 343 (1975)*. Accordingly, "a party must demonstrate both constitutional standing and prudential standing." *McHale, Jr. v. Boulder Capital LLC (In re 1031 Tax Grp., LLC), 439 B.R. 47, 59 (Bankr. S.D.N.Y. 2010)* (citing *Sullivan v. Syracuse Hous. Auth., 962 F.2d 1101, 1106 (2d Cir. 1992))*.

**HN12**[⬆] Under Article III of the Constitution, federal judicial power extends only to "Cases" and "Controversies." *U.S. Const., Art. III, § 2, cl. 1*. *See*

Raines v. Byrd, 521 U.S. 811, 818, 117 S. Ct. 2312, 138 L. Ed. 2d 849 (1997) ("No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal court-jurisdiction to actual cases or controversies." (quoting Simon v. E. Ky. Welfare Rights Org., 426 U.S. 26, 37, 96 S. Ct. 1917, 48 L. Ed. 2d 450 (1976))). Article III standing is a threshold requirement for federal court jurisdiction. See Lujan v. Defenders of Wildlife, 504 U.S. 555, 559-60, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992); DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 342, 126 S. Ct. 1854, 164 L. Ed. 2d 589 (2006) ("The 'core component' of the requirement that a litigant have standing to invoke the authority of a federal court 'is an essential and unchanging part of the case-or-controversy requirement of Article III.'" (quoting Lujan, 504 U.S. at 560)). The "irreducible constitutional minimum" requirements of constitutional standing are:

(1) an injury in fact (i.e., a concrete and particularized invasion of a legally protected interest);

(2) causation (i.e., a fairly traceable connection between the alleged injury in fact and the alleged conduct of the defendant); and

(3) redressability (i.e., it is likely and not merely speculative that the plaintiff's injury will be remedied by the relief plaintiff [*98] seeks in bringing suit).

Lujan, 504 U.S. at 560-61. See also Sprint Commc'n Co., L.P. v. APCC Servs., Inc., 554 U.S. 269, 273-74, 128 S. Ct. 2531, 171 L. Ed. 2d 424 (2008).

HN13[↑] The Constitution is not the source of the prudential standing requirements. Rather, those requirements "have been developed by the Supreme Court on its own accord and applied in a more discretionary fashion as rules of judicial 'self-restraint' . . . further to protect, to the extent necessary under the circumstances, the purpose of Article III." Sullivan v. Syracuse Hous. Auth., 962 F.2d at 1106 (citations omitted). The doctrine of prudential standing encompasses "the general prohibition on a litigant's raising another person's legal rights, the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches, and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked." Allen v. Wright, 468 U.S. 737, 751, 104 S. Ct. 3315, 82 L. Ed. 2d 556 (1984) (citing Valley Forge Christian Coll. v. Americans United for Separation of Church & State,

Inc., 454 U.S. 464, 474-475, 102 S. Ct. 752, 70 L. Ed. 2d 700 (1982)), abrogated by Lexmark Int'l, Inc. v. Static Control Components, Inc., 572 U.S. 118, 134 S. Ct. 1377, 188 L. Ed. 2d 392 (2014).

HN14[↑] A plaintiff must establish its standing to sue on a claim by claim basis. See DaimlerChrysler, 547 U.S. at 352 ("[T]he standing inquiry requires careful judicial examination of a complaint's allegations to ascertain whether the particular plaintiff is entitled to an adjudication of the particular claims asserted.") (internal quotation marks and citation omitted). To meet that burden, the plaintiff must demonstrate that its complaint clearly [*99] "allege[s] facts demonstrating that [it] is a proper party to invoke judicial resolution of the dispute." Bogart v. Isr. Aero. Indus. Ltd., No. 09-Civ-4783, 2010 U.S. Dist. LEXIS 12263, 2010 WL 517582, at *3 (S.D.N.Y. Feb. 5, 2010) (quoting Thompson v. Cty. of Franklin, 15 F.3d 245, 249 (2d Cir. 1994)).

HN15[↑] When a bankruptcy case is commenced, an estate is created by operation of law. See 11 U.S.C. § 541. The estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a). Under the Plan, and through the Litigation Trust Agreement, the Trust stands in the shoes of the Debtors with the authority to pursue claims on behalf of the Litigation Trust. See, e.g., Plan Art. VI (Implementation of the Plan), § 6.17 (creation, purpose, and scope of the Litigation Trust).[61] The State Law claims in the Amended Complaint (Counts 1-11) are "legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a). See Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec., LLC, 460 B.R. 106, 114 (Bankr. S.D.N.Y. 2011) ("Property of the estate therefore includes any cause of action the debtor had on the petition date . . . as well as avoidance actions created on the petition date[.]") (citations omitted), aff'd, 474 B.R. 76 (S.D.N.Y. 2012); In re Ionosphere Clubs, Inc., 156 B.R. 414, 436-37 (S.D.N.Y. 1993) ("A debtor's interests in property,

---

[61] In part, § 6.17 states:

From and after the Effective Date, the Litigation Trustee, in accordance with section 1123(b)(3) of the Bankruptcy Code, and on behalf of the Litigation Trust, shall serve as a representative of the Debtors' Estates and shall retain and possess the sole and exclusive right to commence, pursue, settle, compromise or abandon, as appropriate, any and all causes of action, whether arising before or after the Petition Date, in any court or other tribunal.

Plan § 6.17(e).

including causes of action, are defined by state law, and become assets of the estate once the bankruptcy petition is filed.") (citations omitted), **[\*100]** *aff'd*, *17 F.3d 600 (2d Cir. 1994)*. *See also Tronox Inc. v. Anadarko Petroleum Corp. (In re Tronox Inc.), 549 B.R. 21, 42-43 (S.D.N.Y. 2016)* ("Courts have held that state law causes of action for successor liability and veil-piercing are properly characterized as property of the bankruptcy estate." (citing *In re Emoral, Inc.*, 740 F.3d 875, 880 (3d Cir. 2014))). As a general rule, the Trust has prima facie standing to assert those claims. *See Picard v. JP Morgan Chase & Co., 460 B.R. 84, 91 (Bankr. S.D.N.Y. 2011)* (noting that a bankruptcy trustee steps into the shoes of the debtor for purposes of bringing property into the estate, and, as such, possesses all of the rights of a debtor). The Trust also has prima facie standing to assert claims to avoid and recover alleged actual and constructively fraudulent transfers under *§§ 548* and *550 of the Bankruptcy Code* (Counts 12 & 14). **HN16[↑]** That is because "*[s]ection 548* is a simple grant of power to the bankruptcy trustee to avoid transfers under certain circumstances." *United States Bank Nat'l Ass'n v. Verizon Communs., Inc., 479 B.R. 405, 415 (N.D. Tex. 2012)*. The same is not true for the Trust's claims seeking to avoid and recover alleged actual and constructive fraudulent transfers under state law, pursuant to *§§ 544(b)* and *550 of the Bankruptcy Code* (Counts 13 & 15). The Trust *per se* does not have direct standing to assert those claims. **HN17[↑]** Pursuant to *§ 544(b)(1) of the Bankruptcy Code*, a trustee "may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim **[\*101]** that is allowable[.]" *11 U.S.C. § 544(b)(1)*. In other words, *§ 544(b)* allows the Trust to stand in the shoes of an existing unsecured creditor and bring a state fraudulent conveyance action, or other state law claim that such a creditor could bring. Accordingly, here, the Trust's rights to avoid and recover alleged fraudulent transfers under state law, if any, "are derivative of an actual unsecured creditor's rights." *Smith v. Am. Founders Fin. Corp., 365 B.R. 647, 659 (S.D. Tex. 2007)* (citations omitted). **HN18[↑]** As the Fifth Circuit has explained:

> If an actual, unsecured creditor can, *on the date of the bankruptcy*, reach property that the debtor has transferred to a third party, the trustee may use *§ 544(b)* to step into the shoes of that creditor and 'avoid' the debtor's transfer. Although the cause of action belonged to one creditor, any property the trustee recovers becomes estate property and is divided *pro rata* among all general creditors. The

trustee may recover the full extent of the fraudulently transferred property on the basis of one creditor's claim. In other words, an entire transfer may be set aside even though the creditor's claim is nominal.

*MC Asset Recovery LLC v. Commerzbank A.G. (In re Mirant Corp.), 675 F.3d 530, 534 (5th Cir. 2012)* (quoting *In re Moore, 608 F.3d 253, 260 (5th Cir. 2010))*. *See also U.S. Bank Nat'l Ass'n. v. Verizon Communs., Inc., 479 B.R. at 414* ("Under *Section 544(b)*, the bankruptcy trustee's ability to avoid transfer comes from the existence of a 'triggering' creditor that **[\*102]** could have brought a state law fraudulent transfer claim at the time of the filing of the bankruptcy petition.").

**HN19[↑]** On a *Rule 12(b)(1)* motion, "[t]he plaintiff bears the burden of proving subject-matter jurisdiction by a preponderance of the evidence." *Nanak Hospitality., LLC v. Haskins Gas Serv. (In re Rome Family Corp.), No. 02-11771, 2007 Bankr. LEXIS 4029, 2007 WL 4244697, at \*3 (Bankr. D. Vt. Dec. 3, 2007)* (citing *Luckett v. Bure, 290 F.3d 493, 497 (2d Cir. 2002))*; *see also Mathirampuzha v. Potter, 548 F.3d 70, 85 (2d Cir. 2008)* ("The burden of demonstrating subject matter jurisdiction lies with the party asserting it[.]"). *Rule 12(b)(1)* motions can present "factual" or "facial" challenges to the court's subject matter jurisdiction. A *facial* attack "challenges the sufficiency of the jurisdictional facts alleged, not the facts themselves." *Poodry v. Tonawanda Band of Seneca Indians, 85 F.3d 874, 887 n.15 (2d Cir. 1996)*. In reviewing such a challenge, a trial court takes the allegations in the complaint as true. *See Ohio Nat'l Life Ins. Co. v. U.S., 922 F.2d 320, 325 (6th Cir. 1990)*. In contrast, a factual attack "challenge[s] whether sufficient facts exist for the court to determine that it has jurisdiction **[\*103]** to hear the plaintiff['s] claims." *Greater N.Y. Hosp. Ass'n v. United States, No. 98 Civ. 2741, 1999 U.S. Dist. LEXIS 17391, 1999 WL 1021561, at \*4 (S.D.N.Y. Nov. 9, 1999)* (citations omitted). Where there is a factual attack on the court's subject matter jurisdiction, "no presumptive truthfulness attaches to the complaint's jurisdictional allegations . . . rather, the burden is on the plaintiff to satisfy the Court, as fact-finder, of the jurisdictional facts." *Guadagno v. Wallack Ader Levithan Assoc., 932 F. Supp. 94, 95 (S.D.N.Y. 1996)* (citations omitted).

The Defendants contend that this Court lacks subject matter jurisdiction to adjudicate all or some of the claims at issue in the Amended Complaint for the following reasons:

> (i) The Trust fails to allege facts demonstrating that

it satisfies constitutional standing requirements that are prerequisites to the Court's exercise of subject matter jurisdiction over all of the claims asserted in the Amended Complaint.

(ii) By application of the "*Wagoner* rule" and in pari delicto doctrine, the Trust lacks prudential standing to assert the claims underlying Counts 1-11 of the Amended Complaint against any of the Defendants.

(iii) The Trust lacks standing to assert any of the claims alleged against the HVM Defendants (Counts 5-11), because the Trust has standing to assert only those claims that are referenced in Examiner's Report and the HVM Defendants **[*104]** are not identified in the report as potential defendants in the causes of action transferred to the Litigation Trust.

(iv) The Trust lacks standing to assert claims for waste (Count 8), conversion (Count 9), conspiracy (Count 10) and aiding and abetting breaches of fiduciary duty and conversion (Counts 6 & 11) because those claims are not identified in the Examiner's Report and thus, were not transferred to the Litigation Trust.

The Court considers those arguments below.

Whether the Facts Alleged In The Amended Complaint Demonstrate That The Trust Has Standing To Bring Suit

The Lightstone Defendants seek to dismiss all seventeen Counts of the Amended Complaint on the grounds that the Trust failed to allege facts sufficient to establish that it has constitutional standing to prosecute this adversary proceeding because the Amended Complaint improperly lumps all seventy-five Debtors together, without alleging (i) which Debtor made the challenged Transfers, (ii) whether that Debtor was insolvent (for claims requiring insolvency or lack of surplus), and (iii) whether that Debtor had any creditors who were injured by the transfer and did not consent to or actually participate in the alleged **[*105]** conduct. They say that the Trust has not alleged an "injury in fact" to any particular Debtor and it is "impossible" that all of the Debtors did or suffered the acts alleged in the Amended Complaint. *See* Lightstone MTD at 38. They also assert that the undisputed and admitted facts are that Wachovia, as a Mortgage Lender, transferred the Dividend Payments to the Series A Unit holders and the Management Fees to Lichtenstein from the Cash Management Account that it controlled, and it was the Mortgage Lender itself that transferred the LIBOR Floor

Certificates to DL-DW. *Id.* at 61. Moreover, they maintain that since the Debtors were structured as a REIT, which divides property ownership from mezzanine indebtedness obligations, and operations from holding companies, the asset-less and structurally junior special purpose Debtors that were Mezzanine Borrowers could not possibly have made or funded any of the Transfers. They contend that the Property Owners are the only entities whose assets conceivably could have been transferred to the Defendants, but that they were solvent at all relevant times with no unpaid creditors, let alone innocent or "triggering" creditors that were injured or could serve to confer standing **[*106]** for avoidance purposes. *See id.* at 5, 39. They also assert that the only "eligible" creditors — i.e., entities that were owed money and, as such, conceivably could have been damaged by the Transfers — were the M&T Noteholders, positioned at least twelve entity levels away from the Property Owners. In short, the Lightstone Defendants assert that the Trust has not satisfied the standing requirement to allege an injury in fact on account of any particular Debtor, and that such failure is not inadvertent because the Debtors have always been organized, for the benefit of their lenders and tax purposes, as a standard mezzanine/REIT structure. *See id.* at 5.

With one exception, the allegations in the Amended Complaint do not identify the specific Debtors that allegedly made each of the Transfers, or state the injuries allegedly suffered by reason of the Transfers.[62] For example, the allegations in the Amended Complaint in support of the Trust's claims to avoid and recover allegedly fraudulent transfers by the Debtors are, for the most part pled in the passive voice,[63] or state that the Debtors, collectively, made the Transfers.[64] *HN20*[⬆]

---

[62] The Trust alleges that in 2007, Debtor ESA P Portfolio Operating Lessee Inc. made equity distributions totaling $5.2 million, to Arbor Commercial on account of its Series A-1 Units. *See* Amd. Compl. ¶ 147.

[63] *See, e.g.*, Amd. Compl. ¶ 200 ("Floor Certificates were diverted from the Debtors and assigned to DL-DW"); *id.* ¶ 208 ("the Debtors' funds were used"); *id.* ¶¶ 213, 374 ("Lichtenstein or a Lichtenstein affiliate received the Management Fee Transfers"); *see also id.* ¶¶ 204, 211, 240, 257.

[64] The following are examples of such allegations:

"[T]he Debtors never received the LIBOR Floor Certificates, even though they made the pertinent concession and all payments under the loan

2020 Bankr. LEXIS 2128, *106

Complaints that are brought for the benefit of a number of parties are deficient where [*107] they fail to identify which parties are harmed and the extent of such harm. *See, e.g., Bautista v. Los Angeles Cty., 216 F.3d 837, 840 (9th Cir. 2000)* (finding a complaint filed on behalf of fifty-one plaintiffs that alleged three claims for relief based on three types of discrimination to be deficient, and explaining that a plaintiff's individual right to relief "depends upon proof of the operative facts giving rise to an enforceable right in favor of that plaintiff" and that "each plaintiff's claim being founded upon a separate transaction or occurrence, it is properly 'stated in a separate count ... [because] a separation facilitates the clear presentation of the matters set forth.'" (*quoting Fed. R. Civ. P. 10(b)*)). That is so because "there may be defenses available to the defendants which are applicable to one or more plaintiffs but not to the others[.]" *Erone Corp. v. Skouras Theatres Corp., 19 F.R.D. 299, 300 (S.D.N.Y. 1956)*.

HN21[⬆️] Standing requires a "particular plaintiff" to demonstrate that it is entitled to assert "particular claims." *See, e.g., DaimlerChrysler Corp v. Cuno, 547 U.S. 332, 352, 126 S. Ct. 1854, 164 L. Ed. 2d 589 (2006)* (citations omitted). The distinction between which

_____

agreements." Amd. Compl. ¶ 138;

"The Debtors, directly or indirectly through other entities in the Debtors' corporate structure, made the following distributions to equity holders[.]" *Id.* ¶ 143;

"[T]he Debtors distributed a total of $6,166,666.66 [*108] to Series A-2 Unit Holders." *Id.* ¶ 144;

"On information and belief, [a certain distribution] was made from the Debtors' funds[.]" *Id.* ¶ 145;

"[T]he Debtors distributed approximately $7,656,666.63 on account of equity holdings in the Debtors ..." *Id.* ¶ 146;

"Despite the foregoing, and despite the Debtors' poor performance, strained liquidity, budget issues and concerns, lack of surplus, and insolvency, during the third quarter of 2008 the Debtors paid, either by wire or by transfers from the cash management account, the following cash distributions to equity totaling $3,750,000.00 to Series A-1 Unit Holders in violation of applicable law[.]" *Id.* ¶ 166;

"[T]he Debtors did not have a surplus and/or were insolvent." *Id.* ¶ 203; and

"The Management Fee Transfers were made at a time when the Debtors did not have a surplus or were insolvent, or rendered the Debtors insolvent." *Id.* ¶ 213.

Debtors were rendered insolvent by which transfers is important in evaluating the avoidance claims because a particular Debtor transferor is [*109] only entitled to avoid a transfer for the benefit of that Debtor transferor's creditors. *See, e.g., Adelphia Recovery Tr. v. Bank of Am., N.A., 390 B.R. 80, 92 (S.D.N.Y. 2008)* (dismissing complaint where the avoidance claims may only be brought for the benefit of unpaid creditors of the actual transferor, not for unpaid creditor of its affiliates), *aff'd, 379 F. App'x 10 (2d Cir. 2010)*. The Trust argues that group pleading in these circumstances is appropriate and should be permitted because the factual allegations demonstrate that the Defendants actually operated the Debtors as a group. A key element to the Amended Complaint is the Trust's assertion that the Debtors' corporate structure was only nominally decentralized, but in reality, the Defendants managed and operated the Debtors on a completely centralized basis. To that end, among other things, the Trust alleges that from the moment the LBO Transaction closed:

The Debtors, under the control of the Defendants, disregarded all semblance of legal formality regarding the corporate status of the Debtors and affiliated entities.

The Debtors made no effort to maintain their separateness or fulfill the covenants of the LBO loan agreements mandating their separateness.

The Debtors were treated internally at all relevant times as part of one [*110] company, sometimes described as "the Company" in the corporate minutes for the "Extended Stay Hotels family of companies."

The Debtors had common officers and directors and had no separate governance.

The Debtors conducted all material board of directors meetings on a consolidated basis for the so-called "Extended Stay Hotels family of companies," which included the Debtors' direct equity owners.

The Debtors utilized one centralized Cash Management Account in their operations and cash disbursements.

*See* Amd. Compl. ¶ 192. As support for those contentions, the Trust points to what it says is a "typical set of corporate minutes," from a May 15, 2008 "Meeting of the Board of Directors Extended Stay Hotels." It contends that the minutes illustrate the Debtors' disregard of separate corporate entities. *See id.* ¶ 193. The minutes open:

A meeting of the Board of Directors Extended Stay

Hotels (The Company) was conducted at 100 Dunbar Street, Spartanburg, SC on Thursday, May 15th, 2008 commencing at 9:30 a.m." They add, "Present by invitation were the following officers of the Company: Gary DeLapp, President; David Kim, EVP & Chief Investment Officer" and "[o]n the management side, Mr. Delapp [ **[*111]** sic] stated that the company is concentrating on job enhancement.

*Id.* The Trust alleges that "even though DeLapp technically was an officer of HVM and three Debtor entities, he was treated as an executive officer of all of the Debtor affiliates. Kim was not an officer of any Debtor entity, yet he was treated as an officer of all of the Debtors." *Id.* It contends that the operational and management integration of the Debtors was manifest in other respects, including in the Debtors' corporate books and records.[65] In short, the Trust asserts that "the 'Company,' as it was described in the corporate minutes for the 'Extended Stay Hotels family of companies,' completely ignored the fiction of legal separateness of its entities." *Id.* ¶ 197. The Trust further contends that the Defendants' case law is inapposite and that their attack on the adequacy of the pleadings is misplaced. *See* Opp'n at 57-59. It asserts that the Defendants' challenges to its standing to sue fail because it has multiple grounds for showing that an injury to one or more Debtors, while insolvent, was caused by the wrongful transfers in question. *See id.* at 59-60.

The Trust contends that by application of either veil-piercing or substantive consolidation theories, the insolvency of the Debtors may be determined on an aggregate basis. *See id.* at 56, 59-70. It says that "aggregation" of the Debtors through veil piercing and

---

[65] Further to that point, the Trust contends that "after the LBO's closing, an opening balance sheet for DL-DW showed the impact of the LBO on DL-DW and the appropriate allocation of the price paid for the LBO." Amd. Compl. ¶ 195. It says that, in contrast:

> The mortgage and mezzanine debt was recorded at the ESI and Homestead accounting **[*112]** database levels, as opposed to being recorded by each legal entity mortgage borrower or mezzanine borrower; and

> The subsidiaries' assets and liabilities, including hotel property and equipment, were recorded at the ESI and Homestead database level, rather than being recorded at the individual entity level and treated as owned by that entity.

*Id.*

substantive consolidation is appropriate because the Defendants blatantly disregarded the REIT and mezzanine finance structure and, in doing so, injured the Debtors. *See id.* at 60. It maintains that aggregation of the Debtors' estates is appropriate because the subsidiaries are intertwined, and because aggregation reflects the economic realities of the parties' relationships. It says that is so because under the waterfall in the Cash Management Agreement: (i) all of the subsidiaries' interests were subordinated to those of the parents; (ii) liabilities were merged and mixed without any regard to the actual corporate **[*113]** structure; and (iii) mortgage borrowers effectively became responsible for the mezzanine debt since payment of that indebtedness had priority in the waterfall ahead of vital hotel operating expenses and obligations. *Id.* In that light, the Trust also argues that the Debtors may assert the claims of the Indenture Trustee, as a creditor of ESI, to recover for the injuries suffered by the Mortgage Borrowers as a result of the Transfers. *See* Opp'n at 7.

It also argues that even without the aggregation of the Debtors' estates, the Mortgage Borrowers — i.e., the Debtors who were initially injured by the upstream transfers of the dividends and LIBOR Floor Certificates to the alleged "corporate insiders" — can be shown to be insolvent; but that a determination of insolvency cannot be made at the motion to dismiss stage, particularly where the Debtors did not maintain individual financial books and records. The Trust asserts that since the Mortgage Borrowers continue to have active creditor claims against them, it clearly has standing to bring these claims. *See id.* at 71-72. It also contends that even if the Mortgage Borrowers were not insolvent, the Debtors above them in the corporate structure were insolvent **[*114]** and are deemed to have transferred these funds and assets upstream to their detriment. Accordingly, it argues that there is ample basis for the claims to proceed.

The Court cannot assess the solvency of any of the Debtors at this stage of the litigation. To the extent relevant, resolution of those issues will await a factual determination by the Court. However, below, the Court considers whether, for purposes of the Motions, the Trust has demonstrated that there are grounds for aggregating the Debtors' estates.

Piercing the Corporate Veil

The Court first considers whether the Trust has alleged

facts demonstrating that aggregation of the Debtors' estates through veil piercing is appropriate in this case. HN22[↑] Veil piercing "is a state law remedy that allows the creditor of one entity to recover its claim from a separate but related entity." *In re Coleman, 417 B.R. 712, 726 (Bankr. S.D. Miss. 2009)* (citation omitted). The choice of law rules of the forum state determine which state's law governs a veil piercing claim. *See Pereira v. Grecogas Ltd. (In re Saba Enters., Inc.), 421 B.R. 626, 648 (Bankr. S.D.N.Y. 2009)*. Under New York choice of law principles, "[t]he law of the state of incorporation determines when the corporate form will be disregarded and liability will be imposed on shareholders[.]" *Kalb, Voorhis & Co. v. Am. Fin. Corp., 8 F.3d 130, 132 (2d Cir. 1993)*; *see also Soviet Pan Am Travel Effort v. Travel Comm., Inc., 756 F. Supp. 126, 131 (S.D.N.Y. 1991)* ("Because a corporation is a **[*115]** creature of state law whose primary purpose is to insulate shareholders from legal liability, the state of incorporation has the greater interest in determining when and if that insulation is to be stripped away."). The Court finds and the parties agree that Delaware law controls on the application of veil piercing in this case. HN23[↑] Veil piercing is "a tool of equity" used "to disregard the existence of a corporation and impose liability on the corporation's individual principals and their personal assets." *Blair v. Infineon Techs. AG, 720 F. Supp. 2d 462, 469 (D. Del. 2010)*. In *Kelley v. Opportunity Fin., LLC (In re Petters Grp. Worldwide, LLC), 561 B.R. 738 (Bankr. D. Minn. 2016)*, the court summarized application of the veil piercing doctrine, as follows:

> The first and most common variety of corporate veil piercing is the vertical veil pierce. In a vertical pierce, a court pierces a limited liability entity's veil to hold the entity's principal liable for the entity's obligations. Liability therefore extends from the limited liability entity to the entity's principal. In a reverse veil pierce, either a corporate insider or a person with a claim against a corporate insider has the insider and the corporate entity treated as alter egos for some purpose. There are therefore two distinct forms of reverse veil piercing, each characterized by whether the party **[*116]** seeking to pierce a limited liability entity's corporate veil is outside or inside the limited liability entity. In an *insider* reverse veil pierce, a limited liability entity's insider seeks to pierce the corporate veil so that the insider may use the entity's claims against third parties. . . . In an *outsider* reverse veil pierce, a limited liability entity's creditor seeks to hold the entity liable for the insider's obligation. An outsider

reverse veil piercing claim originates from outside the limited liability entity, with liability extending from the entity to the entity's insider. Finally, there is horizontal veil piercing, in which a limited liability entity is considered to be the alter ego of another limited liability entity with the same owner. HN24[↑] In this situation, a creditor with a claim against one of the limited liability entities seeks to disregard corporate separateness between the entities to reach assets belonging to both.

*Id. at 750* (citations omitted); *see also ALT Hotel, LLC v. Diamondrock Allerton Owner, LLC (In re ALT Hotel, LLC)*, 479 B.R. 781, 801 (Bankr. N.D. Ill. 2012) ("Traditionally, courts employ the doctrine of piercing the corporate veil to hold shareholders, who would otherwise have no liability for corporate debts, liable for those debts. . . . Some jurisdictions also recognize **[*117]** a form of "piercing the veil in 'reverse' . . . [i]n the typical reverse piercing case, a corporation will be held liable for the debts of a corporate insider, a shareholder or a subsidiary.") (citations omitted). Under Delaware law, "[t]he terms '*alter ego* theory' and 'piercing the corporate veil' are used interchangeably[.]" *Winner Acceptance Corp. v. Return on Capital Corp., No. CIV.A. 3088-VP, 2008 Del. Ch. LEXIS 196, 2008 WL 5352063, at *5 n.32 (Del. Ch. Dec. 23, 2008)*.

HN25[↑] Under Delaware law, a corporation has an identity separate from the identities of its shareholders. *See Schoon v. Smith, 953 A.2d 196, 204 n.22 (Del. 2008)*. "Delaware courts take the corporate form and corporate formalities very seriously[.]" *Case Fin. v. Alden, No. CIV.A. 1184-VCP, 2009 Del. Ch. LEXIS 153, 2009 WL 2581873, at *4 (Del. Ch. Aug. 21, 2009)*. Indeed, "[i]t is only the exceptional case where a court will disregard the corporate form[.]" *Sprint Nextel Corp. v. iPCS, Inc., No. CIV.A. 3746-VCP, 2008 Del. Ch. LEXIS 90, 2008 WL 2737409, at *11 (Del. Ch. Jul. 14, 2008)* (quoting *Sears Roebuck & Co. v. Sears plc, 744 F. Supp. 1297, 1305 (D. Del. 1990)*); *see also BASF Corp. v. POSM II Props. P'ship, L.P., No. CIV.A. 3608-VCS, 2009 Del. Ch. LEXIS 33, 2009 WL 522721, at *8 n.50 (Del. Ch. Mar. 3, 2009)* ("Delaware public policy does not lightly disregard the separate legal existence of corporations.") (citation omitted). For that reason, "[p]ersuading a Delaware court to disregard the corporate entity is a difficult task." *Wallace ex rel. Cencom Cable Income Partners II, Inc., L.P. v. Wood, 752 A.2d 1175, 1183-84 (Del. Ch. 1999)* (quoting *Harco Nat'l Ins. Co. v. Green Farms, No. 1131, 1989 Del. Ch. LEXIS 114, 1989 WL 110537 (Del. Ch. Sept. 19, 1989))*. Delaware courts recognize vertical, or forward, veil

piercing. *See Harper v. Del. Valley Broad., Inc., 743 F. Supp. 1076, 1085 (D. Del. 1990)* (denying **[*118]** consultant's motion for summary judgment as to whether company was alter ego of its majority shareholder, and noting that consultant could not prevail on an alter ego theory because he had failed to make the requisite showing of unfairness or injustice, and "a showing of fraud or something like fraud is necessary to persuade the Delaware courts to pierce a corporate veil[.]") *aff'd, 932 F.2d 959 (3d Cir. 1991); In re Broadstripe, LLC, 444 B.R. 51, 102 (Bankr. D. Del. 2010)* ("Delaware law permits a court to pierce the corporate veil of a company 'where there is fraud or where [it] is in fact a mere instrumentality or alter ego of its owner.'") (citation omitted). They also permit horizontal veil piercing among affiliate subsidiaries. *See, e.g., Capmark Fin. Grp., Inc. v. Goldman Sachs Credit Partners L.P., 491 B.R. 335, 349 (S.D.N.Y. 2013)* (noting that Delaware law allows veil piercing "to disregard the corporate formalities separating horizontal affiliates" in order to hold insiders liable but rejecting claim in that case based on the facts); *see also Outokumpu Eng'g Enters., Inc. v. Kvaerner Enviropower, Inc., 685 A.2d 724, 729 (Del. Super. Ct. 1996)* (stating that in order to disregard corporate formalities separating "sister" subsidiaries, a plaintiff must first pierce the veil separating one subsidiary from its corporate parent and then pierce the veil separating the corporate parent from the second subsidiary). The Delaware courts have not addressed whether **[*119]** reverse veil piercing is permitted under Delaware law. *See Paloian v. Seal (In re Canopy Fin., Inc.), 477 B.R. 696, 703 (Bankr. N.D. Ill. 2012)* ("Under Delaware law, however, it is not clear if a party can reverse-pierce the corporate veil." (citing *MicroStrategy Inc. v. Acacia Research Corp., No. 5735—VCP, 2010 Del. Ch. LEXIS 254, 2010 WL 5550455, at *12 n.90 (Del. Ch. Dec. 30, 2010)*)).

The Trust asserts that aggregating the subsidiaries for purposes of determining insolvency and the identity of triggering creditors does not involve the parent entities and thus, does not implicate concerns over reverse veil piercing. The Trust contends that since its sole objective is to allow the subsidiaries to reclaim assets that it contends were wrongfully taken upstream by the parents and insiders, the remedy it seeks is best viewed as classic upward veil piercing. *See* Opp'n at 61. The Defendants dispute that assertion. They maintain that the Trust is attempting to pierce the Debtors' corporate veils to make subsidiary Mortgage Borrowers liable for the Mezzanine Debt or ESI's M&T Notes. *See* Lightstone Reply at 17. They assert that without reverse

veil piercing, the Trust cannot properly bring its fraudulent transfer claims, among others, because the Trust seeks to deem creditors of ESI and the Mezzanine **[*120]** Borrowers to be creditors of the Mortgage Borrowers for the dual purposes of retroactively making the Mortgage Borrowers insolvent and creating triggering creditors. *Id.* at 17-18. The Trust's assertion that the Debtors were insolvent is based upon the $3.3 billion of Mezzanine Debt. The obligation to pay the Mezzanine Debt belonged to the Mezzanine Borrowers, the indirect shareholders of the Mortgage Borrowers. The Defendants assert, however, that the Mezzanine Borrowers could not possibly have funded the Transfers because they did not own the hotel properties and did not have any other business assets or operations. The Defendants contend that, in trying to hold the subsidiary Debtors liable for their parents' debts, the Trust is advocating text-book reverse veil piercing. The Court agrees. *HN26*[⤴] Conventional, or forward, veil piercing is used "to hold shareholders, who would otherwise have no liability for corporate debts, liable for those debts." *In re ALT Hotel, LLC*, 479 B.R. at 801 (citation omitted). Reverse veil piercing is used to hold the corporation liable for the debts of a shareholder or corporate insider. *Id.* The latter is at issue here. The Court finds no merit to the Trust's assertions to the contrary.

As noted, Delaware **[*121]** courts have not addressed whether reverse veil piercing is permitted under Delaware law. Accordingly, in considering whether it is applicable here, the Court must predict how the highest court in Delaware would resolve that issue. *See Travelers Ins. Co. v. 633 Third Assocs., 14 F.3d 114, 119 (2d Cir. 1994)* ("Where the substantive law of the forum state is uncertain or ambiguous, the job of the federal courts is carefully to predict how the highest court of the forum state would resolve the uncertainty or ambiguity."). In doing so, this Court's role "is not to adopt innovative theories that may distort established state law." *Travelers Ins. Co. v. Carpenter, 411 F.3d 323, 329 (2d Cir. 2005)* (quoting *Nat'l Union Fire Ins. Co. of Pittsburgh PA. v. Stroh Cos., 265 F.3d 97, 106 (2d Cir. 2001)*). For that reason, the Court "must give 'fullest weight' to the decisions of a state's highest court" and "'proper regard' to the decisions of a state's lower courts[,]" and can "consider the decisions of federal courts construing state law." *Phansalkar v. Andersen Weinroth & Co., L.P., 344 F.3d 184, 199 (2d Cir. 2003)* (citations omitted). To that end, the Court finds the following cases (the "Delaware Veil Piercing Cases") helpful in its effort to predict how Delaware courts would resolve the issue:

(i) *Case Fin. v. Alden, No. CIV.A. 1184-VCP, 2009 Del. Ch. LEXIS 153, 2009 WL 2581873 (Del. Ch. Aug. 21, 2009)*;

(ii) *MicroStrategy Inc. v. Acacia Research Corp., No. CIV.A. 5735-VCP, 2010 Del. Ch. LEXIS 254, 2010 WL 5550455 (Del. Ch. Dec. 30, 2010)*;

(iii) *Cancan Dev., LLC v. Manno*, No. CV 6429-VCL, 2015 Del. Ch. LEXIS 144, 2015 WL 3400789 (Del. Ch. Mar. 30, 2015), *aff'd*, 132 A.3d 750 (Del. 2016); and

(iv) **[*122]** *Spring Real Estate, LLC v. Echo/RT Holdings, LLC*, No. CIV.A. 7994-VCN, 2016 Del. Ch. LEXIS 46, 2016 WL 769586 (Del. Ch. Feb. 18, 2016 )

The Court reviews those cases below.

*Case Fin. v. Alden, 2009 Del. Ch. LEXIS 153, 2009 WL 2581873 (Del. Ch. Aug. 21, 2009)*

In *Case Fin. v. Alden*, "Old CFI," a company that financed plaintiff attorneys through advances or high interest loans, sold some of its assets and operations to a new company ("Case Financial"). For a time, Old CFI's CEO ("Alden") remained at Case Financial where he continued to act as CEO and as a director. *2009 Del. Ch. LEXIS 153, 2009 WL 2581873, at *1*. At some point, Case Financial set up a wholly-owned subsidiary - Case Capital - to comply with certain usury laws. Eventually, individuals associated with Case Financial began suspecting that Alden had committed fraud in the course of the Old CFI asset sale to Case Financial and had committed various breaches of fiduciary duty in the wake of the acquisition. *Id*. Case Financial authorized its largest shareholder ("CCWIPP") to bring a derivative suit on its behalf against Alden and others. After CCWIPP settled with all defendants except Alden, it withdrew as a plaintiff from the action. Thereafter, Case Financial intervened to pursue the claims against Alden. 2009 Del. Ch. LEXIS 153, [WL] at *3. Alden sought to dismiss the action and argued, among other things, that Case Financial did not have standing to pursue the claims against Alden because the **[*123]** actions complained about in the complaint concerned activity within Case Capital — not Case Finance. In opposing that motion, Case Financial argued, among other things, that the Court should disregard the corporate form in these circumstances and find that Case Financial's claims are direct and not derivative. *2009 Del. Ch. LEXIS 153, [WL] at *4*.

Ultimately, the court found no merit to the argument. It observed that "[f]or the alter ego argument, Case Financial asserts that it and Case Capital are really the same company, so there should be no difference in standing. Essentially, Case Financial seems to be trying to pierce its own corporate veil, which would be unusual to say the least." *2009 Del. Ch. LEXIS 153, [WL] at *4*. Still, the court considered the merits of the request. It observed that as support for its alter ego claim, "Case Financial notes that it has filed consolidated financial statements with the SEC, which include Case Capital's results, has overlapping boards of directors with Case Capital, and often causes actions of Case Capital to be taken by written consent, so that the subsidiary has had only a limited number of board meetings." *Id*. The court nevertheless rejected the assertion, finding that "[d]emonstrating that one company is **[*124]** an alter ego of another, however, is not that easy." *Id*. (internal footnote omitted). *HN27*[⬆] The court explained that, in determining whether to disregard the corporate form, Delaware courts:

> require[] a fact intensive inquiry, which may consider the following factors, none of which are dominant: (1) whether the company, Case Capital in this case, was adequately capitalized for the undertaking; (2) whether the company was solvent; (3) whether corporate formalities were observed; (4) whether the controlling shareholder siphoned company funds; and (5) whether, in general, the company simply functioned as a facade for the controlling shareholder. There also must be an element of fraud to justify piercing the corporate veil.

*Id*. (footnotes omitted). The court found that although there were allegations of fraud in the case, none of the other factors severally or jointly supported disregarding Case Capital's corporate form. *2009 Del. Ch. LEXIS 153, [WL] at *5*.

*MicroStrategy Inc. v. Acacia Research Corp., 2010 Del. Ch. LEXIS 254, 2010 WL 5550455 (Del. Ch. Dec. 30, 2010)*

In *MicroStrategy Inc. v. Acacia Research Corp.*, the plaintiff, MicroStrategy Inc. ("MSI"), entered into a settlement agreement with defendant Acacia Research Corp. ("ARC") which resolved a number of patent infringement claims brought by one of ARC's subsidiaries against MSI in **[*125]** federal court. Six months later, another of ARC's subsidiaries, co-defendant Database Application Solutions, LLC ("DAS"),

delivered a letter to MSI stating that it planned to assert an infringement claim against MSI based on a patent that was not in issue in the prior litigation. *2010 Del. Ch. LEXIS 254, 2010 WL 5550455, at *1*. MSI protested. It asserted that it obtained a broader release than ARC acknowledged and greater protection against certain future claims ARC might assert against it, including the claim discussed in DAS's letter. *Id.* Thereafter, MSI sued ARC and DAS alleging, among other things, that ARC and DAS breached certain representations and warranties in the agreement, and fraudulently induced MSI to enter into the agreement. *See id.* ARC and DAS moved to dismiss MSI's claims. The court granted the motions in part and denied them in part.

Among other things, in opposing the motions to dismiss, MSI argued that DAS was an alter ego of ARC and, as such, the court should pierce ARC's corporate veil and attribute ARC's actions to its subsidiary DAS. *2010 Del. Ch. LEXIS 254, [WL] at *11*. However, DAS countered that if the court granted such relief, and pierced ARC's corporate veil to attribute the parent's actions to its subsidiary, it would "create new law **[*126]** by doing something that no other Delaware court has ever done: hold a subsidiary liable for its parents' actions through a reverse piercing of the corporate veil." *2010 Del. Ch. LEXIS 254, [WL] at *12 n.90*. As in *Case Financial*, the court did not reject the reverse piercing claim out of hand. Rather, it rejected it after determining that the complaint failed to allege sufficient facts for the court to disregard ARC's corporate form. *Id.*[66] In doing so, the

_____

[66] In reaching that conclusion, the court reasoned that:

> [T]he Complaint fails to allege sufficient facts for the Court to disregard ARC's corporate form. Indeed, for this Court to pierce the corporate veil or hold that ARC is the alter ego of DAS, MSI must prove that some "fraud or injustice" would be perpetrated through misuse of the corporate form. *HN28[↑]* Specific facts a court may consider when being asked to disregard the corporate form include: "(1) whether the company was adequately capitalized for the undertaking; (2) **[*127]** whether the company was solvent; (3) whether corporate formalities were observed; (4) whether the dominant shareholder siphoned company funds; and (5) whether, in general, the company simply functioned as a facade for the dominant shareholder." A decision to disregard the corporate entity generally results not from a single factor, but rather some combination of them, and "an overall element of injustice or unfairness must always be present, as well." Most importantly, because Delaware public policy does not lightly disregard the separate legal existence of corporations, a plaintiff must do more than

court "offer[ed] no opinion on whether Delaware law permits reverse piercing on facts such as these because assuming it does, [the Court] still would find the Complaint entirely deficient of allegations that would permit the Court to pierce ARC's corporate veil under Delaware's traditional theory of veil piercing." *2010 Del. Ch. LEXIS 254, [WL] at *12 n.90*.

### Cancan Dev., LLC v. Manno, 2015 Del. Ch. LEXIS 144, 2015 WL 3400789 (Del. Ch. Mar. 30, 2015), aff'd 132 A.3d 750 (Del. 2016)

In *Cancan Dev., LLC v. Manno*, Sandra Manno ("Manno"), sought to build and develop a casino in D'Iberville, Mississippi (the "Project"). Two individuals (the "Investors") invested in the Project by way of their $2 million investment in CanCan Development, LLC ("CanCan"), an entity formed by Manno for the Project. The Investors and Manno had a falling out and the Investors assumed control over CanCan and the Project. Thereafter they uncovered **[*128]** evidence that Manno had used the Project to enrich herself, her family, and their friends through generous compensation, frequent cash withdrawals, and lavish living, as well as by using CanCan's resources to fund unrelated ventures. 2015 Del. Ch. LEXIS 144, 2015 WL 3400789, at *2. The Investors caused CanCan to sue Manno and Manno Enterprises LLC ("Manno Enterprises") for damages occasioned by, among other things, their alleged breach of contract and breach of fiduciary duty. After a trial, the court found that Manno breached her fiduciary duties to CanCan. *See* 2015 Del. Ch. LEXIS 144, [WL] at *16. In its post-trial briefing, CanCan sought to hold Manno Enterprises secondarily liable for Manno's breaches of fiduciary duty under theories of aiding and abetting and piercing the corporate veil. The court rejected the aiding and abetting claim because it was not introduced until the post-trial brief, and, as such, it was too late for CanCan to argue a new claim. 2015 Del. Ch. LEXIS 144, [WL] at *22. The court noted that the veil-piercing claim was actually a reverse veil-piercing claim and that "[d]espite seeking to hold Manno Enterprises liable for Manno's conduct, CanCan's arguments rely entirely on instances when courts have done the opposite and held an

_____

plead that one corporation is the alter ego of another in conclusory fashion in order for the Court to disregard their separate legal existence.

*MicroStrategy Inc. v. Acacia Research Corp., 2010 Del. Ch. LEXIS 254, 2010 WL 5550455, at *11* (footnotes omitted).

individual liable for the debts of an entity." [*129] *Id.* The court did not reject the claim but did not resolve it because the parties failed to put relevant evidence and legal analysis before the court. Apparently, the parties relied upon case law focused on conventional vertical piercing. The court found that "[r]everse pierce claims implicate different policies and require a different analytical framework from the more routine corporate creditor veil-piercing attempts," and that "[n]o one grappled with the different implications." *Id.* (internal quotation marks and citation omitted). However, in doing so, the court concluded that "[h]ad the claim been properly presented and supported, it might have prevailed. Under the circumstances, it fails for lack of support." *Id.*

### *Spring Real Estate, LLC v. Echo/RT Holdings, LLC,* 2016 Del. Ch. LEXIS 46, 2016 WL 769586 (Del. Ch. Feb. 18, 2016)

In *Spring Real Estate, LLC v. Echo/RT Holdings, LLC,* Spring Real Estate, LLC d/b/a Spring Capital Group ("Spring Capital") filed a complaint against Echo/RT Holdings, LLC ("Echo/RT") alleging that, in 2009, RayTrans Holdings, Inc. ("Holdings") and its subsidiary RayTrans Distribution Services, Inc. ("RayTrans Distribution") entered into an asset purchase agreement (the "APA") with Echo/RT for the sale of substantially all of RayTrans Distribution's assets to Echo/RT for [*130] $12,550,000 and the assumption of certain liabilities. 2016 Del. Ch. LEXIS 46, 2016 WL 769586, at *1. Spring Capital alleged successor liability and fraudulent transfer in connection with the APA. Holdings filed for chapter 7 bankruptcy, and the chapter 7 trustee, brought cross-claims against Echo/RT, Echo Global Logistics, Inc. ("Echo"), and RayTrans Distribution (together, the "Echo Defendants"), seeking an accounting, avoidance of certain transfers among the Echo Defendants, and injunctive relief. Certain of the Echo Defendants moved to dismiss the cross—claims. In opposing the motion, the Chapter 7 trustee argued, among other things, that he had standing to avoid an asset transfer from Holdings' subsidiary to one of the Echo Defendants. 2016 Del. Ch. LEXIS 46, [WL] at *2. The court rejected that contention, explaining that as a "general rule . . . a parent has no property interest in the assets of a subsidiary," because "a corporation's assets are owned by the corporation, which is considered by state law to be a legal entity distinct from its shareholders." 2016 Del. Ch. LEXIS 46, [WL] at *3 (footnote omitted). *HN29*[⬆] The court noted, however, that "where the subsidiary is a mere alter ego of the

parent to the extent that the Court may engage in 'reverse veil-piercing,' the Court may treat the [*131] assets of the subsidiary as those of the parent for purposes of a trustee's standing to void allegedly fraudulent transfers of such assets." *Id.* (citing *Searcy v. Knight (In re Am. Int'l Refinery), 402 B.R. 728, 742-46 (Bankr. W.D. La. 2008))*. The court found that the chapter 7 trustee failed to demonstrate any grounds for disregarding the separate corporate structures, and stated that "nowhere in the Cross—Claims or the Trustee's Answering Brief does the Trustee allege that RayTrans Distribution was an 'alter ego' of Holdings, or that the Court should for any other reason disregard the separate corporate structures. Thus, Holdings has no direct interest in the assets of RayTrans Distribution, and the Trustee has no standing to assert that the Defendants' transfer of assets pursuant to the APA was fraudulent."

None of the courts in the Delaware Veil Piercing Cases balked at applying the doctrine of reverse veil piercing, and the *Cancan Development, LLC* court indicated that it might have done so if the claim had been properly presented and supported. The courts in *Case Financial* and *MicroStrategy Inc.* did not go that far, but in declining to apply reverse veil piercing, both analyzed the facts of the cases and the merits of the claims. Finally, most recently, the *Spring* [*132] *Real Estate, LLC* court recognized the doctrine. Based on those cases, it appears to the Court that, under the appropriate circumstances, Delaware courts will recognize reverse veil piercing. That is what the Fourth Circuit found in *Sky Cable, LLC v. DIRECTV, Inc.*, 886 F.3d 375, 388 (4th Cir. 2018) (determining, after a review of Delaware case law, that a Delaware court would be likely to recognize a claim for outsider reverse veil piercing), and the bankruptcy court found in *In re Petters Grp. Worldwide, LLC, 561 B.R. 738* (determining, after a review of Delaware case law, that a Delaware court would be likely to recognize a claim for insider reverse veil piercing). *But see In re ALT Hotel, LLC*, 479 B.R. at 801 (determining, after a review of Delaware case law, that a Delaware court would not be likely to recognize a claim for outsider reverse veil piercing); *Gierum v. Glick (In re Glick), 568 B.R. 634, 658 (Bankr. N.D. Ill. 2017)* (same).

The Court next considers whether the Trust has demonstrated that there are plausible grounds for invoking reverse veil piercing in this case. *HN30*[⬆] "Delaware law permits a court to pierce the corporate veil 'where there is fraud or where [the corporation] is in fact a mere instrumentality or alter ego of its owner.'"

2020 Bankr. LEXIS 2128, *132

*NetJets Aviation, Inc. v. LHC Commc'ns LLC, 537 F.3d 168, 176 (2d Cir. 2008)* ("*NetJets*") (quoting *Geyer v. Ingersoll Publ'ns Co., 621 A.2d 784, 793 (Del. Ch. 1992)*); *accord Fletcher v. Atex, Inc., 68 F.3d 1451, 1457 (2d Cir. 1995)* (same). To prevail under the alter-ego theory of piercing the veil in Delaware, "a plaintiff need not prove that there was actual **[*133]** fraud but must show a mingling of the operations of the entity and its owner plus an 'overall element of injustice or unfairness.'" *NetJets, 537 F.3d at 176* (quoting *Harco Nat'l Ins. Co. v. Green Farms, No. 1131, 1989 Del. Ch. LEXIS 114, 1989 WL 110537, at *4 (Del. Ch. Sept. 19, 1989))*. That standard applies equally to claims for reverse veil piercing. *See In re Hecker, 414 B.R. 499, 505 (Bankr. D. Minn. 2009)* ("An insider seeking a reverse pierce is required to demonstrate 'that it was unfair and unjust not to pierce the corporate veil.'") (citations omitted).

In *NetJets*, the district court granted summary judgment dismissing the plaintiff's claims against defendant LHC Communications, LLC ("LHC"), for breach of contract and their claims against defendant Laurence S. Zimmerman ("Zimmerman"), as LHC's alter ego, for breach of contract and account stated. *537 F.3d at 172.* In so ruling, the district court found that the plaintiff had not adduced sufficient evidence to support its breach-of-contract and account-stated claims against Zimmerman as LHC's alter ego. On appeal, the Second Circuit vacated the judgment and remanded for further proceedings. *Id.* In doing so, the Circuit Court reviewed the standards applicable under Delaware law for piercing the corporate veil when the subject entity is a mere instrumentality or alter ego of its owner. After reviewing Delaware state and federal law, the **[*134]** Second Circuit noted that:

"[n]umerous factors come into play when discussing whether separate legal entities should be regarded as alter egos," [*Harper v. Del. Valley Broad., Inc., 743 F. Supp. at 1085*], and "[t]he legal test for determining when a corporate form should be ignored in equity cannot be reduced to a single formula that is neither over-nor under-inclusive," *Irwin & Leighton, Inc. v. W.M. Anderson Co., 532 A.2d 983, 989 (Del. Ch. 1987)*. Stated generally, the inquiry initially focuses on whether "those in control of a corporation" did not "treat[ ] the corporation as a distinct entity"; and, if they did not, the court then seeks "to evaluate the specific facts with a standard of 'fraud' or 'misuse' or some other general term of reproach in mind," *id.*, such as whether the corporation was used to engage in

conduct that was "inequitable," *Mobil Oil Corp. v. Linear Films, Inc., 718 F. Supp. 260, 269 (D. Del. 1989)* ("*Mobil Oil* ") (internal quotation marks omitted), or "prohibited," *David v. Mast, No. 1369-K, 1999 Del. Ch. LEXIS 34, 1999 WL 135244, at *2 (Del. Ch. Mar. 2, 1999)*, or an "unfair trade practice," *id.*, or "illegal," *Martin v. D.B. Martin Co., 10 Del.Ch. 211, 219, 88 A. 612, 615 (1913)*.

*537 F.3d at 177.* The Court further observed that:

Simply phrased, the standard may be restated as: "whether [the two entities] operated as a single economic entity such that it would be inequitable for th[e] Court to uphold a legal distinction between them." *Mabon, Nugent & Co. [v. Texas American Energy Corp., No. CIV.A. 8578, 1990 Del. Ch. LEXIS 46, 1990 WL 44267, at *5 (Del.Ch. Apr.12, 1990)]*.

*Id.* (quoting *Harper v. Del. Valley Broad., Inc., 743 F. Supp. at 1085*). **[*135]** The Court equated that standard to the Second Circuit's "two-pronged test focusing on (1) whether the entities in question operated as a single economic entity, and (2) whether there was an overall element of injustice or unfairness." *Id.* (citing *Fletcher v. Atex, Inc., 68 F.3d at 1457*).

The law is clear that "the requisite injustice or unfairness referred to in *Fletcher* is also not simple in nature but rather something that is similar in nature to fraud or a sham." *In re Foxmeyer Corp., 290 B.R. 229, 236 (Bankr. D. Del. 2003)*; *see also E.I. du Pont de Nemours & Co. v. Agfa-Gavaert NV*, 335 F. Supp. 3d 657, 675 (D. Del. 2018) ("To state a veil-piercing claim under Delaware law, a plaintiff must 'plead facts supporting an inference that the corporation through its alter ego, has created a sham entity designed to defraud investors or creditors.'" (quoting *Robinson Mech. Contractors Inc. v. PTC Grp. Holdings Corp.*, No. 15-77, 2017 WL 2377509, at *5 (E.D. Mo. June 1, 2017)); *Blair v. Infineon Techs. AG, 720 F. Supp. 2d 462, 470 (D. Del. 2010)* ("This court has required an element of fraudulent intent in its alter ego test, as well as the traditional requirement that the corporation and its subsidiaries operated as a single economic entity[.]") (footnotes omitted); *Case Fin. v. Alden, 2009 Del. Ch. LEXIS 153, 2009 WL 2581873, at *4* ("Demonstrating that one company is an alter ego of another, however, is not that easy. . . . There must also be an element of fraud to justify piercing the corporate veil."). Furthermore, "[t]he law requires that fraud or injustice be found in the defendants' use of the corporate form." *Mobil Oil Corp. v. Linear Films, Inc.,*

718 F. Supp. 260, 269 (D. Del. 1989). *See also* [*136] *Wallace ex rel, Cencom Cable Income Partners II, Inc., L.P. v. Wood, 752 A.2d 1175, 1184 (Del. Ch. 1999)* ("Piercing the corporate veil under the alter ego theory 'requires that the corporate structure cause fraud or similar injustice. Effectively, the corporation must be a sham and exist for no other purpose than as a vehicle for fraud.'" (quoting *Outokumpu Eng'g Enters. v. Kvaerner Enviropower, 685 A.2d 724, 729 (Del. Super. 1996)))*; *Official Comm. of Unsecured Creditors v. Bay Harbour Mkt. Ltd. (In re BH S & B Holdings LLC), 420 B.R. 112, 140 (Bankr. S.D.N.Y. 2009)* ("The plaintiff must plead facts showing that the corporation is a sham and exists for no other purpose than as a vehicle for fraud."), *aff'd as modified*, *807 F. Supp. 2d 199 (S.D.N.Y. 2011)*. In other words, "[t]he underlying cause of action does not supply the necessary fraud or injustice. To hold otherwise would render the fraud or injustice element meaningless and would sanction bootstrapping." *Mobil Oil v. Linear Films, Inc., 718 F. Supp. at 268*.

*HN31*[⬆] In effect, although "[r]everse pierce claims implicate different policies and require a different analytical framework from the more routine corporate creditor veil-piercing attempts," this basic finding of injustice or unfairness is still required. *Sky Cable LLC v. Coley*, No. 5:11cv00048, 2016 U.S. Dist. LEXIS 93537, 2016 WL 3926492, at *14 (W.D. Va. July 18, 2016), *aff'd in part, appeal dismissed in part sub nom, Sky Cable, LLC v. DIRECTV, Inc.*, 886 F.3d 375, 391 (4th Cir. 2018); *See also* *Searcy v. Knight (In re Am. Int'l Refinery), 402 B.R. 728, 751 (Bankr. W.D. La. 2008)* (analyzing reverse piercing claim under Delaware state law standard for traditional veil piercing, which required a finding of fraud or injustice).

The Amended Complaint does not allege that the Debtors are sham corporations that exist [*137] for no other purpose than as a vehicle for fraud. Therefore, assuming, arguendo, that Delaware law would recognize reverse veil piercing, the Trust has not alleged facts that would provide grounds for permitting the Trust to resort to that remedy. Moreover, it does not appear that it can allege such facts. The lenders, holding well over 99% of the total enterprise-wide debt, were expressly aware of the Debtors' corporate structure and required the Debtors to maintain this corporate structure. *See* Amd. Compl. ¶ 196. Furthermore, the Debtors were formed and organized into a REIT/mezzanine structure by parties other than the Defendants long before the LBO Transaction. *Id.* ¶¶ 106, 108, 126. The Trust argues that the Defendants

disregarded the corporate form, violated loan agreements and paid illegal dividends. *See* Opp'n at 65-66, 111. However, those are not allegations that the Defendants used the corporate form to perpetuate fraud or injustice. The Trust has not, and does not appear to be able to allege facts demonstrating grounds for it to assert a forward or reverse veil piercing theory in support of its standing under the Amended Complaint.

Substantive Consolidation

The Court now considers [*138] whether the Trust has alleged facts in the Amended Complaint, which, if true, demonstrate that there are grounds for aggregating the Debtors' estates under principles of substantive consolidation. *HN32*[⬆] "The concept of substantively consolidating separate estates begins with a commonsense deduction. Corporate disregard as a fault may lead to corporate disregard as a remedy." *In re Owens Corning, 419 F.3d 195, 206 (3d Cir. 2005)* (footnote omitted). Substantive consolidation is an equitable doctrine that "permits a Court in a bankruptcy case involving one or more related corporate entities, in appropriate circumstances, to disregard the separate identity of corporate entities, and to consolidate and pool their assets and liabilities and treat them as though held and incurred by one entity." *In re Drexel Lambert Grp., Inc., 138 B.R. 723, 764 (Bankr. S.D.N.Y. 1992)* (citations omitted). "The result is that claims of creditors against separate debtors morph to claims against the consolidated survivor." *In re Genesis Health Ventures, 402 F.3d 416, 423 (3d Cir. 2005)*. *See also* *In re WorldCom, Inc., No. 02-13533, 2003 Bankr. LEXIS 1401, 2003 WL 23861928, at *35 (Bankr. S.D.N.Y. Oct. 31, 2003)* ("Substantive consolidation has the effect of consolidating assets and liabilities of multiple debtors and treating them as if the liabilities were owed by, and the assets held by, a single legal entity.") (citations omitted). "Substantive consolidation stems from a bankruptcy court's equitable powers and is [*139] a remedy unique to bankruptcy, and indeed, does not exist outside of it." *Rodriguez v. Boyd (In re Boyd), No. 11-51797, 2012 Bankr. LEXIS 4969, 2012 WL 5199146, at *3 (W.D. Tex. Oct. 22, 2012)* (citations omitted). *See also* *In re Petters Co., Inc., 506 B.R. 784, 793 (Bankr. D. Minn. 2013)* ("The remedy [of substantive consolidation] had its antecedents in other principles of general equity jurisprudence—piercing of the corporate veil, 'alter ego' liability, and the like . . . . [S]ubstantive consolidation is uniquely a matter of bankruptcy law and its application is limited to bankruptcy cases.") (citation and footnote omitted).

HN33[⬆] Courts consider the following factors in determining whether to approve substantive consolidation:

• The presence or absence of consolidated financial statements;

• The unity of interest and ownership among various corporate entities;

• The degree of difficulty in segregating and ascertaining individual assets and liabilities;

• The transfers of assets without formal observance of corporate formalities;

• The commingling of assets and business functions;

• The profitability of consolidation at a single physical location; and

• The disregard of legal formalities.

*In re Worldcom, Inc., 2003 Bankr. LEXIS 1401, 2003 WL 23861928, at *35* (citing *Soveriero v. Franklin Nat'l Bank, 328 F.2d 446, 447-48 (2d Cir. 1964)*). In *In re Augie/Restivo Baking Co., Ltd.* ("*Augie/Restivo*"), the Second Circuit found that those "considerations" were "merely variants on two critical factors: (i) whether creditors [*140] dealt with the entities as a single economic unit and 'did not rely on their separate identity in extending credit,' . . . or (ii) whether the affairs of the debtors are so entangled that consolidation will benefit all creditors[.]" *860 F.2d 515, 518 (2d Cir. 1988)* (citations omitted). The satisfaction of either prong will support a request for substantive consolidation. *See Official Comm. of Unsecured Creditors v. Am. Tower Corp. (In re Verestar, Inc.), 343 B.R. 444, 463 (Bankr. S.D.N.Y. 2006)* ("The Second Circuit set forth these tests in the disjunctive and the presence of either may justify an order of substantive consolidation."); *see also In re 599 Consumer Elecs., Inc., 195 B.R. 244, 248 (S.D.N.Y. 1996)* ("Conceivably, substantive consolidation could be warranted on either ground; the Second Circuit's use of the conjunction 'or' suggests that the two cited factors are alternatively sufficient criteria.").

HN34[⬆] The first prong of the *Augie/Restivo* test embodies the Court's recognition that lenders "structure their loans according to their expectations regarding th[e] borrower and do not anticipate either having the assets of a more sound company available in the case of insolvency or having the creditors of a less sound debtor compete for the borrower's assets." *Augie/Restivo, 860 F.2d at 518-19*. Accordingly, in practice, that prong is "applied from the creditors' perspective" and the inquiry "is whether creditors treated the debtors [*141] as a single entity, not whether the managers of the debtors themselves, or

consumers, viewed the [debtors] as one enterprise." *In re 599 Consumer Elecs., Inc., 195 B.R. at 249*; *see also In re Leslie Fay Cos., Inc., 207 B.R. 764, 780 (Bankr. S.D.N.Y. 1997)* (finding that the first prong was satisfied where "the record is clear that creditors dealt with the Leslie Fay companies as a consolidated unit and did not rely on any subsidiaries' separate identity in extending credit.").

HN35[⬆] The second prong focuses on whether the proponent of substantive consolidation demonstrates "either an operational or a financial entanglement of business affairs." *In re Republic Airways Holdings Inc., 565 B.R. 710, 717 (Bankr. S.D.N.Y. 2017)* (citation omitted). In applying that prong, "[t]he question is not whether some affairs were not entangled, but rather whether the commingling in this case was so pervasive that 'the time and expense necessary even to attempt to unscramble' the debtors' books would be 'so substantial as to threaten the realization of any net assets for all the creditors ... or where no accurate identification and allocation of assets is possible.'" *In re Source Enters., Inc., 392 B.R. 541, 553 (S.D.N.Y. 2008)* (quoting *Augie/Restivo, 860 F.2d at 519*). The Second Circuit stressed that in applying the second prong of the test, "[r]esort to consolidation . . . should not be Pavlovian," but should be used "only after it has been determined that all creditors will benefit because [*142] untangling is either impossible or so costly as to consume the assets." *Augie/Restivo, 860 F.2d at 519*. The Circuit Court concluded that "[c]ommingling . . . can justify substantive consolidation only where 'the time and expense necessary even to attempt to unscramble them [is] so substantial as to threaten the realization of any net assets for all the creditors.'" *Id*. *See also Chem. Bank New York Tr. Co. v. Kheel, 369 F.2d 845, 847 (2d Cir. 1966)* ("*Kheel*") (noting that "in the rare case such as this, where the interrelationships of the group are hopelessly obscured and the time and expense necessary even to attempt to unscramble them so substantial as to threaten the realization of any net assets for all the creditors, equity is not helpless to reach a rough approximation of justice to some rather than deny any to all."); *In re Leslie Fay Cos., Inc., 207 B.R. at 780* (finding the second test under *Augie/Restivo* was established where the evidence showed that the "debtors' operations, cash, and decision-making were all shared such that it would be detrimental to the estates to attempt to disentangle those operations.").

HN36[⬆] The "sole purpose of substantive consolidation is to ensure the equitable treatment of all creditors." *Augie/Restivo, 860 F.2d at 518*. However,

since application of that doctrine may place creditors of one debtor on parity with creditors of **[\*143]** a less solvent debtor, "[t]he power to consolidate should be used sparingly because of the possibility of unfair treatment of creditors of a corporate debtor who have dealt solely with that debtor without knowledge of its interrelationship with others." *Kheel, 369 F.2d at 847.* The Trust bears the burden of proving the appropriateness of substantive consolidation. *See In re Jennifer Convertibles, Inc., 447 B.R. 713, 723 (Bankr. S.D.N.Y. 2011).* Accordingly, at this stage of the litigation, it must demonstrate that it has alleged facts which, if taken as true, demonstrate grounds for aggregating the Debtors' estates through substantive consolidation.

Before considering the adequacy of the pleadings, the Court addresses the Lightstone Defendants' contentions that the Trust cannot invoke the doctrine of substantive consolidation in support of its complaint because: (i) its assertion that the Debtors should be substantively consolidated amounts to a collateral attack on the Plan and Confirmation Order which decreed that the Debtors were consolidated "for Plan Purposes Only;" (ii) the Court's approval of the ESI Settlement and a January 3, 2013 stipulation and order of the Court (the "January 3 Stipulation")[67] precludes the substantive consolidation of the Debtors; (iii) post Plan confirmation, **[\*144]** cash receipts and disbursements have been accounted for separately at each of the seventy-five Debtors;[68] (iv) the Trust cannot employ substantive consolidation as a sword to deprive creditors of rights they otherwise possess against the Debtors; and (v) in pleadings filed in these cases, the Trust admitted the separateness among the Property Owners and the Mezzanine Borrowers. *See Lightstone MTD at 46-49.*

Alleged Admissions in the Pleadings

Turning first to the last issue, the Lightstone Defendants contend that prior to the filing of the Amended Complaint, the Trust had not sought to aggregate the

Debtors' estates through substantive consolidation or veil piercing in any prior complaint, and in fact, had asserted claims against the Mezzanine Lenders that were premised upon the separateness of the Debtors. *See Lightstone MTD at 48-49.* They say that the Trust sought to avoid and recover $300 million of interest payments made to the Mezzanine Borrowers as constructive and intentional fraudulent conveyances on the grounds that those payments were made from the assets of those Debtors that were not obligors on the Mezzanine Debt. *Id.* at 49. Specifically, they contend that the Trust had alleged:

> As a result of the Cash Management Agreement **[\*145]** requirements, the payments to the Mezzanine Lenders were made from cash contributed by entities who were not obligors under the Mezzanine Loans but who were nonetheless compelled by the effect of the collective transaction documents to actually pay those loans. ... The payments are fraudulent transfers ... because the entities that actually paid the money did not even owe the obligation.

*See Prior Amended Complaint ¶ 257.* The Lightstone Defendants construe that allegation as an admission by the Trust that those Debtors that conceivably could be alleged to have funded transfers to the Defendants (i.e., the Property Owners), are entities that have no unpaid creditors. They say that this judicial admission bars the Trust from invoking the principle of substantive consolidation to aggregate the Debtors' estates. *See Lightstone MTD at 48-49.* The Court disagrees. It is undisputed that in other complaints filed herein, the Trust pled an independent claim for veil-piercing based upon an alter ego theory that the Lightstone Defendants sought to dismiss in its earlier motion to dismiss. *See Lightstone First MTD at 70-72.*[69] The Trust contends that even if there was some inconsistency between seeking to pierce the corporate veil among the Debtors **[\*146]** and seeking to recover intra-corporate transfers used to pay debts of other Debtors — which they deny — the fact that Trust had sought to pierce the corporate veil and sought to recover intra-corporate transfers would at most constitute alternative pleading. *See Opp'n at 70.* The Court credits those assertions and does not read the Prior Amended Complaint to contain

---

[67] *See* Stipulation and Order Reconciling, Fixing and Allowing Class 4B Mezzanine Facilities Claims [Case No. 09-13764, Dkt. 1709].

[68] *See, e.g.*, Debtors' Fourth Post-Confirmation Status Report, filed on July 15, 2011 [Case No. 09-13764, Dkt. 1459]; Debtors' Post-Confirmation Quarterly Operating Report for the Period from 7/1/2011 to 9/30/2011, filed on October 17, 2011 [Case No. 09-13764, Dkt. 1516].

---

[69] *See* Lightstone Defendants' Motions and Memorandum of Law in Support of Their Motions to Dismiss the Complaints Pursuant to *Fed. R. Bankr. 7012(b)* and *Fed. R. Civ. P. 12(b)(1)* and *(b)(6)* [Dkt. 116] (the "Lightstone First MTD").

judicial admissions that bar the Trust from invoking the doctrines of substantive consolidation or veil piercing to aggregate the Debtors' estates.

Collateral Attack on the Plan and Confirmation Order

The Court next considers whether the Trust's attempt to aggregate the Debtors' estates through substantive consolidation is an impermissible "collateral attack" on the Plan and Confirmation Order. As relevant, the Plan provides that it "is premised upon the substantive consolidation of the Debtors solely for purposes of voting, confirmation and distribution." Plan § 6.1. The Plan addressed the impact of such limited consolidation on the aggregation of the Debtors' assets and liabilities, as follows:

> On and after the Effective Date (i) all assets and liabilities of the Debtors shall be treated for purposes of the Plan as though they **[\*147]** were merged, (ii) all guarantees of the Debtors of payment, performance or collection of obligations of any other of the Debtors shall be eliminated and cancelled, (iii) all joint obligations of two or more of the Debtors and all multiple Claims against such entities on account of such joint obligations, shall be considered a single Claim against the Debtors, (iv) all intercompany claims and obligations between one Debtor and any of the other Debtors, including as a result of the rejection of any executory contract or unexpired lease, shall be eliminated, extinguished and cancelled, except for such intercompany claims and obligations necessary to pursue Litigation Trust Assets, and (v) any Claim filed against any of the Debtors shall be deemed filed against the consolidated Debtors and shall be one Claim against and a single obligation of the consolidated Debtors.

*Id.* Thus, as a practical matter, among other things, the limited Plan consolidation ensured that creditors with claims against multiple Debtors could not get a double recovery under the Plan. For example, the Mortgage Lenders held a $4.1 billion claim against all the Property Owners. That provision ensures that they will recover **[\*148]** only once on their claim. The Plan also addressed the impact of the limited consolidation on the Debtors' post Effective Date operations, as follows:

> Except as otherwise provided in the Plan or the Restructuring Transactions (a) all property of each Debtor shall vest in each respective Reorganized Debtor, free and clear of all Claims, Liens,

encumbrances, charges or other interests and (b) each Debtor shall continue to exist after the Effective Date as a separate corporate entity, limited liability company, partnership or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other formation documents) in effect before the Effective Date. The provisions of the Intercreditor Agreement shall remain in full force and effect notwithstanding any substantive consolidation of the Debtors pursuant to the Plan.

*Id.* The Confirmation Order tracks the language of § 6.1 of the Plan.[70]

─────────────────────

[70] The Confirmation Order states, in relevant part:

> Substantive Consolidation for Plan Purposes Only. Entry **[\*149]** of this Order shall constitute the approval, pursuant to *section 105(a) of the Bankruptcy Code*, effective as of the Effective Date, of the substantive consolidation of the Debtors solely for the purpose of voting, confirmation and distribution as provided in section 6.1 of the Plan. On and after the Effective Date, (i) all assets and liabilities of the Debtors shall be treated for purposes of the Plan as though they were merged, (ii) all guarantees of the Debtors of payment, performance or collection of obligations of any other of the Debtors shall be eliminated and cancelled, (iii) all joint obligations of two or more of the Debtors and all multiple Claims against such entities on account of such joint obligations, shall be considered a single Claim against the Debtors, (iv) all intercompany claims and obligations between one Debtor and any of the other Debtors, including as a result of the rejection of any executory contract or unexpired lease, shall be eliminated, extinguished and cancelled, except for such intercompany claims and obligations necessary to pursue Litigation Trust Assets, and (v) any Claim filed against any of the Debtors shall be deemed filed against the consolidated Debtors and shall be one Claim against and **[\*150]** a single obligation of the consolidated Debtors. Except as otherwise provided in paragraph 72 of this Order, the Plan or the Restructuring Transactions, (a) all property of each Debtor shall vest in each respective Reorganized Debtor, free and clear of all Claims, Liens, Liabilities, encumbrances, charges and other interests and (b) each Debtor shall continue to exist after the Effective Date as a separate corporate entity, limited liability company, partnership or other form, as the case may be, with all the powers of a corporation, limited

The Lightstone Defendants assert that: (i) in confirming the Plan and entering the Confirmation Order, the Court determined that each of the Debtors was and would continue [*151] to exist after the Effective Date as "a separate corporate entity, limited liability company, partnership or other form, as the case may be," (ii) the confirmed plan "holds the status of a binding contract as between the debtor and its creditors," and (iii) any challenge to the separate corporate identity of the Debtors necessarily is a collateral attack on the Plan and Confirmation Order. *See* Lightstone MTD at 46-47. They also argue that, as a matter of fact, because substantive consolidation requires a showing that untangling entities is either impossible or so costly as to consume the entangled assets, it is impossible for the Debtors to be separate entities in July 2010 and beyond, by express order of this Court, if prior to that time they were also hopelessly entangled to the point where one could not even attempt to unscramble them and identifying their assets is impossible. *See id.* As support for their contentions, the Lightstone Defendants rely on *Adelphia Recovery Tr. v. Goldman, Sachs & Co.*, 748 F.3d 110 (2d Cir. 2014) ("*Adelphia*").

In that case, the Adelphia Recovery Trust (the "Adelphia Trust") established under the confirmed chapter 11 plan (the "Adelphia Plan") of Adelphia Communications Corp. ("ACC") and certain of its affiliates sued Goldman Sachs & Co. ("Goldman"), [*152] pursuant to *§§ 548(a)(1)(A)* and *550(a) of the Bankruptcy Code*, to avoid and recover $63 million in pre-petition margin payments made to Goldman for the benefit of "Highland," a non-debtor affiliate of ACC, on account of a loan by Goldman to Highland. The source of the payments was an account (the "Concentration Account") held in the name of Adelphia Cablevision LLC ("Adelphia Cablevision"), a debtor affiliate of ACC. 748 F.3d at 114. Under the Adelphia Plan, all debts of Adelphia Cablevision -- but not of ACC -- were paid in full. *Id.* at 113. Goldman sought summary judgment dismissing the complaint, arguing that the trust lacked standing to sue on behalf of Adelphia Cablevision -- the owner of the

---

liability company, partnership or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other formation documents) in effect before the Effective Date. The provisions of the Intercreditor Agreement shall remain in full force and effect notwithstanding any substantive consolidation of the Debtors pursuant to the Plan.

Confirmation Order ¶ 14.

Concentration Account -- because Adelphia Cablevision had no unpaid creditors. *Id.* at 114. In opposing the motion, the Adelphia Trust argued that ACC comingled its funds in the Concentration Account and that ACC was the real owner of and payor under the account. As it was undisputed that ACC had creditors, the Adelphia Trust argued that it had standing to sue Goldman. *Id.* The district court rejected those contentions. It found that Adelphia Cablevision was the source of the payments to Highland and that Adelphia Cablevision had no unpaid creditors. For that reason, it granted [*153] summary judgment dismissing the complaint on the grounds that the Adelphia Trust lacked standing to sue Goldman. *Id.*

On appeal, the Adelphia Trust argued that the court should attribute ownership of the funds aggregated in the Concentration Account to ACC because ACC exercised complete domination and control over the funds and had all the legally cognizable indicia of ownership of the account. *Id.* at 115. Thus, the issue before the Second Circuit was "[w]hether the margin loan payments to Goldman were transfers of the property of ACC, or should be deemed to be so[.]" *Id.* However, the circuit did not reach that issue because it found that the Trust was barred by judicial estoppel from raising it. *HN37*[⬆] In applying the doctrine, the Second Circuit observed that "the exact criteria for invoking judicial estoppel will vary based on 'specific factual contexts,' and that 'courts have uniformly recognized that its purpose is to protect the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment.'" *Id.* at 116 (quoting *New Hampshire v. Maine, 532 U.S. 742, 749-51, 121 S. Ct. 1808, 149 L. Ed. 2d 968 (2001))*. It noted that the "circumstances under which judicial estoppel may appropriately be invoked are probably not reducible [*154] to any general formulation of principle," but found that three factors "typically inform the decision whether to apply the doctrine in a particular case." *Id.* (internal quotation marks and citation omitted). *HN38*[⬆] The Court identified those factors as:

• First, whether a party's later position is clearly inconsistent with its earlier position.

• Second, whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled.

• Third, whether the party seeking to assert an inconsistent position would derive an unfair

advantage or impose an unfair detriment on the opposing party if not estopped.

*Id.* In considering those factors, the Second Circuit noted that "whether a party's position with regard to the ownership of assets is inconsistent with its later claims is largely informed by the bankruptcy court's treatment of those claims." *Id.* (citation omitted). It found that the debtors' asset schedules played a key role in both the bankruptcy court's supervision of the Adelphia debtors' chapter 11 cases and in the parties' [*155] development and understanding of the Adelphia Plan. It noted that at no time during the four and a half years that the cases were pending did ACC or any party attribute ownership of the Concentration Account assets to ACC, and that, to the contrary, at the time of bankruptcy filing and again in February 2004, ACC Operations, Inc., another ACC subsidiary, identified the Concentration Account as its property in its schedules and ACC did not. Moreover, it found that in January and May of 2005, the amended schedules of liabilities listed Adelphia Cablevision as the owner of the Concentration Account. *See id.* at 118. The record was clear to the circuit that one of the foremost difficulties that the bankruptcy court encountered in overseeing the chapter 11 cases was accounting for the assets and liabilities of the debtors, including the intercompany transfers between the various entities controlled by the Rigas family. To address that issue, during the cases, the Adelphia entities underwent a massive restatement of their accounting records. *Id.* at 119. In doing so, and in order to track the intercompany transfers, Adelphia adopted the so-called "Bank of Adelphia Paradigm," which tracked intercompany transfers [*156] through Adelphia Cablevision, as the single subsidiary that controlled the main account. *Id.* The Second Circuit found that the Bank of Adelphia Paradigm, which included Adelphia Cablevision's ownership of the Concentration Account in the asset schedules, was the cornerstone of the bankruptcy plan, and without it the entire process would have been at risk of unraveling. *Id.* In that light, the Second Circuit held that ACC was judicially estopped from asserting ownership of the Concentration Account. In part, the circuit stated:

> The asset schedules showing that the Concentration Account were held by a subsidiary of ACC were approved by appellant's predecessors in interest. The bankruptcy court adopted the asset schedules and approved a plan of reorganization that treated ACC separately from its subsidiaries based on those schedules. Revisiting the accuracy of those schedules to permit the present action to proceed would clearly threaten the integrity of

bankruptcy proceedings. We, therefore, hold that appellant's complaint is barred by the doctrine of judicial estoppel. The judgment of the district court is affirmed.

*Id.* at 120.

The Lightstone Defendants contend that like the *Adelphia* debtors, each [*157] Debtor here filed its own schedules and statement of affairs, and, as in *Adelphia*, during the case, no party contested any Debtor's separateness, sought consolidation, litigated over any Debtor's respective ownership of assets (including the Cash Management Account), or sought to assert claims against non-obligors under principles of veil piercing, alter-ego, agency or otherwise. They argue that provision in the Plan and Confirmation Order for limited consolidation under the Plan precludes the Trust from seeking to aggregate the Debtors' estates through substantive consolidation. The Court finds no merit to those assertions. First, although the Debtors filed individual Schedules and Statements of Financial Affairs, those schedules and statements did not necessarily demonstrate that each of the Debtors was managed and operated as a separate entity. For example, the Debtors' Statements of Financial Affairs reflected no payments to creditors within 90 days preceding the Petition Date, other than payments to HVM. The only unsecured creditors contained in the schedules are litigation claimants and/or HVM. *See, e.g.*, Schedules & SOFA [Case No. 09-13764, Dkts. 329-350]. The schedules also [*158] show that the Debtor entities did not have their own cash/bank accounts. Lastly, all of the statements included a disclaimer to the effect that the schedules and statement of financial affairs could not be prepared based upon the records of any Debtor, but rather, all of the information needed to prepare the Schedules and Statements were supplied by HVM and the corporate records of the Lightstone Group.[71] Moreover, *Adelphia*

_____

[71] Each of the Debtors' SOFA contained the same disclaimer, which reads, in relevant part:

> HVM has historically been the entity that has been responsible for the payments to employees, utilities companies and other third party vendors that provide services to the Extended Stay hotels. However, certain contracts may also list one of the [*159] Debtor entities as a party, and as a result, it may not be immediately clear whether that certain Debtor entities or HVM is liable for certain of the obligations listed on the Schedules and SOFAs . . . . [T]he financial affairs and business of the Debtors and HVM are complex and intertwined, and

is distinguishable because during the chapter 11 cases the Debtors did nothing to confirm the separateness of their estates. Further, because *Adelphia* involved a massive accounting fraud perpetrated by the Rigas principals, the "cornerstone" of the Adelphia Plan, upon which all parties relied in formulating the plan, was the proper identification and ownership of the Concentration Account. There is no similar reliance here. *Adelphia* is distinguishable. It does not support the position advanced by the Lightstone Defendants.

The Trust is correct that the Confirmation Order addresses prospective, post-confirmation issues. There is nothing in the record demonstrating that in entering that order, the Court considered pre-petition substantive consolidation issues. Thus, it has no bearing on the application of substantive consolidation in these cases. *See In re Coleman, 417 B.R. 712, 717 (Bankr. S.D. Miss. 2009)* (ruling that confirmation order applied prospectively only and did not apply retroactively to prepetition conduct that was not addressed at confirmation). Further, the Trust also correctly notes that the Plan and Confirmation Order specifically reserved for later litigation, issues and claims identified in the Examiner's Report. *See* Opp'n at 68 n.16; *see also* Plan § 1.89 (defining "Litigation Trust Assets" as including "any other potential claims, causes of action, charges, suits or rights of **[*160]** recovery referenced in the Examiner's Report[.]"). In turn, the Examiner's Report identifies claims and remedies that may be available to the Trust to assert for the benefit of the Debtors' creditors. One such remedy includes the substantive consolidation of all of the Debtors' estates. *See* Examiner's Report at 246-261. Those claims and remedies became assets available to the Litigation Trust to be pursued for the benefit of the estates' creditors. The Trust is not barred from doing so by the res judicata effect of the Plan and/or Confirmation Order. *See Eastern Air Lines, Inc. v. Brown & Williamson Tobacco Corp. (In re Ionosphere Clubs, Inc.), 262 B.R. 604, 612 (Bankr. S.D.N.Y. 2001)* ("Res judicata does not apply when a cause of action has been expressly reserved for later adjudication.") (citation omitted); *Baeshen v. Arcapita Bank B.S.C.(c) (In re Arcapita Bank B.S.C.(c)), 520 B.R. 15, 21 (Bankr. S.D.N.Y. 2014)* (same).

Thus, the Court concludes that for purposes of these

---

certain payments may have been made by one entity on behalf of another.

*See, e.g.*, Case No. 09-13764, Dkt. 329 (ESA FL Properties L.L.C. SOFA).

Motions, the Lightstone Defendants have not demonstrated that the Plan and Confirmation Order have the preclusive effect that the Lightstone Defendants advance.[72]

<u>The ESI Settlement Agreement and January 3 Stipulation</u>

As previously discussed, the ESI Settlement was reached in connection with the Debtors' formulation of the Plan and in light of the Sponsors' decision not to acquire **[*161]** ESI. In approving the ESI Settlement, the Court:

> ORDERED that the ESI Settlement represents a fair, prudent and reasonable compromise of the controversies resolved therein and is in the best interests of the Debtors' estates and ESI's estate, and their respective creditors[.]

*See* ESI *Rule 9019* Order. The Lightstone Defendants assert that by this settlement, the Court expressly recognized the separateness of ESI, its estate, and its "respective creditors" from those of the other Debtors. However, the record is devoid of any evidence that in approving the ESI Settlement, this Court intended to foreclose any assertion that the Debtors' estates could be aggregated under principles of substantive consolidation. Instead, the settlement merely addressed the prospective disposition of ESI's assets and claims post-Plan-confirmation, funding for its wind-down, and

---

[72] Insofar as the Trust asserts that the Plan and Confirmation Order somehow established that the Debtors' estates should be, or have been, substantively consolidated because the Confirmation Order calls for all claims against the Debtors to be treated as claims against every single Debtor, the Court finds no merit to that assertion. There is nothing in the record to support the notion that in approving the limited substantive consolidation under the Plan, the bankruptcy court substantively consolidated the estates for all purposes. *See Stillwater Liquidating LLC v. Net Five at Palm Pointe LLC (In re Stillwater Asset Backed Offshore Fund Ltd.), 559 B.R. 563, 587 (Bankr. S.D.N.Y. 2016)* (rejecting the argument that the debtors' estates had been substantively consolidated by the plan and confirmation order, and explaining that "[t]he notion that Judge Gropper ordered a silent 'substantive consolidation' of all of the Stillwater Funds—without addressing the unusual character of the requested relief, without making any of the factual findings that such unusual relief would require, without soliciting votes by the affected creditors of the Funds, without consolidating the creditor pools, and without even discussing the relevant legal standards and questions—is preposterous.").

its intercompany issues with the other Debtors.

The January 3 Stipulation resolved objections to the claims filed by the Class 4B Mezzanine Facilities Claims (the "Class 4B Claimants") against various Debtors. In that stipulation, the parties agreed to fix and allow the Class 4B Claims against Debtor Homestead in the amounts and priority set forth **[*162]** in the schedule annexed thereto. The Court understands the Lightstone Defendants to argue that those claims resolutions undermine the Trust's contentions in support of aggregating the Debtors' estates because those resolutions recognized that Homestead is a separate Debtor entity from ESI and the other Debtors. However, like the ESI Settlement, the January 3 Stipulation neither mentions substantive consolidation nor purports to resolve any issues relevant to substantive consolidation. Moreover, that claims may be resolved and allowed as against one Debtor entity is not dispositive of whether substantive consolidation of the Debtors is appropriate.

Post Confirmation Accounting Reports

The Lightstone Defendants say that post-confirmation, the parties have continued to recognize the Debtors' separateness. They point to the fact that post-confirmation, the Debtors have accounted for cash receipts and disbursements separately at each of the seventy-five Debtors as additional grounds for barring aggregation of the estates. *See* Lightstone MTD at 48. But that fact, without more, is of little significance to the Trust's argument for substantive consolidation because it does not speak to the Debtors' separateness **[*163]** (or lack thereof) during the period following the LBO Transaction and before the chapter 11 cases. In sum, none of these filings serve to preclude the Trust from invoking principles of substantive consolidation in support of its contention that the Debtors' estates should be aggregated in assessing its standing under the Amended Complaint.

Alleged Improper Application of Substantive Consolidation

The Arbor Defendants argue that the Trust's "proposed use of substantive consolidation as a sword against [nondebtors] is improper and impermissible." Arbor Reply at 6. As support, they cite to *In re Geneva ANHX IV LLC, 496 B.R. 888 (Bankr. C.D. Ill. 2013)* ("*Geneva*"), and *In re Owens Corning, 419 F.3d 195 (3d Cir. 2005)*

("*Owens Corning*"). Neither case is relevant to the matters before the Court. In both cases, the debtors sought to employ substantive consolidation in furtherance of the confirmation of their respective plans of reorganization, and to the detriment of a targeted group of creditors.[73] That is plainly not the situation

---

[73] In *Geneva*, the debtors consisted of 13 special purpose limited liability companies ("LLCs") that, together with 20 LLCs not in bankruptcy, owned 100% of the fractional interests in a senior citizens residential facility (the "Property") as tenants in common ("TIC"). *496 B.R. at 893*. The Property was encumbered by a mortgage held by Anchorbank, FSB ("Anchorbank"). The mortgage was to secure repayment of a loan to Geneva Exchange Fund XV, LLC ("GEF"). When the mortgage matured, GEF failed to satisfy it, and Anchorbank commenced a foreclosure action, naming all 33 TIC owners as defendants. The state court entered a judgment of foreclosure and ordered the Property to be sold at foreclosure. However, the debtors filed their bankruptcy cases before Anchorbank could sell the Property. *See id. at 893*. The matter before the court was Anchorbank's motion for relief from the automatic stay to proceed with the foreclosure sale, or alternatively, to dismiss the case. Anchorbank argued, among other things, that the Property was not necessary to an effective reorganization. It contended that the debtors collectively owned a 29.22 % interest in the Property and as minority interest holders, they did not have the right, power or authority, either by contract, state law, or bankruptcy law, to successfully restructure the debt and reorganize. *See id. at 894*. The debtors countered that they could successfully reorganize, by bringing the "entire joint venture" (including non-debtor TIC owners) before the court under their proposed plan of reorganization. *See id. at 896*. They proposed a three-step process. First, they would substantively consolidate the estates of the debtors with the TIC ownership interests of the non-debtor TIC owners. Second, they would convert the united interest to a limited liability company. Third, they would make a capital call for each TIC owner to contribute new value that would be applied towards satisfying the Anchorbank claim. Under the plan, any TIC owner who did not meet the capital call would be deemed to relinquish its interest in the limited liability company. *See id. at 900*. Anchorbank objected, contending that such a proposed plan was not feasible because it employed substantive consolidation as a sword against the non-debtor TIC owners. The bankruptcy court agreed and rejected the debtors' proposed plan, finding that "the proposed use of substantive consolidation as a sword against the non-debtor TIC owners is improper and impermissible." *Id. at 901*. The court reasoned that "the rights of the non-debtor TIC owners are defined by their status as holders of a tenancy-in-common estate. Substantive consolidation cannot be used to deprive them of those rights." *Id.*

before the Court.

The Defendants also maintain that the Trust cannot aggregate the estates through substantive consolidation to assert that the prepetition transfers of one of the Debtors were fraudulent transfers as to **[*164]** the creditors of another. That is, they say that substantive

---

In *Owens Corning*, Owens Corning ("OCD") and seventeen of its subsidiaries (the "OCD Debtors") were chapter 11 debtors. Prepetition, OCD obtained a $2 billion loan (the "1997 Credit Agreement") from certain lenders (the "Banks"), which loan was cross-guaranteed by certain of OCD's domestic subsidiaries. *419 F.3d at 201-02*. The Banks negotiated the 1997 Credit Agreement expressly to limit ways in which OCD could deal with its subsidiaries. For example, under the loan, the subsidiaries explicitly agreed to maintain themselves as separate entities. *Id. at 201*. The OCD Debtors, with the support of various creditor groups, filed a reorganization plan (the "OCD Plan") predicated on the "deemed" consolidation of the OCD Debtors along with three non-OCD Debtor subsidiaries for purposes of valuing and satisfying claims, voting on the Plan, and making distributions on claims. *Id. at 202*. The OCD Plan provided that the "deemed" consolidation would not result in the merger of or the transfer or commingling of any assets of the OCD Debtors or non-OCD Debtor subsidiaries. *See id.* Nonetheless, the OCD Plan provided that any claim against an OCD Debtor and any guarantee of such claim, would be deemed to be one obligation of the OCD Debtors with respect to the deemed consolidated estate. Thus, the OCD Plan eliminated the separate obligations of OCD's domestic subsidiaries arising from the guarantees of the 1997 Credit Agreement. *Id.* The Banks objected to the proposed consolidation. The district court granted the consolidation motion. *Id.* In doing so, it found that the OCD Debtors had established grounds for the substantive consolidation of the estates because, among other things: (i) there existed substantial identity between OCD and its wholly-owned subsidiaries; (ii) in extending credit, the Banks had not relied upon the separate credit the subsidiary guarantors; (iii) substantive consolidation would simplify and expedite the successful completion of the bankruptcy; and (iv) it would be exceedingly difficult to untangle the financial affairs of the various entities. *See id. at 202-03*. On appeal, the Third Circuit reversed, finding that the evidence did not support the deemed substantive consolidation of the estates. The circuit also noted that "substantive consolidation should be used defensively to remedy identifiable harms, not offensively to achieve advantage over one group in a plan negotiation process[.]" *Id. at 215*. It found that the plan proponents sought to "remake substantive consolidation not as a remedy, but rather a stratagem to 'deem' separate resources reallocated to OCD to strip the Banks of rights under the Bankruptcy Code, favor other creditors, and yet trump possible plan objections by the Banks." *Id. at 216*.

consolidation cannot confer standing to avoid alleged fraudulent transfers. *See* Supplemental MTD at 3-4. As support, they cite *Kelley v. Opportunity Fin., LLC (In re Petters Co.)*, 550 B.R. 438, 450 (Bankr. D. Minn. 2016) ("*Petters*"), and *In re Bauman, 535 B.R. 289 (Bankr. C.D. Ill. 2015)* ("*Bauman*"). Both cases are distinguishable because the trustee in each case appeared able to identify the transferor debtor and creditors without difficulty, and no allegation was made that the corporate structures were so intertwined that it was impossible to match transfers with parties. Moreover, and in any event, the Defendants overstate the significance of the holdings of those cases. In *Petters*, the court was interpreting the scope of the substantive consolidation order that it issued in the case. In doing so, it rejected the trustee's broad application of that order.[74] In *Bauman*, the bankruptcy

---

[74] In *Petters*, Thomas J. Petters ("Petters") was the principal of Petters Company, Inc. ("PCI") and a number of related entities. In October 2008, in the wake of the discovery that Petters had committed a massive business fraud, PCI and affiliates including PC Funding LLC ("PC Funding") and SPF Funding LLC ("SPF Funding") (collectively, the "Petters Debtors") filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. 550 B.R. at 441. The chapter 11 trustee appointed in those cases commenced avoidance actions against a host of parties, including Opportunity Finance LLC, and others (collectively, the "Opportunity Finance Defendants"). *See id.* In part, he sued the Opportunity Finance Defendants to avoid and recover alleged actual and constructive fraudulent transfers under Minnesota law pursuant to the Minnesota version of the *Uniform Fraudulent Transfer Act* as made applicable pursuant to *§ 544(b) of the Bankruptcy Code*, for the benefit of the estates of PC Funding and SPF Funding. *Id.* at 443.

While that action was pending, over the objection of the Opportunity Finance Defendants and others, the trustee obtained an order of the bankruptcy court (the "Substantive Consolidation Order") substantively consolidating the estates of most of the Petters Debtors (including PC Funding and SPF Funding ). *See In re Petters Co., Inc., 506 B.R. 784 (Bankr. D. Minn. 2013)*. Before the chapter 11 trustee obtained the Substantive Consolidation Order, the Opportunity Finance Defendants had moved to dismiss the Minnesota state law claims asserted by the trustee against them and on behalf of PC Funding and SPF Funding on the grounds that those Debtor entities had no statutorily qualified creditors when they commenced their chapter 11 cases. 550 B.R. at 442. After the bankruptcy court entered the Substantive Consolidation Order, the chapter 11 trustee amended his complaint against the Opportunity Finance Defendants. In doing so, he contended that he had standing to assert claims against them on behalf of the PC Funding and SPF Funding estates because, as

alleged in the amended complaint, at all times material to the matters raised in the complaint, there was at least one or more creditors who held an allowed unsecured claim against the consolidated estates of the Debtors. *Id.* at 445.

Although the amended complaint identified multiple creditors towards satisfying the predicate-creditors requirement, it did not identify any creditors for PC Funding and SPF Funding. *Id.* Still, the trustee contended that he stated a claim for relief against the Opportunity Finance Defendants under Minnesota law, on account of transfers made to them by PC Funding and SPF Funding. In essence, the trustee asserted that by application of the Substantive Consolidation Order, to satisfy the predicate-creditors requirement for the transfers by PC Funding and SPF Funding, he could use creditors of the Debtor-entities whose estates were substantively consolidated with PC Funding and SPF Funding. *Id.* The Opportunity Finance Defendants' motion to dismiss raised several issues. At the trustee's request, the sole issue before the court was whether the Substantive Consolidation Order could be read to permit the trustee to use the standing of a pre-petition creditor of one of those debtor-entities to satisfy the predicate-creditor requirement for the avoidance of a pre-petition transfer made by another of the debtor-entities, where the proposed predicate creditor itself had no pre-petition claim against the transferor-debtor. *Id.* at 446-47.

In determining that it could not be so construed, the court focused on applicable case law, the terms of the order, and the issues raised by the parties in connection with the issuance of the Substantive Consolidation Order. *Id.* at 448-56. In interpreting its order, the bankruptcy court stated:

> The substantive consolidation of the cases and estates of all of the debtors but PGW, **[*165]** as ordered in BKY 08-45257 on November 22, 2013, had no effect on the Plaintiff's standing as Trustee to maintain suit under *11 U.S.C. § 544(b)* on any of the transfers by any of the debtors that he seeks to avoid in this adversary proceeding, and it had no effect on the Trustee's case in fact and law as to the avoidability of any such transfer.

*Id.* at 456. The court noted that in arguing against substantive consolidation, the objecting parties pointed out that several of the debtors did not have creditors when they were put into bankruptcy, or their related lender was their only creditor (on any unpaid loans). Those parties contended that this would mean that there was no predicate creditor from which the trustee would derive standing to sue in avoidance. *See In re Petters, 506 B.R. at 849.* In response to that argument, the bankruptcy court, relying on observed that "[u]nder the authority of several extant opinions, consolidation could overcome this defect by making any predicate creditor with a claim against any of the previously-separate estates, the creditor from which the Trustee would derive standing, post-litigation." *Id. at 846 n.90* (citations omitted). In interpreting the

court denied the trustee's motion to substantively consolidate the *Bauman* and *Midwest* estates because the trustee failed to meet his burden of demonstrating grounds for doing so.[75] The Court views the discussions

Substantive Consolidation Order, the bankruptcy court addressed that observation, as follows:

> And to make sure nothing is thrown back: the statement made in the order for substantive consolidation, at n.90, *506 B.R. at 849*, was not a ruling. It was not even made as a categorical declaration of law. It was a conjecture, resonating with the Trustee's position at the time, not even dictum. The accompanying text says that explicitly. The text also makes it clear that the issue on its merits was not before the court then.

550 B.R. at 456 n.34.

[75] In *Bauman*, Ronald Bauman, the individual debtor, filed a voluntary chapter 7 petition for himself and separately, a chapter 7 petition on behalf of Midwest Asphalt Repair, Inc. ("Midwest"), his wholly owned business. *535 B.R. 291-92*. The same chapter 7 trustee was appointed for both estates. *See id. at 292*. In Midwest's case, the trustee sold estate assets and successfully prosecuted a number of avoidance actions that left him with enough money to pay Midwest's creditors in full, and to make a distribution to Bauman, as Midwest's sole shareholder. *See id.* The trustee sought bankruptcy court authorization to pay Midwest's creditors in full (including administrative creditors), dissolve Midwest, and distribute Midwest's remaining assets (including unasserted and/or unadjudicated transfer avoidance claims arising under chapter 5 of the Bankruptcy Code for wrongful transfers of Midwest's assets) to Bauman as Midwest's sole shareholder. *See id.* The court granted the requested relief, except that it did not authorize the trustee to transfer the causes of action to Bauman. Thereafter, the trustee brought a number of actions on behalf of Bauman's estate to recover allegedly fraudulent transfers. Among those actions was one seeking to avoid and recover transfers totaling $322,000, representing the value (including goodwill) of tangible operating assets transferred by Midwest to certain third parties. *See id. at 294*. The defendants sought to dismiss the action on the grounds that the transferred operating assets belonged to Midwest, not Bauman, and, as such, the trustee lacked standing to sue the defendants to avoid and recover the transfers. In response, the trustee filed motions in the *Bauman* and *Midwest* cases to substantively consolidate the cases. *See id. at 295*. As support for his motions, the trustee contended that Bauman had commingled the assets of Midwest with his own, that Midwest was Bauman's *alter ego*, and that Bauman caused Midwest to transfer its assets and goodwill in an effort to dissipate the assets and, in doing so, keep them out of the hands of his ex-wife, who was among Bauman's largest creditors. *Id. at 291-94*. The bankruptcy court denied the motions. In doing so, it found that, assuming arguendo, that the doctrine of

by the courts in those cases on matters relating to substantive consolidation as *dicta*.

HN39[↑] Moreover, and in any event, other **[*166]** courts have found that substantive consolidation can confer standing on a trustee for purposes of satisfying the elements for the avoidance of fraudulent transfers. *See, e.g., Zazzali v. Mott (In re DBSI, Inc.), 447 B.R. 243, 248 (Bankr. D. Del. 2011)* (holding that trustee's allegations of insolvency of the debtor entities collectively was sufficient to meet the insolvency criteria for fraudulent transfer analysis because the relevant debtor entities have been substantively consolidated); *Gray v. O'Neill Props. Group, L.P. (In re Dehon, Inc.), No. 02-41045, 2004 Bankr. LEXIS 1470, 2004 WL 2181669, at *6 (Bankr. D. Mass. Sept. 24, 2004)* (setting motion for substantive consolidation for purposes of establishing timeliness and standing to assert fraudulent transfer claims); *In re Bonham, 229 F.3d 750, 760 (9th Cir. 2000)* (authorizing substantive consolidation of two non-debtor entities with debtor's estate where the entities were co-mingled and used by the debtor to perpetrate a Ponzi scheme, for the purpose of allowing trustee to commence fraudulent conveyance actions against the creditors of the consolidated nondebtor entities); *Kroh Bros. Realty Co. v. Kroh Bros. Mgmt. Co. (In re Kroh Bros.), 117 B.R. 499, 502 (W.D. Miss. 1989)* (affirming bankruptcy court's grant of substantive consolidation, *nunc pro tunc*, so that debtor did not violate statute of limitations in bringing avoidance action). It is enough for the Court to find that for purposes of the Motions, the Trust is not barred from invoking substantive consolidation in support of its assertion **[*167]** that it can aggregate the Debtors' estates in establishing its standing to sue. Should it

---

substantive consolidation applied to cases in the Seventh Circuit, the trustee had failed to meet his burden of demonstrating that either:

> (A) prepetition, Midwest and Bauman disregarded their separateness so significantly as to cause creditors to rely on the breakdown or absence of separateness and treat them as one and same legal entity; or

> (B) that post-petition, Midwest and Bauman's assets and liabilities were so hopelessly commingled that unscrambling them is prohibitive and would harm all creditors.

*Id. at 296-97.* In so ruling, the court rejected the trustee's assertion that application of the doctrine of substantive consolidation can be justified simply as a matter of equity in order to provide a remedy for the alleged dissipation of Midwest's assets. *Id. at 299.*

become relevant at a later date, the Court can address the impact of substantive consolidation on the Trust's standing to avoid and recover alleged fraudulent transfers.

## Whether the Amended Complaint Alleges Grounds For Substantive Consolidation

The Court now considers whether, taking all facts in the Amended Complaint as true, whether the Trust has demonstrated that there are grounds to aggregate the Debtors' estates through substantive consolidation. The Trust's allegations in the Amended Complaint focus on the second prong of the *Augie/Restivo* test -- i.e., whether there has been either an operational or a financial entanglement of the Debtors' business affairs. The Trust maintains that upon the closing of the LBO Transaction, the Defendants in control of the Debtors and their affiliates treated them as a single entity, did not follow the corporate formalities, exercised complete control or domination of the corporation, and operated as a single business enterprise where each entity was the mere instrumentality or alter ego of the others. *See* Amd. Compl. ¶ 198. It asserts that the Defendants **[*168]** used this domination to commit a fraud, wrong, or paramount inequity against the Debtors, resulting in their injuries alleged in the Amended Complaint, such that it would be fundamentally unfair to recognize the corporate forms. *See id.* The Trust contends that from the moment the LBO Transaction closed, the Defendants managed and operated the Debtors on a completely centralized basis, even if their corporate structure was decentralized, at least nominally. *See id.* ¶ 192. The Trust alleges that:

> (i) The Debtors made no effort to maintain their separateness or fulfill the covenants of the LBO loan agreements mandating their separateness;[76]

---

[76] The Trust maintains that this "wholesale disregard" of the Debtors' formally separate identities violated covenants of the applicable loan agreements. *See* Amd. Compl. ¶ 196. It asserts that these agreements contained extensive "special purpose" entity and separateness representations and other covenants requiring, among other things, that each mortgage borrower, operating lessee entity and property owning entity would (i) not make any loans or advances to any other; (ii) pay debts from its assets as such debts become due; (iii) do all things necessary to observe organizational formalities; (iv) maintain all of its books, records, financial statements, and bank accounts separate from those of any other person; (v) except as expressly permitted under the applicable loan agreement or the Cash Management Agreement, not

(ii) At all relevant times, the Debtors were treated internally as part of one company, and sometimes described as "the Company" in the corporate minutes for the "Extended Stay Hotels family of companies;"[77]

(iii) The Debtors had common officers and directors and had no separate governance;[78]

(iv) The Debtors conducted all material board of directors meetings on a consolidated basis for the so-called "Extended Stay Hotels family of companies," which included the Debtors' direct equity owners;

(v) The Debtors maintained an integrated financial

system;[79] and

(vi) **[\*169]** None of the Mortgage Borrowers or Mezzanine Borrowers kept their own books and records, and adequate records of complete accounting activity related to each legal entity were not maintained.[80]

*See id.* ¶¶ 192, 194; *see also id.* ¶ 197 ("In short, the 'Company,' as it was described in the corporate minutes for the 'Extended Stay Hotels family of companies,' completely ignored the fiction of legal separateness of its entities."). The Trust also says that the integrated treatment of the Debtors and related entities is manifest in the Debtors' corporate books. It notes that after the LBO Transaction closed, an opening balance sheet for DL-DW showed the impact of the LBO Transaction on DL-DW and the appropriate allocation of the price paid for the LBO Transaction. *See id.* ¶ 195. It also asserts that the Mortgage and Mezzanine debt, as well the subsidiary Debtors' assets and liabilities, including hotel property and equipment, were recorded at the ESI and Homestead accounting database levels, as opposed to being recorded by each Mortgage Borrower or Mezzanine Borrower, and treated as owned by that

---

commingle assets; (vi) not guarantee or become obligated for the debts of any other person; (vii) not pledge assets for the benefit of any other person other than with respect to the applicable mortgage or mezzanine loans; (viii) remain solvent and maintain adequate capital in light of its contemplated business operations; (ix) maintain a sufficient number of employees in light of its contemplated business operations and pay the salaries of its own employees from its own funds; (x) not assume or incur any liabilities except the mortgage and mezzanine loans, certain other specified liabilities not germane to the Amended Complaint, and "liabilities incurred in the ordinary course of business," subject to certain liability caps, which liabilities would not be more than 60 days past the date incurred; and (xi) maintain its assets and liabilities in such a manner that it would not be costly or difficult to segregate, ascertain or identify its individual assets and liabilities from those of any other person. *Id.*

[77] More specifically, the Trust asserts that:

The daily business of operating the hotels of the Extended Stay **[\*170]** Hotels family of companies was managed by HVM, which in turn was managed by HVM Manager, of which Lichtenstein was the sole member;

All of the Debtors were either wholly-owned or predominantly-owned by DL-DW and other Defendants;

*See* Amd. Compl. ¶ 194.

[78] The Trust asserts that:

While many of the lower level Debtor entities had independent board members, none of the independent board member attended or participated at the key Company Board meetings, but rather key decisions were made by the single Company Board;

The full board of the "Extended Stay Hotels family of companies" decided matters affecting a particular company, such as the resolution of the 25% Note, an obligation of DL-DW.

---

[79] More specifically, the Trust contends that:

The Debtors' expenses were generally funded from the consolidated cash management account and a single working capital reserve account;

The Debtors failed to observe corporate formalities for intercompany transfers, which generally were not properly recorded; and

The dividends and distributions made to equity on behalf of various Debtors were generally funded from the consolidated cash management account and other general accounts.

*See id.*

[80] The Trust asserts that:

The Debtors did not have specific general ledger codes in their accounting system to track specific accounting activity **[\*171]** for the mezzanine borrowers; and Debt to the mortgage and mezzanine lenders was recorded only at the ESI and Homestead levels, debt service was paid only from the Debtors' consolidated cash management account, and the Debtors failed to properly record any financial or accounting activities (including debt service) relating to the mezzanine or mortgage loans.

*Id.*

*Id.*

entity, respectively. *See id.*[81]

It contends that those in control of the Debtors and their affiliates treated the Debtors as a single entity, did not follow the corporate formalities, exercised complete control or domination through a unitary Company Board, and operated the Debtors as a single business enterprise where each entity was the mere instrumentality or alter ego of the **[*172]** others. The Trust further asserts that this domination was used to commit a fraud, wrong, or paramount inequity against the Debtors, resulting in the injuries alleged herein, such that it would be fundamentally unfair to recognize the corporate forms. *Id.* ¶ 198.

Taking all of the facts in the Amended Complaint as true and drawing all reasonable inferences in favor of the Trust, the Court finds that for pleading purposes, the Trust has demonstrated that this is the "rare case" in which "the interrelationships of the [Debtors] are hopelessly obscured [such that] the time and expense necessary even to attempt to unscramble them [is] so substantial as to threaten the realization of any net assets for all the creditors[.]" *Chem. Bank New York Tr. Co. v. Kheel, 369 F.2d at 847.* As such, the Amended Complaint states grounds for substantively consolidating the Debtors' estates under the second prong of the test under *AAugie/Restivo. See First Nat'l Bank v. Rafoth (In re Baker & Getty Fin. Servs.), 974 F.2d 712, 720 (6th Cir. 1992)* (noting that interrelationships of debtors must be "hopelessly obscured" to merit consolidation); *In re WorldCom, Inc., No. 02-13533, 2003 Bankr. LEXIS 1401, 2003 WL 23861928, at *36 (Bankr. S.D.N.Y. Oct. 31, 2003)* (explaining that substantive consolidation is appropriate when "it would be so costly and difficult to

untangle the [d]ebtors' financial affairs, such that doing so is a 'practical impossibility,'" or "that it is **[*173]** not possible to create *accurate* financial data for each legal entity."); *In re Drexel Burnham Lambert Grp., Inc., 138 B.R. 723, 766 (Bankr. S.D.N.Y. 1992)* (finding substantive consolidation appropriate where debtors operated as single enterprise *and* establishing allocation of liability "would be a Herculean task consuming years of costly professional services, thereby draining significant amounts of value from the [d]ebtors' estates"); *In re I.R.C.C., Inc., 105 B.R. 237, 243 (Bankr. S.D.N.Y. 1989)* (granting substantive consolidation where books and records of the debtors "were in disarray" making it impossible to determine financial status of individual entities). Moreover, the Examiner concluded that on the facts before him, that the first prong of the *Augie/Restivo* test was satisfied in these cases, and that the Debtor' estates should be substantively consolidated. *See* Examiner's Report at 241.

The Court considers that factor in concluding that the allegations in the Amended Complaint, which the Court assumes to be true, are sufficient to state grounds for aggregating the estates through substantive consolidation. The Court finds that the Trust has alleged facts enough to satisfy constitutional standing requirements that are a prerequisite to the Court's exercise of subject matter jurisdiction over the claims asserted in **[*174]** the Amended Complaint.

## Whether Application of the *Wagoner* Rule Limits The Trust's Standing to Assert the State Law Claims

The Arbor Defendants contend that by application of the "*Wagoner* rule," the Trust lacks standing to assert the State Law claims (Counts 1-11) against them and, for that reason, the Court must dismiss those claims for lack of subject matter jurisdiction. *See* Arbor MTD at 57-59. The Lightstone Defendants and PGRT ESH join in that argument. *See* Lightstone MTD 78-79; PGRT Reply at 2-3. The Court addresses these arguments below.

*HN40*[↑] The Bankruptcy Code "places a trustee in the shoes of the bankrupt corporation and affords the trustee standing to assert any claims that the corporation could have instituted prior to filing its petition for bankruptcy." *The Mediators, Inc. v. Manney (In re The Mediators, Inc.), 105 F.3d 822, 826 (2d Cir. 1997)* (citations omitted). However, a trustee lacks standing to assert claims belonging to estate creditors. *See Wight v. BankAmerica Corp., 219 F.3d 79, 86 (2d Cir. 2000).*

---

[81] The Trust contends that if the Debtors had established and maintained separate books for each of the individual mortgage borrowers and mezzanine borrowers as of the LBO Transaction, then the accounting by the Mortgage Borrowers and Mezzanine Borrowers should have reflected:

> The mortgage debt and the related proceeds — at each legal entity level for the individual mortgage borrowers — allocated based on the release amounts included in the mortgage loan agreement; and

> The mezzanine debt and the related proceeds — at the legal entity level for the individual mezzanine borrowers — allocated based on the sum of the allocated release amounts included in the mortgage loan agreement for the mortgage borrowers directly below the relevant mezzanine borrower.

*See id.* ¶ 195.

*Accord In re The Mediators, Inc., 105 F.3d at 825-26; Hirsch v. Arthur Andersen & Co., 72 F.3d 1085, 1093-94 (2d Cir. 1995)*. State law determines whether a claim belongs to the debtor or to individual creditors. *See St. Paul Fire & Marine Ins. Co. v. PepsiCo., Inc., 884 F.2d 688, 700 (2d Cir. 1989)*. *See also In re Ionosphere Clubs, Inc. (Sobchack v. Am. Nat'l Bank & Trust Co.), 17 F.3d 600, 607 (2d Cir. 1994)* ("Bankruptcy courts have long been charged with ascertaining, under state law, whether claims belong to the bankruptcy estate or to other claimants.").

HN41[↑] The *Wagoner* rule is a prudential standing rule first articulated in *Shearson Lehman Hutton, Inc. v. Wagoner, 944 F.2d 114 (2d Cir. 1991)* ("*Wagoner [*175]* "). *See McHale v. Citibank (In re 1031 Tax Grp., LLC), 420 B.R. 178, 192 (Bankr. S.D.N.Y. 2009)*. The *Wagoner* court held that under New York law, "[a] claim against a third party for defrauding a corporation with the cooperation of management accrues to creditors, not to the guilty corporation." *944 F.2d at 120* (citations omitted). *Accord In re The Mediators, Inc., 105 F.3d at 826; Breeden v. Kirkpatrick & Lockhart LLP (In re Bennett Funding Grp.), 336 F.3d 94, 100 (2d Cir. 2003)*. "The rationale underlying the *Wagoner* rule derives from the fundamental principle of agency that the misconduct of managers within the scope of their employment will normally be imputed to the corporation." *Wight v. BankAmerica Corp., 219 F.3d at 86*. In that way, the *Wagoner* rule draws "on the state law affirmative defense of in pari delicto and standard agency principles which allow the imputation of management's misconduct to the corporation itself." *Pergament v. Amton (In re PHS Grp. Inc.), 581 B.R. 16, 30 (Bankr. E.D.N.Y. 2018)*. *See also T.S. Employment, Inc. v. Kossoff & Kossoff LLP (In re TS Employment, Inc.)*, 597 B.R. 543, 549 (Bankr. S.D.N.Y. 2019) (noting that the in pari delicto doctrine "uses agency determinations to determine if a plaintiff should be prohibited from recovering damages due to his equal fault." (citing *LaSala v. Bank of Cyprus Public Co. Ltd., 510 F. Supp. 2d 246, 278 (S.D.N.Y. 2007)))*. While the *Wagoner* rule draws on the in pari delicto doctrine, it differs from it because in pari delicto is a defense to liability and *Wagoner* focuses on standing. *See In re Parmalat Sec. Litig., 477 F. Supp. 2d 602, 609 n.45 (S.D.N.Y. 2007)* (explaining that although the doctrines are "quite similar," the *Wagoner* rule concerns standing, and in pari delicto is a defense). The *Wagoner* doctrine "elevates the [*176] in pari delicto defense to a jurisdictional bar based on lack of standing." *In re PHS Grp. Inc., 581 B.R. at 30* (citations omitted). *See also Picard v. HSBC Bank PLC, 454 B.R. 25, 29 (Bankr.*

S.D.N.Y. 2011)* ("[I]n federal court prudential considerations deprive a bankruptcy trustee of standing to even bring a claim that would be barred by in pari delicto.") (citation omitted).

Under the Plan, the Trust stands in the Debtors' shoes with the power to assert claims that belong to the Debtors and are identified in Examiner's Report. HN42[↑] The Trust's exercise of that power is subject to application of the *Wagoner* rule, because the "[Trust's] function is virtually indistinguishable from that of the bankruptcy estate itself: to gather the assets of a defunct debtor for distribution to its creditors." *In re Refco, Inc. Sec. Litig., 628 F. Supp. 2d 432, 442 (S.D.N.Y. 2008)* (applying *Wagoner* to liquidation trustee's lawsuit); *see also In re The Mediators, Inc., 105 F.3d at 826* (applying *Wagoner* to a suit brought by an unsecured creditors' committee, which is "analogous" to a trustee in bankruptcy); *Picard v. JPMorgan Chase & Co. (In re Bernard L. Madoff Inv. Sec.)*, 721 F.3d 54, 64 (2d Cir. 2013) (applying the *Wagoner* rule to bar a trust's claims and stating that "[the Trust] stands in the shoes of [the debtor] and may not assert claims against third parties for participating in a fraud that [the debtor] orchestrated").

In Counts 1-11 of the Amended Complaint, the Trust, standing in the shoes of the Extended [*177] Stay estate, asserts State Law claims seeking compensatory and punitive damages from some or all of the Defendants based upon actions taken by them in connection with the Transfers. In the Amended Complaint, the Trust describes the Debtors' former senior management's central role in the alleged misconduct associated with the Transfers.[82] The

---

[82] The Amended Complaint alleges, in part, that the Debtors' management participated in the misconduct, as follows:

> Amd. Compl. ¶ 124 ("The Debt Yield percentage . . . was required to be reported to the Debtors' lenders on a monthly basis . . . but the Debtors failed to do so. . . . this failure to report was intentional and allowed improper distributions to continue .... the Debtors immediately failed the Debt Yield test on the date the LBO closed, were unlikely to meet the test at the first trigger date in January 2008, and concealed this fact from the Lenders.").

> *Id.* ¶ 129 ("Senior management received frequent updates on [the Debtors] declining performance.").

> *Id.* ¶ 143 ("Despite [*178] the Debtors' non-compliance with the Debt Yield, lack of surplus, insolvency, and the future financial and operational declines that

management foresaw or should have foreseen, the Debtors . . . made [] distributions . . . in violation of the loan agreement and applicable law"); ("Lichtenstein, Owen, Teichman, and De Vinck signed a written consent authorizing the pertinent parties to execute the necessary agreements for [the 25% Note and the Floor Bonds Reserve Account.]").

*Id.* ¶ 162 ("Despite . . . the Debtors' poor performance, strained liquidity, budget issues and concerns, lack of surplus, and insolvency, during the second quarter of 2008 the Debtors paid, either by wire or by transfers from the cash management account, . . . cash distributions to equity in violation of applicable law . . . These distributions violated applicable law, as they were made (i) despite a lack of surplus, (ii) when the Debtors were insolvent or were rendered insolvent by the distributions, and (iii) despite the future financial and operational declines that management foresaw or should have foreseen.").

*Id.* ¶ 166 ("Despite . . . the Debtors' poor performance, strained liquidity, budget issues and concerns, **[*179]** lack of surplus, and insolvency, during the third quarter of 2008 the Debtors paid, either by wire or by transfers from the cash management account, . . . cash distributions to equity in violation of applicable law . . . These distributions violated applicable law, as they were made (i) despite a lack of surplus, (ii) when the Debtors were insolvent or were rendered insolvent by the distributions, and (iii) despite the future financial and operational declines that management foresaw or should have foreseen.").

*Id.* ¶ 172 ("Despite . . . the Debtors' poor performance, strained liquidity, budget issues and concerns, lack of surplus, and insolvency, during the fourth quarter of 2008 the Debtors paid, either by wire or by transfers from the cash management account, . . . cash distributions to equity in violation of applicable law . . . These distributions violated applicable law, as they were made (i) despite a lack of surplus, (ii) when the Debtors were insolvent or were rendered insolvent by the distributions, and (iii) despite the future financial and operational declines that management foresaw or should have foreseen.").

*Id.* ¶ 182 ("Although the board of the "Extended Stay Hotels family **[*180]** of companies" had passed a resolution stopping equity distributions in November 2008 in light of the financial and liquidity crises, the improper distributions to equity continued to be made *after* that resolution, using a "Preferred Equity Reserve Account" created at the LBO's closing as "security" for certain equity holders.")

*Id.* ¶ 192 ("The Debtors . . . disregarded all semblance of

Defendants assert that under *Wagoner*, the Trust, as "successor in interest" to management and the Extended Stay Hotels entities, lacks standing to bring the claims in Counts 1-11 against them, as third parties, for their alleged assistance in the Debtors' own alleged wrongful transfers.

*HN43*[⬆] As relevant here, an important limitation to the application of the *Wagoner* rule is that it does not protect fiduciaries or "insiders" of the debtor from their own alleged wrongdoing. The rationale underlying that exception is as follows:

> The insider exception derives from the notion that it would be inequitable to allow an insider to rely on [*in pari delicto*] imputation because it would essentially shield the insiders from the consequences of their own handiwork. . . . Accordingly, a trustee may assert claims against the debtor's insiders when there is an alleged injury to the debtor.

*In re TS Employment, Inc.*, 597 B.R. at 550 (internal quotation **[*181]** marks and citations omitted); *see also Trott v. Platinum Mgmt. (NY) LLC (In re Platinum-Beechwood Litig.)*, No. 18-cv-6658 (JSR), 2019 U.S. Dist. LEXIS 104562, 2019 WL 2569653, at *7 (S.D.N.Y. June 21, 2019) ("[I]t would be absurd to allow a wrongdoing insider to rely on the imputation of his own conduct to the corporation as a defense." (quoting *In re Refco Inc. Secs. Litig., No. 07-MD-1902 (JSR), 2010 U.S. Dist. LEXIS 132778, 2010 WL 6549830, at *16 (S.D.N.Y. Dec. 6, 2010)*, *report and recommendation adopted in part, rejected in part on other grounds sub nom. In re Refco Secs. Litig., 779 F. Supp. 2d 372 (S.D.N.Y. 2011)*, *aff'd sub nom. Krys v. Butt*, 486 F. App'x 153 (2d Cir. 2012))).

*HN44*[⬆] Thus, the *Wagoner* rule does not bar a litigation trustee standing in the shoes of a debtor from suing a fiduciary of the debtor to redress alleged wrongdoing on the part of the fiduciary. *See, e.g., Official Comm. Of Unsecured Creditors of Grumman Olson Indus., Inc. v. McConnell (In re Grumman Olson Indus., Inc.), 329 B.R. 411, 425 (Bankr. S.D.N.Y. 2005)* ("[T]he *Wagoner* Rule does not bar claims against corporate fiduciaries[.]"); *Tese-Milner v. Beeler (In re Hampton Hotel Inv'rs, L.P.), 289 B.R. 563, 577 n.3 (Bankr. S.D.N.Y. 2003)* ("The *Wagoner* Rule only deals

legal formality regarding the corporate status of the Debtors and affiliated entities. The Debtors made no effort to maintain their separateness or fulfill the covenants of the LBO loan agreements.").

2020 Bankr. LEXIS 2128, *181

with claims against third parties. It does not proscribe actions against insiders for breach of fiduciary duty, which are properly claims of the trustee."); *Official Comm. of Unsecured Creditors v. Austin Fin. Serv., Inc. (In re KDI Holdings, Inc.), 277 B.R. 493, 518 (Bankr. S.D.N.Y. 1999)* ("[T]he *in pari delicto* doctrine is inapplicable where a cause of action is brought against an insider."); *Global Crossing Estate Representative v. Winnick, No. 04 Civ. 2558, 2006 U.S. Dist. LEXIS 53785, 2006 WL 2212776, at *15 (S.D.N.Y. Aug. 3, 2006)* ("Courts have held that the *Wagoner* and 'in pari delicto' rules do not apply to claims against corporate insiders for breach of their fiduciary duties.").[83]

The Trust asserts that the exception to the *Wagoner*

---

[83] *HN45*[↑] The "adverse interest exception" is the second of the two exceptions to application of the *Wagoner* doctrine. *See In re Platinum-Beechwood Litig.*, 2019 WL 2569653, at *7 (noting that the two exceptions to the *Wagoner* rule are the "insider exception" and the "adverse interest exception."). The adverse interest exception is "a narrow exception to the presumption of imputation [existing] 'where the corporation is actually the victim of a scheme undertaken by the agent to benefit himself or a third party personally, which is therefore entirely opposed (i.e., 'adverse') to the corporation's own interests.'" *In re FKF 3, LLC*, No. 13 Civ. 3601 (JCM), 2018 WL 5292131, at *7 (S.D.N.Y. Oct. 24, 2018) (quoting *Kirschner v. KPMG LLP, 15 N.Y.3d 446, 467, 938 N.E.2d 941, 912 N.Y.S.2d 512 (2010))*. The New York Court of Appeals characterized the adverse interest exception as the "most narrow of exceptions" reserved for cases of "outright theft or looting or embezzlement—where the insider's misconduct benefits only himself or a third party; i.e., where the fraud is committed *against* a corporation rather than on its behalf." *Kirschner, 15 N.Y.3d at 466-67*. However, the adverse interest exception has its own exception known as the "sole actor rule." *See In re ICP Strategic Credit Income Fund Ltd., Case No. 13-12116 (REG), 2015 Bankr. LEXIS 3128, 2015 WL 5404880, at *19 (Bankr. S.D.N.Y. Sept. 15, 2015)*. Under that rule, even if management takes harmful, entirely unbeneficial actions, if management acts as the sole decision maker, its actions will be imputed to the corporation. *See id.* ("The sole actor rule demands that *in pari delicto [*182]* apply even where a principal's agent totally abandons the interests of the principal, and takes harmful, entirely unbeneficial, actions, so long as the agent is the sole decision maker of the principal." (citing *The Mediators, Inc. v. Manney (In re The Mediators, Inc.), 105 F.3d 822, 827 (2d Cir. 1997)))*. The Trust mentions the adverse interest exception in a string citation. The Trust does not allege that the Defendants looted, embezzled or stole from the Debtors. Accordingly, the Court finds that the allegations in the Amended Complaint do not support application of the "adverse interest exception" to the *Wagoner* rule.

---

rule applies here, and that it has standing to sue the Defendants because they are fiduciaries of the Debtors, whose breach of those duties injured the Debtors. *See* Opp'n at 73. The Trust contends that it has alleged facts in the Amended Complaint that demonstrate that the Arbor and Lightstone Defendants have been the dominant directors, officers and other controlling persons and entities of the Debtors that are responsible as insider fiduciaries for the harm they proximately caused the Debtors. *Id.* If the Trust properly pleads facts that support its characterization of the Defendants as insiders of the Debtors, and that they breached their fiduciary duties, then it has demonstrated that it has standing to pursue claims against them under the "insider exception" to the *Wagoner* rule. *See, e.g., Global Crossing Estate Representative v. Winnick, 2006 U.S. Dist. LEXIS 53785, 2006 WL 2212776, at *15* ("[T]o the extent [the Trust] can establish that defendants' alleged control and domination of [the Debtors] rendered them corporate insiders and fiduciaries, *Wagoner* and the 'in pari delicto' rules will not bar [the Trust's] fiduciary duty claims."). Accordingly, the Court must determine whether the Amended Complaint alleges facts demonstrating **[*183]** that the Defendants have dominated or controlled the Debtors, such that they should be treated as fiduciaries owing such duties to the Debtors.

In Count 5 of the Amended Complaint, the Trust seeks damages from all the Defendants based upon their alleged breaches of their fiduciary and contractual duties of care, loyalty and good faith. *See* Amd. Compl. ¶¶ 260-272. The Defendants seek to dismiss that claim on the grounds that they are not fiduciaries of the Debtors. As discussed below in connection with its analysis of Count 5, the Court has determined that assuming the truth of the matters asserted in support of the Amended Complaint, and drawing all reasonable inferences in favor of the Trust, the Trust has demonstrated that the following Defendants plausibly owed fiduciary duties to the Debtors:

Lightstone Individuals
David Lichtenstein
Bruno de Vinck
Peyton Owen
Joseph Teichman

Arbor Individuals
Joseph Chetrit
Joseph Martello
Guy Milone

Lightstone Entities
DL-DW
BHAC
Lightstone Group
Lightstone Holdings

The Court incorporates those findings and the underlying analysis here in considering whether application of the *Wagoner* rule bars the Trust from asserting claims against the Defendants for lack **[*184]** of subject matter jurisdiction. The Court finds that the in pari delicto rule do not bar the Trust's claims against those Defendants, and that application of the *Wagoner* rule does not preclude the Trustee from asserting the State Law claims against them. *See, e.g.,* *In re Grumman Olson Indus., Inc., 329 B.R. at 425*; *In re Keene Corp., 164 B.R. 844, 853 (Bankr. S.D.N.Y. 1994)*; *In re FKF 3, LLC*, No. 13 Civ. 3601 (JCM), 2018 WL 5292131 at *1 (S.D.N.Y. October 24, 2018). The Court finds that the Trust has demonstrated that it has standing to assert the State Law claims (Counts 1-11) against those Defendants, because they are insiders that owe fiduciary duties and thus, fall within the insider exception to the *Wagoner* rule.

The same does not hold true for the remaining Defendants. As discussed below in the Court's analysis of Count 5 of the Amended Complaint, the Court has determined that the Trust failed to demonstrate that, even assuming the truth of the matters asserted in the Amended Complaint, it is plausible that the following Defendants can be deemed to be insiders that owed fiduciary duties to the Debtors:
    Polar Extended Stay
    PGRT ESH

    Lightstone Entities
    Lightstone Commercial
    Park Avenue Funding

    Arbor Entities
    Arbor ESH
    Arbor Commercial
    Princeton ESH
    Atmar Associates
    Glida One
    Ron Invest
    ABT-ESI
    Mericash Funding

By application of the *Wagoner* rule, the Trust lacks **[*185]** prudential standing to assert the State Law claims against those Defendants. Accordingly, the Court dismisses Counts 1-11, as asserted against those

Defendants, for lack of subject matter jurisdiction.

Whether The Claims Asserted In The

Amended Complaint Are Litigation Trust Assets

The Litigation Trust was established under the Plan and pursuant to the Litigation Trust Agreement. Section 1.7 of the Litigation Trust Agreement states that the Trustee is the "duly appointed representative of the [Debtors'] Estates and ESI" and "succeeds to all of the rights and powers of a trustee in bankruptcy with respect to preservation of the Litigation Trust Assets for the benefit of the Litigation Trust Beneficiaries." Litigation Trust Agreement § 1.7. The Litigation Trust Assets consist of:

> (i) all claims and causes of action of the Debtors or the Debtors in Possession under *sections 502(d), 542* through *551*, and *553 of the Bankruptcy Code*, and (ii) any other potential claims, causes of action, charges, suits or rights of recovery referenced in the Examiner's Report [subject to certain irrelevant exceptions.]

Plan § 1.89. The HVM Defendants are named defendants in Counts 5-11 and 17 of the Amended Complaint. They contend that the Court must dismiss them from those Counts **[*186]** because the Trust has standing to assert only those claims that are "referenced in the Examiner's Report" (*see* Plan § 1.89(ii)), and the report does not identify them as potential defendants in respect of any of the claims discussed in the report. *See* HVM MTD at 12-13. Alternatively, they contend that, in any event, the Court must dismiss the Trust's claims for waste (Count 8), conversion (Count 9), conspiracy (Count 10), and aiding and abetting breaches of fiduciary duty and conversion (Counts 6 & 11) because those claims are not specifically referenced in the Examiner's Report and, as such, the Trust lacks standing to assert those claims against any of the Defendants. Arbor joins in that argument. The Court considers those matters below.

As relevant, the Examiner's Report states that "the fiduciaries of both ESI and Homestead, including the Buyer [DL-DW], may be liable for breaching their duties of loyalty in authorizing the [Post LBO Transfers]." Examiner's Report at 415. The report identifies fiduciaries of ESI to be "[t]he Individuals serving as directors and officers of ESI[.]" *Id.* at 410.[84] It also

---

[84] The Examiner identifies the "Debtors' Fiduciaries" as:

    The Individuals serving as directors and officers of ESI

provides that, following the LBO Transaction, the buyer (i.e., Lightstone and Arbor) owed fiduciary duties to Homestead. **[*187]** *Id.* The HVM Defendants did not serve as directors or officers of ESI or Homestead, and the Amended Complaint does not allege otherwise. The exhibits to the Examiner's Report confirm that they were not officers or directors of ESI or Homestead. *See* Examiner's Report, Amd. Ex. III-E-1 & III-E-2.

*HN46*[⬆] A confirmed chapter 11 plan is treated as a contract that is binding on all parties to the plan. *See Adelphia Recovery Tr. v. Bank of Am., N.A., 390 B.R. 80, 88 (S.D.N.Y. 2008).* Like the Plan, the Litigation Trust Agreement approved and authorized by the Plan is a contract. Accordingly, the Litigation Trust holds only those assets that were specifically and affirmatively transferred to it. *HN47*[⬆] In determining the universe of those assets, the Court will apply ordinary principles of contract interpretation. *See, e.g., Charter Asset Corp. v. Victory Mrts. (In re Victory Mkts.), 221 B.R. 298, 303 (B.A.P. 2d Cir. 1998); Rahl v. Bande, 328 B.R. 387, 400-401 (S.D.N.Y. 2005).* "Where the language of the plan is unequivocal . . . a Court must adopt the plain and natural meaning only of the words contained within the text of the instrument itself." *In re Victory Mkts., 221 B.R. at 303.*

The HVM Defendants assert that because they are not "fiduciaries," as that term is defined in the Examiner's Report, of either ESI or Homestead, the claims that the Trust is asserting against them in the Amended Complaint are not part of the Litigation Trust Assets. They maintain that those claims must be dismissed for lack of subject matter jurisdiction, because the Trust lacks standing to assert those claims. In support of their

---

owe fiduciary duties to ESI under Delaware law. ESI is majority owned by BHAC, which would also owe fiduciary duties to ESI under Delaware law as a majority shareholder. Additionally, since ESI was indirectly owned by BHAC, one of the Sellers, prior to the Acquisition, and by the Buyer following the Acquisition, a court may fairly conclude that each was a "controlling shareholder" of ESI as the result of their (i) stock ownership and/or (ii) actual control over ESI in connection with the Acquisition and Post-Acquisition Distributions, as applicable. If the Sellers or Buyer are determined to have controlling shareholders of ESI, they would owe fiduciary duties directly to ESI. Moreover, Homestead was wholly-owned by one of the Sellers prior to the Acquisition and by the Buyer following the Acquisition; each of those entities would owe **[*188]** fiduciary duties to Homestead under Delaware law.

Examiner's Report at 410 (footnotes omitted).

argument, the HVM Defendants rely on *Rahl v. Bande, 328 B.R. 387* ("*Rahl*"), and *Shults & Tamm, ALC v. Ruley (In re Hawaiian Telcom Communs., Inc.), No. 08-02005, 2011 Bankr. LEXIS 4511, 2011 WL 5854693, at *1 (Bankr. D. Haw. Nov. 21, 2011)* ("*Hawaiian Telcom*").

In *Hawaiian Telcom*, **[*189]** a litigation trust formed under a confirmed chapter 11 plan brought an action against Cartus Corporation ("Cartus"), among others. *2011 Bankr. LEXIS 4511, 2011 WL 5854693, at *1.* The litigation trust agreement defined the litigation trust assets to include claims against the entities that were identified on a specific schedule made part of the agreement. The schedule did not identify Cartus as such an entity. *See 2011 Bankr. LEXIS 4511, [WL] at *2.* Cartus moved to dismiss the action for lack of subject matter jurisdiction and the court granted the motion. In doing so, it found that "[a]ny causes of action against Cartus . . . are not Litigation Trust Assets, were not transferred to Plaintiff, and cannot be prosecuted by Plaintiff." *Id.* Similarly, in *Rahl*, the court dismissed claims brought by a litigation trustee against certain corporate defendants because the litigation trust assets that were transferred to the litigation trust was unambiguous in identifying potential causes of action as only against the debtors' current or former officers and directors. *328 B.R. at 399-402.* In doing so, the *Rahl* court rejected the trustee's argument of adopting a broad interpretation of the word "claim," and concluded that the language of the trust agreement was clear that it did not assign the **[*190]** trustee "the right, title and interest to claims and causes of actions against third parties." *Id. at 400.*

The HVM Defendants assert that the rationale in *Rahl* and *Hawaiian Telcom* is applicable in this case. The Court agrees. The Litigation Trust Assets do not include any claims against the HVM Defendants because the Examiner's Report does not identify them as potential defendants in claims belonging to the Litigation Trust. As a consequence, the Trust lacks standing to sue them. *See Zahn v. Yucaipa Capital Fund (In re Almac's), 202 B.R. 648, 657 (D.R.I. 1996)* (finding that trustee lacked standing to pursue breach of fiduciary duty claims where the plan assigned only avoidance claims to the trustee); *Sun Microsystems Inc. v. Hynix Semiconductor Inc., 534 F. Supp. 2d 1101, 1119 (N.D. Cal. 2007)* (concluding that trustee lacked standing to pursue claims outside the time period designated in the plan because those claims were not transferred to the trustee).

In reaching this conclusion, the Court notes that the Trust insists that the Examiner identified the HVM Defendants as potential defendants and, as such, the Trust has standing to sue them. The Trust contends (i) that the *Rahl* court stated that claims assigned to a litigation trustee must be "interpreted as broadly as possible under the Bankruptcy Code to encompass any possible right to payment," (citing *Rahl, 328 B.R. at 399-402*); (ii) **[*191]** *Rahl*, in turn, cited to *Mazzeo v. U.S. (In re Mazzeo), 131 F.3d 295, 302 (2d Cir. 1997)*, which noted that the term "claim" is interpreted "extremely broadly" and in the "broadest possible" way to cover "any possible obligation to make payment"; and (iii) in both *Rahl* and *Hawaiian Telecom*, in excluding claims from the litigation trust assets, the courts relied on the clear and unambiguous language in those trust agreements defining the scope of the trust's claims. *See* Opp'n at 75-76. More specifically, the Trust says that in *Rahl*, the litigation trust assets were clearly defined to include claims against officers and directors only, and excluded claims against an auditor and corporate defendants; and in *Hawaiian Telecom*, the litigation trust agreement defined the trust assets to include claims against only the parties identified on a schedule, and therefore excluded claims against unnamed parties. The Trust argues that, in contrast with those cases, the Examiner did not identify specific defendants against whom the trust claims could be asserted. It contends that it is significant that in his report, the Examiner spoke only of "fiduciaries" generally, and did not (i) name those fiduciaries, (ii) limit those fiduciaries, (iii) state that only formally **[*192]** designated directors or officers could be considered fiduciaries, or (iv) otherwise limit the claims. *See id.* at 75. The Trust asserts that "[b]ecause the Examiner did not limit the reference [to fiduciaries] to any specific individuals," he "clearly meant the [term] to apply to *any* party that could be found to owe fiduciary duties to ESI or Homestead and not just those specifically listed formally as officers or directors." *Id.* It says that includes the HVM Defendants because the Trust alleges that the HVM Defendants owed fiduciary duties to ESI, Homestead, and the other Debtors as *de facto* officers. The Trust further argues that the HVM Defendants' focus on titles is misplaced "hyper-formalism" and that the Amended Complaint contains sufficient allegations to support the inference that the HVM Defendants were *de facto* fiduciaries "through their conduct in controlling the Debtors and their respective importance within the Debtors' consolidated organization." *See* Opp'n at 100-102. According to the Trust, the claims against the HVM Defendants are clearly encompassed by the Examiner's specific reference to claims for breaches of loyalty by

fiduciaries of ESI and Homestead, and that the HVM Defendants' **[*193]** cited cases actually support the Trust's standing to bring these claims against them. *Id.* at 76.

That argument is unconvincing. First, *Rahl* does not stand for the proposition that when interpreting whether a particular claim has been assigned to a litigation trust, a court must broadly construe the term "claim." Contrary to the Trust's assertions, the *Rahl* court did not formulate such a rule. Instead, what the Trust asserts was the *Rahl* court's holding was actually the *Rahl* court's recitation of the plaintiff's argument in that case. *See 328 B.R. at 400*. Second, *Mazzeo* has no bearing on these cases. It involved the question of whether a debtor was eligible to proceed under Chapter 13. *Mazzeo, 131 F.3d 295 at 301*. Thus, *Mazzeo* had nothing to do with the transfer of claims to a litigation trust. Finally, contrary to the Trust's assertions, the Examiner's Report did identify the fiduciaries of ESI and Homestead. *See* Examiner Report at 410. The HVM Defendants are not among them.

The HVM Defendants and Arbor Defendants also contend that the Trust lacks standing to assert (i) a claim for aiding and abetting the breaches of fiduciary duty in Count 6, and (ii) claims for waste, conversion, conspiracy, and aiding and abetting conversion (Counts **[*194]** 8-11) against any of the Defendants, because those claims are not specifically referenced in the Examiner's Report. In particular, they say that the Examiner's Report does not reference any aiding and abetting claims in connection with the post-LBO transfers against any potential defendants. *See* HVM MTD at 14. The Court finds merit to that assertion. In discussing claims for aiding and abetting a breach of fiduciary duty, the Examiner found that "[t]o the extent that any of the Debtors' fiduciaries breached their respective duties in authorizing the [LBO Transaction], it may be possible to hold other entities liable for aiding and abetting those breaches." Examiner's Report at 446. The Examiner's Report expressly limited any potential aiding and abetting claims to claims against the buyer, its controlling shareholders, and the various lenders and professionals involved in the LBO Transaction. *See id. at 421*.[85] The Defendants are not

_____

[85] In relevant part, the Examiner's Report states:

> [T]he Debtors' respective fiduciaries may have breached their duties to the Debtors by authorizing the Acquisition. . . . To the extent that a breach of duty by a fiduciary is established, other entities and individuals may also be

among the parties identified by the Examiner, and the aiding and abetting claim asserted in the Amended Complaint against the Defendants is not based upon any actions the Defendants took in connection with the LBO Transaction. The Trust cannot assert an aiding and abetting claim **[*195]** against different defendants that arises from different transfers during different time periods than what was "referenced in the Examiner's Report." *See, e.g., Hawaiian Telecom, 2011 Bankr. LEXIS 4511, 2011 WL 5854693, at \*2*; *see also Sun Microsystems v. Hynix Semiconductor Inc., 534 F. Supp. 2d at 1119* (finding that trustee cannot assert claims arising outside of time period designated in the plan).

The HVM Defendants and Arbor Defendants make similar arguments relating to Counts 8-11. The Examiner's Report does not speak to claims for (i) waste; (ii) conversion; (iii) aiding, abetting, inducing, or participating in conversion; and (iv) conspiracy. Still, the Trust asserts that that is not a basis for dismissing those claims. First, it contends that in determining whether it has standing to sue, the Court must interpret the scope of the claims included in the Litigation Trust as "broadly as possible." As support, it relies on *Rahl* and *Mazzeo. See* Opp'n at 77. For the reasons already discussed, the Court finds no merit to those assertions. *HN48*[↑] Litigation trust agreements and plans are contracts to be read using the ordinary rules of contractual interpretation. *See, e.g., In re Victory Mkts., 221 B.R. at 303; Rahl, 328 B.R. at 400-01*. To the extent there is any ambiguity in the Plan, the Court must construe it against the Debtors, and therefore, against the Trust standing in the Debtors' shoes. *See, e.g., Scheiderer v. Producers Credit Corp. (In re Scheiderer), No. 04-8066,*

---

held liable on an aiding and abetting theory for knowingly participating in those breaches. In particular, if the Sellers, as the ultimate controlling shareholders of ESI prior to the Acquisition, were not fiduciaries of ESI, but are found to have caused or influenced ESI's fiduciaries to transfer funds to the Sellers in connection with the Acquisition, those entities may be liable for aiding and abetting a breach of duty.

It may also be possible to hold the Buyer and its controlling shareholders, as well as the various Lenders and Professionals involved in the Acquisition liable for aiding and abetting the Debtors' fiduciaries' breaches of duty. Although those entities likely did not have **[*196]** control over the fiduciaries at the time of the Acquisition, the relevant standard requires only "knowing participation" in the breach. . . .

Examiner's Report at 420-21.

---

*2005 Bankr. LEXIS 861, 2005 WL 1279261, at \*3 (B.A.P. 6th Cir. May 19, 2005)* ("[T]he debtor as draftsman of the plan has to pay the price if there is any ambiguity about the meaning **[*197]** of the terms of the plan. This comports with the long-standing rule that ambiguous terms of a document are to be interpreted against the party that drafted them.") (citation omitted); *Ice Cream Liquidation, Inc. v. Calip Dairies, Inc. (In re Ice Cream Liquidation, Inc.), 319 B.R. 324, 333 (Bankr. D. Conn. 2005)* (explaining that where plan creates an ambiguity, it must be construed against the debtor, and holding that where plan was silent on *section 542* or any turnover actions, the debtor lacked standing to bring such an action).

Second, the Trust asserts that the claims for aiding and abetting the breaches of fiduciary duty, waste, conversion, conspiracy, and aiding and abetting conversion, are the same claims allowed by the Examiner under additional theories. *See* Opp'n at 76. It says that these claims are essentially alternatively pled claims for breach of fiduciary duties and fraudulent transfer, and that the Defendants have recognized as much by their prior motions to dismiss. *See id.*[86] It also contends that it is undisputed that fiduciary duty and fraudulent transfer claims were referenced in the Examiner's Report and therefore were transferred to the Litigation Trust. *Id.* The Trust further contends that as the Examiner recites the facts and circumstances underlying the claims in his report, and the claims at issue **[*198]** here are based on those facts, it follows that those claims necessarily are "referenced" in the Examiner's Report. *See, e.g., Liberty Mut. Ins. Co. v. Wetzel, 424 U.S. 737, 743, n.4, 96 S. Ct. 1202, 47 L. Ed. 2d 435 (1976)* (affirming for purposes of *Fed. R. Civ. P. 54(b)* that a complaint "asserting only one legal right, even if seeking multiple remedies for the alleged violation of that right, states a single claim for relief"). Thus, the Trust says that all of the State Law claims that it asserts in the Amended Complaint belonged to the Debtors pre-petition, were part of the bankruptcy estate post-petition, were referenced in the Examiner's Report, were transferred to the Litigation Trust, and may be prosecuted by the Trust on the Debtors' behalf pursuant to the confirmed Plan, the Confirmation Order, and the Litigation Trust Agreement. *See* Opp'n at 76-77. The Court disagrees.

---

[86] *See* Lightstone First MTD at 68-69; Arbor Memorandum of Law in Support of Moving Defendants' Motion to Dismiss the Complaints [Dkt. 115], at 56-57.

The Examiner was appointed to investigate the LBO Transaction and the financial circumstances that led to the Debtors' bankruptcy filing, and to determine "whether the estates of the Debtors and Extended Stay Inc. have any claims against any person with respect to" those two issues. *See* Confirmation Order ¶ E. In his report, the Examiner identified all of the claims that he concluded could viably be asserted by the Debtors. **[*199]** *See* Examiner's Report at 236-430. In his summary of the "Claims of the Estate," the Examiner explained that he would provide a "detailed discussion of possible estate causes of action . . . organized by way of a claim by claim analysis" and a "brief description of the claims [he] investigated[.]" *Id.* at 236-237. He also explained that "[c]onsistent with the purpose of this aspect of the Report - to assist the parties in interest in assessing the merits of possible causes of action - the Report includes an analysis of certain defenses that might be relevant to each potential cause of action." *Id.* Thus, the Examiner's Report includes a complete list of the "potential claims" of the Debtors. It is of no moment that the facts and circumstances described in the Examiner's Report may support the Trust's claims for waste, conversion, conspiracy, and aiding and abetting conversion. Nor is it significant that those claims allegedly are the same claims allowed by the Examiner, albeit under additional theories. The Examiner's Report does not identify claims for waste, conversion, conspiracy, and aiding and abetting conversion. Accordingly, the Trust lacks standing to assert those claims.

To summarize, under **[*200]** the Plan, the Trust succeeds to all of the rights and powers of a trustee in bankruptcy with respect to the preservation of the Litigation Trust Assets for the benefit of the Litigation Trust Beneficiaries. Those assets consist, in part, of any potential claims, causes of action, charges, suits or rights of recovery referenced in the Examiner's Report. The report does not identify the HVM Defendants as potential defendants in respect of any of the claims discussed in the report. Accordingly, the Trust lacks standing to assert the claims underlying Counts 5-11 of the Amended Complaint against the HVM Defendants. The Court dismisses those claims against the HVM Defendants for lack of subject matter jurisdiction.[87] The

---

[87] The HVM Defendants are also named as defendants in Count 17 of the Amended Complaint. In that count, the Trust seeks to disallow the HVM Defendants' filed and scheduled claims, pursuant to *§ 502(d) of the Bankruptcy Code*. *See* Amd. Compl. ¶¶ 376-378. The HVM Defendants contend that

Examiner's Report does not identify claims for waste, conversion, conspiracy and aiding and abetting breaches of fiduciary duties and conversion, as Litigation Trust Assets. Accordingly, the Trust lacks standing to assert those claims. The Court dismisses Counts 6 and 8-11 against the Defendants named therein for lack of subject matter jurisdiction.

Having considered the Defendants' arguments in support of their request to dismiss the Amended Complaint pursuant **[*201]** to *Rule 12(b)(1)*, the Court turns its attention to the Defendants' requests for relief pursuant to *Rule 12(b)(6)*.

The Adequacy Of Pleadings In Support of the Amended Complaint

Whether The Trust's Resort To Group Pleading Is

Grounds To Dismiss All Counts In The Amended Complaint

*HN49*[⬆] A *Rule 12(b)(6)* motion is "designed to test the legal sufficiency of the complaint, and thus does not require the [c]ourt to examine the evidence at issue." *DeJesus v. Sears, Roebuck, Co., 87 F.3d 65, 69 (2d Cir. 1996)* (citing *Carey v. Mt. Desert Island Hosp., 910 F. Supp. 7, 9 (D. Me. 1995))*. *See also Chance v. Armstrong, 143 F.3d 698, 701 (2d Cir. 1998)* (noting that under *Rule 12(b)(6)*, the issue "is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims" (quoting *Branham v. Meachum, 77 F.3d 626, 628 (2d Cir. 1996)))*. Accordingly, in resolving a *Rule 12(b)(6)* motion, a court must "accept all factual allegations in the

---

Count 17 is inapplicable to them because the claims asserted against them are all brought under *§ 541*, which is not mentioned in either Count 17 or *§ 502(d)* of the Bankruptcy, and there is no allegation that the HVM Defendants possess any property of the bankruptcy estate. *See* HVM MTD at 37-38. The Trust concedes that such argument could be correct in theory. However, it contends that the Court should allow discovery to proceed first to determine whether the HVM Defendants received any transfers at issue and if they did not, the Court should dismiss Count 17 as against the HVM Defendants. *See* Opp'n at 129. Count 17 is a claim for disallowance of claim under *§ 502(d) of the Bankruptcy Code*, and thus falls squarely within the above definition of Litigation Trust Assets. *See* Plan § 1.89(i). As such, the Trust has standing to assert it against the HVM Defendants. Insofar as the HVM Defendants have not asserted a claim against the Debtors' estates, then they simply have no claim to be disallowed., and as such, the Court dismisses Count 17 as moot as to the HVM Defendants.

22-11509-pb   Doc 180   Filed 02/21/23   Entered 02/21/23 16:53:50   Main Document
Pg 105 of 191
2020 Bankr. LEXIS 2128, *201

Page 89 of 153

complaint as true," *Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 309, 127 S. Ct. 2499, 168 L. Ed. 2d 179 (2007)*, even if the allegations are doubtful in fact. *See Bell Atl. Corp. v. Twombly, 550 U.S. 544, 554, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)* ("*Twombly*").

**HN50**[⬆] In resolving a *Rule 12(b)(6)* motion, courts assess the sufficiency of the complaint in light of the pleading requirements in *Rule 8 of the Federal Rules of Civil Procedure*. Under *Rule 8(a)(2)* a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief[.]" *Fed. R. Civ. P. 8(a)(2)*. A claim is the "aggregate of operative facts which give rise to a right enforceable in the courts." *Original Ballet Russe, Ltd. v. Ballet Theatre, Inc., 133 F.2d 187, 189 (2d Cir. 1943)* (citation omitted). Under *Rule 8*'s "liberal notice pleading standards, "the pleader need only **[*202]** set forth a short and plain statement of the claim showing that the pleader is entitled to relief." *Liquidation Tr. v. Daimler AG (In re Old CarCo LLC), 435 B.R. 169, 176 (Bankr. S.D.N.Y. 2010)* (citation omitted). *See also Swierkiewicz v. Sorema N.A., 534 U.S. 506, 514, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002)* ("The liberal notice pleading of *Rule 8(a)* is the starting point of a simplified pleading system, which was adopted to focus litigation on the merits of a claim."). Thus, *Rule 8* "does not demand that a complaint be a model of clarity or exhaustively present the facts alleged[.]" *Atuahene v. City of Hartford, 10 F. App'x 33, 34 (2d Cir. 2001)* (citation omitted). However, it requires that each defendant is given "fair notice of what the plaintiff's claim is and the ground upon which it rests." *Mayle v. Felix, 545 U.S. 644, 655, 125 S. Ct. 2562, 162 L. Ed. 2d 582 (2005)* (quoting *Conley v. Gibson, 355 U.S. 41, 47, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957))*. *See also Harrison v. N.J. Cmty. Bank (In re Jesup & Lamont, Inc., 507 B.R. 452, 459-60 (Bankr. S.D.N.Y. 2014)* (explaining that under *Rule 8(a)*, "a plaintiff must disclose sufficient information to permit the defendant 'to have a fair understanding of what the plaintiff is complaining about and to know whether there is a legal basis for recovery.'") (citation omitted). Accordingly, the "short and plain statement" called for in *Rule 8* must provide "enough facts to state a claim to relief that is plausible on its face." *Twombly, 550 U.S. at 547*. In other words, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)*. *See also Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 729 (2d Cir. 2013). As previously noted, to meet this standard, **[*203]** and thus survive a motion to dismiss under *Rule 12(b)(6)*, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal, 556 U.S. at 678* (quoting *Twombly, 550 U.S. at 570*); *cf. Matson v. Bd. of Educ. of City Sch. Dist. of New York, 631 F.3d 57, 72 (2d Cir. 2011)* ("The corollary to *Rule 8(a)* is that a complaint attacked on a motion to dismiss pursuant to *Rule 12(b)(6)* will survive so long as the factual allegations - viewed in a light most favorable to the plaintiff and drawing all reasonable inferences in her favor - are sufficient to 'raise a right to relief above the speculative level' and present a claim that is 'plausible on its face.'") (citation omitted) (Straub, J., concurring in part and dissenting in part).

**HN51**[⬆] Where, as here, the Amended Complaint includes claims seeking to avoid transfers of estate property as actual fraudulent conveyances under federal and state law pursuant to *§ 548(a)(1)(A)* (Count 12) and *§ 544 of the Bankruptcy Code* (Count 13), respectively, those claims must satisfy the additional pleading requirements of *Rule 9(b) of the Federal Rules of Civil Procedure*.[88] *See Picard v. Taylor (In re Park S. Sec., LLC), 326 B.R. 505, 517 (Bankr. S.D.N.Y. 2005)*; *Sharp Int'l Corp. v. State St. Bank & Tr. Co. (In re Sharp Int'l Corp.), 281 B.R. 506, 514 (Bankr. E.D.N.Y. 2002)*, *aff'd on other grounds*, *302 B.R. 760 (E.D.N.Y. 2003)*, *aff'd on other grounds*, *403 F.3d 43 (2d Cir. 2005)*. *Rule 9(b)* provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." *Fed. R. Civ. P. 9(b)*. The rule is intended to "provide a defendant with fair notice of a plaintiff's claim, **[*204]** to safeguard a defendant's reputation from 'improvident charges of wrongdoing,' and to protect a defendant against the institution of a strike suit." *Campaniello Imports, Ltd. v. Saporiti Italia S.P.A., 117 F.3d 655, 663 (2d Cir. 1997)* (quoting *O'Brien v. Nat'l Prop. Analysts Partners, 936 F.2d 674, 676 (2d Cir. 1991))*. To "serve the purpose of *Rule 9(b)*," plaintiffs "[must] allege facts that give rise to a strong inference of fraudulent intent." *Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1128 (2d Cir. 1994)*.

In the Amended Complaint, the Trust seeks in excess of $143.5 million in damages and/or restitution/disgorgement, plus punitive damages for state law tort claims. All of those claims are in respect of the post-LBO Transfers. **HN52**[⬆] To satisfy the

---

[88] *Rule 9 of the Federal Rules of Civil Procedure* is made applicable herein by *Bankruptcy Rule 7009*.

pleading requirements in *Rule 8(a)(2)*, at a minimum, the Trust must provide notice to the Defendants of which Debtor made each transfer, the date and amount of the transfer, the Defendant who received the transfer and the other necessary elements of the cause of action. *See, e.g., In re Trinsum Grp., Inc., 460 B.R. 379, 388 (Bankr. S.D.N.Y. 2011)* (holding that "adequate factual information" to survive a motion to dismiss complaint against former officers of corporate debtor, seeking to set aside certain transfers as constructively fraudulent to creditors under both federal bankruptcy and state law, as well as to recover from officers on unjust enrichment theory, includes "the transferor and the transferees as well as the amount of each transfer **[*205]** and the year in which each took place"); *In re Enron Corp., No. 01-16034 (AJG), 2006 Bankr. LEXIS 4650, 2006 WL 2400369, at *6 (Bankr. S.D.N.Y. May 11, 2006)* (finding that to adequately plead a constructively fraudulent transfer, the plaintiff must allege that the transfer "actually involved property of [the debtor] being transferred to the Defendant."); *Miller v. Mitsubishi Dig. Elecs. Am., Inc. (In re Tweeter Opco), 452 B.R. 150, 154-55 (Bankr. D. Del. 2011)* (granting motion to dismiss preferential transfer claim where debtor failed to identify which of its affiliates was the transferor).

The Arbor Defendants argue that the Court should dismiss all the claims in the Amended Complaint for failure to comply with *Rule 8(a)*, and to dismiss Counts 12 and 13 for the additional reason that the Trust fails to plead fraud with particularity as required by *Rule 9(b)*. They assert that the Amended Complaint adopts an impermissible group pleading format because it: (i) alleges that the Transfers were made by the "Debtors" (*see* Arbor MTD at 13 (citing Amd. Compl. ¶¶ 144, 146, 151, 162, 166, 172)); (ii) refers to the defendants, including both LBO investors and their nominee directors, as "initial transferees, parties for whose benefit the transfers were made, or immediate or mediate transferees" (*see id.* at 14 (citing Amd. Compl. ¶ 232)); and (iii) fails to allege which Debtor entity was entitled to receive the LIBOR Floor Certificates. *See id.* (citing Amd. **[*206]** Compl. ¶¶ 138, 139). They say that as a consequence of the latter, it is unclear which Debtor allegedly was entitled to the income generated by the certificates, and whose supposedly diverted income was used to pay the 25% Note Payments and the Floor Bonds Payments. *See* Arbor MTD at 13-14. They also contend that following the same pattern of "group pleading," the Trust alleges insolvency of the Debtors as a group (*see id.* (citing Amd. Compl. ¶¶ 211, 220, 228)), and thereby fails to allege that each Debtor-

related transferor was insolvent or inadequately capitalized. *Id.*

The Defendants also say that the Amended Complaint fails to plead fraud with particularity because it does not contain any allegations, let alone specific and particular allegations, of fraudulent intent, but merely tracks the language of the statute, and then alleges that at the time the Transfers were made, the Debtors were insolvent. *See* Arbor MTD at 22 (citing, as examples, Amd. Compl. ¶¶ 330, 338). They assert that the Amended Complaint fails to identify anyone at the Debtors who acted with the requisite fraudulent intent. *See* Arbor MTD at 22. They contend that this omission is fatal and cannot be obscured by the Trust's bare-bones conclusions that:

> the Transfers **[*207]** "were incurred at a time when the Debtors were controlled by insiders who benefited directly and indirectly from the transfers and obligations," that when the Alleged Transfers were made "the Debtors and the insiders had knowledge of the Debtors' insolvency," and that the "Defendants and the insiders knew that they were hindering, delaying, or defrauding the Debtors' creditors when the Debtors paid equity owners on account of their equity ahead of paying off creditors."

*See* Arbor MTD at 22-23 (quoting Amd. Compl. ¶¶ 329-30, 337-38). They also assert that in alleging fraud, the Trust ignores its own allegations that the Transfers were made pursuant to contractual arrangements put in place at the time of the LBO Transaction (e.g., the BHAC LLC Agreement and Cash Management Agreement (*see* Amd. Compl. ¶¶ 118, 182 and 196)), or to satisfy loan obligations (e.g., repayment of the 25% Note)). *Id.* ¶¶ 30, 69, 71, 155-157; *see also* Arbor MTD at 23. They contend that other than conclusory allegations, the Amended Complaint is silent as to who acted with intent to defraud, and how creditors were defrauded. They say that instead, the Trust lumps together all of the Transfers and asserts that they were made with actual intent to **[*208]** hinder, delay or defraud. *See* Arbor MTD at 22-23 (citing Amd. Compl. ¶¶ 329, 337). According to the Arbor Defendants, that is conclusory group pleading that fails to satisfy *Rule 9(b)*.

The Trust disputes those contentions. As an initial matter, it asserts that the Arbor Defendants' challenge to the Trust's use of "group pleading" allegations errs in its threshold premise that group pleading is not permitted by *Rules 8(a)* or *9(b)*. *See* Opp'n at 116. The Trust asserts that group pleading is permitted in pleading

fraud claims and claims that sound in fraud or involve alleged corporate wrongdoing, in cases in which similarly situated insiders together make tortious corporate decisions. *Id*. It contends that is the case here and, as such, its failure to identify with specificity the Defendants and Debtors that were parties to the Transfers is not a pleading defect. *Id*.

HN53[↑] It is settled that "[w]here multiple defendants are asked to respond to allegations of fraud, the complaint should inform each defendant of the nature of [its] alleged participation in the fraud." *DiVittorio v. Equidyne Extractive Indus., Inc., 822 F.2d 1242, 1247 (2d Cir. 1987)*. The requirements of *Rule 9(b)* are "not satisfied by a complaint in which defendants are clumped together for vague allegations." *Ellison v. Am. Image Motor Co., Inc., 36 F. Supp. 2d 628, 640 (S.D.N.Y. 1999)* (internal quotations marks and citation omitted); [*209] *see also Pallickal v. Technology Int'l, No. 94 Civ. 5738, 1996 U.S. Dist. LEXIS 4039, 1996 WL 153699, at *1 (S.D.N.Y. Apr. 3, 1996)* ("Where there are multiple defendants, a complaint must identify which defendant is responsible for which act[.]"). The so-called "group pleading doctrine" is an exception to that general rule. *See Cyganowski v. Beechwood Re Ltd. (In re Platinum-Beechwood Litig.)*, 427 F. Supp. 3d 395, 2019 WL 4934967, at *20 (S.D.N.Y. 2019)* ("The group pleading doctrine is an exception to the requirement that the fraudulent acts of each defendant be identified separately in the complaint." (citing *Elliott Assocs., L.P. v. Hayes, 141 F. Supp. 2d 344, 354 (S.D.N.Y. 2000)))*. It allows plaintiffs to "rely on a presumption that statements in prospectuses, registration statements, annual reports, press releases, or other group-published information, are the collective work of those individuals with direct involvement in the everyday business of the company." *In re Oxford Health Plans, Inc., 187 F.R.D. 133, 142 (S.D.N.Y. 1999)* (internal quotations omitted). *Cf. In re Livent, Inc. Sec. Litig., 78 F. Supp. 2d 194, 219 (S.D.N.Y. 1999)* (noting that group pleading doctrine permits plaintiffs "to allege that misstatements contained in company documents may be presumed to be the work of the company's officers and directors").

HN54[↑] The doctrine is "extremely limited in scope." *Polar Int'l Brokerage Corp. v. Reeve, 108 F. Supp. 2d 225, 237 (S.D.N.Y. 2000)*. First, it applies only to "group-published documents, such as SEC filings and press releases." *Elliott Assocs., L.P. v. Hayes, 141 F. Supp. 2d at 354* (citations omitted); *see also The Jordan (Bermuda) Inv. Co. v. Hunter Green Invs. Ltd., 205 F. Supp. 2d 243, 253 (S.D.N.Y. 2002)* (noting that the doctrine applies to statements in "group published

information," such as "prospectuses, registration statements, annual reports, [*210] [or] press releases"); *In re BISYS Sec. Litig., 397 F. Supp. 2d 430, 438 (S.D.N.Y. 2005)* (same). Second, it only applies where the officers or directors of the company participated in the preparation and dissemination of the group published document. *See Degulis v. LXR Biotechnology, Inc., 928 F. Supp. 1301, 1311 (S.D.N.Y. 1996)* ("Consequently, where . . . the defendants are a narrowly defined group of highly ranked officers or directors who participated in the preparation and dissemination of a prospectus, plaintiffs are not expected to bear the burden of having to identify the role of each defendant in the fraud without the benefit of any discovery."); *see also In re Alstom SA Sec. Litig., 406 F. Supp. 2d 433, 448 (S.D.N.Y. 2005)* ("[T]o invoke the group pleading doctrine against a particular defendant the complaint must allege facts indicating that the defendant was a corporate insider, with direct involvement in day-to-day affairs, at the entity issuing the statement.") (citation omitted).

The Trust correctly notes both that the group pleading doctrine is applicable where the defendants are alleged to be a small group of officers and directors with control over the day-today affairs of the company, and that the Amended Complaint has alleged that the Defendants are corporate insiders with control of the Debtors. *See* Opp'n at 117-118 ("Moreover, the test for group pleading is particularly [*211] tied to the defendant's status as an insider.... Surely, each of the Defendants in this case fit the following description."). However, it overstates the application of the group pleading doctrine in this case because in support of the Amended Complaint, the Trust does not assert that the allegedly fraudulent misconduct by the Defendants is predicated on a written misstatement or misrepresentation issued on behalf of a group of individuals, and that the source of the misinformation cannot be attributed to a particular individual. *Cf. In re Livent, Inc. Sec. Litig., 78 F. Supp. 2d at 219* (explaining that group pleading doctrine permits plaintiffs "to allege that misstatements contained in company documents may be presumed to be the work of the company's officers and directors"). Although the Trust alleges that the Arbor Individuals were corporate insiders that worked together, it does not allege that any of the purported misconduct by the Arbor Individuals (or any of the Defendants) is based upon or connected to any published document, written material or other communicated information by the Debtors or any Entity Defendants, which information is misleading or contains misstatements. Rather, the Trust complains about the alleged acts [*212] or omissions by the

2020 Bankr. LEXIS 2128, *212

Defendants in authorizing and facilitating the Transfers resulted in harm to the Debtors and their creditors. Thus, the "group pleading doctrine" is not applicable herein. *See, e.g., LaMonica v. Tilton (In re Transcare Corp.), 592 B.R. 272, 288 (Bankr. S.D.N.Y. 2018)* (concluding that the group pleading doctrine was not applicable in part because the plaintiffs did not "base any claim on a group statement issued by any entity.).[89]

Alternatively, the Trust contends that it should be permitted to group plead the Defendants' alleged bad acts because the specific information regarding the Transfers resides within the Defendants' knowledge and control. *See* Opp'n at 117. HN55[⬆] Courts take a liberal approach when construing allegations of actual fraud when pled by a bankruptcy trustee, because a trustee is an outsider to the transaction who must plead fraud from second-hand knowledge. *See, e.g.,*

---

[89] The cases that the Trust cites in support of its argument are not to the contrary and do not support its reliance on the "group pleading doctrine." In all of those cases, the courts applied the group pleading doctrine where, in contrast to the claims at issue in the Amended Complaint, the plaintiffs' claims of fraud (or claims sounding in fraud) were predicated upon or were connected to some form of written statement or published document that could not be attributed to a particular defendant. *See Adelphia Recovery Tr. v. Bank of Am., N.A., 624 F. Supp. 2d 292, 316 (S.D.N.Y. 2009)* (allowing the use of group pleading where the allegedly fraudulent conduct was based upon the banks' participation in the preparation of false term sheets); *Rahl v. Bande, 328 B.R. 387, 413 (S.D.N.Y. 2005)* (finding that plaintiff's claim for breach of fiduciary duties was premised on the directors' and officers' fraudulent conduct in 'misrepresenting and concealing [the company's] true financial condition' through the filing of false financial statements"); *Asdourian v. Konstantin, 77 F. Supp. 2d 349, 351 (E.D.N.Y. 1991)* (allowing use of group pleading doctrine where alleged misconduct included falsifying documents such as tax returns, employment records and bank verifications in connection with defendants' sale of fraudulent mortgages); *Elliott Assocs., L.P. v. Hayes, 141 F. Supp. 2d 344, 354 (S.D.N.Y. 2000)* (allowing group pleading where the court found that misstatements in the company's Registration Rights Agreement representing the defendant's absolute obligation to convert the defendant's preferred shares); *King Cty., Wash. v. IKB Deutsche Industriebank AG, 863 F. Supp. 2d at 311-312* (finding group pleading appropriate where defendant was an insider or affiliate who solicited offering materials it knew contained misleading credit ratings of loan portfolios); *In re Fruehauf Trailer Corp., No. 96-01563 PJW, 2011 Bankr. LEXIS 2644, 2011 WL 2838168, at *5 (Bankr. D. Del. July 15, 2011)* (finding use of group pleading inapplicable where the alleged misrepresentations were made to plaintiff personally).

*Nisselson v. Softbank AM Corp. (In re MarketXT Holdings Corp.), 361 B.R. 369, 395 (Bankr. S.D.N.Y. 2007)* ("A plaintiff alleging an actual fraudulent transfer under *section 548(a)(1)(A)* must state with particularity the circumstances constituting fraud . . . . However, courts take a more liberal view when examining allegations of actual fraud that are pled by a bankruptcy trustee in the context of a fraudulent conveyance, since a trustee is an outsider to the transaction **[*213]** who must plead fraud from second-hand knowledge.") (internal quotation marks and citation omitted); *Geltzer v. Barish (In re Geltzer), 502 B.R. 760, 769 (Bankr. S.D.N.Y. 2013)* ("[C]ourts take a more liberal approach when construing allegations of actual fraud pled by a trustee, because 'a trustee is an outsider to the transaction who must plead fraud from second-hand knowledge[.]'" (quoting *Picard v. Taylor (In re Park S. Sec., LLC), 326 B.R. 505, 517-18 (Bankr. S.D.N.Y. 2005)))*; *Silverman v. H.I.L. Assocs. (In re Allou Distribs., Inc.), 387 B.R. 365, 385 (Bankr. E.D.N.Y. 2008)* ("A more liberal standard has been applied to fraud allegations in bankruptcy cases [because] 'it is often the trustee, a third party, who is pleading fraud on secondhand information.'") (citation omitted); *Enron Corp. v. Credit Suisse First Boston Int'l, Inc. (In re Enron Corp.), 328 B.R. 58, 73 (Bankr. S.D.N.Y. 2005)* ("Courts take a liberal approach when reviewing allegations of fraud pled by a trustee because, as an outside party to the transactions in issue, the trustee must plead the claim of fraud for the benefit of the estate and its creditors based upon second-hand knowledge.").[90] HN56[⬆] Moreover, application of *Rule 9(b)* is relaxed when the factual information regarding the alleged fraud is peculiarly within the defendant's control. *Weiner v. Quaker Oats Co., 129 F.3d 310, 319 (3d Cir. 1997)*. In those cases, courts will permit group pleading provided that the complaint delineates "at least the nature and

---

[90] The Arbor Defendants assert that the Trust has had full access to information through the Examiner's Report and "unfettered access to records." Arbor MTD at 23. The Trust disputes that assertion. It says that it does not have access to all information received by the Examiner because it was provided to the Examiner pursuant to confidentiality agreements, and that e-mails generally were not provided to the Examiner. *See* Opp'n at 119 n.34. It also contends that it does not have access to the Defendants or to any of the Debtors' former employees, as they work for HVM, or the Defendants or their agents. In any event, the Arbor Defendants have not identified any specific information that they believe that the Trust has in its possession that it should have included in the Amended Complaint. The Court attaches no weight to the Arbor Defendants' assertion.

scope of plaintiffs' effort to obtain, before filing the complaint, the information needed to plead with particularity." *Shapiro v. UJB Fin. Corp., 964 F.2d 272, 285 (3d Cir. 1992)* cert. denied, 506 U.S. 934, 113 S. Ct. 365, 121 L. Ed. 2d 278 (1992). "This **[*214]** requirement is intended to ensure that plaintiffs thoroughly investigate all possible sources of information, including but not limited to all publicly available relevant information, before filing a complaint." *Id.* The case of *Haskell v. Goldman, Sachs & Co. (In re Genesis Health Ventures, Inc.), 355 B.R. 438 (Bankr. D. Del. 2006)* is instructive. There, certain investors sued the debtors' chief financial officer and three of the debtors' lenders alleging fraud, conspiracy to commit fraud and gross negligence. *Id. at 443*. In part, and as relevant, the defendants moved to dismiss the fraud claim on the grounds that the complaint made allegations against them as a group rather than individually. *Id. at 455*. The plaintiffs opposed the motion arguing, in part, that they should not be expected to describe the individual defendants' actions in committing the alleged fraud with great specificity because the information regarding the planning of the fraud was particularly within the defendants' knowledge and control. *Id.* In approving the group pleading and denying the motion to dismiss, the court, after reviewing the complaint, found that (i) the plaintiffs had very clearly provided a statement of facts upon which their allegation was based; and (ii) although there was no explicit statement in the complaint regarding **[*215]** the scope of the plaintiffs' efforts to obtain information, it was clear from the complaint that the plaintiffs had searched through available resources for information regarding their claims. In making that finding, the *Genesis* court focused on the fact that the defendants operated as a group and decided in committee meetings to engage in the fraudulent conduct in manipulating Genesis' financial statements. *See id. at 457*. In this light, the court concluded that collective references to the "defendants" made sense. The court also observed that references in the complaint to the defendants' notes from the meetings of the steering committee provided sufficient evidence to establish that they had investigated their claims. *See id. at 456*. Here, the Trust is plainly an outsider to the Transfers without any firsthand knowledge regarding the alleged acts and omissions of the Defendants and Debtors and alleges that the Defendants acted as a group in operating the Debtors. The Amended Complaint contains a detailed statement of the facts underlying the claims. Although it does not specifically describe the Trust's efforts to obtain information regarding the Transfers, the Trust clearly utilized available sources **[*216]** in compiling the facts in support of the complaint. For example, the

Amended Complaint makes multiple references to the minutes of the Company Board meetings during the period of November of 2007 through March of 2009. *See* Amd. Compl. ¶¶ 129, 131, 132, 169, 170, 175, 177, 178, 182, 184, 192 and 193. The Amended Complaint also makes clear that the claims asserted therein are derivative of the findings in the Examiner's Report. *See id.* ¶ 9. The Court finds that in these circumstances it will permit group pleading in asserting the fraud claims.[91]

*HN57*[↑] Still, the use of group pleading does not permit a plaintiff to circumvent the requirement of *Rule 8* that the complaint give a defendant "fair notice of what the plaintiff's claim is and the ground upon which it rests." *Atuahene v. City of Hartford, 10 F. App'x 33, 34 (2d Cir. 2001)* (internal quotation marks and citation omitted). The Trust is not attempting to do so here. The Amended Complaint identifies every Transfer by date, recipient, and amount, and often by the source, i.e., whether the transfers were made by BHAC, DL-DW, from a reserve account, or from the LIBOR Floor Certificates proceeds. *See* Amd. Compl. ¶¶ 143-47, 151, 16-64, 166-69, 172-74, 182-83, 201, 202, 208. The Amended Complaint contains specific **[*217]** allegations describing each of the Defendants, including whether a Defendant allegedly was an insider that exercised control, held an equity, board or management position, and/or was the recipient of some or all of the Transfers. *See id.* ¶¶ 24-104. Further, the Trust asserts that those allegedly in control of the Debtors and their affiliates treated them as a single unit, did not follow corporate formalities, and operated and managed them as a single business enterprise where each entity was the instrumentality or alter ego of the other. *See id.* ¶ 198; *see also id.* ¶¶ 194-195 (alleging facts in support of alleged operational and management integration of the Debtors). Those allegations provide sufficient notice to the Defendants of the nature of the claims asserted against them and the basic facts underlying those claims. *See, e.g., David v. Weinstein Co. LLC*, No. 18-cv-5414, 2019 U.S. Dist. LEXIS 69917, 2019 WL 1864073, at *4-5 (S.D.N.Y. Apr. 24, 2019) (holding that plaintiff satisfied *Rule 8* and did not impermissibly group plead, even where she did not distinguish the individual defendant directors' actions, because she had alleged that the defendant directors knew of Weinstein's sexual

_____

[91] As discussed below, the Court finds that for the same reasons, the Trust has met the *Rule 9(b)* pleading requirements in respect of its claim for breach of contractual and fiduciary duties of care, loyalty and good faith in Count 5 of the Amended Complaint.

misconduct, were negligent in failing to curb the behavior or protect her, and **[*218]** engaged in the negligent retention of Weinstein, and therefore, the director defendants had adequate notice of the nature of the claims against them). As pled, the Amended Complaint is hardly "so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised," that it violates *Rule 8(a)* and requires dismissal. *Strunk v. U.S. House of Representatives, 68 F. App'x 233, 235 (2d Cir. 2003)*. Accordingly, the Court finds no merit to the Arbor Defendants' assertion that the Amended Complaint should be dismissed for failing to satisfy *Rule 8(a)*'s liberal pleading standards or that Counts 12 and 13 of the Amended Complaint fail to satisfy the more exacting standards for fraud claims under *Rule 9(b)*.

The Defendants also assert that most of the Counts in the Amended Complaint should be dismissed pursuant to *Rule 12(b)(6)* because they fail to state claims for relief under applicable law. Before reviewing those matters, the Court considers the Defendants' reliance on the *Bangor*

<u>*Punta* doctrine in support of the Motions.</u>

Application of the *Bangor Punta* Doctrine The Defendants also contend that application of the *Bangor Punta* doctrine bars the Trust from asserting the State Law claims (Counts 1-11) against them. The *Bangor Punta* doctrine arises out of the Supreme Court's **[*219]** decision in *Bangor Punta Operations, Inc. v. Bangor & Aroostook R.R. Co., 417 U.S. 703, 94 S. Ct. 2578, 41 L. Ed. 2d 418 (1974)* ("*Bangor Punta*"). In that case, Amoskeag Co. ("Amoskeag") acquired the stock of Bangor & Aroostock Railroad Co. ("BAR") and thereafter assumed management over BAR. Two years after that acquisition, BAR sued its former parent for damages allegedly occasioned by corporate mismanagement of BAR. The suit sought damages for the benefit of Amoskeag, BAR's new parent, that substantially exceeded the amount that Amoskeag paid for the stock. *Id. at 706*. The district court dismissed the action finding that since Amoskeag would have been barred from maintaining a shareholder derivative action due to its failure to satisfy the 'contemporaneous ownership' requirement of both *Fed. R. Civ. P. 23.1(1)* and state law, equitable principles precluded the use of the corporate fiction to evade that requirement. In rendering its decision, the district court observed that Amoskeag would be the principal beneficiary of any recovery, and was thus the real party in interest, and that since Amoskeag had acquired its BAR stock long after the

alleged wrongs had occurred, any recovery by Amoskeag would be a windfall. *See id. at 708*. The Court of Appeals reversed primarily on the grounds that any recovery by BAR would also inure to the public's **[*220]** benefit because of its status as a 'public' or 'quasi-public' corporation and the important nature of the services it provides; a factor the court found to be sufficient to support a corporate cause of action and to render any windfall to Amoskeag irrelevant. *See id. at 703*.

*HN58*[⬆] On appeal, the Supreme Court held that a stockholder who has purchased all or substantially all of the shares of a corporation from a vendor at a fair price may not seek to have the acquired corporation recover against the vendor for prior corporate mismanagement and waste of corporate assets that may have occurred during the prior vendor's ownership. *Id. at 711*. In part, the Supreme Court reasoned that where the purchaser acquired the shares after the commission of wrongful acts and received full value for its purchase price (i.e., the price paid reflected the impact of the wrongful acts on the entities' value), it is not injured, and any further recovery would result in a windfall to the plaintiff. *Id.* ("Moreover, it would in effect allow the shareholders to recoup a large part of the price they agreed to pay for their shares, notwithstanding the fact that they received all they had bargained for."). *HN59*[⬆] Thus, *Bangor Punta* stands for **[*221]** the proposition that, "where a buyer purchases a subsidiary for fair value, it cannot later cause the subsidiary to pursue claims against the seller that had accrued prior to the sale." *Bensen v. American Ultramar, No. 92 CIV 4420 (KMV), 1996 U.S. Dist. LEXIS 1222, 1996 WL 48601, at *5 (S.D.N.Y. Feb. 6, 1996)*; *see also Global Crossing Estate Representative v. Winnick, No. 04-CIV-2588, 2006 U.S. Dist. LEXIS 53785, 2006 WL 2212776, at *17 (S.D.N.Y. Aug. 3, 2006)* ("[I]n essence [*Bangor Punta*] held that a subsequent owner of a corporation, through his company, cannot sue the prior owner for mismanagement when it is not claimed that the subsequent owner was defrauded, the theory being that the subsequent owner got exactly what he bargained for when he purchased the company, and that in equity should not be permitted to seek additional relief that would provide him with a windfall."). In short, "*Bangor Punta* is generally concerned with actions which are, in essence, derivative in nature. That is, after acquiring shares, the new owner uses the acquired company's corporate machinery to sue the prior owners for acts which were or could have been already 'baked into' the sales price." *TNS Media Research, LLC v. TiVo Research and Analytics, Inc., 193 F. Supp. 3d 307, 311*

*(S.D.N.Y. 2016)*. *See also Midland Food Servs., LLC v. Castle Hill Holdings V, LLC, 792 A.2d 920, 929 (Del. Ch. 1999)* ("The *Bangor Punta* Doctrine ensures that a purchaser who obtains a controlling interest in a corporation after potential claims arose against those persons from whom the purchaser obtained his shares cannot **[*222]** use his control of the corporate machinery to cause the corporation to assert those claims [whether in contract, tort or otherwise] directly."). In that way, the *Bangor Punta* doctrine is an equitable defense. *See Bangor Punta, 417 U.S. at 709* ("The resolution of the issue turns on the applicability of settled principles of equity . . .").

The Defendants assert that by application of this doctrine, the Trust is barred from bringing suit against them because the real beneficiaries of the Trust's claims are the Mortgage Lenders and the Mezzanine Lenders, and they are prohibited from bringing suit in their own names because they participated in the LBO Transaction and Transfers at issue. *See* Arbor MTD at 53 ("The State Law Claims are barred by the [*Bangor Punta* doctrine], which precludes a corporation from asserting a claim . . . when the real beneficiaries of the suit could not bring the suit themselves."); Lightstone MTD at 63 ("[The *Bangor Punta* doctrine] strongly applies here, where the Trust is acting for, and controlled by, a beneficiary that has no right to benefit from the Trust's claims under the facts of this case.").

The Court finds no merit in that argument. Courts uniformly find that *Bangor Punta* is not applicable in bankruptcy proceedings **[*223]** brought for the benefit of creditors. *See, e.g., Think3 Litig. Trust v. Zuccarello (In re Think3, Inc.), 529 B.R. 147, 183 (Bankr. W.D. Tex. 2015)* (collecting cases). Moreover, the Second Circuit has expressly declined to adopt a broad reading of *Bangor Punta*, emphasizing that the decision turned on the fact that the subsequent shareholder, "having paid a fair price for its shares, suffered no injury as a result of any earlier mismanagement." *Siegel v. Converters Transp. Inc., 714 F.2d 213, 215 (2d Cir. 1983)* ("*Siegel*"). In doing so, the *Siegel* court rejected the defendants' assertion that the doctrine applies to bar recovery by a plaintiff that ratified the alleged bad acts. In *Siegel*, Robert Siegel was a shareholder and President of Converters Transportation ("Converters"), a contract carrier that was formed for the sole purpose of providing transportation services to Elk Piece Dye Works ("Elk"). *Id. at 214*. In the course of its relationship with Elk, Converters agreed to pay certain individuals who were principals of Elk the sum of $12,500 annually as "commissions" for obtaining Elk's trucking business.

On behalf of Converters, Siegel sued Elk and the individuals to recover the commissions as illegal rebates and for compensation due and owing for services rendered. *Id. at 215*. The district court granted Siegel **[*224]** summary judgment on the amended complaint. On appeal, Elk argued, among other things, that the district court erred in granting summary judgment because Converters should be estopped from obtaining any recovery from the defendants because there was uncontroverted evidence that Siegel knew, ratified and participated in the alleged illegal payments. *Id.* Relying heavily on *Bangor Punta*, Elk argued, in substance, that "a party ought not to profit from his own wrongdoing." *Id.* It contended that *Bangor Punta* "recognize[s] the principle that a stockholder may not maintain an action to recover for wrongful conduct if that stockholder acquiesced in, participated in, or ratified the wrongdoing complained of." *Id.* The Second Circuit rejected that contention. It found that the Supreme Court's decision "was not a case where recovery was denied under either an 'unclean hands' or 'in pari delicto' rationale." *Id.* Rather the decision "ultimately turned on [the Supreme Court's] view that the plaintiff in *Bangor Punta*, having paid a fair price for its shares, suffered no injury as a result of any earlier mismanagement of the acquired corporation." *Id.* The Defendants have failed to demonstrate that **[*225]** *Bangor Punta* has any application in this case.

Claim Specific Grounds For Relief Under *Rule 12(b)(6)*

As noted, the Defendants assert that most of the Counts in the Amended Complaint should be dismissed because they fail to state claims for relief under applicable law. In seeking to dismiss the Amended Complaint, the HVM Defendants argue, in the alternative, that the Court should dismiss Counts 5-11 because those Counts fail to state claims for relief against them. *See* HVM MTD at 17-36. Likewise, the Lightstone and Arbor Defendants argue that the Trust has failed to allege facts demonstrating that they can state claims for relief against them under Counts 6 and 8-11. *See, e.g.*, Lightstone MTD at 79-82, 84-86; Arbor MTD at 67-73. Given the Court's determination that the Trust lacks subject matter jurisdiction to assert those claims, the Court will not consider the *Rule 12(b)(6)* arguments with respect to those Counts. Below, the Court considers the balance of the parties' arguments in support of their requests for relief under *Rule 12(b)(6)*.

The Fraudulent Transfer Claims

In Counts 3, 12-15 of the Amended Complaint (the

"Fraudulent Transfer Claims"), the Trust seeks to avoid and recover the Transfers pursuant to § 544 of the Bankruptcy Code under state law as illegal dividends and/or constructive fraudulent transfers [*226] (Counts 3 and 15) and/or actual fraudulent transfers (Count 13), and pursuant to §§ 548(a)(1)(A) and (B) of the Bankruptcy Code under federal law as actual (Count 12) and constructive (Count 14) fraudulent transfers, and to recover them pursuant to § 550 of the Bankruptcy Code. To summarize, the Arbor and Lightstone Defendants contend that all or parts of those claims must be dismissed because:

> (i) The Trust is prosecuting those claims for the benefit of the lenders who ratified all of the Transfers and, as such, are not entitled to any relief from the Defendants. Since the Trust, through the settlement of the LBO Claims has recovered funds sufficient to pay in full the claims of the Indenture Trustee and General Unsecured Creditors, the Amended Complaint must be dismissed because no creditor entitled to assert a claim against the Defendants will benefit from continued prosecution of the action.

> (ii) The LIBOR Floor Certificate Distributions and the PERA Payments cannot be avoided as fraudulent transfers or otherwise because those transfers were made by third parties, not the Debtors, and the LIBOR Floor Certificates and the proceeds thereof, and the funds in the Preferred Equity Reserve Account were never the Debtors' property.

> (iii) The safe harbor provisions [*227] of § 546(e) of the Bankruptcy Code bar the claims alleged in Counts 3, 13-15 of the Amended Complaint.

> (iv) The Fraudulent Transfer Claims fail to state claims for relief under the relevant provisions of the Bankruptcy Code.

The Court considers those matters below.

### Whether The Trust Is Prosecuting The

### Claims For The Benefit Of The Lenders

**HN60**[↑] An estate representative cannot use the avoidance powers in actions in which estate creditors will not benefit from the action. This principle was applied under the Bankruptcy Act to efforts to avoid liens, as well as to pursue preference or fraudulent conveyance actions. *See, e.g., Vintero Corp. v. Corporacion Venezolana De Fomento (In re Vintero Corp.), 735 F.2d 740 (2d Cir. 1984)* (lien avoidance proceeding); *Whiteford Plastics Co. v. Chase Nat'l Bank*

*of New York City, 179 F.2d 582 (2d Cir. 1950)* (prohibiting debtor from commencing an avoidance action that could not benefit creditors). Courts apply that principle to bar actions under the Bankruptcy Code to avoid fraudulent transfers where the debtor on whose behalf the action is brought has no unpaid unsecured creditors of its own. *See Adelphia Recovery Tr. v. Bank of America, N.A., 390 B.R. 80, 95 (S.D.N.Y. 2008)* (finding that plaintiff lacked standing to pursue post-confirmation avoidance action because all of the debtors' creditors had already been paid in full with interest), *aff'd 379 Fed. App'x 10 (2d Cir. 2010)*. *See also Balaber-Strauss v. Town of Harrison (In re Murphy), 331 B.R. 107, 122 (Bankr. S.D.N.Y. 2005)* ("Courts have consistently held that an avoidance action can only be pursued if there is some benefit [*228] to creditors and may not be pursued if it would only benefit the debtor.") (citation omitted).

**HN61**[↑] In fraudulent transfer actions, "avoidance and recovery are distinct concepts and processes . . . [that] are addressed in two separate sections of the code, 11 U.S.C. § 544 and § 550, respectively[.]" *Burns v. Burns (In re Burns), 322 F.3d 421, 427 (6th Cir. 2003)*. *Section 544* focuses on the avoidance of a transfer. In substance, it provides that a transfer must first be avoided before a plaintiff can recover it under § 550. *See 11 U.S.C. § 544(b)(1)* ("[T]he trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim[.]"). In turn, § 550 specifies the conditions under which a trustee can recover an avoided transfer. *See 11 U.S.C. § 550*. *See also Lippi v. City Bank, 955 F.2d 599, 605 (9th Cir. 1992)* ("There are, in effect, three conceptual steps to the trustee's case; the trustee must establish: 1) fraud or illegality under the applicable substantive law; 2) resulting voidness or voidability of the transfer under the applicable law so as to allow avoidance pursuant to 544(b); and 3) liability of the particular transferee pursuant to the provisions of section 550."). For these purposes, a "triggering creditor" is a creditor holding an allowable unsecured claim who [*229] could have avoided the transfer under non-bankruptcy law. *See 11 U.S.C. § 544(b)(1)*. *See also Acequia Inc. v. Clinton (In re Acequia, Inc.), 34 F.3d 800, 809 (9th Cir. 1994)* ("[T]he existence of a 'triggering creditor' under section 544(b) gives the trustee an unlimited *right* to invoke state-law avoidance powers. The *extent* of the trustee's ability to exercise that right is, in turn, governed by section 550(a)."). In *Moore v. Bay, 284 U.S. 4, 5, 52 S. Ct. 3, 76 L. Ed. 133 (1931)*, the Supreme Court held that a bankruptcy

trustee's right under the Bankruptcy Act to avoid a mortgage that was invalid under state law was "to be enforced for the benefit of the estate." **HN62**[⇡] Thus, it is settled that if a trustee establishes standing to avoid a fraudulent transfer under *§ 544(b) of the Bankruptcy Code* based on the existence of a so-called "triggering creditor," the trustee may do so for the benefit of all of the estate's unsecured creditors, and not merely for that creditor. *See Responsible Person of Musicland Holding Corp. v. Best Buy Co. (In re Musicland Holding Corp.), 424 B.R. 95, 102-03 (Bankr. S.D.N.Y. 2010)* ("[U]nder the principle derived from rule of *Moore v. Bay, 284 U.S. 4, 52 S. Ct. 3, 76 L. Ed. 133 (1931)*, the trustee can 'recover the entire fraudulent conveyance for the benefit of all creditors even though the only actual creditor who could have avoided it under state law is owed only a fraction of that amount.'") (citation omitted); *see also U.S. Bank Nat'l Ass'n v. Verizon Commc'ns Inc., 479 B.R. 405, 410 (N.D. Tex. 2012)* ("To recapitulate, a bankruptcy trustee can bring a fraudulent transfer action under *Section 544(b)* only if there is a 'triggering' unsecured creditor that could have **[*230]** brought such an action when the bankruptcy petition was filed. If such a triggering creditor exists, then the bankruptcy trustee can set aside the entire fraudulent transfer, for the benefit of all unsecured creditors, even if the triggering creditor's claim was nominal."). However, the rule is subject to an important caveat: the trustee "is subject to any defenses that could be asserted against the triggering creditor." *Belfance v. Bushey (In re Bushey), 210 B.R. 95, 100 (6th Cir. BAP 1997)*. Thus, "[i]n order for a trustee to maintain an action for avoidance of a fraudulent conveyance, the trustee must show that at least one of the present unsecured creditors of the estate holds an allowable claim, against whom the transfer or obligation was invalid under applicable state or federal law." *Young v. Paramount Commc'ns Inc. (In re Wingspread Corp.), 178 B.R. 938, 945 (Bankr. S.D.N.Y. 1995)* (citation omitted).

Under the Litigation Trust Agreement, the Mortgage Trust is the Tier I Trust Beneficiary and is to be paid the first $142.5 million recovered by the Litigation Trust (minus the amount of any funds released from the Mortgage Parties Indemnification Fund). *See* Litigation Trust Agreement, Ex. A. The Mezzanine Lenders are among the Tier III Trust Beneficiaries. *Id.*[92] The

Lightstone Defendants maintain that in agreeing to the terms of the Cash Management **[*231]** Agreement, the Mortgage and Mezzanine Lenders consented to the Transfers, because the Transfers were made in accordance with the terms of the Cash Management Agreement. They say that as a matter of law, those lenders and their assignees are barred from challenging the Transfers as fraudulent transfers, and, as such, they cannot serve as "triggering creditors" under *§ 544(b) of the Bankruptcy Code*. The Lightstone Defendants also contend that the Trust's *ad damnum* in the Amended Complaint is inflated, arbitrary and contrary to law, and that, as a matter of law, the damages that the Trust can recover in this litigation, if any, will not be enough to satisfy the Mortgage Lender's Tier I distribution (i.e., $142.5 million) under the Litigation Trust Agreement. Lightstone MTD at 50-51, 60.[93] They argue that because the Tier I claimants lack standing to avoid the Transfers, and the Litigation Trust cannot recover more than the amount necessary to fully satisfy the Tier I claims, the existence of unpaid unsecured creditors that can confer standing under *§ 544(b)* for the Trust to bring avoidance actions under state law has become a ruse,

---

transformed into a "double" of the Mortgage Lenders - even to the point that the trust retained the Mortgage Lenders' counsel as its own counsel. Lightstone MTD at 50-51. The Lightstone Defendants say that the Mezzanine Lenders made a deal with the Mortgage Lenders and that the *quid pro quo* for the Trust's agreement to release the $300 million in preference claims against the Mezzanine Lenders from the Litigation Trust asset pool, was the Mezzanine Lenders' agreement to cede control over the Trust litigation to the Mortgage Lenders. *Id.* at 52-53. There is nothing in the record that supports those assertions. In resolving the Motions, the Court does not credit those contentions.

[93] Briefly, the Lightstone Defendants assert that drawing all inferences in the Trust's favor, the damages the Trust can recover in this action will be insufficient to pay the Mortgage Lender's Tier I claim under the Litigation Trust Agreement. They say that the Trust's *ad damnum* must add up to an amount considerably lower than the $143.5 million it claims, because the Trust:

(i) neglected to reduce its claims by even so much of the value in exchange received by the Debtors that appears within the four corners of the complaints, and

(ii) did not value the LIBOR Floor Certificates by any legally or economically recognized methodology when it simply employed hindsight to add up all the payments they yielded without applying any discounts for time and risk.

Lightstone Reply at 42-43.

---

[92] The Lightstone Defendants contend that when the Court approved the amendment to the "Trust Oversight" provisions in the Litigation Trust Agreement and the Special Servicer assumed control over the litigation, the Litigation Trust was

because those creditors (i.e., the Tier II (Indenture Trustee) and Tier IV (General Unsecured Creditors) Trust Beneficiaries) will not benefit from any [*232] recoveries in this litigation. *Id.* at 50-51. They also say that the Mortgage Lender acknowledged as much in a prior pleading. *Id.* at 51.[94] They maintain that because the $10 million that the Trust recovered in settling the LBO Claims is more than enough to pay the claims of the alleged "innocent" Trust Beneficiaries in full - i.e., the claims of the Indenture Trustee ($4 million) and the General Unsecured Creditors ($100,000) - the "one-satisfaction" rule bars the Trust from further recoveries herein. Thus, the Lightstone Defendants assert that the Court must dismiss this adversary proceeding for want of subject matter jurisdiction because there is no party that has standing to challenge the Transfers. *See* Lightstone Reply at 46-47.

The Mortgage Lenders' alleged consent to the Transfers is the linchpin to [*233] the Lightstone Defendants' argument that the Trust lacks standing to sue. As previously discussed, the corpus of the Mortgage Trust is the Mortgage Loan and collateral therefor. The Certificate Holders own 100% of the beneficial interests in that indebtedness and, as such, the Certificate Holders are successors to the Mortgage Lenders. HN63[↑] "A fraudulent transfer is not void, but voidable; thus, it can be ratified by a creditor who is then estopped from seeking its avoidance." *Adelphia Recovery Tr. v. HSBC Bank USA (In re Adelphia*

---

[94] The Court finds no merit to that assertion. The document that the Lightstone Defendants refer to is a pleading filed on behalf of the Special Servicer on June 15, 2010, prior to confirmation of the Plan on July 20, 2010, and before the final alignment of the post-confirmation remaining claims. *See* Case No. 09-13764, Dkt. 1065 (Objection of Special Servicers to Motion of the Official Committee of Unsecured Creditors for an Order Appointing the Creditors' Committee as Estate Representative with Respect to the Prosecution of Certain Causes of Action). At that time, the Special Servicer took the position that the primary non-mezzanine and non-mortgage, unsecured creditor - i.e., the Indenture Trustee - had a claim solely against ESI, and therefore it would not have a stake in the Litigation Trust, and that various trade claimants would possibly get paid in full under the Plan. However, those facts have since changed. As discussed above, as a result of Plan negotiations, and as set forth in the Plan and the ESI Settlement, the Indenture Trustee is a Litigation Trust Beneficiary and next in priority to any recoveries after distributions on account of the Mortgage Facility Deficiency Claim. Furthermore, the trade claimants - i.e., holders of General Unsecured Claims - are also Litigation Trust Beneficiaries.

*Recovery Tr.), 634 F.3d 678, 691 (2d Cir. 2011)* (quoting *In re Best Prods. Co., 168 B.R. 35, 57 (Bankr. S.D.N.Y. 1994))*. *See also Eberhard v. Marcu, 530 F.3d 122, 131 (2d Cir. 2008)* ("Were transferors allowed to assert fraudulent conveyance claims against those to whom they transfer property, transferors would be empowered to rescind transactions by virtue of their own fraudulent or deceptive designs. Such empowerment would be perverse."). "Ratification is the act of knowingly giving sanction or affirmance to an act which would otherwise be unauthorized and not binding . . . . [it] may be express or implied, or may result from silence or inaction." *In re Adelphia Recovery Tr., 634 F.3d at 691* (footnote omitted) (quoting 57 N.Y. Jur. 2d *Estoppel, Ratification, and Waiver* §§ 87, 88). However, "[t]he intent required for ratification 'must be clearly established and may not be inferred from doubtful or equivocal acts or language.'" [*234] *Id. at 693* (quoting *Chem. Bank v. Affiliated FM Ins. Co., 169 F.3d 121, 128 (2d Cir. 1999))*. Creditors can consent to allegedly fraudulent transfers in advance of the transfer. *See, e.g., Nordberg v. Cont'l Ill. Nat'l Bank & Trust Co., No. 02-10322, 2002 U.S. App. LEXIS 28756, 2002 WL 31688702, at *4 (5th Cir. Oct. 28, 2002)* (upholding a bankruptcy court's finding after a trial that the trustee could not challenge an alleged fraudulent transfer because the creditor attempting to recover the transfer had affirmatively consented to it pursuant to the terms of a loan agreement).

HN64[↑] Ratification is an affirmative defense to liability. *See Riker, Danzig, Scherer, Hyland & Perretti, LLP v. Premier Capital, LLC, No. 15-CV-8293, 2016 U.S. Dist. LEXIS 129943, 2016 WL 5334980, at *8 (S.D.N.Y. Sept. 21, 2016)*. It "may be raised by a pre-answer motion to dismiss under *Rule 12(b)(6)*, . . . if the defense appears on the face of the complaint." *Pani v. Empire Blue Cross Blue Shield, 152 F.3d 67, 75 (2d Cir. 1998)*. *See also Landau v. American Int'l Group, No. 97 Civ. 3465, 1997 U.S. Dist. LEXIS 14325, 1997 WL 590854, at *3 (S.D.N.Y. Sept. 23, 1997)* ("Although ratification is an affirmative defense, it is properly considered on a motion to dismiss when . . . the issue is obvious from the pleadings and papers before the court.").

The Lightstone Defendants assert that the Transfers were effectuated with the Mortgage Lenders' consent and active participation as the primary actor, and, thus, cannot be avoided as fraudulent transfers. *See* Lightstone MTD at 61; Lightstone Reply at 32-36. They argue that the Mortgage Lender - whether directly or through their related party predecessors and agents - all

of whom were Wachovia entities - executed all of the loan documents including the Cash Management Agreement in [*235] capacities that included being the initial lender on the Mortgage Loan and initial lender on all ten Mezzanine Loans. Lightstone Reply at 33. They further allege that a Wachovia entity then became the agent for, holder of, and lienholder in, the Cash Management Account, which was authorized, required and created pursuant to the Cash Management Agreement. *Id.* They contend that the Cash Management Agreement:

Mandated the accumulation of all revenue generated by the properties into a single account, and also dictated to whom and in what priority funds must (not may) be disbursed. *See* Amd Compl. ¶¶ 118, 126; Cash Mgmt. Agmt. §§ 3.1, 3.4.

Required the creation of an account that was "for The Benefit of Wachovia" and was always held at Wachovia. *See* Cash Mgmt. Agmt. § 2.2; Prior Amended Complaint ¶116; Fraudulent Transfer Complaint ¶ 113; Fiduciary Duty Complaint ¶ 194.

Established that all funds collected in the Cash Management Account were subject to the "continuing security interest" of Wachovia in its capacity as both lender and agent. *See* Cash Mgmt. Agmt. §§ 5.1(a), (b).

The Lightstone Defendants assert that the disbursement of funds collected in the Cash Management Account was controlled by the cash "waterfall" [*236] provisions of § 3.4 of the Cash Management Agreement. *Id.* at 33-34 (citing Amd. Compl. ¶ 126; Cash Mgmt. Agmt. § 3.4). They contend "[t]his section, in conjunction with § 4.1, specifies the circumstances under which, and order of, the disbursements that are to be made, including payments for taxes, insurance, debt service, operating expenses, management fees, and dividends, among others." Lightstone Reply at 34 (citing Cash Mgmt. Agmt. § 3.4). Thus, they contend that the Mortgage Lenders (and Wachovia in all of its other capacities) had advance knowledge of these payments and was a party to the contract that authorized and required them. Moreover, they argue that "the loan documents provided the Mortgage Lenders with the right to review and approve or reject the Debtors' annual budgets." *Id.* If the budget was rejected, the Debtors had to revise the budget to the satisfaction of the lenders. *Id.* (citing Mortgage Loan Agreement § 5.1.11(e)). That process could take months. They also contend that the Mortgage Lenders consented to permit the LIBOR Floor

Certificates to be transferred to any party the Debtors designated, which included non-Debtors. *Id.* (citing Amd. Compl. ¶ 137).

The Lightstone Defendants argue that the Trust cannot [*237] deny the Mortgage Lenders had advance knowledge of the Transfers. They say that the lenders expressly authorized the Dividend Payments by agreeing to the Cash Management Agreement, the Mortgage Lenders (if not others as well) expressly authorized the transfer of the LIBOR Floor Certificates to a non-debtor party by negotiating and agreeing to an agreement that permitted such a transfer, and either implicitly or expressly authorized the Management Fees through the exercise of the contractual right to approve and disapprove the Debtors' annual budgets. In sum, the Lightstone Defendants contend that the lenders, through Wachovia as the initial holder of the Mortgage and Mezzanine Debt, agreed to all the Transfers, in advance, and for that reason, the Trust is barred from challenging them now. *See* Lightstone Reply at 32-33. They maintain that for the same reasons, the Trust lacks standing to assert the tort-based claims in the Amended Complaint - i.e., because the Mortgage Lenders participated in and acquiesced to the Transfers, and therefore, may not recover on those claims on the grounds of in pari delicto and the doctrine of unclean hands. *See* Lightstone MTD at 58.

The Trust denies that either the Mortgage [*238] Trust or Wachovia Bank ratified or intended to ratify the Transfers because, at most, Wachovia Bank and Wachovia Capital Markets LLC were financial conduit entities that did what they were told to do and played no role whatsoever in causing or authorizing these transfers. *See* Opp'n at 82. It argues that the Lightstone Defendants do not even try to show any such intent to ratify, and that no such showing is possible under the facts of record in the Motions. It asserts that Wachovia Bank played no role in the payment of illegal dividends to the Defendants other than serving as a conduit for those payments to be made through the cash management account it administered and the decision to pay dividends and distributions to equity holders when the Debtors were insolvent rested with the Company Board, and that the waterfall merely provided the means for making the payments. *Id.* at 82-83. The Trust argues that Wachovia Bank's agreement to the waterfall provisions in the Cash Management Agreement at the time of the LBO Transaction does not constitute an intentional ratification of the Defendants' alleged bad acts in allowing distributions on account of equity interests when the Debtors were

insolent. **[*239]** *Id.* at 83. Moreover, it asserts that some of the allegedly improper transfers were made from reserve accounts operating separately from the waterfall and established long after the LBO Transaction - i.e., the Floor Bonds Account. *See id.* at 83-84 (citing Amd. Compl. ¶¶ 156, 163, 167, 173). The Trust also asserts that Wachovia Bank played no role in the Defendants' decision to have the LIBOR Floor Certificates issued to DLDW instead of the Mortgage Borrowers, and that, Wachovia Capital Markets, LLC, which is an entity distinct from Wachovia Bank, merely acted as the conduit that held the LIBOR Floor Certificates, and was directed to transfer them to DL-DW. *Id.* at 84. The Trust denies that there are factual allegations in the Amended Complaint or otherwise "suggesting that Wachovia [Bank], the Mortgage Trustee, or the Mortgage Trust" were aware that the LIBOR Floor Certificates had been wrongfully "looted." *Id.* Finally, it maintains that neither Wachovia Bank nor the Mortgage Trust played any role in the Management Fee Transfers distributed to Lichtenstein or his affiliates. In sum, the Trust asserts that there is nothing in the record to suggest that (a) Wachovia Bank knew that the transfer of the LIBOR Floor Certificates **[*240]** was fraudulent, (b) Wachovia Bank had any role in the distribution of the Dividend Payments other than that funds were deposited into the Cash Management Account and disbursed per instructions, and (c) Wachovia Bank had any involvement with the payment of the Management Fees other than that it was encompassed in the budgets approved by the lenders.

In support of their argument, the Lightstone Defendants rely heavily on *Crescent Res. Litig. Tr. v. Duke Energy Corp., 500 B.R. 464 (W.D. Tex. 2013)* ("*Crescent Resources*"), and *Weisfelner v. Fund 1 (In re Lyondell Chem. Co.), 503 B.R. 348 (Bankr. S.D.N.Y. 2014)* ("*Lyondell*"), *as corrected* (Jan. 16, 2014), *and abrogated by In re Tribune Co. Fraudulent Conveyance Litig.*, 818 F.3d 98 (2d Cir. 2016). In *Lyondell*, Lyondell Chemical Company ("Lyondell") was acquired by means of a leveraged buyout (the "Lyondell LBO"). The transaction was 100% financed by debt that was secured by Lyondell's assets. Lyondell borrowed approximately $21 billion from a group of lenders (the "Lyondell LBO Lenders"), of which $12.5 billion was paid out to Lyondell's stockholders. *503 B.R. at 353*. Thirteen months later, Lyondell and its affiliates filed for bankruptcy. Eventually a litigation trust (the "Lyondell Trust"), as assignee of the Lyondell creditors' claims, commenced an action against certain of the shareholders to avoid approximately $6.3 billion in payments to the shareholders as **[*241]** constructive

fraudulent transfers under state law. *Id. at 353-54*. The shareholders filed a *Rule 12(b)(6)* motion to dismiss the complaint, contending, among other things, that the trust lacked standing to sue on behalf of the Lyondell LBO Lenders because the lenders ratified the transfers in question. *Id. at 356*. The court granted the motion. Focusing on the Lyondell LBO documents which the Lyondell Trust relied on in drafting the complaint, the court found that those documents clearly required that the loan proceeds be used, as they were - to pay stockholders. *Id. at 384-385* ("The Court has difficulty seeing how the [Lyondell] Trust could plausibly be alleging that any [Lyondell] LBO Lender was ignorant of the fact that it was lending for the purpose of financing an LBO, and that LBO proceeds would then go to stockholders—especially since, as the Movants have pointed out . . . the loan documents required loan proceeds to be used for that purpose."). The court found that the language in the loan documents, in and of itself, "is more than sufficient to establish the requisite participation and ratification, which in the context here, requires no more than that knowledge. While more nuanced knowledge might be necessary to establish ratification **[*242]** in other contexts, it is more than sufficient here for the LBO lenders to have known—as the documents themselves establish—that they were lending for the purposes of an LBO, and that the proceeds of their loans were going to stockholders." *Id.*

In *Crescent Resources*, Duke Capital LLC ("Duke Capital") wholly owned Duke Ventures, LLC ("Duke Ventures") which, in turn, wholly owned Crescent Resources, LLC ("Crescent Resources"). *500 B.R. at 467*. In 2006, as part of the so-called "2006 Duke Transaction," and pursuant to a "Formation and Sale Agreement," Duke Ventures formed a new entity - Crescent Holdings, LLC ("Crescent Holdings") - and contributed all of its interests in Crescent Resources to Crescent Holdings. Thereafter, Crescent Holdings contributed all of its membership interests in itself to Duke Ventures. *Id.* As part of the 2006 Duke Transaction, Crescent Resources, as borrower, and Crescent Holdings and certain of its subsidiaries, as guarantors, entered into a credit agreement (the "2006 Credit Agreement") with a bank group (the "CR Lenders"). Among other things, under that agreement, the lenders made a $1.2 billion term loan to Crescent Resources. *Id. at 467-68*. Under the terms of the loan agreement, Crescent **[*243]** Resources distributed $1.1 billion of the term loan proceeds to Crescent Holdings. In accordance with the Formation and Sale Agreement, Crescent Holdings distributed those proceeds to Duke Capital. *Id.* (the "CR Transfer"). That agreement also

called for Morgan Stanley Real Estate Fund ("MSREF") to purchase 49% of the membership interests in Crescent Holdings from Duke Capital for $414 million and for Crescent Holdings to enter into an employment agreement with Arthur Fields (a Duke executive) which provided, among other things, for the issuance to Fields of 2% of the membership interests in Crescent Holdings. _Id. at 468_. Under the 2006 Credit Agreement, in the event of a default, the CR Lenders were entitled to take ownership of Crescent Resources and Crescent Holdings. _Id. at 468_. The CR Lenders sold portions of the loan to syndicate lenders. _Id._

Three years after the 2006 Duke Transaction closed, Crescent Resources and various subsidiaries filed for bankruptcy. _500 B.R. at 469_. The debtors' reorganization plan gave the CR Lenders and their successors full ownership of Crescent Holdings and Crescent Resources post-bankruptcy, and a $961 million unsecured claim. _Id._ The plan also established a trust (the "CR Trust") **[*244]** and authorized the CR Trust to pursue claims against parties other than the CR Lenders, who were fully released from liability. _Id._ The trust beneficiaries were divided into two classes. Class A creditors were those creditors whose claims against the debtors were not based on the 2006 Credit Agreement. The value of these claims totaled approximately $279 million. Class B creditors were the lenders whose claims totaled approximately $961 million. _Id._

The CR Trust sued Duke Capital seeking, in part, to avoid the $1.1 billion CR Transfer to Duke Capital as actual and constructive fraudulent transfers under state law under _§ 544(b) of the Bankruptcy Code_. In support of its motion for summary judgment dismissing those counts of the complaint, Duke Capital contended that the CR Transfers could not be avoided because the 2006 Duke Transaction was a safe harbored transaction under _§ 546(e) of the Bankruptcy Code_. _See id. at 471_. Second, Duke Capital argued that the CR Trust could not recover the $961 million sought for the Class B creditors because, under North Carolina law, the original lender banks could never bring claims to avoid the transfers they participated in as fraudulent. _Id._

In considering whether the CR Lenders had acquiesced to the transfers, the court **[*245]** noted that "[t]he evidence Duke presents in support of its defense theory is substantial." _500 B.R. at 478_. It found that the evidence of record in the summary judgment motion demonstrated that (i) the contractual documents drafted and executed by the CR Lenders disclosed the disbursement to Duke Capital of the $1.1 billion directly, (ii) the CR Lenders' representatives testified that they understood that the $1.1 billion would be distributed to Duke Capital, (iii) in the offering memorandum that the CR Lenders sent to syndicate investors, the CR Lenders disclosed that the proceeds were distributed to Duke Capital, and (iv) in documents filed in the bankruptcy court, the CR Lenders obtained stipulations from the debtors to the effect that the 2006 Credit Agreement was legal, binding and enforceable. _Id. at 478-79_. In part, the district court stated that "[w]hether the defense is consent, ratification, or estoppel, the undisputed evidence shows the original lending banks participated in the 2006 Duke Transaction with full knowledge of the transaction they helped design. After the transaction had closed, the original lenders continued to bless the deal, disclosing its terms in subsequent syndication offerings, **[*246]** amending the credit agreement so crucial to the entire transaction, and representing to the Bankruptcy Court the transaction was valid." _Id. at 479-80_.

The Mortgage Lenders agreed to the waterfall in the Cash Management Agreement, including the Dividend Payments. However, notwithstanding the terms of that agreement, the Company Board regulated the Dividend Payments (_see_ Amd. Compl. ¶¶ 169-170 (Company Board ratified previously paid dividends and prospectively authorized payment of dividends)) and ultimately suspended the payment of dividends. _Id._ ¶ 175. The Trust is not seeking to avoid and recover every transfer under the Cash Management Agreement. The Trust contends that the Dividend Payments and LIBOR Floor Certificate Transfers are fraudulent transfers because they were made when the Debtors were insolvent, and they were paid in violation of the pertinent loan documents. Nothing in the Amended Complaint and the record of the Motions demonstrates that the Mortgage Lenders knew or should have known that those payments would be made in violation of the loan agreements and/or at a time that the Debtors were insolvent.[95] Moreover, although the Mortgage Lenders

---

[95] That is one of the reasons this case is distinguishable from _In re Refco, Inc. Secs. Litig. v. CSFB, No. 07 MDL 1902, 2009 U.S. Dist. LEXIS 129944, 2009 WL 7242548, at *1 (S.D.N.Y. Nov. 13, 2009)_, _report adopted_, _2010 U.S. Dist. LEXIS 145751, 2010 WL 5129072 (S.D.N.Y. Jan. 12, 2010)_, another case relied on by the Lightstone Defendants. There, the trustee for the Estate of Suffolk LLC ("Suffolk") sued to avoid transfers of funds to a group of bank defendants as part of a transaction in which Suffolk acquired stock of PlusFunds

had the power to review and veto the Debtors' [*247] budget, and exercised that right (*see* Amd. Compl. ¶ 158), nothing in the Amended Complaint and the record of the Motion demonstrates that the Mortgage Lenders

---

Group, Inc. (PlusFunds"). Refco was the only creditor specifically identified in the complaint, and the court found that, based on the facts alleged in support of the complaint, Refco was not a legitimate creditor because it was an active party to the fraud alleged in the complaint. *See 2009 U.S. Dist. LEXIS 129944, 2009 WL 7242548, at \*10-11*. In the complaint, the plaintiff alleged the following:

1) Suffolk was created for the purpose of purchasing PlusFunds shares and was thinly capitalized. Complaint ¶¶ 30 and 31.

2) Suffolk's principal asset was a Refco letter of credit, which Suffolk drew upon to facilitate the purchase of PlusFunds shares. Complaint ¶¶ 8 and 31.

3) PlusFunds shares were of little or no value. Complaint ¶ 33.

4) Suffolk rendered itself insolvent by using the Refco funds to purchase the PlusFunds shares. [*249] Complaint ¶ 34.

5) Other actions in the MDL have alleged that PlusFunds placed SPhinX assets at risk and that those assets "were used to fund the loan to Suffolk so that Refco could 'buy out' the Suffolk Insiders' interests in PlusFunds for far more than those interests were worth." Those allegations "and their factual substantiation, are highly relevant to this action." Complaint ¶ 17.

*2009 U.S. Dist. LEXIS 129944, [WL] at \*10*. The court found that:

[a]ny realistic assessment of the inferences raised by the above paragraphs leads to the conclusion that Refco was heavily involved in structuring the transaction for the purchase of PlusFunds shares. It is easily inferred that Refco knew about Suffolk's financial situation, given that Suffolk's main asset was a Refco letter of credit. Refco's intimate involvement in the transaction for assertedly worthless shares is more than enough to disqualify Refco as a legitimate creditor of the Suffolk estate. Moreover, the oblique reference to the allegations in related cases, while perhaps not an incorporation of all of the assertions in those other complaints, can at least be considered an implicit assertion that Refco was engaged in fraud in arranging the PlusFunds transaction.

*2009 U.S. Dist. LEXIS 129944, [WL] at \*11*.

Nothing in the Amended Complaint and the record of the Motions demonstrates that the Mortgage Lenders believed that the Debtors were insolvent at the time of the Transfers or otherwise effectuating fraudulent transfers.

knowingly and intentionally approved the payment of management fees to Lichtenstein or an affiliate. Nor do they demonstrate that the Mortgage Lenders approved the distribution of the LIBOR Floor Certificates or their proceeds. This case is distinguishable from *Crescent Resources* and *Lyondell* because the lenders in those cases did not argue that they lacked sufficient information to be deemed to have ratified the alleged fraudulent transfers. In granting the defendants summary judgement dismissing the CR Trust's claim, the district court in *Crescent Resources* had the benefit of an evidentiary record that included written and verbal admissions by representatives of the CR Lenders that they understood that the $1.1 billion would be distributed to Duke. Indeed, in that case, the lenders obtained an order of the bankruptcy court to the effect that the 2006 Credit Agreement was legal, binding and enforceable. *Crescent Resources, 500 B.R. at 479*. Thus, on that record, there were no material facts in dispute precluding the award of summary judgement to the plaintiffs [*248] on the issue of ratification. *Id.* The *Lyondell* court relied solely on the facts alleged in the complaint and the plain language of the loan documents in finding that it was "implausible" that the Lyondell LBO Lenders were ignorant of the fact they were lending for the purpose of financing an LBO, and that LBO proceeds would then go to stockholders. *Lyondell, 503 B.R. at 384-385*. On the facts of that case it was apparently so. Here, however, in resolving the Motions, a "more nuanced" knowledge is necessary on the part of the Mortgage Lenders to demonstrate that they plausibly ratified the Transfers. That is because the Trust denies that the Mortgage Lenders had full knowledge of all material facts when the Transfers were made, and, as such, did not consent to the Transfers.

*HN65*[⬆] Courts reject claims that a party [*250] has ratified a transaction where that party lacks all the material facts necessary to do so. For example, in *ASARCO v. Americas Mining Corp., 396 B.R. 278, 428 (S.D. Tex. 2008)*, the court rejected the defendant's assertion that the plaintiff ratified the alleged fraudulent transfers finding, in part, that it "failed to meet its burden of proving that [plaintiff] intended to ratify the wrongful act with full knowledge of all material acts." Likewise, in *Kerr McGee Corp. v. Tronox, Inc. (In re Tronox Inc.), 503 B.R. 239, 276 (Bankr. S.D.N.Y. 2013)*, the court rejected a claim that the bondholders had ratified the alleged fraudulent transfers, finding that defendants "did not establish that the bondholders knowingly gave sanction to the fraudulent conveyances complained of in this case." The case of *PAH Litig. Tr. v. Water St. Healthcare Partners L.P. (In re Physiotherapy Holdings,*

*Inc.*), No. 13-12965, 2016 WL 3611831, at *1 (Bankr. D. Del. June 20, 2016) is also instructive. In that case, the PAH Litigation Trust (the "PAH Trust") sued numerous shareholders (the "PAH Selling Shareholders") to recover $248.6 million in payments made to them in exchange for their equity in the debtor (the "PAH Debtor"). *Id.* To purchase the stock, the buyer issued $210 million in secured notes (the "PAH Secured Noteholders"). In the transaction, the PAH Debtor assumed those notes, together with other liabilities. *Id.* The PAH Trust asserted that the purchaser ultimately acquired an insolvent company. It maintained that [*251] the PAH transaction lead to the PAH Debtor's bankruptcy and that the PAH Secured Noteholders received debt instruments worth far less than face value. *Id.* The PAH Trust sued under both state and federal fraudulent transfer law to claw back payments made to the PAH Selling Shareholders. *Id.* The PAH Selling Shareholders moved to dismiss the fraudulent transfer claims in the complaint pursuant to *Rule 12(b)(6)*. In support of the motion, they asserted, among other things, that because the PAH Secured Noteholders were aware that the proceeds from the issuance would be used to cash out the PAH Selling Shareholders, they were estopped from seeking to avoid the very transfer they allegedly approved. *2009 U.S. Dist. LEXIS 129944, [WL] at *12*. In opposing the motion, the PAH Trust claimed that PAH Secured Noteholders could not possibly have ratified the transaction because they purchased the notes in reliance on fraudulent financial statements. *Id.* The bankruptcy court adopted the *ASARCO* rationale and based upon that record, the court found that there was a material dispute as to whether or not the PAH Secured Noteholders had knowledge of the material facts surrounding the transaction. *2009 U.S. Dist. LEXIS 129944, [WL] at *13*.

It is premature to consider the affirmative defense of ratification [*252] because the defense does not appear on the face of the Amended Complaint. At a minimum, nothing in the Amended Complaint or the documents of record in the Motions demonstrates that the Mortgage Lenders intentionally or knowingly authorized the payment of Management Fees or, or on behalf of, Lichtenstein, or consented to distributions to equity holders in violation of the loan documents or at a time that the Debtors were insolvent. As noted, the Lightstone Defendants also say that the Trust lacks standing to assert the tort-based claims in the Amended Complaint because the Mortgage Lender participated and acquiesced in the Transfers, and therefore, may not recover on those claims on the grounds of in pari delicto

and the doctrine of unclean hands. *See* Lightstone MTD at 62. Resolution of that issue likewise is premature.

The Lightstone Defendants argue that the Trust is barred from recovering more than $4.1 million in this action (i.e., for the benefit of the Tier II and IV Litigation Trust Beneficiaries) and that because the Trust recovered $10 million under its settlement with Blackstone, the "one-satisfaction rule" bars the Trust from recovering additional funds. *See* Lightstone Reply 46-47. **HN66**[⬆] Under that [*253] rule, "[a] plaintiff may not recover twice for the same injury." *Phelan v. Local 305 of United Ass'n of Journeymen, 973 F.2d 1050, 1063 (2d Cir. 1992)* (citing *Ostano Commerzanstalt v. Telewide Sys., 880 F.2d 642, 649 (2d Cir. 1989)*). *See also Gervis v. Berg, No. 00-CV-3362(JS)(ETB), 2006 U.S. Dist. LEXIS 108705, 2006 WL 8445730, at *6 (E.D.N.Y. Sept. 13, 2006)* ("The 'one satisfaction' rule states that a plaintiff cannot recover more than once for the same injury.") (citation omitted); *MC Asset Recovery LLC v. Commerzbank A.G. (In re Mirant Corp.), 675 F.3d 530, 534 (5th Cir. 2012)* (finding that trustee's avoidance rights cease when avoidance will no longer benefit the estate under *§ 550*). In other words, "[a] person . . . can gain but one satisfaction, even though that person may pursue numerous possible avenues of relief simultaneously" and should not be allowed a double recovery for the same wrong. *47 Am. Jur. 2d Judgments § 808* (2013). It is premature to consider this defense, as it assumes that the Mortgage Trust lacks standing to avoid the Transfers. For the same reason, at this time, the Court will not consider whether the Trust's *ad damnum* is inflated. *See* Lightstone MTD at 54.

## Transfers of Estate Property

The Defendants contend that the Trust cannot demonstrate either that (i) the LIBOR Floor Certificates and the proceeds thereof were ever estate property, or (ii) that the Debtors controlled the PERA or had legal title to the funds in the account. Accordingly, they contend that the Court must dismiss the Fraudulent Transfer Claims, with prejudice, as to transfers related [*254] to the PERA and LIBOR Floor Certificates. *See* Arbor MTD at 26-29; Arbor Reply at 11-14. **HN67**[⬆] *Section 548 of the Bankruptcy Code* allows a trustee to avoid a transfer "of an interest of the debtor in property, or any obligation . . . incurred by the debtor . . . ." *11 U.S.C. § 548(a)(1)*. "An interest in property, for purposes of *§ 548*, includes any interest of the debtor that would have been preserved for the benefit of the bankruptcy estate but for the alleged

transfer." *Besing v. Hawthorne (Matter of Besing), 981 F.2d 1488, 1493 (5th Cir. 1993)*; see also *A.W. Lawrence & Co., Inc. v. Burstein (In re A.W. Lawrence & Co., Inc.), 346 B.R. 51, 56 (Bankr. N.D.N.Y. 2006)*. Under *§ 544*, a trustee can "avoid any transfer of property of the debtor or any obligation incurred by the debtor. . . ." *11 U.S.C. § 544(a)*. "*Section 544* only applies to actions based on pre-bankruptcy transfers of a debtor's own property. . . . [I]t does not apply to claims that are based on transfers of property that were made by non-debtor entities." *Stillwater Liquidating LLC v. Net Five at Palm Pointe LLC (In re Stillwater Asset Backed Offshore Fund, Ltd.), 559 B.R. 563, 585 (Bankr. S.D.N.Y. 2019)*.

The burden is on the party seeking to avoid an alleged fraudulent conveyance to establish the debtor's interest in property transferred. *See In re A.W. Lawrence & Co., 346 B.R. at 56*. In resolving the Motions, the Court must consider whether the Trust can plausibly allege that, at the time of the transfers, the PERA, the funds on deposit therein, and the LIBOR Floor Certificates were property of the Debtors' estates. *See, e.g., Enron Corp. v. Granite Constr. Co. (In re Enron Corp.), No. 01-16034, 2006 Bankr. LEXIS 4650, 2006 WL 2400369, at *6 (Bankr. S.D.N.Y. May 11 2006)* ("The Court must consider whether the Amended Complaint properly alleged that the **[*255]** [t]ransfer in this matter actually involved property of Enron being transferred to the Defendant. More specifically, the Court considers whether the Bank Account from which the [t]ransfer was made was sufficiently alleged to be property of the Enron estate."). "[T]he primary consideration in determining if funds are property of the debtor's estate is whether the payment of those funds diminished the resources from which the debtor's creditors could have sought payment." *Southmark Corp. v. Grosz (In re Southmark Corp.), 49 F.3d 1111, 1117 (5th Cir. 1995)*.

### LIBOR Floor Certificates

The Trust asserts that, after the LBO Transaction closed, that the Mortgage and Mezzanine Lenders had difficulty syndicating the indebtedness, and requested the Mortgage and Mezzanine Borrowers' agreement to modify the terms of the loans to make them more marketable. The borrowers agreed to make the requested accommodations and in consideration for loan agreement, the lenders agreed to issue the LIBOR Floor Certificates to the borrowers or their designees. The lenders issued the LIBOR Floor Certificates directly to DL-DW, an ultimate equity holder of the Debtor. *See* Amd. Compl. ¶¶ 136-38. *See also id.* ¶ 187 ("Prior to...

transfers [on account of the 25% Note and Floor Bonds Reserve], the highly **[*256]** valuable LIBOR Floor Certificates that should have belonged to the Debtors had been transferred to DLDW for no consideration . . . ."). As to certain of the payments that the Trust seeks to recover herein, the Trust alleges, as follows:

> The 25% Note Payments: "The income generated from the LIBOR Floor Certificates went directly to make all interest and principal payments on the 25% Note . . . . As of December 31, 2008, $3.3 million of the principal on the 25% Note had been repaid through diversion of income from the LIBOR Floor Certificates that should have been paid to the Debtors." *Id.* ¶ 156.

> The Floor Bonds Payments: "[T]he excess income from the LIBOR Floor Certificates was deposited into [the Floor Bonds Reserve Account] for the benefit of BHAC Capital IV Series A-1 Unit Holders[.]" *Id.* ¶ 156. Payments from the Floor Bonds Reserve Account "were made with funds derived from the proceeds of the LIBOR Floor Certificates, which belonged to the Debtors but were wrongfully assigned to the benefit of equity interests in the Debtors . . . ." *Id.* ¶¶ 164, 168, 174.

The Trust contends that it can avoid the LIBOR Floor Certificates Transfers and the LIBOR Floor Certificates Income Distributions **[*257]** as fraudulent transfers because the certificates should have been issued to the Mezzanine and Mortgage Borrowers, not a non-Debtor "designee" of the borrowers, and the fact that the borrowers designated a non-Debtor "designee" is evidence that the Borrower had legal title to, and control over the use of, the LIBOR Floor Certificates. Opp'n at 72.[96] It is undisputed that the Debtors never had title to

---

[96] In its Opposition, the Trust also asserts, in substance, that the Debtors transferred the LIBOR Floor Certificates, since it contends that "the insiders arranged for valuable securities (the so-called "LIBOR Floor Certificates") belonging to the Debtors to be transferred to a Defendant entity controlled by the Defendants." Opp'n at 2. The Court does not credit that argument. First, it is inconsistent with the Trust's later assertion in its Opposition that "[t]he Debtors never received the LIBOR Floor Certificates, even though they made the pertinent concessions and all payments under the loan agreements" to the non-party LBO lenders. *Id.* at 32. Moreover, it is inconsistent with, and not supported by, the allegations in the Amended Complaint. *See* Amd. Compl. ¶¶ 137-38, 156, 164, 168, 174, 184, 187. The Trust alleges no facts in the Amended Complaint that support its assertion in its Opposition that the Defendants interfered with the lenders

the LIBOR Floor Certificates. The Mortgage Trust, a non-Debtor, issued the LIBOR Floor Certificates to DLDW, a non-Debtor, and DL-DW held title to the certificates from the time the Mortgage Trust issued them. HN68[↑] In the Second Circuit, property fraudulently transferred is not considered property of the estate unless and until it is recovered. *See FDIC v. Hirsch (In re Colonial Realty Co.), 980 F.2d 125, 131 (2d Cir. 1992);* accord *Rajala v. Gardner, 709 F.3d 1031, 1038-39 (10th Cir.),* cert. denied sub nom., Rajala v. Lookout Windpower Holding, 571 U.S. 826, 134 S. Ct. 164, 187 L. Ed. 2d 41 (2013). As Judge Wiles explained:

> When a Trustee pursues a fraudulent transfer claim the Trustee seeks to recover property (or the value of property) that once belonged to an estate but that was previously transferred. The prior transfer deprived the estate of its ownership interest in the transferred property, and that interest is not restored unless and until the Trustee succeeds in avoiding the transfer and recovering **[*258]** the property.

*Geron v. Craig (In re Direct Access Partners, LLC), 602 B.R. 495, 559 (Bankr. S.D.N.Y. 2019)* (citing *FDIC v. Hirsch (In re Colonial Realty Co., 980 F.2d at 131)*). *See also* *Picard v. Fairfield Greenwich Ltd., 762 F.3d 199, 207 n.7 (2d Cir. 2014)* (holding that the decision in *Colonial Realty* forecloses any contention that a debtor retains property rights in property that has been transferred, and that fraudulently conveyed property may not be considered to be property of the estate unless and until it is recovered). The Debtors never had title to the LIBOR Floor Certificates. The Trust cannot plausibly demonstrate that the LIBOR Floor Certificate Distributions constitute a transfer "of an interest of the debtor in property." *See* *11 U.S.C. § 548(a)(1).*

Alternatively, the Trust says that the Debtor borrowers have a claim against the Defendants for wrongfully assigning the LIBOR Floor Certificates away to DL-DW, and that it has standing to avoid the alleged wrongful diversion of those certificates, and recover the certificates, even though the Debtors never had possession of the certificates. It contends that the claim for wrongful diversion of the LIBOR Floor Certificates was assigned to the Litigation Trust. Opp'n at 72. The Trust asserts that it can challenge the alleged misappropriation by actual or implicit assignment of the Debtors' property rights in the Certificates because it

_____

issuance of the LIBOR Floor Certificates.

has at least plausibly alleged **[*259]** that the Debtors were prejudiced by a transfer between third parties. *Id.* As support for that contention, the Trust relies on *Lyondell, 503 B.R. 348.* As discussed, in that case, the Lyondell Trust sued a group of shareholders to avoid and recover payments to them in the Lyondell LBO as constructive fraudulent transfers under state law. *Id. at 353-54.* As relevant, in support of their motion to dismiss, the shareholders argued that the Lyondell Trust's claims failed as a matter of law because the trust sought to avoid transfers of funds that merely passed through the Debtors to the beneficial holders of the Lyondell stock and never became property of any Debtor. *Id. at 379.* They contended that the cash transferred to the shareholders came from the Lyondell LBO Lenders through their paying agent, not from the Lyondell Debtors; did not involve the Lyondell Debtors' own, pre-existing assets; and thus, did not cause any injury to the Lyondell Debtors' creditors. *Id.* In opposing the motion, the Lyondell Trust pointed the court to two separate "value transferring" transactions -- the transfer of the value of Lyondell's assets to the Lyondell LBO Lenders in the form of liens securing the financing, and the transfer to stockholders of **[*260]** the proceeds of the loans secured by Lyondell's assets. *Id.* It argued that the court could find that it was plausible that the two transactions must be considered together, as a means of withdrawing the equity that previously existed in Lyondell's property, transferring it to Lyondell's stockholders, and replacing the underlying equity that supported unsecured debt with more senior secured debt. *Id.* The court found that the allegation seemed to be supported by the transaction documents and, moreover, that courts assessing the effect of LBOs routinely analyze them "by reference to their economic substance, 'collapsing' them, in many cases, to consider the overall effect of multi-step transactions." *Id.* The court applied the collapsing doctrine in rejecting the movants' argument. It found, in part, that "as a consequence of the pledge of Lyondell's assets, the [Lyondell] Trust has at least plausibly alleged that Lyondell was truly prejudiced by a transaction that was assertedly a transfer between third parties." *Id. at 381.*

In arguing that *Lyondell* supports its position, the Trust asserts that the *Lyondell* court denied a motion to dismiss "where Trust 'has at least plausibly alleged that [the Debtor] **[*261]** was truly prejudiced by a transaction that was assertedly a transfer between third parties.'" Opp'n at 72 (quoting *Lyondell, 503 B.R. at 381*). However, as noted, the *Lyondell* court reached that conclusion by applying the collapsing doctrine to the multi-step transaction. *503 B.R. at 381.* The "collapsing

doctrine" has no application in this case, and this aspect of *Lyondell* does not support the Trust's argument. The Trust also contends that the *Lyondell* court found that "assignors had standing [to sue] when assignment of their rights to the Trust caused them injury." Opp'n at 72. It relies on the *Lyondell* court's observation that although the LBO Shareholders argued that the Lyondell Trust lacked standing to sue on behalf of the Lyondell LBO Lenders, because the lenders were deemed to have ratified the alleged fraudulent transfers, it did not view the alleged deficiency as one impairing the Lyondell Trust's standing to sue. Specifically, the court explained, as follows:

> The Court sees the [Lyondell] Trust's standing as turning on whether there was a due assignment of assignors' rights to the [Lyondell] Trust (*i.e.*, on whether the [Lyondell] Trust "owns" the causes of action it is asserting), and on whether the assignors suffered [*262] an injury in fact. Looking at that, the [Lyondell] Trust has the requisite standing. The real problem, as the Court sees it, is that with respect to the LBO Lenders subset of the assignors from whom the [Lyondell] Trust took assignments of the creditors' avoidance rights, there is an additional defense.

*Id. at 383 n.173*. There is no question that the Trust "owns" all of the Debtors' causes of action. The Court does not read that provision to support the assertion that the Trust has standing to avoid, as a fraudulent transfer, the assignment of property that the Debtors never owned or possessed.

In the Amended Complaint, the Trust fails to demonstrate that the Debtors ever owned the LIBOR Floor Certificates or the proceeds thereof. As such, the Trust cannot plausibly allege that it can avoid the LIBOR Floor Certificate Transfers under *§§ 544* and *548 of the Bankruptcy Code* or recover the LIBOR Floor Certificates and the proceeds thereof under *§ 550 of the Bankruptcy Code*. The Court dismisses the Fraudulent Transfer Claims predicated on the LIBOR Floor Certificate Distributions.

## The PERA Payments

Section 5.11(a) of the BHAC LLC Agreement called for BHAC to maintain a Mandatory Cash Reserve (deposited into a "Mandatory Cash Reserve Account" to be opened by BHAC) equal to $20,000,000 [*263] "for the purpose of funding unpaid cash distributions on the

Preferred Return of the Series A-1 Units." *See* BHAC LLC Agreement § 5.11(a). BHAC opened the Mandatory Cash Reserve Account (which the Trust refers to as the Preferred Equity Account, or PERA) at Wachovia. *See* Amd. Compl. ¶ 182. The Trust alleges that although the board of the "Extended Stay Hotels family of companies" had passed a resolution stopping equity distributions in November 2008, during the period of December 18, 2008 through March 11, 2009, Arbor Commercial was paid approximately $20.5 million from the PERA on account of its interests in BHAC. *Id.* The Trust describes the PERA as having been created "at the LBO's closing as 'security' for certain equity holders." *Id.* It asserts that (i) the PERA was funded with $20 million of the Debtors' funds at the LBO Transaction's closing; (ii) certain equity holders could instruct that distributions be made from that reserve account to them; and (iii) if the account was used for such distributions, then BHAC, using the Debtors' cash, was required to replenish the reserve back up to $20 million. *Id.* It contends that considering the Debtors' poor performance, strained liquidity, budget [*264] issues and concerns, lack of surplus, and insolvency, these payments were made in violation of applicable law. *Id.*

The Arbor Defendants assert that the Trust cannot avoid the PERA Payments as actual or constructive fraudulent transfers under Counts 3, 12, 13-15 because the funds in the PERA Account were not the Debtors' property. *See* Arbor MTD at 26. They say that is so because the Mandatory Cash Reserve Account is BHAC's account, BHAC is not a debtor, and contrary to the Trust's allegations, the account was not funded by the Debtor's funds, but rather, was funded by proceeds of the Series A-1 Unitholders' investment in BHAC Capital. *Id.* at 28-29. As support for that alleged fact, the Arbor Defendants rely on a page from what they contend is the "LBO Closing Funds Sources & Uses" that reads, in part, as follows:

Closing Outside Borrower Structure

⊞ *Go to table3*

*Id.* at 29.[97] On its face, that entry does not establish that the reserve account was not funded with the Debtors' funds. Moreover, assuming, arguendo, that the PERA was initially funded with the proceeds from the unitholders' investment in BHAC, the Trust alleges that to the extent that the account was replenished, [*265] it

---

[97] A copy of that page is annexed as Ex. F to the Goldberg Declaration.

was done so with the Debtors' funds. *See* Amd. Compl. ¶ 182. Nothing in the record demonstrates that the PERA Payments were not made with the Debtors' funds. In resolving the Motions, the Court assumes the truth of the Trust's allegations that those payments were made with the Debtor's funds. The Court rejects the Arbor Defendants' contention that, based upon this record, the Trust cannot plausibly demonstrate that the PERA Payments are avoidable under Counts 3, 12, 13-15 of the Amended Complaint.

Application of the "Safe Harbor" Provisions

The Defendants contend that the Dividend Payments and PERA Payments are excepted from avoidance under the "safe harbor" provisions of *§ 546(e) of the Bankruptcy Code*. *See* Arbor MTD at 31-40; Lightstone MTD at 23-29.[98] That section states, as follows:

> Notwithstanding *sections 544*, *545*, *547*, *548(a)(1)(B)*, and *548(b)* of this title, the trustee may not avoid a transfer that is a margin payment, as defined in *section 101*, *741*, or *761* of this title, or settlement payment as defined in *section 101* or *741* of this title, made by or to (or for the benefit of) a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency, or that is a transfer made by or to (or for the benefit of) a commodity broker, forward contract merchant, **[*266]** stockbroker, financial institution, financial participant, or securities clearing agency, in connection with a securities contract, as defined in *section 741(7)*, commodity contract, as defined in *section 761(4)*, or forward contract, that is made before the commencement of the case, except under *section 548(a)(1)(A)* of this title.

*11 U.S.C. § 546(e)*. *HN69*[⬆] By its terms *§ 546(e)* bars the avoidance of a limited group of transfers that otherwise would be avoidable as actual and/or constructive fraudulent transfers under state fraudulent

transfer law, or as constructive fraudulent transfers under federal fraudulent transfer law. As such, "[t]he structure of *[§ 546(e)]* is that of an affirmative defense: even if a trustee can succeed in proving the elements of a case in chief under any of the enumerated avoidance provisions, *§ 546(e)* intervenes to shield the transfer from avoidance, except in cases where *§ 548(a)(1)(A)* (actual fraud) applies." *DeGirolamo v. Truck World, Inc. (In re Laurel Valley Oil Co.), No. 07-6109, 2009 Bankr. LEXIS 1451, 2009 WL 1758741, at *3 (Bankr. N.D. Ohio June 16, 2009)*. *See also 45 John Lofts, LLC v. Meridian Capital Grp., LLC (In re 45 John Lofts, LLC)*, 599 B.R. 730, 748 (Bankr. S.D.N.Y. 2019) (noting that "*Section 546(e)* provides defendants with an affirmative defense[.]"); *Enron Corp. v. Int'l Fin. Corp. (In re Enron Corp.), 341 B.R. 451, 455 n.3 (Bankr. S.D.N.Y. 2006)* (discussing "the affirmative defense of the protections of the *11 U.S.C. § 546(e)* safe harbor"). The Lightstone and Arbor Defendants contend that the Dividend Payments and PERA Payments qualify as "safe harbored" payments under *§ 546(e)* because they were made **[*267]** "in connection with a securities contract," as defined in *§ 741(7)* and constitute transfers by a financial institution that are "settlement payments" under *§ 741(8) of the Bankruptcy Code*. Below, the Court considers whether the Arbor and Lightstone Defendants have demonstrated that on the face of the Amended Complaint, application of the safe harbor bars the assertion of the claims underlying Counts 3 and 13-15, as they relate to the Dividend Payments and the PERA Payments. *See Pani v. Empire Blue Cross Blue Shield, 152 F.3d 67, 74 (2d Cir. 1998)* ("An affirmative defense may be raised by a pre-answer motion to dismiss under *Rule 12(b)(6)*... if the defense appears on the face of the complaint."). *See also Stanziale v. Nachtomi (In re Tower Air, Inc.), 416 F.3d 229, 238 (3d Cir. 2005)* ("[A] complaint may be dismissed under *Rule 12(b)(6)* where an affirmative defense appears on its face[.]" (citing *ALA, Inc. v. CCAIR, Inc., 29 F.3d 855, 859 (3d Cir. 1994))*.

Dividend Payments

*HN70*[⬆] *Section 101(54) of the Bankruptcy Code* defines the term "transfer" to include "each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with-- (i) property; or (ii) an interest in property." *See 11 U.S.C. § 101(54)(D)*. The Trust labels the Dividend Payments as "transfer[s]." *See, e.g.*, Amd. Compl. ¶ 208 (defining the distributions related to payments to Series A-1, A-2 and A-3 Unit Holders as the "Dividend Transfers"); ¶ 172

---

[98] They also contend that the proceeds from the LIBOR Floor Certificates are excepted from avoidance under *§ 546(e) of the Bankruptcy Code*. In light of the Court's determination that the Trust has not alleged facts that can plausibly demonstrate that the Debtors ever owned the LIBOR Floor Certificates, and that the proceeds from LIBOR Floor Certificates are subject to avoidance and recovery under *§§ 544*, *548* and *550 of the Bankruptcy Code*, the Court does not address that aspect of the Arbor and Lightstone Defendants' arguments.

(the Preferred Dividends were paid "either by wire or by transfers"). **[\*268]** The Dividend Payments are transfers of the Debtors' funds that fall within that definition. *See Guinn v. Lester (In re Lester), No. 09-34273, 2012 Bankr. LEXIS 54, 2012 WL 71013, at \*2 (Bankr. E.D. Tenn. Jan. 10, 2012)* ("Unquestionably, payments of money from the Debtor . . . to the Defendant constituted transfers of property or an interest in property for the Defendant's benefit [under *§ 101(54)(D)*]."). **HN71[↑]** The Bankruptcy Code defines the term "financial institution" to include "a commercial or savings bank[.]" *11 U.S.C. § 101(22)(A)*. In the Amended Complaint, the Trust alleges that the Dividend Payments were made from the Cash Management Account, or through the Debtors' cash management system. *See* Amd. Compl. ¶¶ 5, 162, 166, 172, 194. The Cash Management Account was located at Wachovia, and Wachovia is a "national banking association." As such, Wachovia fits within the Bankruptcy Code's definition of a "financial institution."[99] The Trust does not dispute that the Dividend Payments were paid to the Arbor and Lightstone Defendants by a "financial institution."

**HN72[↑]** *Section 101(49) of the Bankruptcy Code* contains a non-exclusive definition of the term "securities." Membership units in a limited liability corporation constitute "securities" under the Bankruptcy Code. *See O'Donnell v. Tristar Esperanza Props., LLC (In re Tristar Esperanza Props., LLC), 488 B.R. 394, 399 (B.A.P. 9th Cir. 2013)* ("[A]n interest of a member in an LLC is a 'security'" under *section 101(49)(A)*, analogous to an interest of a limited partner **[\*269]** in a limited partnership under *section 101(49)(A)(xiii)*); *SeaQuest Diving LP v. S & J Diving Inc. (In re SeaQuest Diving L.P.), 579 F.3d 411, 418 (5th Cir. 2009)* ("LLC interest either qualifies as a 'transferable share' or falls within the broad residual category." (citing *11 U.S.C. § 101(49)(A)(viii)*)). The Trust does not contend otherwise. BHAC is a Delaware limited liability corporation. Amd. Compl. ¶ 26. Under Delaware law, an LLC membership interest is contractual in nature. *See 6 Del. C. § 18-101(7)* ("A member or manager of a limited liability company or an assignee of a limited liability company interest is bound by the limited liability company agreement whether or not the member or manager or assignee executes the limited liability

company agreement[.]"). *See also Fletcher Int'l, Ltd. v. ION Geophysical Corp., No. 5109-VCS, 2011 Del. Ch. LEXIS 53, 2011 WL 1167088, at \*4 (Del. Ch. Mar. 29, 2011)* (noting that under Delaware law, "a preferred stockholder's rights 'are contractual in nature.'" (quoting *In re Appraisal of Metromedia Int'l Grp., Inc., 971 A.2d 893, 899 (Del. Ch. 2009))*).

**HN73[↑]** *Section 741(7) of the Bankruptcy Code* defines the term "securities contract" to mean:

> (i) a contract for the purchase, sale, or loan of a security, a certificate of deposit, a mortgage loan, any interest in a mortgage loan, a group or index of securities, certificates of deposit, or mortgage loans or interests therein (including an interest therein or based on the value thereof), or option on any of the foregoing, including an option to purchase or sell any such security, certificate of deposit, mortgage loan, interest, **[\*270]** group or index, or option, and including any repurchase or reverse repurchase transaction on any such security, certificate of deposit, mortgage loan, interest, group or index, or option (whether or not such repurchase or reverse repurchase transaction is a "repurchase agreement", as defined in *section 101*);

*11 U.S.C. § 741(7)(A)(i)*. "The plain language of *section 741(7)* is very broad in its application and encompasses virtually any contract for the purchase or sale of securities, any extension of credit for the clearance or settlement of securities transactions, and a wide array of related contracts, including security agreements and guarantee agreements." *Lehman Bros. Holdings, Inc. v. JPMorgan Chase Bank, N.A. (In re Lehman Bros. Holdings, Inc.), 469 B.R. 415, 438 (Bankr. S.D.N.Y. 2012)*.

**HN74[↑]** *Section 546(e)*'s "in connection with" language "is by its own terms very broad; in the context of avoidance of transfers it has been interpreted to mean 'related to an agreement.'" *Peterson v. Enhanced Investing Corp. (Cayman) Ltd. (In re Lancelot Inv'rs Fund), 467 B.R. 643, 656 (Bankr. N.D. Ill. 2012)* (quoting *In re Casa de Cambio Majapara S.A. de C.V., 390 B.R. 595, 599 (Bankr. N.D. Ill. 2008))*. *See also In re Lehman Bros. Holdings, Inc., 469 B.R. at 442* (stating, in the context of *§ 546(e)*, that "[i]t is proper to construe the phrase 'in connection with' broadly to mean 'related to'"). The Trust denies that the Dividend Payments are safe harbored payments. The hallmarks of a dividend are that (i) it is subject to the control of the corporate board, (ii) it may be paid only when a

---

[99] The Court takes judicial notice that Wachovia is a financial institution within the meaning of *§ 546(e)*. *See, e.g., In re Enron Corp., 341 B.R. at 458* (taking judicial notice that Chase Manhattan Bank was a financial institution for purposes of *§ 546(e)*).

company is solvent, and (iii) it is paid on account of the ownership [*271] of equity in the company, not in exchange for ownership. The Trust argues that the dividends were paid simply as a return on equity (i.e., on account of equity interests in BHAC and DL-DW) and, as such, are "pure, post LBO dividends" that were not paid in connection with the LBO Transaction or as part of the consideration for the LBO. Opp'n at 43-44. It says that the dividends were not paid for value received when the equity securities (i.e., the Units) were issued, and that since those payments were not made as consideration for the purchase sale or loan of a security, they were not paid "in connection" with a securities contract. Id. at 44.

In assessing whether the Dividend Payments are safe harbored transfers, it is appropriate to consider the elements of the transaction giving rise to the payments. Crescent Resources is instructive. There, Duke Capital argued that § 546(e) exempted the $1.1 billion CR Transfer from avoidance because it was "a transfer made by or to (or for the benefit of) a ... financial institution ... in connection with a securities contract." 500 B.R. at 476 (citation omitted). The CR Trust contended that § 546(e) did not apply because the transfer from Crescent Resources to Duke Capital was a one-way [*272] dividend payment unconnected to any securities contract. Id. In rejecting that contention, the court found that the Formation and Sale Agreement designed a large, multi-step transaction that could not close unless all the steps closed. Id. at 473 ("There is simply no factual basis for extracting a single aspect of the 2006 Duke Transaction and analyzing it divorced from its context and relationship to the actual transaction. If the distribution had not been made to Duke, the entire transaction would not have closed."). It found that the 2006 Duke Transaction was a "securities contract" because it "called for the exchange of securities between Duke, Crescent Resources, Crescent Holdings, and MSREF[.]" Id. at 476. In addition, it "refuse[d] to conceptually sever the term loan proceeds transfer from the rest of the 2006 Duke Transaction[,]" and found that "Crescent [Resource's] distribution of funds to Duke was certainly 'in connection with' a securities contract[.]" Id.

BHAC's members acquired Interests under the BHAC LLC Agreement in consideration for their "Capital Contributions," and those interests are evidenced by the Series A-1, A-2 and A-3 Units. See BHAC LLC Agmt. § 3.01 ("Capital Contributions"); § 3.02 ("Units; [*273] Initial Capitalization"). The BHAC LLC Agreement vests the holders of Series A-1 Units with a preferred right to

receive distributions on account of their equity interests. See id. § 1.120 ("Series A-1 Minimum Cash Monthly Distribution"); § 3.03 ("Series A-1 Units"); § 5.01 ("Distribution of Non-Capital Proceeds"). The Lightstone Defendants label the Series A Units as "hybrid securities" that gave the unit holders equity rights in BHAC, but that had features of a debt security, i.e., mandatory periodic payments at a fixed annual rate with priority of payment above certain other debt obligations. See Lightstone MTD at 27. They say that the latter was accomplished through the "waterfall" payment provisions under the Cash Management Agreement that was put into place by the lenders as a condition of the LBO Transaction. Id. at 28. The Lightstone Defendants assert that the Dividend Payments were mandatory periodic coupon payments in respect of the Series A Units. To that end, they contend that significant funds for payment of the coupons were prefunded in the "Preferred Equity Reserve Account" as an integrated element of the LBO Transaction, and equity holders were granted the right "to instruct that distributions be made from that reserve [*274] account to them" was one of the rights carried by the securities. Id. (citing Amd. Compl. ¶ 182). They maintain that when the Series A Units were authorized by the lenders in connection with the LBO Transaction, the right to the payment of dividends was made an integral part of the Cash Management Agreement, such that when the Lightstone Defendants acquired the securities, they did so (i) with the knowledge of the mandatory payment requirements, (ii) with the understanding that they were entitled to be paid the mandatory payments under those securities, and (iii) with the expectation that they would receive those payments. Id. In short, they contend that the Dividend Payments were made "in connection with" the LBO Transaction because the payments were an expected and valuable part of the Unit holders' consideration when they purchased those securities.

The Trust maintains that on its face, the Cash Management Agreement merely addresses the mechanics for BHAC to make payments to Unit holders, not their status of the payments as dividends. Opp'n at 45. Moreover, it asserts that, in any event, the terms of the BHAC LLC Agreement and Cash Management Agreement regarding distributions to [*275] Unit holders were immaterial because those distributions ultimately were subject to the discretion of the Company Board - not the provisions in the security. The Trust also contends that the Lightstone Defendants (a) omit the fact that the Cash Management Agreement waterfall accounted only for the Series A-1 Unit's "preferred dividends" - not the dividends payable to the holders of

Series A-2 and Series A-3 Units, and (b) in support of their argument seek to introduce facts that are not alleged in the Amended Complaint or otherwise found in the record. To accept the Lightstone Defendants' contention that the Dividend Payments were automatic, the Court must adopt their construction of the Cash Management Agreement and BHAC LLC Agreement and disregard the Trust's allegations that the Company Board controlled the distribution of the Dividend Payments. *See* Amd. Compl. ¶¶ 169-170. That is plainly beyond the scope of a *Rule 12(b)(6)* motion. *See DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 113 (2d Cir. 2010)* ("In ruling on a motion pursuant to *Fed. R. Civ. P. 12(b)(6)*, the duty of a court 'is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof.'") (citation omitted). Moreover, there is no support in the **[*276]** record for their assertion that the "mandatory payment requirements" were known, understood and constituted an expected and valuable part of the consideration for the purchase of the securities. Their reliance on those alleged facts bars the Court's consideration of the application of the safe harbor at this time. *See Motors Liquidation Co. Avoidance Action Tr. v. JPMorgan Chase Bank, N.A. (In re Motors Liquidation Co.), 552 B.R. 253, 279 (Bankr. S.D.N.Y. 2016)* (concluding that determination as to application of safe harbor cannot be made because defendant's argument in support of affirmative defense was based on facts not pled in the complaint).

The Arbor Defendants assert that the Preferred Dividends distributions were made "in connection with a securities contract" under *§ 741(7)* because the BHAC LLC Agreement is a contract for the sale of securities, the Units are securities that were issued pursuant to the BHAC LLC Agreement, and the Preferred Dividends were paid to Series A-1 Unit Holders pursuant to the terms of the BHAC LLC Agreement. Arbor MTD at 34-35; Arbor Reply at 15-19. In making that argument, in substance, the Arbor Defendants maintain that any payment made in connection with a security or a contract that involves a security is a safe harbored payment made "in connection with a securities contract." That is too broad a reading of the statute. *HN75*[↑] The safe-harbor **[*277]** provisions in *§ 546(e)* were enacted to "minimiz[e] the displacement caused in the commodities and securities markets in the event of a major bankruptcy affecting those industries." *Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V. (In re Enron Creditors Recovery Corp.), 651 F.3d 329, 334 (2d Cir. 2011)* (quoting *Kaiser Steel Corp. v. Charles Schwab & Co., Inc., 913 F.2d 846, 849 (10th Cir.*

*1990))*; *see also* H.R. Rep. No. 97-420, at 2 (1982), *reprinted in* 1982 U.S.C.C.A.N. 583, 583. The Arbor Defendants' broad reading of the term "securities contract" to encompass limited liability agreements does not further the intent of the draftsmen in enacting *§ 546(e)*. Moreover, the case law does not support that reading of the statute. To that end, the Court finds *EPLG I, LLC v. Citibank, N.A. (In re Qimonda Richmond, LLC), 467 B.R. 318 (Bankr. D. Del. 2012)* to be instructive. There, the debtors issued bonds pursuant to an indenture. To collateralize their payment obligations to their bondholders, the debtors arranged for Citibank to issue a letter of credit in favor of the indenture trustee. In exchange, the debtors agreed to reimburse Citibank if the letter of credit was drawn upon and gave Citibank liens on certain assets. *Id. at 320*. When Citibank did not renew the letter of credit, the indenture trustee drew down the letter of credit. The debtors directed the indenture trustee to redeem the bonds and the debtors deposited money into their Citibank account for various purposes, including to satisfy their obligation **[*278]** to reimburse Citibank under the letter of credit. *Id.* Citibank debited funds from the account and transferred money to the indenture trustee, who retired the bonds. The litigation trustee sought to avoid as preferences two transfers made by the debtors to Citibank: (a) the debtors' deposit of funds into the Citibank account, which gave Citibank a security interest in favor of such funds (the "Deposit"); and (b) the debit of those funds by Citibank from the debtors' account (the "Debit"). Citibank moved to dismiss the case on the grounds that the transfers were safe harbored under *§ 546(e)*. *Id. at 321*. In rejecting that contention, the court stated that "[a]lthough it is settled law that bonds and indentures are *contracts*, the Court is not persuaded that the Bonds and Indenture are *securities contracts* within the definitions in the Bankruptcy Code." *Id. at 323*. It held that it "cannot conclude that the Deposit and Debit made in connection with the LC (even if the LC was a credit enhancement to the Bonds) were 'in connection with a securities contract' and protected by *section 546(e)*." *Id. See also In re MPM Silicones, LLC, No. 14-22503, 2014 Bankr. LEXIS 3926, 2014 WL 4436335, at *21 (Bankr. S.D.N.Y. Sept. 9, 2014)* (finding that for purposes of *§ 741(7)*, "the indentures themselves are not contracts for the purchase, sale or loan of a security; they **[*279]** instead set forth the terms under which the underlying notes will be governed and the role of the trustees in connection therewith." (citing *In re Qimonda Richmond, LLC, 467 B.R. at 323*)), *aff'd*, *531 B.R. 321 (S.D.N.Y. 2015)*, *aff'd in part, rev'd in part, and remanded* 874 F.3d 787 (2d Cir. 2017). *HN76*[↑] "Limited liability companies are

22-11509-pb    Doc 180    Filed 02/21/23    Entered 02/21/23 16:53:50    Main Document
Pg 127 of 191

Page 111 of 153
2020 Bankr. LEXIS 2128, *279

creatures of contract, and the parties have broad discretion to use an LLC agreement to define the character of the company and the rights and obligations of its members. Among other things, a company's LLC agreement defines when members of the LLC can be liable for breach of provisions of that agreement." _Kuroda v. SPJS Holdings, L.L.C., 971 A.2d 872, 880-881 (Del. Ch. 2009)_. Thus, an LLC operating agreement is the essential contract that governs the affairs of a limited liability company. In that way, it serves the same purpose as an indenture does in respect of the underlying bonds. *Compare* _Lorenz v. CSX Corp., 1 F.3d 1406, 1409 n.1 (3d Cir. 1993)_ ("An 'indenture' is a contract between the issuing corporation and indenture trustee pursuant to which debentures are issued."). The BHAC LLC Agreement is no different. Among other things it speaks to the rights of its members (Article 3), the management of the LLC (Article 4), the distribution of capital and non-capital proceeds (Article 5) and the dissolution and liquidation of the LLC (Article 9). *See* BHAC LLC Agreement. Neither **[*280]** that agreement, nor the Units representing the membership interests in BHAC issued under the agreement call for the purchase and sale of securities. The Court finds that for purposes of the Motions, the Arbor Defendants have not demonstrated that they are securities contracts for purposes of _§ 741(7)_.

The Arbor Defendants argue that the Preferred Dividend distributions are safe harbored "settlement payments." *See* Arbor MTD at 35 n.18. _**HN77**_[⬆] As used in _§ 546(e)_, the term "settlement payment" means

> a preliminary settlement payment, a partial settlement payment, an interim settlement payment, a settlement payment on account, a final settlement payment, or any other similar payment commonly used in the securities trade[.]

_11 U.S.C. § 741(8)_.[100] That definition "defies plain meaning; to the contrary . . . it is circular and cryptic." _Zahn v. Yucaipa Capital Fund, 218 B.R. 656, 675 (D.R.I._

---

[100] _**HN78**_[⬆] The term "settlement payment" is defined for purposes of the forward contract provisions of the Bankruptcy Code as:

> a preliminary settlement payment, a partial settlement payment, an interim settlement payment, a settlement payment on account, a final settlement payment, a net settlement payment, or any other similar payment commonly used in the forward contract trade.

_11 U.S.C. § 101(51A)_.

_1998)_ (citation omitted). Nonetheless, it is clear that the term must be construed "in the context of the securities trade." _In re Enron Creditors Recovery Corp., 651 F.3d at 334_ ("*Enron*"); *see also* _Kaiser Steel Corp. v. Pearl Brewing Co. (In re Kaiser Steel Corp.), 952 F.2d 1230, 1237 (10th Cir. 1991)_ ("[W]e must interpret the term 'settlement payment' as it is plainly understood within the securities industry.") (citation omitted), *abrogated on other grounds by Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*, 138 S. Ct. 883, 200 L. Ed. 2d 183 (2018). In *Enron*, the Second Circuit broadly construed the plain language of _§ 741(8)_ and defined a "settlement payment" as "the transfer **[*281]** of cash or securities made to complete a securities transaction." _651 F.3d at 339_ (alterations omitted). *Accord* _Lowenschuss v. Resorts Int'l Inc. (In re Resorts Int'l Inc.), 181 F.3d 505, 515 (3d Cir. 1999)_ ("In the securities industry, a settlement payment is generally the transfer of cash or securities made to complete a securities transaction."), *abrogated on other grounds by Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*, 138 S. Ct. 883, 200 L. Ed. 2d 183 (2018). *See also* _In re Motors Liquidation Co., 552 B.R. at 281_ ("[T]he touchstone for application of the 'settlement payment' safe harbor is the transfer of cash or securities to *complete* a securities transaction[.]").

In *Enron*, the payments at issue were made to redeem Enron's widely issued and tradable commercial paper prior to maturity. _651 F.3d at 336_. Enron argued that the redemption payments were not settlement payments because they involved the retirement of debt, not the acquisition of title to the commercial paper. *Id.* The circuit rejected that contention. It reasoned that because _§ 101(49)(A)(i) of the Bankruptcy Code_ defines the term "security" to include a commercial paper, and the redemption payments paid off the commercial paper in full, the payments constituted **[*282]** the "transfer of cash . . . made to complete [a] securities transaction" and were settlement payments within the plain meaning of _§ 741(8)_. _Id. at 339-40_. In doing so, the circuit noted, among other things, that its construction of the term furthered Congress's purpose of "'minimiz[ing] the displacement caused in the commodities and securities markets in the event of a major bankruptcy affecting those industries' . . . [because] if a firm is required to repay amounts received in settled securities transactions, it could have insufficient capital or liquidity to meet its current securities trading obligations, placing other market participants and the securities markets themselves at risk." _Id. at 334_ (citation omitted).

The Trust contends that the Preferred Dividend payments are not "settlement payments" because they

are one-way distributions that do not complete a securities transaction. Opp'n at 48. HN79[↑] A dividend is "a distribution by a corporation to its shareholders of a share of the earnings of the corporation." *In re IAC/InterActive Corp., 948 A.2d 471, 511 (Del Ch. 2008)* (citation omitted). Thus, by definition, a dividend transaction does not involve an exchange of value, it is a one-way payment. *See* Black's Law Dictionary (9th ed. 2009) ("*Dividend*—A portion of a company's [*283] earnings or profits distributed pro rata to its shareholders, usually in the form of cash or additional shares."). "[A] traditional corporation-to-shareholder dividend may not be a 'settlement payment' within the plain meaning of *§ 546(e)* because it is a one-way distribution that occurs without commensurate consideration." *Buchwald Cap. Advisors, LLC v. Papas (In re Greektown Holdings, LLC), No. 08-53104, 2015 Bankr. LEXIS 4147, 2015 WL 8229658, at *6 (Bankr. E.D. Mich. Nov. 24, 2015)* (citation omitted), *aff'd* 584 B.R. 161 (E.D. Mich. 2018), *vacated on other grounds* 765 F. App'x 132 (6th Cir. 2019). *See also Glob. Crossing Estate Representative v. Alta Partners Holdings LDC (In re Glob. Crossing, Ltd.), 385 B.R. 52, 56 n.1 (Bankr. S.D.N.Y. 2008)* (rejecting contention that a dividend payment was a safe harbored "settlement payment," noting that "[r]ecovery of an improper dividend from the ultimate recipient—as contrasted to a clearing agent or broker that might have been a conduit or counterparty to dealings with others in the securities markets"); *Michaelson v. Farmer (In re Appleseed's Intermediate Holdings, Inc.), 470 B.R. 289, 302 (D. Del. 2012)* ("[T]he dividend transaction was not an exchange, but a one-way payment. . . . As alleged, Debtors received nothing in exchange for the dividend." (citing Black's Law Dictionary (9th ed. 2009))); *Weinman v. Fid. Capital Appreciation Fund (In re Integra Realty Res.), 198 B.R. 352, 358-60 (Bankr. D. Colo. 1996)* (finding that no "settlement payment" occurred in connection with chapter 11 debtor's prepetition spin-off stock transfer, where common stock was distributed to shareholders). But the focus of the Trust's analysis is too narrow because the Trust fails [*284] to account for the relationship of the BHAC LLC Agreement and the Cash Management Agreement to the LBO Transaction. On that issue, *Crescent Resources* is instructive. In addition to finding that the $1.1 billion transfer to Duke Capital was made "in connection with" a securities contract, the court found that the transfer was a safe harbored "settlement payment." *500 B.R. at 473-76*. In doing so, the court rejected the CR Trust's contentions to the contrary and found that the transfer had to be analyzed in the context of the entire transaction. *Id. at 473-74*. The court viewed the transfer as a necessary transfer in the completion of the multi-step securities transaction described in the Formation and Sale Agreement. It found that "Crescent Resources' distribution (through Crescent Holdings) of the term loan proceeds to Duke [Capital] was a settlement payment within the meaning of *Section 546(e)* because it was made to complete a securities transaction, namely the 2006 Duke Transaction." *Id.*[101] It is not at all clear on the face of the documents that the Preferred Dividend payments were made to complete the LBO Transaction. On this record, the Court is not able to determine whether the "settlement payment" safe harbor bars the Trusts [*285] claims to avoid those transfers. It is premature to make that determination. The Defendants have not demonstrated that on the face of the Amended Complaint, application of the safe harbor bars the assertion of the claims underlying Counts 3 and 13-15, as they relate to the Dividend Payments.

PERA Payments

The Arbor Defendants are succinct and to the point when they assert that the "PERA Payments satisfy the requirements for the safe harbor of *section 546(e)* for the same reasons that the Preferred Dividends are protected." Arbor Reply at 19. [*286] For the reasons discussed above, the Court finds that it is premature to consider whether the PERA Payments are safe harbored "settlement payments" or safe harbored payments made "in connection with" a securities contract.[102]

---

[101] Among other things, the *Crescent Resources* court noted that:

> [I]n describing the "Closing Actions," the Formation and Sale Agreement listed the following: (1) the exchange of membership interests between Duke [Capital], Crescent Holdings, and Crescent Resources, which resulted in Crescent Holdings wholly owning Crescent Resources, and Duke Ventures owning 98% of Crescent Holdings (the remaining 2% going to Fields); (2) "simultaneously" with those transfers, a "distribution of capital" in the amount of $1,187 billion in term loan proceeds from Crescent Resources to Crescent Holdings and on to Duke [Capital]; and (3) Duke [Capital]'s sale of a 49% interest in Crescent Holdings to the MSREF investors. . . .

*500 B.R. at 473*.

[102] The Lightstone and Arbor Defendants contend that all or

<u>Whether The Fraudulent Transfer Claims State Claims For Relief</u>

<u>Actual Fraudulent Transfers</u>

In Counts 12 and 13 of the Amended Complaint, the Trust seeks to avoid the Transfers as actual fraudulent transfers under federal and state law pursuant to *§ 548(a)(1)(A)* (Count 12) and *§ 544* (Count 13) of the Bankruptcy Code, respectively (collectively, the "Actual Fraudulent Conveyance Claims"), and to recover the sums transferred, plus interest, from Lichtenstein, and the Arbor and Lightstone Entities pursuant to *§ 550 of the Bankruptcy Code*. The Defendants seek to dismiss those Counts.

Before addressing whether there are grounds to dismiss those Counts, the Court must consider which state law is applicable to Count 13. *HN80*[↑] It is settled that "bankruptcy courts confronting state law claims that do not implicate federal policy concerns should apply the choice of law rules of the forum state." *Bianco v. Erkins (In re Gaston & Snow., 243 F.3d 599, 601-02 (2d Cir. 2001)*; *see also In re PSINet, Inc., 268 B.R. 358, 376 (Bankr. S.D.N.Y. 2001)* ("Where, as here, this Court's subject matter jurisdiction is based on *28 U.S.C. § 1334*, the Court applies, with respect to matters of state **[*287]** law, the conflict of law principles of the forum state, i.e., the State of New York."). Fraudulent transfer actions do not implicate federal policy concerns. *See Official Comm. of Unsecured Creditors of Enron Corp. v. Whalen (In re Enron Corp.), 357 B.R. 32, 50 n.22 (Bankr. S.D.N.Y. 2006)* (implicitly holding that fraudulent transfer actions at issue did not implicate federal policy concerns); *see also Terry v. Walker, No. 3:04CV00064, 2006 U.S. Dist. LEXIS 24076, at *8 (W.D. Va. March 23, 2006)* (holding fraudulent transfer action does not present federal interest sufficiently compelling to justify federal choice of law rules). It follows that the Court will apply New York's choice of law analysis. *HN81*[↑] For that purpose, a fraudulent conveyance is considered to be a tort. *See Geron v. Seyfarth Shaw LLP (In re Thelen LLP)*, 736 F.3d 213, 219 (2d Cir. 2013) (noting that "[t]he parties [did] not

dispute that a fraudulent conveyance is a tort") (citation omitted); *see also RCA Corp. v. Tucker, 696 F. Supp. 845, 854 (E.D.N.Y. 1988)* ("[W]hether the assignment of the . . . note may be avoided as a fraud on New York creditors—should be characterized as a tort for purposes of selecting the appropriate New York conflict of laws principles."); *Hassett v. Far West Federal Savings and Loan Assoc. (In re O.P.M. Leasing Services, Inc.), 40 B.R. 380, 391-95 (Bankr. S.D.N.Y.)*, (deeming a fraudulent conveyance a tort in selecting applicable conflict of law principles), *aff'd on other grounds*, *44 B.R. 1023 (S.D.N.Y. 1984)*. New York applies an "interest analysis" in determining the choice of law for tort claims. *See Schultz v. Boy Scouts of Am., Inc., 65 N.Y.2d 189, 197, 480 N.E.2d 679, 491 N.Y.S.2d 90 (N.Y. 1985)* (noting that the "[i]nterest analysis [is] the relevant analytical **[*288]** approach to choice of law in tort actions in New York."); *see also Arochem Int'l, Inc. v. Buirkle, 968 F.2d 266, 270 (2d Cir. 1992)* ("In tort actions, New York applies a so-called interest analysis.") (citation omitted). Under that analysis, "the law of the jurisdiction having the greatest interest in the litigation will be applied[.]" *Kalb, Voorhis & Co. v. Am. Fin. Corp., 8 F.3d 130, 132 (2d Cir. 1993)* (quoting *Intercontinental Planning, Ltd. v. Daystrom, Inc., 24 N.Y.2d 372, 248 N.E.2d 576, 300 N.Y.S.2d 817 (N.Y. 1969))*. The factors relevant to such an analysis "are the nature of the legal issue in conflict, the policy or purpose supporting the provision in conflict, and an examination of the contacts of the competing jurisdictions to determine which jurisdiction has the greatest concern with the specific issue in question." *Advanced Portfolio Techs., Inc. v. Advanced Portfolio Techs. Ltd., No. 94 Civ. 5620, 1999 U.S. Dist. LEXIS 1265, 1999 WL 64283, *5 (S.D.N.Y. Feb. 8, 1999)* (citation omitted). "As part of interest analysis, the New York Court of Appeals has distinguished between rules regulating conduct and rules governing loss allocation. Generally, when the laws in conflict are conduct regulating, the law of the locus jurisdiction applies." *Arochem Int'l, Inc. v. Buirkle, 968 F.2d at 270* (citing *Schultz, 65 N.Y.2d at 189*). *See also Cooney v. Osgood Mach., Inc., 81 N.Y.2d 66, 72, 612 N.E.2d 277, 595 N.Y.S.2d 919 (N.Y. 1993)* ("If conflicting conduct-regulating laws are at issue, the law of the jurisdiction where the tort occurred will generally apply because that jurisdiction has the greatest interest in regulating behavior within its borders.").[103] For these

_____

some of the State Law claims are pre-empted by the safe harbor provisions and, as such, must be dismissed. *See* Lightstone MTD at 29-32; Arbor MTD at 40-46. In light of the Court's ruling on the application of the safe harbor provisions, the Court will not consider the preemption argument at this time.

_____

[103] *HN82*[↑] The law of the jurisdiction with the most significant contacts to the relevant transfers and relevant parties applies to a state constructive fraudulent transfer claim brought under *§ 544(b) of the Bankruptcy Code*. *See In re*

purposes, "[a] fraudulent conveyance statute is conduct regulating rather [*289] than loss allocating." *GFL Advantage Fund, Ltd. v. Colkitt, No. 03 Civ. 1256, 2003 U.S. Dist. LEXIS 10643, 2003 WL 21459716, at *3 (S.D.N.Y.)* (citing *Comer v. Titan Tool, Inc., 875 F. Supp. 255, 259 (S.D.N.Y. 1995))*, *order amended on reconsideration*, No. 03 CIV.1256 JSM, 2003 WL 21556935 (S.D.N.Y. July 10, 2003).

The fraudulent transfer provisions of New York, South Carolina and Delaware may be relevant herein. Each of those states has its own fraudulent transfer law, and they differ from one another: New York has adopted the *Uniform Fraudulent Conveyance Act*, Delaware has adopted the *Uniform Fraudulent Transfer Act*, and South Carolina applies the Statute of Elizabeth to fraudulent transfer claims. The three groups of Transfers have different characteristics. For example, and without limitation, they include (i) transfers that were specifically authorized by the Company Board at meetings in New York or by telephone, (ii) transfers consisting of preferred and non-preferred equity distributions under the BHAC LLC Agreement and DL-DW LLC Agreement, and (iii) transfers in satisfaction of management fees paid to Lichtenstein presumably accounted for in the Debtors' budgets. The Arbor Defendants contend that the Court should apply South Carolina law to the Actual Fraudulent Transfer Claims because ESI is headquartered in South Carolina, and under New York's choice of law rules, the law of the state where the injury was [*290] inflicted governs, and that is usually where the plaintiff is located. *See Drenis v. Haligiannis, 452 F. Supp. 2d 418, 427 (S.D.N.Y. 2006)*. The Examiner concluded that New York law should apply to the fraudulent transfers, although he was not focused on the post-LBO Transfers at issue herein. *See* Examiner's Report at 277. The Trust asserts that the choice of law is not clear and that given New York's choice of law rules, the determination of the state law applicable to the Actual Fraudulent Conveyance Claims should await completion of discovery. The Court finds merit to that contention. Accordingly, it will not reach the merits of the Defendants' arguments that the Amended Complaint fails to state claims for relief under state fraudulent transfer laws (i.e., Count 13). Instead, the Court will focus its discussion on whether Count 12 states a claim

_____

*WorldCom, Inc., No. 02-13522, 2003 Bankr. LEXIS 1401, 2003 WL 23861928, at *41 (Bankr. S.D.N.Y. Oct. 31, 2003)*. Contacts to be considered include the domicile, residence, place of incorporation and place of business of the parties; the place of injury; and the place of injury-causing conduct. *See id.* (citing *Restatement (Second) of Conflicts of Laws § 145*).

upon which the Court can grant relief.

*HN83*[↗] To plead a claim of an actual fraudulent transfer under federal law, a plaintiff must allege, with specificity, that in making the transfers, the transferor acted with actual intent to hinder, delay or defraud its creditors. *See 11 U.S.C. § 548(a)(1)(A)* ("The trustee may avoid any transfer . . . if the debtor . . . made such transfer . . . with actual intent to hinder, delay, or defraud" [*291] creditors.). For these purposes, only the intent of the *transferor* in making the transfer is relevant. *See, e.g., Silverman v. Actrade Capital Inc. (In re Actrade Fin. Techs., Ltd.), 337 B.R. 791, 808 (Bankr. S.D.N.Y. 2011)* ("Cases under *§ 548(a)(1)(A)* indicate that it is the intent of the transferor and not the transferee that is relevant for purposes of pleading a claim for intentional fraudulent conveyance under the Bankruptcy Code.") (citation omitted). In support of its claim under Count 12, the Trust asserts that despite knowing that the LBO Transaction left ESI and its affiliated companies in precarious financial condition and in desperate need of cash, the Defendants used their ownership, control, and management authority over the Debtors' post LBO business to improperly withdraw cash and assets (or to authorize, aid or abet such action) from the financially distressed Debtors to benefit themselves. *See* Amd. Compl. ¶¶ 2, 3. The Trust maintains that the insider Defendants disregarded the corporate forms for the numerous Debtor entities and owned and operated the Debtors as a single business including, for example, by vesting a single corporate board with authority to make key decisions for all Debtor entities. *Id.* ¶ 3. It also asserts that the cash management system implemented through the LBO Transaction [*292] facilitated the money grab because it was devised to provide a "certain return" to the equity holders, while placing some creditors at great risk of not being paid. *Id.* ¶ 5. The Trust contends that by design, and with the Defendants' approval, the cash management system provided a route for payments to be made to equity holders directly, appearing to circumvent the normal process for corporate directors to determine in advance, before the payments were made, whether the company had the financial wherewithal to make such distributions to equity. *Id.*; *see also id.* ¶ 6 ("As this cash management system was devised to benefit insiders and other equity holders to the detriment of creditors, depleting corporate reserves at a time when cash was desperately needed, use of it to make the payments was a fraudulent ruse to hinder, delay, or defraud creditors."); *id.* ¶ 125 ("Through the cash management system instituted after the sale, post-LBO equity holders could receive improper dividends or

distributions from the Debtors even as the Debtors' financial condition deteriorated into insolvency."). In this light, and in support of Count 12, the Trust alleges, among other things, that the Transfers [*293] "were made and/or the obligations were incurred with actual intent to hinder, delay, or defraud one or more entities to which the Debtors were or became indebted[,]" and the "Defendants, and the insiders who directed the Debtors to make these transfers and incur these obligations, had knowledge of the Debtors' insolvency when the transfers were made and the obligations incurred." *Id.* ¶ 329. The Trust asserts that "the Defendants and the insiders knew that they were hindering, delaying, or defrauding the Debtors' creditors when the Debtors paid equity owners on account of their equity ahead of paying off creditors." *Id.* It alleges that the following are among the "many facts" demonstrating that the Transfers were made with actual intent to hinder, delay, or defraud the Debtors' creditors:

(i) the transfers were made and the obligations were incurred when the Debtors were insolvent;

(ii) the transfers were made and the obligations were incurred at a time when the Debtors were controlled by insiders who benefited directly and indirectly from the transfers and obligations;

(iii) the transfers were made and the obligations incurred without any benefit or value received by the Debtors;

(iv) [*294] when the transfers were made and the obligations incurred, the Debtors and the insiders had knowledge of the Debtors' insolvency;

(v) the transfers were not made and the obligations were not incurred in the ordinary course of business;

(vi) these distributions to equity were unlawful under applicable state law, as they were made while the Debtors were insolvent; and

(vii) the transfers and obligations depleted much needed cash, adversely impacted and jeopardized the liquidity of the company, and hindered and delayed payments to creditors on obligations owed by the Debtors.

*See* Amd. Compl. ¶ 330.

*HN84*[↑] As previously discussed, to state a claim for actual fraudulent conveyance, a plaintiff must satisfy the general pleading requirements in *Rule 8(a)* and the heightened standards of *Rule 9(b) of the Federal Rules of Civil Procedure*. To satisfy the pleading requirements of *Rule 9(b)*, a complaint must "(1) specify the statements that the plaintiff contends were fraudulent,

(2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Mills v. Polar Molecular Corp., 12 F.3d 1170, 1175 (2d Cir. 1993)* (citing *Cosmas v. Hassett, 886 F.2d 8, 11 (2d Cir. 1989))*. That is to say that the "plaintiff must plead the who, what, when and where of his allegations." *United States ex rel. Barmak v. Sutter Corp., No. 95 CIV. 7637 (KTD), 2003 U.S. Dist. LEXIS 10446, 2003 WL 21436213, at *4 (S.D.N.Y. June 20, 2003)*; *see also U.S. ex rel. Vallejo v. Investronica, Inc., 2 F. Supp. 2d 330, 336 (W.D.N.Y. 1998)* ("In this Circuit, to pass muster under *Rule 9(b)*, the amended [*295] complaint must allege when and where the statements were made, identify the individual responsible for the statements, and specify the content of the alleged fraudulent statements.") (citation omitted). The plaintiff also "must state with particularity the circumstances constituting fraud or mistake," including, at a minimum, "facts that give rise to a strong inference of fraudulent intent." *Pereira v. Grecolas Ltd. (In re Saba Enters., Inc.), 421 B.R. 626, 642 (Bankr. S.D.N.Y. 2009)* (citation omitted); *see also Cruz v. TD Bank, N.A., 855 F. Supp. 2d 157, 176 (S.D.N.Y. 2012)* (same). A strong inference of fraudulent intent arises if a plaintiff plausibly alleges: (i) that the "defendants had both motive and opportunity to commit fraud," or (ii) "strong circumstantial evidence of conscious misbehavior or recklessness." *Shields v. Citytrust Bancorp, 25 F.3d 1124, 1128 (2d Cir. 1994)* (citation omitted).[104] "To qualify as 'strong,' 'the inference of scienter must be more than merely 'reasonable' or 'permissible'—it must be cogent and compelling, thus strong in light of other explanations.'" *The Responsible Person of Musicland Holding Corp. v. Best Buy Co. (In re Musicland Holding Corp.), 398 B.R. 761, 774 (Bankr. S.D.N.Y. 2008)* (citation omitted). In assessing whether the allegations in a complaint give rise to a "strong inference" of fraudulent intent, the Court must consider "plausible opposing inferences" such that "a reasonable person

---

[104] This two-prong test is commonly applied to analyze scienter in securities fraud actions, but the "same standard has been applied in [the Second] Circuit to non-securities fraud claims." *In re Musicland Holding Corp., 398 B.R. at 774 n.7* (applying the two-prong test to establish fraudulent intent under *§ 544* of the Code and applicable state law); *see also Serova v. Teplen, No. 05-CIV-6748 (HB), 2006 U.S. Dist. LEXIS 5781, 2006 WL 349624, at *8 (S.D.N.Y. Feb. 16, 2006)* ("This Circuit applies the same [two-prong] standard to pleading fraudulent intent under common law fraud as to pleading scienter in securities fraud.") (citation omitted); *In re Saba Enters., Inc., 421 B.R. at 641-42* (applying the two-prong test to establish fraudulent intent under *§ 548(a)(1)(A)* of the Code).

would deem the inference of scienter cogent and at least as compelling as any opposing inference one could [*296] draw from the facts alleged." *In re Bear Stearns Cos., Sec. Derivative, and ERISA Litig., 763 F. Supp. 2d 423, 499 (S.D.N.Y. 2011)* (citation omitted).

The Arbor and Lightstone Defendants maintain that the Court should dismiss Count 12, with prejudice, because (i) the allegations in support of that Count do not meet the heightened pleading standard of *Rule 9(b)* since the amended Complaint adopts an impermissible group pleading format; (ii) the Trust fails to allege badges of fraud sufficient to support a reasonable inference that in causing the Debtors to make the Transfers, the Defendants intended to hinder, delay or defraud the Debtors' existing or future creditors; and (iii) the factual allegations underlying these claims are facially implausible under the pleading requirements set forth in *Iqbal, 556 U.S. 662, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)* and *Twombly, 550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)* and their progeny. *See* Arbor MTD at 16-26; *see also* Lightstone MTD at 86-87. The Trust disputes those assertions. *See* Opp'n at 115-125. The Court considers those matters below.

### Whether the Amended Complaint Pleads Fraud with Particularity

Turning first to the issue of whether the Amended Complaint satisfies the heightened pleading standards of *Rule 9(b)*, the Court adopts the analysis of that issue previously set forth herein and finds that the Amended Complaint satisfies the pleading requirements under *Rule 9(b)*.

### Whether the Amended [*297]  Complaint Alleges Intent to Defraud

*HN85*[⬆] In proving fraud, the group pleading doctrine "has no effect on the . . . *scienter* requirement. It merely gives plaintiffs the benefit of a presumption that certain kinds of statements were made by certain kinds of defendants. It does not permit plaintiffs to presume the state of mind of those defendants at the time the alleged misstatements were made." *In re BISYS Sec. Litig., 397 F. Supp. 2d 430, 440 (S.D.N.Y. 2005)* (citation omitted). *See also In re CRM Holdings, Ltd. Sec. Litig., No. 10 Civ. 975, 2012 U.S. Dist. LEXIS 66034, 2012 WL 1646888, at *30 (S.D.N.Y. May 10, 2012)* (noting that scienter "cannot be satisfied through group pleading" because complaint must allege each individual defendant's fraudulent intent). Thus, even with group pleading, the Trust still must plead sufficient factual allegations to demonstrate that in facilitating the Transfers, the Defendants did so with the intent to hinder, delay or defraud the Debtors' existing or future creditors. *See In re Bayer AG Sec. Litig., No. 03 Civ. 1546 WHP, 2004 U.S. Dist. LEXIS 19593, 2004 WL 2190357, at *15 (S.D.N.Y. Sept. 30, 2004)* (noting that plaintiffs relying on the group pleading doctrine "must still establish scienter as to each defendant" (citing *Steed Fin. LDC v. Nomura Sec. Intern., Inc., No. 00 Civ. 8058(NRB), 2004 U.S. Dist. LEXIS 18580, 2004 WL 2072536, at *5 (S.D.N.Y. Sept. 14, 2004)*)).

*HN86*[⬆] But because proving such actual intent is difficult, to support its case, "the pleader is allowed to rely on 'badges of fraud' . . . i.e., circumstances so [*298]  commonly associated with fraudulent transfers that their presence gives rise to an inference of intent." *Sharp Int'l Corp. v. State Street Bank & Tr. Co. (In re Sharp Int'l Corp.), 403 F.3d 43, 56 (2d Cir. 2005)* (citation omitted) (finding badges applied to pleading of state law claim of intentional fraudulent claim); *Salomon v. Kaiser (In re Kaiser), 722 F.2d 1574, 1582-83 (2d Cir. 1983)* (applying badges of fraud in finding actual fraud). Common badges of fraud include:

(1) lack or inadequacy of consideration;

(2) the family, friendship or close associate relationship between the parties;

(3) the retention of possession, benefit or use of the property in question;

(4) the financial condition of the party sought to be charged both before and after the transaction in question;

(5) the existence or cumulative effect of a pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors;

(6) the general chronology of the events and transactions under inquiry;

(7) a questionable transfer not in the usual course of business; and

(8) the secrecy, haste, or unusualness of the transaction.

*In re Actrade Fin. Techs., Ltd., 337 B.R. at 809*; *Wall St. Assocs. v. Brodsky, 257 A.D. 2d 526, 529, 684 N.Y.S.2d 244 (N.Y. App. Div. 1999)*.

As a preliminary matter, the Arbor Defendants contend that the Trust cannot resort to the badges of fraud to plead and prove its case, because it is armed with the

22-11509-pb    Doc 180    Filed 02/21/23    Entered 02/21/23 16:53:50    Main Document
Pg 133 of 191
2020 Bankr. LEXIS 2128, *298

Page 117 of 153

Examiner's Report, has had **[\*299]** unfettered access to the Debtors' books and records, and has all of the information it needs to plead its case, generally, and specifically, concerning the Debtors' intent to defraud. *See* Arbor MTD at 23. They say that its failure to do so mandates that the Court dismiss the Actual Fraudulent Conveyance Claims. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 106 (2d Cir. 2007)* ("ATSI cannot sufficiently plead fraud by simply providing a method for the defendant to discover the underlying details. If ATSI had access to the details necessary to make these allegations, it must plead them and not just tell the defendants to go find them."). The Court finds no merit to that assertion. First, there is nothing in the record to support the contention that the Trust has access to information not otherwise available to the parties and, in any event, the Arbor Defendants fail to identify any specific information it believes the Trust possesses that should have been included in the Amended Complaint. Further, it is undisputed that (i) the Trust does not have access to all information received by the Examiner because it was provided to the Examiner pursuant to confidentiality agreements, (ii) e-mails generally were not provided to the Examiner, and (iii) the Trust does **[\*300]** not have access to the Defendants or to any of the Debtors' employees, as they are employed either by HVM, the Defendants or their agents. *See* Opp'n at 119 n.34.

The Arbor Defendants next contend that by application of the Supreme Court's decisions in *Iqbal* and *Twombly*, the Trust cannot rely on the "badges of fraud" in pleading a plausible and particularized actual fraudulent transfer claim. The Court finds no merit to that assertion. First, the cases cited by the Defendants do not support that proposition.[105] Moreover, "[w]hile *Twombly* and

*Iqbal* together have toughened the pleading standards for purposes of judging the adequacy of a complaint under *Rule 12(b)(6)*, those cases do not speak directly to questions as to the sufficiency of a complaint that alleges badges of fraud as a means to infer fraudulent intent for purposes of *Rule 9(b)*." *In re Lehman Bros. Holdings Inc., 469 B.R. at 448*. **HN87**[⬆️] In the wake of *Twombly* and *Iqbal*, courts in this district routinely apply the badges of fraud test in assessing the adequacy of fraud claims. *See, e.g., Tronox v. Anadarko Petroleum (In re Tronox Inc.), 429 B.R. 73, 95 (Bankr. S.D.N.Y. 2010)* ("The existence of several badges of fraud can constitute clear and convincing evidence of actual intent." (quoting *In re Actrade Fin. Techs. Ltd., 337 B.R. at 809*)); *Weisfelner v. Hoffman (In re Lyondell Chem. Co.), 554 B.R. 635, 652-53 (S.D.N.Y. 2016)* (noting that under the caselaw, a plaintiff is allowed to plead "badges of fraud" to support a claim **[\*301]** for intentional fraudulent transfer) (citations omitted). *See also Chase Bank, U.S., N.A. v. Vanarthos (In re Vanarthos), 445 B.R. 257, 263-264 (Bankr. S.D.N.Y. 2011)* (concluding, post-*Twombly*, that a complaint alleging fraud and seeking non-dischargeability of debt under *§ 523(a)(2)(A)* satisfied the "particularity" requirement of *Rule 9(b)* by alleging a number of "circumstantial factors").

Finally, the Arbor Defendants argue that the Trust has not demonstrated the existence of any of the badges of fraud in support of its assertion that the Defendants acted with an intent to hinder, delay or defraud existing or future creditors in facilitating the Transfers. *See* Arbor MTD at 23-26. **HN88**[⬆️] The case law is clear that the presence or absence of any single badge of fraud generally is not conclusive evidence of a plaintiff's intent to hinder, delay or defraud existing or future creditors. Rather, in assessing whether the badges of fraud demonstrate fraudulent intent in a particular case, courts look to whether, when viewed together, the badges present in that case evidence an intent to defraud. Thus, "[w]hile '[t]he presence of a single badge of fraud may spur mere suspicion, the confluence of several can constitute conclusive **[\*302]** evidence of an actual intent to defraud, absent 'significantly clear' evidence of a legitimate supervening purpose.'" *In re Tribune Co. Fraudulent Conveyance Litig.*, No. 11-md-2296, 2019 U.S. Dist. LEXIS 10983, 2019 WL 294807, at *10 (S.D.N.Y. Jan. 23, 2019) (quoting *Max Sugarman Funeral Home, Inc. v. A.D.B. Inv'rs, 926 F.2d 1248, 1254-55 (1st Cir. 1991)*). *See also Goodman v. H.I.G.*

---

[105] The cases cited by the Arbor Defendants do not say that *Iqbal* and *Twombly* overturned the Statute of Elizabeth and eliminated badges of fraud for fraudulent transfer claims. *See* Arbor MTD at 23 n.13. In *Babin v. Caddo E. Estates I, Ltd., 496 B.R. 804, 2013 WL 4048979, at *3 (E.D. La. 2013)*, the court recognized and applied the badges of fraud, and found that a fraudulent transfer was established based on the badges of fraud. The case of *Rubloff Dev. Grp., Inc. v. SuperValu, Inc., 863 F. Supp. 2d 732, 745-46 (N.D. Ill. 2012)*, involved wire fraud and did not mention badges of fraud. *CadleRock, L.L.C. v. Morey (In re Morey), No. 1100005EE, 2012 Bankr. LEXIS 656, 2012 WL 369486, at *6 (Bankr. S.D. Miss. Feb. 3, 2012)*, also did not mention badges of fraud. Finally, *Airport Blvd. Apts., Ltd. v. NE 40 Partners, L.P. (In re NE 40 Partners, L.P.), 440 B.R. 124, 129 (Bankr. S.D. Tex. 2010)*, did not address badges of fraud, and instead elected

not to apply a relaxed pleading standard for a bankruptcy trustee.

*Capital, LLC (In re Gulf Fleet Holdings, Inc.), 491 B.R. 747, 767 (Bankr. W.D. La. 2013)* ("No particular 'badge' is dispositive, and courts typically require the confluence of multiple badges to establish fraudulent intent." (citing *In re Equip. Acquisition Res., Inc.*, 481 B.R. 422, 431 (Bankr. N.D. Ill. 2012))).

HN89[↑] In applying the badges in a given case, "[t]he proper inquiry is whether the badges of fraud are present, not whether some factors are absent." *Dobin v. Hill (In re Hill), 342 B.R. 183, 198 (Bankr. D.N.J. 2006)* (citation omitted). The Trust asserts that many of the factors are present here and that it has alleged and will prove numerous badges of fraud in support of its allegations that the Defendants engaged in actual fraud in making the Transfers. *See* Opp'n at 122-24. As is apparent in the allegations in the Amended Complaint, the Trust focuses on the relationship among the Debtors and the Defendants; the Debtors' financial condition before and after the Transfers; and the Defendants' knowledge of the Debtors' ostensibly distressed financial condition. The substance of its allegations in paragraphs 330 and 338 of the Amended Complaint in support of its claims of actual fraud, is that (i) the Transfers **[*303]** were made to insiders (Badge #2); (ii) the Debtors were undercapitalized, if not insolvent, before and after the Transfers, and that the insiders knew as much (Badge #4); (iii) the Transfers were made without any benefit or value received by the Debtors and were not incurred in the ordinary course - especially those Transfers that Weil and Lazard advised the Debtors to discontinue (Badge #1); and (iv) the Transfers constitute unlawful distributions under state law to equity holders because they were made while the Debtors were insolvent and under financial distress (Badge #7). The Trust also submits that the Defendants' fraud is manifest by the fact that, even though the Company Board ultimately voted to discontinue the Dividend Payments, those payments continued to be made (i) despite the advice of counsel and financial advisors that the payments should be halted and the board's vote to halt the distributions; and (ii) even after counsel sent a memo to independent directors of the Debtors informing them that Extended Stay's management and board of directors was considering filing a bankruptcy petition. *See* Amd. Compl. ¶¶ 175, 181. Taking all facts in the Amended Complaint as true **[*304]** and drawing all reasonable inferences in favor of the Trust, the Court finds that for pleading purposes the confluence of the badges of fraud alleged in the Amended Complaint is sufficient to allege that the Defendants acted with an intent to hinder, delay or defraud existing or future creditors in facilitating the

Transfers. *See* *In re Saba Enters., Inc., 421 B.R. at 644* (finding five badges of fraud sufficient to constitute "clear and convincing evidence of actual intent" where inadequate consideration given in connection with the transfers (Badge #1), the corporate entities involved in the transfers were affiliates controlled by a single individual (Badge #2), the transfers left the debtor "without assets of any real value" to pay its debts (Badge # 4), the transfers were executed within days following the entry of $19.4 million in judgments against the debtor (Badge #5) and assets of the debtor were transferred to non-filing affiliates within one year period before the debtor filed for bankruptcy (Badge #6)); *In re Lehman Bros. Holdings, Inc., 469 B.R. at 447-48* (finding five badges of fraud sufficient where the debtor was wholly dependent on lender to conduct its business and lender was an insider with access to information regarding the debtor's state of affairs and future **[*305]** plans (Badge #2), each transaction occurred on a rushed basis out of step with the parties' prior course of dealing and the industry standards (Badge # 7), the debtor received no consideration in connection with the transactions (Badge #1), the transactions resulted in a massive drain of the debtor's liquidity (Badge #5), and each transaction occurred at a time when the debtor was insolvent or undercapitalized (Badge #4)); *Amusement Indus., Inc. v. Midland Ave. Assocs., LLC, 820 F. Supp. 2d 510, 531-32 (S.D.N.Y. 2011)* (finding four badges of fraud sufficient where there was a close relationship between officers of the debtor and the entities that received the transfers (Badge #2), the transfers were not performed as they would have been in the usual course of business (Badge #7), there was a lack of consideration for some of the transfers (Badge #1), and the debtor directed escrowed funds to be released to dummy or fictitious parties (Badge #8)).

## Whether the Amended Complaint States a Plausible Claim for Relief

Finally, the Court considers whether the allegations in support of Count 12 state a claim for relief that is plausible on its face. *See* *Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)* ("To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that **[*306]** is plausible on its face.'"). HN90[↑] The factual allegations in support of a complaint must consist of more than mere labels, legal conclusions, or a "formulaic recitation of the elements of a cause of action[.]" *Id.* (quoting *Twombly, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)).* In assessing the

adequacy of the pleadings, plausibility "is a relative measure." *Arar v. Ashcroft, 585 F.3d 559, 617 (2d Cir. 2009)* (en banc). The plausibility determination is a "'context-specific' [task that requires] the reviewing court 'to draw on its judicial experience and common sense.'" *Id.* (quoting *Iqbal, 556 U.S. at 679*). Thus, a claim is plausible when the plaintiff pleads "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal, 556 U.S. at 678* (citing *Twombly, 550 U.S. at 556*). A plaintiff's factual allegations "must be enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true." *Twombly, 550 U.S. at 545*. The plausibility standard does not require a showing of a "probability" of misconduct, however it demands more than a "sheer possibility that a defendant has acted unlawfully." *Iqbal, 556 U.S. at 678*. Where there is an "obvious alternative explanation" that is more likely, the plaintiff's cause of action is not plausible and must be dismissed. *Id. at 682* (quoting *Twombly, 550 U.S. at 567*). Allegations [*307] "become implausible when the court's commonsense credits far more likely inferences from the available facts." *Arar v. Ashcroft, 585 F.3d at 617*. The Trust alleges that the "transfers were made and/or the obligations were incurred with actual intent to hinder, delay, or defraud one or more entities to which the Debtors were or became indebted." Amd. Compl. ¶ 329. The Actual Fraudulent Conveyance Claims require "intent to defraud on the part of the transferor." *In re Sharp Int'l Corp., 403 F.3d at 56* (citation omitted). Thus, *Sharp* stands "for a central postulate in fraudulent conveyance analysis. HN91[⬆] That is, the Court must focus precisely on the specific transaction or transfer sought to be avoided in order to determine whether that transaction falls within the statutory parameters of either an intentional or constructive fraudulent conveyance." *Bayou Superfund, LLC v. WAM Long/Short Fund II, L.P. (In re Bayou Grp., LLC), 362 B.R. 624, 637-38 (Bankr. S.D.N.Y. 2007)*. *See also Daly v. Deptula (In re Carrozzella & Richardson), 286 B.R. 480, 490 (D. Conn. 2002)* (applying Connecticut state law stating that "the proper focus of a fraudulent transfer inquiry is on the transfer itself, not the overall business practices of the Debtor").

The Defendants contend that the Trust's assertion of actual fraud on their part in facilitating the Dividend Payments is contradicted by an obvious, common sense explanation from the Trust's own allegations - the payments were made [*308] pursuant to contractual obligations put into place in connection with the LBO Transaction. *See, e.g.*, Arbor MTD at 20 (citing Amd.

Compl. ¶ 118 ("As part of the LBO, revenue and other cash received for the Debtors' operations were funneled into an integrated cash management account, pursuant to a Cash Management Agreement. The Cash Management Agreement sought to protect certain lenders and equity owners by imposing a set waterfall payout structure.")); Examiner's Report at 91-92 (noting that the Cash Management Agreement required all funds on deposit to be applied pursuant to a certain waterfall, which included "the lesser of $1.25 million or an amount that would yield 8% return to Preferred Equity Holders into the Preferred Equity Subaccount"). *See also Lightstone MTD at 86.*

The Arbor Defendants say that it is not plausible that when the LBO Transaction was negotiated the Defendants agreed to the BHAC LLC Agreement, including the Cash Management Agreement, with the actual intent to hinder, delay or defraud the Debtor's business. They also contend that the 25% Note payments and LIBOR Floor Certificate Transfers were made to the Arbor Defendants on account of antecedent debt—namely, the 25% Note, the proceeds of which [*309] were used to repay the 9.15% Notes that matured in March 2008. As such, they say that in making those payments, there was no plausible fraudulent intent. *See* Arbor MTD at 20-22. The Lightstone Defendants similarly assail the plausibility of the Trust's fraud theory. Among other things, they maintain that the claims against Lichtenstein make no sense because it is nonsensical to draw an inference that Lichtenstein and his affiliates would intentionally harm the company he owned, had recently invested hundreds of millions of dollars of his own funds to purchase, and for which he issued a personal guaranty for an additional $100 million that could be triggered by misconduct. *See* Lightstone MTD at 86. In short, the Defendants assert that the Trust's premise that the Defendants would have invested $400 million to acquire the Debtors, with the knowledge and participation of the LBO Lenders and other sophisticated parties, only to then harm the company by drawing out $139 million, all with the intent to defraud creditors, is "nonsensical." *See id.*

However, as the Trust points out, in acquiring the Extended Stay business, the Arbor and Lightstone Entities received the equity for the business, not an absolute guarantee entitling [*310] them to get their money back from the business - ahead of creditors - irrespective of how the business performed. *See* Opp'n at 121. The Trust also argues that the fact that the dividends were paid under the BHAC LLC Agreement

and DL-DW LLC Agreement does not insulate the dividend payments from challenge. That is because those agreements and the right to receive payments under the agreements cannot supersede applicable state law ban against issuing dividends where the corporation is insolvent or has no surplus out of which to fund the dividend. *See id.* at 127. Indeed, the Trust notes that the Defendants acknowledge as much because the Company Board suspended the payment of dividends in the face of the likely insolvency of the Debtors. The Trust asserts that the Defendants' protests notwithstanding, their bad faith is manifest by the fact that the Defendants: (i) ignored the advice of their legal and financial advisors by continuing to make the payments even after Weil and Lazard recommended that the dividends be ceased, (ii) allowed the dividends to be paid even when the Debtors were unable to fulfill their legal obligations to collect and pay occupancy taxes on behalf of the state and local [**311**] taxing authorities, and (iii) emptied out the reserve accounts for the Series A-1 owners one month after counsel had warned the Debtors' "independent" directors that a chapter 11 petition was under contemplation. *See* Opp'n at 24, 34, and 121. Moreover, the Trust asserts that there is no proof that the Mortgage Borrowers received any consideration when the LIBOR Floor Certificates were issued to DL-DW in November 2007, or that a $22 million payment in March 2008 was consideration for that transfer. *See* Opp'n at 32-33. It asserts that, in any event, the Defendants' claim that a $22 million payment in March 2008 was consideration for the LIBOR Floor Certificate Transfer to DL-DW is contradicted by the Examiner's finding that the payment had been recorded by the Defendants as a capital payment to ESI, Inc. *See* Opp'n at 121.

In substance, the Arbor and Lightstone Defendants assert that it is far more plausible that the Transfers were made and received without the intent to hinder, delay or defraud existing or future creditors of the Debtors. However, that their explanation may be more plausible is of no moment in assessing the merits of the Motion. As the court in *Tronox* observed:

> It is also [**312**] quite irrelevant whether Defendants' scenario has "greater plausibility," as Defendants assert . . . . *HN92*[⬆] For pleading purposes, a defendant's rebuttal of a plaintiff's contentions with its own does not entitle the defendant to dismissal of an action. As *Iqbal* made clear, "[t]he plausibility standard is not akin to a 'probability requirement....'" *129 S. Ct. at 1949*, quoting *Twombly, 550 U.S. at 556, 127 S. Ct. 1955*.

> The relative strength of the parties' explanations is not a question to be decided at the pleading stage unless the plaintiff's version is so remote as to be implausible. Plaintiffs in this proceeding have satisfied this burden in their detailed and explicit catalogue of plausible facts.

*In re Tronox, Inc., 429 B.R. at 91*. The Court finds that, taking all factual allegations in the Amended Complaint as true and drawing all reasonable inferences in favor of the Trust, the Trust has met its burden of demonstrating that it has stated a claim for relief under Count 12. The Court denies the Motions to dismiss Count 12.

Constructive Fraudulent Transfers

In Counts 14 and 15 of the Amended Complaint, the Trust seeks to avoid the Transfers as constructive fraudulent transfers under federal and applicable state law pursuant to *§ 548(a)(1)(B)* (Count 14) and *§ 544* (Count 15) of the Bankruptcy Code [**313**] (the "Constructive Fraudulent Transfer Claims"), and to recover the sums transferred, plus interest, from Lichtenstein and the Arbor and Lightstone Entities pursuant to *§ 550 of the Bankruptcy Code*.

The Arbor Defendants contend that the Court should dismiss Count 15 because South Carolina law governs the state-law claim since ESI was headquartered there, and South Carolina does not recognize the doctrine of constructive fraudulent conveyance. *See* Arbor MTD at 46. The Trust does not concede that South Carolina law applies herein. It contends that a determination of applicable state law has to await discovery due to the complexity of New York's balancing test. As with the choice of law matters at issue with Count 13, it is premature for the Court to address the Arbor Defendants' contention that Count 15 of the Amended Complaint fails to state a claim for relief under state constructive transfer law.

*HN93*[⬆] To state a claim for constructive fraudulent conveyance under *§ 548(a)(1)(B) of the Bankruptcy Code*, the Trust must allege facts demonstrating that within two years of the Petition Date, (i) there was a transfer of an interest of the Debtor in property; (ii) the debtor (a) was insolvent at the time of the transfer or became insolvent as a result of the transfer, (b) was [**314**] engaged in business or was about to engage in business for which the debtor's remaining property was an unreasonably small capital, or (c) intended to incur or believed that it would incur debts

beyond its ability to pay as they matured, and (iii) the debtor received less than a reasonably equivalent value in exchange for such transfer. *See 11 U.S.C. § 548(a)(1)(B)*; *see also In re Adler, Coleman Clearing Corp., 247 B.R. 51, 105 (Bankr. S.D.N.Y. 1999)* (explaining that to prevail under *§ 548(a)(1)(B)* claim, trustee must show that debtor (i) received less than reasonably equivalent value in exchange for the obligations it purportedly was placed under and/or the transfers it purportedly effected; and (ii) was either insolvent at the time of the transfers, was engaged in, or about to engage in, a business or transaction for which the property remaining constituted unreasonably small capital, or intended to incur, or believed it would incur, debts beyond its ability to pay when they matured), *aff'd, 263 B.R. 406 (S.D.N.Y. 2001)*.

The Arbor Defendants assert that the Amended Complaint fails to meet that standard because the Trust does not allege (i) on whose behalf the Transfers were made; (ii) whether any individual debtor-transferor was insolvent at the time of the Transfer or rendered insolvent by the Transfer; and (iii) what **[*315]** value was given in consideration for any of the Transfers. *See* Arbor MTD at 47. The Trust disputes those contentions. It says that the Amended Complaint addresses whether the transferees gave value for the transfers because it alleges throughout the complaint that the transferees gave no value for the Transfers. *See* Opp'n at 126-27. The Trust also contends that the Defendants' claims that the Amended Complaint does not identify which specific Debtors funded which transfers ignores the facts that (i) all of the Mortgage Borrowers were entitled to receive the LIBOR Floor Certificates; and (ii) the dividend transfers were paid out of centralized accounts (e.g., the PERA and the Cash Management Account). *See id.* It also asserts that those facts are not crucial to the viability of Count 14 because the identity of the transferor does not change the fact that the Defendants failed to pay value for the transfers. The Court credits those arguments. The Trust alleges that the Debtors did not receive any consideration, let alone reasonably equivalent value, for the Transfers. *See, e.g.*, Amd. Compl. ¶ 138 ("None of the pertinent accounting entries show that DL-DW provided consideration for its receipt of the **[*316]** certificates or otherwise account for the fact that property rightfully belonging to the Debtor borrowers was diverted to DL-DW."); ¶ 346 ("The Debtors received no value, let alone reasonably equivalent value, in exchange for the transfers and obligations.") Moreover, the Trust asserts that when the transfers were made, the Debtors (i) were insolvent or became insolvent as a result thereof; (ii) were engaged

in a business or transaction, or were about to engage in a business or transaction, for which their remaining property was an unreasonably small capital; or (iii) intended to incur, or believed they would incur, debts that would be beyond the Debtors' ability to pay as the debts matured. *Id.* ¶ 349. The Court has determined that the Amended Complaint meets the pleading standards under *Rule 8 of the Federal Rule of Civil Procedure*, and that the Trust has alleged enough facts to state grounds for aggregating the Debtors' estates under principles of substantive consolidation. The Court finds no merit to the Arbor Defendants' challenge to the adequacy of the pleadings in support of Count 14.

The Arbor Defendants also contend that the Trust cannot plausibly allege a claim that the Preferred Dividends and PERA Payments are avoidable **[*317]** transfers under *§ 548(a)(1)(B)* because those transfers were made in exchange for reasonably equivalent value. *See* Arbor MTD at 47-48. First, they say that the Preferred Dividends and PERA Payments were lawfully declared dividends that established a debt in favor of the equity holder, establishing the contractual right to payment of the debt. *See id.* at 47. They maintain that satisfaction of present or antecedent debt meets the requirement that the transfer be made for reasonably equivalent value. *See id.* They also contend that because the BHAC LLC Agreement and Cash Management Agreement provided for the payment of the Preferred Dividends and PERA Payments, those transfers are not avoidable as constructive fraudulent transfers, because contractually requirement payments constitute reasonably equivalent value. *See, e.g., Lustig v. Weisz and Assocs., Inc. (In re Commercial Capital, Inc.), 260 B.R. 343, 350-351 (Bankr. W.D.N.Y. 2001)* (finding that debtor's payment of interest under contractual obligation was not a constructively fraudulent transfer).

*HN94*[⬆] *Section 548 of the Bankruptcy Code* defines "value" as "property, or satisfaction or securing of a present or antecedent debt of the debtor..." *11 U.S.C. § 548(d)(2)(A)*. However, the Bankruptcy Code does not define "reasonably equivalent value." That is left for the courts' determination according to a "totality of the circumstances." *Walker v. Sonafi Pasteur (In re Aphton Corp.), 423 B.R. 76, 89 (Bankr. D. Del. 2010)*. *HN95*[⬆] "In general, repayment **[*318]** of an antecedent debt constitutes fair consideration unless the transferee is an officer, director or major shareholder of the transferor." *Atlanta Shipping Corp. v. Chem. Bank, 818 F.2d 240, 249 (2d Cir. 1987)* (citations omitted). It is also the case that a lawful declaration of dividend establishes a debt

between the corporation and stockholder. *See Caleb & Co. v. E.I. DuPont de Nemours & Co., 615 F. Supp. 96, 105 (S.D.N.Y. 1985)* ("When there is both a declaration date and a record date, the declaration of the dividend creates a debtor-creditor relationship between the corporation and the owner of the stock on the date of the declaration"); *Anadarko Petro. Corp. v. Panhandle E. Corp., 545 A.2d 1171, 1175 (Del. 1988)* ("The general rule regarding the vesting of cash dividends is that a contractual right of the stockholder to the dividend becomes fixed upon the declaration of the dividend. Thus, upon a valid declaration of a dividend the corporation becomes indebted to the stockholder, and the stockholder may recover the declared amount in an action, *ex contractu*, against the corporation.").

The Trust does not dispute that the payment of a lawful dividend or an antecedent debt satisfies the reasonably equivalent value requirement under *§ 548 of the Bankruptcy Code*. However, it contends, in substance, that the cases cited by the Arbor Defendants in support of the proposition are inapposite because the Preferred Dividend Payments and PERA **[*319]** Payments were not lawful dividends. *See* Opp'n at 127. They have alleged as much. *See, e.g.*, Amd. Compl. ¶ 211 (alleging that "[e]ach of these dividends or distributions was made at a time when the Debtors did not have a surplus or were insolvent, or rendered the Debtors insolvent"). Assuming, arguendo, the truth of that contention, and others like it in the Amended Complaint, there is no support for the Arbor Defendants' assertion that the payments are legal dividend payments.

The Arbor Defendants also argue that those portions of the constructive fraudulent transfer claims seeking to avoid and recover transfers of the 25% Note Payments (i.e., the payments to the (Arbor) lenders on the 25% Note), should be dismissed because they were made on account of an antecedent debt - namely the 25% Note. *See* Arbor MTD at 48. They say that the Trust concedes that the 25% Note was a loan that the Arbor Defendants expected to be repaid, and that the 25% Note Payments and LIBOR Floor Certificate Payments were just that - repayment of the principal and interest on the 25% Note. *See* Amd. Compl. ¶ 184 ("The board then unanimously resolved to pay off the 25% Note by transferring the LIBOR Floor Certificates . . . [to **[*320]** the] 25% Note lenders."); ¶ 232 ("[T]he LIBOR Floor Certificates were used to pay principal and interest owed on the 25% Note."). Thus, they contend that those transfers were payment on account of an antecedent debt, and thus, not avoidable as constructively fraudulent because, as discussed above, payment on

account of an antecedent debt constitutes reasonably equivalent value. *See Commodity Futures Trading Comm'n v. Probber Int'l Equities Corp., 504 F. Supp. 1154, 1162 (S.D.N.Y. 1981)* (concluding that repayment in satisfaction an antecedent debt was, "assuming good faith, made for fair consideration").

The Trust assails this argument as based on conjured facts. It says that the Arbor Defendants have offered no evidence "to prove that . . . the certificates were transferred to satisfy any obligation of the mortgage borrower Debtors, and indeed, [it is] not aware of any such obligations." Opp'n at 127-28. In the Amended Complaint the Trust alleges the following facts as to the LIBOR Floor Certificate Transfers vis-a-vis the 25% Note Payments:

> On April 16, 2008, six months after receiving the LIBOR Floor Certificates, DLDW secured a $22 million "loan" - i.e., the 25% Note - from Lightstone Entity Defendant, Park Avenue (for $11 million), and certain Arbor Entity Defendants, who contributed **[*321]** the other $11 million. *Id.* ¶ 154.

> The 25% Note was guaranteed by Defendant BHAC and secured by the LIBOR Floor Certificates held by DL-DW. *Id.* ¶ 155.

> The income generated from the LIBOR Floor Certificates went directly to make all interest and principal payments on the 25% Note rather than DL-DW making payments separately. *Id.* ¶ 156.

As alleged by the Trust, the income generated from the LIBOR Floor Certificates was used to repay the 25% Note. Such payments were not on account of an antecedent debt of any ESI or the Mortgage and Mezzanine Borrowers. Repayment of the 25% Note by the LIBOR Floor Certificates (either by the proceeds, or by their transfer) merely satisfied an antecedent debt of DL-DW, a non-debtor, and Defendant herein. Therefore, insofar as the Arbor Defendants contend that the LIBOR Floor Certificate Transfers cannot be avoided because as payments of an antecedent debt, it was not an antecedent debt of any Debtor transferor. Based on the foregoing, the Court denies the request to dismiss Counts 14.

To summarize, based on the foregoing, the Court denies the Motions to dismiss the Fraudulent Transfer Claims, except that it grants the Motions to the extent the Trust is seeking **[*322]** to avoid and recover the LIBOR Floor Certificates Distributions as actual and/or constructive fraudulent transfers under state and federal law. The Trust has failed to allege facts demonstrating

that the LIBOR Floor Certificates were property of the Debtors' estates and thus, cannot state a claim to avoid and recover the LIBOR Floor Certificates Distributions as fraudulent transfers.

## Counts 1 and 2 of the Amended Complaint

In Counts 1 and 2 of the Amended Complaint, the Trust seeks the entry of a judgment declaring that the Transfers were illegal under Delaware law and holding a host of Defendants liable for authorizing the alleged illegal Transfers. In support of those claims, the Trust asserts the following:

## LIBOR Floor Certificates

The Trust complains that in November of 2007, the LIBOR Floor Certificates were diverted from the Debtors and assigned to DL-DW for no consideration, even though those instruments rightfully belonged to the Debtors who had made the requested accommodations to their mortgage loans in exchange for issuance of the LIBOR Floor Certificates. *See* Amd. Compl. ¶ 200. It asserts that the assignment of the LIBOR Floor Certificates to DL-DW constitutes a distribution [*323] of the Debtors' property on account of DL-DW's direct and indirect equity interests in the Debtors that deprived the Debtors of at least $74.3 million in income (that was transferred to equity holders) that would have been earned by October 2010, when the certificates finally were extinguished. *Id.* More specifically, but without limitation, in support of those claims, the Trust points to (i) the transfers of the LIBOR Floor Certificates proceeds to certain equity holder Defendants (*id.* ¶¶ 201, 202); (ii) the assignment of the LIBOR Floor Certificates to ABT-ESI for the benefit of various equity-holder Defendants, including DL-DW, pursuant to the "Floor Bonds Agreement" (*id.* ¶ 204); and (iii) the liquidation of the Floor Bonds Reserve Account and distribution of the balance in the account to Lightstone Commercial. *Id.*

The Trust alleges that when DL-DW was assigned the LIBOR Floor Certificates and received the proceeds from those certificates, it was aware that the Debtors did not have a surplus and/or were insolvent, or that the assignment or payment rendered the Debtors insolvent. *Id.* ¶ 203. It also asserts that at the time each equity-holder Defendant received certificate proceeds, [*324] it was aware that the Debtors did not have a surplus and/or were insolvent or that the assignment or payment

rendered the Debtors insolvent. At all pertinent times, the equity holder Defendants were allegedly aware of the distressed condition of the Debtors. *Id.* ¶¶ 205-206.

## The Dividend Payments

The Trust asserts that the Debtors' funds were used to make various payments to Series A-1, A-2 and A-3 Unit Holders while the Debtors were insolvent. *See* Amd. Compl. ¶ 208. It contends that those payments were made with funds of the Debtors and were paid on account of equity interests in one or more affiliates in the "Extended Stay Hotels family of companies." *Id.* It also asserts that some of the Dividend Payments were made with proceeds of the LIBOR Floor Certificates, and many were made through BHAC or HVM LLC on behalf of BHAC, using funds received from the Debtors. *Id.* ¶¶ 209-210. The Trust asserts that:

> (i) each of these dividends or distributions was made at a time when the Debtors did not have a surplus or were insolvent or rendered the Debtors insolvent;

> (ii) each recipient of these dividend or distribution payments was an insider and therefore was aware at the time that the Debtors did [*325] not have a surplus or were insolvent, or that the payment rendered the Debtors insolvent; and

> (iii) at all pertinent times, each of the recipients was aware of the distressed condition of the Debtors.

*Id.* ¶ 211. Moreover, and in any event, the Trust contends that the payments that were made to Series A-2 and A-3 Unit Holders violated the terms of the pertinent loan agreements, which prohibited such dividends or distributions to equity when the Debt Yield calculation fell below a certain percentage as set forth in the loan covenants (as had been the case since the LBO Transaction closed). *Id.* ¶ 212.

## Management Fee Transfers

The Trust contends that Lichtenstein or a Lichtenstein-affiliate received the Management Fee Transfers totaling up to $1 million per year on account of their equity interest in the Company and without providing management services or other consideration. *Id.* ¶ 213. It asserts that those transfers were made at a time when the Debtors did not have a surplus or were insolvent or rendered the Debtors insolvent. *Id.* It also asserts that each of the recipients of each of these dividend or distribution payments was an insider and therefore was

aware at the time that the Debtors **[\*326]** did not have a surplus or were insolvent, or that the payment rendered the Debtors insolvent, and that at all pertinent times, each of the recipients was aware of the distressed condition of the Debtors. *Id.*

In Count 1, the Trust seeks the entry of an order pursuant to § 541 of the Bankruptcy Code and applicable state law, including §§ 160, 173 and 174 of the Delaware General Corporation Law ("DGCL") and/or § 18-607 of the Delaware Limited Liability Company Act ("DLLCA"), declaring that those transfers were illegal under Delaware law and that the Trust is entitled to recover these transfers, plus disgorgement of profits or reinvestment proceeds lost by the Debtors, prejudgment interest, costs and fees to the extent permitted by law. *See* Amd. Compl. ¶¶ 215-216. In Count 2, the Trust asserts that one or more of the directors of the "Extended Stay Hotels family of companies" authorized or allowed each of the alleged Improper and Fraudulent Transfers, as follows:

a. Lichtenstein, de Vinck, Owen, Teichman, Chetrit, and Martello authorized or allowed all of the unlawful distributions in the period of June 11, 2007 through August 14, 2008.

b. Lichtenstein, de Vinck, Owen, Teichman, Chetrit, and Milone authorized or allowed all of the unlawful **[\*327]** distributions in the period of August 15, 2008 through March 11, 2009.

*Id.* ¶ 218. It contends that each of the distributions was made from funds that came from the Debtors, and that in authorizing or allowing these distributions, Lichtenstein, de Vinck, Owen, Teichman, Chetrit, Milone, and Martello acted on behalf of and for the benefit of at least one of the following entities: DL-DW, BHAC, Lightstone Holdings, Lightstone Group, Lightstone Commercial, Park Avenue, Arbor ESH, Arbor Commercial, Princeton ESH, Atmar Associates, Glida One, Ron Invest, ABT-ESI, Mericash Funding, Polar Extended Stay, and PGRT ESH. *Id.* ¶¶ 218-219. The Trust asserts that each of these payments was an illegal dividend or distribution to equity under applicable state law because: (i) each dividend or distribution was made at a time when the Debtors did not have a surplus or were insolvent, or otherwise rendered the Debtors insolvent; (ii) each of the Defendants knew of the distressed condition of the Debtors, including the fact that the Debtors did not have a surplus and/or were insolvent or that the assignment or payment rendered the Debtors insolvent; and (iii) each of the dividends or distributions was willfully **[\*328]** authorized or allowed

by the Defendants despite the Debtors' insolvency or lack of a surplus. *Id.* ¶¶ 220-223. The Trust contends that under § 541 of the Bankruptcy Code and §§ 160 and 174 of the DGCL and/or § 18-607 of the DLLCA, or under comparable provisions of any other pertinent state law, the Defendants are liable for repayment of the unlawful dividends or transfers that they authorized or allowed when they were directors, plus reinvestment proceeds lost by the Debtors, prejudgment interest, costs and fees to the extent permitted by law. *Id.* ¶ 224.

The Lightstone Defendants challenge both the substance of Counts 1 and 2, and the adequacy of the allegations pled in support of those claims. *See* Lightstone MTD at 82-83. They contend that, as a matter of law, the Lightstone Entities named as Defendants in those Counts cannot have liability under DGCL § 174 because an entity cannot serve as a director of a Delaware corporation,[106] and §174(a) provides for "[l]iability of directors for unlawful payment of dividend[s] or unlawful stock purchase or redemption." *See* 8 Del. C. § 174.[107] They argue that the entity defendants must be dismissed from the claims under DGCL § 174. *See* Lightstone MTD at 82. The Court agrees that those entities could not have served as directors of any of the Debtors but disagrees that **[\*329]** the Trust is barred as a matter of law from seeking relief against the Lightstone Entities under § 174. Section 174(c) states:

(c) Any director against whom a claim is

_____

[106] *See* 8 Del. C. §§ 141(b) ("The board of directors of a corporation shall consist of 1 or more members, each of whom shall be a natural person.").

[107] Section 174 is titled "Liability of directors for unlawful payment of dividend or unlawful stock purchase or redemption; exoneration from liability; contribution among directors; subrogation." Section 174(a) states, in part:

In case of any willful or negligent violation of § 160 or § 173 of this title, the directors under whose administration the same may happen shall be jointly and severally liable, at any time within 6 years after paying such unlawful dividend or after such unlawful stock purchase or redemption, to the corporation, and to its creditors in the event of its dissolution or insolvency, to the full amount of the dividend unlawfully paid, or to the full amount unlawfully paid for the purchase or redemption of the corporation's stock, with interest from the time such liability accrued.

8 Del. C. § 174(a).

successfully asserted under this section shall be entitled, to the extent of the amount paid by such director as a result of such claim, to be subrogated to the rights of the corporation against stockholders who received the dividend on, or assets for the sale or redemption of, their stock with knowledge of facts indicating that such dividend, stock purchase or redemption was unlawful under this chapter, in proportion to the amounts received by such stockholders respectively.

*8 Del. C. § 174(c)*. **HN96**[🔼] As the Trust correctly notes (*see* Opp'n at 111), courts have recognized that, in addition to providing expressly for director liability on account of an illegal dividend, *§ 174(c)* also provides a cause of action against a shareholder that receives an illegal dividend or redemption payment with notice of its impropriety. *See, e.g., Buchwald v. Renco Grp., Inc. (In re Magnesium Corp. of Am.), 399 B.R. 722, 778 (Bankr. S.D.N.Y. 2009)* ("*Section 174(c)* thus recognizes an existing right on the part of the corporation, presumably under common law, to recover, from a receiving shareholder, an unlawfully issued dividend."); *PHP Liquidating, LLC v. Robbins, 291 B.R. 603, 608 (D. Del. 2003)* (same and explaining notice requirement), *aff'd, 128 F. App'x 839 (3d Cir. 2005)*. Accordingly, the Court **[\*330]** denies the Lightstone Defendants' request to dismiss the claims asserted in Counts 1 and 2 under *§ 174* as to the Lightstone Entities.

Next, the Lightstone Defendants contend that the Trust cannot state any claims against them under DGCL *§ 160*. **HN97**[🔼] That section bars a corporation from "purchas[ing] or redeem[ing] its own shares of capital stock" if its capital is impaired or would be impaired by the redemption. *8 Del. C. § 160(a)(1)*. The Lightstone Defendants correctly assert that the Amended Complaint does not state a claim for relief under *§ 160* because none of the Trust's allegations pertains to a capital stock purchase or redemption. *See* Lightstone MTD at 83. The Trust does **[\*331]** not dispute that assertion. It maintains that claims for relief under *§ 160* are "moot" in light of the claims asserted under DGCL *§ 174*. *See* Opp'n at 111. Accordingly, the Court dismisses the claims asserted in Counts 1 and 2 of the Amended Complaint based on DGCL *§ 160*.

In challenging the adequacy of the pleadings in support of Counts 1 and 2, the Lightstone Defendants first assert that the Trust fails to state a claim against the Lightstone Entities, as members of the LLCs, under *§ 18-607(b)* of the DLLCA. *See* Lightstone MTD at 83. That section states in part that "[a] member [of a limited

liability company] who receives a distribution in violation of [*§ 18-607(a)*], and who knew at the time of the distribution that distribution violated [*§ 18-607(a)*], shall be liable to a limited liability company for the amount of the distribution." *6 Del. C. § 18-607(b)*.[108]*See also Pepsi-Cola Bottling Co. of Salisbury, Md. v. Handy, No. 1973-S, 2000 Del. Ch. LEXIS 52, 2000 WL 364199, at \*3 (Del. C. March 15, 2000)* ("*Section 18-607(b)* provides that if an LLC member receives a distribution that results in the LLC becoming insolvent, and knew at that time that the LLC would become insolvent as a result of the distribution, the LLC member is liable to the LLC for the amount of the distribution."). The Lightstone Defendants contend that under the plain language of the statute, to state a claim for relief, the Trust must plead that a given **[\*332]** defendant was a member of a limited liability company and received a distribution from that company. *See* Lightstone MTD at 83. They argue that, as a consequence of the Trust's decision not to plead which Debtors made which distributions, the Amended Complaint is devoid of the facts necessary to state a claim against them under *§ 18-607(b)*. *Id.* The Court finds no merit to those assertions because for all the reasons discussed above, for purposes of the Motions, the Trust has demonstrated that aggregation of the Debtors for pleading purposes is appropriate and warranted.

Finally, they assert that Counts 1 and 2 fail to allege claims against the Lightstone Individuals, as directors of the Debtors, because those Counts do not meet the "specific proof requirements" of *§ 174*. *See Terr. of the U.S. V.I. v. Goldman, Sachs & Co., 937 A.2d 760, 794 (Del. Ch. 2007)* (noting that *§ 174* "provides for a cause of action against the directors authorizing the dividends,

---

[108] *Section 18-607(a)* of the DLLCA states, in relevant part:

(a) A limited liability company shall not make a distribution to a member to the extent that at the time of the distribution, after giving effect to the distribution, all liabilities of the limited liability company, other than liabilities to members on account of their limited liability company interests and liabilities for which the recourse of creditors is limited to specified property of the limited liability company, exceed the fair value of the assets of the limited liability company, except that the fair value of property that is subject to a liability for which the recourse of creditors is limited shall be included in the assets of the limited **[\*333]** liability company only to the extent that the fair value of that property exceeds that liability.

*6 Del. C. § 18-607(a)*.

with specific proof requirements[.]"). They contend that the claims fail because of the Trust's use of the passive voice in its allegations and failure to allege which Debtor made or funded the transfers at issue. *See* Lightstone MTD at 83. In that regard, they assert that there are no allegations: (a) that a given defendant was (b) a director of any Debtor that is a corporation, (c) that such Debtor issued an illegal dividend, (d) as to why the dividend was improper under Delaware corporate law (*i.e.*, whether at the time of each challenged dividend the issuing entity had a surplus), and (e) that the subject defendant authorized it. *Id.* They assert that without these particulars, Counts 1 and 2 fail to conform even to basic notice pleading standards and therefore must be dismissed. *See Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)*; *Twombly, 550 U.S. 544, 555-56, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)*.

The Trust labels that objection **[*334]** as "purely hypothetical." It asserts that the Amended Complaint makes clear that all of the dividends and distributions were paid out from the integrated cash management account and separate cash reserves established for that purpose. As such, it contends that no Debtor literally paid any dividends individually, although dividends deemed to move upward through the hierarchical chain of companies was the legal way that the money would be deemed to have moved. *See* Opp'n at 112. It maintains that every fact necessary to establish liability has been alleged in detail, in that the Amended Complaint explicitly spells out the dates, amounts and recipients of those dividends and distributions, all of which were authorized on behalf of the Debtors by the Company Board, as reflected in the meeting minutes of the board of the "Extended Stay Hotels family of companies," and were discussed in detail in the Amended Complaint. *Id.* The Court credits those contentions.

Accordingly, the Court denies the Lightstone Defendants' request to dismiss Counts 1 and 2 of the Amended Complaint, except that it dismisses Counts 1 and 2 to the extent that they seek relief under DGCL *§§ 160* and *174(a)*.

Count 4 of the Amended Complaint **[*335]**

In Count 4 of the Amended Complaint, the Trust contends that upon receipt of their distributions of the Transfers, each of the Defendants was unjustly enriched at the Debtors' expense. It maintains that "pursuant to *§ 541 of the Bankruptcy Code* and applicable state law, [it

is] entitled to restitution from each of the Defendants as set forth above, or the Defendants should be required to disgorge that amount, plus disgorgement of profits or reinvestment proceeds lost by Debtors, prejudgment interest, costs and fees to the extent permitted by law." Amd. Compl. ¶ 259.

In sum, in its allegations in support of Count 4, the Trust complains that the Defendants were unjustly enriched by the following: (i) the issuance of the LIBOR Floor Certificates to DLDW (Amd. Compl. ¶ 237); (ii) payments to DL-DW of proceeds from the LIBOR Floor Certificates from November 2007 through February 2009, totaling approximately $20 million (*id.* ¶ 235); (iii) DL-DW's use of portions of the proceeds from the LIBOR Floor Certificates to pay down the 25% Note and to fund equity payments under the BHAC LLC Agreement, to Mericash Funding, ABT-ESI, Princeton, Park Avenue, and Lightstone Commercial (*id.* ¶¶ 238-249); (iv) the assignment of the LIBOR **[*336]** Floor Certificates to ABT-ESI pursuant to the "Floor Bonds Agreement," for the benefit of various equity-holder Defendants, including DL-DW (*id.* ¶ 240); (v) the use of the Debtors' funds to make equity distributions under the LLC agreements (*id.* ¶¶ 241-256); and (vi) the use of the Debtors' funds to pay management fees to Lichtenstein or a Lichtenstein-affiliated entity totaling up to $1 million per year, even though such fees were redundant, as management services for the hotel operations were provided by HVM and HVM Canada. *Id.* ¶ 257.

*HN98*[↑] A claimant seeking relief under a theory of unjust enrichment must demonstrate "(1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution." *Mid-Island Hosp., Inc. v. Empire Blue Cross & Blue Shield (In re Mid-Island Hosp., Inc)., 276 F.3d 123, 129 (2d Cir. 2002)* (internal quotations omitted). *See also Lake Erie Distribs. v. Martlet Importing Co., 221 A.D.2d 954, 956, 634 N.Y.S.2d 599 (N.Y. App. Div. 1995)* ("To state a cause of action for unjust enrichment, a plaintiff must allege that it conferred a benefit upon defendants and that defendants will obtain such benefit without adequately compensating plaintiff.") (internal quotation marks and citation omitted); *Tarrytown House Condominiums v. Hainje, 161 A.D.2d 310, 313, 555 N.Y.S.2d 83 (N.Y. App. Div. 1990)* (noting that "[a] cause of action for unjust enrichment is also demonstrated in that plaintiffs have properly asserted that a benefit was bestowed **[*337]** upon the property by plaintiffs and that defendants will obtain such benefit without adequately compensating plaintiffs therefor"). Unjust enrichment "is a quasi-contractual doctrine that

applies only in the absence of a contract." *Koch Indus., Inc. v. Hoechst AG, 727 F. Supp. 2d 199, 216 (S.D.N.Y. 2010)* (citation omitted).[109] Accordingly, the existence of a contract between parties to a dispute ordinarily precludes recovery for unjust enrichment for events arising out of the same subject matter as the contract. *See Chrysler Capital Corp. v. Century Power Corp., 778 F. Supp. 1260, 1272 (S.D.N.Y. 1991)* ("Unjust enrichment is a quasi-contract claim, and the existence of a *valid and enforceable* written contract governing a particular subject matter ordinarily precludes recovery in quasi-contract for events arising out of the subject matter.") (internal quotation marks and citations omitted); *Hartford Fire Ins. Co. v. Federated Dep't Stores, Inc., 723 F. Supp. 976, 994 (S.D.N.Y. 1989)* ("Unjust enrichment is designed to prevent one person who has obtained a benefit from another without ever entering into a contract with that person from unjustly enriching himself at the other person's expense.") (internal quotation marks and citation omitted).

The Arbor Defendants assert that Count 4 must be dismissed because the Trust's allegations are clear that the Transfers were paid and received pursuant to valid and enforceable contracts. *See* Arbor MTD at 73. They **[*338]** assert that as alleged in the Amended Complaint, the LIBOR Floor Certificates Income Distributions were paid in satisfaction of the 25% Note and pursuant to the Floor Bonds Agreement,[110] and the

Dividend Payments were made pursuant to the applicable LLC agreement and the Cash Management Agreement. *See id.*[111]

The Trust notes that the Arbor Defendants do not argue that the alleged diversion of the LIBOR Floor Certificates was accomplished pursuant to an agreement of any kind, and it denies that the Dividend Payments were required by contract. *See* Opp'n at 128. Moreover, it maintains that even if "a valid contractual requirement existed," the non-preferred Dividend Payments were made in violation of other governing contracts (namely, the LBO loan documents), and "a huge portion" of the preferred Dividend Payments were made after, and in violation of, the Company Board's resolution to stop declaring dividends. *See id.* The Trust is correct that nothing in the Amended Complaint or the

---

Note, the excess income from the LIBOR Floor Certificates was deposited into a reserve bank account (the "Floor Bonds Reserve Account") for the benefit of BHAC Capital IV Series A-1 Unit Holders and was used to pay certain distributions to equity. As of December 31, 2008, $3.3 million of the principal on the 25% Note had been repaid through diversion of income from the LIBOR Floor Certificates that should have been paid to the Debtors.

Amd. Compl. ¶¶ 155-156.

[111] As support, they cite to paragraphs 5 and 118 of the Amended Complaint, which state:

These actions were facilitated by a cash management system that was devised to provide a certain return to the equity holders, while placing some creditors at great risk. By design, and with the approval of Defendants, this cash management system provided a route for payments to be made to equity holders directly, appearing to circumvent the normal process for corporate directors to determine in advance, before the payments were made, whether the company had the financial wherewithal to make such distributions to equity. Eventually, the payments were brought to a vote after the fact, and the directors (Defendants in this action) approved the payments retroactively. The directors finally ordered **[*340]** a halt to the payments only a half year before the Debtors petitioned for bankruptcy protection.

As part of the LBO, revenue and other cash received for the Debtors' operations were funneled into an integrated cash management account, pursuant to a Cash Management Agreement. The Cash Management Agreement sought to protect certain lenders and equity owners by imposing a set waterfall payout structure.

*Id.* ¶¶ 5, 118.

---

[109] The Trust does not challenge the Arbor Defendants' choice of New York law.

[110] As support, the Arbor Defendants cite to paragraphs 155 and 156 of the Amended Complaint, which state:

This $22 million "loan", together with $10.6 million in additional funds from DL-DW, was used to pay off the outstanding principal balance and accrued interest on the 9.15% Notes plus $100,000 in professional fees. It was guaranteed by BHAC Capital IV and, pursuant to a pledge agreement executed by Lichtenstein, secured by the valuable LIBOR Floor Certificates wrongfully held by DLDW and not the Debtors, the rightful owners. Though the loan was well collateralized, it accrued interest at an annual rate of 25% and thus is known as the "25% Note." The note would mature on May 1, 2011.

The income generated from the LIBOR Floor Certificates went directly to make all interest and principal payments on the 25% Note, rather than DL-DW making payments separately, with a maximum monthly principal repayment of $416,666. Because cash income from the LIBOR Floor Certificates was greater than the principal **[*339]** and interest payments due (or even allowable) on the 25%

record of these Motions suggests that the initial transfer of the LIBOR Floor Certificates from the Debtors to **[*341]** DL-DW was made pursuant to any agreement. The Arbor Defendants do not argue that the payments of the LIBOR Floor Certificates proceeds to DL-DW during the period of November of 2007 through April 2008 were dictated by any agreement. Thus, the Arbor Defendants have not raised grounds for dismissing Count 4's unjust enrichment claims as they relate to the initial transfer of the LIBOR Floor Certificates and the proceeds paid to DL-DW thereunder. The Trust disputes the validity of the 25% Note. It says that the $22 million payment underlying the loan was an equity contribution. *See* Opp'n at 11 ("Indeed, contrary to Lightstone's unsubstantiated theory, the Examiner found that Defendants had recorded the $22 million as a *capital payment* to ESI, Inc., which flatly and fatally contradicts Lightstone's theory."). That is grounds for denying relief under *Rule 12(b)(6)* as to the 25% Note payments. *See, e.g., Sofi Classic S.A. de C.V. v. Hurowitz, 444 F. Supp. 2d 231, 249 (S.D.N.Y. 2006)* (noting that the preclusion of a claim for unjust enrichment based on a governing contract only applies "when the existence of a contract governing the transaction in question is undisputed.") (citation omitted); *cf. Am. Tel. & Util. Consultants v. Beth Israel Med. Ctr., 307 A.D.2d 834, 835, 763 N.Y.S.2d 466 (N.Y. App. Div. 2003)* ("[W]here there is a bona fide dispute as to the existence of a contract or where **[*342]** the contract does not cover the dispute in issue, plaintiff may proceed upon a theory of quantum meruit and will not be required to elect his or her remedies.") (citation omitted).

The Court agrees with the Arbor Defendants that the Dividend Payments were governed by the applicable LLC agreement—namely, the BHAC LLC Agreement and DL-DW LLC Agreement. Specifically, Article V of the BHAC LLC Agreement provides for the manner, timing, and priority of distributions to BHAC's members. *See, e.g.*, BHAC LLC Agmt. § 5.05 (stating that "Capital Proceeds shall be distributed as soon as reasonably practicable but in any event within 30 days after the date that such proceeds are received[,]" and "Distributions of Non-Capital Proceeds in respect of the Series A-1 Units, Series A-2 Units, Series A-3 Units and Series B Units shall be payable monthly in arrears...."). In addition, holders of BHAC's Preferred Series A-1 Units were entitled to "Series A-1 Minimum Cash Monthly Distributions" at the "rate of 0.833% of the $1,000,000 liquidation preference of such Series A-1 Unit" on the 15th of each calendar month, beginning on July 16, 2007. *See id.* §§ 1.120; 5.05(b)(i). Similarly, under the

DL-DW LLC Agreement, Article **[*343]** V dictated the manner, priority, and timing of distributions to DL-DW's members. *See, e.g.*, DL-DW LLC Agmt. § 5.05. Further, like the members of BHAC, holders of the Preferred Series A-1 Units of DL-DW were entitled to receive "Series A-1 Minimum Cash Monthly Distributions" at the "rate of 0.833% of the $1,000,000 liquidation preference of such Series A-1 Unit" on the 15th of each calendar month, beginning on July 16, 2007. *See id.* §§ 1.133; 5.05(b)(i). The Trust does not dispute the existence, enforceability, or validity of these LLC Agreements. The Trust also says that even if these documents created contractual obligations for the Dividend Payments, the distributions were nonetheless in violation of the Debtors' loan covenants and the Company's Board's own directives to stop payments. But even assuming the truth of such allegations, they would only support the Trust's claims for illegal dividends and/or breach of fiduciary duties; they do not negate the contention by the Arbor Defendants that these are payments governed by existing, valid contracts, and thus, the Trust is precluded from recovering them on a theory of unjust enrichment. Accordingly, the unjust enrichment claim in Count 4 is dismissed **[*344]** as to the Dividend Payments.

## Count 5 of the Amended Complaint

In Count 5 of the Amended Complaint, the Trust seeks compensatory and punitive damages from all of the Defendants, occasioned by their alleged breaches of their fiduciary and contractual duties of care, loyalty and good faith owed the Debtors and the Debtors' creditors under applicable state law. In support of these claims, the Trust asserts that during their respective tenures as directors, officers, or persons that otherwise managed, owned, controlled, and dominated the Debtors, the Lightstone Individuals - i.e. Lichtenstein, de Vinck, Owen, and Teichman, and the Arbor Individuals - i.e., Chetrit, Martello, and Milone, owed the Debtors and their creditors the fiduciary and contractual duties of good faith, care and loyalty. *See* Amd. Compl. ¶ 261. It contends that as a result of or in connection with the LBO Transaction, the Debtors were either rendered insolvent or placed in the zone of insolvency and remained insolvent at all times from and after the date the LBO closed. *Id.* ¶ 263. The Trust asserts that, as a consequence, during their respective tenures as directors, officers, or persons that otherwise managed, owned, **[*345]** controlled, and dominated the Debtors, each of the Lightstone and Arbor Individuals owed fiduciary and contractual duties to the Debtors and the

Debtors' creditors -- not just to the Debtors' post-LBO direct and indirect equity owners. *See id.* The Trust maintains that at all relevant times following the closing of the LBO Transaction, during their respective tenures as directors, officers, or persons that otherwise managed, owned, controlled, and dominated the Debtors, each of Lightstone and Arbor Individuals: (i) had the authority to control the management, affairs, and direction of the Debtors; (ii) was capable of influencing and did in fact influence the acts and omissions giving rise to the claims alleged in the complaint; (iii) managed, owned, controlled, and dominated the Debtors; and (iv) acting both individually and collectively, breached his fiduciary and contractual duties, by, among other things, causing or allowing the Debtors to improperly pay substantial illegal dividends or other improper distributions of value from Debtors to the applicable Defendants and, upon information and belief, in some cases, to himself, as described in the Amended Complaint, at times when the **[*346]** Debtors were insolvent. *Id.* ¶¶ 264, 265(a).[112] The Trust asserts

_____

[112] Specifically, the Trust complains that each of Lichtenstein, de Vinck, Owen, Teichman, Chetrit, Martello and Milone breached his fiduciary and contractual duties by causing or allowing the following actions:

(i) Distribution of the LIBOR Floor Certificates to DL-DW on or around November 2, 2007, and subsequent payments received by (or for the benefit of) DL-DW on account of those certificates, totaling no less than approximately $20 million;

(ii) Unlawful dividends or distributions to equity, made at a time when the Debtors were insolvent or lacked a surplus, or otherwise rendered the Debtors insolvent, totaling no less than $62.1 million;

(iii) Securing the 25% Note with the LIBOR Floor Certificates that belonged to the Debtors but had been wrongly assigned to DL-DW;

(iv) Distribution of funds held in the Preferred Equity **[*349]** Reserve Account to insiders on the eve of bankruptcy totaling no less than approximately $20.5 million in early 2009;

(v) Diverting proceeds from the LIBOR Floor Certificates that belonged to the Debtors to pay off the insider 25% Note, thus providing ABT-ESI (and A-1 equity holders) with at least $55 million in value that belonged to the Debtors;

(vi) Distribution of funds from the Floor Bonds Reserve Account on the eve of the Debtors' eventual bankruptcy filing totaling approximately $4.8 million;

(vii) Payment of substantial "asset management" fees

that the acts or omissions that it attributes to the Lightstone and Arbor Individuals were: (a) alternatively fraudulent, willful, deliberate, knowing, in bad faith, reckless, or grossly negligent and in derogation of applicable law; and (b) fell substantially below the standards generally practiced and accepted by other fiduciaries in similar circumstances. *Id.* ¶¶ 266, 267. It maintains that in exercising their fiduciary duties as directors of the "Extended Stay Hotels family of companies," generally, and in authorizing or allowing these alleged acts or omissions, in particular, Lichtenstein, de Vinck, Owen, Teichman, Chetrit, Milone, and Martello acted under the domination and control of their employers or principals in connection with the alleged acts and omissions. *Id.* ¶ 268. The Trust asserts that in doing so, they acted on behalf of one or more of the following entities: DL-DW, ABT-ESI, BHAC, Park Avenue, Princeton ESH, Mericash Funding, Lightstone Commercial, Arbor Commercial, Arbor ESH, Polar Extended Stay, PGRT ESH, Lightstone Holdings, Glida One, and Ron Invest. Moreover, it asserts that in exercising that domination **[*347]** or control, or in allowing Lichtenstein, de Vinck, Owen, Teichman, Chetrit, Milone, and Martello to act on their behalf, each of those entities acted for its own benefit. *Id.* It maintains that each of these alleged acts and omissions directly and proximately caused harm to the Debtors, their estates and creditors of the Debtors' creditors who are Trust Beneficiaries. *Id.* ¶ 269. Accordingly, the Trust contends that:

> By reason of each of the acts and omissions of Lichtenstein, de Vinck, Owen, Teichman, Chetrit, Martello, and Milone described in the Amended Complaint, it is entitled to recovery of actual, compensatory, and consequential damages from the Defendants, jointly and severally as to each injury to the Debtors, in amounts to be determined

_____

totaling up to $1 million annually to Lichtenstein or a Lichtenstein-affiliated entity, despite the fact that HVM was managing the Debtors' daily business affairs and despite the fact that neither Lichtenstein or any Lichtenstein-affiliated entity had performed work to justify these payments; and

(viii) Delaying the commencement of bankruptcy proceedings, with self-dealing motives, until slightly more than two years after the LBO's closing, in an attempt to adversely impact the Debtors' ability to avoid and recover those transfers under the Bankruptcy Code for the benefit of the Debtors, the Debtors' estates and the Debtors' creditors.

Amd. Compl. ¶ 265(a).

at trial, pursuant to *§ 541 of the Bankruptcy Code*;
Each of Lichtenstein, de Vinck, Owen, Teichman, Chetrit, Martello, and Milone are personally liable for the amount of the illegal dividends or other improper distributions alleged herein due to their willful and negligent approval of such illegal dividends or other improper distributions at a time when the Debtors did not have a surplus or were insolvent, or rendered the Debtors insolvent; and

In breaching his or its fiduciary **[*348]** duties to the Debtors, each of the above Defendants acted intentionally, outrageously and egregiously, demonstrating a high degree of moral culpability, and with wanton, willful, and reckless disregard for the Debtors' rights. As such, the Trust asserts that it is entitled to punitive damages of at least three times the damages, or such other amount as the Court may determine after trial, awarded against each Defendant individually to punish and deter him and others from engaging in such conduct in the future, pursuant to *§ 541 of the Bankruptcy Code* and applicable state law.

See Amd. Compl. ¶¶ 270-272.

The **[*350]** Defendants contend that Count 5 does not state a claim for relief against them. *HN99*[⬆] The internal affairs doctrine "is a conflict of laws principle which recognizes that only one State should have the authority to regulate a corporation's internal affairs—matters peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders—because otherwise a corporation could be faced with conflicting demands." *Edgar v. MITE Corp, 457 U.S. 624, 645, 102 S. Ct. 2629, 73 L. Ed. 2d 269 (1982)* (citing *Restatement (Second) of Conflict of Laws § 302, cmt. b* (1971)). Under New York law, "questions relating to the internal affairs of corporations are decided in accordance with the law of the place of incorporation." *Scottish Air Int'l, Inc. v. Brit. Caledonian Grp., PLC, 81 F.3d 1224, 1234 (2d Cir. 1996)* (citation omitted). The New York Court of Appeals has rejected automatic application of the internal affairs doctrine. *See Greenspun v. Lindley, 36 N.Y. 2d 473, 478, 330 N.E.2d 79, 369 N.Y.S.2d 123 (N.Y. 1975)*. That is because "in certain circumstances 'application of the local law of some other state is required by reason of the overriding interest of that other state in the issue to be decided.'" *Stephens v. Nat'l Distillers & Chem. Corp., No. 91 Civ. 2901, 1996 U.S. Dist. LEXIS 6915, 1996 WL 271789, at *4 (S.D.N.Y. May 21, 1996)* (applying New York law to breach of fiduciary duty claim against Kentucky

corporation) (quoting *Restatement (Second) of Conflict of Laws § 302, cmt. b* (1971)); *see also Norlin Corp. v. Rooney, Pace Inc., 744 F.2d 255, 263-64 (2d Cir. 1984)* (rejecting use of internal affairs doctrine in matter of corporate governance of Panamanian corporation where public policy of New York weighed in **[*351]** favor of application of New York law).

At issue here is whether the Trust has adequately pled that the Defendants have breached their alleged contractual and fiduciary duties of care, loyalty and good faith to the Debtors. All of the Debtors, save for ESA Canada Operating Lessee Inc., are Delaware entities. *HN100*[⬆] As a general rule, "the law of the state of incorporation governs an allegation of breach of fiduciary duty owed to a corporation." *Walton v. Morgan Stanley & Co., 623 F.2d 796, 798 n.3 (2d Cir. 1980)*. *See also Galef v. Alexander, 615 F.2d 51, 58 (2d Cir. 1980)* (noting that under New York choice-of-law rules, law of state of incorporation controls in adjudicating corporation's "internal affairs," including liability of directors and officers). Nothing in the record suggests that another state has an overriding interest in the resolution of the question of whether the Defendants owed fiduciary duties to the Debtors and, if so, whether they breached those duties. Accordingly, the Court will apply Delaware law in assessing whether, or the extent to which, the Trust has stated a claim for relief against the Defendants under Count 5. *See High View Fund, L.P. v. Hall, 27 F. Supp. 2d 420, 428 n.6 (S.D.N.Y. 1998)* (applying Delaware law to breach of fiduciary duty claim against directors of Delaware corporation and noting that "[p]ursuant to New York choice of law principles, **[*352]** a breach of fiduciary duty claim is governed by the law of the relevant company's state of incorporation.") (citation omitted). *See also BHC Interim Funding, L.P. v. Finantra Capital, Inc., 283 F. Supp. 2d 968, 989 (S.D.N.Y. 2003)* (noting that under New York's choice of law principles, "a claim involving breach of a fiduciary duty owed by a corporate officer is governed by the law of his company's state of incorporation," and then applying California law as California was state of incorporation) (citation omitted).

The Defendants contend that, assuming the truth of the allegations in support of Count 5 of the Amended Complaint, the Court must dismiss that Count because it fails to state a claim upon which relief can be granted against any of the them for the following reasons:

(i) The Trust's breach of fiduciary duties claims sound in fraud, but the Trust fails to meet the heightened pleading standard required under *Rule*

9(b) and fails to attribute actions to individual Defendants with particularity.

(ii) The Trust fails to allege facts demonstrating that any of the Defendants owed fiduciary duties to any of the Debtors.

(iii) The Trust's breach of fiduciary duty claims against the Lightstone Defendants are insufficient to overcome the business judgment rule.

(iv) The Trust fails to state **[*353]** a claim of breach of the duty of care against the Lightstone Defendants.

(v) The exculpatory provisions in ESI's Certificate of Incorporation bar the Trust from asserting breach of fiduciary duty claims against any Defendant that served as an officer or director of ESI.

(vi) The claim for breach of contractual duties of care, loyalty and good faith must be dismissed because the Trust does not allege a breach of any contract between the Debtors and any of the Defendants.

(vii) The Trust cannot recover punitive damages on a claim of breach of fiduciary duties.

The Court considers those arguments below.


## Whether Count 5 "Sounds in Fraud"

**HN101**[⤴] ] *Rule 9(b)* "is not limited to allegations styled or denominated as fraud or expressed in terms of the constituent elements of a fraud cause of action." *Rombach v. Chang, 355 F.3d 164, 171 (2d. Cir. 2004)*. To the extent any of the Trust's claims are "premised on fraudulent conduct, the facts alleging that conduct are subjected to the higher pleading standard of [*Rule 9(b)*]." *DeBlasio v. Merrill Lynch & Co., No. 07 Civ. 318(RJS), 2009 U.S. Dist. LEXIS 64848, 2009 WL 2242605, at *11 (S.D.N.Y. July 27, 2009)* (quoting *Sec. Inv'r Prot. Corp. v. Stratton Oakmont, Inc., 234 B.R. 293, 311 (Bankr. S.D.N.Y. 1999))*. *See also Icebox Scoops v. Finanz St. Honore, B.V., 676 F. Supp. 2d 100, 110 (E.D.N.Y. 2009)* (noting that "[c]laims of negligent misrepresentation must also be pled with particularity if based on the same set of facts as intentional fraud claims") (citation omitted). Although fraud, *per se*, is not an element of a claim for breach **[*354]** of fiduciary duty, if that claim is based on fraudulent conduct, the allegations in support of the claim must satisfy *Rule 9(b)*. *In re Grumman Olson Indus., Inc., 329 B.R. 411, 429 (Bankr. S.D.N.Y. 2015)* (citations omitted). *See also King Cty., Wash. v. IKB Deutsche Industriebank A.G., 863 F. Supp. 2d 288, 311-12 (S.D.N.Y.)* ("*Rule 9(b)* applies . . . whenever the alleged conduct of defendants

is fraudulent in nature" and "applies to breach of fiduciary duty claims that are rooted in fraud[.]"), *rev'd in part on other grounds*, No. 09 Civ. 8387(SAS), 2012 U.S. Dist. LEXIS 191994, 2012 WL 11896326, at *1 (S.D.N.Y. Sept. 28, 2012).

**HN102**[⤴] ] In *Grumman*, Judge Bernstein observed that a claim will "sound in fraud" if either the claim arose out of events that the pleading describes in terms of fraud, or the pleading includes a claim based on fraud, and the non-fraud claim incorporates the fraud allegations. *See In re Grumman Olson Indus., Inc., 329 B.R. at 429*. The Arbor Defendants maintain that Count 5 sounds in fraud because the Trust's claim for relief under *§ 548(a)(1)(A) of the Bankruptcy Code* (Count 12) specifically pled actual fraud, and the claims for relief under Count 5 are based on the same underlying facts and allegations. *See Arbor MTD at 62*. They also assert that in Count 11, the Trust alleges that the Defendants have engaged in a fraudulent conspiracy. *Id.* They further contend that Count 5 fails to state a claim for relief because the Trust does not meet the heightened pleading standard under *Rule 9(b)* and fails to attribute actions to individual defendants with particularity. **[*355]** *See id.* at 61-64. They assert that because there are no plausible, specific allegations in the Amended Complaint describing exactly how they allegedly breached their fiduciary duties, the Amended Complaint fails to meet this higher pleading standard. *See id.* They say that the allegations demonstrate that the Arbor Entity Defendants had merely acquired, in an arms-length business transaction, non-controlling membership interests in DLDW and BHAC after the close of the LBO Transaction, and that such arms-length transaction is insufficient to establish a special relationship or fiduciary relationship. *See id.* at 65.

**HN103**[⤴] ] Application of the group pleading doctrine "applies whenever *Rule 9(b)* applies, which is whenever the alleged conduct of defendants is fraudulent in nature." *Cyganowski v. Beechwood Re Ltd. (In re Platinum-Beechwood Litig.)*, 427 F. Supp. 3d 395, 2019 WL 4934967, at *20 (S.D.N.Y. 2019) (quoting *Schwartzco Enters. LLC v. TMH Mgmt., LLC, 60 F. Supp. 3d 331, 350 (E.D.N.Y. 2014)*). *See also IKB Deutsche Industriebank AG, 863 F. Supp. 2d at 311* ("Because negligent misrepresentation is a type of fraud, the group pleading doctrine does apply to negligent misrepresentation claims. Further, the group pleading doctrine applies to breach of fiduciary duty claims that are rooted in fraud, as is the case here.") (footnotes omitted). The Trust does not dispute that Count 5 sounds in fraud. However, **[*356]** it contends,

and the Court agrees, that for the same reasons that the Trust met its burden to plead fraud with particularity in respect of Count 12, it has met its burden to plead the Defendants' alleged breaches of fiduciary duties. In assessing the adequacy of the allegations in support of the alleged breaches of the fiduciary duties of care, loyalty, and good faith, it is equally the case here, as with the fraud claims, that the Trust is permitted to group plead because, without limitation, the specific information regarding the Transfers is within the Defendants' knowledge and control. Thus, the rationale for permitting group pleading in the fraud cases applies herein. *See, e.g., Nisselson v. Softbank AM Corp. (In re Marketxt Holdings Corp.), 361 B.R. 369, 385 (Bankr. S.D.N.Y. 2007)* (noting that "[o]rdinarily, pleadings of fraud cannot be based on information and belief, except where the facts are peculiarly within the opposing party's knowledge[.]" (citing *Granite Partners, L.P. v. Bear, Stearns & Co. Inc. (In re Granite Partners, L.P.), 58 F. Supp. 2d 228, 258-59 (S.D.N.Y. 1999))*; *Haskell v. Goldman Sachs & Co. (In re Genesis Health Ventures, Inc.), 355 B.R. 438, 455 (Bankr. D. Del. 2006)* ("The Third Circuit has ruled that the *Rule 9(b)* heightened standard may be relaxed when necessary information 'lies in defendants' exclusive control,' provided that the plaintiffs provide 'a statement of facts upon which their allegation is based,' and 'delineate at least the nature and scope of plaintiffs' effort to obtain, before **[*357]** filing the complaint, the information needed to plead with particularity.'" (quoting *Weiner v. Quaker Oats Co., 129 F.3d 310, 319 (3d Cir. 1997)))*. The Court finds no merit to the Arbor Defendants' assertion that Count 5 runs afoul of the pleading standards under *Rule 9(b)*.

Whether The Trust Has Pled Facts Demonstrating That Any Of The Defendants Owed Fiduciary Duties To Any Of The Debtors

*HN104*[↑] To state a claim for breach of a fiduciary duty under Delaware law, "the factual allegations in a complaint must be such that they reasonably could support a finding that a fiduciary duty existed and the defendant breached that duty." *Stewart v. Wilmington Tr. SP Servs., Inc.*, 112 A.3d 271, 297 (Del. Ch.) (citing *In re Mobilactive Media, LLC, No. 5725-VCP, 2013 Del. Ch. LEXIS 26, 2013 WL 297950, at *21 (Del. Ch. Jan. 25, 2013))*, aff'd, 126 A.3d 1115 (Del. 2015). *See also Lightsway Litig. Servs., LLC v. Yung (In re Tropicana Entm't, LLC), 520 B.R. 455, 470 (Bankr. D. Del. 2014)* ("The elements of a breach of fiduciary duty claim are (1) that the fiduciary duty exists and (2) that the fiduciary breached that duty." (quoting *York Linings v. Roach, No.*

*16622-NC, 1999 Del. Ch. LEXIS 160, 1999 WL 608850, *2 (Del. Ch. July 28, 1999)))*. "If there is no existing fiduciary duty then the claims fail, and there is no need to examine whether a fiduciary breached a duty." *Beskrone v. OpenGate Capital Grp. (In re Pennysaver USA Publ'g, LLC), 587 B.R. 445, 464 (Bankr. D. Del. 2018)*.

*HN105*[↑] Under Delaware law, "a parent corporation does not owe fiduciary duties to its whollyowned subsidiaries or their creditors." *See Trenwick Am. Litig. Tr. v. Ernst & Young, L.L.P., 906 A.2d 168, 191 (Del. Ch. 2006)* (citation omitted). However, a parent corporation could owe such duties if the subsidiary has minority stockholders, (*see id. at 192 n.66*), or if the subsidiary was insolvent. *See [*358] id. at 173* (noting plaintiff "failed to plead facts supporting the inference that either the holding company or its top U.S. subsidiary were insolvent" and therefore "settled law indicates that the holding company owed no fiduciary duty to the top U.S. subsidiary or that entity's creditors"). As "the ultimate beneficial owners" of a corporation, shareholders have standing to bring breach of fiduciary duty claims derivatively on behalf of the corporation. *See Quadrant Structured Prods. Co., Ltd. v. Vertin*, 115 A.3d 535, 550 (Del. Ch. 2015). Once the corporation becomes insolvent, however, "creditors take the place of the shareholders as the residual beneficiaries of any increase in value," (*id.* at 551) and such creditors "have standing to maintain derivative claims against directors on behalf of the corporation for breaches of fiduciary duties." *Id.* at 554 (quoting *N. Am. Catholic Ed. Programming Found., Inc. v. Gheewalla, 930 A.2d 92, 101-102 (Del. 2007)*).

*HN106*[↑] Directors and officers of Delaware corporations owe identical fiduciary duties of care, good faith and loyalty to their corporations and stockholders. *See Gantler v. Stephens, 965 A.2d 695, 709 (Del. 2009)* ("In the past, we have implied that officers of Delaware corporations, like directors, owe fiduciary duties of care and loyalty, and that the fiduciary duties of officers are the same as those of directors. We now explicitly so hold.") (internal citations omitted). *See also NHB Assignments LLC v. Gen. Atl. LLC (In re PMTS Liquidating Corp.)*, 526 B.R. 536, 545 (D. Del. 2014) ("Under **[*359]** Delaware law, a corporate director owes a 'triad' of fiduciary duties to the company: loyalty, good faith, and due care." (citing *Malone v. Brincat, 722 A.2d 5, 10 (Del. 1998)))*; *Cede & Co. v. Technicolor, Inc., 634 A.2d 345, 361 (Del. 1993)* (same).

*HN107*[↑] In addition, "controlling shareholders" of a

Delaware corporation are considered to be fiduciaries of that corporation. *See Official Comm. of Unsecured Creditors of Hechinger Inv. Co. of Del. Inc. v. Fleet Retail Fin. Grp. (In re Hechinger Inv. Co. of Del.), 274 B.R. 71, 93 (D. Del. 2002)* ("Under Delaware law, fiduciary duties are owed only by directors, officers, or controlling shareholders.") (citation omitted); *see also Harris v. Carter, 582 A.2d 222, 234 (Del. Ch. 1990)* ("[W]hen a shareholder presumes to exercise control over a [Delaware] corporation, to direct its actions, that shareholder assumes a fiduciary duty of the same kind as that owed by a director to the corporation.") (citation omitted). For these purposes, "a controlling shareholder exists when a stockholder: 1) owns more than 50% of the voting power of a corporation; or 2) exercises control over the business and affairs of the corporation." *Dubroff v. Wren Holdings, LLC, No. 3940-VCN, 2009 Del. Ch. LEXIS 89, 2009 WL 1478697, at *3 n.22 (Del. Ch. May 22, 2009)* (quoting *In re PNB Holding Co. S'holders Litig., No. Civ.A.28-N, 2006 Del. Ch. LEXIS 158, 2006 WL 2403999, at *9 (Del. Ch. Aug. 18, 2006)*).

*HN108*[⬆] Minority shareholders will be treated as "controlling shareholders" if they "have such formidable voting and managerial power that they, as a practical matter, are no differently situated than if they had majority voting control." *In re PNB Holding Co. S'holders Litig., 2006 Del. Ch. LEXIS 158, 2006 WL 2403999, at *9*; *see also Carfagno ex rel. Centerline Holding Co. v. Schnitzer, 591 F. Supp. 2d 630, 634-35 (S.D.N.Y. 2008)* (stating that Delaware law imposes fiduciary obligations [*360] on "stockholders who, although lacking a clear majority, have such formidable voting and managerial power that they, as a practical matter, are no differently situated than if they had majority voting control"). A minority shareholder will be considered a fiduciary only if it actually exercises control over the corporation, and its business. However, that control need not be pervasive, and can be evaluated with regard to particular transactions:

> "[T]o be deemed a controlling stockholder for purposes of imposing fiduciary obligations, the plaintiff must establish the *actual exercise* of control over the corporation's conduct by that otherwise minority stockholder." In order to append the label of "controlling shareholder," pervasive control over the corporation's actions is not required; indeed, a plaintiff "can survive the motion to dismiss by alleging actual control with regard to the particular transaction that is being challenged."

*Superior Vision Servs. v. ReliaStar Life Ins. Co.*, No. CIV.A. 1668-N, 2006 Del. Ch. LEXIS 160, 2006 WL 2521426, at *4 (Del. Ch. Aug. 25, 2006) (first quoting *Weinstein Enters. v. Orloff, 870 A.2d 499, 507 (Del. 2005)*; then quoting *Williamson v. Cox Commc'ns, Inc., 2006 Del. Ch. LEXIS 111, 2006 WL 1586375, at *4 (Del. Ch. June 5, 2006)*); *see also In re Western Nat'l Corp. S'holders Litig., No. 15927, 2000 Del. Ch. LEXIS 82, 2000 WL 710192, at *20 (Del. Ch. May 22, 2000)* ("[A] significant stockholder that does not, as a general matter, exercise actual control over the investee's business and affairs or over [*361] the investee's board of directors but does, in fact, exercise actual control over the board of directors during the course of a particular transaction, can assume fiduciary duties for purposes of that transaction.") (citation omitted). The focus of the inquiry is whether the party, through its control of the relevant board, "dominate[d] the corporate decision-making process." *Superior Vision Servs.*, 2006 Del. Ch. LEXIS 160, 2006 WL 2521426, at *4. However, "it is the actual exercise of such control, not the simple potential for control, that creates the special duty." *Citron v. Steego Corp., No. CIV.A. 10170, 1988 Del. Ch. LEXIS 119, 1988 WL 94738, *6 (Del. Ch. Sept. 9, 1988)* (citation omitted). *See also Kahn v. Lynch Commc'ns Sys., 638 A.2d 1110, 1114 (Del. 1994)* (finding that 43.3% minority shareholder was controlling shareholder because of influence it exercised over board of directors); *In re Morton's Rest. Grp., Inc. S'holders Litig., 74 A.3d 656, 665 (Del. Ch. 2013)* (concluding that shareholder with 27.7% stake in company and two employees on board of eight was not enough to establish actual domination of the board to confer controlling shareholder status).

*HN109*[⬆] In the context of LLCs, "[t]here are three ways fiduciary duties can be established." *Beskrone v. OpenGate Capital Grp. (In re PennySaver USA Publ'g, LLC), 587 B.R. 445, 464 (Bankr. D. Del. 2018)*. "Primarily, fiduciary duties in LLCs are governed by the limited liability company agreement." *See id.* (citation omitted). Absent an agreement, or if the LLC agreement is silent, "the Delaware Chancery Court has found consistently a default rule that the [*362] manager or director of the LLC owes fiduciary duties to fellow LLC members and the LLC." *See id.* (citation omitted); *see also William Penn P'ship v. Saliba, 13 A.3d 749, 758 (Del. 2011)* ("[M]anagers of a Delaware limited liability company owe traditional duties of loyalty and care to members of the LLC, unless the parties modify or eliminate those duties in the operating agreement.") (citation omitted). That is because an LLC manager has "more than an armslength, contractual relationship with the members of the LLC," and "is vested with

discretionary power to manage the business of the LLC." *Auriga Capital Corp. v. Gatz Props., 40 A.3d 839, 850-51 (Del. Ch.)*, *aff'd sub nom., 59 A.3d 1206 (Del. 2012)*. The corollary to this rule, however, is that "while managers and managing members owe default fiduciary duties, 'passive members do not,' . . . . absent a modification of the LLC agreement or facts suggesting the purportedly passive member was acting in a managerial capacity." *CMS Inv. Holdings LLC v. Castle*, No. 9468-VCP, 2015 Del. Ch. LEXIS 169, 2015 WL 3894021, at *18 (Del. Ch. June 23, 2015) (citing *Feeley v. NHAOCG, LLC, 62 A.3d 649, 662 (Del. Ch. 2012))*. Third, "in rare and highly fact-specific instances" courts may find a defendant "had actual control over an LLC which was not granted under the LLC agreement." *In re PennySaver USA Publ'g, LLC, 587 B.R. at 464* (citation omitted).

Below, the Court considers whether the Amended Complaint asserts facts that, viewed in a light most favorable to the Trust and drawing **[*363]** all reasonable inferences in the Trust's favor, demonstrate that it is plausible that the Defendants owed fiduciary duties to the Debtors.


The Lightstone Individuals

The Lightstone Individuals served as members of the Company Board. The Trust alleges that, at all pertinent times, the Debtors operated as a single business in an entity denoted as the "Extended Stay family of companies," solely through the board (*see, e.g.*, Amd. Compl. ¶¶ 13, 35) and that the Lightstone Individuals participated and made decisions on the board. *See id.* ¶¶ 38, 42, 46, 49 (listing dates that Lightstone Individuals attended Company Board meetings). As pled, these facts give rise to the plausible inference that those individuals had sufficient control of the Debtors through the control of a single board that would confer them with fiduciary duties owed to the Debtors under Delaware law. *See, e.g., In re PennySaver USA Publ'g, LLC, 587 B.R. at 464*.


The Arbor Individuals

The same holds true for the Arbor Individuals as they likewise served as directors on the Company Board. The Trust asserts that Arbor ESH had the right to appoint one or more Arbor designees to the board (*see* Amd. Compl. ¶ 55), and that, as Arbor ESH's designee, Joseph Martello served as a member **[*364]** of the

Company Board from June 11, 2007 through May of 2008, when he was succeeded by Guy R. Milone. *See id.* ¶¶ 74, 75, 79. The Arbor Defendants deny that the Arbor Individuals had control rights over the Debtors and contend that they served as directors only for limited periods of time, and were appointed as representatives of minority, non-controlling equity members—i.e., the Arbor Entities. *See* Arbor MTD at 2. However, the Trust asserts that during their respective tenures on the board, Messrs. Martello and Milone participated in and made decisions on board matters, and as such, managed or controlled aspects of the post-LBO operations and activities of the "Extended Stay Hotels family of companies," including the Debtors. *See* Amd. Compl. ¶¶ 76, 77, 81, 82. It also asserts that Joseph Chetrit was a direct or indirect owner or member of senior management of Atmar Associates, Glida One, Ron Invest, and affiliates of those entities, and that he attended Company Board meetings both as a director and an "invited guest," and, as such, he too, participated and made decisions on Board matters. *See, e.g., id.* ¶¶ 84, 85 (describing dates that Arbor Individuals attended Company Board meetings). The Court **[*365]** finds that as pled, these facts give rise to the plausible inference that those individuals had sufficient control of the Debtors through the single Company Board that would confer them with fiduciary duties to the Debtors under Delaware law. *See In re PennySaver USA Publ'g, LLC, 587 B.R. at 464*. However, in that regard, the Arbor Defendants correctly assert that those individuals owed fiduciary duties to the Debtors only for so long as they served as directors on the board. *See, e.g., In re Walt Disney Co. Derivative Litig., 907 A.2d 693, 758 (Del. Ch. 2005)* (concluding that "[j]ust as Delaware law does not require directors-to-be to comply with their fiduciary duties, former directors owe no fiduciary duties" and cannot be liable breach of duties they no longer had) (citation omitted), *aff'd, 906 A.2d 27 (Del. 2006)*; *see also DiRienzo v. Lichtenstein, No. CV 7094-VCP, 2013 Del. Ch. LEXIS 242, 2013 WL 5503034, at *17 (Del. Ch. Sept. 30, 2013)* (holding that defendants Mullen and Schwarz cannot be liable for general partner's misconduct "during a time period when they were not directors or otherwise obligated to act[,]" and holding that defendant Schwarz could not be liable for actions taken by the general partner after the time that Schwarz ceased to be a director).


The Lightstone Entities

The Lightstone Defendants deny that any of the Lightstone Entities owed fiduciary duties to the Debtors.

*See* Lightstone MTD at 68. They **[\*366]** correctly assert that none of the Lightstone Entities could have served as a director or officer of any of the Debtors because the entities are not natural persons, and under Delaware law, only natural persons can serve as directors or officers of a Delaware corporation.[113] That rationale applies equally to the Arbor Entities, PGRT ESH and Polar Extended Stay. They also contend that the Trust fails to allege specific facts that demonstrate that any of the Lightstone Entities actually exerted control over the Debtors. *See id.* at 69. In that regard, the Lightstone Defendants assert that the Trust's admissions, and other documents of record of which this Court may take judicial notice, reflect that Wachovia Bank, as a Mortgage Lender, had significant, if not complete control, with respect to the Transfers challenged in the Amended Complaint. *See id.* at 70. They contend that neither the Lightstone Individuals nor the Lightstone Entities could have breached any fiduciary duties by reason of the Mortgage Lender exercising rights that were conferred upon it under the Cash Management Agreement. *See id.* The Court finds no merit to those contentions. Even assuming, arguendo, that the Mortgage Lender had control **[\*367]** of the central cash account through the Cash Management Agreement, the facts in the record do not demonstrate that it could exert control over management or operational decisions by the Debtors, including decisions relating to the Transfers. The facts alleged do not support a determination that the Mortgage Lender is a shareholder, member or director, or otherwise in control, of ESI or Homestead.

The Lightstone Defendants also contend that the Court must dismiss the Lightstone Entities from Count 5 because the Trust fails to allege specific facts demonstrating that any of the Lightstone Entities actually exerted control over the Debtors. *See id.* at 69. The Arbor Defendants make a similar argument in contending that the Amended Complaint fails to plead facts demonstrating that the Arbor Entities were fiduciaries of the Debtors. *See* Arbor MTD at 64-65.

---

[113] *See* **8 Del. C. § 141(b)** ("The board of directors of a corporation shall consist of 1 or more members, each of whom shall be a natural person."). *Id.* **§ 142(a)** ("Every corporation organized under this chapter shall have such officers with such titles and duties as shall be stated in the bylaws or in a resolution of the board of directors which is not inconsistent with the bylaws and as may be necessary to enable it to sign instruments and stock certificates which comply with **§§ 103(a)(2)** and **158** of this title.").

**HN110**[↑] A fiduciary relationship is characterized by the "reliance by one party on the integrity or discretion of another." *Mia Shoes, Inc. v. Republic Factors Corp., No. 96 CIV. 7974 (TPG), 1997 U.S. Dist. LEXIS 12571, 1997 WL 525401, at \*2 (S.D.N.Y. Aug. 21, 1997)* (citations omitted). It requires "great confidence and trust on the one part, and a high degree of good faith on the other part." *United States v. Wolfson, 642 F.3d 293, 295 (2d Cir. 2011)* (citation omitted). As a general rule, an arms-length business transaction is not sufficient to establish a special **[\*368]** relationship. *See In re Our Alchemy, LLC, No. 16-11596 (KG), 2019 Bankr. LEXIS 2907, 2019 WL 4447519, at \*6 (Bankr. D. Del. Sept. 16, 2019)* ("However, a 'straightforward commercial relationship arising from contract' that 'is in all of its aspects an arms-length relationship' will not give rise to fiduciary duties.") (citing *McMahon v. New Castle Assoc., 532 A.2d 601, 605 (Del. Ch. 1987)*). *See also Henneberry v. Sumitomo Corp., 415 F. Supp. 2d 423, 460 (S.D.N.Y. 2006)* ("Absent extraordinary circumstances, however, parties dealing at arms length in a commercial transaction lack the requisite level of trust or confidence between them necessary to give rise to a fiduciary obligation.") (citation omitted). The Arbor Defendants assert that the Amended Complaint does not allege that the Debtors relied on the Arbor Entities' "integrity or discretion" at any time, and, in any event, such an allegation would not be credible, given the sophisticated nature of the Debtors and their management. *See* Arbor MTD at 65-66. They also contend that it is implausible that they could be considered controlling insiders because, at bottom, they are merely members in BHAC or DL-DW with limited control rights over those entities and their affiliates. *See* Arbor Reply at 28-29. They maintain that the allegations in the Amended Complaint demonstrate nothing but their arms-length purchase of non-controlling membership interests in BHAC and/or DL-DW after the close of the LBO Transaction. **[\*369]** *See* Arbor MTD at 65. They say that even if the Trust's allegations that an Arbor principal attended the Company Board meetings "to ensure that improper equity distributions would continue to be made" (*see* Amd. Compl. ¶ 58) were true, the Amended Complaint fails to describe how such conduct created a confidential or special relationship between the Arbor Entities and the Debtors.

The Trust contends that the Lightstone Entities clearly operated as a block of majority shareholders, under the direction and at the behest of Lichtenstein, their owner. *See* Opp'n at 90. It asserts that in these circumstances, it is not required to plead their separate individual control of the Debtors, when they acted with complete

unity reflecting their unitary interests and ownership. *See id.* It maintains that it does not matter whether the Lightstone Entities' ownership interests in the Debtors are based on one company, or two, or five, because all of the entities were corporate proxies for Lichtenstein and his principals, and thus were the instruments of his control. According to the Trust, the fact that those entities repeatedly were successful in obtaining the distributions in the face of the Debtors' financial and [*370] operational difficulties alone supports a plausible inference that they controlled the Debtors and owed them fiduciary duties. *See id.* at 92. It asserts that through their conflicted individual representatives on the Company Board of the "Extended Stay Hotels family of companies," the Lightstone Entities caused the dividends and distributions to continue when the Debtors were insolvent, undercapitalized and unable to pay their debts as they came due and further caused the LIBOR Floor Certificates to be issued to DL-DW.

The Trust argues that Delaware courts have consistently imposed corporate fiduciary duties on persons other than direct shareholders where those persons exercise control over corporate affairs and that under the facts alleged in the Amended Complaint, all of the Lightstone Entities owed fiduciary duties to the Debtors as their *de facto* majority shareholders. *See id.* at 91. One of the cases that the Trust relies on in making that argument is *In re USACafes, L.P. Litig., 600 A.2d 43 (Del. Ch. 1991).* There, the Delaware Chancery Court held that where a corporation is the general partner of a limited partnership, the corporation's directors owe fiduciary duties to the corporate stockholders, as well as to the limited partnership and its limited [*371] partners (assuming the fiduciary duties has not been disclaimed by the partnership agreement). *Id. at 49.* In doing so, the court applied general principles of partnership law and by analogy to trust law. The court focused on the general partner's ability to control the actions of the limited partnership and noted that "the principle of fiduciary duty, stated most generally, to be that one who controls property of another may not, without implied or express agreement, intentionally use the property in a way that benefits the holder of the control to the detriment of the property or its beneficial owner." *Id. at 48.* The court did not specify the scope of the directors' fiduciary duties owed to the limited partnership but found that they owed a duty of loyalty not to use control over the limited partner's property to the advantage of a director at the expense of the limited partner. *See id. See also Bigelow/Diversified Secondary P'ship Fund 1990 v. Damson/Birtcher Partners, No. Civ. A.16630-NC, 2001 Del. Ch. LEXIS 152, 2001 WL 1641239, at *6 (Del. Ch. Dec. 4, 2001)* (denying motion to dismiss complaint against general partners' "upstream" affiliates where limited partner sued general partners of limited partnership and those affiliates for breach of fiduciary duty and breach of [*372] contract, because limited partner had alleged that the affiliates exercised control over the limited partnership's property). "[HN111[↑]] USACafes] and its progeny have established that a director, member, or officer of a corporate entity serving as the general partner of a limited partnership . . . who exercises control over the partnership's property owes fiduciary duties directly to the partnership and its limited partners." *Paige Capital Mgmt., LLC v. Lerner Master Fund, LLC, No. 5502-CS, 2011 Del. Ch. LEXIS 116, 2011 WL 3505355, at *30 (Del. Ch. Aug. 8, 2011)* (citation omitted).

That principle has been extended to cases in which an LLC is acting as the managing member of an LLC. For example, in *Bay Ctr. Apartments Owner, LLC v. Emery Bay PKI, LLC, No. C.A. No. 3658-VCS, 2009 Del. Ch. LEXIS 54, 2009 WL 1124451, at *1 (Del. Ch. Apr. 20, 2009),* the court found that an individual who was the owner and manager of the LLC that served as the managing member of a second LLC, owed fiduciary duties directly to the other members of the second LLC because that person exerted control over the assets owned by the second LLC. There, defendant PKI, an LLC, was the managing member of another LLC defendant, Emery Bay. *Id.* PKI was owned and managed by an individual, Alfred Nevis. The project for which Emery Bay was formed was a joint venture between PKI and plaintiff Bay Center LLC. *Id.* Emery Bay's LLC Agreement contemplated that PKI would be responsible for managing the project, but the [*373] parties defined those responsibilities through a separate agreement, the "Development Management Agreement," by which one of PKI's designated affiliates, defendant ETI, another LLC, was bound. *See id.* ETI's only counterparty to the Development Management Agreement was a wholly-owned subsidiary of Emery Bay. *Id.* The court found that the plaintiff adequately pled that PKI breached its fiduciary duties to Emery Bay, "[a]nd Nevis, as the human who directly managed Emery Bay for PKI, had a fiduciary duty not to use his control over Emery Bay's assets to benefit himself at Emery Bay's expense," where "Nevis ... renegotiat[ed] [a] Loan to advantage himself personally at the expense of Emery Bay." *Id.* Thus, *Bay Center* analyzed fiduciary duties of a party with management control, not a non-controlling member of an LLC. Similarly, in *Paige Capital Mgmt., LLC v. Lerner Master Fund, LLC, 2011*

*Del. Ch. LEXIS 116, 2011 WL 3505355, at \*30*, another case in which the Trust, the court found that allegations that managing member of the hedge fund's general partner had exerted control over hedge fund's assets were sufficient to allege fiduciary duties on the part of managing member). *See also Kuroda v. SPJS Holdings, L.L.C., No. 4030-CC, 2010 Del. Ch. LEXIS 57, 2010 WL 925853, at \*7 (Del. Ch. March 16, 2010)* (criticizing as "entirely baseless" the prospect of imposing fiduciary duties on a non-managing LLC member which **[\*374]** had no right to control company assets).

In the Amended Complaint, the Trust alleges that ESI and Homestead directly or indirectly controlled all of the ESI Debtors and Homestead Debtors, respectively. *See* Amd. Compl. ¶¶ 17-18. The Trust also alleges that BHAC was the majority shareholder of ESI and, at all pertinent times, held no less than approximately 99% of the equity of ESI. *See id.* ¶ 26. The Lightstone Defendants challenge the latter so-called "boilerplate allegations" because the Disclosure Statement revealed that "ESI currently has approximately 90 preferred stock investors." (See Lightstone MTD at 70 (citing Disclosure Statement at 23, § IV.B). The Court attaches no weight to that data point. First, the Lightstone Defendants do not explain the significance of the 90 preferred stock investors of ESI. More importantly, as set forth in the Amended Complaint, those shareholders only held, collectively, 0.2% of the equity interest in ESI. Obviously, that is substantially dwarfed by the 98.8% held by BHAC. *See* Debtors' Org. Chart (Amd. Compl., Ex. A). The Court finds that, as pled, these facts give rise to the plausible inference that BHAC had control of the ESI Debtors that would confer them with **[\*375]** fiduciary duties to those debtors under Delaware law. *See, e.g., Matter of Reading Co., 711 F.2d 509, 517 (3d Cir. 1983)* (noting that "a majority shareholder, or a group of shareholders who combine to form a majority, has a fiduciary duty to the corporation and to its minority shareholders if the majority shareholder dominates the board of directors and controls the corporation.") (citation omitted). The same holds true for DL-DW and the Homestead Debtors, because DL-DW held 100% of the membership interests in Homestead and solely controlled the Homestead Debtors. *See* Debtors' Org. Chart.

After the LBO Transaction closed, and prior to the restructuring, DL-DW held 100% of the membership interests in BHAC. After the restructuring closed, DL-DW did not hold a direct interest in BHAC. Nonetheless, the facts of record available to the Court in resolving these Motions demonstrate that through Homestead,

DL-DW retained control over BHAC. Homestead's interests in BHAC include 58.07 Series A-3 Units and 58.07 Common A-3 Units. *See* Sch. A to BHAC LLC Agmt. Those are the only Series A-3 and Common A-3 Units issued and outstanding for BHAC. *Id.* In substance, under the BHAC LLC Agreement, the holders of Series A-3 Units and Common A-3 Units had the **[\*376]** exclusive right to elect BHAC's board members. *See* BHAC LLC Agmt. §§ 3.05(e), 3.09(e)(iii). The board had the exclusive right to manage the property and affairs of BHAC. *Id.* § 4.01; *see also* § 2.04 (setting forth purpose and power of company). The Court finds that for purposes of these Motions, that is sufficient to demonstrate that DL-DW exerted control over BHAC and, as such, owed fiduciary duties to the ESI Debtors. *See, e.g., Bay Ctr. Apartments Owner, LLC, 2009 Del. Ch. LEXIS 54, 2009 WL 1124451, at \*9-10.*

In the Amended Complaint, the Trust alleged facts that demonstrate that Lightstone Group and Lightstone Holdings exerted control over DL-DW that would confer upon them fiduciary duties to the Homestead and ESI Debtors. Lightstone Group is a New Jersey limited liability company. *See* Amd. Compl. ¶ 28. The Trust alleges that the Lightstone Group was a corporate parent or grandparent of DL-DW, and that, through such ownership interest, it directly or indirectly controlled DL-DW. *See id.* The Trust also alleges that at all pertinent times, Lightstone Group was controlled by Lichtenstein and his affiliates. *Id.* These allegations, which the Court must accept as true in resolving these Motions, raise the plausible inference that the Lightstone Group, through its control of DL-DW and affiliation with **[\*377]** Lichtenstein, exercised actual control over Homestead and BHAC, and through them, the ESI Debtors and Homestead Debtors.

Lightstone Holdings is a limited liability company organized in Delaware. *See id.* ¶ 27. The Trust alleges that at all pertinent times, Lightstone Holdings was indirectly controlled by Lichtenstein, and that it was a member of DL-DW. *See id.* Without limitation, Lightstone Holdings held 97.9 Series A-3 Units and 100 Common A-3 Units in DL-DW. The Series A-3 Units represented 100% of the Series A-3 Units that were issued and outstanding. In substance, under the DL-DW LLC Agreement, the holders of Series A-3 Units and Common A-3 Units had the exclusive right to elect DL-DW's board members. *See* DL-DW LLC Agmt. § 3.05(e), 3.09(e)(iii). The Lightstone Individuals - Lichtenstein, de Vinck, Owen and Teichman were elected directors of DL-DW. The board had the

exclusive right to manage the property and affairs of DL-DW. *Id.* § 4.01; *see also* § 2.04 (setting forth purpose and power of company). The Trust has demonstrated that it is plausible that Lightstone Holdings had control over DLDW, and indirectly over the Homestead and ESI Debtors.

The same does not hold true for the remainder of the Lightstone Entities. **[*378]** Defendant Park Avenue is a limited liability company organized under New York law. *See* Amd. Compl. ¶ 30. The Trust alleges that at all pertinent times, Park Avenue was controlled by Lichtenstein and his affiliates. *See id.* Park Avenue was a lender on the 25% Note, and, as such, received certain proceeds of the LIBOR Floor Certificates until the transfer of its pertinent interests to Lightstone Commercial. *Id.* It is not alleged to have had a direct or indirect membership interest in DL-DW or BHAC, or otherwise exert control over either of them. The Trust has not alleged facts that give rise to the plausible inference that Park Avenue had control over BHAC or DL-DW that would confer upon it fiduciary duties to BHAC, DL-DW, or the Homestead and ESI Debtors. Lightstone Commercial is a limited liability company organized under New Jersey law. *See id.* ¶ 29. At all pertinent times, it was controlled by Lichtenstein and his affiliates. *See id.* It was not a member of DL-DW or BHAC. In 2009, it received certain proceeds of the LIBOR Floor Certificates as assignee and successor to the rights of Park Avenue regarding those certificates. Lightstone Commercial did not hold a membership interest **[*379]** in either DL-DW or BHAC. The Trust has not alleged facts that give rise to the plausible inference that Lightstone Commercial had control over either BHAC or DL-DW that would confer upon it fiduciary duties to BHAC, DL-DW, or the Homestead and ESI Debtors.

The Arbor Entities

Princeton ESH and Atmar Associates were non-managing members of DL-DW. Each held Common J Units but had no right to elect directors of DL-DW or otherwise assert control over DL-DW. *See* DL-DW LLC Agmt § 3.11(e)(i), Sch. A (showing Princeton ESH and Atmar Associates as each owning 5 Common J Units). The Trust alleges no facts that give rise to the plausible inference that any of them had control over DL-DW that would confer upon them fiduciary duties owing to DL-DW or the Homestead and ESI Debtors.

Princeton ESH, Glida One, Ron Invest and Atmar

Associates were non-managing members of BHAC, holding Preferred Series A-1 Units. Under the BHAC LLC Agreement, Preferred Series A-1 Units generally had no right to elect BHAC's directors. *See* BHAC LLC Agmt. § 3.03(f). Pursuant to § 3.03(g) of the BHAC LLC Agreement, holders of Preferred Series A-1 Units could: (i) elect one member of the BHAC board in the event the Mandatory Cash Reserve is not fully funded **[*380]** for four consecutive months, or four Series A-1 Minimum Cash Monthly Distributions remain unpaid; (ii) elect two members of the BHAC board in the event the Mandatory Cash Reserve is not fully funded for five consecutive months, or five Series A-1 Minimum Cash Monthly Distributions remain unpaid; and (iii) among other things, elect a majority of the members of the BHAC Board upon the occurrence and continuation of certain events. *See* BHAC LLC Agmt. § 3.03(g). The Trust does not allege that any of those contingencies occurred. Moreover, the mere potential to exercise control does not vest those Arbor Entities with fiduciary duties. *Citron v. Steego Corp., 1988 Del. Ch. LEXIS 119, 1988 WL 94738, at *6.* Although the Trust alleges that all of them were part of the "Arbor Group," it alleges no facts that give rise to the plausible inference that any of them had control over BHAC that would confer upon them fiduciary duties to the Homestead and ESI Debtors.

Mericash Funding is a limited liability company organized under the laws of Delaware. *See* Amd. Compl. ¶ 70. The Trust asserts that it was an affiliate of the Arbor Group. *See id.* It was a lender on the 25% Note and in that capacity, it received transfers based on the LIBOR Floor Certificates and their proceeds. **[*381]** *See id.* ¶ 71. Mericash Funding did not hold a membership interest in either DL-DW or BHAC. The Trust alleges no facts that give rise to the plausible inference that Mericash Funding had control over DL-DW or BHAC that would confer upon it fiduciary duties to the Homestead and ESI Debtors.

ABT-ESI is a limited liability company organized under Delaware law. *See id.* ¶ 68. The Trust asserts that it is an affiliate and insider of Arbor ESH and Arbor Commercial. *Id.* ABTESI served at all pertinent times as Lead Lender/Servicer of the 25% Note and, as such, received subsequent transfers based on the LIBOR Floor Certificates and their proceeds. *See id.* ¶ 69. ABT-ESI did not hold a membership interest in either DL-DW or BHAC. The Trust alleges no facts that give rise to the plausible inference that ABT-ESI had control over either LLC that would confer upon them fiduciary duties to the Homestead and ESI Debtors.

Arbor ESH is a limited liability company organized under Delaware law. Amd. Compl. ¶ 52. The Trust asserts that, "upon information and belief," Arbor ESH was an affiliate of Kaufman and was treated as a member of the "Arbor Group." *Id.* ¶ 53. It was a member of BHAC and held 190 units of [*382] the Preferred Series A-1 Units, as well as 5.8 units of the BHAC Common J Units. *See id.* ¶ 52. *See also* BHAC LLC Agmt., Sch. A. The Trust asserts that Arbor ESH was an affiliate of Arbor Commercial, and that due to Arbor ESH's membership in BHAC, Arbor ESH and its affiliates had the right to appoint one or more Arbor designees to the consolidated board of directors for the "Extended Stay Hotels family of companies." *See Amd. Compl.* ¶ 55. The Trust also asserts "upon information and belief," that Arbor ESH was a direct or indirect wholly owned subsidiary of Arbor Realty Limited Partnership, which was itself a wholly-owned operating subsidiary of Arbor Realty Trust, Inc., a publicly traded REIT with managed assets well in excess of $1.5 billion. *Id.* ¶ 54. The Trust alleges no facts that give rise to the plausible inference that Arbor ESH had control over BHAC that would confer upon it any fiduciary duties owing to BHAC or the ESI Debtors. While it is uncontested that ABT-ESH held Common J and Preferred Series A-1 Units, those membership interests were generally nonvoting, and did not grant a right of electing any BHAC board members. *See* BHAC LLC Agmt. §§ 3.03(f), 3.11. Although as a holder of Preferred [*383] Series A-1 Units, ABT ESH had a "Springing Director Right" upon the occurrence of certain events, the Trust does not allege that such events occurred or that the Springing Director Right had been triggered. At best, ABT ESH had the potential to exercise control through its appointed BHAC board member, but, in fact, did not have actual control over the Transfers at issue. Any potential control, however, is not enough; actual control is what is required. *See Williamson v. Cox Commc'ns, Inc., 2006 Del. Ch. LEXIS 111, 2006 WL 1586375, at *4* (noting that plaintiffs must allege actual control of the relevant corporate conduct, and that mere potential to exercise control is insufficient to survive a motion to dismiss); *Citron v. Steego Corp., 1988 Del. Ch. LEXIS 119, 1988 WL 94738, at *6* (explaining that "it is the actual exercise of such control, not the simple potential for control" that gives rise to a fiduciary duty).

## Polar Extended Stay

Polar Extended Stay is a Delaware limited liability company. *See* Amd. Compl. ¶ 98. It was a member of BHAC, and held 10 Preferred Series A-1 Units, and 10 Common A-1 Units. *Id.* ¶ 99. *See also* BHAC LLC Agmt., Sch. A. The Trust asserts that through that interest, Polar Extended Stay exercised control over BHAC and ESI after the LBO Transaction, and that due to the Defendants' failure to observe the corporate [*384] formalities and boundaries of the various Debtor entities, Polar Extended Stay also exercised indirect control over the Debtors. *See* Amd. Compl. ¶ 99; *see also id.* ¶ 20 ("After the LBO [Transaction], ESI and Homestead were directly or indirectly owned by the 'Lightstone Group Defendants' . . . the 'Arbor Group Defendants' . . . and Polar Extended Stay (USA) LP."). However, those allegations do not support a plausible inference that Polar Extended Stay controlled DL-DW or BHAC. As noted above, as a holder of BHAC's Preferred Series A-1 Units and Common A-1 Units, Polar Extended Stay had no voting rights to elect any board members. Accordingly, the Trust has failed to allege facts giving rise to the plausible inference Polar Extended Stay exercised any actual control over BHAC and ESI, and the Transfers at issue, such as to confer any fiduciary duties owed by Polar Extended Stay.

## PGRT ESH

PGRT ESH is a limited liability company organized under Delaware law. *See* Amd. Compl. ¶ 31. The Trust alleges that PGRT ESH was owned or controlled, directly or indirectly, by Lichtenstein at all pertinent times, and that it was a member of BHAC. *See id.* ¶¶ 31, 32.[114] The Trust also alleges that through [*385] that interest, PGRT ESH exercised control over BHAC and ESI, and due to the Defendants' failure to observe the corporate boundaries, PGRT ESH's control also extended indirectly to the Debtor entities. *See id.* ¶ 32. Under the BHAC LLC Agreement, PGRT ESH holds 71.18 Series A-2 Units and 71.18 A-2 Common Units. *See* BHAC LLC Agmt., Sch. A. *See also* PGRT Reply at 3 (explaining that it "purchased a $120 million membership interest in BHAC . . . . from Lightstone Holdings, LLC[.]"). As previously noted, the only BHAC

---

[114] In its Reply, PGRT ESH appears to argue that it was not owned or controlled, directly or indirectly, by Lichtenstein. *See* PGRT Reply at 3-4 (noting that its purchase of the BHAC interests were approved by its parent's independent trustees, and that PGRT ESH's parent, Prime Group Realty Trust, "enjoyed a separate corporate existence before, during and after its business dealings with David Lichtenstein."). Whether PGRT ESH was under Lichtenstein's control is a factual dispute which cannot be resolved on a motion to dismiss.

membership interests able to vote on the election of members of the BHAC's board of directors are the Preferred A-3 Units. As a holder of the Series A-2 Units, PGRT ESH had no voting rights, and was not able to designate any members of the BHAC's board (or the Company Board). Furthermore, unlike holders of the Series A-1 Units, PGRT ESH does not have a "Springing Director Right," so as to have the potential to exercise control. The Trust failed to allege facts that give rise to the plausible inference that PGRT ESH had control over DL-DW or BHAC that would confer upon it fiduciary duties to them or to the Homestead and ESI Debtors.

To summarize, the Court finds that the facts **[*386]** alleged in support of the Amended Complaint give rise to the plausible inference that the following Defendants owed fiduciary duties to the Debtors:

> Lightstone Individuals
> David Lichtenstein
> Bruno de Vinck,
> Peyton Owen
> Joseph Teichman
>
> Arbor Individuals
> Joseph Chetrit
> Joseph Martello
> Guy Milone
>
> Lightstone Entities
> DL-DW
> BHAC
> Lightstone Group
> Lightstone Holdings

Accordingly, the Court denies the Motions to the extent they seek to dismiss the claims in Count 5 predicated on alleged breaches of fiduciary duties of care, loyalty and good faith to the Debtors and the Debtors' creditors, and as alleged against those parties.

In contrast, the Court finds that the Trust has failed to allege facts in support of the Amended Complaint that give rise to the plausible inference that the following Defendants owed fiduciary duties to the Debtors or the Debtors' creditors:

Arbor Entities

Arbor ESH

Arbor Commercial

Princeton ESH

Atmar Associates

Glida One

Ron Invest

ABT-ESI

Mericash Funding

Lightstone Entities

Park Avenue

Lightstone Commercial

Polar Extended Stay

PGRT ESH

The Court dismisses the claims in Count 5 as alleged against those parties predicated on their alleged breaches of their fiduciary duties of care, loyalty and good **[*387]** faith to the Debtors and the Debtors' creditors.

Whether The Allegations In The Amended Complaint Are Sufficient To Overcome The Business Judgment Rule

The Lightstone Defendants assert that even if the Amended Complaint pled the existence of fiduciary duties by "all Defendants," the Trust's allegations that the fiduciary duties were breached do not overcome the business judgment rule. Accordingly, they contend that the breach of fiduciary duty claims asserted against the Lightstone Individuals must be dismissed. *See* Lightstone MTD at 70.

**HN112[↑]** The business judgment rule is "a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Aronson v. Lewis, 473 A.2d 805, 812 (Del. 1984),* overruled on other grounds by *Brehm v. Eisner, 746 A.2d 244 (Del. 2000). See also Official Comm. Of Unsecured Creditors of Verestar, Inc. v. Am Tower Corp. (In re Verestar, Inc.), 343 B.R. 444, 472 (Bankr. S.D.N.Y. 2006)* ("To establish a breach of fiduciary duty by a corporate director, a plaintiff must take into account the business judgment rule, which provides that in making business decisions, there is a presumption that the directors of a corporation act on an informed basis, in good faith and in the honest belief that the action taken is in the best

interests of the company.") (citations omitted). "[W]here [*388] the business judgment [rule] presumptions are applicable, the board's decision will be upheld unless it cannot be 'attributed to any rational purpose.'" *In re Walt Disney Co. Derivative Litig., 906 A.2d 27, 74 (Del. 2006)* (citation omitted). To rebut that presumption, a plaintiff must "provid[e] evidence that directors, in reaching their challenged decision, breached any one of the *triads* of their fiduciary duty—good faith, loyalty or due care." *Cede & Co. v. Technicolor, Inc., 634 A.2d at 361*; *accord Citron v. Fairchild Camera & Instrument Corp., 569 A.2d 53, 64 (Del. 1989)*. *See also Official Comm. of Unsecured Creditors v. Beckoff (In re RSL COM PRIMECALL, Inc.), No. 01-11457(ALG), 2003 Bankr. LEXIS 1635, 2003 WL 22989669, at *10 (Bankr. S.D.N.Y. Dec. 11, 2003)* ("In any case, absent well-pleaded allegations of specific acts of self-dealing or even bad faith, Plaintiffs cannot overcome the presumption afforded by the business judgment rule that the directors acted reasonably and in good faith[.]") In that way, "the business judgment rule is process oriented and informed by a deep respect for all *good faith* board decisions." *In re Caremark Int'l Inc. Derivative Litig., 698 A.2d 959, 967-68 (Del. Ch. 1996)*.

The Lightstone Defendants contend that the Amended Complaint describes transactions, particularly the Series A Unit distribution, that occurred in accordance with contractual obligations incurred by the Debtors and ratified by creditors. They assert that the purported acts upon which the Trust's breach of fiduciary duty claims rest were taken pursuant to and in accordance with, transactional documents that were in place before [*389] the alleged acts occurred. *See* Lightstone MTD at 71-72. They say that the Trust's allegation that the Lightstone Individuals are liable for causing or allowing the Debtors to pay improper dividends (*see* Amd. Compl. ¶ 265) is wrong as a matter of law. *See id.* at 72-73. They maintain that because the equity distributions were part of the LBO Transaction's contractual framework, it is untenable to argue that authorization of the distributions was improper because the mechanism through which the distributions were triggered was negotiated by the contracting parties - including the Debtors and the lenders - before any Lightstone Defendant had fiduciary duties to the Debtors. *Id.* at 72. In sum, they contend that the allegations in the complaint that the Defendants breached their fiduciary duties are not enough to overcome the business judgment rule and, accordingly, must be dismissed.

*HN113*[⬆] The business judgment rule is an affirmative defense. *See Stanziale v. Nachtomi (In re Tower Air, Inc.), 416 F.3d 229, 238 (3d Cir. 2005)*. Where claims in a complaint allege facts that invoke application of the business judgment rule, the Court may dismiss the claim pursuant to *Rule 12(b)(6)*, unless the plaintiff "plead[s] around the business judgment rule" to show it is inapplicable. *Joseph v. Frank (In re Troll Commc'ns), 385 B.R. 110, 118 (Bankr. D. Del. 2008)* (quoting *In re Tower Air, 416 F.3d at 238*). Otherwise, it is inappropriate to consider the [*390] affirmative defense in the context of the *Rule 12(b)(6)* motion. *Official Comm. of the Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP, 322 F.3d 147, 158 (2d Cir. 2003)*. *See also Deckard v. General Motors Corp., 307 F.3d 556, 560 (7th Cir. 2002)* (concluding that granting a motion to dismiss based on an affirmative defense is improper because "the existence of a defense does not undercut the adequacy of the claim") (citation omitted). The Trust does not invoke or otherwise rely on the business judgment rule in support of the allegations in the Amended Complaint. *Cf. In re Tower Air, 416 F.3d at 238* ("Stanziale's Amended Complaint declares that the business judgment rule does not vitiate any of his claims. He thus must plead that he overcomes the presumption created by that rule[.]"); *In re W.J. Bradley Mortgage Capital, LLC, 598 B.R. 150, 165 (Bankr. D. Del. 2019)* (finding that the Trustee raised the business judgment rule in the Complaint by alleging "Defendants are not entitled to the protection of the 'business judgment rule' because the facts, as pleaded, demonstrate that they were not disinterested, and that they breached their duties of loyalty, care and good faith, and engaged in willful misconduct."). Accordingly, in resolving the Motions, the Court will not evaluate the Lightstone Defendants' business judgment defense. *See Stanziale v. Versa Capital Mgmt., LLC (In re Simplexity, LLC), No. 14-10569(KG), 2017 Bankr. LEXIS 37, 2017 WL 65069, at *8 (Bankr. D. Del. Jan. 5, 2017)* ("Here, there is no question that the Trustee did not raise the business judgment rule in his Complaint, and thereby did not give the [*391] Defendants any opening to raise the affirmative defense in the Motions. The Court will not judge the Complaint on the basis of the business judgment rule and, therefore, will not dismiss the Complaint on the Defendants' arguments that they exercised their business judgment."); *Ad Hoc Comm. of Equity Holders of Tectonic Network, Inc. v. Wolford, 554 F. Supp. 2d 538, 557 (D. Del. 2008)* (refusing to dismiss breach of fiduciary duties claim where defendants "do not, and can not [sic] contend that the business judgment rule appears on the face of the Complaint.").

**Whether the Trust Has Alleged Facts to Support Its Claim That The Lightstone Individuals Breached Their Duty Of Care**

HN114[ ] The duty of care is "the duty to act on an informed basis." *Burtch v. Huston (In re USDigital, Inc.), 443 B.R. 22, 41 (Bankr. D. Del. 2011)* (citing *Cede & Co. v. Technicolor, Inc., 634 A.2d at 361*). "[A] corporate director is only considered to have breached his duty of care in instances of gross negligence." *Cargill, Inc. v. JWH Special Circumstance LLC, 959 A.2d 1096, 1113 (Del. Ch. 2008)* (citing *Cinerama, Inc. v. Technicolor, Inc., 663 A.2d 1134, 1148 (Del. Ch. 1994))*. *See also Official Comm. of Unsecured Creditors v. Bay Harbour Master Ltd. (In re BH S & B Holdings LLC), 420 B.R. 112, 146 (Bankr. S.D.N.Y. 2009)* ("Delaware courts have found that the standard in Delaware for breach of the duty of care is 'gross negligence[.]'"), *aff'd as modified*, *807 F. Supp.2d 199 (S.D.N.Y. 2011)*. In this context, courts define "gross negligence" as a "'reckless indifference to or a deliberate disregard of the whole body of stockholders' or actions which are 'without the bounds of reason.'" *Tomczak v. Morton Thiokol, Inc., CIV. A. No. 7861, 1990 Del. Ch. LEXIS 47, 1990 WL 42607, at *12 (Del. Ch. Apr. 5, 1990)* (first quoting *Allaun v. Consol. Oil Co., 16 Del. Ch. 318, 147 A. 257, 261 (Del. Ch. 1929)*; then quoting *Gimbel v. Signal Cos., Inc., 316 A.2d 599, 615 (Del. Ch.)*, *aff'd*, *316 A.2d 619 (Del. 1974))*. *See also Solash v. Telex Corp., 1988 Del. Ch. LEXIS 7, 1988 WL 3587, at *9 (Del. Ch. Jan. 19, 1988)* (explaining that to be grossly negligent, [*392] a "decision has to be so grossly off-the-mark as to amount to 'reckless indifference' or a 'gross abuse of discretion.'") (citations omitted).

HN115[ ] In assessing the merits of actions taken by a board and reviewing whether the board members breached their duty of care, courts focus on the process undertaken by the directors in reaching their decision, not on the merits of the decision that they reached. As noted by the court in *In re Caremark Int'l Inc. Derivative Litig.*:

[C]ompliance with a director's duty of care can never appropriately be judicially determined by reference to *the content of the board decision* that leads to a corporate loss, apart from consideration of the good faith *or* rationality of the process employed. HN116[ ] That is, whether a judge or jury considering the matter after the fact, believes a decision substantively wrong, or degrees of wrong extending through "stupid" to "egregious" or "irrational", provides no ground for director liability,

so long as the court determines that the process employed was either rational or employed in *a good faith* effort to advance corporate interests.

*698 A.2d at 967*. *See also Brehm v. Eisner, 746 A.2d 244, 264 (Del. 2000)* (noting that in applying the duty of care, "[c]ourts do not measure, weigh or quantify [*393] directors' judgments. We do not even decide if they are reasonable in this context. Due care in the decision-making context is *process* due care only.") (internal citation omitted).

The Lightstone Defendants contend that the Trust has failed to state a claim for breach of the duty of care against the Lightstone Individuals because it has not pled facts to support the charge that they were grossly negligent in adopting the process they used to facilitate the Transfers. *See* Lightstone MTD at 73-74. They say that is so because in asserting that they breached an alleged duty of care by causing or allowing the distribution of the LIBOR Floor Certificates, substantial equity distributions and improper distributions, the Trust focuses solely on the ultimate business result of their decisions, instead of the decision process that led to those results. *See id.* at 73. They also argue that in "retrospectively" assailing each business decision allegedly made by the Lightstone Defendants as the catalyst for the Debtors' eventual aggregate insolvency, they have failed to plead that there was gross negligence or a lack of good faith in making those decisions. Further, they assert that not only does the Amended Complaint fail to suggest [*394] that the decision process underlying the challenged distributions was "without the bounds of reason," but that it alleges the opposite. *See id.* at 74. They say that the Amended Complaint alleges, in substance, that the Company Board met regularly to discuss material developments and how to proceed in light of them (*see id.* (citing Amd. Compl. ¶¶ 131-32, 158, 190, 169-70)), and that the board solicited and acted upon the advice of its professional advisors. *See id.* They contend that the Amended Complaint provides no actual factual allegations to support a gross negligence theory. *Id.*

In support of their argument, the Lightstone Defendants rely on *Gagliardi v. TriFoods Int'l, Inc., 683 A.2d 1049 (Del. Ch. 1996)* ("*Gagliardi*"). In *Gagliardi*, a shareholder, and former chairman of TriFoods International, Inc. ("TriFoods"), brought an action against certain directors and large shareholders. In his complaint, Gagliardi contended that the defendants were liable to him individually, and to TriFoods, for corporate loss occasioned by their alleged

mismanagement of TriFood's business. *Id. at 1050*. The defendants moved pursuant to *Rule 12(b)(6)* to dismiss the individual claims. **HN117**[↑] In reviewing the adequacy of the plaintiff's allegations in stating a claim for negligent mismanagement, the court [*395] noted that "an elementary precept of corporation law" is that "in the absence of facts showing self-dealing or improper motive, a corporate officer or director is not legally responsible to the corporation for losses that may be suffered as a result of a decision that an officer made or that directors authorized in good faith." *Id. at 1051*. The court concluded that the allegations concerning the alleged mismanagement of TriFoods described ordinary business decisions characterized in a pejorative manner, but did not demonstrate any self-interest or conflict by the defendants. Specifically, the court noted that the:

• Allegations that defendants acquiesced in a "reckless" commission structure in order to build volume did not state a claim because it alleged no conflicting interest or improper motivation, but only a business decision with a pejorative characterization.

• Allegations of "duplication" of existing product research and product facility, and therefore a further waste of corporate assets simply stated a matter that falls within ordinary business judgment.

• Allegations that defendants "recklessly" caused TriFoods to purchase "Steakumms" on terms that seemed "unwise" to plaintiff also failed [*396] to state any legal claim and did not allege any self-interest or improper motive.

• Allegations that corporate losses resulting from harm to customer relations by delivery of inferior products, and harm to supplier relations by "poor payment practices," stated nothing that constitutes a legal claim.

*Id. at 1053*. The Lightstone Defendants contend that *Gagliardi* is on point because the Trust's use of pejorative terms to characterize the Defendants' actions amounts to "the same type of conclusory allegations" rejected by the court in *Gagliardi*. Lightstone MTD at 75.

The Trust does not dispute that under Delaware law, the duty of care applies to the process employed by a board of directors and not just the results of the board's decision. *See* Opp'n at 96. However, it denies that the "process" used by Defendants was undertaken in good faith and to advance corporate interests. It contends that the directors paying themselves dividends and other distributions from an insolvent corporation and in violation of state law and loan covenants, in disregard of the advice of counsel and other professional advisors, and ahead of needed operating expenses was blatant self-dealing, and that the process that the Lightstone Individuals employed [*397] in depleting critical funds was grossly negligent, was not undertaken in good faith, and did not advance corporate interests. *See id.* In that regard, the allegations in the Amended Complaint as to the Lightstone Individuals' purported misconduct differ qualitatively from the allegations at issue in *Gagliardi*. The Amended Complaint alleges that the Lightstone Defendants:

(i) Allowed tens of millions in dividends and distributions to be paid out to insider Lightstone and Arbor Defendants for the benefit of their own coffers,

(a) despite their knowledge of the Debtors' financial distress in failing to meet budgets, pay operational expenses, repay their debts (such as the 9.15% Note), and experience with reduced occupancy rates (*see, e.g.,* Amd. Compl. ¶¶ 133-35, 150-53, 160-69),

(b) while the Debtors were insolvent and in violation of state law (*see id.* ¶¶ 1, 140, 144-47, 151, 162, 166, 188, 200, 203-08, 211-14, 220-22, 226-28, 237-38), and

(c) even after they were warned by corporate and bankruptcy counsel that the dividend payments could be illegal, and even though the payments were prohibited by governing loan covenants (*see id.* ¶¶ 124, 132, 175, 212, 251, 253).

(ii) Took the LIBOR Floor [*398] Certificates from the Debtors for no consideration, generating payments of $74.3 million to the Lightstone and Arbor insiders that should have belonged to the Debtors (*see id.* ¶¶ 138-39, 164, 168, 174, 187, 200, 235-36, 238, 265); and

(iii) Allowed Lichtenstein or a Lichtenstein affiliated entity to receive unwarranted $1 million annual management fees (*see id.* ¶¶ 188-89).

These allegations are clearly more substantial than the allegations found to be inadequate in *Gagliardi*. They contain facts that support the Trust's theory that in facilitating the Transfers, the Lightstone Individuals acted with gross negligence, at best, and were engaged in self-dealing. *See, e.g., Forman v. Kelly Capital, LLC (In re Nat'l Serv. Indus.), No. 12-12057, 2015 Bankr.*

LEXIS 2029, 2015 WL 3827003, at *6 (Bankr. D. Del. 2015) (finding that trustee's claims for breach of fiduciary duties sufficiently pled where trustee alleged that defendants "engaged in self-interested transactions, namely directing the Debtor to transfer funds to them and their related entities for no legitimate business reason and with no expectation that they would be repaid."). In challenging the Transfers, the Trust has put into issue, among other things, the process that the Company Board adopted in authorizing and facilitating the Transfers. The Court finds that, assuming **[*399]** the truth of the allegations in the Amended Complaint, the Trust's pleadings give rise to the plausible inference that the Lightstone Individuals breached their fiduciary duty of care to the Debtors. See In re Tower Air, 416 F.3d at 240 (reversing dismissal of count 3, finding that directors had employed an irrational decision-making process in approving multi-million dollar leases of jet engines.); CTC Litig. Tr. v. Fabbricatore (In re CTC Commc'ns Grp., Inc.), No. 02-12873 (PJW), 2007 Bankr. LEXIS 956, 2007 WL 760389, at *4 (Bankr. D. Mass. March 13, 2007) (denying dismissal of complaint, finding that Trust had alleged facts necessary to overcome the business judgment rule by charging that the directors "failed to establish an information and reporting system reasonably designed to provide . . . the board with information regarding the corporation's legal compliance and business performance, resulting in liability.") Accordingly, the Court denies the Lightstone Defendants motion to dismiss the Trust's claims based on their alleged breaches of their duty of care.

Whether the Exculpatory Provision in ESI's Certificate Of Incorporation Bars the Trust's Breach of the Duty of Care Claims

HN118[↑] Section 102(a) of the Delaware General Corporate Law ("DGCL") identifies matters that must be set forth in a certificate of incorporation. Section 102(b)(7) of the DGCL provides that a certificate of incorporation may include: **[*400]**

A provision eliminating or limiting the personal liability of a director to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, provided that such provision shall not eliminate or limit the liability of a director: (i) for any breach of the director's duty of loyalty to the corporation or its stockholders; (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law; (iii) under § 174 of this title; or (iv) for any transaction from which the director derived an

improper personal benefit.

8 Del. C. § 102(b)(7). See also Prod. Res. Grp., L.L.C. v. NCT Grp., Inc., 863 A.2d 772, 793 (Del. Ch. 2004) ("Section 102(b)(7) authorizes corporate charter provisions that insulate directors from personal liability to the corporation for breaches of the duty of care.") ESI's Certificate of Incorporation states, as follows:

A director of this Corporation shall not be liable to the Corporation or the Stockholders for monetary damages for breach of fiduciary duty as a director, except to the extent such exemption from liability or limitation thereof is not permitted under the [Delaware General Corporation Law] as the same exists or may hereby be amended.

Certificate of Incorporation, Art. VIII.[115]

In the complaint, the Trust **[*401]** alleges that ESI's certificate of incorporation:

[E]stablishes that, pursuant to § 102(b)(7) of the Delaware General Corporation Law ("DGCL"), its directors may be liable in damages (i) for any breach of the director's duty of loyalty to the corporation or its stockholders; (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law; (iii) under § 174 of the DGCL (providing liability for the unlawful payment of dividends); or (iv) for any transaction from which the director derived an improper personal benefit. ESI's officers have no exculpated fiduciary duties under the certificate of incorporation and thus may be liable to the full extent permitted under the DGCL and the common law.

Amd. Compl. ¶ 21. HN119[↑] Courts characterize a § 102(b)(7) charter provision as in the nature of an affirmative defense. See Ad Hoc Comm. of Equity Holders of Tectonic Network, Inc. v. Wolford, 554 F. Supp. 2d 538, 561 (D. Del. 2008); Miller v. McCown De Leeuw & Co., Inc. (In re The Brown Schools), 368 B.R. 394, 401 (Bankr. D. Del. 2007). As the Trust has alleged § 102(b)(7) in support of its complaint, the Court will consider whether application of that section supports the Lightstone Defendants' request for relief under Rule 12(b)(6).

HN120[↑] Exculpatory clauses in certificates of incorporation are enforceable against a bankruptcy

---

[115] A copy of the Certificate of Incorporation is annexed as Exhibit S to the Kurland Declaration.

estate representative asserting a debtor's claims on behalf of creditors. *See Nymex S'holder Litig. v. N.Y. Mercantile Exch., Inc., C.A. Nos. 3621-VCN, 3835-VCN, 2009 Del. Ch. LEXIS 176, 2009 WL 3206051, at \*6 (Del. Ch. Sept. 30, 2009)* **[\*402]** (granting motion to dismiss breach of the duty of care claims where the corporation's certificate of incorporation contained an exculpatory clause authorized by *8 Del. C. § 102(b)(7)*); *Pereira v. Farace, 413 F.3d 330, 341-42 (2d Cir. 2005)* (holding that "the exculpatory clause in Trace's Certificate of Incorporation precludes the Trustee from bringing any due care claims seeking monetary awards against the directors, whether brought on behalf of the creditors or Trace itself"). *See also In re Verestar, Inc., 343 B.R. at 473* (dismissing "allegations of the [c]omplaint that charge the directors with breach of the duty of care" based on exculpatory provision in the charter of the corporation authorized by *8 Del. C. § 102(b)(7)*).

The Arbor and Lightstone Defendants argue that the exculpatory clause in the Certificate of Incorporation provides a separate and independent basis to dismiss Count 5 of the Amended Complaint against Defendants who were directors or officers of ESI, including the Arbor and Lightstone Individuals. *See* Arbor MTD at 66-67; Lightstone MTD at 76-77. In substance, they argue that the exculpatory clause bars the Trust from asserting claims for a breach of the duty of care and Count 5 fails to state claims for breaches of the duty of loyalty, acts or omissions not in good faith **[\*403]** and transaction from which a director derived an improper benefit. *See* Lightstone Reply at 56. The Trust contends that application of *§ 102(b)(7)* does not bar its breach of fiduciary duties claims the Debtors' officers and directors because *§ 102(b)(7)* does not apply to officers, and because the Amended Complaint has numerous elements of improper, bad faith conduct by the directors that are more than sufficient to overcome the Debtors' alleged exculpation provisions. *See* Opp'n at 96-98.

There is merit to the Trust's first point. The exculpation clause speaks only to "a director of this Corporation;" it does not purport to cover corporate officers. *See* ESI Certificate of Incorporation, Art. VII. The exculpatory clause is no bar to the Trust's claims against the Debtors' officers.[116] **HN121**[⬆] In considering the

Trust's second point, the Court notes that "[s]ince its enactment, Delaware courts have consistently held that the adoption of a charter provision, in accordance with *Section 102(b)(7)*, bars the recovery of monetary damages from directors for a successful shareholder claim that is based exclusively on establishing a violation of the duty of care." *Emerald Partners v. Berlin, 787 A.2d 85, 91 (Del. 2001)*. *See also In re Walt Disney Co. Derivative Litig., 906 A.2d at 65* (*Section 102(b)(7)* "authorizes Delaware corporations, by a provision in the certificate **[\*404]** of incorporation, to exculpate their directors from monetary damage liability for a breach of the duty of care.") (citation omitted). Nonetheless, it is well settled that under *§ 102(b)(7)*, an exculpation clause "can exculpate directors from monetary liability for a breach of the duty of care, but not for conduct that is not in good faith or a breach of the duty of loyalty." *Stone ex rel. AmSouth Bancorporation v. Ritter, 911 A.2d 362, 367 (Del. 2006)* (citation omitted). *See also Pereira v. Farace, 413 F.3d at 341-42* (holding that under Delaware law, an exculpatory clause allowed bankruptcy trustee to sue directors for "improper dividends or redemptions" or "breaches of the duties of good faith or loyalty"); *In re RSL COM PRIMECALL, Inc., 2003 Bankr. LEXIS 1635, 2003 WL 22989669, at \*12* ("RSL USA's exculpation clause . . . does not eliminate claims based on breach of loyalty and does

_____

exculpation for officers." (citing *8 Del. C. § 102(b)(7)*)); *Gantler v. Stephens, 965 A.2d 695, 709 n.37 (Del. 2009)* ("Under *8 Del. C. § 102(b)(7)*, a corporation may adopt a provision in its certificate of incorporation exculpating its directors from monetary liability for an adjudicated breach of their duty of care. Although legislatively possible, there currently is no statutory provision authorizing comparable exculpation of corporate officers."); *McPadden v. Sidhu, 964 A.2d 1262, 1273 (Del. Ch. 2008)* ("Dubreville, though he, as an officer, owes the same duties to the Company as the Director Defendants, does not benefit from the same protections as the Director Defendants because the *section 102(b)(7)* provision operates to exculpate only directors, not officers."). *See also Arnold v. Soc'y for Sav. Bancorp, Inc., 650 A.2d 1270, 1288 (Del. 1994)* (suggesting that while directors may be protected under *section 102(b)(7)*, officers are not, by citing to R. Franklin Balotti & Jesse A. Finkelstein, *Delaware Law of Corp. & Business Org.* § 4.19, at 4-335 (Supp. 1992) (noting where a defendant is a director and officer, only those actions taken solely in the defendant's capacity as an officer are outside the purview of *Section 102(b)(7)*)). *But see Continuing Creditors' Comm. of Star Telecomms., Inc. v. Edgecomb, 385 F. Supp. 2d 449, 464 (D. Del. 2004)* (finding plaintiff's claim for breach of the fiduciary duty of care "fails as a matter of law because the exculpation clause protects the Edgecomb Directors and Officers against any claim for a breach of the duty of care") (citation omitted).

_____

[116] **HN122**[⬆] In any event, Delaware courts are virtually unanimous in holding that *§ 102(b)(7)* does not apply to officers. *See, e.g., Chen v. Howard-Anderson, 87 A.3d 648, 686 (Del. Ch. 2014)* ("*Section 102(b)(7)* does not authorize

not bar '[a]cts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law. . . .'"). Thus, a complaint is subject to dismissal under § 102(b)(7) if the only claim it asserts is for breach of the duty of care. *See* Emerald Partners v. Berlin, 787 A.2d at 92 (If a complaint "unambiguously asserts *only* a due care claim, the complaint is dismissible once the corporation's Section 102(b)(7) provision is properly invoked.") (footnote omitted).

HN123[ ] The duty of loyalty "mandates **[*405]** that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally." Cede & Co. v. Technicolor, Inc., 634 A.2d at 361. *See also* In re USDigital, Inc., 443 B.R. at 42 (same). "The essence of a duty of loyalty claim is the assertion that a corporate officer or director has misused power over corporate property or processes in order to benefit himself rather than advance corporate purposes." Steiner v. Meyerson, Civ. A. No. 1339, 1995 Del. Ch. LEXIS 95, 1995 WL 441999, at *2 (Del. Ch. July 19, 1995). Accordingly, "[t]o state a legally sufficient claim for breach of the duty of loyalty, plaintiffs must allege facts showing that a self-interested transaction occurred, and that the transaction was unfair to the plaintiffs." Joyce v. Cuccia, No. CIV.A. 14953, 1997 Del. Ch. LEXIS 71, 1997 WL 257448, at *5 (Del. Ch. May 14, 1997) (citation omitted). "Where a plaintiff alleges an otherwise sufficient breach of duty of loyalty, there is no obligation to plead resulting injury as an element of the claim." Id. (citation omitted). *See also* In re Coca-Cola Enters., Inc. S'holders Litig., C.A. No. 1927-CC, 2007 Del. Ch. LEXIS 147, 2007 WL 3122370, at *4 (Del. Ch. Oct. 17, 2007) ("To establish a breach of the fiduciary duty of loyalty, plaintiffs must show that the defendants either (1) 'stood on both sides of the transaction and dictated its terms in a self-dealing way,' or (2) 'received in the transaction a personal benefit that was not enjoyed by the shareholders generally.'" (quoting Chaffin v. GNI Grp., Inc., CA No. 16211-NC, 1999 Del. Ch. LEXIS 182, 1999 WL 721569, at * 5 (Del. Ch. Sept. 3, 1999))); Bridgeport Holdings Inc. Liquidating Tr. v. Boyer (In re Bridgeport Holdings, Inc.), 388 B.R. 548, 563 (Bankr. D. Del. 2008) ("To **[*406]** allege a breach of the duty of loyalty based on actions or omissions of the Board, the Plaintiff must 'plead facts demonstrating that a *majority* of a board that approved the transaction in dispute was interested and/or lacked independence.'" (quoting Continuing Creditors' Comm. of Star Telecomms. Inc. v. Edgecomb, 385 F. Supp. 2d 449, 460 (D. Del. 2004))). "The failure to act in good faith may result in liability because the requirement to

act in good faith 'is a subsidiary element[,]' i.e., a condition, 'of the fundamental duty of loyalty.'" Stone ex rel. AmSouth Bancorporation v. Ritter, 911 A.2d at 370-71 (quoting Guttman v. Huang, 823 A.2d 492, 506 (Del. Ch. 2003)). Accordingly, HN124[ ] "although good faith may be described colloquially as part of a 'triad' of fiduciary duties that includes the duties of care and loyalty, the obligation to act in good faith does not establish an independent fiduciary duty that stands on the same footing as the duties of care and loyalty." Id. at 370 (footnote omitted). "In other words, 'acts taken in bad faith breach the duty of loyalty.'" In re Bridgeport Holdings, Inc., 388 B.R. at 564 (quoting Ryan v. Gifford, 918 A.2d 341, 357 (Del. Ch. 2007)). The behavior that must be shown to prove a violation of the duty to act in good faith "requires conduct that is qualitatively different from, and more culpable than, the conduct giving rise to a violation of the fiduciary duty of care (i.e., gross negligence)." Stone v. Ritter, 911 A.2d at 369. The Delaware Supreme Court has identified three examples of conduct that **[*407]** may establish a failure to act in good faith:

> First, it has held that such a failure may be shown where a director intentionally acts with a purpose other than that of advancing the best interests of the corporation. Second, it has held that a failure may be proven where a director "acts with the intent to violate applicable positive law." Third, it has held that a failure may be shown where the director intentionally fails to act in the fact of a known duty to act, demonstrating a conscious disregard for his duties. . . . [T]here "may be other examples of bad faith yet to be proven or alleged, but these three are the most salient."

In re Sols. Liquidation LLC, 608 B.R. at 401 (quoting In re Walt Disney Co. Derivative Litig., 906 A.2d at 67).

The Lightstone Defendants deny that the Trust has properly pled claims against any director for self-dealing (or breaches of the duty of loyalty), bad faith, or personal benefits. *See* Lightstone Reply at 56-57. As such, they say that the exculpatory clause in the Certificate of Incorporation provides grounds for dismissing Count 5. First, they contend that the Trust has not properly alleged a claim for self-dealing against any director with respect to any transaction because it did not allege which individual authorized which action for which **[*408]** entity. Moreover, they contend the Trust has failed to allege which directors received what improper personal benefits, other than to make the implausible allegation that all Defendants diverted all of the challenged transfer to the mutual control and benefit

of all of them. *See, e.g.*, Amd. Compl. ¶ 4 ("insider Defendants diverted valuable assets . . . to their control and benefit"); *id.* ¶ 265(a) ("Causing or allowing the Debtors to improperly pay substantial illegal dividends or other improper distributions of value from Debtors to the applicable Defendants and, upon information and belief, in some cases, to himself.").

The Court finds no merit in those assertions. In the Amended Complaint, the Trust alleges that Lichtenstein was an ESI director and that he derived a personal benefit from the Transfers because he was paid no less than $3 million in Management Fees that he did not earn. *See id.* ¶¶ 35-37, 188, 213, 257, 265, 305, 321, 374. Moreover, for the reasons previously discussed, at this stage of the litigation, the Court sanctions group pleading. The Trust alleges that the Arbor and Lightstone Individuals breached their duties of loyalty to the Debtors based on acts that were **[*409]** not taken in good faith, and which involve intentional misconduct or a knowing violation of law. The Amended Complaint alleges that those individuals acted in bad faith, with great disloyalty to the Debtors, and without due care for the Debtors' solvency or lack thereof, by allowing tens of millions of dividends and distributions to be paid out to the Lightstone and Arbor Defendants while the Debtors were insolvent, in violation of state law. *See, e.g., id.* ¶¶ 4, 140-41, 143-47, 151, 162-63, 166-67, 172-73, 182, 211. The Trust alleges that the Arbor and Lightstone Individuals allowed this to occur even after they were warned by corporate and bankruptcy counsel that the payments could be illegal. *See id.* ¶¶ 175, 182. Moreover, it asserts that they allowed payments to occur even though they were prohibited by governing loan covenants. *See id.* ¶¶ 124, 130, 142-48, 151.

These allegations in the Amended Complaint are examples of the Lightstone Individuals' alleged improper, bad faith conduct that are more than enough to overcome the Debtors' alleged exculpation provisions. *See, e.g., Emerald Partners v. Berlin, 787 A.2d at 92* (stating "in actions against the directors of Delaware corporations with a *Section 102(b)(7)* charter [exculpatory] provision, **[*410]** a shareholder's complaint must allege well-pled facts that, if true, implicate breaches of loyalty or good faith"); *In re RSL COM PRIMECALL, Inc., 2003 Bankr. LEXIS 1635, 2003 WL 22989669, at *12* ("Plaintiffs have challenged the Defendants' good faith and this is enough, at this stage, to overcome the exculpation clause.") (citation omitted). The Court finds that the Trust has sufficiently alleged claims against the Lightstone Individuals predicated on their alleged breaches good faith and the duty of loyalty.

"Because the duty of loyalty is implicated in this case, the *§ 102(b)(7)* provision cannot operate to negate plaintiffs' duty of care claim on a motion to dismiss." *Alidina v. Internet.com Corp., No. 17235, 2002 Del. Ch. LEXIS 156, 2002 WL 31584292, at *6 (Del. Ch. Nov. 6, 2002).*

Whether The Amended Complaint Alleges A Breach Of Implied Contractual Duties Of Care, Loyalty And Good Faith

*HN125*[⬆] Under Delaware law, to state breach of contract claim, a plaintiff must allege: (i) a contractual obligation, (ii) a breach of that obligation, and (iii) resulting damage to the plaintiff. *See H-M Wexford LLC v. Encorp, Inc., 832 A.2d 129, 140 (Del. Ch. 2003)* (citing *Moore Bus. Forms, Inc. v. Cordant Holdings Corp., Civ. A. No. 13911, 1995 Del. Ch. LEXIS 134, 1995 WL 662685, at *7 (Del. Ch. Nov. 2, 1995)*). The Lightstone and Arbor Defendants contend that Count 5 does not state a claim for breach of contractual duties of care, loyalty and good faith owed to the Debtor because the Trust has not identified a contract that the Defendants are parties to, and under which they have purportedly breached such **[*411]** contractual duties. *See* Arbor MTD at 64 ("Absent allegation of the existence of a contract supposedly breached by the Moving Entities, the Trustee fails to state a claim."); Lightstone MTD at 68 ("No contract or contractual duties are identified, so there is no claim stated for breach of contractual duties.").

*HN126*[⬆] Under Delaware law, the scope of the fiduciary duties owed by members or managers of an LLC is "primarily . . . governed by the [LLC] agreement." *See In re PennySaver USA Publ'g, LLC, 587 B.R. at 464*. "'[I]n the absence of a contrary provision in the LLC agreement,' LLC managers and members owe 'traditional fiduciary duties of loyalty and care' to each other and to the company." *Kelly v. Blum, No. 4516-VCP, 2010 Del. Ch. LEXIS 31, 2010 WL 629850, at *10 (Del. Ch. Feb. 24, 2010)* (quoting *Bay Ctr. Apartments Owner, LLC v. Emery Bay PKI, LLC, 2009 Del. Ch. LEXIS 54, 2009 WL 1124451, at *8 n.33*). *See also In re PennySaver USA Publ'g, LLC, 587 B.R. at 464* (noting that the default rule in Delaware is that "the manager or director of the LLC owes fiduciary duties to fellow LLC members and the LLC."). Under *§ 18-1101(c)(1)* of the Delaware Limited Liability Company Act, parties to an LLC agreement can expand, restrict or eliminate altogether common law fiduciary duties of members and managers of the LLC. That means that members of an LLC can contractually eliminate both the duty of care

and the duty of loyalty. *See, e.g., Liquidation Trust of Solutions Liquidation LLC v. Stienes (In re Solutions Liquidation LLC)*, 608 B.R. 384, 407 (Bankr. D. Del. 2019) (noting that, consistent with *§ 18-1101(c)*, the LLC agreement in question provided for modification **[\*412]** of duty of care and eliminated fiduciary duties of loyalty and good faith). The statute is clear, however, that they cannot eliminate the implied contractual covenant of good faith and fair dealing from the agreement. *Section 18-1101(c)(1)* states:

> To the extent that, at law or in equity, a member or manager or other person has duties (including fiduciary duties) to a limited liability company or to another member or manager or to another person that is a party to or is otherwise bound by a limited liability company agreement, the member's or manager's or other person's duties may be expanded or restricted or eliminated by provisions in the limited liability company agreement; provided, that the limited liability company agreement may not eliminate the implied contractual covenant of good faith and fair dealing.

*Del. Code Ann. tit. 6, § 18-1101(c)(1)* (2013). **HN127**[↑] Thus, as a matter of Delaware law, there is an implied contractual duty of good faith and fair dealing imposed on management in every Delaware LLC, and the parties to an LLC agreement cannot waive it. *See Kahn v. Portnoy, No. 3515-CC, 2008 Del. Ch. LEXIS 184, 2008 WL 5197164, at \*3 (Del. Ch. Dec. 11, 2008)* ("LLC agreements are contracts that are enforced according to their terms, and all fiduciary duties, except for the implied contractual covenant of good faith and fair dealing, can be waived **[\*413]** in an LLC agreement.") (citation omitted); *Kelly v. Blum, 2010 Del. Ch. LEXIS 31, 2010 WL 629850, at \*13* ("Under the LLC Act, the contracting parties to an LLC agreement may not waive the implied covenant of good faith and fair dealing.") (citation omitted). *See also Elf Atochem N. Am., Inc. v. Jaffari, 727 A.2d 286, 290 (Del. 1999)* ("The [LLC] Act can be characterized as a 'flexible statute' because it generally permits members to engage in private ordering with substantial freedom of contract to govern their relationship, provided they do not contravene any mandatory provisions of the Act.") (citation omitted). For that reason, the Trust contends that "an implied *contractual* duty of good faith and fair dealing exists as a matter of statute and is imposed on management in every corporation and Delaware LLC . . . . Management therefore may be liable for breaching it." Opp'n at 88 (citations omitted).

**HN128**[↑] "Stated in its most general terms, the implied covenant requires 'a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits' of the bargain." *Dunlap v. State Farm Fire and Cas. Co., 878 A.2d 434, 442 (Del. 2005)* (quoting *Wilgus v. Salt Pond Inv. Co., 498 A.2d 151, 159 (Del. Ch. 1985))*. Thus, the implied covenant does not "constitut[e] a free floating duty imposed on a contracting party," instead it "can only be used conservatively **[\*414]** 'to ensure the parties' 'reasonable expectations' are fulfilled." *Kuroda v. SPJS Holdings, L.L.C., 971 A.2d 872, 888 (Del. Ch. 2009)* (quoting *Dunlap, 878 A.2d at 442*). To state a claim of breach of the implied covenant of good faith and fair dealing, a party must allege: (1) a specific implied contractual obligation, (2) a breach of that obligation by the defendant, and (3) damages resulting to the plaintiff. *Kelly v. Blum, 2010 Del. Ch. LEXIS 31, 2010 WL 629850, at \*13* (citation omitted). *See also Blaustein v. Lord Balt. Capital Corp., No. 6685-VCN, 2012 Del. Ch. LEXIS 126, 2012 WL 2126111, at \*5 (Del. Ch. May 31, 2012)* (same).

Lichtenstein and Teichman served as the Chief Executive Officer/President/Chairman and Secretary/General Counsel, respectively, of BHAC and DL-DW. *See* BHAC LLC Agmt. § 4.03(c); DL-DW LLC Agmt. § 4.03(c). The Lightstone and Arbor Individuals served as directors of BHAC and DL-DW. Without limitation, the Trust asserts that the Arbor and Lightstone Individuals enabled the Debtors to pay illegal dividends and make distributions of value to the Defendants at a time when the Debtors were insolvent. The Trust also alleges that the Debtors, their estates and creditors were injured by reason of those distributions. The Court finds that the Trust has alleged facts that, if taken as true, would state a claim that the Arbor and Lightstone Individuals breached their implied contractual obligations of good faith and fair dealing to BHAC and DL-DW. *Airborne Health, Inc. v. Squid Soap, LP, 984 A.2d 126, 146-47 (Del. Ch. 2009)* ("There is **[\*415]** support in our law for this argument. When a contract confers discretion on one party, the implied covenant requires that the discretion be used reasonably and in good faith."); *Hub City P.B.E., Inc. v. E.I. DuPont De Nemours and Co.*, No. 12-60765-CIVWILLIAMS, 2012 WL 13005971, at\*2 (S.D. Fla. Nov. 20, 2012) (denying motion to dismiss claim for breach of implied covenant of good faith and fair dealing for purported breaches of incentive program by arbitrarily removing funds from plaintiffs' "empowerment account," and finding that " [w]hether the improper withdrawals actually occurred, whether they would be subsumed

under the Agreement and whether Defendant exercised its contractual discretion in good faith are factual inquiries more appropriate for summary judgment"); *Charlotte Broad., LLC v. Davis Broad. of Atlanta, L.L.C.*, No. 13C-04-143-WCC CCLD, 2015 Del. Super. LEXIS 303, 2015 WL 3863245, at *7-8 (Del. Super. Ct. June 10, 2015) (denying summary judgment on defendant's counterclaim for breach of implied covenant of good faith and fair dealing, finding that "even though Plaintiffs had the right to terminate the Agreement, Plaintiffs still had an overarching obligation to comply with the implied covenant to terminate in good faith" and "the issues of whether Plaintiffs breached the implied covenant, . . . remain[ed] questions of fact [*416] for trial."). The Court denies the Defendants' request to dismiss the Trust's claim in Count 5 for breach of an implied contractual duty of good faith and fair dealing and finds that it states claims for relief as against the Lightstone and Arbor Individuals.

To summarize, based on the foregoing, the Court denies the Motions to dismiss Count 5 of the Amended Complaint, except that it dismisses the claims in Count 5 predicated on the following parties alleged breaches of their fiduciary duties of care, loyalty and good faith to the Debtors and the Debtors' creditors:

Arbor Entities

Arbor ESH

Arbor Commercial

Princeton ESH

Atmar Associates

Glida One

Ron Invest

ABT-ESI

Mericash Funding

Lightstone Entities

Park Avenue

Lightstone Commercial

Polar Extended Stay

PGRT ESH

Whether the Trust Can Recover Punitive Damages for Breach of Fiduciary Duties

In Counts 5 and 7, the Trust seeks to recover punitive damages against the Defendants predicated on their alleged breaches of their fiduciary duties claims. *See* Amd. Compl. ¶¶ 272, 285. The Arbor and Lightstone Defendants assert that the Trust cannot recover punitive damages to redress breaches of fiduciary duties because under Delaware law, claims for breach of [*417] fiduciary duty are within the jurisdiction of the Chancery Court, *see Del. Code Ann. tit. 10 § 341* (2011), and punitive damages are not available in that court. *See* Arbor MTD at 67; Lightstone MTD at 77-78.[117]

HN130[⬆] It is settled that because the Delaware Chancery Court sits only in equity, it cannot award punitive damages for breaches of fiduciary duty. *See Adams v. Calvarese Farms Maint. Corp., No. 4262, 2010 Del. Ch. LEXIS 199, at *82 n.204 (Del. Ch. Sept. 17, 2010)* ("The Legislature has not authorized punitive damages for a director's breach of fiduciary duty; thus, [plaintiff's] claim for such relief must be denied."); *Gesoff v. IIC Indus., Inc., 902 A.2d 1130, 1154 (Del. Ch. 2006)* ("Obviously, the court cannot award punitive damages" for a breach of the duty of loyalty.); *Albert v. Alex. Brown Mgmt. Servs., No. 04C-05-250, 2004 Del. Super. LEXIS 303, at *21 (Del. Super. Ct. Sept. 15, 2004)* (noting that claims "involving breach of fiduciary duty[] are heard exclusively in Chancery without possibility of punitive damages"). That is as far as the cases cited by Arbor and Lightstone go on that issue. They do not stand for the proposition that punitive damages for a breach of fiduciary duties claim are barred under Delaware law. HN131[⬆] The majority rule in Delaware is that the limitation on punitive damages for breach of fiduciary duties under Delaware law is strictly limited to actions brought in the Chancery Court. *See Standard Chlorine of Del., Inc. v. Sinibaldi, 821 F. Supp. 232, 252-53 (D. Del. 1992)* (allowing punitive damage claim for breach of fiduciary duty to proceed); *In re The Brown Schools, 368 B.R. at 398-99, 411* (same); *Niehoff v. Maynard, 299 F.3d 41, 52-53 (1st Cir. 2002)* ("Under Delaware law, punitive damages [*418] for breach of fiduciary

---

[117] HN129[⬆] Punitive damages for breaches of fiduciary duty and are available to plaintiffs under New York and South Carolina law. *See, e.g., Bishop v. 59 W. 12th St. Condo., 66 A.D.3d 401, 886 N.Y.S.2d 153, 154 (N.Y. App. Div. 2009)* (reinstating claim for punitive damages for breach of fiduciary duties based on wanton and reckless disregard of plaintiff's rights); *Mazloom v. Mazloom, 382 S.C. 307, 675 S.E. 2d 746, 755 (S.C. 2009)* (upholding punitive damages award based on breach of fiduciary duties under South Carolina law).

may be awarded, but only upon proof that the Defendant acted maliciously for the purpose of injuring the Plaintiff"); *Rosenthal v. Sonnenschein Nath & Rosenthal, LLP, 985 A.2d 443, 455 (D.C. 2009)* (stating that, for claim for breach of fiduciary duty under Delaware law, "[p]unitive damages are . . . to be awarded only in cases of outrageous or egregious wrongdoing where the defendant has acted with evil motive, actual malice, or in willful disregard for the rights of the plaintiff") (citation omitted); *cf. Official Comm. of Unsecured Creditors of TOUSA, Inc. v. Tech. Olympic, S.A. (In re TOUSA, Inc.), 437 B.R. 447, 465 (Bankr. S.D. Fla. 2010)* (denying motion to dismiss claim for punitive damages for breach of fiduciary duty and aiding and abetting claims under Delaware law). Thus, there is no support for the Defendants' assertions that the Trust's requests for the punitive damages should be dismissed because Delaware law does not recognize punitive damages as recovery for breach of fiduciary duties claims.

### Count 7 of the Amended Complaint

In Count 7 of the Amended Complaint, the Trust contends that by committing the acts and omissions at issue in Count 5, the Defendants breached their fiduciary duties to the Debtors' creditors. *See* Amd. Compl. ¶ 281; *see also id.* ¶ 284 ("The Trust is asserting the claims in Count 7 "on behalf of all of the Debtors' creditors and claimants[.]"). **[*419]** It alleges that "[e]ach of the Defendants' acts or omissions was either fraudulent, willful, deliberate, knowing, in bad faith, reckless, grossly negligent or negligent and in derogation of applicable law" (*id.* ¶ 282), and that each such act or omission "proximately caused generalized harm to the Debtors' creditors[.]" *Id.* ¶ 283. It contends that it is entitled to recover actual, compensatory and consequential damages from them, jointly and severally, and punitive damages against each Defendant individually. *Id.* ¶¶ 284-285.

**HN132**[↑] Under Delaware law, "*creditors* of an *insolvent* corporation have *no right to assert direct* claims for breach of fiduciary duty against corporate directors." *N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla, 930 A.2d 92, 103 (Del. 2007)* ("*Gheewalla*"); *accord In re Trados Inc. S'holder Litig., 73 A.3d 17, 42 n.15 (Del. Ch. 2013)*; *In re USDigital, Inc., 443 B.R. at 42. See also The Resp. Person of Musicland Holding Corp. v. Best Buy Co., Inc. (In re Musicland Holding Corp.), 424 B.R. 95, 101 (Bankr. S.D.N.Y. 2010)* (stating that under Delaware law,

"[i]ndividual creditors . . . have *no right to assert direct* claims for breach of fiduciary duty against corporate directors" (quoting *Gheewalla, 930 A.2d at 103*)).

Relying on *Gheewalla*, the Defendants argue that the Trust lacks standing to assert the claims at issue in Count 7 because under Delaware law a creditor of an insolvent corporation cannot assert direct claims for breach of fiduciary duty against corporate directors. They also assert that the Plan bars the **[*420]** Trust from asserting such claims. They say that is so because "the U.S. Supreme Court established that bankruptcy trustees and litigation trusts formed as part of reorganization plans do not have standing to bring direct claims belonging to creditors under the federal bankruptcy statute." *Trenwick Am. Litig. Tr. v. Ernst & Young, L.L.P., 906 A.2d 168, 191 (Del. Ch. 2006)* (citing *Caplin v. Marine Midland Grace Tr. Co. of N.Y., 406 U.S. 416, 434, 92 S. Ct. 1678, 32 L. Ed. 2d 195 (1972))*.

The Trust rejects those arguments. It says the Defendants misconstrue the nature of the Count 7 claims and that while it seeks relief in Count 7 on behalf of all creditors, the Trust is bringing the claim under *§ 541 of the Bankruptcy Code*, as one that belongs to the Debtors, not as a claim belonging to creditors under *§ 544(b) of the Bankruptcy Code. See* Opp'n at 85. **HN133**[↑] While creditors of an insolvent corporation do not have standing to prosecute direct claims against directors and officers for breach of their fiduciary duties, they "have standing to maintain derivative claims against directors on behalf of the corporation for breaches of fiduciary duties." *Gheewalla, 930 A.2d at 101* (citation omitted). In that regard, the Trust notes that although creditors have standing to prosecute such claims derivatively on behalf of the company, the company owns the claims:

> The fact that the corporation has become insolvent does not turn [derivative] claims into direct creditor claims, **[*421]** it simply provides creditors with standing to assert those claims. At all times, claims of this kind belong to the corporation itself because even if the improper acts occur when a firm is insolvent, they operate to injure the firm in the first instance by reducing its value, injuring creditors only indirectly by diminishing the value of the firm and therefore the assets from which creditors may satisfy their claims.

*Id. at 102* (quoting *Prod. Res. Grp., L.L.C. v. NCT Grp., Inc., 863 A.2d 772, 776 (Del. Ch. 2004))*. Thus, the Trust contends that because the claim for breach of

fiduciary duties to creditors belonged to the Debtors pre-petition, it became property of the Debtors' bankruptcy estate under *§ 541* and was thereafter transferred to the Trust. Accordingly, it contends that it has standing to pursue the claims. *See* Opp'n at 86.

In Count 5 of the Amended Complaint, the Trust, standing in the Debtors' shoes, alleged directly that the Debtors were injured as a result of the Defendants' alleged breach of fiduciary duties. *See* Amd. Compl. ¶¶ 260-272. *HN134*[↑] Creditors of an insolvent corporate debtor have derivative standing to assert that the debtor was injured as a result of a director's breach of fiduciary duty. *See Gheewalla, 930 A.2d at 102* (noting that creditors may only assert that the directors' conduct **[\*422]** "operate[d] to injure the firm in the first instance by reducing its value, injuring creditors only indirectly by diminishing the value of the firm") (citation and internal quotation omitted). *See also Buchwald v. Renco Grp., Inc. (In re Magnesium Corp. of Am.), 399 B.R. 722, 759 (Bankr. S.D.N.Y. 2009)* (noting that fiduciary duty claims "remain derivative, with either shareholders or creditors suing to recover for a harm done to the corporation as an economic entity and any recovery logically flows to the corporation and benefits the derivative plaintiffs indirectly to the extent of their claim on the firm's assets") (citation omitted). The Defendants contend that in Count 5, the Trust is asserting the same claim directly, that creditors could be permitted to assert derivatively. Thus, they contend that, at best, the claim for breach of fiduciary duties in Count 7 merely repackages the claim in Count 5, under a different name. They assert that the Court should dismiss Count 5 because "[t]he Trust does not get to assert the same claim twice, once directly and a second time double-derivatively by round-tripping the right to assert the claim first to creditors and then back again." Lightstone Reply at 52.

The Trust does not dispute that courts dismiss redundant or duplicative claims alleged **[\*423]** in a complaint. However, it contends that it is too early in this litigation to determine whether the claims will prove to be duplicative. As support, it cites to *Peabody v. Weider Publ'ns, Inc., 260 F. App'x 380 (2d Cir. 2008)*, and *Banker v. Esperanza Health Sys., No. 05 CV 4115 DAB, 2011 U.S. Dist. LEXIS 24457, 2011 WL 867217, at \*1 (S.D.N.Y. Mar. 10, 2011)*. In those cases, the courts dismissed duplicative claims, but did so in the context of summary judgment motions. *See Peabody, 260 F. App'x at 383-84* (affirming the district court's grant of summary judgment in favor of defendants and dismissing plaintiff's "good faith and fair dealing claim as duplicative

of the breach of contract claim"); *Banker, 2011 U.S. Dist. LEXIS 24457, 2011 WL 867217, at \*2* (accepting magistrate court's report and recommendation and granted summary judgment in favor of defendant dismissing plaintiff's "Fifth and Sixth Causes of Action for quantum meruit; and Seventh and Eighth Causes of Action for unjust enrichment, [that] rely on the same facts and seek the same relief as the Plaintiff's Third and Fourth Causes of Action"). *HN135*[↑] However, there is no bar to dismissing duplicative or redundant claims at the pleading stage. *See Geltzer v. Bedke (In re Mundo Latino Mkt., Inc.), 590 B.R. 610, 619 (Bankr. S.D.N.Y. 2018)* (in granting *Rule 12(b)(6)* motion, court dismissed "[t]he Third Claim sounding in negligence [as] duplicative of the First Claim for breach of fiduciary duty [because] [i]t relies on the same facts, the same element . . . and **[\*424]** seeks the same relief"); *In re Food Mgmt. Grp., LLC, 380 B.R. 677, 704 (Bankr. S.D.N.Y. 2008)* (dismissing pursuant to *Rule 12(b)(6)* "Count III, Conspiracy to Commit Fraudulent Concealment, [as] duplicative of Count II, Fraudulent Concealment against the Rattet Defendants [because] [t]he same facts were allegedly concealed by all of the defendants"); *Dayan Enters., Corp. v. Nautica Apparel, Inc., No. 03 Civ. 5706 (LLS), 2003 U.S. Dist. LEXIS 21344, 2003 WL 22832706, at \*2 (S.D.N.Y. Nov. 26, 2003)* (granting motion to dismiss counterclaims and holding that plaintiff's "claim for breach of implied covenant of good faith and fair dealing . . . . is not separate from its breach of contract claim; it simply alleges a different way in which [the plaintiff] breached a covenant which . . . formed part of the contract"). *See also Osram Sylvania Inc. v. Townsend Ventures, LLC*, No. 81230VC, 2013 Del. Ch. LEXIS 281, 2013 WL 6199554, at \*6 (Del. Ch. Nov. 19, 2013) (holding that on a motion to dismiss, "[a] court may decline to consider a claim that is identical to or redundant with another") (citation omitted); *Collab9, LLC v. En Pointe Techs. Sales, LLC*, No. 16C-12-032, 2019 Del. Super. LEXIS 443, 2019 WL 4454412, at \*3 (Del. Sup. Ct. Sept. 17, 2019) (holding that in a motion pursuant to *Rule 12(b)(6)* "[f]raud claims that duplicate contract claims, and seek essentially the same recovery, cannot survive.") (citation omitted).

Counts 5 and 7 are based on identical facts, allege the same damages and seek the same forms of relief from the same parties. *See* Amd. Compl. ¶¶ 260-272; 280-285. The claims underlying Counts 7 are identical to those at issue in Count 5. Accordingly, the Court dismisses Count **[\*425]** 7 of the Amended Complaint as redundant and duplicative of Count 5. *See Weil, Gotshal & Manges, LLP v. Fashion Boutique of Short Hills, Inc.,*

2020 Bankr. LEXIS 2128, *425

*10 A.D.3d 267, 780 N.Y.S. 2d 593, 596 (N.Y. App. Div. 2004)* ("As to the claim for breach of fiduciary duty, we have consistently held that such a claim, premised on the same facts and seeking the identical relief sought in the legal malpractice cause of action, is redundant and should be dismissed." (citing *Estate of Nevelson v. Carro, Spanbock, Kaster & Cuiffo, 290 A.D.2d 399, 736 N.Y.S.2d 668, 670 (N.Y. App. Div. 2002))); see Murray Hill Invs. v. Parker Chapin Flattau & Klimpl, LLP, 305 A.D.2d 228, 759 N.Y.S.2d 463, 464 (N.Y. App. Div. 2003)*. *See also Weiner v. King*, 43 Misc. 3d 1203[A], 990 N.Y.S.2d 440, 2014 NY Slip Op 50455[U], 2014 WL 1258230, at *7 [N.Y. Sup. Ct. March 27, 2014] ("Under Delaware law, dismissal of an equitable claim may be appropriate where it is 'duplicative of a legal claim that could provide an adequate remedy.'" (citing *Dubroff v. Wren Holdings, LLC, 2011 Del. Ch. LEXIS 164, 2011 WL 5137175, at *11 n.58 (Del. Ch. Oct. 28, 2011))*); *Rafool v. The Goldfarb Corp. (In re Fleming Packaging Corp.), No. 03-82408, 2005 Bankr. LEXIS 1740, 2005 WL 2205703, at *9 (Bankr. C.D. Ill. Aug. 26, 2005)* ("If the elements of a deepening insolvency claim are identical to a breach of fiduciary claim, even if cast in slightly different terminology, dismissal of [the insolvency claim] would be appropriate since duplicative counts are properly dismissed." (first citing *Ferran v. Town of Nassau, 11 F.3d 21 (2d Cir. 1993)*; then citing *In re Buckhead Am. Corp., 178 B.R. 956 (D. Del. 1994)*)).

<u>Conclusion</u>

Based on the foregoing, the Court grants the Motions to the following extent:

The Court dismisses the following claims pursuant to *Rule 12(b)(1)*, for lack of subject matter jurisdiction:

    Counts 1-11 of the Amended Complaint with respect to:

        Polar Extended Stay
        PGRT ESH

        <u>Lightstone Entities</u>
        Lightstone Commercial
        Park Avenue Funding

        <u>Arbor Entities</u>
        Arbor ESH
        Arbor Commercial
        Princeton ESH

        Atmar Associates **[*426]**
        Glida One

        Ron Invest
        ABT-ESI
        Mericash Funding
    Counts 5-11 with respect to the HVM Defendants.
    Counts 6 and 8-11 with respect to all Defendants.

The Court dismisses the following claims pursuant to *Rule 12(b)(6)*:

    The Fraudulent Transfer Claims (Counts 3, 12-15) to the extent predicated on the LIBOR Floor Certificates Distributions.

    Counts 1 and 2 of the Amended Complaint, to the extent they seek relief under *§§ 160* and *174(a)* of the Delaware General Corporation Law.
    Count 4 of the Amended Complaint to the extent the Trust seeks restitution on account of the Dividend Payments.
    Count 5 of the Amended Complaint as to the following Defendants:

        Polar Extended Stay
        PGRT ESH

        <u>Lightstone Entities</u>
        Lightstone Commercial
        Park Avenue Funding

        <u>Arbor Entities</u>
        Arbor ESH
        Arbor Commercial
        Princeton ESH
        Atmar Associates
        Glida One
        Ron Invest
        ABT-ESI
        Mericash Funding
    Count 7 of the Amended Complaint.
    The Court dismisses Count 17 of the Amended Complaint, as moot, with respect to the HVM Defendants.
To the extent not granted, the Motions are denied.

IT IS SO ORDERED.

Dated: August 8, 2020

New York, New York

/s/ *James L. Garrity, Jr.*

Hon. James L. Garrity, Jr.

United     States     Bankruptcy     Judge

2020 Bankr. LEXIS 2128, *426

**Table1** (*Return to related document text*)

| | |
|---|---|
| Lightstone Holdings | 120 Series A-2 Units |
| | 97.9 Series A-3 Units |
| | 100 Common A-3 Units |
| BRE/ESH Holdings LLC | 200 Series B Units[28] |
| Princeton ESH | 5 Common J Units |
| Atmar Associates | 5 Common J Units |

**Table1** (*Return to related document text*)

---

**Table2** (*Return to related document text*)

| | |
|---|---|
| Arbor ESH | 190 Preferred Series A-1 Units |
| | 190 Common A-1 Units |
| | 5.88 Common J Units |
| Polar Extended Stay | 10 Preferred Series A-1 Units |
| | 10 Common A-1 Units |
| PGRT ESH | 71.18 Series A-2 Units |
| | 71.18 A-2 Common Units |
| Princeton ESH | 10 Preferred Series A-1 Units |
| | 10 Common A-1 Units |
| Homestead | 58.07 Series A-3 Units |
| | 58.07 Common A-3 Units |
| | 158.56 Series B Units |
| | 158.56 Common B Units |
| | 8.36 Common J Units [*34] |

**Table2** (*Return to related document text*)

---

**Table3** (*Return to related document text*)

| | | |
|---|---|---|
| USES | Pfd Equity Reserve | $25,100,000 |
| | Hotel Purchases | 9,943,000 |
| | | $35,043,000 |

**Table3** (*Return to related document text*)

---

**End of Document**

---

[28] BRE/ESH Holdings, LLC is a Blackstone-related LLC. It is not a party to this Adversary Proceeding.

Christopher Livingston

⬥ Positive
As of: February 18, 2023 1:59 AM Z

## *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*

United States Bankruptcy Court for the Southern District of New York

October 30, 2014, Decided

Adv. Pro. No. 08-01789 (SMB), SIPA LIQUIDATION, (Substantively Consolidated), Case No. 09-11893 (SMB), Adv. Pro. No. 14-01840 (SMB)

**Reporter**
2014 Bankr. LEXIS 4603 *; 60 Bankr. Ct. Dec. 57

SECURITIES INVESTOR PROTECTION CORPORATION, Plaintiff, — against — BERNARD L. MADOFF INVESTMENT SECURITIES LLC, Defendant.In re: BERNARD L. MADOFF, Debtor.IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, Plaintiff, CAPITAL GROWTH COMPANY; DECISIONS, INC.; FAVORITE FUNDS; JA PRIMARY LIMITED PARTNERSHIP; JA SPECIAL LIMITED PARTNERSHIP; JAB PARTNERSHIP; JEMW PARTNERSHIP; JF PARTNERSHIP; JFM INVESTMENT COMPANIES; JLN PARTNERSHIP; JMP LIMITED PARTNERSHIP; JEFFRY M. PICOWER SPECIAL COMPANY; JEFFRY M. PICOWER, P.C.; THE PICOWER FOUNDATION; THE PICOWER INSTITUTE OF MEDICAL RESEARCH; THE TRUST F/B/O GABRIELLE H. PICOWER; BARBARA PICOWER, individually and as Executor of the Estate of Jeffry M. Picower, and as Trustee for the Picower Foundation and for the Trust f/b/o Gabriel H. Picower, Intervenors, — against — SUSANNE STONE MARSHALL; ADELE FOX; MARSHA PESHKIN; RUSSELL OASIS; A & G GOLDMAN PARTNERSHIP; and PAMELA GOLDMAN, Defendants.

**Subsequent History:** Related proceeding at, Petition denied by *Marshall v. Madoff, 2015 U.S. Dist. LEXIS 61482 (S.D.N.Y., May 11, 2015)*

**Prior History:** *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC, 515 B.R. 161, 2014 Bankr. LEXIS 3563 (Bankr. S.D.N.Y., 2014)*

## Core Terms

Parties, discovery, Injunction, perpetuate, withdraw, district court, judicial estoppel, adversary proceedings, amended complaint, bankruptcy court, deposition

## Case Summary

### Overview

HOLDINGS: [1]-Defendants' discovery request pursuant to *Fed. R. Bankr. P. 2004* was denied because, although the discovery they requested implicated the acts and conduct of the debtors, defendants were not seeking the discovery for use in the debtors' cases, and the discovery had no bearing on the property, liabilities or financial condition of either estate and would not affect the administration of either estate; [2]-The court lacked the authority to grant a motion pursuant to *Fed. R. Civ. P. 27(a)* to perpetuate the individual debtor's testimony for use in a lawsuit, because the court lacked *subject matter jurisdiction* over the underlying litigation, which was between non-debtor parties; [3]-The request for perpetuation under *Rule 27(b)* was denied because the testimony would not likely be needed in the event of further proceedings in the court.

### Outcome
Motion denied.

## LexisNexis® Headnotes

Bankruptcy Law > ... > Bankruptcy > Case Administration > Examinations of Debtors

**HN1**[⬇] **Case Administration, Examinations of Debtors**

See *Fed. R. Bankr. P. 2004*.

2014 Bankr. LEXIS 4603, *4603

Bankruptcy Law > ... > Bankruptcy > Case
Administration > Examinations of Debtors

Evidence > Burdens of Proof > Allocation

**HN2[↓]** **Case Administration, Examinations of
Debtors**

The scope of *Fed. R. Bankr. P. 2004* discovery is very
broad and can encompass broader discovery than is
available under the Federal Rules of Civil Procedure.
The underlying purpose of *Rule 2004* is to allow the
court to gain a clear picture of the condition and
whereabouts of the bankrupt's estate. The party seeking
*Rule 2004* discovery has the burden to show good
cause for the examination it seeks, and relief lies within
the sound discretion of the Bankruptcy Court.

Civil Procedure > ... > Preclusion of
Judgments > Estoppel > Judicial Estoppel

**HN3[↓]** **Estoppel, Judicial Estoppel**

Judicial estoppel is an equitable doctrine that generally
prevents a party from prevailing in one phase of a case
on an argument and then relying on a contradictory
argument to prevail in another phase. The Supreme
Court has outlined several factors to consider when
determining whether judicial estoppel should apply:
First, a party's later position must be clearly inconsistent
with its earlier position. Second, courts regularly inquire
whether the party has succeeded in persuading a court
to accept that party's earlier position. A third
consideration is whether the party seeking to assert an
inconsistent position would derive an unfair advantage
or impose an unfair detriment on the opposing party if
not estopped. Because the rule is intended to prevent
improper use of judicial machinery, judicial estoppel is
an equitable doctrine invoked by a court at its discretion.

Bankruptcy Law > ... > Bankruptcy > Case
Administration > Examinations of Debtors

**HN4[↓]** **Case Administration, Examinations of
Debtors**

Despite its broad scope, *Fed. R. Bankr. P. 2004* has
limits. An examination as to matters having no
relationship to the bankrupt's affairs or the
administration of the estate is improper under *Rule*

*2004*. Accordingly, *Rule 2004* should not be used to
obtain information for use in an unrelated case or
proceeding pending before another tribunal. The use of
*Rule 2004* to further its case in state court constitutes an
abuse of *Rule 2004*.

Civil Procedure > ... > Discovery > Methods of
Discovery > Perpetuation of Testimony

**HN5[↓]** **Methods of Discovery, Perpetuation of
Testimony**

See *Fed. R. Civ. P. 27*.

Civil Procedure > ... > Discovery > Methods of
Discovery > Perpetuation of Testimony

**HN6[↓]** **Methods of Discovery, Perpetuation of
Testimony**

*Fed. R. Civ. P. 27(a)* authorizes a litigant to file a
petition to perpetuate testimony in a District Court where
any expected adverse party resides regarding any
matter cognizable in a United States court. While *Fed.
R. Bankr. P. 7027* extends *Rule 27* to adversary
proceedings, the contemplated adversary proceeding
must lie within the bankruptcy jurisdiction of the court
that will preside over the anticipated lawsuit. As
translated into bankruptcy terms, the requirement that
the action for which the testimony is sought to be
perpetuated must be cognizable in any court of the
United States and that the petitioner expects to be a
party means that the contemplated adversary
proceeding must be cognizable by the court exercising
bankruptcy jurisdiction, be it the district court or the
bankruptcy court. Thus, while the petition itself does not
require any independent grounds of federal or
bankruptcy jurisdiction to support it, there must be a
showing and determination by the court that the
anticipated adversary proceeding is within the
bankruptcy jurisdiction of the court where it is to be
brought.

Civil Procedure > ... > Discovery > Methods of
Discovery > Perpetuation of Testimony

**HN7[↓]** **Methods of Discovery, Perpetuation of
Testimony**

*Fed. R. Civ. P. 27(b)* authorizes the court in which a judgment has been rendered to permit a party to perpetuate testimony if an appeal has or may be taken and the testimony would be used in the event of further proceedings in that court. *Fed. R. Civ. P. 27(b)(1)*.

**Counsel:** **[*1]** For Irving H. Picard, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and the Estate of Bernard L. Madoff: David J. Sheehan, Esq., Deborah H. Renner, Esq., Tracy L. Cole, Esq., Keith R. Murphy, Esq., Amy Vanderwal, Esq., Ferve Ozturk, Esq., Of Counsel, BAKER & HOSTETLER LLP, New York, New York.

For Susanne Stone Marshall, Adele Fox, Marsha Peskin, and Russell Oasis: Helen Davis Chaitman, Esq., Lance Gotthoffer, Esq., Peter W. Smith, Esq., Julie Gorchkova, Esq., Of Counsel, BECKER & POLIAKOFF LLP, New York, New York.

For Intervenors the Picower Parties: William D. Zabel, Esq., Marcy Ressler Harris, Esq., Michael Kwon, Esq., Jennifer M. Opheim, Esq., Of Counsel, SCHULTE ROTH & ZABEL LLP, New York, New York.

**Judges:** STUART M. BERNSTEIN, United States Bankruptcy Judge.

**Opinion by:** STUART M. BERNSTEIN

# Opinion

**MEMORANDUM DECISION REGARDING DEFENDANTS' MOTION FOR DISCOVERY FROM THE TRUSTEE, APRIL FRIELICH, BARBARA PICOWER, AND BERNARD MADOFF**

**STUART M. BERNSTEIN**

**United States Bankruptcy Judge**:

The defendants (the "Fox Parties"), former customers of Bernard L. Madoff Investment Securities LLC ("BLMIS"), request discovery pursuant to *Rule 2004 of the Federal Rules of Bankruptcy Procedure* ("*Rule 2004*") and *Rules 26*, *27*, and *30(a)(2)(B) of the Federal Rules of Civil Procedure* from (i) Irving H. **[*2]** Picard, as trustee ("Trustee") for the substantively consolidated liquidation of BLMIS under the Securities Investor Protection Act and Bernard L. Madoff, (ii) April Frielich, (iii) Barbara Picower, and (iv) Bernard L. Madoff in order to

prosecute a lawsuit in a Florida federal court against the "Picower Parties."[1] The request is opposed by the Trustee and the Picower Parties.

For the reasons that follow, the motion is denied except to the extent that the Fox Parties may withdraw their request for discovery under *Federal Civil Rule 27(a)* without prejudice.

## BACKGROUND

The background to this adversary proceeding is described **[*3]** in detail in this Court's June 23, 2014 decision, *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC, 511 B.R. 375 (Bankr. S.D.N.Y. 2014)* (the "*Injunction Decision*"). The Court assumes familiarity with the *Injunction Decision* and limits the discussion to the facts germane to this discovery dispute.

The Fox Parties invested with BLMIS, and the current dispute relates to the ongoing efforts by some or all of the Fox Parties to sue the Picower Parties for the damages they allege they suffered as a result of investing with BLMIS. The Trustee had sued the Picower Parties in May 2009 to avoid and recover $7.2 billion in fictitious profits. *Injunction Decision, 511 B.R. at 379-80*. The parties ultimately settled for $5 billion.[2] *Id. at 380*. The settlement included an injunction (the "Permanent Injunction") enjoining customers, creditors and anyone else from suing the Picower Parties based on claims that arose from or related to "BLMIS or the Madoff Ponzi scheme" and were "duplicative or derivative of the claims brought by the Trustee, or which

---

[1] The Picower Parties include, Capital Growth Company; Decisions, Inc.; Favorite Funds; JA Primary Limited Partnership; JA Special Limited Partnership; JAB Partnership; JEMW Partnership; JF Partnership; JFM Investment Companies; JLN Partnership; JMP Limited Partnership; Jeffry M. Picower Special Company; Jeffry M. Picower, P.C.; The Picower Foundation; The Picower Institute of Medical Research; The Trust f/b/o Gabrielle H. Picower; and Barbara Picower, individually and as Executor of the Estate of Jeffry M. Picower, and as Trustee for the Picower Foundation and for the Trust f/b/o Gabriel H. Picower.

[2] The settlement also provided that the Picower Parties would pay $2.2 billion to the Government on account of civil forfeiture liability under *18 U.S.C. § 981(a)(1)(C)*. *Injunction Decision, 511 B.R. at 380*. All together, the Picower Parties paid $7.2 billion in settlement to the Trustee and the Government representing 100% of the withdrawals the Trustee sought to avoid.

could have been brought by the Trustee against the Picower BLMIS Accounts or the Picower [Parties]." *Id.* The Bankruptcy Court approved the settlement, including the Permanent Injunction, over the objections of Fox and Marshall, and its order was affirmed by the District Court and Second **[*4]** Circuit Court of Appeals. *See Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC, 429 B.R. 423 (Bankr. S.D.N.Y. 2010)*, aff'd sub nom *Fox v. Picard (In re BLMIS), 848 F. Supp. 2d 469 (S.D.N.Y. 2012)*, aff'd sub nom *Marshall v. Picard (In re BLMIS), 740 F.3d 81 (2d Cir. 2014)*.

Intent on suing the Picower Parties notwithstanding the Permanent Injunction, the Fox Parties sought leave, on February 5, 2014, to file a second amended complaint in their action against the Picower Parties pending in the United States District Court for the Southern District of Florida (the "Florida Action"). The proposed amended complaint purported to assert claims under the federal securities laws, federal and Florida RICO laws, and Florida common law. *Injunction Decision, 511 B.R. at 383*.

The Fox Parties' motion for leave to amend in the Florida Action prompted the Trustee to seek enforcement of the Permanent Injunction against the Fox Parties in this Court, *Id. at 386*, and the Picower Parties intervened seeking the same relief. The Court granted the motion, ruling that the Fox Parties' new claims were barred by the Permanent Injunction. Although **[*5]** relabeled as direct claims sounding in violations of the federal securities laws, federal and state RICO laws and Florida common law, the new claims were based on the secondary effects of the Picower Parties' fraudulent withdrawals from BLMIS. The proposed amended complaint did not include any particularized allegations that the Picower Parties participated in the preparation or dissemination of any false financial information to the customers. *Id. at 394-95*. The Fox Parties have appealed from the ensuing order. (*See* ECF Doc. # 62.)[3]

Following issuance of the *Injunction Decision*, the Fox Parties concluded that they needed discovery to frame a non-derivative claim. After an unsuccessful effort to obtain the relief through a letter to the Court, the Fox Parties filed their *Motion for an Order: (i) Authorizing Discovery From the Trustee, April Frielich, Barbara Picower, and Bernard Madoff Pursuant to FRBP 2004,*

*and Authorizing the Deposition of Madoff to Preserve Testimony Pursuant to FRCP 27; (ii) Authorizing the Deposition of Madoff Pursuant to FRCP 30(a)(2)(B); and (iii) Directing the Sequence of Discovery Pursuant to FRCP 26*, dated July 18, 2014 (the "Motion") **[*6]** (ECF Doc. # 64). They assert that *Rule 2004* authorizes the deposition and/or production of documents from the Trustee, Madoff, Friehlich and Picower. Alternatively, they contend that *Federal Civil Rule 27* allows the Fox Parties to take Madoff's deposition to preserve his testimony.[4] The Trustee opposes the Motion, (*Brief in Opposition to Fox Plaintiffs' Motion for Discovery*, dated August, 8, 2014 (ECF Doc. # 69)), and the Picower Parties do too. (*See Intervenors' Opposition to the Fox Plaintiffs' Motion for Discovery*, dated August 8, 2014 (ECF Doc. # 71).)

## DISCUSSION

### A. *Rule 2004*

*Rule 2004(b)* states:

> *HN1*[⬆] The examination of an entity under this rule . . . *may relate only to the acts, conduct, or property or to the liabilities and financial condition of the debtor*, or to any matter which may affect the administration of the debtor's estate, or to the debtor's right to discharge . . . .

*Fed. R. Bankr. P. 2004(b)* (emphasis added).*HN2*[⬆] The scope of *Rule 2004* discovery is "very broad" and can encompass broader discovery than is available under the Federal Rules of Civil Procedure. *In re Recoton Corp., 307 B.R. 751, 755 (Bankr. S.D.N.Y. 2004)* (citing *In re Drexel Burnham Lambert Group, Inc., 123 B.R. 702, 711 (Bankr. S.D.N.Y. 1991))*; *see also In re Duratech Indus., Inc., 241 B.R. 283, 289 (E.D.N.Y. 1999)*. The underlying purpose of *Rule 2004* is to "allow the **[*7]** court to gain a clear picture of the condition and whereabouts of the bankrupt's estate." *Keene Corp. v. Johns-Manville Corp. (In re Johns-Manville Corp.), 42 B.R. 362, 364 (S.D.N.Y. 1984)* (citing *Cameron v. United States, 231 U.S. 710, 717, 34 S. Ct. 244, 58 L. Ed. 448 (1914))*. The party seeking *Rule 2004* discovery has the burden to show good cause for the examination

---

[3] "ECF Doc. # __" refers to documents filed in this adversary proceeding.

[4] The other Federal Civil Rules cited by the Fox Parties relate to their request to perpetuate Madoff's testimony pursuant to *Federal Civil Rule 27*.

it seeks, *In re Express One Int'l., Inc., 217 B.R. 215, 217 (Bankr. E.D. Tex. 1998)* (citing *In re Eagle-Picher Indus., Inc., 169 B.R. 130, 134 (Bankr. S.D. Ohio 1994))*, and relief lies within the sound discretion of the Bankruptcy Court. *In re Bd. of Dirs. of Hopewell Int'l Ins. Ltd., 258 B.R. 580, 587 (Bankr. S.D.N.Y. 2001)*.

Initially, the Fox Parties contend that the doctrine of judicial estoppel prevents the Trustee from denying the requested discovery under *Rule 2004* because he previously argued successfully that the Bankruptcy Court is the proper venue for the enforcement of the Permanent Injunction. (*Motion* at ¶ 11.) *HN3*[↑] Judicial estoppel is an equitable doctrine that "generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." *Zedner v. United States, 547 U.S. 489, 504, 126 S. Ct. 1976, 164 L. Ed. 2d 749 (2006)* (internal citations and quotation marks omitted). The Supreme Court has outlined several factors to consider when determining whether judicial estoppel should apply:

> First, a party's later position must be clearly inconsistent with its earlier position. Second, courts regularly inquire whether the party has succeeded in persuading a court to accept that party's earlier position. . . . A third consideration is whether the party [*8] seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.

*Id.* (quoting *New Hampshire v. Maine, 532 U.S. 742, 750-51, 121 S. Ct. 1808, 149 L. Ed. 2d 968 (2001))*. "Because the rule is intended to prevent improper use of judicial machinery, judicial estoppel is an equitable doctrine invoked by a court at its discretion." *New Hampshire v. Maine, 532 U.S. at 750* (internal quotation marks and citations omitted).

The Fox Parties' judicial estoppel argument is hard to fathom. The Trustee previously argued that the Bankruptcy Court had jurisdiction to enforce the Permanent Injunction because it had issued the Permanent Injunction. He now maintains that the Fox Parties have failed to show good cause for the *Rule 2004* discovery they seek. One has nothing to do with the other, the positions are not inconsistent and the judicial estoppel argument lacks merit.

As to the merits, the Fox Parties' attempted use of *Rule 2004* is improper. *HN4*[↑] Despite its broad scope, *Rule*

*2004* has limits. An examination "as to matters having no relationship to the bankrupt's affairs or the administration of the estate" is improper under *Rule 2004*. *Johns-Manville, 42 B.R. at 364* (citing 12 COLLIER ON BANKRUPTCY ¶ 205.15, at 2-92 - 2-94 (14th ed. 1978)). Accordingly, *Rule 2004* "should not be used to obtain information for use in an unrelated [*9] case or proceeding pending before another tribunal." *In re Coffee Cupboard, Inc., 128 B.R. 509, 516 (Bankr. E.D.N.Y. 1991)*; *see also Synder v. Soc'y Bank, 181 B.R. 40, 42 (S.D.Tex. 1994)* ("The use of *Rule 2004* to further its case in state court constitutes an abuse of *Rule 2004*.").

The Fox Parties admit that they are seeking discovery "to amplify the factual allegations [in the Florida Action] against the [Picower Parties] to show that those claims are non-derivative." (*Motion* at ¶ 19.) Although the discovery they request implicates the acts and conduct of Madoff, who is a debtor, the Fox Parties are not seeking the discovery for use in the Madoff or BLMIS cases, and the discovery has no bearing on the property, liabilities or financial condition of either estate and will not affect the administration of either estate.[5] In short, the Fox Parties have failed to show cause, and their application is denied.[6]

---

[5] The Court and other courts in this Circuit have been drawn into this dispute and expended considerable time dealing with it because the Permanent Injunction prohibits the Fox Parties from alleging derivative claims. Nevertheless, the Fox Parties' ability to plead around the Permanent Injunction and end this Court's involvement is no reason to allow the Fox Parties the use of *Rule 2004* for the sole purpose of improving the prospects [*10] of the action against the Picower Parties.

[6] The cases cited by the Fox Parties do not provide any support. They involved requests under *Rule 2004* (or its predecessor Rule 205) to conduct examinations concerning claims belonging to the estate, *see Recoton Corp., 307 B.R. at 756* (allowing the Committee to proceed under *Rule 2004* "to obtain information necessary to determine whether claims beneficial to the estates exist and whether to pursue such claims."); *In re Table Talk, Inc, 51 B.R. 143, 145-46 (Bankr. Mass. 1985)* (allowing *Rule 2004* examination sought by the trustee where one purpose was to examine into potential anti-trust claims), *In re Mittco, Inc., 44 B.R. 35, 36-37 (Bankr. E.D. Wis. 1984)* (permitting creditor to conduct *Rule 2004* discovery of debtor's accountant to inquire into the possibility of obtaining assets for the benefit of the estate); *cf. In re CIS Corp., 123 B.R. 488, 490-91 (S.D.N.Y. 1991)* (acknowledging that *Rule 2004* may be used to examine the debtor's auditors regarding potential estate claims but concluding that the trustee had failed to demonstrate the relevancy of the auditor's

## B. Federal Civil Rule 27

As an alternative to Rule 2004, the Fox Parties seek to take Madoff's deposition to perpetuate his testimony under Federal Civil Rule 27(a) and (b), made applicable by Rule 7027 of the Federal Rules of Bankruptcy Procedure.[7] During oral argument, the Court questioned

---

internal auditing manuals to those potential claims), claims against the estate, Drexel Burnham, 123 B.R. at 712 (permitting FDIC/RTC to obtain discovery under Rule 2004 based on the possible connection to their claims against the estate), or property of the estate. In re Larkham, 24 B.R. 70, 71-72 (Bankr. Vt. 1982) (permitting examination of debtors by secured creditors pursuant to former Bankruptcy Rule 205 where debtor listed claims against [*11] banks in its schedules and refused to answer questions regarding the claims at the meeting of creditors). The Fox Parties are not seeking Rule 2004 discovery to identify claims by or against the BLMIS or Madoff estates or to identify property of the estate.

The Fox Parties also cited In re Federated Dep't Stores, Inc., 114 B.R. 501 (Bankr. S.D. Ohio 1990), which concerned a retention application, not a Rule 2004 examination, and In re Johns-Manville, 42 B.R. 362 (S.D.N.Y. 1984), in which the District Court reversed the Bankruptcy Court's Rule 2004 order directing a non-debtor to provide certain information to the debtor as the quid pro quo for acquiring similar information from the debtor, ruling that "the facilitation of negotiations was not a proper ground on which to order the non-voluntary production of documents not otherwise discoverable under Rule 2004." Id. at 365. Neither decision is relevant to the issues raised by the Fox Parties' application for Rule 2004 discovery.

[7] Federal Civil Rule 27 provides in pertinent part:

HN5[⬆] (a) BEFORE AN ACTION IS FILED.

(1) *Petition*. A person who wants to perpetuate testimony about any matter cognizable in a United States court may file a verified petition in the district court for the district where any expected adverse party resides. . . . The petition . . . must show:

(A) [*13] that the petitioner expects to be a party to an action cognizable in a United States court but cannot presently bring it or cause it to be brought;

(B) the subject matter of the expected action and the petitioner's interest;

(C) the facts that the petitioner wants to establish by the proposed testimony and the reasons to perpetuate it;

(D) the names or a description of the persons whom the

its jurisdiction to grant a motion to perpetuate testimony for use in a proceeding over which it lacked **_subject matter jurisdiction_**. In response, the Fox Parties wrote to the Court withdrawing their Federal Civil Rule 27 discovery [*12] request so that it could be refiled in the appropriate District Court. (See Letter, dated October 7, 2014 (ECF Doc. # 80).) The Trustee opposed the request on three grounds: (1) the Fox Parties could not seek relief by letter and had to proceed by formal motion, (2) the Trustee had incurred costs and fees opposing the Motion, and the Fox Parties should not be allowed to withdraw the request for fear of losing or to gain a strategic advantage and (3) the Court also had jurisdiction to grant the request. The Trustee also reiterated his position that the Fox Parties had failed to comply with Federal Civil Rule 27. (See Letter, dated October 9, 2014 (ECF Doc. # 81).) The Picower Parties joined in the Trustee's objection, and demanded that the Fox Parties reimburse the Picower Parties for their costs in opposing the Rule 27 request as the price of withdrawal. (Letter, dated October 10, 2014 (ECF Doc. # 82).)

## 1. Federal Civil Rule 27(a)

The Court will permit the Fox Parties to withdraw [*14] their request for discovery under Federal Civil Rule 27(a) without prejudice because they made it in the wrong court. HN6[⬆] Rule 27(a) authorizes a litigant to file a petition to perpetuate testimony in a District Court

---

petitioner expects to be adverse parties and their addresses, so far as known; and

(E) the name, address, and expected substance of the testimony of each deponent.

. . .

(b) PENDING APPEAL.

(1) *In General*. The court where a judgment has been rendered may, if an appeal has been taken or may still be taken, permit a party to depose witnesses to perpetuate their testimony for use in the event of further proceedings in that court.

(2) *Motion*. The party who wants to perpetuate testimony may move for leave to take the depositions, on the same notice and service as if the action were pending in the district court. The motion must show:

(A) the name, address, and expected substance of the testimony of each deponent; and

(B) the reasons for perpetuating the testimony.

where any expected adverse party resides regarding "any matter cognizable in a United States court." While *Federal Bankruptcy Rule 7027* extends *Federal Civil Rule 27* to adversary proceedings, the contemplated adversary proceeding must lie within the bankruptcy jurisdiction of the court that will preside over the anticipated lawsuit. As the leading bankruptcy treatise explains:

> As translated into bankruptcy terms, the requirement that the action for which the testimony is sought to be perpetuated must be "cognizable in any court of the United States" and that the petitioner "expects to be a party" means that the *contemplated adversary proceeding must be cognizable by the court exercising bankruptcy jurisdiction*, be it the district court or the bankruptcy court. Thus, while the petition itself does not require any independent grounds of federal or bankruptcy jurisdiction to support it, *there must be a showing and determination by the court that the anticipated adversary proceeding is within the bankruptcy jurisdiction of the court where it is to be brought [\*15]* .

10 ALAN N. RESNICK & HENRY J. SOMMER, *COLLIER ON BANKRUPTCY § 7027.02*, at 7027-3 (16th ed. 2014) (emphasis added).

This Court lacks **subject matter jurisdiction** under *28 U.S.C. § 1334(b)* over a lawsuit between the Fox Parties and the Picower Parties. The litigation concerns a third-party dispute whose outcome would have no conceivable effect on either the BLMIS or the Madoff estates; this Court's only involvement arises from the Trustee's efforts to enforce the Permanent Injunction which applies to all customers and creditors. For the same reason, the Florida District Court where the Fox Parties propose to file their amended complaint would also lack bankruptcy jurisdiction. Furthermore, neither Fox nor Marshall have invoked bankruptcy jurisdiction in the Florida Action. Their prior Florida complaints based **subject matter jurisdiction** on *28 U.S.C. §§ 1332(d)* and *1337*, various other non-bankruptcy federal statutes and principles of supplemental jurisdiction. (*See Declaration of Keith R. Murphy in Support of Trustee's Application for Enforcement of Permanent Injunction and Automatic Stay*, dated Mar. 10, 2012, Ex. B at ¶¶ 3-4; Ex. C at ¶ 16; Ex. E at ¶ 10; Ex. F at ¶ 10 (ECF Doc. # 4).) Finally, *In re Residential Capital, LLC, 480 B.R. 529 (Bankr. S.D.N.Y. 2012)*, cited by the Trustee in his October 9 letter, [\*16] does not support this Court's authority. The issues in that case were whether the

automatic stay barred discovery from the debtors in a third-party action, and if it did not, whether the Court should extend the automatic stay pursuant to *11 U.S.C. § 105(a)* to accomplish that end. The decision did not address the Bankruptcy Court's power under *Federal Civil Rule 27(a)* to permit the discovery of a debtor in a third-party action over which it lacked jurisdiction.

Since the Court lacks **subject matter jurisdiction** over the underlying litigation, it lacks the authority to grant a motion to perpetuate testimony for use in that lawsuit. As the Fox Parties recognized in their letter to the Court, the proper procedure is to refile the motion in an appropriate District Court. Even if the Court declined to permit the Fox Parties to withdraw the *Federal Civil Rule 27(a)* request and denied the motion for the reasons stated, the denial would be without prejudice to refiling in the appropriate court. This is precisely what the voluntary withdrawal accomplishes. For this reason, the Picower Parties' demand for costs and fees is denied.

## 2. *Federal Civil Rule 27(b)*

The Fox Parties' request for the same relief under *Federal Civil Rule 27(b)* requires only brief comment. HN7[↑] *Federal Civil Rule 27(b)* authorizes the Court in which a judgment has been [\*17] rendered to permit a party to perpetuate testimony if an appeal has or may be taken and the testimony would be used "in the event of further proceedings in *that* court." *Fed. R. Civ. P. 27(b)(1)* (emphasis added). The Fox Parties have appealed from the *Injunction Decision*, and this Court is the appropriate place to seek to perpetuate Madoff's testimony under *Federal Civil Rule 27(b)* provided it is or may be needed in the event of further proceedings in *this* Court. Therein lies the rub. The enforcement motion that resulted in the *Injunction Decision* raised purely legal issues requiring the Court to match the allegations in the Fox Parties' amended complaint against the language in the Permanent Injunction. The Court did not receive any testimony, and in the event of a remand and further proceedings, it is not likely that it will receive any testimony. Consequently, Madoff's testimony will not be required, it need not be perpetuated, and the application for discovery under *Federal Civil Rule 27(b)* is denied.

Settle order on notice.

Dated: New York, New York

October 30, 2014

/s/ Stuart M. Bernstein

2014 Bankr. LEXIS 4603, *17

STUART M. BERNSTEIN

United States Bankruptcy Judge

---

**End of Document**

⚠️ Caution
As of: February 15, 2023 6:18 PM Z

## *In re Jamesway Corp.*

United States Bankruptcy Court for the Southern District of New York

September 30, 1996, Decided ; September 30, 1996, DOCKETED

Chapter 11, Case No. 95-44821 (JLG), Jointly Administered

**Reporter**
201 B.R. 73 *; 1996 Bankr. LEXIS 1426 **

In re: JAMESWAY CORPORATION, et al., Debtors.

**Disposition:  [**1]**  We grant debtor's requested for an order declaring that the profit sharing provisions of the Leases are unenforceable and direct that the $ 50,000 currently held in escrow from the assignment proceeds of the Newberry Lease be released to debtor.

## Core Terms

lease, assign, provisions, Landlords, Tenant, invalidate, premises, Modification, assignee, realized, lease assignment, unexpired lease, conditioning, shopping center, leasehold, proceeds, profits, lease provision, profit sharing, debtor-in-possession, restricting, executory, terminate, escrow, modify, cases

## Case Summary

### Procedural Posture

Chapter 11 debtor-in-possession, a retailer, sought an order under *11 U.S.C.S. § 365(a)* declaring that the profit sharing provisions of non-residential real property leases the court authorized it to assume and assign were unenforceable. The lease provisions required the retailer to pay the landlords an assumption fee. The retailer also requested the release of the assignment proceeds placed in escrow pending resolution of the dispute.

### Overview

The landlords filed a proof of administrative claim for the sum they alleged to be their share of the profits realized by the retailer from the lease assignments. The retailer contended that the profit sharing lease provisions were void and unenforceable under *11 U.S.C.S. § 365(f)(1)* because they limited its ability to realize the full economic value of the assigned leases for the benefits of all unsecured creditors. The court held (1) the retailer did not have to raise the issue of the enforceability of the profit sharing lease provisions when it assumed and assigned the leases, (2) the landlords had not demonstrated that the retailer waived its right to challenge the enforceability of the profit sharing lease provisions, and (3) the lease provisions limited the retailer's ability to realize the intrinsic value of the lease, which thwarted the fundamental bankruptcy policy of allowing a debtor to realize the maximum value for its assigned leases for the benefit of its estate and creditors.

### Outcome

The court granted the retailer's request for an order invalidating the profit sharing provisions of the non-residential real estate leases and directed that the money held in escrow from the assignment proceeds be released to the retailer.

## LexisNexis® Headnotes

Business & Corporate Compliance > ... > Contracts Law > Types of Contracts > Executory Contracts

Contracts Law > Third Parties > Delegation of Performance

Bankruptcy Law > Administrative Powers > Estate Property Lease, Sale & Use > General Overview

Bankruptcy Law > Administrative Powers > Executory Contracts & Unexpired Leases > General Overview

Bankruptcy Law > Administrative Powers > Executory Contracts & Unexpired Leases > Assignments

Bankruptcy Law > Administrative Powers > Executory Contracts & Unexpired Leases > Existing Defaults

Bankruptcy Law > Administrative Powers > Executory Contracts & Unexpired Leases > Powers to Assume & Reject

Bankruptcy Law > Reorganizations > Debtors in Possession > General Overview

Business & Corporate Compliance > ... > Contracts Law > Standards of Performance > Creditors & Debtors

Contracts Law > Types of Contracts > Lease Agreements > General Overview

Real Property Law > Bankruptcy > Leases

### *HN1*[↓]  Types of Contracts, Executory Contracts

*Section 365(a) of the Bankruptcy Code*, *11 U.S.C.S. § 365(a)*, authorizes a debtor-in-possession to assume or reject, subject to the court's approval, any executory contract or unexpired lease of the debtor. A debtor-in-possession may assign an unexpired lease of the debtor only if it assumes the lease in accordance with *§ 365(a)*, and provides adequate assurance of future performance by the assignee, whether or not there has been a default under the lease.  *11 U.S.C.S. § 365(f)(2)*. Except as otherwise provided in the Bankruptcy Code, an executory contract or unexpired lease is assumed cum onere.

Bankruptcy Law > Administrative Powers > Executory Contracts & Unexpired Leases > Assignments

Bankruptcy Law > Administrative Powers > Estate Property Lease, Sale & Use > General Overview

### *HN2*[↓]  Executory Contracts & Unexpired Leases, Assignments

See *11 U.S.C.S. § 365(f)*.

Bankruptcy Law > Administrative Powers > Executory Contracts & Unexpired Leases > Powers to Assume & Reject

Contracts Law > Types of Contracts > Lease Agreements > General Overview

Real Property Law > Bankruptcy > Leases

Bankruptcy Law > Administrative Powers > Estate Property Lease, Sale & Use > General Overview

Bankruptcy Law > Administrative Powers > Executory Contracts & Unexpired Leases > Assignments

Bankruptcy Law > Reorganizations > Debtors in Possession > General Overview

### *HN3*[↓]  Executory Contracts & Unexpired Leases, Powers to Assume & Reject

*11 U.S.C.S. § 365(f)(1)* works by operation of law to invalidate lease provisions which restrict or discourage a debtor-in-possession from assigning the lease.

Civil Procedure > ... > Responses > Defenses, Demurrers & Objections > Waiver & Preservation of Defenses

### *HN4*[↓]  Defenses, Demurrers & Objections, Waiver & Preservation of Defenses

Waiver is the intentional relinquishment of a known right. The party asserting the defense must prove it. Waiver must be evidenced by a clear manifestation of intent and be unmistakable and unambiguous.

Bankruptcy Law > ... > Types of Claims > Unsecured Priority Claims > Subordination

Contracts Law > Contract Conditions & Provisions > General Overview

Bankruptcy Law > Administrative Powers > Estate Property Lease, Sale & Use > General Overview

Bankruptcy Law > Administrative Powers > Executory Contracts & Unexpired Leases > Assignments

Bankruptcy Law > Administrative Powers > Executory Contracts & Unexpired Leases > Powers to Assume & Reject

Business & Corporate
Compliance > ... > Assignments > Assignment of
Obligations > Consent Requirements

Contracts Law > Types of Contracts > Lease
Agreements > General Overview

Contracts Law > Personal Property > Personalty
Leases > General Overview

Real Property Law > Bankruptcy > Leases

## HN5[⬇] Unsecured Priority Claims, Subordination

Reservation of bankruptcy court jurisdiction in an order
approving lease assumption and assignment confirms
that trustee did not waive rights under *§ 365(f)(1) of the
Bankruptcy Code*, *11 U.S.C.S. § 365(f)(1)*. The court
finds a waiver of rights to challenge post-assignment
rent increases where the assignee expressly consented
to it in the lease assignment agreement. The court
enforces a subordination provision after finding that *§
365(f)(1)* is inapplicable.

Contracts Law > Breach > General Overview

Real Property Law > ... > Lease
Agreements > Commercial Leases > Shopping
Center Leases

Bankruptcy Law > Administrative Powers > Estate
Property Lease, Sale & Use > General Overview

Bankruptcy Law > Administrative
Powers > Executory Contracts & Unexpired
Leases > Assignments

Bankruptcy Law > Administrative
Powers > Executory Contracts & Unexpired
Leases > Existing Defaults

Contracts Law > Types of Contracts > Lease
Agreements > General Overview

Labor & Employment Law > Employment
Relationships > Employment Contracts > Breaches

Labor & Employment Law > ... > Employment
Contracts > Conditions & Terms > General
Overview

Real Property Law > Bankruptcy > Leases

Real Property Law > Landlord & Tenant > Lease
Agreements > Assignments

Real Property Law > Landlord & Tenant > Lease
Agreements > Lease Provisions

Real Property Law > ... > Lease
Agreements > Performance > General Overview

Real Property Law > ... > Lease
Agreements > Performance > Adequate Assurance
of Performance

## HN6[⬇] Contracts Law, Breach

Under *11 U.S.C.S. § 365(b)(3)(C)*, for purposes of *11
U.S.C.S. § §§ 365(b)(1)* and *365(f)(2)(B) of the
Bankruptcy Code*, adequate assurance of future
performance of a lease of real property in a shopping
center includes adequate assurance that assumption or
assignment of such lease is subject to all the provisions
thereof, including but not limited to provisions such as a
radius, location, use or exclusivity provision, and will not
breach any such provisions in any other lease, financing
agreement, or master agreement relating to such
shopping center. *11 U.S.C.S. § 365(b)(3)(C)*.

Contracts Law > Types of Contracts > Lease
Agreements > General Overview

Real Property Law > Landlord & Tenant > Lease
Agreements > Assignments

Bankruptcy Law > Administrative Powers > Estate
Property Lease, Sale & Use > General Overview

Bankruptcy Law > Administrative
Powers > Executory Contracts & Unexpired
Leases > Existing Defaults

Bankruptcy Law > Reorganizations > Debtors in
Possession > General Overview

Real Property Law > Bankruptcy > Leases

Real Property Law > ... > Lease
Agreements > Commercial Leases > Shopping
Center Leases

## HN7[⬇] Types of Contracts, Lease Agreements

Under *11 U.S.C.S. § 365(b)(3)(D)*, a debtor must

201 B.R. 73, *73; 1996 Bankr. LEXIS 1426, **1

demonstrate that assumption or assignment of the subject lease will not disrupt any tenant mix or balance in a shopping center.

Business & Corporate Compliance > ... > Contracts Law > Standards of Performance > Creditors & Debtors

Contracts Law > Contract Conditions & Provisions > General Overview

Bankruptcy Law > Administrative Powers > Estate Property Lease, Sale & Use > General Overview

Bankruptcy Law > Administrative Powers > Executory Contracts & Unexpired Leases > General Overview

Bankruptcy Law > Administrative Powers > Executory Contracts & Unexpired Leases > Assignments

Contracts Law > Types of Contracts > Lease Agreements > General Overview

Real Property Law > Bankruptcy > Leases

Real Property Law > Landlord & Tenant > Lease Agreements > Lease Provisions

### *HN8*[ ]  Standards of Performance, Creditors & Debtors

*11 U.S.C.S. § 365(f)(1)* permits assignment of an unexpired lease despite a clause in the lease prohibiting, conditioning, or restricting the assignment. *11 U.S.C.S. § 365(f)(1)* exceeds the scope of *11 U.S.C.S. §365(f)(1)* by prohibiting enforcement of any clause creating a right to modify or terminate the contract because it is being assumed or assigned, thereby indirectly barring an assignment by the debtor. The essence of *11 U.S.C.S. § 365 (f)(1)* and *(f)(3)* is that all contractual provisions, not merely those entitled anti-assignment clauses are subject to the court's scrutiny regarding their anti-assignment effect. While they operate in tandem to promote Congress' policy favoring a debtor's ability to maximize the value of its leasehold assets, *11 U.S.C.S. §365(f)(1)* and *(f)(3)* deal with different problems; *11 U.S.C.S. §365(f)(1)* deals with provisions that prohibit, restrict, or condition assignment; *11 U.S.C.S. § 365(f)(3)* deals with provisions that terminate or modify the terms of a lease because it has

been assumed or assigned.

Bankruptcy Law > ... > Automatic Stay > Relief From Stay > Procedural Matters

Contracts Law > Types of Contracts > Lease Agreements > General Overview

Real Property Law > Landlord & Tenant > Lease Agreements > Assignments

Bankruptcy Law > Administrative Powers > Estate Property Lease, Sale & Use > General Overview

Bankruptcy Law > Administrative Powers > Executory Contracts & Unexpired Leases > Assignments

Bankruptcy Law > Reorganizations > Debtors in Possession > General Overview

Bankruptcy Law > ... > Reorganizations > Debtors in Possession > Powers & Rights

Real Property Law > Bankruptcy > Leases

### *HN9*[ ]  Relief From Stay, Procedural Matters

Lease provisions conditioning a debtor-in-possession's right to assignment upon the payment of some portion of the "profit" realized upon such assignment are routinely invalidated under *11 U.S.C.S. § 365(f)(1)*. The court invalidates under *11 U.S.C.S. § 365(f)(1)*, a lease clause conditioning assignment of the lease upon a lessee's payment of 80 percent of the net proceeds to the lessor. A provision in the lease requiring a lessee to remit to the landlord 75 percent of the appreciation in value of the lease as a condition to the landlord's consent to assignment constitutes an invalid restriction on assignment even if it is valid under state law. The court holds that a lease provision that gave the landlord, as part of the price of its consent to assignment, the right to request profits realized by the tenant upon assignment applies only to a consensual assignment and is unenforceable in the tenant's bankruptcy by operation of *11 U.S.C.S. § 362(f)*.

Business & Corporate Compliance > ... > Contracts Law > Standards of Performance > Creditors & Debtors

201 B.R. 73, *73; 1996 Bankr. LEXIS 1426, **1

Contracts Law > Types of Contracts > Lease Agreements > General Overview

Bankruptcy Law > Administrative Powers > Estate Property Lease, Sale & Use > General Overview

Bankruptcy Law > Reorganizations > Debtors in Possession > General Overview

Business & Corporate Compliance > ... > Assignments > Assignment of Obligations > Consent Requirements

Business & Corporate Compliance > ... > Secured Transactions > Installment Contracts > Assignment of Interests

Business & Corporate Compliance > ... > Contracts Law > Types of Contracts > Executory Contracts

*HN10*[⬇]  **Standards of Performance, Creditors & Debtors**

The court invalidates a provision of an executory sale contract conditioning consent to assignment upon the payment by the debtor of an "assumption fee" equal to 4 percent of the amount outstanding under the contract.

**Counsel:** APPEARANCES:

KAYE, SCHOLER, FIERMAN, HAYS & HANDLER, LLP, New York, New York, Attorneys for Debtors.

BACHNER, TALLY, POLEVOY & MISHER, LLP, New York, New York, Attorneys for Massachusetts Mutual Life Insurance Co.

OTTERBURG, STEINDLER, HOUSTON & ROSEN, P.C., New York, New York, Attorneys for Monticello Mall and Tri-State Mall.

TRAUB, BONACQUIST & FOX, New York, New York, Attorneys for Unsecured Creditors' Committee.

**Judges:** BEFORE: James L. Garrity, Jr., United States Bankruptcy Judge

**Opinion by:** James L. Garrity, Jr.

# Opinion

**[*74] MEMORANDUM DECISION REGARDING JAMESWAY'S REQUEST FOR ORDER DECLARING**

**LEASE ASSIGNMENT RESTRICTIONS UNENFORCEABLE**

BEFORE:

James L. Garrity, Jr.

United States Bankruptcy Judge

Pursuant to *§ 365(a) of the Bankruptcy Code*, we authorized Jamesway Corporation, as chapter 11 debtor-in-possession ("Jamesway" or the "debtor"), to assume and assign three leases of non-residential real property (the **[**2]** "Leases") with Massachusetts Mutual Life Insurance Company ("Mass Mutual"), Monticello Mall ("Monticello") and Tri-State Mall ("Tri-State" and together with Mass Mutual and Monticello, the "Landlords") respectively, as landlords. Jamesway seeks an order pursuant to *§ 365(f)(1) of the Bankruptcy Code* invalidating provisions in those leases obligating it to pay the Landlords differing percentages of the "profit" it realized from the assignments and directing that $ 50,000 placed in escrow pursuant to the Newberry Order (defined below) be released to it. Over the Landlords' objections, we grant that request.

## Facts

The facts are not disputed. On October 18, 1995 ("petition date"), Jamesway and its affiliates (collectively, the "debtors") filed **[*75]** separate petitions for relief under chapter 11 of the Bankruptcy Code in this district. At that time, debtors operated discount department stores under the "Jamesway" name. Debtors are in possession of their businesses and properties as debtors-in-possession pursuant to *§§ 1107* and *1108 of the Bankruptcy Code*.

As of the petition date, Jamesway and Mass Mutual, as Successor-in-interest to Valley Green Mall Co., were parties to an agreement **[**3]** dated July 16, 1986, as amended (the "Newberry Lease") whereby Jamesway, as tenant, leased certain retail space located in the Newberry Commons shopping center in Etters, Pennsylvania. Paragraph 17 of that lease states in relevant part that:

> if Tenant assigns this Lease or sublets all or substantially all of the demised premises (not including an assignment or sublease to an affiliate, parent or subsidiary of Tenant, or to a successor to Tenant by merger, consolidation or operation of law), and such assignment or subletting

commences in or extends into the extension periods reserved under Article 3 of this Lease, then during the first twenty (20) years of such extension periods in which such assignment or sublease is in effect, Tenant shall pay Landlord 50% of the "profits" received by Tenant from the assignee or sublessee. Thereafter, Tenant shall pay Landlord 60% of such profits. As used herein, "profits" shall mean the amount, if any, paid by the assignee or sublessee to Tenant in excess of the fixed rent and additional rent payable by Tenant for the corresponding period of such assignment or sublease, excluding the reasonable costs to Tenant for effectuating such assignment **[**4]** or sublease (such as, without limitation, brokerage fees, reasonable attorneys' fees and costs to prepare the demised premises for such assignee or sublessee and the amount, if any, paid by such assignee or sublessee to purchase Tenant's fixtures, equipment or leasehold improvements in the demised premises.

Newberry Lease P 17. On or about February 9, 1996, Jamesway moved under _§ 365 of the Bankruptcy Code_ to assume and assign the Newberry Lease to Rite Aid of Pennsylvania, Inc. ("Rite Aid") for $ 100,000 (the "Rite Aid Motion"). Over Mass Mutual's objection, we granted the motion. The dispute over the enforceability of P 17 arose upon the settlement of the order implementing our decision ("Newberry Order"). The parties agreed to defer consideration of that issue and pursuant to the Newberry Order debtor placed in escrow $ 50,000 of the assignment proceeds pending resolution of the dispute.

As of the petition date Jamesway was party to an agreement dated April 18, 1966 (as amended, the "Monticello Lease"), as amended by an Amendment and Modification to Lease dated November 30, 1987 (the "Monticello Lease Modification"), whereby Monticello, successor-in-interest to Monticello **[**5]** Mall, Inc., leased certain retail premises to Jamesway in a shopping center located in Monticello, New York. Jamesway also leased premises located in Montague, New Jersey pursuant to an agreement with Tri-State dated as of May 16, 1967 (as amended, the "Tri-State Lease"), as amended by an Amendment and Modification to Lease dated January 31, 1988 (the "Tri-State Lease Modification"). Paragraphs 13 and 14 of the Tri-State Lease and Monticello Lease Modifications, respectively, are identical and state in relevant part as follows:

Upon the Tenant's sale, transfer, assignment, underletting or underleasing of the demised premises or a material portion thereof the Tenant shall pay to the Landlord, in consideration of this lease modification, an amount equal to one third (1/3) of the appreciated value of the leasehold received by the Tenant from the transferee, assignee, underlettee or underleasee of the premises. The appreciated value of the leasehold being that amount of money or other consideration paid by the transferee, assignee, underlettee or underleasee for the Tenant's leasehold interest less the net book value of any fixtures, inventory and leasehold improvements transferred.

**[**6]** Tri-State Lease Modification P 13; Monticello Lease Modification P 14. By order dated February 5, 1996, we approved debtor's assumption and assignment to Ames Realty II, Inc. of ten leases, including the Monticello **[*76]** Lease, for $ 2,750,000. By order dated March 28, 1996, we authorized debtor to assume and assign the Tri-State Lease to SNJ Corporation for $ 80,000. Neither Monticello nor Tri-State objected to the respective lease assignments and the relevant orders contain no escrow provisions for amounts allegedly payable to Monticello and Tri-State from the assignment proceeds. In both orders we retained jurisdiction to determine any disputes regarding the assignments. Monticello and Tri-State have each filed a proof of administrative claim in the respective sums of $ 83,250 and $ 26,640, for what they allege to be their share of the profits realized by Jamesway from the lease assignments.

## Discussion

Our subject matter jurisdiction of this contested matter is predicated on _28 U.S.C. §§ 1334(b)_ and _157(a)_ and the "Standing Order of Referral of Cases to Bankruptcy Judges" of the United States District Court for the Southern District of New York, dated July 10, 1984 (Ward, **[**7]** Acting C.J.). This is a core proceeding. See _28 U.S.C. § 157(b)(2)(A)_, _(N)_ and _(O)_.

_HN1_[↑] _Section 365(a) of the Bankruptcy Code_ authorizes a debtor-in-possession to assume or reject, subject to the court's approval, any executory contract or unexpired lease of the debtor. _11 U.S.C. § 365(a)_. A debtor-in-possession may assign an unexpired lease of the debtor only if it assumes the lease in accordance with _§ 365(a)_, and provides adequate assurance of future performance by the assignee, whether or not there has been a default under the lease. See _11 U.S.C. § 365(f)(2)_. Except as otherwise provided in the

Bankruptcy Code, an executory contract or unexpired lease is assumed cum onere. See *Thompson v. Texas Mexican Railway Co., 328 U.S. 134, 141, 66 S. Ct. 937, 942, 90 L. Ed. 1132 (1946)* (discussing assumption of lease under § 70 of the former Bankruptcy Act); In re Nitec Paper Corp., 43 Bankr. 492, 498 (S.D.N.Y. 1984); Rockland Center Associates v. TSW Stores of Nanuet, Inc., (In re TSW Stores of Nanuet, Inc.), 34 Bankr. 299, 304 (Bankr. S.D.N.Y. 1985). In relevant part, *HN2*[⬆] *§ 365(f) of the Bankruptcy Code* states that

(1) Except as provided in subsection (c) of this [**8] section, notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease under [*11 U.S.C. § 365(f)(2)*];

* * *

(3) Notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law that terminates or modifies, or permits a party other than the debtor to terminate or modify, such contract or lease or a right or obligation under such contract or lease on account of an assignment of such contract or lease, such contract, lease, right, or obligation may not be terminated or modified because of the assumption or assignment of such contract or lease by the trustee.

*11 U.S.C. § 365(f)*. Jamesway contends that the subject lease provisions are void and unenforceable under *§ 365(f)(1)* because they limit its ability to realize the full economic value of the Leases for the benefit of all unsecured creditors.

As a preliminary matter, Mass Mutual contends that Jamesway cannot challenge the enforceability of P 17 of the Newberry Lease because it failed [**9] to do so when it assumed and assigned that lease. The Tri-State and Monticello landlords do not make a waiver argument. *HN3*[⬆] *Section 365(f)(1)* works by operation of law to invalidate lease provisions which restrict or discourage a debtor-in-possession from assigning the lease. In re Office Products of America, Inc., 140 Bankr. 407, 410 (Bankr. W.D. Tex. 1992); In re Howe, 78 Bankr. 226, 229 (Bankr. D.S.D. 1987). Jamesway did not have to raise the issue when it assumed and assigned the Newberry Lease and it has not waived its right to do so. *HN4*[⬆] Waiver is the intentional relinquishment of a known right. *Johnson v. Zerbst, 304 U.S. 458, 464, 58 S. Ct. 1019, 1023, 82 L. Ed. 1461*

*(1938)*. As the party asserting the defense, Mass Mutual must prove it. In re Ionosphere Clubs, Inc., 111 Bankr. 436, 443 (Bankr. **[*77]** S.D.N.Y. 1990). Waiver must be evidenced by a clear manifestation of intent and be unmistakable and unambiguous. *Port Distributing Corp. v. Pflaumer, 880 F. Supp. 204, 211* (S.D.N.Y.), aff'd, *70 F.3d 8 (2d Cir. 1995)*. Mass Mutual has not demonstrated that Jamesway waived its right to challenge the enforceability of P 17 and the Newberry Order's provision for the $ 50,000 [**10] escrow proves the opposite. See *In re Office Products of America, Inc., 140 Bankr. at 410-11* (*HN5*[⬆]) reservation of bankruptcy court jurisdiction in order approving lease assumption and assignment confirms that trustee did not waive rights under *§ 365(f)(1) of the Bankruptcy Code*). The cases cited by Mass Mutual are distinguishable. In *Cukierman v. Mechanics Bank of Richmond (In re J.F. Hink & Son), 815 F.2d 1314, 1317-18 (9th Cir. 1987)*, the court found a waiver of rights to challenge post-assignment rent increases where the assignee expressly consented to it in the lease assignment agreement. No such pact exists here. In In re Village Rathskeller, Inc., 147 Bankr. 665, 671-72 (Bankr. S.D.N.Y. 1992), the court enforced a subordination provision after finding that *§ 365(f)(1)* was inapplicable.

Mass Mutual contends that in authorizing Jamesway to assume the Newberry Lease, we necessarily found that assumption of that lease is in the best interests of the estate, even if the sums allegedly due under P 17 are payable to Mass Mutual. It argues that as a matter of fact, P 17 did not impair Jamesway's ability to assign the Newberry Lease and as a legal matter, under *§ 365(f)* Jamesway [**11] must abide by the burdens of the assumed lease.

Mass Mutual opposed the Rite Aid Motion asserting that Jamesway and Rite Aid failed to provide adequate assurance of future performance under the Newberry Lease. It contended that Rite Aid's then intended (and now current) use of the premises for non-retail purposes breached use provisions in other tenants' leases in Newberry Commons and violated *§ 365(b)(3)(C) of the Bankruptcy Code*. *HN6*[⬆] Under that section, for purposes of *§§ 365(b)(1)* and *365(f)(2)(B) of the Bankruptcy Code*, adequate assurance of future performance of a lease of real property in a shopping center includes adequate assurance

that assumption or assignment of such lease is subject to all the provisions thereof, including (but not limited to) provisions such as a radius, location, use or exclusivity provision, and will not breach any

201 B.R. 73, *77; 1996 Bankr. LEXIS 1426, **11

such provisions in any other lease, financing agreement, or master agreement relating to such shopping center . . . .

11 U.S.C. § 365(b)(3)(C). Mass Mutual also argued that the proposed assignment violated § 365(b)(3)(D) because the Newberry Lease allegedly mandates that the premises be operated as a retail store or not at all. HN7[↑] [**12] Under § 365(b)(3)(D), debtor must demonstrate "that assumption or assignment of [the subject] lease will not disrupt any tenant mix or balance in such shopping center." 11 U.S.C. § 365(b)(3)(D).

We overruled the objection and granted the Rite Aid Motion. See Order dated March 1, 1996; Transcript of February 27, 1996 Hearing on Rite Aid Motion, pp. 56-64. We held that the Newberry Lease is a lease of real property in a shopping center. Id., p. 56. Subject to irrelevant restrictions, we construed the lease to permit debtor to use the premises for any legal purpose. Id., pp. 56-60. We noted, but did not address, the profit sharing provision in P 17 of the lease. Id., p. 60. Thus, contrary to Mass Mutual's assertion, we did not consider the impact of P 17 on Jamesway's right to assume and assign the lease.

Mass Mutual argues that § 365(f)(1) does not empower us to nullify the profit sharing provisions in the lease, but merely permits us to authorize the assignment over its objection. It argues that our power to invalidate lease provisions is limited by § 365(f)(3) to "ipso facto" or forfeiture provisions and that to hold otherwise will read § 365(f)(3) out of the [**13] statute. Courts do not have carte blanche to rewrite leases under §§ 365(f)(1) and (f)(3) or any provision of the statute. Simpson, Leases and the Bankruptcy Code: Tempering the Rigors of Strict Performance, 38 BUS. LAW. 60, 75 (cited hereinafter as "Simpson")); In re Howe, 78 Bankr. at 231. However, § 365 reflects the clear Congressional policy of assisting the debtor to realize the equity in all of its assets. See In re Howe, 78 Bankr. at 230 n.7 [*78] (citing Matter of Haffner's 5 Cent to $ 1.00 Stores, Inc., 26 Bankr. 948, 949 (Bankr. N.D. Ind. 1983); Simpson at p. 61). Toward that end, HN8[↑] § 365(f)(1) permits assignment of an unexpired lease despite a clause in the lease prohibiting, conditioning or restricting the assignment. Subsection (f)(3) goes beyond the scope of subsection (f)(1) by prohibiting enforcement of any clause creating a right to modify or terminate the contract because it is being assumed or assigned, "thereby indirectly barring an assignment by the debtor." In re Howe, 78 Bankr. at 226 (citing In re J.F. Hink & Son, 815 F.2d at 1317-18; In re Sapolin Paints, Inc., 20

Bankr. 497, 509 (Bankr. E.D.N.Y. 1982)). "The essence of Subsections [**14] (1) and (3) is that all contractual provisions, not merely those entitled 'anti-assignment clauses' are subject to the court's scrutiny regarding their anti-assignment effect." Id. at 229-30 (citing Matter of U.L. Radio Corp., 19 Bankr. 537, 543 (Bankr. S.D.N.Y. 1982)). While they operate in tandem to promote the Congressional policy favoring a debtor's ability to maximize the value of its leasehold assets, subsections (f)(1) and (f)(3) deal with different problems; (f)(1) with provisions that prohibit, restrict or condition assignment, and (f)(3) with provisions that terminate or modify the terms of a lease because it has been assumed or assigned. For this reason, construing the former to invalidate provisions that directly or indirectly restrict the debtor's ability to assign the subject lease does not render § 365(f)(3) superfluous.

Moreover, Mass Mutual's literal construction of § 365(f)(1) makes nonsense of the statute while undermining its purpose. For Mass Mutual, even if assignment of an assumed lease were expressly conditioned upon the payment of a portion of the proceeds realized upon assignment to the lessor, § 365(f)(1) would permit assignment but would not [**15] affect any lease term associated with the condition. As applied herein, it would mean that Jamesway could assign the Leases provided it paid the Landlords the relevant percentages of the profits realized through the assignments. In order words, Jamesway would be complying with the very condition that subsection (f)(1) was designed to invalidate. This is not the correct reading of the statute.

In furtherance of Congressional policy favoring the assumption and assignment of unexpired leases as a means of assisting the debtor in its reorganization or liquidation efforts, we interpret § 365(f)(1) to invalidate provisions restricting, conditioning or prohibiting debtor's right to assign the subject lease. See In re Howe, 78 Bankr. at 228; In re U.L. Radio Corp., 19 Bankr. 537 at 543. No court has read the statute as narrowly as Mass Mutual. Rather, HN9[↑] lease provisions conditioning a debtor-in-possession's right to assignment upon the payment of some portion of the "profit" realized upon such assignment are routinely invalidated under § 365(f)(1). See Robb v. Schindler, 142 Bankr. 589 (D. Mass. 1992) (invalidating under § 365(f)(1) lease clause conditioning assignment of lease upon [**16] lessee's payment of 80% of net proceeds to lessor); South Coast Plaza v. Standor Jewelers West, Inc. (In re Standor Jewelers West, Inc.), 129 Bankr. 200 (Bankr. 9th Cir. 1991) (provision in lease requiring lessee to remit to

22-11509-pb    Doc 180    Filed 02/21/23    Entered 02/21/23 16:53:50    Main Document
Pg 186 of 191
Page 9 of 9

201 B.R. 73, *78; 1996 Bankr. LEXIS 1426, **16

landlord 75% of appreciation in value of lease as condition to landlord's consent to assignment constituted invalid restriction on assignment even if valid under state law); In re The National Sugar Refining Co., 21 Bankr. 196 (Bankr. S.D.N.Y. 1982) (lease provision that gave landlord, as part of price of its consent to assignment, right to request profits realized by tenant upon assignment applied only to consensual assignment and was unenforceable in tenant's bankruptcy by operation of § 362(f)); see also In re Howe, 78 Bankr. at 228 (HN10[↥] invalidating provision of executory sale contract conditioning consent to assignment upon payment by debtor of "assumption fee" equal to 4% of amount outstanding under contract).

Mass Mutual distinguishes those cases arguing that P 17 is enforceable under § 365(f)(1) because it does not prevent Jamesway from assigning the Newberry Lease to Rite Aid, does not alter any term in the lease based upon the assignment and [**17] is not triggered by the filing of Jamesway's chapter 11 case. It urges that the only effect of P 17 is to allocate funds between Jamesway [*79] and the landlord upon assignment of the lease and that it is relevant only as it may impact on Jamesway's business judgment in electing to assume or reject the leases. The practical effect of the profit sharing clause in the Newberry Lease is the same as those at issue in the cited cases: it limits Jamesway's ability to realize the intrinsic value of the lease. See In re Howe, 78 Bankr. at 230 n.7 ("The four percent fee may also be viewed as an attempt by the vendor to extract any profit realized upon the assignment of the contract. . . . Such a purpose would frustrate the Congressional policy of assisting the debtor in realizing the equity in all his or her assets") (citing In re National Sugar Refining Co., 21 Bankr. 196 (Bankr. S.D.N.Y. 1982); Matter of Haffner's 5 Cent to $ 1.00 Stores, Inc., 26 Bankr. at 949; Simpson at p. 61). The Landlords cannot, by artful drafting, thwart the fundamental bankruptcy policy allowing a debtor to realize maximum value from its assigned leases for the benefit of its estate and creditors.

Finally, [**18] the Tri-State and Monticello landlords contend that § 365(f)(1) bars enforcement of profit sharing provisions that are so burdensome as to constitute penalties. They urge that we should conduct a balancing test and enforce the provisions at issue here as reasonable fees payable upon assignment. Some cases contain language leaving open the possibility that the courts might have ruled differently had the amounts payable by the debtor upon assignment been less. See, e.g., Robb v. Schindler, 142 Bankr. at 592; In re Office

Products of America, Inc., 140 Bankr. at 412; In re Howe, 78 Bankr. at 230. None of these courts ruled that the contract provisions in question would be enforced if the debtors had to pay a "reasonable" percentage of the assignment proceeds. Nothing in § 365(f)(1) support's the Landlord's position.

## Conclusion

We grant debtor's request for an order declaring that the profit sharing provisions of the Leases are unenforceable and direct that the $ 50,000 currently held in escrow from the assignment proceeds of the Newberry Lease be released to debtor.

SETTLE ORDER.

Dated: New York, New York

September 30, 1996

James L. Garrity, Jr.

United [**19] States Bankruptcy Judge

---

**End of Document**

⚠ Caution
As of: February 20, 2023 1:47 PM Z

# *In re Toys "R" Us, Inc.*

United States Bankruptcy Court for the Eastern District of Virginia, Richmond Division

May 31, 2018, Decided; May 31, 2018, Entered on Docket

Case No. 17-34665-KLP, Chapter 11

**Reporter**

2018 Bankr. LEXIS 1604 *

In re: Toys "R" Us, Inc., et al.,[1] Debtors.

**Subsequent History:** Stay denied by, Motion denied by, As moot *Brea Union Plaza I, LLC v. Toys "R" Us, Inc., 2018 U.S. Dist. LEXIS 123049 (E.D. Va., July 23, 2018)*

## Core Terms

Lease, bid, use restriction, Premises, furniture, assign, executory contract, free and clear, bankrupt estate, unexpired lease, provisions, Entities

## Case Summary

### Overview

HOLDINGS: [1]-Corporate debtors that rented a building from a LLC before they declared Chapter 11 bankruptcy were entitled to assume and assign the lease to a furniture company, pursuant to *11 U.S.C.S. § 365(f)*, even though the lease contained a provision which stated that the demised premises would not be used for a store which had as its principal business the sale of furniture; [2]-Although the LLC was owned by a company that owned and leased other buildings that were located near the building, the building was not part of a "shopping center," as that term was used in *§ 365(b)(3)*, the use restriction unduly hampered the debtors' ability to assign the lease and prevented the full realization of the value of their assets, and the interest of the debtors in obtaining the full value of the lease outweighed any detriment to the LLC.

### Outcome

The court overruled the LLC's objection to the debtors' proposed assumption and assignment of the lease.

## LexisNexis® Headnotes

Bankruptcy Law > Administrative Powers > Executory Contracts & Unexpired Leases > Assignments

*HN1*[ ⬇ ]  **Executory Contracts & Unexpired Leases, Assignments**

*11 U.S.C.S. § 365(f)(1)* provides that except as provided in *§ 365(b)* or *(c)*, notwithstanding a provision in an executory contract or unexpired lease of a debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, a trustee may assign such contract or lease under *§ 365(f)(2)*. *Section 365(f)(2)* provides that a trustee may assign an executory contract or unexpired lease of a debtor only if: (A) the trustee assumes such contract or lease in accordance with the provisions of *§ 365*; and (B) adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease. *Section 365(f)(3)* provides that notwithstanding a provision in an executory contract or unexpired lease of a debtor, or in applicable law that terminates or modifies, or permits a party other than a debtor to terminate or modify, such contract or lease or a right or obligation under such contract or lease on account of an assignment of such contract or lease, such contract, lease, right, or obligation may not be terminated or modified under such provision because of the assumption or assignment of such contract or lease by the trustee.

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's tax identification number, are set forth in the Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief [Dkt. No. 78].

Bankruptcy Law > Administrative
Powers > Executory Contracts & Unexpired
Leases > Assignments

*HN2*[⬇]  **Executory Contracts & Unexpired Leases, Assignments**

In analyzing *11 U.S.C.S. § 365(f)*'s function in the assignment of executory contracts, the United States Bankruptcy Court for the Eastern District of Virginia, Richmond Division, is guided by the philosophy the United States Bankruptcy Court for the Southern District of New York espoused in *In re Adelphia Communications Corp.*: *Section 365(f)* addresses the assignment of executory contracts, and *§ 365(f)(1)*, which implements a general Congressional purpose to permit assignments, to maximize recovery for creditors, sets forth a general rule authorizing the assignment of executory contracts notwithstanding provisions in those contracts that prohibit, restrict, or condition assignment. That is important, as *§ 365(f)* implements a Congressional policy determination that executory contracts are valuable assets of a debtor's bankruptcy estate, and that except in those relatively rare cases where the realization of their value gives rise to material prejudice to the contract counterparty other than the loss of a prospective windfall, the economic value in such contracts should go not to the contract counterparty, but rather to a debtor's creditor community generally.

Bankruptcy Law > Administrative
Powers > Executory Contracts & Unexpired
Leases > Assignments

*HN3*[⬇]  **Executory Contracts & Unexpired Leases, Assignments**

Courts have addressed the harm that must be demonstrated by a landlord in applying a balancing test under *11 U.S.C.S. § 365(f)*. In *In re U.S. Radio Corp.*, the United States Bankruptcy Court for the Southern District of New York held that *§ 365* expresses a clear Congressional policy favoring assumption and assignment of unexpired leases. Such a policy will insure that potential valuable assets will not be lost by a debtor who is reorganizing his affairs or liquidating assets for distribution to creditors. This policy parallels case law which disfavors forfeiture. To prevent an assignment of an unexpired lease by demanding strict enforcement of a use clause, and thereby contradict

clear Congressional policy, a landlord or lessor must show that actual and substantial detriment would be incurred by him if the deviation in use was permitted.

**Counsel:**  **[*1]** For Toys "R" Us, Inc., Debtor: Peter J. Barrett, Kutak Rock L.L.P., Richmond, VA; Michael A. Condyles, Loc Pfeiffer, Jeremy S. Williams, Kutak Rock LLP, Richmond, VA.

For Judy A. Robbins, William K. Harrington, U.S. Trustees: Shannon Pecoraro, Robert B. Van Arsdale, Office of the U.S. Trustee, Richmond, VA.

For Official Committee of Unsecured Creditors, Creditor Committee: Olga Antle, Joshua David Stiff, Wolcott Rivers Gates, Virginia Beach, VA; Cullen Drescher Speckhart, Wolcott Rivers Gates, Richmond, VA.

For DLC Management Corp., Creditor Committee: Joseph D. Wilson, Kelley Drye & Warren LLP, Washington, DC.

**Judges:** Keith L. Phillips, United States Bankruptcy Judge.

**Opinion by:** Keith L. Phillips

# Opinion

## MEMORANDUM OPINION AND ORDER

NTH 250 E LLC ("NTH") owns premises (the "Premises") located at 250 East Route 4, Paramus, New Jersey. NTH leases the Premises to Debtors ("TRU") pursuant to a lease executed on September 19, 1972 (the "Lease") between the predecessors in interest of TRU and NTH. On March 23, 2018, the Court entered the Order (I) Establishing Bidding Procedures and (II) Granting Related Relief [Dkt. No. 2351] (the "Bidding Procedures Order"), approving the Debtors' sale, and assumption and assignment, of **[*2]** certain real property and unexpired leases and auction and bidding procedures for soliciting and selecting the best offers for those assets. The Lease was one of the assets included in the Bidding Procedures Order. TRU, in connection with the Bidding Procedures Order, is seeking final approval of the assumption and assignment of the Lease to Raymours Furniture Company, Inc. ("Raymours") [Dkt. No. 2494].

NTH has objected to the proposed assignment, asserting that the transaction is impermissible because the Debtors cannot assign the Lease free and clear of

the use restriction contained therein. The Court held an evidentiary hearing on May 10, 2018. At the Court's direction, each party thereafter submitted proposed findings of fact and conclusions of law. The Court has carefully considered the evidence and submissions of the parties. For the following reasons, NTH's objection is overruled.

### Jurisdiction

Pursuant to _28 U.S.C. §§ 157(a)_ and _1334(b)_ and the general order of reference for the U.S. District Court for the Eastern District of Virginia dated August 15, 1984, this Court has subject matter jurisdiction over the Debtors' bankruptcy cases and this contested matter relating to the Debtors' proposed assumption **[*3]** and assignment of the Lease. This is a core proceeding pursuant to _28 U.S.C. § 157(b)(2)(A)_,_(N)_ and _(O)_. Venue is proper pursuant to _28 U.S.C. §§ 1408_ and _1409_.

### Facts

At an active auction conducted on March 29, 2018, pursuant to the Bidding Procedures Order, Raymours and NTH were the primary bidders on the Lease, with Raymours ultimately being the successful bidder. The Raymours bid was $1,300,000. In connection with its bid, Raymours represented that it "intend[ed] to occupy and use . . . the Premises for the retail sale of home and home office furniture, furnishings and accessories and mattresses and box springs, and such ancillary office and other uses as are incidental to the operation of a retail furniture store. . . ." The bid also provided that it was subject to this Court's order that the assignment would be free and clear of any use restrictions contained in the Lease. The Lease contains the following use restriction: "The demised premises shall not be used for a store which has as its principal business the sale at retail of automobiles, other than toy automobiles, and furniture, excluding juvenile furniture" (the "Use Restriction"). On March 30, 2018, the Debtors filed a notice proposing to assume and assign the Lease to Raymours, **[*4]** with NTH[2] as the backup bidder.

The Premises are located on a fifty-acre real estate development that contains sixteen buildings. Each building is owned by a separate LLC (collectively, the

"Hegeman Entities"), with each LLC being owned by N.T. Hegeman Co., Ltd., the managing member and sole equity owner of NTH. Among the tenants in the development are Macy's, Thomasville Furniture, and Mattress Firm.

### Discussion

NTH has objected to the proposed assignment, asserting that the transaction is impermissible because the Use Restriction cannot be voided. The Debtors argue that _§ 365(f) of the Bankruptcy Code_, _11 U.S.C. § 365(f)_, allows them to assign the Lease free and clear of the Use Restriction. _HN1_[⬆] _Section 365(f)_ provides that:

> (f)(1) Except as provided in _subsections (b)_ and _(c)_ of this section, notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease under _paragraph (2)_ of this subsection.
> (2) The trustee may assign an executory contract or unexpired lease of the debtor only if--
> (A) the trustee assumes such contract or lease in accordance with the provisions of this section; and
>
> (B) adequate assurance of future **[*5]** performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.
> (3) Notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law that terminates or modifies, or permits a party other than the debtor to terminate or modify, such contract or lease or a right or obligation under such contract or lease on account of an assignment of such contract or lease, such contract, lease, right, or obligation may not be terminated or modified under such provision because of the assumption or assignment of such contract or lease by the trustee.

The parties agree that the Premises are not part of a shopping center, as that term is used in _§ 365(b)(3)_, thus making the provisions of _§ 365(b)(3)_ inapplicable.[3]

---

[2] The notice listed "Landlord" as the backup bidder. The NTH representative testified at the hearing that NTH's final bid was $1,250,000.

[3] _Section 365(b)(3)_ contains separate requirements for the provision of adequate assurance of future performance if a shopping center lease is sought to be assigned.

Thus, the only issue before the Court is whether the Debtors may, using the authority of § 365(f), assign the Lease free and clear of the Use Restriction.

HN2[⬆] In analyzing § 365(f)'s function in the assignment of executory contracts, the Court is guided by the philosophy espoused in *In re Adelphia Communications Corp.*:

> Section 365(f) of the Code addresses the assignment of executory contracts, and its subsection (f)(1), which implements a general Congressional [*6] purpose to permit assignments, to maximize recovery for creditors, sets forth a general rule authorizing the assignment of executory contracts notwithstanding provisions in those contracts that prohibit, restrict or condition assignment. That is important, as Code section 365(f) implements a Congressional policy determination that executory contracts are valuable assets of the estate, and that except in those relatively rare cases where the realization of their value gives rise to material prejudice to the contract counterparty other than the loss of a prospective windfall, the economic value in such contracts should go not to the contract counterparty, but rather to the debtor's creditor community generally.

359 B.R. 65, 73 (Bankr. S.D.N.Y. 2007). Similarly, the court in *In re Chicago Investments, LLC*, observed that a court must balance the benefit to the debtor versus the harm to the landlord by examining

> the particular facts and circumstances of the transaction to determine whether a lease clause restricts or conditions assignment including the extent to which the provision hampers a debtor's ability to assign, whether the provision would prevent the bankruptcy estate from realizing the full value of its assets, and the economic detriment [*7] to the non-debtor party.

470 B.R. 32, 89 (Bankr. D. Mass. 2012) (quoting E-Z Serve Convenience Stores, Inc., 289 B.R. 45, 50 (Bankr. M.D. N.C. 2003)). *See also* Hannaford Bros. Co. v. Ames Dep't Stores, Inc. (In re Ames Dep't Stores, Inc.), 316 B.R. 772, 794 (Bankr. S.D.N.Y. 2004) ("Section 365(f) performs an important function for maximizing the value in an estate for creditors. It protects the body of creditors as a whole from provisions, typically in leases, that frustrate the estate's ability to convert the economic value in leases into cash that can increase creditor recoveries. But while section

365(f) can, and should, be used to invalidate provisions that frustrate those goals, a bankruptcy court nevertheless must be attentive to the facts of the particular case to ensure that section 365(f) is not used indiscriminately.").

HN3[⬆] Courts have addressed the harm that must demonstrated by a landlord in applying such a balancing test. In *In re U.S. Radio Corp.*, the court held that:

> [s]ection 365 expresses a clear Congressional policy favoring assumption and assignment. Such a policy will insure that potential valuable assets will not be lost by a debtor who is reorganizing his affairs or liquidating assets for distribution to creditors. This policy parallels case law which disfavors forfeiture. To prevent an assignment of an unexpired lease by demanding strict enforcement of a use clause, and thereby contradict clear Congressional policy, *a landlord or lessor* [*8] *must show that actual and substantial detriment would be incurred by him if the deviation in use was permitted*.

In re U.L. Radio Corp., 19 B.R. 537, 544 (Bankr. S.D. N. Y. 1982) (emphasis added) (citing In re Huntington Limited, 654 F.2d 578, 584 n.7 (9th Cir. 1981); 2 Collier on Bankruptcy P 365.06 n.1 (15th ed. 1981)).

The facts and circumstances of this case compel the Court to find that the Use Restriction will unduly hamper the Debtors' ability to assign the Lease and prevent the full realization of the value of the Debtors' assets. When balancing the interests of the Debtors against those of NTH, it is evident that the interest of the Debtors in obtaining the full value of the below-market Lease outweighs the detriment to NTH. In this case, NTH has failed to provide any clear evidence of harm beyond its inability to acquire an undervalued lease at the expense of the Debtors. The $1,300,000 offered by Raymours represents maximum value to the bankruptcy estates.

The evidence before the Court is that Raymours would not have bid on the Lease had it thought that the Use Restriction would be retained. (Transcript of May 10, 2018 hg. at 99)[Dkt. No. 3073]. The effect of the Raymours auction participation was to increase the price of the Lease to $1,300,000, which was a substantial increase over NTH's initial $500,000 bid. The parties do not [*9] contest that after multiple rounds of bidding between Raymours and NTH, NTH withdrew, leaving Raymours the successful bidder. This undoubtedly led to a maximization of the value to be received by the bankruptcy estates. Despite the

assertion by NTH that the difference between its highest bid and Raymours' winning bid was only $50,000, had Raymours not continued bidding on the Lease, the purchase price undoubtedly would have been substantially lower than the eventual $1,300,000 winning bid. To find that Raymour's bid would add only $50,000 to the bankruptcy estates would discount the value of Raymour's contribution to the bidding process and may have a chilling effect on future competitive bidding.

The Court also finds that NTH has not proven any definitive harm it will suffer if the Use Restriction is invalidated pursuant to *§ 365(f)*. The Debtors and Raymours point out that NTH does not own any other properties near the Premises, since each of the other nearby properties is owned by a separate limited liability company in the Hegeman Entities. Therefore, they argue, any possible damage from enforcement of the Use Restriction would be to those separate companies and not to NTH. However, even **[*10]** if the Court disregards those corporate identities and treats all of the separate Hegeman Entities as one entity, the Court finds that NTH has failed to establish the "actual and substantial detriment" required by *U.L. Radio Corp*.

NTH argues that operation of a furniture store on the Premises could negatively impact tenants of other Hegeman Entities that might be competitive with Raymours. In particular, NTH posits that the failure to invalidate the Use Restriction might discourage another tenant, Macy's furniture store, from renewing its lease. However, NTH has not provided the Court with any evidence beyond speculation and generalized references to tenant mix to support its theory. There was no evidence that any representative of NTH had spoken to a representative of Macy's with respect to the Use Restriction or Macy's future plans. In fact, NTH's representative testified that Macy's has not threatened to leave if Raymours establishes a store on the Premises. (Transcript of May 10, 2018 hg. at 133) [Dkt. No. 3073]

The Court finds that the possibility of harm to NTH resulting from the assignment free and clear of the Use Restriction is outweighed by the benefit of the sale to the Debtors' **[*11]** bankruptcy estates. Therefore, the Court will approve the assignment of the Lease to Raymours free and clear of the Use Restriction pursuant to *§ 365(f)*, and

**IT IS ORDERED** that NTH's objection to the proposed assumption and assignment of the Lease is overruled.

Date: May 31, 2018

/s/ Keith L. Phillips

United States Bankruptcy Judge

Entered on Docket: May 31, 2018

**End of Document**

Christopher Livingston