**KLESTADT WINTERS JURELLER**
**SOUTHARD & STEVENS, LLP**
200 West 41st Street, 17th Floor
New York, NY 10036
Telephone: (212) 972-3000
Tracy L. Klestadt
Kathleen M. Aiello

*Counsel to The Residential Board of*
*Managers of the Millennium Point*
*Condominium*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re | Chapter 11 |
| URBAN COMMONS 2 WEST LLC, *et al.*,[1] | Case No. 22-11509 (PB) |
| Debtors. | (Jointly Administered) |

## CURE STATEMENT OF THE RESIDENTIAL BOARD OF MANAGERS OF
## MILLENNIUM POINT CONDOMINIUM

The Residential Board of Managers of the Millennium Point Condominium (the "Residential Board'), by and through its undersigned counsel, Klestadt Winters Jureller Southard & Stevens LLP, hereby submits its Cure Statement Regarding Obligations Required to be Satisfied by the Debtors Upon the Assumption and Assignment of certain Hotel Lease Interests (the "Cure Statement"), including the Condominium Governing Documents, as of March 10, 2023, and in support thereof, respectfully sets forth and represents as follows:

---

[1] Jointly administered with Urban Commons 2 West II LLC (Tax ID: **-***7987), Urban Commons 2 West III LLC (Tax ID: **-***3270), Urban Commons 2 West IV LLC (Tax ID: **-***8418), and Urban Commons 2 West Operating Tenant LLC (Tax ID: **-***0849), with a shared mailing address of 3334 East Coast Highway, No. 350, Corona Del Mar, CA 92625.

## PRELIMINARY STATEMENT

In connection with the Debtors' anticipated assumption and assignment of the Hotel Lease
Interests (as they are defined in the Bid Procedures Order), the Residential Board is entitled to
payment of a Cure Payment (later defined) as outlined herein to satisfy all obligations resulting
from the Debtors' pre-petition defaults under the Hotel Lease Interests, which specifically include,
but are not limited to, "all right, title and interest of the Debtors, if any, in and to the Ground
Lease;" […] "all the foregoing being and remaining subject to the provisions, terms and conditions
of (and the obligations of the parties under) the Ground Lease […] and the Declaration of
Condominium ("Declaration") and By-Laws of Millennium Point Condominium ("By-Laws").[2]

The Bankruptcy Code Section 365(a) permits the Debtors, subject to court approval, to
assume or reject any executory contract or unexpired lease of the Debtors (*i.e.*, the Hotel Lease
Interests). However, where there has been a default in the Hotel Lease Interests, the Debtors may
not assume and assign them unless they can show that, upon assumption of the Hotel Lease
Interests, they will: (A) cure, or provide adequate assurance that the Debtors will promptly cure,
such default; (B) compensate, or provide adequate assurance that the Debtors will promptly
compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss
to such party resulting from such default; and (C) provide adequate assurance of future
performance under such contract or lease." *See* 11 U.S.C. § 365(b)(1).

Here, the Debtors seek to assume and assign the Hotel Lease Interests, include, among
other agreements, the Ground Lease, the Declaration and the By-Laws, in connection with the
contemplated asset sale. The Hotel Lease Interests are executory in nature. Thus, the Debtors must

---

[2] *See* Order (I) Approving Bid Procedures and (II) Scheduling Auction and Sale Hearing and Granting
Related Relief (the "Bid Procedures Order") at Ex. A, p. 1.

assume and cure any defaults, both monetary and non-monetary, before they can assign the Hotel Lease Interests to any Successful Bidder upon the sale of the Debtors' assets.

The Residential Board has already set forth at length the Debtors' pre-petition non-monetary defaults, along with the requirements that an assignee (*i.e.,* the Successful Bidder) will be required to show to satisfy the adequate assurance of future performance requirement under Bankruptcy Code Section 365(b)(1)(C).[3]    However, the Debtors must also cure the Debtors' monetary defaults on the Hotel Lease Interests, including those owed to the Residential Board, and to compensate the Residential Board for any actual pecuniary loss caused by those defaults, upon assignment of those interests.  Although the Battery Park City Authority ("BPCA"), as landlord, and Millennium BPC Development LLC ("Millennium BPC") and the Debtors as successors in interest, as tenant, are the contracting parties to that certain ground lease, dated January 1, 2000 (the "Ground Lease" and together with the Declaration and By-Laws, the "Governing Documents"), the Supreme Court of the State of New York, Appellate Division, First Judicial Department (the "First Department"), has already held that the Residential Board and individual residential condominium unit owners are intended third-party beneficiaries[4] under the Ground Lease.  The First Department expressly found that the Governing Documents (not only the Ground Lease, but also the Condominium Declaration and By-Laws), by their terms and in accordance

---

[3] *See Limited Objection of the Residential Board of Managers of the Millennium Point Condominium to the Debtors' Motion Seeking Entry of : (I) Sale Procedures Order (A) Approving Bidding Procedures, (B) Scheduling Auction and Sale Approval Hearing; and (II) Sale Approval Order (A) Authorizing (I) the Sale of All the Debtors' Real Property and Leasehold Interests and Assignment of Hotel Unit Lease and Sublease Free and Clear of All Liens, Claims, Interests and Encumbrances, (II) Rejecting Franchise and Owner Agreements with Marriott International, Inc. and (III) Granting the Successful Bidder Good Faith Status*, filed on February 7, 2023 [ECF No. 154] (the "Residential Board's Limited Objection to Sale Motion").

[4] The First Department entered a Decision and Order on August 5, 2021 (the "First Department Decision"), finding that the Residential Board and individual residential condominium unit owners are third-party beneficiaries of the Ground Lease, as further discussed below. *See* First Department Decision at p. 3.

with the ruling of the First Department, are binding and enforceable contracts which protect the Residents' rights and seek to ensure the Condominium is managed and operated consistent therewith. The First Department further held that the Residential Board is either an intended third-party beneficiary or a direct contracting party with respect to each of those agreements. Respecting that same case, the trial court held, and the First Department affirmed on appeal, that based on the "express terms of the Ground Lease, it is clear the residents were intended to benefit" and "[d]espite the fact that the Declaration and Bylaws directly grant the Condominium Board authority to make decisions regarding the condo, the Plaintiffs benefit from the Ground Lease and may assert claims for breach of the Ground Lease where they have been harmed." *See Residential Board v. Condominium Board, et al.* Supreme Court of the State of New York, New York County (Index No. 651238/2018), dated July 18, 2018, at pp. 12:5-6, 14:9-13.

In accordance with the By-Laws, each Condominium unit, including the Hotel Unit, is liable for its *pro rata* share of the costs and expenses necessary for the maintenance and operation of the General Common Elements of the Condominium (as defined by the Declaration and By-Laws). *See* By-Laws at §6.1.1. The Condominium Board is responsible for assessing and collecting the amounts necessary to pay for the General Common Expenses from the owners of the Condominium Units, based upon each Unit Owner's *pro rata* share of the Condominium *Id.* Unit Owners are billed monthly for their share of the General Common Charges.

However, under §6.5 of the By-Laws, if any Board (including the Commercial Board) fails to take action to collect unpaid CAM or and/other Shared Expenses (defined cumulatively in the By-Laws as "Common Charges")[5] from a defaulting Unit Owner, another Board may take any action to collect such monies, including instituting legal action to recover the same.

---

[5] "Common Charges," as such pertains to those allocable to the Commercial Unit Owner, are defined as "Commercial Common Charges." *See* Exhibit C (Definitions) to the By-Laws. The term, "Commercial

Specifically, Section 6.5 of the By-Laws provides:

Each Board shall take prompt action to collect any Common Charges due to such Board which remain unpaid for more than twenty business days after the due date for payment thereof.  In the event that any Board fails to take such action, another Board in its own name, or, if necessary, in the name of the Board to which such charges are due, may take any action for the collection of such charges which the Board to which such charges are due may have taken, including, without limitation, the institution of such actions and the recovery of interest and expenses as provided in this Article 6.

As described in detail herein, almost immediately upon the Debtors' assumption of the Hotel Lease Interests in September 2018, they defaulted on their obligations to the Residential Board under the Governing Documents.  Since that time, the Residents have been forced to involuntarily advance the Debtors' portion of the CAM and Shared Common Expenses that Debtors owed to the Condominium, as well as to cover the Debtors' portion of certain labor and operating expenses for the Condominium and were even forced to pay the Debtors' separate utilities because of complete shutdown of the utilities would have been catastrophic to the building. The Residents have been involuntarily supporting the Debtors for years.

By the time the Debtors filed these bankruptcy cases on November 15, 2022, the damages caused by the Debtors to the Residential Board totaled approximately $4,953,251.45 which continued to accrue post-petition in the amount of $392,917.40, as of March 10, 2023.  The total damages caused by the Debtors' defaults as of March 10, 2023, which the Debtors are required to cure for the Residential Board upon assumption and assignment of the Hotel Lease Interests is **$5,346,168.85** (the "Cure Payment"), which continue to accrue.  The Debtors must satisfy the Cure Payment to the Residential Board upon assumption and assignment of the Hotel Lease Interests

---

Common Charges," is defined as those "assessments payable to the Condominium Board by the Commercial Unit Owners, for the purpose of meeting (a) Commercial Common Expenses and (b) each Commercial Unit Owner's pro rata share of General Common Expenses (including the pro rata share of Rent due from each Commercial Unit Owner)." *Id*.

because the Residential Board and individual residential condominium unit owners are intended

third-party beneficiaries under the Ground Lease, and are direct contracting parties under the other

Governing Documents (*i.e.*, the Declaration and By-Laws), who were forced to continue

performing under those contracts even after the Debtors' defaulted on their obligations.

## BACKGROUND

1.    The Millennium Point Condominium (the "Condominium"), located at 2-10 West

Street in Battery Park City, is a hybrid residential and commercial condominium association,

comprised of a commercial unit and a residential section, in which the Residents and Hotel share

the costs of common facilities based on their respective allocated interests in the property -

54.7696% allocated to the Hotel and 45.2304% allocated to the Residential Portion, as set forth in

the Ground Lease (defined below).

2.    The Condominium is intended to be comprised of a 14-story commercial portion,

including a 5-star luxury hotel and museum, and a 30-story residential portion.  The commercial

unit consists of the hotel, which is required to be operated as a 5-star, nationally-branded hotel on

the first 14 floors of the Condominium (the "Hotel" or "Hotel Unit") and a museum (together, the

"Commercial Unit"). The Debtors are the record owners of the Commercial Unit.  Subject to

exceptions set forth in the Declaration, By-Laws and Ground Lease, the Commercial Unit is

generally managed by its own Commercial Board of Managers of Millennium Point (the

"Commercial Board"), which is distinct from the Residential Board. The remaining floors of the

Condominium contain the residential portion (the "Residential Portion"), consisting of 100

apartment units occupied by more than 200 residents (collectively, the "Residents").

3.    The Condominium has three separate boards of managers.  The Commercial Board

handles matters generally affecting only the Commercial or Hotel Unit.  The Residential Board

handles matters affecting the Residential Portion. The Board of Managers of Millennium Point (the "Condominium Board"), comprised of three representatives appointed by the Commercial Board and two representatives appointed by the Residential Board, handles matters affecting both the Commercial Unit and the Residential Unit. *See* By-Laws (later defined) at § 2.1.1.

### A. The Condominium Structure and Governing Documents

4.      Under the Ground Lease, the parties agreed that the BPCA, as landlord, would lease, subject to certain terms and conditions,  the parcel of land (including all improvements and buildings thereon) upon which the Condominium is located to Millennium BPC, as tenant.

5.      To secure the payment obligations of the Hotel Unit Owner under the Ground Lease, the initial developer or sponsor, Millennium BPC, as landlord/sublessor, leased the Hotel Unit to BPCA, as tenant/sublessee, pursuant to the Hotel Unit Lease, dated January 1, 2000 (the "Hotel Unit Lease").  In turn, BPCA, as sublessor, sub-leased the Hotel Unit back to Millennium BPC, as sublessee, pursuant to the Hotel Unit Sublease, dated January 1, 2000 (the "Hotel Unit Sublease").  Millennium BPC entered into the Hotel Unit Lease and Hotel Unit Sublease to provide BPCA with the ability to exercise its rights against the Hotel Unit, in the event of a default under the Ground Lease caused by the Hotel, without terminating the tenancy of the Residential Portion. *See* Ground Lease at § 43.01.

6.      At that time, BPCA approved Ritz-Carlton Hotel Company L.L.C. (the "Ritz-Carlton") as the operator of the Hotel Portion of the Condominium (the "Hotel Operator"), "for as long as the quality of standards set forth in the Hotel Operator Management Agreement […] are maintained." *See* Ground Lease, §23.05(a) at Exhibit D (Hotel Operator Management Agreement, pp. 103).

7.      On December 1, 2000, MPE Hotel I (Downtown New York) LLC ("MPE Hotel I"), as landlord/sub-lessor, and MPE Hotel I Tenant (Downtown New York) LLC ("MPE Hotel I Tenant"), as tenant/sub-lessee, entered into a certain Sub-Sublease (the "Sub-Sublease") for occupancy of the Hotel Unit, which Sub-Sublease was later amended on January 1, 2004 (the "First Amendment to the Sub-Sublease") and again on September 20, 2018 (the "Second Amendment to the Sub-Sublease") when the Debtors acquired their interest in the Hotel.

8.      On May 21, 2002, Millennium BPC, as grantor, executed a Hotel Unit Deed in favor or, MPE Hotel I, as grantee, transferring the Hotel Unit, along with an undivided 53.8010% percentage interest in the General Common Elements (as that term is defined in the Declaration), the appurtenances and all the estate and rights of the Millennium BPC in and to the Hotel Unit, "together with, and subject to, the rights obligations, easements, restrictions and other provisions set forth in the Ground Lease, Declaration, By-Laws and […], all of which shall constitute covenants running with the Land and shall bind any person having at any time any interest or estate in the Unit, as through recited and stipulated at length herein." *See* Sale Motion, at Ex. C1.

9.      On that same date, Millennium BPC also entered into an Assignment and Assumption Agreement with MPE Hotel I, as the assignee of the Hotel Unit Lease. *See* Sale Motion, at Ex. C2.  Those same parties entered into a second Assignment and Assumption Agreement with respect to the Hotel Unit Sublease. *See* Sale Motion, at Ex. C3.

10.     In or around 2012, Westbrook Partners, Inc., Westbrook Partners, L.L.C., and/or its affiliates (collectively, "Westbrook"), a multi-billion-dollar private equity fund, replaced the Condominium sponsor, Millennium BPC, and became the owner of the Hotel through a series of special purpose entities, including but not limited to MPE Hotel I.

11.    On September 20, 2018, the Debtors acquired the Hotel Lease Interests from MPE Hotel I for $147 million, secured by a purchase money mortgage from Westbrook, through BPC Lender, LLC, and became the assignee under the Assignment and Assumption of Hotel Unit Lease and Assignment and Assumption of Hotel Unit Sublease, which were executed on the same day.

12.    By assuming the obligations under the Ground Lease, the Debtors also agreed to be bound by the Condominium Declaration and By-Laws, all of which must be read together.  As previously submitted to this Court in the Residential Board's Limited Objection to Sale Motion, any successors identified in the contemplated sale process must assume the Debtors' rights and obligations under those same Governing Documents and must show, to the Residential Board's satisfaction, they fulfill the qualifications and are prepared and positioned to satisfy the obligations set forth in those agreements, as summarized below. At the same time, the Debtors must also show that any defaults under the Hotel Lease Interests, including the obligations owed to the Residents by the Debtors as a result of their pre-petition monetary defaults, will be cured by paying the Cure Payment in full to the Residential Board upon the assumption and assignment of the Hotel Lease Interests or by providing adequate assurance that the Cure Payment will be made promptly.

**1.  The Ground Lease**

13.    The Ground Lease requires that the tenant satisfy, at a minimum, certain qualifications and comply with certain obligations.  For a complete recitation of the Hotel Requirements required to be satisfied by the tenant under the Ground Lease and other Governing Documents, the Court is respectfully referred to the Residential Board's Limited Objection to Sale Motion.

14.    Neither the Condominium Board nor the Hotel Owner (*e.g*, the Debtors) are permitted to request an amendment to the Ground Lease if such amendment were to "affect the

9

current quality of service and furnishing standards" of the Hotel. *See* Ground Lease at p. 140. Furthermore, because the Residents and Residential Board constitute intended third-party beneficiaries under the Ground Lease, who relied upon its provisions in acquiring their apartments, it may not be amended absent consent of the Residential Board.

15.     The Residential Board is authorized to institute litigation to collect unpaid CAM and other Shared Expenses in place of the Condominium Board under §§43.05(c)(i) and (iii) of the Ground Lease and, as set forth *supra*, §6.5 of the By-Laws.[6]

16.     Consequently, any assignee of the Hotel Lease Interests (*i.e.,* the Successful Bidder) will not only be required to comply with the terms of the Ground Lease, including meeting the Hotel Requirements, but the Debtors must also promptly pay the Cure Payment.

**2.     The Declaration and By-Laws**

17.     All of the Governing Documents, including the Ground Lease, the Declaration and the By-Laws, must be read in concert.

18.     Here, the Hotel Lease Interests, including the Declaration, By-Laws and other Governing Documents, are contracts that govern the relationships between the Hotel Unit owner and the Condominium, including the Residential Board. *See*, *e.g.*, *Bd. of Mgrs. of the 28 Cliff St. Condominium v. Maguire*, 191 A.D.3d 25, 29 (1st Dep't. 2020) ("The condominium by-laws are 'in essence, an agreement among all of the individual unit owners as to the manner in which the condominium will operate, and which set forth the respective rights and obligations of unit owners, both with respect to their own units and the condominium's common elements'") (*quoting*

---

[6] As required by §§43.05(c)(i) and (iii) of the Ground Lease, on or about August 17, 2021, the Residential Board sent written notice to the BPCA ("August 17th Letter") informing the BPCA that: (i) the Debtors were in default of their payment of General Common Charges; and (ii) the Residential Board intended to initiate an action against the Debtors to collect the unpaid balance due, including by enforcing the lien for unpaid "Common Charges" under the Condominium Act if the BPCA failed to cure the Debtors' default. BPCA did not cure the Debtors' default.

*Board of Mgrs. of Vil. View Condominium v. Forman*, 78 A.D.3d 627, 629 (2d Dep't. 2010), *lv. denied* 17 N.Y.3d 704 (2011)); *Weiss v. Bretton Woods Condominium II*, 151 A.D.3d 905, 906 (2d Dep't. 2017) ("The By-Laws of the defendant condominium and its declaration of covenants, restrictions, easements, and liens govern the relationship between the plaintiff, as a unit owner, and the condominium"); *Matter of Olszewski v. Cannon Point Assn., Inc.*, 148 A.D.3d 1306, 1308 (3d Dep't. 2017) ("each condominium association's bylaws and declarations are contracts, and our review and analysis thereof is governed by principles of contract interpretation that are both familiar and well-settled"); *Stony Brook Shores Property Owners Ass'n v. Liscia*, 169 A.D.2d 712, 713 (2d Dep't. 1991) ("the bylaws of the plaintiff [Co-op Board] have the force and effect of a contract"); *Glasser Family Ltd. Partnership II v. Board of Mgr. of the Lido Beach Towers Condominium*, 2010 N.Y. Misc. LEXIS 2030, at *4 (Sup. Ct. Nassau Co. Apr. 22, 2010) ("A condominium's by-laws constitute a contract with the unit owners pursuant to which the affairs of the condominium are conducted"); *Bd. of Mgrs. of the Silk Bldg. Condominium v. Levenbrown*, 2009 N.Y. Misc. LEXIS 5439, *46-47 (Sup. Ct. N.Y. Co. Sep. 16, 2009) (permitting defendant unit owners to add a counterclaim, for breach of contract, against plaintiff condominium board where the unit owners alleged that the condominium board had violated the condominium's by-laws). *See also Ave. A Assoc. LP v. Bd. of Mgrs. of the Hearth House Condominium*, 190 A.D.3d 473, 474 (1st Dep't. 2021) ("the Condominium's Declaration and By-Laws [] constitute a binding contract") (*citing Pomerance v. McGrath*, 124 A.D.3d 481, 482 (1st Dep't. 2015), *lv. dismissed* 25 NY3d 1038 (2015)); *Keller v. Kay*, 170 A.D.3d 978, 980 (2d Dep't. 2019) ("The administration of an HOA's affairs is governed principally by its by-laws, which are, in essence, an agreement among the individual homeowners as to the manner in which the HOA will operate, and which set forth the respective rights and obligations of homeowners, both with respect to their

own homes and the HOA's common elements"); *Unneland v. Greenwood Condominium*, 61 Misc. 3d 132(A), 2018 NY Slip Op 51447(U), *1 (App. T. 2d Dep't. 2018) ("Condominium bylaws are contracts, governed by principles of contract interpretation").

19.    Upon acceptance of the Declaration by the New York Secretary of State approximately 20 years ago, on November 23, 2001, the Condominium became a condominium form of ownership and, pursuant to the terms of the Ground Lease, the Condominium Board became the successor-in interest to Millennium BPC, and therefore, the tenant under the Ground Lease. *See* Ground Lease at Section 43.01.

20.    When read together, as the Governing Documents and New York law instruct (*See* Declaration and By-Laws Section below), there are several requirements to which any potential purchaser of the Debtor's assets must comply and demonstrate they are equipped to satisfy in connection with becoming a Qualified Bidder as that term is defined in the Sale Motion.

21.    The Condominium's By-Laws impose upon the Condominium Board, *to wit* any Successful Bidder of the Debtor's interest in Hotel Unit or Hotel Lease Interests, the unqualified and unconditional obligation to comply with all of the terms and conditions of the Ground Lease, and to require the Commercial Unit Owner to comply therewith. In this regard, the By-Laws state:

§2.2.1: Any obligations of the Tenant [originally, Millennium BPC; now the Condominium Board] under the Lease shall be the obligation of the Condominium Board to perform and the Condominium Board shall have all of the powers and authorities necessary to act in accordance with the Lease.

§6.9: Each of the Boards [including, obviously, the Commercial and Condominium Boards] shall maintain those portions of the Building which [are] the obligation of such Board[s] to maintain in accordance with the provisions of the [Ground] Lease and the BPCA Requirements.

§6.14.4: ... no Unit [including, obviously, the Commercial Unit] can be used ... in any manner which violates the [Ground] Lease or the BPCA Requirements.

§9.12 Each Board shall [] perform the obligations of such Board as may be required

of the Tenant under the [Ground] Lease.

22.     Similar provisions are replete throughout the Declaration. For example, the

Declaration states in pertinent part:

> [E]ach Unit [including, obviously the Commercial Unit] must be used in
> accordance with the requirements of the [Ground] Lease and the BPCA
> Requirements.

See Declaration, §9.4.[7]

23.     As evidenced by the above-referenced provisions of the By-Laws and Declaration,

the Condominium Board is obligated thereunder to comply with all terms and conditions of the

Ground Lease for the benefit of the Condominium and its unit owners (including the Residents),

separate and apart from the Condominium Board's contractual obligations to the BPCA.

24.     Although not listed as a landlord or tenant under the Ground Lease, the Residents,

including the members of the Residential Board, have standing to enforce it by means of an action

at law and in equity, rather than by arbitration. In this regard, the By-Laws state:

> *except as to matters involving compliance under the [Ground] Lease,* any dispute
> between the Residential Board and the Commercial Board with respect to whether
> any matter is entitled to be determined by the Condominium Board shall be settled
> by Arbitration (emphasis added).

*See* By-Laws at §2.2.1; *see also* First Department Decision (described below)

---

[7] **Error! Main Document Only.**"BPCA Requirements" is defined in Exhibit C to the By-Laws:

> those requirements and obligations imposed upon the Tenant set forth in the Lease, the
> Master Lease, the Master Development Plan and the Design Guidelines, as same may be
> amended from time to time and such other requirements of BPCA as may be imposed upon
> the Property pursuant to the terms of the Lease, the Master Lease, the Development Plan
> and the Design Guidelines.

*See* Ex. C to the By-Laws (Definitions). Thus, any assignee of the Hotel Lease interests is required to
comply with, among other requirements and restrictions, those set forth in the Design Guidelines.

25.     Plainly, the language above presupposes that the Residents, as represented by the Residential Board, have the power to institute litigation for breaches of the Ground Lease.  The First Department agreed with this conclusion as explained *infra*.

26.     The By-Laws further provide that "in order to promote the efficient operation and management of the Condominium as a whole and in order to take advantage of the economies of scale inherent in having a single manager for the Condominium, the Museum Unit, the Residential Unit and the Hotel Unit shall operate under a single managing agent selected by the [Condominium] Board, on behalf of the unit owners of the Condominium as a whole and on behalf of the unit owners of the Museum unit, the Residential Unit and the Hotel Unit."

**B.  Management and Operations**

27.     To address the requirements set forth in the By-Laws, the Condominium Board and the Ritz-Carlton entered into that certain Condominium Management Agreement, dated May 15, 2006 (the "Condo Management Agreement"), wherein the Ritz-Carlton would serve as the manager of the Condominium (the "Condo Manager").  Ritz-Carlton remains the Condo Manager today and the Successful Bidder must agree to the terms of the Condo Management Agreement in connection with its positions and representations on the Condo Board.

28.     The Condo Manager is separate and distinct from the Hotel Operator.  The requirements of the Hotel Operator are set forth in Paragraphs 7 and 13(e) herein and is a defined term on p. 11 of the Ground Lease.  In January 2000, the Ritz-Carlton, a well-known and highly regarded five-star hotel chain was designated the Hotel Operator pursuant to the Hotel Operator Management Agreement, which is annexed as Exhibit D to the Ground Lease.  Between January 2000 and January 2018, the Ritz-Carlton was both the Condo Manager and the Hotel Operator.

29.     When Westbook acquired the Hotel Unit in 2012, it began eliminating and reducing the offerings and attributes a nationally recognized five-star luxury hotels typically offers, including, among other things, making improvements and basic repairs and failing to reopen the luxury restaurant that was required to remain open to the residents and the general public under the Governing Documents.  In late 2017 and early 2018, Westbrook began taking steps to convert the Hotel Unit into a new hotel without any national or even local brand recognition.

30.     In or around January 29, 2018, Highgate Hotels LLP ("Highgate") became the new Hotel Operator pursuant to a new Hotel Operator Management Agreement executed by MPE Hotel I. At or about that time, MPE Hotel began the formal process of changing the brand of the Hotel to The Leading Hotels of the World, Ltd. under the name The Wagner at Battery Park.

31.     This change became effective in or around March 29, 2018, when MPE Hotel I as the Hotel Owner and Ritz-Carlton as the Condominium Manager entered into a Hotel Manager Services Agreement with Highgate as the Hotel manager.  Since that time, the Hotel no longer operated as a five-star hotel as required by the Governing Documents.  It quickly became clear that Highgate was unqualified and ill-equipped to satisfy the obligations of the Hotel Operator and the Westbrook's designation of Highgate for that role was a clear breach of the Governing Documents, which became the subject of litigation.[8]

32.     In response to the Residential Board's challenge of Westbook's Highgate implementation of Highgate as the Hotel Operator and change to an unrecognized brand name, among other alleged breaches, the Court ruled that the Residential Board had standing to enforce possible breaches of the Ground Lease as intended third-party beneficiaries thereof, and as direct contracting parties under the Declaration and By-Laws.  In relevant part, the Governing

---

[8] The Hotel promptly lost its five-diamond rating by Triple A at the beginning of the next ratings cycle.

Documents warrant to, and promise, the Residents that any replacement Hotel Operator would be "[an]other nationally-recognized brand, flag or franchise that is equal to or better in quality of service and furnishings" than those provided by the Ritz-Carlton (Ground Lease at §23.0S(a)). *See* Sale Motion, at Exhibit C9. Westbrook, in breach of the Ground Lease and other Governing Documents, failed, *inter alia*, to fulfill the Ground Lease requirement that any replacement for the Ritz-Carlton be operated under "[an]other nationally recognized brand, flag or franchise that is equal to or better in quality of service and furnishings" than the Ritz-Carlton.

### C. The Residential Board and the Residents are the Intended Third-Party Beneficiaries Under the Ground Lease and Have Rights Under the Governing Documents

33.    On March 14, 2018, the Residential Board filed a lawsuit against the Condo Board, the Commercial Board, Westbrook, Highgate, among other defendants (collectively, the "Defendants"), and named the BPCA as a nominal defendant, in the Supreme Court of the State of New York, New York County (the "Supreme Court") (Index No. 651238/2018) (the "State Court Action"), seeking declaratory and injunctive relief and damages arising from declining hotel services promised to the residential condominium unit owners after the Ritz-Carlton ceased operating the hotel. The Residential Board further alleged that Westbrook, the then-owner of the Hotel, breached the Governing Documents, (i) first when it attempted to convert the Hotel into residential units, which such effort was rejected by BPCA, and then (ii) when the Hotel Unit Owner (*i.e.*, Westbrook) took steps to open (and ultimately did open) a hotel that did not comply with the standards set by the Ground Lease and the Governing Documents of the Condominium.

34.    The Defendants moved to dismiss the complaint. The Supreme Court denied the Defendants' motion with respect to the first cause of action, which alleged breach of the Condominium Declaration and By-Laws; the third cause of action which alleged breach of the

Ground Lease,[9] and the fifth cause of action, which alleged violations of Real Property Law § 339-j.  The Supreme Court also sustained a cause of action permitting access to the Condominium's books and records.  The Supreme Court dismissed the remaining causes of action.

35.    The Residential Board appealed the balance of the claims that were dismissed by the Supreme Court in the State Court Action to the First Department.  The Defendants cross-appealed and contended that the remaining claims should be dismissed with prejudice because, *inter alia*, plaintiffs supposedly are not intended third-party beneficiaries of the Ground Lease and do not otherwise have standing to sue the Hotel Unit Owner for its failure to comply with those provisions of the By-Laws and Declaration that pertain to the operation, management and branding of the Hotel Unit.  The First Department rejected Defendants' arguments, and held, in the First Department Decision, that the *Residents are intended third-party beneficiaries of the Ground Lease*.[10]

36.    Thus, the Residents have rights with respect to the Governing Documents, including the Ground Lease.  Therefore, the Cure Payment must be cured by the Debtors or the Assignee upon any subsequent assignment of the Debtors' rights and interests in the Hotel Lease Interests to avoid rejection or other violations by the Debtors of the Governing Documents.

### D.  **The Debtors' Defaults Leading to Bankruptcy**

37.    As set forth in note 9 *supra*, not long after the Debtors acquired the Hotel Lease Interests, the Hotel was downgraded by Triple A. Shortly thereafter, the Hotel was placed into

---

[9] As noted *supra*, the Supreme Court, in its denial of Defendants' motion to dismiss, ruled with regard to the third cause of action, that the Residential Board and the Residents "benefit from the Ground Lease and may assert claims for breach of the Ground Lease where they have been harmed. *See supra.*

[10] The First Department further affirmed the trial court's decision with respect to the Residents' and Residential Board's standing to enforce, *inter alia*, relevant provisions of the Declaration and By-Laws pertaining to the maintenance, operation and branding of the Hotel Unit.

receivership by Urban Commons. Unbeknownst to the Residential Board or the Residents, the Debtors stopped paying their portion of the Shared Condominium Expenses (later defined) pertaining to the common elements of the building which are assessed and allocated based on proportionate ownership of the building, as required by the Governing Documents. The Debtors, as owners of approximately 54.7696% of the Condominium are responsible for paying their allocable portion of the Shared Condominium Expenses; however, the Debtors have not paid any portion of their required share of these expenses for several years. Rather, the Residential Board was forced to satisfy the Debtors' contractual obligations.

38. In fact, when the Debtors stopped paying their portion of the Shared Condominium Expenses, funds belonging to the Residents were taken from the Condominium's general operating account, where the Residents' maintenance and other assessments are deposited, and used in order to make up the Debtors' shortfall. By the time the Residential Board discovered what was happening, approximately $2 million of the Residents' funds had already been applied to cover the Debtors' (Hotel's) share of the Shared Condominium Expenses. Thereafter, the Residents had no choice but to continue paying the *entirety* of the Shared Condominium Expenses or risk a more catastrophic outcome for the entire Condominium to ensure it remained habitable.

39. By early 2020, after months of defaults on their obligations under the Governing Documents to the Residential Board and other parties, the Debtors abandoned the Hotel, leaving the Residential Board to advance the Hotel's portion of the Shared Condominium Expenses, among other resulting problems.[11]

---

[11] For a more expansive recounting of the issues, the Residential Board respectfully refers the Bankruptcy Court to the *Letter to Judge Bentley filed on Behalf of the Residential Board*, filed on November 20, 2022 as ECF No. 15 and the *Limited Objection of the Residential Board to the Debtors' Utilities Motion*, filed on December 20, 2022 as ECF No. 75.

40.     On November 15, 2022 (the "Petition Date"), the Debtors each filed a voluntary

petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code")

in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy

Court"), which shall collectively be referred to herein as the "Chapter 11 Cases").

41.     On January 24, 2023, the Debtors filed the *Motion Seeking Entry of: (I) Sale

*Procedures Order (a) Approving Bidding Procedures, (B) Scheduling Auction and Sale Approval*

*Hearing; and (II) Sale Approval Order (A) Authorizing (I) the Sale of All of the Debtor's Real*

*Property and Leasehold Interests and Assignment of Hotel Unit Lease and Sublease Free and*

*Clear of All Liens, Claims, Interest and Encumbrances, (II) Rejecting Franchise and Owner*

*Agreements with Marriott International, Inc. and (III) Granting the Successful Bidder Good Faith*

*Status* [ECF No. 119] (the "Sale Motion").

42.     On February 17, 2023, the Bankruptcy Court entered the *Order* (I) Approving Bid

Procedures and (II) Scheduling Auction and Sale Hearing and Granting Related Relief [ECF No.

175] (the "Bid Procedures Order").

43.     The Bid Procedures Order provides, *inter alia*, as follows:

> **ORDERED,** that the Residential Board, the Union, and any other party who asserts
> being a party to an executory contract **or unexpired lease** with the Debtors shall
> file a statement of cure costs ("Cure Claim") no later than March 21, 2023.
> Interested parties shall file any objections or responses to the Cure Claim no later
> than March 28, 2023. In the event no objections or responses are filed, the
> applicable Cure Claim shall be deemed allowed for purposes of calculating the Cure
> Claim in connection with the assignment and assumption of the particular executory
> contract **or unexpired lease** pursuant to Section 365(b) of the Bankruptcy Code. In
> the event that an objection is filed, the Bankruptcy Court shall rule on such
> objection(s) no later than (7) seven calendar days before the Bid Deadline; and it is
> **[PB 2/17/2023],**

*See* Bid Procedures Order at p. 5.

**CURE STATEMENT**

44.     The Residential Board files this Cure Statement under compulsion of the Bid Procedures Order to establish the amounts due to cure defaults owed to the Residential Board under the Ground Lease and Governing Documents upon the assumption and assignment of the Hotel Lease Interests.  While the Residential Board's Limited Objection to Sale Motion addresses more substantially the Debtors' ability to satisfy Section 365(b)(1)(C), this Cure Statement focuses more on curing the Debtors' monetary defaults under Section 365(b)(1)(A) and (B).  As set forth in greater detail below, the pre- and post-petition amounts owed to the Residential Board by the Debtors, which comprise the Cure Payment, must be paid upon the Debtors' assumption and assignment of the Hotel Lease Interests, or, at a minimum, the Debtors must provide the Residential Board with adequate assurance that the Cure Payment will be promptly satisfied.

45.     Pursuant to 11 U.S.C. §365(b)(1), "[i]f there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of the assumption of such contract or lease, the trustee – (A) cures, or provides adequate assurance that the trustee will promptly cure, such default other than a default that is a breach of a provision relating to the satisfaction of any provision […] relating to a default arising from any failure to perform nonmonetary obligations under an expired lease of real property, if is impossible for the trustee to cure such default be performing nonmonetary acts at and after the time of the assumption, except that if such default arises from a failure to operate in accordance with a nonresidential real property lease, then such default shall be cured by performance at and after the time of assumption, in accordance with such lease, and pecuniary losses resulting from such default shall be compensated in accordance with the provisions of this paragraph; (B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the

debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and (C) provide adequate assurance of future performance under such contract or lease." *See* 11 U.S.C. § 365(b)(1); *see also In re Old Market Group Holdings Corp.*, 647 B.R. 104, 113 (Bankr. S.D.N.Y. 2022) (holding that these are not alternate remedies and that the statute requires all three requirements to be met in order for a debtor to assume and assign a contract or unexpired lease for which there is an existing default); *see also In re Rock 49th Street Restaurant Corporation*, 2010 WL 1418863 at *5 (Bankr. S.D.N.Y. Apr. 7, 2010) ("If there has been a default under the executory contract, or unexpired lease, at the time of the assumption, the Debtors much comply with the three requirements of Section 365(b)(1)".

46.     "Both the text and purposes of [Bankruptcy Code Section 365] compel the conclusion that that the statutory term "default" means any failure to perform under the assumed contract or lease, regardless of the definition of default contained in that contract or lease." *Old Market Grp. Holdings.*, 647 B.R. at 107, 114.  Upon assumption and assignment of an executory contract or unexpired lease in default, a debtor must "always cure each default – and in addition, it must compensate the counterparty for any pecuniary harm remaining after cure. *Id.* at 114.

47.     "Adequate assurance of a prompt cure requires that there be a firm commitment to make all payments and at least a reasonably demonstrable capability to do so." *In re Embers 86th St., Inc.*, 184 B.R. 892, 900 (Bankr. S.D.N.Y. 1995); *see also Matter of World Skating Center*, Inc., 100 B.R. 147, 148–49 (Bankr. D.Conn.1989) ("Adequate assurance requires a foundation that is nonspeculative and sufficiently substantive so as to assure the landlord that it will receive the amount of the default.")  Whether a cure is "prompt" for purposes of § 365(b)(1)(A) depends on the facts and circumstances of each case. *Id.*

48.     Based on the express holding of the First Department, as a matter of law, the Residential Board and the individual residential condominium unit owners are intended third-party beneficiaries of the Ground Lease and, as such, have standing to enforce its provisions against the owner of the Hotel Unit (*i.e.*, the Debtors).  Under New York law, a third-party beneficiary to a contract has the same rights as the contracting parties. *Bristol Village, Inc. v. Louisiana-Pacific Corporation*, 170 F.Supp.3d 488, 504 (W.D.N.Y. 2016).  Separate and apart from their standing as third-party beneficiaries, the First Department also confirmed that the Residents and Residential Board have standing to enforce the Declaration and By-Laws against the Hotel Unit owner based on principles of contract law.

49.     As set forth *supra*, §6.5 of the By-Laws empowers the Residential Board to take necessary actions to collect unpaid CAM or and/other Shared Expenses from the Hotel Unit Owner if the Commercial Board fails to take such action (which is precisely what has transpired here).  Further, as also set forth *supra*, the Residential Board is separately authorized under the Ground Lease to institute litigation against a delinquent unit owner to collect unpaid CAM and other Shared Expenses in place of the Condominium Board under §§43.05(c)(i) and (iii) of the Ground Lease and, as set forth *supra*, §6.5 of the By-Laws.

50.     The Residential Board incurred substantial damages as a result of being forced to satisfy the Debtors' obligations since as early as the first month after the Debtors' acquired their interest in the Condominium.  Since the Residential Board and the Residents are intended third-party beneficiaries of the Ground Lease and the other Hotel Lease Interests, their Cure Payment must be paid at the time the Debtors assume and assign the Hotel Lease Interests to a Successful Bidder, or provide adequate assurance that it will be promptly paid in full.

A. **The Cure Payment**

51.     In June 2022, the Residential Board filed a lien against the Debtors. A copy of the

Residential Board Lien is annexed here to as **Exhibit A**.  However, to the extent the Residential

Board Lien is unable to be satisfied as a secured claim at the closing on the Debtors' sale of the

Hotel Lease Interests, the Debtors should otherwise be obligated to satisfy the Residential Board's

Cure Payment as set forth herein.

52.     In the ordinary course, where the Hotel Unit is full operating and satisfying its

payments obligations, each of the Residential Board and the Commercial Board pay certain

expenses, including rent, CAM, Shared Condominium Expenses and other Commercial Common

Charges to the Condominium.

53.     However, once the Debtors began defaulting on these obligations, the

Condominium actually took the Residents' funds from the Condominium operating account, which

was supposed to include monies paid by the Debtors, to satisfy the Debtors' obligations upon

which they defaulted.  As set forth in Paragraph 38 above, more than $2 million was taken from

the Residents before the Residential Board and Residents became aware that this was happening.

The monies owed by the Debtors only continued to accrue as the Residents' monies were being

used in order to satisfy the Debtors' contractual obligations under the Hotel Lease Interests.

54.     In this case, the Residential Board was forced to continue performing the Debtors'

obligations under the Governing Documents after they defaulted and the Residential Board will be

forced to continue performing under the Governing Documents and other Hotel Lease Interests

with the assignee of the Hotel Lease Interests (*i.e.,* the Successful Bidder), assuming the Debtors

are able to successfully orchestrate a sale of their assets.  To do so without payment of its Cure

Claim or otherwise paid pecuniary compensation to the Residential Board would deprive the

Residential Board and the Residents of any benefits to which it is entitled under those agreements while bearing a substantial portion of the expense and other damages caused by years of the Debtors' defaults. Equity and injustice prevent such a result.

**1) The Pre-Petition Amounts Due**

55.     As of the Petition Date, the Residential Board held a secured claim against the Debtor in the amount of **$4,953,251.45** (the "Claim"),

56.     The Residential Board Lien consists of the following charges as of the Petition Date, which total $4,953,251.45 (collectively, the "Pre-Petition Cure Amount"):

> ➢ **Unpaid Hotel Portion of Pre-Petition CAM & Shared Utilities Charges Paid for by Residential Board:** $2,803,020.79[12];
> ➢ **Unpaid Hotel Portion of Pre-Petition GL Expenses Paid for by Residential Board:** $1,382,527.37[13];
> ➢ **Unpaid, Pre-Petition Hotel Utility Arrears Covered by Residential Board**: $689,991.28[14]; and
> ➢ **Attorneys' Fees and Expenses**
>    ▪ Hiller P.C. ($77,712 through November 14, 2022):
>       **TOTAL: $4,953,251.45**

**2) The Post-Petition Amounts Due**

57.     The Residential Board continued to accrue attorneys' fees and expenses after the Petition Date, as set forth below:

> ➢ **Attorneys' Fees and Expenses**
>    ▪ Hiller P.C. (November 15, 2022 through February 28, 2023): $120,046.25
>    ▪ Klestadt Winters Jureller Southard & Stevens LLP (November 15, 2022 through March 10, 2023): $272,871.15
>       **TOTAL: $392,917.45**

---

[12] A schedule setting forth the Unpaid Hotel Portion of CAM and Shared Utility charges is annexed hereto as **Exhibit B**.

[13] A schedule setting forth the Unpaid Hotel Portion of Pre-Petition GL Expenses Paid for by the Residential Board is annexed hereto as **Exhibit C**.

[14] A schedule setting forth the Hotel Utility Arrears Covered by Residential Board is annexed hereto as **Exhibit D**.

58.    The Residential Board's post-petition attorneys' fees and expenses continue to accrue, but at a minimum, the total attorneys' fees and expenses incurred from the Petition Date through March 10, 2023, totaling $392,917.45, should be paid in connection with the Cure Payment owed to the Residential Board, if not the Residential Board Lien.

59.    After the Petition Date, the Debtors continued to be liable to the Condominium for CAM, Shared Common Expenses, and other charges.  However, the debtor-in-possession loan (the "DIP Loan") made available by BPC DIP Lender, LLC and BPC Lender LLC, positioned the Debtors to resume paying the Hotel portion of these obligations directly, rather than the Residential Board being required to continue making these payments on the Debtors' behalf to sustain the Condominium. The Condominium Board submitted invoices for November 15 – 30, 2022, December 2022, January 2023 and February 2023 to the Debtors' CRO and is awaiting payment.

## RESERVATION OF RIGHTS

60.    The Residential Board reserves all rights available to it in connection with the Debtors' forthcoming and anticipated sale of the Hotel Lease Interests, as defined in the Sale Motion, that contemplates the assumption and assignment of the Ground Lease and other Governing Documents, in which the Residential Board, as an intended third-party beneficiary, has rights and entitlement to the Cure Payment.  Such rights include but not limited to, any provision that seeks to release the Debtors, Successful Bidder, or any Backup Bidder, from the foregoing liabilities to the Residential Board, and reserves the right to seek payment of any amounts due to the Residential Board against any and all parties who may be liable.

## CONCLUSION

61.    As set forth herein, the Debtors are indebted to the Residential Board in the aggregate amount of **$5,346,168.85** as of March 10, 2023.  The Debtors' assumption and

assignment of the Hotel Lease Interests must be conditioned upon payment of the entire Cure

Payment in full to the Residential Board, or at a minimum, the Debtors must provide the

Residential Board with adequate assurance that it will promptly (within a reasonable timeframe

following the assumption and assignment of the Hotel Lease Interests, pay the Cure Payment to

the Residential Board.

Dated:    New York, New York
          March 21, 2023

**KLESTADT WINTERS JURELLER
SOUTHARD & STEVENS, LLP**

By:    _/s/ Kathleen M. Aiello_
  Tracy L. Klestadt
  Kathleen M. Aiello
  200 West 41st Street, 17th Floor
  New York, NY 10036
  Tel: (212) 972-3000
  Email: tklestadt@klestadt.com
     kaiello@klestadt.com

  *Counsel to The Residential Board of Managers
  of the Millennium Point Condominium*