1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 22-11509-pb

4    - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5    In the Matter of:

6

7    URBAN COMMONS 2 WEST LLC,

8

9            Debtor.

10    - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11        The following constitutes the Court's modified bench
      ruling on the motion of the Residential Board, the
12    Commercial Board and the Condominium Board of Managers for
      judicial review of the appraisal that was recently performed
13    to determine the fair market value of the land underlying
      the Debtors' hotel for the purpose of re-setting the ground
14    lease rent.

15        This modified ruling revises my April 21, 2023 bench
      ruling not only to correct transcription errors but also to
16    make the ruling clearer and more readable. The substance of
      the decision has not changed. Due to its origins as a bench
17    ruling, this decision is more colloquial and immediate in
      style than a formal written decision.

18
      Date: New York, New York
19          May 25, 2023

20
                              /s/ Philip Bentley
21                            United States Bankruptcy Judge

22

23

24

25

```
 1    UNITED STATES BANKRUPTCY COURT

 2    SOUTHERN DISTRICT OF NEW YORK

 3    Case No. 22-11509-pb

 4    - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

 5    In the Matter of:

 6

 7    URBAN COMMONS 2 WEST LLC,

 8

 9            Debtor.

10    - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11

12        MODIFIED BENCH RULING ON MOTION FOR JUDICIAL REVIEW OF

13                            APPRAISAL

14

15    A P P E A R A N C E S :

16

17    DAVIDOFF HUTCHER CITRON LLP

18            Attorneys for the Debtor

19            605 Third Avenue

20            New York, NY 10158

21

22    BY:  JONATHAN S. PASTERNAK

23

24    KLESTADT WINTERS JURELLER SOUTHARD & STEVENS, LLP

25            Attorneys for The Residential Board
```

```
 1          200 West 41st Street, 17th Floor

 2          New York, NY 10036

 3

 4     BY:  TRACY L. KLESTADT

 5          KATHLEEN M. AIELLO

 6

 7     FRIED, FRANK, HARRIS, SHRIVER & JACOBSON LLP

 8          Attorneys for Battery Park Authority

 9          One New York Plaza

10          New York, NY 10016

11

12     BY:  JANICE MAC AVOY

13

14     COHEN, WEISS and SIMON, LLP

15          Attorneys for The Hotel and Gaming Trades Council

16          900 Third Avenue, 21st Floor

17          New York, NY 10022

18

19     BY:  RICHARD M. SELTZER

20

21     PITTA LLP

22          Attorneys for The Hotel and Gaming Trades Council

23          120 Broadway

24          New York, NY 10271

25
```

```
 1    BY:  BARRY N. SALTZMAN

 2

 3    HERRICK, FEINSTEIN LLP

 4          Attorneys for BPC Lender

 5          Two Park Avenue

 6          New York, NY 10016

 7

 8    BY:  STEVEN B. SMITH

 9          SILVIA A. STOCKMAN

10

11    COLE SCHOTZ P.C.

12          Attorneys for VIK XS Services, Inc.

13          1325 Avenue of the Americas, 19th Floor

14          New York, NY 10019

15

16    BY:  MARK TZUKERMAN

17

18    ALSO PRESENT TELEPHONICALLY:

19    CHARLES ESSIG

20    ANDREW HEYMANN

21    MICHAEL HILLER

22    HARRY JEREMIAS

23    BERNARD A. KATZ

24    AVERY S. MEHLMAN

25    MARK PODGAINY
```

```
 1    JENNIFER L. RODBURG

 2    FRANCK RUIMY

 3    ENID NAGLER STUART

 4    DEREK A. WOLMAN

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          THE COURT:  I'm ruling from the bench on the

2    motion of the three parties that call themselves

3    collectively "the Boards" — specifically, the Residential

4    Board, the Commercial Board and the Condominium Board of

5    Managers of the Millennium Point Condominium — for judicial

6    review of the appraisal that determined the fair market

7    value of the land on which the hotel that the Debtors own

8    sits.

9          I'm ruling from the bench today because it's clear

10   that the parties need a prompt ruling in order for the sale

11   process for the hotel to move forward without delay. As I

12   often do, I may subsequently issue a written decision that

13   clarifies and perhaps expands on my bench ruling in minor

14   respects, but which will not change the substance of today's

15   ruling.

16         The dispute before me is over the resetting of

17   ground rent — that is, the rent the Debtors owe as tenants

18   under their ground lease with Battery Park City Authority

19   ("BPCA"), the public authority that owns and manages Battery

20   Park City. I'm going to give some details in a moment about

21   that ground lease and how it relates to some of the other

22   key documents in this case, but first, let me step back and

23   give a slightly broader context.

24         Some of the issues in the dispute now before me

25   are complicated because the legal structure governing the

1    building of which the Debtor's hotel is a part is

2    complicated. As I mentioned, the building is built on

3    ground-leased land. The building is a mixed-use condominium.

4    It's a condo with two principal subunits, one referred to as

5    the residential unit, the other referred to as the

6    commercial unit, and the commercial unit in turn is

7    subdivided into subunits, one of which is the hotel unit.

8    The residential unit is subdivided into the units for the

9    various residents who live in the building.

10          Because of the complexity of this structure, the

11    rights of the building's occupants — the residents, the

12    hotel and the Skyscraper Museum — are governed by a number

13    of legal documents. There's the ground lease between BPCA

14    and the building that I mentioned. There are also a set of

15    design guidelines, a condo declaration and condo bylaws, and

16    deeds for the various condo units in the building. There is

17    also a master lease, which BPCA entered into with another

18    New York State entity in or around 1980, about 20 years

19    before the other governing documents were executed. How

20    these various documents fit together and interrelate is at

21    the heart of the parties' dispute over the rent reset and

22    appraisal process.

23          BPCA, as the owner of the land, entered into the

24    ground lease in or about 2000 for a term of about seven

25    decades. As is common with ground leases, the lease set an

1    initial rent subject to periodic resets, the first reset

2    having been originally scheduled for January 2022, a little

3    more than a year ago. For a variety of reasons, the reset

4    didn't happen then. It got delayed until the parties turned

5    to it a few months ago.

6            As is typical, the ground lease provides a

7    procedure for resetting the ground rent. In a nutshell, the

8    procedure calls for each party to hire its own appraiser —

9    the two parties being BPCA on the one hand and the three

10   Boards on the other hand. If after conducting their own

11   party appraisals, the parties can't agree on the value, the

12   ground lease provides that the two appraisers then try to

13   jointly agree on a third appraiser, a neutral, and the value

14   of the land for rent reset purposes is then determined by

15   majority vote of the three appraisers. The rent is then set

16   as a percentage of the appraised value.

17           This process essentially leaves the final decision

18   to the neutral appraiser, subject to potential input from

19   whichever party appraiser chooses to join with him. For

20   simplicity's sake, I'm going to refer to the appraisal

21   that's being challenged as one done by "the appraiser," by

22   which I mean the neutral appraiser, even though I know

23   technically the appraisal was signed by the neutral plus

24   BPCA's party appraiser.

25           The dispute in this case is over the ground lease

1    provision specifying the key assumptions to be used in these

2    appraisals. Ground lease reset provisions vary in the

3    assumptions they require. For example, some ground leases

4    provide for the land to be valued as if it was unimproved,

5    vacant, and unencumbered — that is, subject to the highest

6    and best use. Other ground leases require different

7    assumptions. For example, some require the land to be valued

8    based on whatever buildings or other improvements have been

9    constructed on the land — "as is," rather than "as if vacant

10    and unimproved."  Other ground leases require the land to be

11    valued subject to certain encumbrances — for example,

12    encumbrances contained in the ground lease, or encumbrances

13    created by operation of law, such as zoning laws or landmark

14    designation laws.

15         In this case, the governing provision of the

16    ground lease provides that the appraiser shall value the

17    land "as unencumbered by this lease and the master lease and

18    unimproved." The parties have no disagreement about the

19    meaning of the word "unimproved." They agree it means the

20    land should be valued as if it were vacant.

21         What the parties disagree about is whether, in

22    valuing the land, the appraiser should assume it is subject

23    to any encumbrances — specially, any development

24    restrictions. BPCA's position is that it should not. It

25    argues that the words "unencumbered by this lease and the

1    master lease" mean unencumbered by <u>any</u> contractual

2    development restrictions. (No-one claims there are any

3    statutory or regulatory development restrictions.)

4          The Boards disagree.  They argue that the

5    governing provision here excludes consideration only of the

6    ground lease and the master lease, and not of the other

7    governing documents — namely, the design guidelines, the

8    condo declaration and bylaws, and the deeds for the various

9    condo units. Moreover, those other documents (like the

10   ground lease and master lease) provide that the land will be

11   developed as a mixed-use project, with a hotel as well as

12   residential units. As a result, the Boards argue, the

13   appraiser must value the land as if it was subject to that

14   requirement, which I'll refer to as the "mixed-use

15   development requirement."

16         In support of this argument, the Boards point to

17   New York case law holding that provisions of this sort,

18   specifying the encumbrances that an appraiser should or

19   should not consider when valuing real property, must be

20   narrowly construed. Here, because the governing provision

21   specifically excludes consideration of the encumbrances

22   contained in the two leases but makes no mention of the

23   encumbrances contained in the other governing documents, the

24   Boards contend the appraiser should have valued the land as

25   subject to the latter encumbrances.

1          The parties here followed the appraisal process

2     required by the ground lease, with each party appraiser

3     conducting its own appraisal, after which a jointly-selected

4     neutral appraiser conducted an appraisal. Both BPCA's

5     appraiser and the neutral appraiser valued the land as if it

6     were unencumbered, and the Boards' appraiser valued the land

7     as subject to the mixed-use development requirement. All

8     three appraisers concluded that the land would be worth

9     vastly more if it were developed as a purely residential

10    building than it is worth in its current use, as a mixed-use

11    building containing a hotel as well as residential units.

12    Consequently, based on the different encumbrance assumptions

13    they used, the appraisals conducted by BPCA's appraiser and

14    the neutral each attributed a value to the land more than

15    triple the $50 million value determined by the Boards'

16    appraisal.

17         The Boards argue that the neutral appraiser should

18    have valued the land as subject to the mixed-use development

19    restriction, rather than as subject to no development

20    restrictions. They ask the Court to overturn his appraisal

21    on the basis of this supposed error.

22         The record before me is purely documentary.  The

23    two sides each annexed a number of documents to their

24    briefs. There's no dispute among the parties as to the

25    admissibility of any of these documents or the propriety of

1    my considering any of these documents in connection with

2    this motion. In addition, none of the parties asked to

3    present testimony, so I'm basing my ruling on the briefs and

4    on the various documents that have been annexed to the

5    parties' motion papers.

6          The threshold issue before me is, what standard of

7    review am I required to apply in reviewing the neutral

8    appraiser's appraisal? I find that the grounds on which a

9    court may overturn an appraisal are very limited under New

10   York law, which the parties agree governs. I also find that

11   the very limited grounds for overturning an appraisal have

12   not been met in this case. On that basis, I'm going to deny

13   the motion.

14         At bottom, I agree with BPCA's contention that the

15   black letter standard under New York law for judicial review

16   of an appraisal is that the Court is permitted to overturn

17   an appraisal only in extremely limited circumstances, such

18   as when fraud, bias, or bad faith has been shown. The Boards

19   do not contend that any fraud, bias, or bad faith exists

20   here on the part of the neutral appraiser. Instead their

21   argument is that I have the power to overturn the appraisal

22   on other grounds. They've advanced a variety of grounds that

23   they say warrant reversal, and I will walk through those in

24   turn in a moment.

25         As a preliminary matter, my task as a federal

1    judge applying New York law is to determine how the New York

2    courts would decide the issue before me — namely, the

3    standard of review. As a first step, I'm required to look to

4    decisions by New York's highest court. If those decisions

5    don't clearly resolve the issue, I'm required to look at the

6    lower court decisions and try to predict how New York's

7    highest court would rule if it was presented with the issue.

8    See, e.g., Chufen Chen v. Dunkin' Brands, Inc., 954 F.3d

9    492, 497 (2d Cir. 2020).

10          Following this approach, the starting point for my

11   analysis is the one Court of Appeals decision that's most

12   closely on point, the decision in In re Penn Central, 56

13   N.Y.2d 120 (1982). That decision arose in a suit brought by

14   Penn Central seeking to confirm an appraisal made by a panel

15   of three appraisers pursuant to an agreement between Penn

16   Central and Conrail. The dispute involved a parcel of land

17   as to which Conrail owned the surface rights and Penn

18   Central owned the air rights above the land. The parties had

19   sold their combined fee interest to a third party and

20   submitted the question of the allocation of the purchase

21   price to the panel of three appraisers.

22          The appraisers allocated the price 65 percent to

23   Penn Central for its air rights and 35 percent to Conrail

24   for its surface rights. Conrail refused to accept this

25   conclusion and refused to direct the escrow agent to release

1    the sale proceeds in accordance with the allocation.

2           Penn Central commenced a proceeding to have the

3    appraisal confirmed. Ultimately, the case reached the Court

4    of Appeals and the court confirmed the appraisal. The Court

5    of Appeals rejected a variety of objections that Conrail

6    advanced, including claims that are somewhat similar, at

7    least in tone, to some of the Boards' arguments here —

8    arguments that the appraisal was "patently defective" and

9    that enforcing the appraisal "would be a gross travesty of

10   justice." Strong claims, all of them rejected by the Court

11   of Appeals.

12          What's most relevant here is the standard the

13   Court of Appeals applied in deciding to reject these

14   arguments by Conrail. The court held, "As a general rule

15   under CPLR 7601, a dissatisfied party who participated in

16   the selection of an independent appraiser has no greater

17   right to challenge the appraiser's valuation than he would

18   have to attack an award rendered by an arbitrator." 56 N.Y.

19   2d at 131.

20          The Boards don't dispute that the standard applied

21   in reviewing an arbitrator's award is extremely limited. As

22   a general matter, courts follow the standard I mentioned

23   earlier — that is, that the award can only be overturned on

24   a finding of "fraud, bias, or bad faith." That's a quotation

25   from a First Department case, 936 Second Avenue L.P. v.

1   Second Corp. Development, 82 A.D.3d 446 (1st Dept 2011). And

2   in that case, notably, the Appellate Division applied that

3   general standard of arbitration award review to a case that

4   sought review of an appraisal. That is, the First Department

5   not only confirmed that that very limited standard governs

6   in review of arbitration awards; it also extended the

7   standard to appraisals, as the Court of Appeals had done in

8   the Penn Central case.

9        Another relevant case is Wien & Malkin LLP v.

10  Helmsley-Spear, 6 N.Y.3d 471 (2006). That's a Court of

11  Appeals case holding that an arbitration award must be

12  upheld even if the arbitrator has made errors of law or

13  errors of fact.

14       Lower courts in New York have by and large

15  followed the rule adopted by the New York Court of Appeals

16  in Penn Central. I just cited the First Department's

17  decision in 936 Second Avenue. For a few further examples,

18  see Vitale v. Friedman, 227 A.D.2d 198 (1st Dept 1996), and

19  101 West 23 Owner I LLC v. 715-723 Sixth Avenue Owners

20  Corp., 174 A.D.3d 447 (1st Dept 2019).

21       I say New York's lower courts have "by and large"

22  followed this standard, because I understand there may be a

23  small number of courts that have applied a more relaxed

24  standard of review. I'm aware of only one such decision, by

25  a New York State trial court. When I'm faced with a conflict

1    of that sort — where the New York Court of Appeals and a

2    number of Appellate Division cases have come out one way and

3    one, or at most a few, trial court cases have come out the

4    other way — then, obviously, there can be no real debate

5    over which rule I'm required to follow.

6         The Boards don't dispute that the standards I

7    mentioned do apply to review of arbitration awards, and as I

8    mentioned earlier, they don't claim they can meet those

9    stringent standards. Instead, their principal argument is

10   that those standards of review apply only to arbitrations,

11   and not also to appraisals. However, the Boards do not point

12   to any New York State court decisions that are contrary to

13   the rule I'm applying today.

14        Two of the three principal cases they rely on are

15   federal district court decisions which in my view are

16   completely unpersuasive as authority for New York State law

17   on this issue. The first case they rely on is a more than

18   50-year-old decision of the District Court for the Southern

19   District of New York, Clark v. Kraftco Corp., 323 F. Supp.

20   358 at 361 (S.D.N.Y. 1971). There, the District Court held

21   that, under New York law, the court "retains the authority

22   to substitute itself for the appraisers" and to overturn an

23   appraisal that it finds rested on mistaken factual or legal

24   grounds. That standard is completely inconsistent with the

25   standard that the New York Court of Appeals applied in Penn

1   Central and that, as I said, the great bulk of the New York

2   courts have applied ever since. And Clark was decided in

3   1971, a decade before Penn Central, so of course it's no

4   basis for me to not follow Penn Central.

5          The Boards also rely on a more recent federal

6   District Court case, Sauer v. Xerox Corp., 17 F. Supp. 2d

7   193 (W.D.N.Y. 1998). That case did postdate Penn Central,

8   but I find it's entitled to no weight in deciding this issue

9   of New York law. Its discussion of this issue consists of

10  nothing other than a citation to Clark and a short quotation

11  from Clark. It contains no discussion of any New York State

12  cases, and it completely disregards the fact that any

13  validity Clark might once have had was repudiated by the

14  Court of Appeals in Penn Central.

15         One other case relied on by the Boards deserves

16  mention — namely, the New York Court of Appeals' decision in

17  936 Second Avenue L.P. v. Second Corp. Development Co., 10

18  N.Y.3d 628 (2008). That was a case in which two parties had

19  each hired their own appraiser. These two appraisers had

20  reached different value conclusions based on using different

21  assumptions about how to value the land. After the two party

22  appraisers finished their appraisals, the two parties then

23  asked the courts to determine the assumptions that a neutral

24  appraiser should use to value the property.

25         In other words, this was not a case where a

1    neutral appraiser issued its report and the court overturned

2    the appraisal on the ground that it had used the wrong

3    assumptions. Instead, this was a case where the parties went

4    to court before the neutral appraiser did his work, and

5    asked the court to determine the standards the neutral

6    should apply. Thus, this case, 936 Second Avenue, is not in

7    any way inconsistent with the New York case law I've

8    described, which addresses judicial review of appraisals

9    after they have been completed.

10           Another argument advanced by the Boards is that

11   the issues addressed and the materials considered by the

12   neutral appraiser exceeded the permissible scope —

13   specifically, that it was improper for the neutral to decide

14   what assumptions to apply, and also improper for BPCA to

15   send the neutral a letter brief advocating its view on that

16   issue. I don't agree with this contention. I think it's

17   defeated by the undisputed facts that were presented to me.

18           Most important, the Boards willingly participated

19   in the very process to which they now object. At the outset,

20   the Boards instructed their own appraiser to use the

21   standard they liked — that is, to value the property as

22   subject to the mixed-use development requirement. They took

23   that issue out of his hands. This is apparent from the

24   appraisal that that the Boards' appraiser went on to issue,

25   which is annexed to the Boards' motion as Exhibit H. At Page

1   8 of that appraisal, the appraiser states that he's been

2   instructed to apply the standard that the Boards are

3   advocating.

4        Throughout the process, the Boards have been

5   represented by a highly capable and very experienced real

6   estate litigator, Mr. Hiller. They undoubtedly knew all

7   along that the issue of what standard to apply was a

8   critical gating issue on which any appraisal would depend —

9   that is, that it's not possible to do an appraisal of the

10  land here without first deciding whether you're valuing the

11  land as subject to encumbrances or not.

12       If the Boards believe it's not proper for an

13  appraiser to decide this issue, they should have brought

14  that issue to the Court for resolution before the neutral

15  issued its appraisal, as the parties did in the Second

16  Avenue case. The Boards should have asked the Court to

17  determine what standard the appraiser should apply, and

18  asked the appraiser to defer its work until the Court had

19  made that determination. At a minimum, the Boards should

20  have done this when they received the appraisal prepared by

21  BPCA's appraiser, which applied a standard opposite to the

22  one the Boards had directed their appraiser to apply.

23       I realize there was a tight schedule in place at

24  that time. The stipulated scheduling order I had entered

25  required the appraisal process to proceed quickly. So I

1    appreciate that at the time the Boards got the BPCA

2    appraiser's appraisal, they would have had to act very

3    quickly, and to ask me to act very quickly, if they had

4    followed this approach.

5            However, the Boards are represented by

6    sophisticated bankruptcy counsel as well as sophisticated

7    real estate counsel, and it's well known that bankruptcy

8    courts are capable of acting very quickly when it's

9    necessary to do so. I've made clear to the parties on more

10   than one occasion in this case, including prior to the time

11   we're talking about, that I'm prepared to act very quickly

12   whenever that is needed.

13           Most important, as I mentioned a moment ago, the

14   Boards could have acted long before that time, since they

15   must have known all along that this issue would be critical

16   to any appraisal. So it's hard to avoid the conclusion that,

17   if they believed it was not proper for the appraiser to

18   decide this issue — that a court instead of an appraiser

19   needed to decide it — they should have brought that issue to

20   me before then, when there would have been plenty of time

21   for me to address the issue.

22           Finally, I'm not persuaded that the issue of what

23   encumbrance assumptions to apply was an issue that

24   appraisers are not themselves qualified to decide. My

25   understanding is that appraisers decide similar issues on a

1    somewhat regular basis. When a ground rent reset dispute

2    arises and appraisers are brought in to value the land for

3    that purpose, it's not uncommon that the landlord and the

4    tenant may have different views on how the land should be

5    valued — for example, whether or not the land should be

6    valued as encumbered. And my understanding is it's not

7    uncommon for the appraiser to make that decision. In any

8    event, I don't have a record on whether that's common or

9    not. What I can say is the Board has made no showing that

10   it's uncommon, let alone unlawful or viewed as improper

11   within the appraisal community. No showing of anything of

12   that sort.

13          For all of these reasons, I find that it was not

14   improper — and certainly not grounds to overturn the

15   appraisal — for the neutral appraiser to consider the issue

16   of what encumbrance assumptions to apply, or for BPCA to

17   submit a letter brief to the neutral appraiser advocating

18   its position on that issue.

19          The Boards argue, next, that I should overturn the

20   appraisal on the ground that it was wholly irrational for

21   the appraiser to value the property as if it were

22   unencumbered. And they've cited at least one case for the

23   proposition that a court can overturn an appraisal that it

24   finds to be wholly irrational.

25          This argument fails for two reasons. First, it is

1     contrary to the standard of review adopted by the New York

2     Court of Appeals in Penn Central and by the various

3     Appellate Division cases that have followed Penn Central.

4     "Wholly irrational" is not the same as fraud, bias, or bad

5     faith. It's an expansion upon that standard. Thus, even if

6     one or two lower courts may have reviewed appraisals using a

7     "wholly irrational" standard, this is contrary to

8     controlling New York law.

9          Second, the appraisal here is anything but wholly

10    irrational. I'm not delivering a comprehensive ruling on the

11    merits, because I've concluded that's outside the scope of

12    proper judicial review in this case. But I have carefully

13    reviewed the record. I have carefully considered the

14    arguments of the parties on the merits as well as on the

15    process issues, and I have read the case law carefully. The

16    governing documents and the case law provide no support for

17    the conclusion that the appraisal is wholly irrational.

18          As discussed earlier, the Boards acknowledge that

19    it was proper for the appraiser not to consider the

20    encumbrances contained in the ground lease or the master

21    lease. Their contention is that the appraiser should have

22    considered the encumbrances contained in the design

23    guidelines, the condo declaration and bylaws, and the

24    various condo deeds, all of which require the building to be

25    developed as a mixed-use property, that is, to include a

1    hotel as well as residential units. However, the governing

2    documents do not support this contention.

3         First, the design guidelines: No showing has been

4    made that the design guidelines had any binding effect on

5    the parties other than through the incorporation of those

6    guidelines into the ground lease and/or the master lease.

7    But for those leases, the parties would not have been bound

8    to the design guidelines. Thus, a valuation of the land "as

9    unencumbered by [the ground] lease and the master lease"

10    means a valuation of the land as unencumbered by the design

11    guidelines.

12         Second, the condo declaration and bylaws: I'm

13    satisfied that, by their terms, those documents do not

14    purport to encumber the land underlying the building.

15    Rather, all they purport to encumber are the leasehold

16    rights held by the various parties other than BPCA under the

17    ground lease.

18         The Boards have argued that the declaration and

19    bylaws are not clear in this regard, and I recognize there

20    may be some ambiguity in the condo declaration and bylaws on

21    this point. But any ambiguity of that sort would not matter,

22    because the condo declaration and bylaws could not encumber

23    the land even if they purported to. Other than BPCA, the

24    parties had no rights to the land except the rights they had

25    under the ground lease. These parties are free to carve up

1    their tenancy rights under the ground lease among themselves

2    through the condo documents. But by contracting among

3    themselves, they can't expand their rights vis-à-vis BPCA or

4    vis-à-vis the land.

5         The same is true of the deeds — the hotel unit

6    deed and the commercial unit deed, for example. These are

7    merely deeds to condo units. They're not deeds to the land.

8         For these reasons, it's clear that the decision of

9    the arbitrator is anything but wholly irrational. In fact,

10   based on my review of the documents and the law, the neutral

11   arbitrator appears to have been correct in his conclusions.

12        Let me address, finally, the Boards' argument that

13   the outcome that I'm approving is unfair. I am sympathetic

14   to the predicament my ruling poses for residential unit

15   owners. My understanding is that the valuation the appraiser

16   has blessed and I have now declined to overturn could result

17   in an enormous increase in the ground rent paid by the

18   building, which could translate into a large increase in the

19   maintenance payments paid by residential unit owners.

20        BPCA has said that it is committed to not

21   enforcing an outcome that will result in residents being

22   unable to afford their apartments, and I'm aware that for a

23   number of other buildings in Battery Park City, BPCA has had

24   negotiations with the buildings and has wound up reducing

25   the rent increases produced by the resetting of the ground

1   rent. I am hopeful that BPCA will enter into very serious

2   negotiations with the residents of this building, as it has

3   promised to do.

4        I understand there may be reasons why BPCA has not

5   yet had extensive negotiations with this building, one of

6   which is that this building has been engaged in pretty

7   heated litigation with BPCA for a number of years now.  It's

8   understandable that a party that's being sued may be

9   reluctant to make concessions that don't result in a

10  settlement of the claims against it.  That said, if BPCA has

11  not already commenced serious negotiations with the

12  Residential Board to try to solve this pressing problem, it

13  is high time for those negotiations to begin.

14       However, these equitable considerations are not a

15  basis to overturn the appraisal. New York law simply doesn't

16  give a judge the ability to overturn an appraisal on the

17  ground that it would lead to results that are unfair or that

18  would cause grief for the losing party. Moreover, the

19  equities here are tempered by that fact that, at bottom,

20  this is a dispute over relatively high-end real estate, with

21  all the risks such investments entail.

22       I'm aware my decision does not address every

23  single argument that the Boards have made in their papers.

24  The papers were lengthy and made a lot of arguments.  I've

25  addressed the arguments I consider the most serious. I want

1    to make clear, though, that I have considered and rejected

2    all of the Boards' arguments, including those that my

3    decision does not specifically mention.

4              This completes my ruling.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25